ACCEPTED
13-14-00725-cv
THIRTEENTH COURT OF APPEAL
CORPUS CHRISTI, TEXAS
4/2/2015 10:45:17 AM
DORIAN RAMIREZ
CLERK

## No. 13-14-00725-CV

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
4/2/2015 10:45:17 AM
DORIAN E. RAMIREZ
Clerk

# Court of Appeals
## for the Thirteenth Judicial District
## Corpus Christi – Edinburg, Texas

Dos Republicas Coal Partnership,
*Appellant,*

v.

David Saucedo as Floodplain Administrator and
County Judge of the Maverick County Commissioners Court
and the Maverick County Commissioners Court,
*Appellees.*

## BRIEF OF APPELLANT

On appeal from the 293rd Judicial District Court
Maverick County, Texas
Cause Number 14-03-29340-MCV

Leonard Dougal
State Bar No. 06031400
Mallory Beck
State Bar No. 24073899
JACKSON WALKER L.L.P.
100 Congress
Suite 1100
Austin, Texas 78701
ldougal@jw.com
T: (512) 236-2233
F: (512) 391-2112

Bill Cobb
State Bar No. 00796372
Matthew Ploeger
State Bar No. 24032838
Jenny Lee Smith
State Bar No. 24079357
COBB & COUNSEL
401 Congress Avenue
Suite 1540
Austin, Texas 78701
bill@cobbxcounsel.com
(512) 693-7570
(512) 687-3432 – Facsimile

*Attorneys for Appellant Dos Republicas Coal Partnership*

April 2, 2015                                Oral Argument Requested

## IDENTITY OF PARTIES AND COUNSEL

| Party | Counsel |
|---|---|

Dos Republicas Coal Partnership, *Appellant*

Bill Cobb
bill@cobbxcounsel.com
Matthew Ploeger
matt@cobbxcounsel.com
Jenny L. Smith
jenny@cobbxcounsel.com
COBB & COUNSEL
401 Congress Avenue
Suite 1540
Austin, Texas 78701
(512) 693-7570
(512) 687-3432 – Facsimile

Leonard Dougal
Mallory Beck
JACKSON WALKER L.L.P.
100 Congress, Suite 1100
Austin, Texas 78701
E: ldougal@jw.com
T: (512) 236-2233
F: (512) 391-2112

Rolando Jasso
Claudio Heredia
Knickerbocker, Heredia, Jasso, & Stewart P.C.
468 East Main Street
Eagle Pass, Texas 78852-4598
rmjasso@khjslaw.com
chlaw750@yahoo.com

David Saucedo, as Floodplain Administrator and County Judge of the Maverick County Commissioners Court, *Appellee*

Alfonso Nevarez C.
Mariliza V. Williams
Nevarez Law Group, PC
590 East Main Street, Suite A
Eagle Pass, Texas 78852
Phone: (830) 776-7003
Fax: (830) 776-7004
anc@nevarezlawgroup.com
mvw@nevarezlawgroup.com

Maverick County Commissioners Court, *Appellee*

Alfonso Nevarez C.
Mariliza V. Williams
Nevarez Law Group, PC
590 East Main Street, Suite A
Eagle Pass, Texas 78852
Phone: (830) 776-7003
Fax: (830) 776-7004
anc@nevarezlawgroup.com
mvw@nevarezlawgroup.com

# TABLE OF CONTENTS

Identity of Parties and Counsel..............................................................................ii

Table of Contents ..................................................................................................iv

Index of Authorities...............................................................................................ix

Statement of the Case ..........................................................................................xiv

Statement Regarding Oral Argument...................................................................xv

Issues Presented ...................................................................................................xvi

   1. ***Ministerial Duty.*** *Pursuant to the Maverick County Flood Damage Prevention Ordinance (the "Ordinance"), "[a]pproval or denial of a Development Permit by the Floodplain Administrator shall be based on all of the provisions of this ordinance and the following relevant factors." Here, DRCP submitted a permit application, which complied with the Ordinance and all relevant factors.* **Was it error for the trial court to find that the Floodplain Administrator was not required to approve DRCP's permit application?** .........................................................xvi

   2. ***Abuse of Discretion.*** *The Floodplain Administer abuses his discretion if he fails to consider a factor the Legislature directs him to consider, or considers an irrelevant factor. Here, the Floodplain Administrator failed to consider any of the ten mandatory factors addressed in the Ordinance, and indeed, purports to have considered several irrelevant factors not addressed in the Ordinance.* ..........................................................xvi

      a. **Was it error for the trial court to find that the Floodplain Administrator did not abuse his discretion by failing to consider the Ordinance's mandatory factors?**................................................xvi

      b. **Was it error for the trial court to find that the Floodplain Administrator did not abuse his discretion by failing to provide any reason or explanation for the denial of DRCP's permit application?** ....................................................xvi

        c.     *Was it error for the trial court to find that the Floodplain Administrator did not abuse his discretion by considering irrelevant factors outside of the Ordinance's exclusive list?* .......................................xvi

    3.    ***Due Process.*** *A person may not be deprived of a property right without due process of law, which requires, at a minimum, notice and an opportunity to be heard. Here, the Floodplain Administrator denied DRCP's permit application without first providing DRCP with notice and an opportunity to be heard.* ***Was it error for the trial court to conclude that the Floodplain Administrator did not violate DRCP's due process rights?*** ........xvi

Record References .......................................................................xvii

Introduction ...................................................................................1

Statement of Facts ..........................................................................2

A.    Dos Republicas Coal Partnership Obtains All State-Required Permits to Operate a Surface Coal Mining Project in Maverick County. ........................................................................................2

B.    The Maverick County Commissioners Court Adopted the Maverick County Flood Damage Prevention Ordinance to Prevent Property Loss in the Floodplain. ..................................3

C.    DRCP Complies with the Ordinance, but Its Permit Application Is Ignored. ........................................................................................5

D.    Two Years of "Deliberation" Begets a Two Sentence "Order": "I Am in Receipt of Dos Republicas Request for Floodplain Permit. After Reviewing the Request, I Am Hereby Denying It." .....................................................................................................7

E.    The Floodplain Administrator Uses the Ordinance to Undermine State-Issued Permits, Testifying that He Would Never Allow Mining in the Floodplain Regardless of Whether the Permit Application Met the Requirements of the Ordinance. ........9

F.    In a Forgone Conclusion, the Trial Court Denies DRCP's Petition for Writ of Mandamus...............................................10

Summary of the Argument...........................................................12

v

Standard of Review............................................................................15

Argument ........................................................................................18

I.    The Trial Court Erred By Failing to Compel the Floodplain
Administrator to Perform the Purely Ministerial Act of
Approving DRCP's Permit Application..................................19

    A.    The Floodplain Administrator's duty to approve an
application is purely ministerial and non-discretionary
when all of the criteria are met.......................................20

    B.    DRCP's Permit Application satisfies the Ordinance's
requirements as a matter of law......................................24

    C.    DRCP's Permit Application satisfies the Ordinance's ten
factors as a matter of law.................................................24

        1.    DRCP's application and trial testimony presented
unrebutted expert opinion that DRCP's mining plan
satisfies each of the ten factors, including (a)-(c). ..............26

            a.    The danger to life and property due to
flooding or erosion damage. ......................................26

            b.    The susceptibility of the proposed facility and
its contents to flood damage and the effect of
such damage on the individual owner......................27

            c.    The danger that materials may be swept onto
other lands to the injury of others.............................28

            d.    The evidence conclusively establishes that
DRCP's Permit Application meets the
remaining factors of the Ordinance. .........................29

        2.    The trial court's erroneous findings that the
Floodplain Administrator properly denied the
permit based on factors (a)-(c) are unsupported by
any evidence. ...................................................30

            a.    There is no legally or factually sufficient
evidence the Floodplain Administrator even
considered factors (a)-(c), much less that he

found that DRCP's Permit Application failed to satisfy them. ...........................................................31

      b.    No legally or factually sufficient evidence supports the trial court's finding that the Floodplain Administrator raised concerns about factors (a)-(c) and gave DRCP an opportunity to respond.................................................34

      c.    No legally or factually sufficient evidence supports the trial court's finding that DRCP failed to address factors (a)-(c).....................................34

II.   The Floodplain Administrator Abused Any Discretion by Failing to Base his Decision on the Factors Mandated by the Ordinance.........................................................................................39

   A.   The failure to consider mandatory factors constitutes an abuse of discretion.........................................................40

   B.   The Floodplain Administrator was required to provide an explanatory order with reasons for his denial. .............................42

      1.    Meaningful judicial review necessitates that the Floodplain Administrator's order provide the reasons for his denial. ............................................42

      2.    *Post hoc* rationalization cannot cure the absence of reasons in the Floodplain Administrator's two-sentence denial letter. .............44

      3.    An explanatory order with reasoning is even more important when conflicting permit decisions are reached. ................................................46

   C.   The Floodplain Administrator's *post hoc* justifications demonstrate that he abused his discretion by considering four irrelevant factors. ....................................................49

      1.    Floodwater quality is an irrelevant factor.........................55

      a.    The purpose of the Ordinance is to prevent property losses rather than protecting floodwater quality. ......................................................56

      b.     The TCEQ has the "sole and exclusive authority to set water quality standards for all water in the state." ........................................................57

    2.    The "best interest of the county" is an irrelevant factor...................................................................58

    3.    Surface Coal Mining Regulations are irrelevant factors...................................................................60

    4.    Personal experience is an irrelevant factor........................63

III.   The Floodplain Administrator Acted Arbitrarily and Capriciously When He Denied DRCP Notice or an Opportunity to be Heard. ..........................................................64

Prayer ...............................................................................66

Certificate of Compliance ...................................................68

Certificate of Service .........................................................68

Appendix............................................................................69

Authorities.........................................................................111

viii

# INDEX OF AUTHORITIES

## Cases

*Amtel Commc'ns, Inc. v. Public Util. Comm'n*, 687 S.W.2d 95 (Tex. App.—Austin 1985, no writ) .......................................................................... 43, 44

*Anderson v. City of Seven Points*, 806 S.W.2d 791 (Tex. 1991) .................... 16, 20

*Austin v. Deats*, 32 S.W.2d 685 (Tex. Civ. App.—Austin 1930, no writ) ........46

*Austin v. Nelson*, 45 S.W.2d 692 (Tex. Civ. App.—Austin 1931, no writ) ......47

*Bauer v. City of Wheat Ridge*, 513 P.2d 203 (Colo. 1973) (en banc) ............ 14, 53

*Brack v. Island Park Estates, LLC*, No. 13-06-698-CV, 2007 WL 4225576 (Tex. App.—Corpus Christi Nov. 29, 2007, no pet.) ...................................... 17, 38

*Cavazos v. Bd. of Governors of Council of Co-Owners of Summit Condominiums*, No. 13-12-00524-CV, 2013 WL 5305237 (Tex. App.—Corpus Christi Sept. 19, 2013, no pet.) .......................................................................................18

*City of Arlington v. Centerfolds, Inc.*, 232 S.W.3d 238 (Tex. App.—Fort Worth 2007, pet. denied) .......................................................................................64

*City of Corpus Christi v. Unitarian Church of Corpus Christi*, 436 S.W.2d 923 (Tex. Civ. App.—Corpus Christi 1968, writ ref'd n.r.e.) ...................... 13, 21

*City of Dallas v. Saucedo-Falls*, 268 S.W.3d 653 (Tex. App.—Dallas 2008, pet. denied) .........................................................................................................65

*City of El Paso v. El Paso Elec. Co.*, 851 S.W.2d 896 (Tex. App.—Austin 1993, writ denied) ...................................................................................................43

*City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179 (Tex. 1994) .......... 16, 39

*City of San Antonio v. City of Boerne*, 111 S.W.3d 22 (Tex. 2003) ......................50

ix

*Comm'rs Court of Titus Cnty. v. Agan*, 940 S.W.2d 77 (Tex. 1997) ..................42

*Consumers Water, Inc. v. Public Util. Comm'n*, 774 S.W.2d 719 (Tex. App.—
Austin 1989, no writ) ................................................................................48

*Ector County v. Stringer*, 843 S.W.2d 477 (Tex. 1992) .......................................43

*Gary Safe Co. v. A. C. Andrews Co., Inc.*, 568 S.W.2d 166 (Tex. Civ. App.—
Dallas 1978, writ ref'd n.r.e.) ..............................................................54

*Griggs v. United States*, 253 F. App'x 405 (5th Cir. 2007) .................................45

*Hartford Cas. Ins. Co. v. State*, 159 S.W.3d 212 (Tex. App.—Austin 2005, pet.
denied) ........................................................................................65

*Hooper v. Generations Cmty. Fed. Credit Union*, No. 04-12-00080-CV, 2013 WL
2645111 (Tex. App.—San Antonio June 12, 2013, no pet.) ..........................18

*In re Bailey*, 975 S.W.2d 430 (Tex. App.—Waco 1998, no pet.) ........................20

*Integrity Group, Inc. v. Medina County Comm'rs Court*, No. 04-03-00413-CV,
2004 WL 2346620 (Tex. App.—San Antonio Oct. 20, 2004, pet. denied)...21

*Lewis v. Metropolitan Savings & Loan Ass'n*, 550 S.W.2d 11 (Tex. 1977)..........64

*Luminant Generation Co., LLC v. United States EPA*, 675 F.3d 917 (5th Cir.
2012) ............................................................................... 45, 49

*Madden v. Tex. Bd. of Chiropractic Examiners*, 663 S.W.2d 622 (Tex. App.—
Austin 1983, writ ref'd n.r.e.)................................................................44

*Mass Mktg., Inc. v. Gaines*, 70 S.W.3d 261 (Tex. App.—San Antonio 2001,
pet. denied)....................................................................................32

*Mitchell Energy Corp. v. Fed. Energy Regulatory Comm'n*, 651 F.2d 414 (5th
Cir. 1981)......................................................................................45

x

*Mobile County v. City of Saraland*, 501 So. 2d 438 (Ala. 1986)....................32, 41

*Moffitt v. Town of S. Padre Island*, No. 13-00-453-CV, 2001 WL 34615363 (Tex. App.—Corpus Christi Nov. 1, 2001, no pet.) ..........................................16, 17

*Morgan Drive Away, Inc. v. R.R. Comm'n of Texas*, 498 S.W.2d 147 (Tex. 1973) ....................................................................................................................43

*Nucor Steel – Tex. v. PUC*, 363 S.W.3d 871 (Tex. App.—Austin 2012, no pet.) ....................................................................................................................45

*O'Connor v. First Court of Appeals*, 837 S.W.2d 94 (Tex. 1992) ........................20

*Pritchett v. Nathan Rodgers Const. & Realty Corp.*, 379 So. 2d 545 (Ala. 1979)......................................................................................... 14, 40

*Public Util. Comm'n v. S. Plains Elec. Coop., Inc.*, 635 S.W.2d 954 (Tex. App.—Austin 1982, writ ref'd n.r.e.).............................................................52

*R.R. Comm'n v. Coppock*, 215 S.W.3d 559 (Tex. App.—Austin 2007, pet. denied) .............................................................................................................62

*S. Plains Lamesa R.R. v. High Plains Underground Water Conservation Dist. No. 1*, 52 S.W.3d 770 (Tex. App.—Amarillo 2001, no pet.)...........................51, 52

*Santoya v. Pereda*, 75 S.W.3d 487 (Tex. App.—San Antonio 2002, pet. denied)............................................................................................................17

*SEC v. Chenery Corp.*, 332 U.S. 194 (1946)............................................................43

*Slavin v. City of San Antonio*, 330 S.W.3d 670 (Tex. App.—San Antonio 2010, no pet.) ..................................................................................................... 64, 65

*Starr Cnty. v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352 (Tex. App.—Austin 1979, writ ref'd n.r.e.)........................................................................................60

*Stolte v. County of Guadalupe*, No. 04-04-00083-CV, 2004 WL 2597443 (Tex. App.—San Antonio Nov. 17, 2004, no pet.) .............................. 13, 21, 39, 52

*Texas Alcoholic Beverage Comm'n v. Good Spirits, Inc.*, 616 S.W.2d 411 (Tex. App.—Waco 1981, no writ) .................................................... 47, 48

*Texas Dep't of Ins. v. State Farm Lloyds*, 260 S.W.3d 233 (Tex. App.—Austin 2008, no pet.) ....................................................................... 51, 52

*Thomas v. Casale*, 924 S.W.2d 433 (Tex. App.—Fort Worth 1996, writ denied) ..................................................................... 36, 37, 38

*Van Brunt v. BancTexas Quorum, N.A.*, 804 S.W.2d 117 (Tex. App.—Dallas 1989, no writ) ......................................................................... 54

*Vondy v. Comm'r Court of Uvalde Cnty.*, 620 S.W.2d 104 (Tex. 1981) . 15, 16, 17

*Vondy v. Comm'rs Ct. of Uvalde Cnty.*, 714 S.W.2d 417 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.) .......................................................... 49

*Withers v. Commissioners' Court of Bandera County*, 75 S.W.3d 528 (Tex. App.—San Antonio 2002, no pet.) ................................................ 15

## Statutes

33 U.S.C. § 1342 ............................................................................................... 57

33 U.S.C. § 1251 ............................................................................................... 57

TEX. GOV'T CODE § 24.020 ...................................................................... 20, 42

TEX. LOCAL GOV'T CODE § 245.002 .................................................................. 50

TEX. LOCAL GOV'T CODE § 81.001 .................................................................... 20

TEX. NAT. RES. CODE § 134.012 ....................................................................... 61

TEX. WATER CODE § 16.312 ..................................................................... 3, 4, 56

TEX. WATER CODE § 26.023 .................................................................57

TEX. WATER CODE § 26.011 .................................................................57

TEX. WATER CODE § 26.027 .................................................................57

TEX. WATER CODE § 16.318.................................................................23

## Rules

TEX. R. APP. P. 43.2.................................................................................66

## Constitutional Provisions

TEX. CONST. art. V, § 18 ......................................................................50

## STATEMENT OF THE CASE

***Nature of the Case:*** Appellant/Plaintiff Dos Republicas Coal Partnership ("DRCP") seeks a writ of mandamus compelling the Maverick County Floodplain Administrator to grant DRCP's application for a floodplain development permit. 1 CR 41-73.

***Course of Proceedings and Trial Court Disposition:*** On October 9, 2014, the trial court conducted a full trial on the merits. While Appellant DRCP introduced evidence and called an expert witness to present testimony in support of its request, Appellees submitted no evidence and offered no witnesses at trial. Upon conclusion, the trial court orally ruled that DRCP's request for mandamus relief should be denied, and issued a ruling to that effect the following day, October 10, 2014. 5 CR 2940 [Tab 1]. DRCP files this appeal because the trial court erred when it refused to issue DRCP a writ of mandamus, compelling the Floodplain Administrator to grant DRCP's floodplain development permit application.

***Trial Court:*** 293rd Judicial District Court, Maverick County, Texas, Honorable Cynthia Muniz, presiding.

## STATEMENT REGARDING ORAL ARGUMENT

This case presents an issue of recurring and increasing importance in the State of Texas: Whether local political subdivisions may thwart statewide permitting regimes governing energy extraction. Notwithstanding that DRCP has obtained the requisite mining and wastewater discharge permits to extract energy in Maverick County from the Railroad Commission of Texas ("RRC") and the Texas Commission on Environmental Quality ("TCEQ"), respectively, the Floodplain Administrator defied the state permitting regime, stating: I need to "protect[] this community from the Railroad Commission" (2 CR 879-80), and denied DRCP's permit application. According to the Floodplain Administrator, DRCP allegedly failed to satisfy TCEQ and RRC regulations. Allowing the trial court's order to stand in this case thus has the potential of rendering state agency permitting meaningless, and for this reason, Appellant respectfully requests oral argument to address this issue.

**ISSUES PRESENTED**

1. **Ministerial Duty.** Pursuant to the Maverick County Flood Damage Prevention Ordinance (the "Ordinance"), "[a]pproval or denial of a Development Permit by the Floodplain Administrator shall be based on all of the provisions of this ordinance and the following relevant factors." Here, DRCP submitted a permit application, which complied with the Ordinance and all relevant factors. **Was it error for the trial court to find that the Floodplain Administrator was not required to approve DRCP's permit application?**

2. **Abuse of Discretion.** The Floodplain Administer abuses his discretion if he fails to consider a factor the Legislature directs him to consider, or considers an irrelevant factor. Here, the Floodplain Administrator failed to consider any of the ten mandatory factors addressed in the Ordinance, and indeed, purports to have considered several irrelevant factors not addressed in the Ordinance.

   a. **Was it error for the trial court to find that the Floodplain Administrator did not abuse his discretion by failing to consider the Ordinance's mandatory factors?**

   b. **Was it error for the trial court to find that the Floodplain Administrator did not abuse his discretion by failing to provide any reason or explanation for the denial of DRCP's permit application?**

   c. **Was it error for the trial court to find that the Floodplain Administrator did not abuse his discretion by considering irrelevant factors outside of the Ordinance's exclusive list?**

3. **Due Process.** A person may not be deprived of a property right without due process of law, which requires, at a minimum, notice and an opportunity to be heard. Here, the Floodplain Administrator denied DRCP's permit application without first providing DRCP with notice and an opportunity to be heard. **Was it error for the trial court to conclude that the Floodplain Administrator did not violate DRCP's due process rights?**

# RECORD REFERENCES

In this brief, the following record citation conventions will be used:

- The Clerk's Record will be cited as "[volume] CR [page]."

- The Reporter's Record will be cited as "[volume] RR [page]."

- The Appendix items are as follows:

  Tab 1   Order Denying Dos Republicas Coal Partnership's Amended Petition for Writ of Mandamus (5 CR 2940)

  Tab 2   Findings of Fact and Conclusions of Law (5 CR 3207-12)

  Tab 3   Maverick County Flood Damage Prevention Ordinance (1 RR, Exhibit 5)

  Tab 4   April 3, 2014 Letter Denying DRCP's Floodplain Development Permit Application (1 RR, Exhibit 4)

  Tab 5   Supplemental Floodplain Analysis, Executive Summary (1 RR, Exhibit 3, at 2-6)

TO THE HONORABLE COURT OF APPEALS:

Appellant Dos Republicas Coal Partnership ("DRCP") respectfully submits this Brief.

## INTRODUCTION

It is no secret that a number of Maverick County residents are opposed to DRCP's proposed 2,700-acre coal mining project near the City of Eagle Pass. Perhaps because of this opposition, Appellees refused to perform their duty to review and approve DRCP's application for a floodplain development permit for two-and-a-half years. And when they finally did act, they summarily denied DRCP's permit application in a two-sentence denial letter, which contained no reason or explanation for the denial. Indeed, the Floodplain Administrator admitted that he would not approve any permit involving mining coal in the floodplain regardless of whether the application satisfied the Ordinance's provisions.

By denying DRCP's permit application, the Floodplain Administrator acted arbitrarily and capriciously and without regard to the requirements of the Ordinance (or the state law authorizing the County to pass it) to deny DRCP the lawful exercise of its property rights. This Court should compel

1

Appellees to comply with the Ordinance and issue DRCP its floodplain development permit.

STATEMENT OF FACTS

**A.    Dos Republicas Coal Partnership Obtains All State-Required Permits to Operate a Surface Coal Mining Project in Maverick County.**

Dos Republicas Coal Partnership ("DRCP") seeks to operate a surface coal mine near the City of Eagle Pass, Texas. To accomplish its goal, DRCP obtained all state-required permits to operate its proposed mine.

Specifically, DRCP owns the surface mining permit for a 2,700-acre coal mining project near Eagle Pass, Texas. 1 RR, Exhibit 8. The permit was originally obtained by Dos Republicas Resources Co., Inc. ("DRRC") in 1994. 1 RR, Exhibit 8, at Finding of Fact No. 1. In January 2009, DRRC transferred the original mining permit, Permit 42, to DRCP, re-numbering it to Permit 42A. *Id.* Beginning in April 2008, DRCP filed an application with the Railroad Commission of Texas ("RRC") to renew, revise, and expand Permit 42A. 1 RR, Exhibit 8, at Finding of Fact No. 2. In January 2013, the Railroad Commission granted DRCP's request to renew, revise, and expand permit 42A, issuing Permit 42B. 1 RR, Exhibit 8.

2

Likewise, DRCP also obtained a wastewater discharge permit, Permit No. WQ0003511000, from the Texas Commission on Environmental Quality ("TCEQ"). 1 RR, Exhibit 7. Under this permit, DRCP is "authorized to treat and discharge wastes from the Eagle Pass Mine" according to the "effluent limitations" established by its permit. *Id.*

**B.    The Maverick County Commissioners Court Adopted the Maverick County Flood Damage Prevention Ordinance to Prevent Property Loss in the Floodplain.**

In addition to these state-required permits, DRCP was required to seek a floodplain development permit under the Maverick County Flood Damage Prevention Ordinance (the "Ordinance"). The Ordinance was approved and adopted by the Maverick County Commissioners Court on August 15, 1996, under the authority granted by the Texas Legislature in the Flood Control Insurance Act ("FCIA"), now embodied in the Texas Water Code. 1 RR, Exhibit 5, Article 1, Article 4 [Tab 3]. The Legislature enacted the FCIA for the express purpose of allowing Texans to "secur[e] flood insurance coverage" and to "minimiz[e] exposure of *property* to flood losses." TEX. WATER CODE § 16.312. The FCIA provides:

> The purpose of this subchapter is to evidence a positive interest in **securing flood insurance coverage** under this federal program and to so procure for those citizens of Texas desiring to

3

participate and in promoting the public interest by providing appropriate protection against the perils of flood losses and in encouraging sound land use by **minimizing exposure of property to flood losses**.

TEX. WATER CODE § 16.312.

The Ordinance—a fill-in-the-blank Federal Emergency Management Agency ("FEMA") template—is in accord. 1 RR, Exhibit 5, Article 1, Section A [Tab 3]; TEXAS WATER DEVELOPMENT BOARD, SAMPLE FEMA ORDINANCES, *available at* http://www.twdb.texas.gov/flood/insurance/participation.asp (last visited April 1, 2015).

Under the heading "Statutory Authorization," the Ordinance expressly provides "The Legislature of the **State of Texas** has in (statutes) VTS-Water Code 16.318 delegated the responsibility of local governmental units to adopt regulations designed to minimize flood losses." 1 RR, Exhibit 5, Article 1, Section A [Tab 3] (emphasis added). And the Floodplain Administrator agrees the Ordinance addresses the "methods of reducing flood losses." 2 CR 855; 1 RR, Exhibit 5, Article 1 [Tab 3].

The Ordinance provides that each permit application shall include particular information, including five specific information requirements in Article 4, Section C(1)(a)-(e) for each permit application. 1 RR, Exhibit 5,

4

Article 4, Section C(1) [Tab 3]. The Ordinance further provides: "Approval or denial of a Development Permit by the Floodplain Administrator shall be based on all of the provisions of this ordinance and the following [ten] relevant factors." 1 RR, Exhibit 5, Article 4, Section C(2) [Tab 3].

The Maverick County Commissioners Court approved and adopted the Ordinance on August 12, 1996, 1 RR, Exhibit 5 [Tab 3], appointing the County Judge as the Floodplain Administrator. 1 RR, Exhibit 5, Article 4 [Tab 3]. In 1998, two years later, DRCP first sought, **and received**, a floodplain development permit from Maverick County. 1 RR, Exhibit 6. Two decades later, under the same Ordinance and substantially the same plan to conduct surface mining operations in Maverick County, Maverick County has denied DRCP's application for a floodplain development permit.

## C. DRCP Complies with the Ordinance, but Its Permit Application Is Ignored.

Because a portion of DRCP's planned mining operations would be in a FEMA-designated floodplain, pursuant to the Ordinance, DRCP filed an application for a floodplain development permit with the Maverick County Floodplain Administrator on November 3, 2011. 1 RR, Exhibit 2.

5

The Floodplain Administrator failed to acknowledge, respond, or otherwise act on DRCP's Permit Application for nine months. While DRCP awaited action, however, FEMA revised its floodplain designations, and issued a new floodplain map. 1 RR, Exhibit 3; 1 RR, Exhibit 1 at ¶ 3. To address these revisions and FEMA's new floodplain map, DRCP filed a Supplemental Application for Floodplain Permit on September 4, 2013 (DRCP's 2011 Permit Application and 2013 Supplemental Application will be referred to collectively herein as DRCP's "Permit Application"). 1 RR, Exhibit 3.

The Permit Application contains a study by Multatech Engineering, Inc. that is based on the 2011 FEMA DFIRM. 1 RR, Exhibit 3, at 2 [Tab 5]. Multatech was contracted by DRCP to evaluate the hydrologic and hydraulic effects resulting from the construction of the Eagle Pass Mine, and its associated ponds, access road, haul roads, collection ditches, railroad loop, loading facility, and mining activity, where it encroaches the three existing floodplains delineated on the 2011 FEMA DFIRM. 1 RR, Exhibit 3, at 2 [Tab 5]. Paul Padilla, a licensed engineer and hydrology expert, addressed (in detail) each requirement and factor set forth in the Ordinance. 1 RR, Exhibit 1 at ¶ 21; 1 RR, Exhibit 3, Executive Summary (2013

6

Supplemental Floodplain Analysis) [Tab 5]. In Mr. Padilla's expert opinion, DRCP's Permit Application satisfies each requirement and factor outlined in the Ordinance. 1 RR, Exhibit 1, at ¶ 21.

Yet again, however, the Floodplain Administrator failed to acknowledge, respond, or otherwise act on DRCP's Permit Application.

**D. Two Years of "Deliberation" Begets a Two Sentence "Order": "I Am in Receipt of Dos Republicas Request for Floodplain Permit. After Reviewing the Request, I Am Hereby Denying It."**

Finally, after more than two years of waiting for the Floodplain Administrator to act on its Permit Application, on March 25, 2014, DRCP filed a Petition for Writ of Mandamus seeking to compel the Floodplain Administrator to do so. 1 CR 4-33. On April 3, 2014, the Floodplain Administrator denied the Permit Application without stating any reason or explanation for the denial. 1 RR, Exhibit 4 [Tab 4]. Indeed, the Floodplain Administrator's "Order" consists of only two sentences: "I am in receipt of Dos Republicas request for floodplain permit. After reviewing the request, I am hereby denying it." 1 RR, Exhibit 4 [Tab 4].

Notwithstanding the Ordinance's clear directive that "[a]pproval or denial of a Development Permit by the Floodplain Administrator *shall* be based on all of the provisions of this ordinance and the following [ten]

7

factors," the Floodplain Administrator denied the Permit Application without seeking the opinion of an engineer, or indeed, even considering DRCP's Permit Application and whether it meets the criteria stated in the Ordinance. 1 RR, Exhibit 4 [Tab 4]; 1 RR, Exhibit 9 at 10:12-14 ("Q. Did any engineers review DRCP's floodplain permit application? A. No."); 1 RR, Exhibit 9 at 54:3-20 ("So that [Wilson & Company 2011 hydrology report] wasn't a basis for your decision? A. Right."); 1 RR 56:23-57:2 ("Q. And was this supplemental floodplain analysis a basis upon which you denied the floodplain permit, or did you consider it when denying the floodplain permit? A. No."). Further, he denied the Permit Application without giving DRCP notice or an opportunity to be heard.

Believing that the Floodplain Administrator's actions are illegal and arbitrary, DRCP amended its petition for writ of mandamus, and sought to compel the Floodplain Administrator to issue the floodplain development permit to DRCP. 1 CR 41-73.

**E.    The Floodplain Administrator Uses the Ordinance to Undermine State-Issued Permits, Testifying that He Would Never Allow Mining in the Floodplain Regardless of Whether the Permit Application Met the Requirements of the Ordinance.**

On October 2, 2014—six months after the denial—the Floodplain Administrator freely admitted that the dispositive factor for his decision was that DRCP planned to mine in the floodplain:

> Q:    There's nothing DRCP could have put in that application that was going to get it granted because they were mining in the floodplain, is that right?
>
> A:    Yes, sir.

1 RR, Exhibit 9 at 29:21-25.

> Q:    And is there any way that DRCP can mine within the floodplain and still get a permit?
>
> A:    Not that I would be comfortable with.

1 RR, Exhibit 9 at 28:12-14.

> Q:    . . . So again, it kind of boils down to DRCP wants to mine in the floodplain, and there's just no way to get a floodplain permit application if you want to mine in the floodplain, right?
>
> A:    Yes, sir.

1 RR, Exhibit 9 at 39:10-14.    In fact, Appellees have confirmed that the Floodplain Administrator was simply overriding the Railroad Commission

9

to prevent mining completely: "the County Judge was doing his job in protecting this community from the Railroad Commission." 2 CR 879-80.

Further, in his briefs and testimony, the Floodplain Administrator insists, after issuing his denial letter, that he considered several factors not found in the Ordinance when denying DRCP's Permit Application, including: "the best interest of the county," his personal experiences, Texas Coal Mining Regulations, and floodwater quality. 5 CR 3209-10 (Findings of Fact Nos. 14, 15, 16, and 17).

## F.    In a Forgone Conclusion, the Trial Court Denies DRCP's Petition for Writ of Mandamus.

On October 9, 2014, the trial court conducted a full trial on the merits. 1 RR 1. While Appellant DRCP introduced evidence and called an expert witness to present testimony in support of its request, the Floodplain Administrator submitted no evidence and offered no witnesses at trial. 1 RR 31:12-13 (DRCP calling Paul Padilla to testify); 1 RR 4 (noting DRCP's exhibits 1-9, and showing Appellees submitted no exhibits); 1 RR 91-97 (Appellees' presentation of argument only to trial court, presenting no witnesses or evidence). In what seemed to be a forgone conclusion, the trial court orally ruled that DRCP's request for mandamus relief would be

denied, and issued a ruling to that effect the following day, October 10, 2014. 1 RR 105:18-21 ("I'm ready to rule. I find that the floodplain administrator did not abuse his discretion in denying the application and therefore I deny the writ of mandamus. That concludes this hearing); 5 CR 2940 [Tab 1].

On December 5, 2014, the trial court entered Findings of Fact and Conclusions of Law. 5 CR 3207-12 [Tab 2]. In particular, despite the Floodplain Administrator's testimony that he did not consider the Permit Application or the attached expert report, the trial court nevertheless found that the Floodplain Administrator reviewed the Permit Application and considered all of the provisions of the Ordinance. 5 CR 3208-10 [Tab 2] (Finding of Fact Nos. 6, 8, 10, & 19). Moreover, the trial court found that the Floodplain Administrator concluded that DRCP failed to satisfy three of the factors contained in the Ordinance. *Id.*

Further, despite the Floodplain Administrator's admission that he considered factors outside of the ten exclusive factors contained in the Ordinance, the trial court found that these outside factors—including floodwater quality, "best interests of [Maverick] County," state mining regulations, and the Floodplain Administrator's personal experiences— were not "standing alone" bases for the Floodplain Administrator's decision,

11

but, rather, were "mere reference[s]" to factors contained in the Ordinance. 5 CR 3209-10 [Tab 2] (Finding of Fact Nos. 14-17). DRCP timely filed this appeal. 5 CR 3179-80 (DRCP's Notice of Appeal, filed November 7, 2014).

## SUMMARY OF THE ARGUMENT

It is no secret that a number of Maverick County residents are opposed to DRCP's mine. Perhaps because of this opposition, Appellees refused to perform their duty to review DRCP's Permit Application for two-and-a-half years. And, in April 2014, when the Floodplain Administrator finally acted, he denied the Permit Application in a two-sentence letter that provides no basis or rationale for the denial. Indeed, he later testified that he did not even consider the Permit Application or the expert study that accompanied it. Nor did he consult any other expert opinion or other evidence. Rather, his decision was based on the fact that DRCP wants to operate a mine.

Mandamus will lie to compel a county commissioners court and its officials to act when they:

(1)     *fail to perform a purely ministerial act;*

(2)     *fail to consider a factor the law directs them to consider; or*

(3)     *consider an irrelevant factor.*

12

Here, the Maverick County Commissioners Court and its Floodplain Administrator did all three. Thus, the trial court erred by refusing to compel the Floodplain Administrator to comply with the law.

*The Floodplain Administrator failed to perform the purely ministerial act of issuing a permit.* DRCP submitted a Permit Application that satisfied all the requirements of Article 4, Section C(1)-(2) of the Ordinance. As this Court has recognized, "[w]here the [applicant] has done all that the statutes and law demands, the authorized granting of a [] permit becomes a mere ministerial duty." *City of Corpus Christi v. Unitarian Church of Corpus Christi*, 436 S.W.2d 923, 927 (Tex. Civ. App.—Corpus Christi 1968, writ ref'd n.r.e.). Thus, the trial court erred in refusing to issue a writ of mandamus to compel the Floodplain Administrator to approve the Permit Application. *Stolte v. County of Guadalupe*, No. 04-04-00083-CV, 2004 WL 2597443, at *4 (Tex. App.—San Antonio Nov. 17, 2004, no pet.) ("[A] county's authority to grant or deny a plat application is limited by statute or other properly adopted rules . . . . Therefore the County's duty to grant the plat application was ministerial in nature and the trial court erred in denying [the developer's] motion for summary judgment and his request for mandamus relief.").

*The Floodplain Administrator failed to consider any factors the Ordinance directed him to consider.* The Floodplain Administrator's two-sentence denial of DRCP's Permit Application fails to address any of the ten factors contained in Article 4, Section C(2), conclusively establishing that the Floodplain Administrator failed to consider any of the mandatory factors in the Ordinance. *See Pritchett v. Nathan Rodgers Const. & Realty Corp.*, 379 So. 2d 545, 547 (Ala. 1979) (it is an abuse of discretion to deny a permit application, "without any statement of the reasons for denying the building permit").

*The Floodplain Administrator considered irrelevant factors, not found in the Ordinance.* The Floodplain Administrator's improper, *post hoc* rationalizations demonstrate, at best, that he considered the best interest of Maverick County, his personal experiences, floodwater quality, and mining regulations, none of which are factors in the Ordinance. *Bauer v. City of Wheat Ridge*, 513 P.2d 203, 204 (Colo. 1973) (en banc) ("The flood plain ordinance establishes the criteria upon which the 'special exception' will be granted. If the council believes that other reasons should be used in denying an application, then the appropriate procedure is to amend the floodplain

14

ordinance. Once an applicant applies under the ordinance, only those factors which apply generally to all applicants may be considered.").

***The Floodplain Administrator violated DRCP's due process rights by failing to give DRCP proper notice and afford it an opportunity to be heard.*** Additionally, the Floodplain Administrator acted arbitrarily and capriciously by failing to give DRCP proper notice and an opportunity to be heard before denying the Permit Application. This failure denied DRCP its due process rights and constitutes an abuse of discretion.

For these reasons, this Court should reverse the trial court's judgment and issue a writ of mandamus ordering Appellees to approve DRCP's Permit Application and issue the development permit to DRCP.

## STANDARD OF REVIEW

A district court is vested with the power to exercise supervisory control over decisions of a commissioners court. *Vondy v. Comm'r Court of Uvalde Cnty.*, 620 S.W.2d 104, 109 (Tex. 1981). A district court may issue a writ of mandamus, requiring a public official—including a county judge or a commissioners court—to do a certain act when the act is "ministerial and nondiscretionary." *Id.*; *Withers v. Commissioners' Court of Bandera County*, 75 S.W.3d 528, 529 (Tex. App.—San Antonio 2002, no pet.) ("A writ of

15

mandamus will issue to compel a public official to perform a ministerial act.").

Moreover, "[e]ven in matters involving some degree of discretion, the commissioners court may not act arbitrarily." *Vondy*, 620 S.W.2d at 109; *Moffitt v. Town of S. Padre Island*, No. 13-00-453-CV, 2001 WL 34615363, at *2 (Tex. App.—Corpus Christi Nov. 1, 2001, no pet.) ("However, mandamus may issue in a proper case to correct a clear abuse of discretion by a public official."). Specifically, "[a] Commissioners Court abuses its discretion—necessitating mandamus relief—when it either: (A) fails to perform a purely ministerial act or (B) fails to consider a factor the Legislature directs it to consider; or considers an irrelevant factor." 5 CR 3211 [Tab 2]; *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994).

Although this action was a mandamus initiated at the trial court, it is "a civil action subject to trial and appeal on substantive law issues and the rules of procedure as any other civil suit." *Anderson v. City of Seven Points*, 806 S.W.2d 791, 792 n.1 (Tex. 1991). Thus, the district court's findings of fact and conclusions of law shall be reviewed "in accordance with standards generally applicable to a trial court's findings and conclusions." *Moffitt*, 2001 WL 34615363, at *2. Therefore, this Court must review the trial court's legal

conclusions *de novo* and factual findings for legal and factual sufficiency. *Id.* at *3.

As an initial matter, a mandamus petition, compelling a county official to do a certain act, may be granted as a matter of law. *Vondy*, 620 S.W.2d at 108-09 (where Constitution required payment of salaries to constable and commissioners court denied payment of salaries to constable, mandamus could issue without assessment of facts); *Santoya v. Pereda*, 75 S.W.3d 487, 491 (Tex. App.—San Antonio 2002, pet. denied) (party demonstrated it was entitled to mandamus relief as a matter of law). Here, because the Floodplain Administrator failed to consider any factors (and at a minimum, considered irrelevant factors), this case can be decided as a question of law.

Nevertheless, even if this Court must review the factual findings here, an appellate court may disregard a trial court's findings of fact as factually insufficient where the trial court's finding is "so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust." *Brack v. Island Park Estates, LLC*, No. 13-06-698-CV, 2007 WL 4225576, at *3 (Tex. App.—Corpus Christi Nov. 29, 2007, no pet.).

Similarly, an appellate court may disregard a trial court's findings where they are legally insufficient—there is no evidence in the record to

support the trial court's findings. *Cavazos v. Bd. of Governors of Council of Co-Owners of Summit Condominiums*, No. 13-12-00524-CV, 2013 WL 5305237, at *2 (Tex. App.—Corpus Christi Sept. 19, 2013, no pet.). An appellate court should

> sustain a legal sufficiency or no evidence challenge when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.

*Hooper v. Generations Cmty. Fed. Credit Union*, No. 04-12-00080-CV, 2013 WL 2645111, at *2 (Tex. App.—San Antonio June 12, 2013, no pet.). Moreover, "[e]vidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists." *Id.* As described below, many of the factual findings here are both legally and factually insufficient and must be disregarded by this Court.

## ARGUMENT

This Court should reverse the trial court's refusal to issue a writ of mandamus to compel the Floodplain Administrator to approve DRCP's Permit Application for each of the following independent reasons:

18

◆ The Floodplain Administrator failed to perform the purely ministerial act of issuing a permit (Part I, *infra*);

◆ The Floodplain Administrator abused any discretion by failing to consider any factors the Ordinance directed him to consider (Part II.A, *infra*);

◆ The Floodplain Administrator abused any discretion by failing to give any reason or explanation for his denial (Part II.B, *infra*);

◆ The Floodplain Administrator abused any discretion by considering four irrelevant factors not found in the Ordinance (Part II.C, *infra*);

◆ The Floodplain Administrator acted arbitrarily and capriciously by denying DRCP due process (Part III, *infra*).

## I. The Trial Court Erred By Failing to Compel the Floodplain Administrator to Perform the Purely Ministerial Act of Approving DRCP's Permit Application.

Where, as here, a permit applicant has satisfied the statutory requirements to obtain the permit, all that remains is the ministerial act of issuing the permit. As discussed below, DRCP's Permit Application satisfied all the requirements and factors contained in the Ordinance. As a result, the Floodplain Administrator had the ministerial duty to grant the floodplain development permit. The trial court erred when it concluded otherwise. 5 CR 3210-12 (Finding of Fact No. 20; Conclusion of Law Nos. 9, 10) [Tab 2].

19

**A.** **The Floodplain Administrator's duty to approve an application is purely ministerial and non-discretionary when all of the criteria are met.**

"The district court has appellate jurisdiction and general supervisory control over the commissioners court, with the exceptions and regulations prescribed by law." TEX. GOV'T CODE § 24.020. A county judge—such as Appellee Judge Saucedo here—is a member of the commissioners court pursuant to Texas law. TEX. LOCAL GOV'T CODE § 81.001. Thus, the district court may issue a writ of mandamus to compel the commissioners court or other public official to perform a duty that there is a clear duty to perform. *In re Bailey*, 975 S.W.2d 430, 432 (Tex. App.—Waco 1998, no pet.) (citing *O'Connor v. First Court of Appeals*, 837 S.W.2d 94, 97 (Tex. 1992)). "Mandamus will issue when there is a legal duty to perform a nondiscretionary, ministerial act, a demand for performance of that act, and a refusal." *Id.* (citing *Anderson v. City of Seven Points*, 806 S.W.2d 791, 793 (Tex. 1991)).

An act is "ministerial" when "the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion." *Id.* And, while county commissioners have broad responsibilities to conduct county business, the "legal basis for any action taken must be grounded ultimately in the Texas Constitution or statutes."

20

*Integrity Group, Inc. v. Medina County Comm'rs Court*, No. 04-03-00413-CV, 2004 WL 2346620, at *1 (Tex. App.—San Antonio Oct. 20, 2004, pet. denied). Where a permit applicant has satisfied the requirements to obtain the permit, all that remains is the ministerial act of issuing the permit. *Stolte v. County of Guadalupe*, No. 04-04-00083-CV, 2004 WL 2597443, at *4 (Tex. App.—San Antonio Nov. 17, 2004, no pet.). As this Court has recognized, a "permit must be granted . . . where the applicant has fulfilled all the requirements required by law. Mandamus will issue to compel the issuing of building permit that has been withheld without lawful reason." *City of Corpus Christi v. Unitarian Church of Corpus Christi*, 436 S.W.2d 923, 927 (Tex. Civ. App.—Corpus Christi 1968, writ ref'd n.r.e.). This Court further noted that "[w]here the [applicant] has done all that the statutes and law demands, the authorized granting of a building permit becomes a mere ministerial duty." *Id.*

The Ordinance outlines "permit procedures" for granting or denying a permit application. 1 RR, Exhibit 5 [Tab 3]. Article 4, Sections C(1)-(2) are the only provisions of the Ordinance that are applicable to determine whether a floodplain permit applicant has satisfied the Ordinance. 1 RR, Exhibit 9 at 71:11-13 ("Q. And were there any other provisions in the

21

Ordinance that affected that decision? A. None that I could see."). The Ordinance provides five specific *requirements* in Article 4, Section C(1)(a)-(e) that every permit application must contain. 1 RR, Exhibit 5 [Tab 3].

The Ordinance also includes a list of ten factors the Floodplain Administrator must consider in evaluating a permit application. 1 RR, Exhibit 5, Article 4, Section C(2) ("[a]pproval or denial of a Development Permit by the Floodplain Administrator shall be based on all of the provisions of this ordinance and the following relevant factors"). Thus, the Ordinance requires the Floodplain Administrator to consider the following ten factors when approving or denying the application:

a.   The danger to life and property due to flooding or erosion damage;

b.   The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner;

c.   The danger that materials may be swept onto other lands to the injury of others;

d.   The compatibility of the proposed use with existing and anticipated development;

e.   The safety of access to the property in times of flood for ordinary and emergency vehicles;

f.   The costs of providing governmental services during and after flood conditions including maintenance and repair of streets and bridges, and public utilities such as sewer, gas, electrical and water systems;

g.    The expected heights, velocity, duration, rate of rise, and sediment transport of the flood waters and the effects of wave action, if applicable, expected at the site;

h.    The necessity to the facility of a waterfront location, where applicable;

i.    The availability of alternative locations, not subject to flooding or erosion damage, for the proposed use;

j.    The relationship of the proposed use to the comprehensive plan for that area.

1 RR, Exhibit 5, Article 4, Section C(2) [Tab 3]. The Maverick County Commissioners Court promulgated the Ordinance pursuant to legislative authority under the TEXAS WATER CODE § 16.318. Under the Ordinance, the Floodplain Administrator "shall" consider the ten factors outlined in Article 4, Section C(2). 1 RR, Exhibit 5, Article 4. And when those factors—the rules established by the Maverick County Commissioners Court—are met, only the ministerial duty of issuing the permit remains.

DRCP satisfied each of these ten factors as a matter of law. Indeed, the only evidence introduced mandates the conclusion that the permit should have been approved. Nevertheless, the trial court erroneously found that the Floodplain Administrator properly determined that DRCP failed to satisfy three of the ten factors.

23

**B. DRCP's Permit Application satisfies the Ordinance's requirements as a matter of law.**

There is no dispute that DRCP's Permit Application satisfies the five requirements found in Section C(1) of the Ordinance. Indeed, the Floodplain Administrator testified that DRCP satisfied the five requirements. 1 RR, Exhibit 9 at 46:7-9 ("Q. DRCP met the requirements in C(1)(a) through (e), correct? A. Yes, sir."); 63:7-11 ("Q. And with respect to Dos Republicas, is there any quarrel with Dos Republicas regarding the requirements part of the ordinance and their satisfaction of it? A. No.").

**C. DRCP's Permit Application satisfies the Ordinance's ten factors as a matter of law.**

The only dispute appears to be whether DRCP's Permit Application satisfies the first three of the ten factors in the Ordinance. As discussed below, the evidence demonstrates that—as a matter of law—DRCP's Permit Application satisfies each of the ten factors, including the first three. DRCP's Permit Application was prepared and submitted by Paul Padilla, a licensed engineer in the State of Texas and Vice President of Multatech Engineering, Inc. 1 RR, Exhibit 1 at ¶ 2; 1 RR, Exhibit 3 [Tab 5]. Mr. Padilla has been an engineer for approximately thirty-one years and is a member of the Texas Society for Professional Engineers, American Public Works Association, and

24

the Society of American Military Engineers. 1 RR 32:18-23; 33:4-6. Mr. Padilla addressed each the factors in the Ordinance in detail and assessed whether DRCP's Permit Application complied with these factors. 1 RR, Exhibit 1 at ¶ 21; 1 RR, Exhibit 3 (2013 Supplemental Floodplain Analysis) [Tab 5]. Further, Mr. Padilla testified at trial about his opinions contained in the Permit Application. 1 RR 40-49; 1 RR, Exhibit 3 (2013 Supplemental Floodplain Analysis) [Tab 5]. In Mr. Padilla's unchallenged, expert opinion, DRCP's Permit Application satisfies each of the Ordinance's factors. 1 RR, Exhibit 1 at ¶ 21; 1 RR, Exhibit 3 (2013 Supplemental Floodplain Analysis) [Tab 5].

The Floodplain Administrator, on the other hand, testified that he did not consult any other expert or obtain any other evidence with respect to any of the ten mandatory factors, including factors (a)-(c). 1 RR, Exhibit 9 at 10:12-14 ("Q. Did any engineers review DRCP's floodplain permit application? A. No."); 1 RR, Exhibit 9, at 49:18-23 (Q. "[W]as there any other evidence that you considered when denying the permit? A. . . . one of the major factors to me is – is what I've actually seen in that community, what I've seen happen in the past with prior flooding."); 1 RR, Exhibit 9 at 46:14-22 (when asked what evidence he had to support his denial, the Floodplain

Administrator merely responded with "what' I've seen in the past"). Nor did the Floodplain Administrator introduce any evidence at trial. 1 RR 4.

As discussed below, DRCP's unrebutted evidence establishes as a matter of law that the Permit Application satisfies the Ordinance's ten mandatory factors (Part 1). Further, the trial court's finding to the contrary is not supported by factually or legally sufficient evidence (Part 2).

**1. DRCP's application and trial testimony presented unrebutted expert opinion that DRCP's mining plan satisfies each of the ten factors, including (a)-(c).**

Mr. Padilla addressed in detail each of the Ordinance's ten factors and demonstrated that DRCP's Permit Application satisfied each factor. 1 RR, Exhibit 1 at ¶ 21; 1 RR, Exhibit 3 (2013 Supplemental Floodplain Analysis) [Tab 5]. As only the first three factors appear to be contested, only those factors are addressed in detail below.

**a. The danger to life and property due to flooding or erosion damage.**

The first factor requires the Floodplain Administrator to consider any danger to life and property due to flooding or erosion damage. DRCP's Permit Application and Mr. Padilla's unrebutted expert testimony establish that under DRCP's mining plan, there is a <u>decreased</u> risk of damage caused

26

by flooding or erosion due to the proposed sedimentation ponds.  1 RR, Exhibit 3, at 5 [Tab 5]; 1 RR, Exhibit 1 at ¶ 13; 1 RR 40:14-41:21.  Specifically, DRCP's Permit Application and Mr. Padilla's unrebutted expert testimony establish that DRCP's proposed mining plan will have a zero net effect on flooding in the Elm Creek watershed outside of the mining project area.  1 RR 53:21-23.  The Floodplain Administrator did not consider any evidence or introduce any evidence at trial to the contrary.  Accordingly, the evidence conclusively establishes that the consideration of the first factor favors granting DRCP's Permit Application.  1 RR 41:19-21.

**b.  The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner.**

The second factor evaluates the risk of flood damage to the proposed facility itself.  DRCP's Permit Application, as well as Mr. Padilla's unrebutted expert testimony, establish as a matter of law that there is very minimal risk of property damage or any other damage to the property owner.  1 RR, Exhibit 5, Article 4, Section C(2)(b) [Tab 3]; 1 RR, Exhibit 3, at 5 [Tab 5]; 1 RR, Exhibit 1 at ¶ 14.  Again, the Floodplain Administrator cannot point to any evidence that there is any substantial risk to DRCP's facility

27

from flood damage. Accordingly, the evidence conclusively establishes that the second factor favors granting DRCP's Permit Application. 1 RR 42:19-20.

### c. The danger that materials may be swept onto other lands to the injury of others.

The evidence also conclusively establishes that the third factor — the danger that materials may be swept onto other lands to the injury of others — strongly favors approving DRCP's Permit Application. The Permit Application and Mr. Padilla's unrebutted expert testimony establish that foreign debris is <u>less likely</u> to be swept downstream with DRCP's mining plan because the use of sedimentation ponds contains the flow within the channel. 1 RR, Exhibit 3, at 5 [Tab 5]; 1 RR, Exhibit 1 at ¶ 15. Furthermore, DRCP's Permit Application and Mr. Padilla's unrebutted expert testimony establish that the sediment load leaving the mine area will be <u>lower</u> if DRCP conducts its proposed mining operation with sedimentation ponds than if DRCP does nothing at all in the floodplain. 1 RR 54:1-2. Again, the Floodplain Administrator has not pointed to any evidence that DRCP's proposal would increase any danger that materials will be swept onto other lands or injure others. Thus, because the evidence conclusively establishes

28

that DRCP's proposal will actually decrease rather than increase this risk, consideration of the third factor favors granting DRCP's Permit Application. 1 RR 43:2-9.

### d. The evidence conclusively establishes that DRCP's Permit Application meets the remaining factors of the Ordinance.

Appellees do not appear to dispute the fact that DRCP's Permit Application meets the Ordinance's remaining seven factors. And the trial court did not find that the Permit Application failed to meet them. 5 CR 3208-09 (Findings of Fact Nos. 6, 8, and 10 addressing factors (a)-(c) only). Indeed, the undisputed evidence demonstrates that DRCP meets these factors as a matter of law. DRCP's Permit Application and Mr. Padilla's unrebutted expert testimony addresses each of these factors and establishes that each favors approval of the Permit Application:

- The compatibility of the proposed use with existing and anticipated development. 1 RR, Exhibit 5, Article 4, Section C(2)(d) [Tab 3]; 1 RR, Exhibit 3, at 5 [Tab 5]; 1 RR, Exhibit 1 at ¶ 16; 1 RR 43:16-44:19.

- The safety of access to the property in times of flood for ordinary and emergency vehicles. 1 RR, Exhibit 5, Article 4, Section C(2)(e) [Tab 3]; 1 RR, Exhibit 3, at 5 [Tab 5]; 1 RR, Exhibit 1 at ¶ 17; 1 RR 44:20-45:11.

29

- The costs of providing governmental services during and after flood conditions including maintenance and repair of streets and bridges, and public utilities and facilities such as sewer, gas, electrical and water systems. 1 RR, Exhibit 5, Article 4, Section C(2)(f) [Tab 3]; 1 RR, Exhibit 3, at 5-6 [Tab 5]; 1 RR, Exhibit 1 at ¶ 18; 1 RR 45:12-46:8.

- The expected heights, velocity, duration, rate of rise, and sediment transport of the flood waters and the effects of wave action, if applicable, expected at the site. 1 RR, Exhibit 5, Article 4, Section C(2)(g) [Tab 3]; 1 RR, Exhibit 3, at 6 [Tab 5]; 1 RR, Exhibit 1 at ¶ 19; 1 RR 46:9-47:10.

- The necessity to the facility of a waterfront location, where applicable. 1 RR, Exhibit 5, Article 4, Section C(2)(h) [Tab 3]; 1 RR, Exhibit 3, at 6 [Tab 5]; 1 RR, Exhibit 1 at ¶ 19; 1 RR 47:17-48:2.

- The availability of alternative locations, not subject to flooding or erosion damage, for the proposed use. 1 RR, Exhibit 5, Article 4, Section C(2)(i) [Tab 3]; 1 RR, Exhibit 3, at 6 [Tab 5]; 1 RR, Exhibit 1 at ¶ 19; 1 RR 48:3-19.

- The relationship of the proposed use to the comprehensive plan for that area. 1 RR, Exhibit 5, Article 4, Section C(2)(j) [Tab 3]; 1 RR 48:20-49:13; 1 RR, Exhibit 3, at 6 [Tab 5]; 1 RR, Exhibit 1 at ¶ 20.

## 2. The trial court's erroneous findings that the Floodplain Administrator properly denied the permit based on factors (a)-(c) are unsupported by any evidence.

Despite this evidence, the trial court erroneously found that (1) the Floodplain Administrator considered factors (a)-(c), and (2) the Floodplain Administrator properly concluded that DRCP failed to satisfy those factors. These findings are wholly unsupported by the evidence in this case.

30

**a.** **There is no legally or factually sufficient evidence the Floodplain Administrator even considered factors (a)-(c), much less that he found that DRCP's Permit Application failed to satisfy them.**

In Findings of Fact 6 and 19, the trial court erroneously found that the Floodplain Administrator considered all provisions of the Ordinance and denied the Permit Application based on concerns with factors (a)-(c).[1] 5 CR 3208, 3210 [Tab 2]. But these findings are not supported by legally or factually sufficient evidence; there is less than a scintilla of evidence that the Floodplain Administrator considered factors (a)-(c), the provisions of the Ordinance, or any other relevant factors, when making his decision to deny DRCP's Permit Application.

Indeed, the only indication that the Floodplain Administrator purportedly considered the factors in Article 4, Section C(2), is a conclusory, self-serving statement by the Floodplain Administrator himself that is belied by his own testimony. 1 RR, Exhibit 9 at 46:10-12. When asked what evidence the Floodplain Administrator relied upon, supporting the denial

---

[1] Conclusion of Law Number 3 also includes these legally insufficient factual findings. 5 CR 3211 (Conclusion of Law No. 3) [Tab 2]. To the extent that Conclusion of Law Number 3 contains these same factual findings, it is likewise legally and factually insufficient.

31

based on these three factors, he could point to no relevant evidence—no opinions from engineers or other professionals, no other hydrological studies, and could not name a single contaminant that he was purportedly concerned about. 1 RR, Exhibit 9 at 46:13-48:25; 1 RR, Exhibit 9 at 10:12-14 ("Q. Did any engineers review DRCP's floodplain permit application? A. No."); 1 RR, Exhibit 9 at 34:17-23 ("Q. . . . And what would be those contaminants that would be in the floodwater? A. I wouldn't be familiar with the technical term to say what they are, sir. Q. Okay. Is there a nontechnical term that you can throw out or just anything – A. No.").

The failure to consult an engineer or any other expert certainly suggests arbitrary and capricious action. *Mobile County v. City of Saraland*, 501 So. 2d 438, 440 (Ala. 1986) (finding permit denial was arbitrary and capricious where, among other issues, "the city did not consult an expert until after the petition for mandamus was filed by the county" and the "decision appear[ed] not to have been based on any expert opinion"). Moreover, this testimony—without any evidence or other support—does no more than "create a mere surmise or suspicion" that the Floodplain Administrator considered these factors. *Mass Mktg., Inc. v. Gaines*, 70 S.W.3d 261, 264 (Tex. App.—San Antonio 2001, pet. denied). As such, it was error

32

for the court to find that the Floodplain Administrator considered factors (a)-(c) without any evidence.

In fact, the opposite is true—the Floodplain Administrator considered none of the factors outlined in the Ordinance. The entirety of the Floodplain Administrator's denial of DRCP's Permit Application is comprised of two sentences that offered no reasoning for his determination, whether based on the mandatory factors identified in the Ordinance, or otherwise. 1 RR, Exhibit 4 [Tab 4]. Indeed, it would have been impossible for the Floodplain Administrator to consider whether DRCP's Permit Application satisfied the mandatory factors identified in the Ordinance, because the Floodplain Administrator **admits** he never considered DRCP's pending Permit Application prior to denying it. 1 RR, Exhibit 9 at 54:3-20, 56:23-57:2 ("Q. And was this supplemental floodplain analysis a basis upon which you denied the floodplain permit, or did you consider it when denying the floodplain permit? A. No.").

Because these findings are unsupported by legally or factually sufficient evidence, this Court should disregard them. As discussed above, the undisputed evidence demonstrates that the Permit Application satisfies each of the Ordinance's provisions.

**b.** **No legally or factually sufficient evidence supports the trial court's finding that the Floodplain Administrator raised concerns about factors (a)-(c) and gave DRCP an opportunity to respond.**

In Finding of Fact 8, the trial court apparently concluded that, after the Floodplain Administrator purportedly considered factors (a)-(c), he raised his concerns regarding those factors with DRCP, which failed to address those concerns. 5 CR 3208-09 [Tab 2]. This finding is wrong in every way possible. Not only did the Floodplain Administrator not consider factors (a)-(c), he did not raise any concerns with DRCP or give DRCP a chance to respond to those concerns. *See* Part III, *infra*. Rather, after more than two years of delay, and at the prompting of a mandamus action, the Floodplain Administrator summarily denied the Permit Application in a two-sentence letter that gives no indication of any concerns with any provision of the Ordinance. 1 RR, Exhibit 4 [Tab 4]. The trial court's finding is not supported by factually or legally sufficient evidence and should be disregarded.

**c.** **No legally or factually sufficient evidence supports the trial court's finding that DRCP failed to address factors (a)-(c).**

In Finding of Fact 10, the trial court erroneously found that DRCP failed to address factors (a)-(c). 5 CR 3209 [Tab 2]. Specifically, the trial court

found that Mr. Padilla failed to demonstrate that his analysis "considered the specific rainfall events Maverick County is and has been susceptible to which have caused significant flooding and damage in Maverick County." 5 CR 3209 (Finding of Fact No. 11) [Tab 2]. The trial court also found that Mr. Padilla failed to demonstrate that "he considered the contaminants and/or sediment contained in the sedimentation ponds that will overflow in the event of a flood event in Maverick County." 5 CR 3209 (Finding of Fact No. 12) [Tab 2]. Compounding this factual error, the trial court erroneously concluded that the "Floodplain Administrator denied DRCP's permit based on the concern that if the permit was approved, the occurrence of a flooding event (such as the flooding events experienced by Maverick County in the past) will carry sediment and/or contaminants downstream into the homes of Maverick County citizens and into Elm Creek." 5 CR 3210 (Finding of Fact No. 18) [Tab 2].

None of these findings is supported by legally or factually sufficient evidence. An appellate court should sustain a no evidence, or legal insufficiency point, when the record discloses one of the following circumstances: "a complete absence of evidence of a vital fact . . . [or] the

evidence establishes conclusively the opposite of a vital fact." *Thomas v. Casale*, 924 S.W.2d 433, 435 (Tex. App.—Fort Worth 1996, writ denied).

First, each of these findings of fact are inherently built on two faulty, underlying premises. Findings of Fact Numbers 11 and 18 necessarily imply that there are "specific rainfall events Maverick County is and has been susceptible to which have caused significant flooding and damage in Maverick County." 5 CR 3209-10 [Tab 2]. There is no evidence in the record of any specific flood events that Mr. Padilla allegedly should have considered. At trial, Appellees merely posed hypothetical questions to Mr. Padilla without providing proof of underlying rain events (which was appropriately objected to for lack of foundation at the hearing). *E.g.*, 1 RR 66:7-10; 1 RR 66:13-17. Because there is a complete absence of a vital fact— proof of specific rain events Mr. Padilla allegedly should have addressed— the evidence is legally insufficient to support these findings. *Thomas*, 924 S.W.2d at 435.

Further, the trial court's Findings 12 and 18 seemingly equate sediment and contaminants, asserting that Paul Padilla did not consider either. 5 CR 3209-10 [Tab 2]. But the evidence conclusively establishes the opposite— Paul Padilla did consider sediment in his analysis of DRCP's development

plan. 1 RR 38:10-12 ("Q. So your analysis includes consideration of certain sedimentation ponds as capturing water and sediment; correct? A. That's correct."); 1 RR 46:25-47:1 (In Mr. Padilla's opinion, DRCP's plan will result in a "[d]ecrease in sediment transport."); 1 RR 60:25-61:1 (explaining that DRCP's plan "would reduce sediment" coming out of the mine). Because the evidence conclusively establishes that Mr. Padilla considered sediment—and concluded that the sediment leaving the mine would decrease under DRCP's development plan—the trial court erred in concluding that Mr. Padilla did not consider sediment in his analysis. *Thomas*, 924 S.W.2d at 435.

Similarly, Findings of Fact 12 and 18 imply that there are contaminants "contained in the sedimentation ponds that will overflow in the event of a flood event in Maverick County." 5 CR 3209-10 [Tab 2]. First and foremost, the Floodplain Administrator could not consider any alleged contaminants in the floodwater because TCEQ has exclusive authority over floodwater quality. *Infra*, Part II.C.3. Second, Appellees wholly failed to establish that contaminants will be contained in the sedimentation ponds. Likewise, Appellees failed to establish that the sedimentation ponds will overflow "in the event of a flood." At most, Appellees established that coal "ha[s] sulfur

in it" and sulfur "could be a contaminant." 1 RR 67:15-22. But there was no proof that DRCP's sedimentation ponds would contain contaminants. And, there was no proof that contaminants would be carried "downstream into the homes of Maverick County citizens and into Elm Creek." 1 RR, Exhibit 9 at 10:12-14 (Q. . . . Did any engineers review DRCP's floodplain permit application? A. No."). To the contrary, the Floodplain Administrator merely raised a concern of the "possibility of any contamination," but could not identify any particular contaminants or contamination that might occur under DRCP's mining plan. 1 RR, Exhibit 9 at 34:10-23. Again, because there is a complete absence of a vital fact underlying Findings of Fact 12 and 18, the evidence is legally insufficient to support these findings. *Thomas*, 924 S.W.2d at 435.

Moreover, Findings of Fact Numbers 10, 11, 12, and 18 are likewise factually insufficient because, as outlined above, these findings are "so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust." *Brack v. Island Park Estates, LLC*, No. 13-06-698-CV, 2007 WL 4225576, at *3 (Tex. App.—Corpus Christi Nov. 29, 2007, no pet.).

\* \* \* \* \*

Because DRCP's Permit Application satisfies the Ordinance's requirements and factors as a matter of law, the trial court erred when it found that the Floodplain Administrator did not have the ministerial duty to approve DRCP's Permit Application.

## II. The Floodplain Administrator Abused Any Discretion by Failing to Base his Decision on the Factors Mandated by the Ordinance.

To the extent the Ordinance affords the Floodplain Administrator any discretion, the Floodplain Administrator clearly abused that discretion. A commissioners court abuses its discretion—necessitating mandamus relief—when it fails to consider a factor the Legislature directs it to consider. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994); *Stolte v. County of Guadalupe*, No. 04-04-00083-CV, 2004 WL 2597443, at *1 (Tex. App.—San Antonio Nov. 17, 2004, no pet.). As discussed below, the Floodplain Administrator failed to consider *any* of the ten factors that the Ordinance mandates that he must consider in evaluating a permit application. Indeed, his two-sentence order denying DRCP's Permit Application failed to give any reason or explanation for the denial, much less any consideration of the mandatory factors. 1 RR, Exhibit 4 [Tab 4]. In its entirety, the order provides: "I am in receipt of Dos Republicas Request for Floodplain Permit. After

reviewing the Request, I am hereby denying it." *Id.* As the Alabama Supreme Court has stated, it is an abuse of discretion to deny a permit application, "without any statement of the reasons for denying the building permit." *Pritchett v. Nathan Rodgers Const. & Realty Corp.*, 379 So. 2d 545, 547 (Ala. 1979). Moreover, the Floodplain Administrator readily admitted that he did not even review DRCP's Permit Application.

### A. The failure to consider mandatory factors constitutes an abuse of discretion.

The Ordinance provides: "Approval or denial of a Development Permit by the Floodplain Administrator *shall* be based on all of the provisions of this ordinance and the following [ten] relevant factors." 1 RR, Exhibit 5, at Article 4, Section C(2) [Tab 3]. Contrary to the express terms of the Ordinance, however, the Floodplain Administrator failed to consider *any* of the ten factors. Indeed, it would have been impossible for the Floodplain Administrator to consider the ten factors; the Floodplain Administrator willingly admitted he did not even review DRCP's Permit Application, violating Article 4, Section B(2) of the Ordinance, which provides: "the Floodplain Administrator shall . . . [r]eview permit applications." 1 RR, Exhibit 5, Article 4, Section B(2) [Tab 3]; 1 RR 56:23-57:2 ("Q. And was this

40

supplemental floodplain analysis a basis upon which you denied the floodplain permit, or did you consider it when denying the floodplain permit? A. No."); 1 RR 54:3-10, 19-20 (Floodplain Administrator admitting that he did not consider DRCP's 2011 permit application prior to denying it, and it was not a basis for his decision).

Moreover, the Floodplain Administrator's two-sentence denial letter demonstrates that his decision was not based upon the consideration of any factors in the Ordinance. 1 RR, Exhibit 4 [Tab 4]. The absence of any additional commentary is telling—none of the ten mandatory factors located in Article 4, Section C(2) are cited, referenced, or otherwise identified in this denial. *Id.* Why? The answer is simple. These mandatory factors were not considered. In addition, the Floodplain Administrator did not consult an engineer or any other expert before denying DRCP's Permit Application, further indicating that his denial was without regard to the ten mandatory factors and, thus, was arbitrary and capricious. *Mobile County v. City of Saraland*, 501 So. 2d 438, 440 (Ala. 1986) (finding permit denial was arbitrary and capricious where, among other issues, "the city did not consult an expert until after the petition for mandamus was filed by the county" and the "decision appear[ed] not to have been based on any expert opinion").

**B.** **The Floodplain Administrator was required to provide an explanatory order with reasons for his denial.**

The Floodplain Administrator has repeatedly asserted that he was not required to explain the reasons for his denial. *E.g.*, 2 CR 873 ("There is no provision in the County Floodplain Damage Prevention Ordinance to provide a detailed explanation of any permit denial."); 2 CR 879 ("The fact that Defendants' denial was brief and not to the liking to the Plaintiff is not reason [sic] for a mandamus nor is it abuse of discretion."). But the law is clear that the Floodplain Administrator must explain his reasons for denying a permit and that the statutory sufficiency of the denial may be reviewed solely on the reasons stated in the order.

**1.** **Meaningful judicial review necessitates that the Floodplain Administrator's order provide the reasons for his denial.**

It is beyond dispute that a district court may exercise judicial review of commissioners court decisions. *Comm'rs Court of Titus Cnty. v. Agan*, 940 S.W.2d 77, 80 (Tex. 1997); TEX. GOV'T CODE § 24.020 ("The district court has appellate jurisdiction and general supervisory control over the commissioners court, with the exceptions and regulations prescribed by law."). As the Texas Supreme Court explained, "[o]nce the commissioners

court acts, the district court may review the commissioners' orders to determine if they are arbitrary, or otherwise constitute an abuse of discretion." *Ector County v. Stringer*, 843 S.W.2d 477, 479 (Tex. 1992). This judicial review necessarily "implies a power to require the [Floodplain Administrator] to supply any reasons or explanations necessary for the reviewing court to understand the [Floodplain Administrator's] final order" so that there may be "meaningful judicial review" rather than a "charade of the real thing." *City of El Paso v. El Paso Elec. Co.*, 851 S.W.2d 896, 900 (Tex. App.—Austin 1993, writ denied). Without a written order, judicial review is impossible, whether a court is reviewing the decision of a state agency, a political subdivision, or a commissioners court.

As the Texas Supreme Court has plainly stated, an explanatory order is essential for judicial review: "We may consider only what was written by the Commission in its order, and we must measure its statutory sufficiency by what it says." *Morgan Drive Away, Inc. v. R.R. Comm'n of Texas*, 498 S.W.2d 147, 152 (Tex. 1973); *see also Amtel Commc'ns, Inc. v. Public Util. Comm'n*, 687 S.W.2d 95, 106 (Tex. App.—Austin 1985, no writ) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1946) (the "order must clearly and explicitly set forth the ground upon which its determination is based so that a reviewing

43

court may know and understand that basis"). Indeed, it would be contrary to public policy to allow any permitting body—a political subdivision, commissioners court, Floodplain Administrator, or otherwise—to evade judicial review by condoning and affirming the issuance of permit denials devoid of any explanation whatsoever.

### 2. *Post hoc* rationalization cannot cure the absence of reasons in the Floodplain Administrator's two-sentence denial letter.

This Court may review the Floodplain Administrator's determination only upon the bases provided in his decision. *See Madden v. Tex. Bd. of Chiropractic Examiners*, 663 S.W.2d 622, 626 n.3 (Tex. App.—Austin 1983, writ ref'd n.r.e.) ("We may in this instance evaluate the Board's final order solely upon the bases stated therein."). As the Austin Court of Appeals explained in *Amtel Commc'ns, Inc. v. Public Util. Comm'n*, 687 S.W.2d 95, 106 (Tex. App.—Austin 1985, no writ): "A reviewing court must judge the propriety of [agency] action solely by the ***grounds invoked by the agency***. If those grounds are improper, the reviewing court may not uphold the agency order on a theory that the agency's determination may be sustained on valid grounds not invoked by the agency in its order."

Justifications for government action provided "after the fact," constitute improper, "*post hoc* rationalizations" of that action, which courts **<u>may not</u>** consider. *Nucor Steel – Tex. v. PUC*, 363 S.W.3d 871, 878 n.2 (Tex. App.—Austin 2012, no pet.) (although Commission did not engage in it, court recognized that it should "disregard" *post hoc* rationalizations). As the Fifth Circuit informs us in *Luminant Generation Co., LLC v. United States EPA*, 675 F.3d 917, 925 (5th Cir. 2012): "We must disregard any *post hoc* rationalizations of the [agency's] action and evaluate it solely on the basis of the agency's stated rationale at the time of its decision." *See also Griggs v. United States*, 253 F. App'x 405, 412 n.7 (5th Cir. 2007) ("Reference to other reasons for the decision . . . offered for the first time on appeal is a '*post hoc* rationalization' advanced by an agency seeking to defend past agency decision against attack." For an "agency's discretionary order [to] be upheld, if at all," it must be "on the same basis articulated in the order by the agency itself."); *Mitchell Energy Corp. v. Fed. Energy Regulatory Comm'n*, 651 F.2d 414, 419 (5th Cir. 1981) (same).

Ignoring this authority, the trial court concluded that "Defendants were not required to provide the reasons for denying DRCP's Development Permit Application and Supplemental Application at the time of issuing the

45

denial, and the failure to do so, did not constitute an abuse of discretion." 5 CR 3211 (Conclusion of Law No. 4) [Tab 2]. In light of this authority, the trial court erred in rendering this conclusion of law and refusing to issue mandamus on this basis.

### 3. An explanatory order with reasoning is even more important when conflicting permit decisions are reached.

Notwithstanding this recent ordeal, the Floodplain Administrator approved DRCP's application for a floodplain development permit in 1998. 1 RR, Exhibit 6. Despite few differences between then and now, however, the Floodplain Administrator denied DRCP's Permit Application in 2014. 1 RR, Exhibit 4 [Tab 4]. The conflicting grant and denial of DRCP's Permit Applications in 1998 and 2014, respectively, demonstrate both the need for an explanatory order in this matter, and that the Floodplain Administrator's denial in 2014 was arbitrary and capricious.

Long-standing Texas case law reflects that a governmental entity exercising its permit powers acts arbitrarily and capriciously where that entity has both granted permits and denied permits for substantially similar applications. *Austin v. Deats*, 32 S.W.2d 685, 687 (Tex. Civ. App.—Austin 1930, no writ) (finding city council's denial of permit application was

46

arbitrary and capricious where council granted similar permit applications, noting that "[t]he city council dilly-dallied with appellee's applications for the permit, and then refused them without giving any reason for the action"); *see also Austin v. Nelson*, 45 S.W.2d 692, 695 (Tex. Civ. App.—Austin 1931, no writ) ("While it is true that a city council has the right to enact and enforce in a lawful manner proper regulatory ordinances for public health, safety, and comfort, still it is equally true that courts may review unwarranted and arbitrary interference with lawful property rights or business by a city council" and a decision to treat businesses that apply for permits differently "must rest upon some reasonable and just difference . . . and can never be made arbitrarily and without any such basis." (internal citations omitted)).

And the same principle applies to a business that has requested multiple permits, where previous permits were granted. For example, in *Texas Alcoholic Beverage Comm'n v. Good Spirits, Inc.*, 616 S.W.2d 411 (Tex. App.—Waco 1981, no writ), Good Spirits had already obtained seven permits with the Texas Alcoholic Beverage Commission ("TABC"), yet upon similar application for the eighth permit, the TABC denied the application. *Id.* at 414-15. The court asked, "[s]ince the [TABC] has approved Appellee's

applications seven times previously, what is the reasoning behind the [TABC's] refusing the permits the eighth time?" *Id.* The TABC argued reasons that were not supported by substantial evidence and the court thus held that TABC's denial of that eighth permit was arbitrary. *Id.* at 415.

All the purported concerns raised by the Floodplain Administrator in 2014 to deny the permit application existed in 1998, but did not provoke the Floodplain Administrator to deny DRCP's permit application then, making consideration of these concerns (which purportedly formed the basis for the denial) in 2014 arbitrary and capricious, and demonstrating the need for an explanatory order, here.

\* \* \* \* \*

Consequently, in this case the Floodplain Administrator's failure to cite or consider any of the ten Ordinance factors in his two-sentence denial letter was an abuse of discretion, arbitrary, and capricious. *See Consumers Water, Inc. v. Public Util. Comm'n*, 774 S.W.2d 719, 722 (Tex. App.—Austin 1989, no writ) ("The Commission did not recite in its final order any findings on the statutorily required criteria of AVIC or its elements as set out in PURA § 41(a). We conclude the omission was arbitrary and capricious."); *Vondy v. Comm'rs Ct. of Uvalde Cnty.*, 714 S.W.2d 417, 422 (Tex. App.—San Antonio

1986, writ ref'd n.r.e.) (Commissioners Court action was arbitrary and capricious where it made decision "without any reason or basis" other than reasons previously rejected by the Texas Supreme Court); *see also Luminant Generation Co., LLC v. United States EPA*, 675 F.3d 917, 925 (5th Cir. 2012) (EPA conceded it "acted arbitrarily and capriciously by failing to supply any reason for its disapproval."). As a result, the trial court erred when it determined that the Floodplain Administrator was not required to "specifically address the requirements and/or factors which he considered as the basis for his decision" in his written denial and failure to do so "did not constitute an abuse of discretion." 5 CR 3209 (Finding of Fact No. 13); 5 CR 3211 (Conclusion of Law No. 4) [Tab 2]. This Court should reverse the trial court's decision to correct this error.

C. **The Floodplain Administrator's *post hoc* justifications demonstrate that he abused his discretion by considering four irrelevant factors.**

Rather than consider any of the required factors outlined in the Ordinance, the Floodplain Administrator—by his own admission— purportedly considered irrelevant issues outside of the ten exclusive factors found in the Ordinance. For this reason, too, it is clear that the Floodplain Administrator's denial was illegal, arbitrary, and an abuse of discretion.

49

Thus, the trial court erred by concluding that "the Floodplain Administrator's denial of the permit was not illegal, arbitrary, or capricious or an abuse of discretion." 5 CR 3212 (Conclusion of Law No. 10) [Tab 2].

Because a commissioners court has only the powers and jurisdiction as conferred by the Constitution and the laws of the State, TEX. CONST. art. V, § 18(b); *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 28 (Tex. 2003), the Floodplain Administrator may only consider those factors identified in the Ordinance when approving or denying DRCP's Permit Application and no others. *See* TEX. LOCAL GOV'T CODE § 245.002 ("Each regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time"). In fact, consideration of only those factors outlined in the Ordinance is consistent with the language of the Ordinance, itself. 1 RR, Exhibit 5, at Article 4, Sections C(2) [Tab 3] ("Approval or denial of a Development Permit by the Floodplain Administrator *shall* be based on all of the provisions of this ordinance and the following [ten] factors.") (emphasis added). To be clear, considering **even one** irrelevant factor renders government action arbitrary and capricious. *Texas Dep't of Ins. v.*

50

*State Farm Lloyds*, 260 S.W.3d 233, 256 (Tex. App.—Austin 2008, no pet.).  As

the Austin Court of Appeals unequivocally held:

> Thus, even if some of the factors on which the order was based were relevant, at least one of the factors was irrelevant.  In other words, even if the commissioner also considered other legally relevant factors, the order was based in part on at least one legally irrelevant factor. . . . **Because the commissioner considered at least one legally irrelevant factor in issuing his order, we agree that the order is arbitrary and capricious."**

*Id.* (emphasis added).

Similarly, the Amarillo Court of Appeals has analyzed whether a

water district abused its discretion when it denied a water well permit "to

prevent the disproportionate taking of water," even though the water

district's rules provided no authority for the district to consider that factor.

*S. Plains Lamesa R.R. v. High Plains Underground Water Conservation Dist. No.

1*, 52 S.W.3d 770, 774, 778 (Tex. App.—Amarillo 2001, no pet.).  Noting the

Legislature granted the district authority to regulate the spacing of wells, the

production of wells, or both, and permitted the water district to implement

rules for such regulation, the appellate court found the district's denial of the

permit to prevent the disproportionate taking of water was improper

because such "authority was not clearly authorized by the Legislature."  *Id.*

51

at 776-79; *see also Texas Dep't of Ins. v. State Farm Lloyds*, 260 S.W.3d 233, 256 (Tex. App.—Austin 2008, no pet.) (holding order of Commissioner of Insurance was arbitrary and capricious where Commissioner considered at least one legally irrelevant factor); *Public Util. Comm'n v. S. Plains Elec. Coop., Inc.*, 635 S.W.2d 954, 957 (Tex. App.—Austin 1982, writ ref'd n.r.e.) (trial court "correctly set [] aside" agency decision because agency's consideration of "non-statutory standard amounts to arbitrary and capricious action").

In *Stolte*, the San Antonio Court of Appeals held that the Guadalupe County Commissioner's Court abused its discretion when it considered two factors—lot frontages and driveways—that it was not directed to consider when reviewing a subdivision plat application:

> a county's authority to grant or deny a plat application is limited by statute or other properly adopted rules, and in this case, there is no statute or other rule governing lot frontages or driveways. Therefore the County's duty to grant the plat application was ministerial in nature and the trial court erred in denying [the developer's] motion for summary judgment and his request for mandamus relief.

*Id.* at *4 (emphasis added).

In a strikingly similar situation to that here, the Colorado Supreme Court held that the Wheat Ridge City Council abused its discretion when it

52

considered one factor—building type—that it was not directed to consider when reviewing a floodplain permit application (referred to as a 'special exception' under Colorado law). *Bauer v. City of Wheat Ridge*, 513 P.2d 203, 204 (Colo. 1973). The *Bauer* Court explained:

> [t]he floodplain ordinance establishes the criteria upon which the 'special exception' will be granted. If the council believes that other reasons should be used in denying an application, then the appropriate procedure is to amend the floodplain ordinance. Once an applicant applies under the ordinance, only those factors which apply generally to all applicants may be considered.

*Id.* at 204.

Here, the evidence and the trial court's findings reflect that the Floodplain Administrator considered four irrelevant factors when denying DRCP's Permit Application, and accordingly, the trial court erred when it concluded the Floodplain Administrator did not abuse his discretion.

Specifically, the trial court determined that the Floodplain Administrator considered (1) floodwater quality, (2) the "best interest of [Maverick] County," (3) Texas Coal Mining Regulations, and (4) the

Floodplain Administrator's own "personal experiences."[2]    5 CR 3209-10

(Findings of Fact Nos. 14, 15, 16, and 17) [Tab 2].[3] Nevertheless, the trial court

attempted to rationalize that unlawful consideration as "mere reference[s]"

to legitimate factors. *Id.* As discussed below, each of these considerations is

not among the list of exclusive factors contained in Article 4, Section C(2) of

the Ordinance, and as a result, each is an irrelevant factor.

And the trial court's attempt to justify the Floodplain Administrator's

unlawful consideration of irrelevant factors—by attempting to relate them

to relevant ones—is unavailing. Factors (a) through (c) include the danger

to life and property due to flooding or erosion damage, the susceptibility of

---

[2]    Oddly enough, despite these findings, the trial court also concluded that "Defendants did not consider any irrelevant factors when denying DRCP's Development Permit Application." 5 CR 3211 (Conclusion of Law No. 5) [Tab 2]. But, this is a contradictory position—the trial court specifically found that the Floodplain Administrator considered certain factors that are not outlined in the Ordinance, and thus, are irrelevant. 5 CR 3209-10 (Findings of Fact Nos. 14-17) [Tab 2]. To the extent this Court agrees with DRCP and the trial court's Findings of Fact 14-17, this Court may disregard the inconsistent finding made in Conclusion of Law Number 5. *Van Brunt v. BancTexas Quorum, N.A.*, 804 S.W.2d 117, 123 (Tex. App.—Dallas 1989, no writ). And, the trial court's findings of fact control over inconsistent conclusions of law at any rate. *Gary Safe Co. v. A. C. Andrews Co., Inc.*, 568 S.W.2d 166, 168 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.) ("Since the trial court's finding conflicts with the conclusions of law, the findings of fact must control.").

[3]    The trial court issued Conclusion of Law Number 6, which contains some of the same factual allegations as Findings of Fact Numbers 14-17. 5 CR 3211 (Conclusion of Law No. 6) [Tab 2].

the proposed facility and its contents to flood damage, and the danger that materials may be swept onto other lands to the injury of others. 1 RR, Exhibit 5, Article 4, Section C(2) [Tab 3]. They do not include—and cannot include—the best interest of the county, personal experiences, floodwater quality, and Surface Coal Mining Regulations. The trial court's blatant attempt to fit a square peg in a round hole is belied by both the evidence in this case and the relevant legal authority.

## 1. Floodwater quality is an irrelevant factor.

The Floodplain Administrator contends, and the trial court found, that he considered floodwater quality as a factor when denying DRCP's Permit Application. *E.g.*, 1 RR, Exhibit 9 at 34:10-12 ("I'm just looking at the possibility of any contamination that can fall into that creek and that would go into people's homes.")); 2 CR 858 (citing water pollution and surface water quality regulations); 2 CR 864 (citing surface water quality regulations); 2 CR 864 ("it is reasonable to assume that [the sedimentation ponds] would all suffer from the same defects of backfilling, overtopping, and sediment release"). Floodwater quality, however, is not among the ten listed factors in the Ordinance. 1 RR, Exhibit 5, Article 4, Section C(2) [Tab 3]. Accordingly, floodwater quality is an irrelevant factor. Further, the

TCEQ has the exclusive authority to regulate water quality, and, consequently, the Floodplain Administrator has no authority to consider water quality in its evaluation of DRCP's Permit Application.

### a. The purpose of the Ordinance is to prevent property losses rather than protecting floodwater quality.

The Maverick County Commissioners Court adopted the Ordinance under the authority granted to it by the Legislature in the Flood Control Insurance Act ("FCIA"), which was enacted to allow Texans to "secur[e] flood insurance coverage" and to "minimiz[e] exposure of property to flood losses." TEX. WATER CODE § 16.312. In other words, the Legislature was concerned with securing flood insurance coverage and minimizing exposure and risk of property to flood loss, *not* floodwater quality. And the Ordinance itself provides that the Legislature conferred authority on the county commissioners to "adopt regulations designed to minimize *flood losses*." 1 RR, Exhibit 5, Article 1, Section A [Tab 3]. Even the Floodplain Administrator admits the Ordinance addresses the "methods of reducing flood losses." 2 CR 855; 1 RR, Exhibit 5, Article 4, Section C(2) [Tab 3]. In contrast, the words "water quality" are not found anywhere in the Ordinance, much less in the list of factors the Floodplain Administrator was

56

required to consider in reviewing DRCP's Permit Application. 1 RR, Exhibit 5 [Tab 3].

### b. The TCEQ has the "sole and exclusive authority to set water quality standards for all water in the state."

Water quality standards are the exclusive province of the Texas Commission on Environmental Quality, TEX. WATER CODE § 26.023, and not within the province of local Floodplain Administrators. TCEQ's control over water quality also derives from the Federal Clean Water Act, which establishes requirements for protecting water quality, including the requirement to have a permit for the discharge of storm water that comes into contact with an industrial activity, s*ee* 33 U.S.C. §§ 1251, *et seq*. A major portion of the Clean Water Act is the national pollutant discharge elimination system ("NPDES"), a federal regulatory program to control discharges of pollutants into surface waters of the United States. The State of Texas assumed authority to administer the NPDES program in Texas ("TPDES") and TCEQ has federal regulatory authority over these permits. *See* 33 U.S.C. § 1342 (b); TEX. WATER CODE §§ 26.011, 26.027.

Here, the TCEQ issued DRCP a TPDES permit that authorizes DRCP to discharge storm water and mine seepage from the "active mining area"

subject to specified effluent limitations. 1 RR, Exhibit 7 (DRCP TPDES Permit). In addition, TCEQ has set certain effluent limitations for discharges from the "active mining area" ponds caused by a precipitation event within any 24-hour period less than or equal to the 10-year, 24-hour precipitation event and for all discharges from all retention ponds. *See id.* Finally, DRCP's TPDES permit requires monitoring water at the point of discharge from the sedimentation ponds and retention ponds located in the proposed mine area. *See id.* Because the quality of the water leaving the mine site and entering state waters is within TCEQ's authority, delegated to it and only it through the NPDES and TPDES statutory scheme, the Floodplain Administrator lacks the authority to further regulate the quality of the floodwaters. Accordingly, floodwater quality is an irrelevant factor under the Ordinance.

### 2. The "best interest of the county" is an irrelevant factor.

The Floodplain Administrator also purports to have considered (and the trial court found that he did consider) "the best interest of the County" as a factor when denying DRCP's Permit Application. 1 RR, Exhibit 9 at 39:21-40:2 ("Q. Amongst the factors to consider in the ordinance in granting or denying a permit, is one of those factors the best interest of the county?

A. The factors I based to make my decision you mean? Q. Correct. A. Yes."); 1 RR, Exhibit 9 at 42:12-43:4 (affirming interrogatory response that the Floodplain Administrator made his decision "in the best interest of the county"); 1 RR, Exhibit 9, at 67:7-13 (referring to discovery response where the Floodplain Administrator stated that he was acting in the best interest of the county); 2 CR 873 ("The County Judge, acting as Floodplain Administrator, must use his best judgment to protect the lives and property of the people of Maverick County. Their safety and wellbeing take precedence over all other considerations."); 2 CR 879-80 ("The County Judge was doing his job in protecting this community from the Railroad Commission and from this Plaintiff.").

"The best interest of the County," however, is not among the Ordinance's exclusive list of ten factors. 1 RR, Exhibit 5, Article 4, Section C(2) [Tab 3]; 1 RR, Exhibit 9 at 43:20-44:3 ("Q: . . . There's just no factor there in the ordinance that says the Floodplain Administrator considers the best interest of the county? . . . A. Okay. Q. And you agree with that? A. In the ordinance itself? Q. Yes. I agree with that."); 1 RR 49:14-17 ("Q. Now we've gone through 10 factors A through J. Among these factors you considered

59

is there one that discusses the best interest of the county?  A. No.").

Accordingly, "the best interest of the County" is an irrelevant factor.

This issue was squarely addressed in a similar matter decided by the Austin Court of Appeals. *See Starr Cnty. v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 356 (Tex. App. — Austin 1979, writ ref'd n.r.e.).  In *Starr County*, the Court held that the Texas Water Quality Board's denial of a permit was arbitrary and capricious based on the Board's finding that "[t]he adamant local opposition to the application for a proposed industrial solid waste management site evidences that the granting of a permit would be contrary to the welfare of the people in the area." *Id.*  The Court explained: "Nowhere in the Act is local opposition mentioned for consideration as a standard to govern the Board's decision and such opposition, standing alone, should have no part in the Board's decision-making process.  Yet obviously it did." *Id.*  As in *Starr County*, the Floodplain Administrator's consideration of the non-statutory, "best interests of the County" was arbitrary and capricious, and constitutes an abuse of discretion.

### 3.     Surface Coal Mining Regulations are irrelevant factors.

The trial court also found that the Floodplain Administrator considered Surface Coal Mining Regulations as a factor when denying

DRCP's Permit Application. 5 CR 3210 (Finding of Fact No. 16) [Tab 2]; 2 CR 857-66 (reviewing various sections of the Texas Surface Coal Mining and Reclamation Act and Texas Coal Mining Regulations, alleging that DRCP failed to comply with certain requirements already addressed by the RRC); 1 RR, Exhibit 9 at 23:8-15 (describing issues with sedimentation ponds, an area addressed by the Texas Coal Mining Regulations). Surface Coal Mining Regulations, however, are not among the ten exclusive factors listed in the Ordinance. 1 RR, Exhibit 5, Article 4, Section C(2) [Tab 3]; 1 RR, Exhibit 9 at 50:3-7 ("Q. Does the floodplain ordinance give you as the Floodplain Administrator the authority to deny a permit if the permit doesn't comply with Texas Railroad Commission Rules? A. I don't see that."). Accordingly, Surface Coal Mining Regulations are an irrelevant factor.

Further, as with water quality, Texas law invests a state agency—the Texas Natural Resources Code invests the Railroad Commission of Texas—with the exclusive authority to enforce surface coal mining regulations. *See* Tex. Nat. Res. Code § 134.012(a)(1) ("Jurisdiction of Commission Over Surface Coal, Iron Ore, and Iron Ore Gravel Mining and Reclamation Operations" . . . "The commission has exclusive jurisdiction over . . . surface coal mining and reclamation operations in this state."). As the Austin Court

61

of Appeals has noted, "[t]he natural resources code specifies that the [Railroad] Commission has been granted exclusive jurisdiction over surface coal mining and reclamation activities, has been charged with enforcing the relevant portions of the [Natural Resources Code], and has been given the authority to issue rules pertaining to mining and reclamation activities that are consistent with the code." *R.R. Comm'n v. Coppock*, 215 S.W.3d 559, 570 (Tex. App.—Austin 2007, pet. denied). By contrast, the Floodplain Administrator has no jurisdiction over surface coal mining and reclamation activities and is not charged with enforcing the relevant portions of the Natural Resources Code. Indeed, the Floodplain Administrator admits he was not permitted to consider coal mining regulations when determining whether to grant or deny DRCP's Permit Application. 1 RR, Exhibit 9 at 50:3-7 ("Q. Does the floodplain ordinance give you as the Floodplain Administrator the authority to deny a permit if the permit doesn't comply with Texas Railroad Commission Rules? A. I don't see that."). Accordingly, Surface Coal Mining Regulations are an irrelevant factor under the Ordinance, and the Floodplain Administrator acted arbitrarily and capriciously by considering them in denying DRCP's Permit Application.

62

### 4. Personal experience is an irrelevant factor.

Last, the Floodplain Administrator testified, and the trial court found, that he considered his own personal experience as a factor when denying DRCP's Permit Application. 5 CR 3210 (Finding of Fact No. 15) [Tab 2]; 1 RR, Exhibit 9 at 46:14-47:25 (Floodplain Administrator describing denial of permit based on "what I've seen in the past"); 1 RR 49:21-23 ("one of the major factors to me is – is what I've actually seen in that community, what I've seen happen in the past with prior flooding. . . . **I'm not saying that Dos Republicas is responsible for the flooding, but I think I have a responsibility to either accept or deny based on what I could see can happen in the future.**" (emphasis added)). Personal experience, however, is not among the ten exclusive factors listed in the Ordinance. 1 RR, Exhibit 5, Article 4, Section C(2) [Tab 3]. Accordingly, personal experience is an irrelevant factor, and is an improper basis for denying DRCP's Permit Application.[4]

---

[4] Even if personal experiences could be considered by the Floodplain Administrator, Appellees failed to even introduce any evidence supporting these alleged personal experiences. The Floodplain Administrator, in his testimony, was never able to provide concrete evidence of flooding or any other purported concerns. 1 RR, Exhibit 9, at 49:18-23 (Q. "[W]as there any other evidence that you considered when denying the permit? A. . . . one of the major factors to me is – is what I've actually seen in that community, what I've seen happen in the past with prior flooding."); 1 RR, Exhibit 9 at

*   *   *   *   *

The Floodplain Administrator's consideration of any one of these irrelevant factors renders his denial of DRCP's Permit Application arbitrary and capricious. Accordingly, the trial court erred when it concluded the Floodplain Administrator did not abuse his discretion.

## III. The Floodplain Administrator Acted Arbitrarily and Capriciously When He Denied DRCP Notice or an Opportunity to be Heard.

Administrative action is "invalid for arbitrariness when the contesting parties are denied due process of law." *Lewis v. Metropolitan Savings & Loan Ass'n*, 550 S.W.2d 11, 12 (Tex. 1977); *see also Slavin v. City of San Antonio*, 330 S.W.3d 670, 672 (Tex. App.—San Antonio 2010, no pet.) (A governmental entity "acts in an arbitrary manner when the treatment accorded to parties in the administrative process denies them due process of law."). Specifically, where a local ordinance deprives a property owner of the use of his property, that property owner is entitled to procedural due process prior to any such deprivation. *City of Arlington v. Centerfolds, Inc.*, 232 S.W.3d 238, 248-54 (Tex. App.—Fort Worth 2007, pet. denied) (affirming trial court's decision that

46:14-22 (when asked what evidence he had to support his denial, the Floodplain Administrator merely responded with "what' I've seen in the past").

64

property owner's procedural due process rights were violated and board action was arbitrary and capricious where License and Amortization Appeal Board of the City of Arlington improperly restricted property owner's opportunity to be heard). Prior to depriving DRCP of its property interests, the Floodplain Administrator provided DRCP with no hearing or opportunity to be heard. Accordingly, the Floodplain Administrator denied DRCP all rights of procedural due process. *See Hartford Cas. Ins. Co. v. State*, 159 S.W.3d 212, 216 (Tex. App.—Austin 2005, pet. denied) ("The procedural due process guarantee protects against arbitrary takings" and requires "[a]t a minimum . . . notice and an opportunity to be heard at a meaningful time and in a meaningful manner."); *City of Dallas v. Saucedo-Falls*, 268 S.W.3d 653, 660 (Tex. App.—Dallas 2008, pet. denied) ("Procedural due process requires an opportunity for a hearing appropriate to the nature of the case."). Because the Floodplain Administrator denied DRCP any due process of law prior to denying the Permit Application, his action was necessarily arbitrary and capricious. *See Slavin*, 330 S.W.3d at 672. As a result, the trial court erred when it determined that due process was not an issue in this matter. 5 CR 3211 (Conclusion of Law No. 7) [Tab 2].

**PRAYER**

Pursuant to TEX. R. APP. P. 43.2, Dos Republicas Coal Partnership respectfully requests that this Court reverse the trial court's final judgment and render judgment in its favor and issue a writ of mandamus ordering the Floodplain Administrator and the Maverick County Commissioners Court to issue a floodplain development permit to DRCP. In the alternative, Dos Republicas Coal Partnership requests that the final judgment be reversed and the case remanded for the trial court to determine any remaining issues of fact, or for resolution of any other issues identified by the Court. Finally, DRCP requests any and all other relief to which it is may be entitled.

Respectfully Submitted,

*/s/ Bill Cobb*

Bill Cobb
State Bar No. 00796372
Matthew Ploeger
State Bar No. 24032838
Jenny Lee Smith
State Bar No. 24079357
COBB & COUNSEL
401 Congress Avenue, Suite 1540
Austin, Texas 78701
bill@cobbxcounsel.com
(512) 693-7570
(512) 687-3432 – Facsimile

Leonard Dougal
State Bar No. 06031400
Mallory Beck
State Bar No. 24073899
JACKSON WALKER L.L.P.
100 Congress, Suite 1100
Austin, Texas 78701
E: ldougal@jw.com
T: (512) 236-2233
F: (512) 391-2112

## CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(3), and relying on the word count function in the word processing software used to produce this document, I hereby certify that the total word count in this document is 13,801.

*/s/ Bill Cobb*
Bill Cobb


## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2015, a true and correct copy of the foregoing document has been served upon the following attorneys by electronic service and email.

Alfonso Nevarez C.
Nevarez Law Group, PC
780 Rio Grande Street
Eagle Pass, Texas 78852
anc@nevarezlawgroup.com
mvw@nevarezlawgroup.com

Rolando Jasso
State Bar No. 10491500
Claudio Heredia
State Bar No. 09505300
Knickerbocker, Heredia, Jasso, & Stewart P.C.
468 East Main Street
Eagle Pass, Texas 78852-4598
rmjasso@khjslaw.com
chlaw750@yahoo.com

*/s/ Bill Cobb*
Bill Cobb

**APPENDIX**

Tab 1     Order Denying Dos Republicas Coal Partnership's Amended Petition for Writ of Mandamus (5 CR 2940)

Tab 2     Findings of Fact and Conclusions of Law (5 CR 3207-12)

Tab 3     Maverick County Flood Damage Prevention Ordinance (1 RR, Exhibit 5)

Tab 4     April 3, 2014 Letter Denying DRCP's Floodplain Development Permit Application (1 RR, Exhibit 4)

Tab 5     Supplemental Floodplain Analysis, Executive Summary (1 RR, Exhibit 3, at 2-6)

# TAB 1

NO. 14-03-29340-MCV

| | | |
|---|---|---|
| DOS REPUBLICAS COAL PARTNERSHIP, § | | IN THE DISTRICT COURT |
| *Plaintiff* § | | |
| § | | |
| VS. § | | |
| § | | |
| DAVID SAUCEDO as FLOODPLAIN § | | MAVERICK COUNTY TEXAS |
| ADMINISTRATOR and COUNTY JUDGE § | | |
| OF THE MAVERICK COUNTY § | | |
| COMMISIONERS COURT and THE § | | |
| MAVERICK COUNTY COMMISIONERS § | | |
| COURT § | | |
| *Defendant* § | | 293rd JUDICIAL DISTRICT |

## ORDER DENYING PLAINTIFF
## DOS REPUBLICAS COAL PARTNERSHIP'S AMENDED PETITION FOR
## WRIT OF MANDAMUS

On October 9, 2014, came to be heard Plaintiff Dos Republicas Coal Parnership (DCCP) Amended Petition for Writ of Mandamus. The Court, having reviewed the Plaintiff's Writ, and the responses, pleadings, briefs, evidence and testimony from both Plaintiff and Defendants therein, and having considered same, is of the opinion that Plaintiff DCCP's Amended Petition for Writ of Mandamus should be **DENIED**.

IT IS THEREFORE, **ORDERED** that the Plaintiff DCCP's Amended Petition for Writ of Mandamus is hereby **DENIED**.

Signed this ___10th___ day of October, 2014.

FILED
AT 3:57 O'CLOCK P M
OCT 10 2014
ESTER RODRIGUEZ
DISTRICT CLERK, MAVERICK COUNTY, TEXAS
_____, DEPUT

_____
PRESIDING JUDGE

2935

2940

# TAB 2

| | | |
|---|---|---|
| DOS REPUBLICAS COAL PARTNERSHIP, § | | IN THE DISTRICT COURT |
| § | | |
| *Plaintiff,* § | | |
| § | | |
| v. § | | |
| § | | |
| DAVID SAUCEDO as FLOODPLAIN § | | MAVERICK COUNTY, TEXAS |
| ADMINISTRATOR and COUNTY JUDGE § | | |
| OF THE MAVERICK COUNTY § | | |
| COMMISIONERS COURT and THE § | | |
| MAVERICK COUNTY COMMISIONERS § | | |
| COURT, § | | |
| § | | |
| *Defendants.* § | | 293rd JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Plaintiff's Amended Motion for Writ of Mandamus in the above-captioned cause came on for hearing before the Court on October 9, 2014. All parties were present through their attorneys. After considering the pleadings, the evidence, and the arguments of counsel, the Court entered it's Order Denying Plaintiff's Amended Motion for Writ of Mandamus on October 10, 2014. On October 27, 2014, Plaintiff requested that this Court enter findings of fact and conclusions of law, which are hereby submitted as follows:

### FINDINGS OF FACT

1. On August 15, 1996, the Maverick County Commissioners Court approved and adopted the Maverick County Flood Damage Prevention Ordinance ("Ordinance"). The Ordinance was adopted pursuant to the National Flood Insurance Program and was established to minimize flood losses in Maverick County, Texas.[1]

---

[1] Plaintiff Exhibit 5, *Maverick County Flood Damage Prevention Ordinance*, pg. 1

3201

3207

2. Through the Ordinance, the Maverick County Commissioners Court appointed the County Judge as the Floodplain Administrator with the authority to review, and either approve or deny all applications for development permits required by adoption of the Ordinance.[2]

3. As per Article 4, Section C(1), an Application for a Development Permit must be presented to the Floodplain Administrator and must include the information contained in Subsections (a)-(e).[3]

4. As per Article 4, Section C(2), approval or denial of a Development Permit by the Floodplain Administrator shall be based on all of the provisions of the Ordinance and the relevant factors contained in Subsections (a)-(j) (the "factors").[4]

5. On November 3, 2011, Dos Republicas Coal Partnership ("DRCP") filed an Application for Floodplain Permit with Maverick County, as required by the Ordinance. DRCP filed a Supplemental Application on September 4, 2013, after a new FEMA floodplain map was adopted.

6. After reviewing DRCP's Application and taking into consideration all of the provisions of the Ordinance, the Floodplain Administrator decided that DRCP satisfied the requirements contained in Article 4, Section C(1) contained in the Ordinance, but had concerns with factors (a)-(c) contained in Article 4, Section C(2).[5]

7. Factors (a)-(c) cited by Floodplain Administrator are:

   (a) The danger to life and property due to flooding or erosion damage;
   (b) The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner; and
   (c) The danger that materials may be swept onto other lands to the injury of others.[6]

8. As a result of DRCP's failure to address the concerns the Floodplain

---

[2] *Id.* at pg. 12

[3] *Id.* at pg. 13

[4] *Id.* at pgs. 13-14

[5] Plaintiff Exhibit 9, Excerpts from Transcript dated October 2, 3014, *Oral and Video Deposition of the Corporate Representative of the Maverick County Commissioners Court (David Raul Saucedo)*, pg. 69 lines 7-22

[6] *Id.* at pgs. 70-71 lines 24-10

2

3202

3208

Administrator had with factors (a)-(c), the Floodplain Administrator denied DRCP's Development Permit[7]. DRCP was notified of the Floodplain Administrators decision in a letter dated April 3, 2014.[8] Thereafter, DRCP filed this cause on March 25, 2014.

9. At the October 9, 2014 hearing, DRCP called its expert, civil engineer Paul Padilla. He had prepared the Supplemental Floodplain Analysis to the original 2011 Floodplain Application, which was submitted to the Floodplain Administrator as a Supplemental Application. Paul Padilla testified regarding the requirements for a floodplain permit, and whether DRCP met all the requirements[9].

10. The Court finds that DRCP's expert Paul Padilla failed to demonstrate through his testimony that all ten factors contained in Article 4, Section C (2) (a)-(j) of the Ordinance were satisfied, so as to support the granting of the Permit. Specifically, Mr. Padilla failed to address factors (a)-(c) which the Floodplain Administrator referenced as his reason for denying DRCP's Development Permit.[10]

11. The Court finds that DRCP's expert, Paul Padilla, failed to demonstrate through his testimony that in his analysis he considered the specific rainfall events Maverick County is and has been susceptible to which have caused significant flooding and damage in Maverick County.[11]

12. The Court finds that DRCP's expert, Paul Padilla, failed to demonstrate through his testimony that in his analysis he considered the contaminants and/or sediment contained in the sedimentation ponds that will overflow in the event of a flood event in Maverick County.[12]

13. The Permit Procedures are outlined in Article 4, Section C of the Ordinance. There is no requirement in the Ordinance that the Floodplain Administrator's written denial of the Permit specifically address the requirements and/or factors which he considered as the basis for his decision.[13]

14. The Court finds that the "best interest of [Maverick] county" was not a basis

---

[7] *Deposition of David Raul Saucedo*, pg. 69 lines 7-14

[8] Plaintiff Exhibit 4, Defendant's letter of denial, April 3, 2014

[9] Excerpts from Transcript dated October 9, 2014, *Hearing on Abatement and Writ of Mandamus*, p.31

[10] Id. pg. 69 lines 9-21

[11] *Id.* at lines 18-21

[12] *Id.* at lines 9-17

[13] *Floodplain Prevention Ordinance*, pgs.13-14

3203

3209

for Defendants' decision standing alone, but was merely referenced when considering the Ordinance was designed to minimize flood losses in flood hazard areas of Maverick County, Texas.

15. The Court finds that the Floodplain Administrator's personal experiences were not a basis for Defendants' decision standing alone, but knowledge of the specific rainfall events in Maverick County which have caused significant flood damage in Maverick County was a mere reference when considering factors (a)-(c) contained in the Ordinance.

16. The Court finds that the Texas Coal Mining Regulations was not a basis for Defendants' decision standing alone, but was a mere reference when considering factors (a)-(c) contained in the Ordinance.

17. The Court finds that the floodwater quality was not a basis for Defendants' decision standing alone, but was a mere reference when considering the factors contained in the Ordinance; specifically, the danger to life and property due to flooding or erosion damage, and the danger that materials may be swept onto other lands to the injury of others.

18. The Court finds that the Floodplain Administrator denied DRCP's permit based on the concern that if the permit was approved, the occurrence of a flooding event (such as the flooding events experienced by Maverick County in the past) will carry sediment and/or contaminants downstream into the homes of Maverick County citizens and into Elm Creek.

19. The Court finds that the Floodplain Administrator based his decision to deny DRCP's Development Permit on all of the provisions of the Ordinance and the relevant factors, as he was authorized to do by Article 4 of the Ordinance.[14]

20. The Court finds that the Floodplain Administrator did not abuse his discretion when rendering his decision to deny DRCP's Development Permit.

## CONCLUSIONS OF LAW

1. A district court may issue a writ of mandamus to rectify an abuse of discretion, when a Commissioners Court acts illegally, unreasonably, or arbitrarily.

---

[14] *Deposition of David Raul Saucedo*, pg. 69 lines 7-14

4

2. A Commissioners Court abuses its discretion—necessitating mandamus relief—when it either: (A) fails to perform a purely ministerial act, or (B) fails to consider a factor the Legislature directs it to consider, or considers an irrelevant factor.

3. Defendants considered all of the provisions of the Ordinance as well as the relevant factors as per Article 4, Section C(2) of the Ordinance, and denial of DRCP's Development Permit did not constitute an abuse of discretion.

4. Defendants were not required to provide the reasons for denying DRCP's Development Permit Application and Supplemental Application at the time of issuing the denial, and the failure to do so, did not constitute an abuse of discretion.

5. Defendants did not consider any irrelevant factors when denying DRCP's Development Permit Application and Supplemental Application and the denial of same did not constitute an abuse of discretion.

6. Defendants' reference to the best interest of the county, floodwater quality, surface coal mining regulations, and personal experience was not a basis for Defendants' decision standing alone and that reference did not render Defendants' denial of DRCP's Development Permit Application and Supplemental Application arbitrary and capricious.

7. The Ordinance does not deprive DRCP of the use of its property because Defendants' denial of DRCP's Development Permit Application does not deprive it of all economically viable uses of its property, therefore due process is not an issue, and the denial was not arbitrary or capricious or an abuse of discretion.

8. The Floodplain Administrator was required, under Article 4, Section C(2) to approve or deny DRCP's Development Permit Application and Supplemental Application based on all of the provisions of the Ordinance, and the relevant factors listed in (a)-(j).

9. The Floodplain Administrator was not required, and did not have a ministerial duty to grant DRCP's Development Permit Application and Supplemental Application if the Floodplain Administrator found that the application did not meet the provisions of the Ordinance and relevant factors.

5

3211

3205

10. DRCP's Development Permit Application and Supplemental Application did not satisfy the requirements of the Ordinance and the act of approving or denying it was not a ministerial act, therefore, the Floodplain Administrator's denial of the permit was not illegal, arbitrary or capricious or an abuse of discretion.

SIGNED this 5ᵗʰ day of December, 2014.

_____
JUDGE PRESIDING

FILED
AT 433 O'CLOCK P M
DEC 05 2014
IRENE RODRIGUEZ
DISTRICT CLERK, MAVERICK COUNTY TEXAS
BY_____ DEPUTY

3206

3212

# TAB 3

60.3(b) Revised as of October 1, 1989

RECEIVED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS

12/22/2014 3:27:24 PM

DORIAN E. RAMIREZ
Clerk

FLOOD DAMAGE PREVENTION ORDINANCE

ARTICLE I

STATUTORY AUTHORIZATION, FINDINGS OF FACT, PURPOSE AND METHODS

SECTION A.   STATUTORY AUTHORIZATION

The Legislature of the State of ___Texas___ has in (statutes) VTS-Water Code 16.318 delegated the responsibility of local governmental units to adopt regulations designed to minimize flood losses. Therefore, the County Commissioners (governing body) of ___Maverick County___, ___Texas___, does ordain as (local unit)      (State) follows:

SECTION B. FINDINGS OF FACT

(1) The flood hazard areas of ___Maverick County___ are subject to periodic inundation which results in loss of life and property, health and safety hazards, disruption of commerce and governmental services, and extraordinary public expenditures for flood protection and relief, all of which adversely affect the public health, safety and general welfare.

(2) These flood losses are created by the cumulative effect of obstructions in floodplains which cause an increase in flood heights and velocities, and by the occupancy of flood hazards areas by uses vulnerable to floods and hazardous to other lands because they are inadequately elevated, floodproofed or otherwise protected from flood damage.

SECTION C.   STATEMENT OF PURPOSE

It is the purpose of this ordinance to promote the public health, safety and general welfare and to minimize public and private losses due to flood conditions in specific areas by provisions designed to:

(1) Protect human life and health;

(2) Minimize expenditure of public money for costly flood control projects;

-1-

Plaintiff Exhibit 5

EXHIBIT
5  ARL
10/09/14

(3)  Minimize the need for rescue and relief efforts associated with flooding and generally undertaken at the expense of the general public;

(4)  Minimize prolonged business interruptions;

(5)  Minimize damage to public facilities and utilities such as water and gas mains, electric, telephone and sewer lines, streets and bridges located in floodplains;

(6)  Help maintain a stable tax base by providing for the sound use and development of flood-prone areas in such a manner as to minimize future flood blight areas; and

(7)  Insure that potential buyers are notified that property is in a flood area.

## SECTION D.  METHODS OF REDUCING FLOOD LOSSES

In order to accomplish its purposes, this ordinance uses the following methods:

(1)  Restrict or prohibit uses that are dangerous to health, safety or property in times of flood, or cause excessive increases in flood heights or velocities;

(2)  Require that uses vulnerable to floods, including facilities which serve such uses, be protected against flood damage at the time of initial construction;

(3)  Control the alteration of natural floodplains, stream channels, and natural protective barriers, which are involved in the accommodation of flood waters;

(4)  Control filling, grading, dredging and other development which may increase flood damage;

(5)  Prevent or regulate the construction of flood barriers which will unnaturally divert flood waters or which may increase flood hazards to other lands.

# ARTICLE 2

## DEFINITIONS

Unless specifically defined below, words or phrases used in this ordinance shall be interpreted to give them the meaning they have in common usage and to give this ordinance its most reasonable application.

ALLUVIAL FAN FLOODING - means flooding occurring on the surface of an alluvial fan or similar landform which originates at the apex and is characterized by high-velocity flows; active processes of erosion, sediment transport, and deposition; and unpredictable flow paths.

APEX - means a point on an alluvial fan or similar landform below which the flow path of the major stream that formed the fan becomes unpredictable and alluvial fan flooding can occur.

AREA OF SHALLOW FLOODING - means a designated AO, AH, or VO zone on a community's Flood Insurance Rate Map (FIRM) with a one percent chance or greater annual chance of flooding to an average depth of one to three feet where a clearly defined channel does not exist, where the path of flooding is unpredictable and where velocity flow may be evident. Such flooding is characterized by ponding or sheet flow.

AREA OF SPECIAL FLOOD HAZARD - is the land in the floodplain within a community subject to a one percent or greater chance of flooding in any given year. The area may be designated as Zone A on the Flood Hazard Boundary Map (FHBM). After detailed ratemaking has been completed in preparation for publication of the FIRM, Zone A usually is refined into Zones A, AE, AH, AO, A1-99, VO, V1-30, VE or V.

BASE FLOOD - means the flood having a one percent chance of being equalled or exceeded in any given year.

BASEMENT - means any area of the building having its floor subgrade (below ground level) on all sides.

CRITICAL FEATURE - means an integral and readily identifiable part of a flood protection system, without which the flood protection provided by the entire system would be compromised.

DEVELOPMENT - means any man-made change in improved and unimproved real estate, including but not limited to buildings or other structures, mining, dredging, filling, grading, paving, excavation or drilling operations or storage of equipment or materials.

ELEVATED BUILDING - means a nonbasement building (i) built, in the case of a building in Zones A1-30, AE, A, A99, AO, AH, B, C, X, and D, to have the top of the elevated floor, or in the case of a building in Zones V1-30, VE, or V, to have the bottom of the lowest horizontal structure member of the elevated floor elevated above the ground level by means of pilings, columns (posts and piers), or shear walls parallel to the floor of the water and (ii) adequately anchored so as not to impair the structural integrity of the building during a flood of up to the magnitude of the base flood. In the case of Zones A1-30, AE, A, A99, AO, AH, B, C, X, and D, "elevated building" also includes a building elevated by means of fill or solid foundation perimeter walls with openings sufficient to facilitate the unimpeded movement of flood waters. In the case of Zones V1-30, VE, or V, "elevated building" also includes a building otherwise meeting the definition of "elevated building," even though the lower area is enclosed by means of breakaway walls if the breakaway walls met the standards of Section 60.3(e)(5) of the National Flood Insurance Program regulations.

EXISTING CONSTRUCTION - means for the purposes of determining rates, structures for which the "start of construction" commenced before the effective date of the FIRM or before January 1, 1975, for FIRMs effective before that date. "Existing construction" may also be referred to as "existing structures."

EXISTING MANUFACTURED HOME PARK OR SUBDIVISION - means a manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including, at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed before the effective date of the floodplain management regulations adopted by a community.

EXPANSION TO AN EXISTING MANUFACTURED HOME PARK OR SUBDIVISION - means the preparation of additional sites by the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads).

FLOOD OR FLOODING - means a general and temporary condition of partial or complete inundation of normally dry land areas from:

     (1)   the overflow of inland or tidal waters.
     (2)   the unusual and rapid accumulation or runoff of surface waters from any source.

FLOOD HAZARD BOUNDARY MAP (FHBM) - means an official map of a community, issued by the Administrator, where the boundaries of the flood, mudslide (i.e., mudflow) related erosion areas having special hazards have been designated as Zones A, M, and/or E.

FLOOD INSURANCE RATE MAP (FIRM) - means an official map of a community, on which the Federal Emergency Management Agency has delineated both the areas of special flood hazards and the risk premium zones applicable to the community.

FLOOD INSURANCE STUDY - is the official report provided by the Federal Emergency Management Agency. The report contains flood profiles, water surface elevation of the base flood, as well as the Flood Boundary-Floodway Map.

FLOODPLAIN OR FLOOD-PRONE AREA - means any land area susceptible to being inundated by water from any source (see definition of flooding).

FLOODPLAIN MANAGEMENT - means the operation of an overall program of corrective and preventive measures for reducing flood damage, including but not limited to emergency preparedness plans, flood control works and floodplain management regulations.

FLOODPLAIN MANAGEMENT REGULATIONS - means zoning ordinances, subdivision regulations, building codes, health regulations, special purpose ordinances (such as a floodplain ordinance, grading ordinance and erosion control ordinance) and other applications of police power. The term describes such state or local regulations, in any combination thereof, which provide standards for the purpose of flood damage prevention and reduction.

FLOOD PROTECTION SYSTEM - means those physical structural works for which funds have been authorized, appropriated, and expended and which have been constructed specifically to modify flooding in order to reduce the extent of the areas within a community subject to a "special flood hazard" and the extent of the depths of associated flooding. Such a system typically includes hurricane tidal barriers, dams, reservoirs, levees or dikes. These specialized flood modifying works are those constructed in conformance with sound engineering standards.

FLOOD PROOFING - means any combination of structural and non-structural additions, changes, or adjustments to structures which reduce or eliminate flood damage to real estate or improved real property, water and sanitary facilities, structures and their contents.

FLOODWAY (REGULATORY FLOODWAY) - means the channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than a designated height.

LOWEST FLOOR - means the lowest floor of the lowest enclosed area (including basement). An unfinished or flood resistant enclosure, usable solely for parking or vehicles, building access or storage in an area other than a basement area is not considered a building's lowest floor; provided that such enclosure is not built so as to render the structure in violation of the applicable non-elevation design requirement of Section 60.3 of the National Flood Insurance Program regulations.

MANUFACTURED HOME - means a structure transportable in one or more sections, which is built on a permanent chassis and is designed for use with or without a permanent foundation when connected to the required utilities. The term "manufactured home" does not include a "recreational vehicle".

MANUFACTURED HOME PARK OR SUBDIVISION - means a parcel (or contiguous parcels) of land divided into two or more manufactured home lots for rent or sale.

MEAN SEA LEVEL - means, for purposes of the National Flood Insurance Program, the National Geodetic Vertical Datum (NGVD) of 1929 or other datum, to which base flood elevations shown on a community's Flood Insurance Rate Map are referenced.

NEW CONSTRUCTION - means, for the purpose of determining insurance rates, structures for which the "start of construction" commenced on or after the effective date of an initial FIRM or after December 31, 1974, whichever is later, and includes any subsequent improvements to such structures. For floodplain management purposes, "new construction" means structures for which the "start of construction" commenced on or after the effective date of a floodplain management regulation adopted by a community and includes any subsequent improvements to such structures.

NEW MANUFACTURED HOME PARK OR SUBDIVISION - means a manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed on or after the effective date of floodplain management regulations adopted by a community.

RECREATIONAL VEHICLE - means a vehicle which is (i) built on a single chassis; (ii) 400 square feet or less when measured at the largest horizontal projections; (iii) designed to be self-propelled or permanently towable by a light duty truck; and (iv) designed primarily not for use as a permanent dwelling but as temporary living quarters for recreational, camping, travel, or seasonal use.

-7-

FUNCTIONALLY DEPENDENT USE - means a use which cannot perform its intended purpose unless it is located or carried out in close proximity to water. The term includes only docking facilities, port facilities that are necessary for the loading and unloading of cargo or passengers, and ship building and ship repair facilities, but does not include long-term storage or related manufacturing facilities.

HIGHEST ADJACENT GRADE - means the highest natural elevation of the ground surface prior to construction next to the proposed walls of a structure.

HISTORIC STRUCTURE - means any structure that is:
    (a) Listed individually in the National Register of Historic Places (a listing maintained by the Department of Interior) or preliminarily determined by the Secretary of the Interior as meeting the requirements for individual listing on the National Register;

    (b) Certified or preliminarily determined by the Secretary of the Interior as contributing to the historical significance of a registered historic district or a district preliminarily determined by the Secretary to qualify as a registered historic district;

    (c) Individually listed on a state inventory of historic places in states with historic preservation programs which have been approved by the Secretary of Interior; or

    (d) Individually listed on a local inventory or historic places in communities with historic preservation programs that have been certified either:

        (1) By an approved state program as determined by the Secretary of the Interior or;

        (2) Directly by the Secretary of the Interior in states without approved programs.

LEVEE - means a man-made structure, usually an earthen embankment, designed and constructed in accordance with sound engineering practices to contain, control, or divert the flow of water so as to provide protection from temporary flooding.

LEVEE SYSTEM - means a flood protection system which consists of a levee, or levees, and associated structures, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices.

START OF CONSTRUCTION - (for other than new construction or substantial improvements under the Coastal Barrier Resources Act (Pub. L. 97-348)), includes substantial improvement and means the date the building permit was issued, provided the actual start of construction, repair, reconstruction, rehabilitation, addition, placement, or other improvement was within 180 days of the permit date. The actual start means either the first placement of permanent construction of a structure on a site, such as the pouring of slab or footings, the installation of piles, the construction of columns, or any work beyond the stage of excavation; or the placement of a manufactured home on a foundation. Permanent construction does not include land preparation, such as clearing, grading and filling; nor does it include the installation of streets and/or walkways; nor does it include excavation for basement, footings, piers or foundations or the erection of temporary forms; nor does it include the installation on the property of accessory buildings, such as garages or sheds not occupied as dwelling units or not part of the main structure. For a substantial improvement, the actual start of construction means the first alteration of any wall, ceiling, floor, or other structural part of a building, whether or not that alteration affects the external dimensions of the building.

STRUCTURE - means a walled and roofed building, including a gas or liquid storage tank, that is principally above ground, as well as a manufactured home.

SUBSTANTIAL DAMAGE - means damage of any origin sustained by a structure whereby the cost of restoring the structure to its before damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred.

SUBSTANTIAL IMPROVEMENT - means any reconstruction, rehabilitation, addition, or other improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure before "start of construction" of the improvement. This includes structures which have incurred "substantial damage", regardless of the actual repair work performed. The term does not, however, include either: (1) Any project for improvement of a structure to correct existing violations of state or local health, sanitary, or safety code specifications which have been identified by the local code enforcement official and which are the minimum necessary conditions or (2) Any alteration of a "historic structure", provided that the alteration will not preclude the structure's continued designation as a "historic structure."

VARIANCE - is a grant of relief to a person from the requirement of this ordinance when specific enforcement would result in unnecessary hardship. A variance, therefore, permits construction or development in a manner otherwise prohibited by this ordinance. (For full requirements see Section 60.6 of the National Flood Insurance Program regulations.)

VIOLATION – means the failure of a structure or other development to be fully compliant with the community's floodplain management regulations. A structure or other development without the elevation certificate, other certifications, or other evidence of compliance required in Section 60.3(b)(5), (c)(4), (c)(10), (d)(3), (e)(2), (e)(4), or (e)(5) is presumed to be in violation until such time as that documentation is provided.

WATER SURFACE ELEVATION – means the height, in relation to the National Geodetic Vertical Datum (NGVD) of 1929 (or other datum, where specified), of floods of various magnitudes and frequencies in the floodplains of coastal or riverine areas.



## ARTICLE 3

## GENERAL PROVISIONS

### SECTION A. LANDS TO WHICH THIS ORDINANCE APPLIES

The ordinance shall apply to all areas of special flood hazard with the jurisdiction of ___Maverick County___.
(local unit)

### SECTION B. BASIS FOR ESTABLISHING THE AREAS OF SPECIAL FLOOD HAZARD

The areas of special flood hazard identified by the Federal Emergency Management Agency on its Flood Hazard Boundary Map (FHBM), Community Number _480470_ , dated _December 20, 1977_ , and any revisions thereto are hereby adopted by reference and declared to be a part of this ordinance.

### SECTION C. ESTABLISHMENT OF DEVELOPMENT PERMIT

A Development Permit shall be required to ensure conformance with the provisions of this ordinance.

### SECTION D. COMPLIANCE

No structure or land shall hereafter be located, altered, or have its use changed without full compliance with the terms of this ordinance and other applicable regulations.

### SECTION E. ABROGATION AND GREATER RESTRICTIONS

This ordinance is not intended to repeal, abrogate, or impair any existing easements, covenants, or deed restrictions. However, where this ordinance and another ordinance, easement, covenant, or deed restriction conflict or overlap, whichever imposes the more stringent restrictions shall prevail.

### SECTION F. INTERPRETATION

In the interpretation and application of this ordinance, all provisions shall be; (1) considered as minimum requirements; (2) liberally construed in favor of the governing body; and (3) deemed neither to limit nor repeal any other powers granted under State statutes.

## SECTION G.   WARNING AND DISCLAIMER OR LIABILITY

The degree of flood protection required by this ordinance is
considered reasonable for regulatory purposes and is based on
scientific and engineering considerations.  On rare occasions
greater floods can and will occur and flood heights may be
increased by man-made or natural causes.  This ordinance does not
imply that land outside the areas of special flood hazards or
uses permitted within such areas will be free from flooding or
flood damages.  This ordinance shall not create liability on the
part of the community or any official or employee thereof for any
flood damages that result from reliance on this ordinance or any
administrative decision lawfully made thereunder.

# ARTICLE 4

## ADMINISTRATION

### SECTION A. DESIGNATION OF THE FLOODPLAIN ADMINISTRATOR

The _____County Judge_____ is hereby appointed the Floodplain Administrator to administer and implement the provisions of this ordinance and other appropriate sections of 44 CFR (National Flood Insurance Program Regulations) pertaining to floodplain management.

### SECTION B. DUTIES & RESPONSIBILITIES OF THE FLOODPLAIN ADMINISTRATOR

Duties and responsibilities of the Floodplain Administrator shall include, but not be limited to, the following:

(1) Maintain and hold open for public inspection all records pertaining to the provisions of this ordinance.

(2) Review permit application to determine whether proposed building site, including the placement of manufactured homes, will be reasonably safe from flooding.

(3) Review, approve or deny all applications for development permits required by adoption of this ordinance.

(4) Review permits for proposed development to assure that all necessary permits have been obtained from those Federal, State or local governmental agencies (including Section 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. 1334) from which prior approval is required.

(5) Where interpretation is needed as to the exact location of the boundaries of the areas of special flood hazards (for example, where there appears to be a conflict between a mapped boundary and actual field conditions) the Floodplain Administrator shall make the necessary interpretation.

(6) Notify, in riverine situations, adjacent communities and the State Coordinating Agency which is _____T.N.R.C.C._____, prior to any alteration or relocation of a watercourse, and submit evidence of such notification to the Federal Emergency Management Agency.

(7) Assure that the flood carrying capacity within the altered or relocated portion of any watercourse is maintained.

(8)  When base flood elevation data has not been provided in accordance with Article 3, Section B, the Floodplain Administrator shall obtain, review and reasonably utilize any base flood elevation data and floodway data available from a Federal, State or other source, in order to administer the provisions of Article 5.

SECTION C.  PERMIT PROCEDURES

(1)  Application for a Development Permit shall be presented to the Floodplain Administrator on forms furnished by him/her and may include, but not be limited to, plans in duplicate drawn to scale showing the location, dimensions, and elevation of proposed landscape alterations, existing and proposed structures, including the placement of manufactured homes, and the location of the foregoing in relation to areas of special flood hazard. Additionally, the following information is required:

    a.  Elevation (in relation to mean sea level), of the lowest floor (including basement) of all new and substantially improved structures;

    b.  Elevation in relation to mean sea level to which any nonresidential structure shall be floodproofed;

    c.  A certificate from a registered professional engineer or architect that the nonresidential floodproofed structure shall meet the floodproofing criteria of Article 5, Section B(2);

    d.  Description of the extent to which any watercourse or natural drainage will be altered or relocated as a result of proposed development.

    e.  Maintain a record of all such information in accordance with Article 4, Section (B)(1).

(2)  Approval or denial of a Development Permit by the Floodplain Administrator shall be based on all of the provisions of this ordinance and the following relevant factors:

    a.  The danger to life and property due to flooding or erosion damage;

    b.  The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner;

    c.  The danger that materials may be swept onto other lands to the injury of others;

    d.  The compatibility of the proposed use with existing and anticipated development;

e. The safety of access to the property in times of flood for ordinary and emergency vehicles;

f. The costs of providing governmental services during and after flood conditions including maintenance and repair of streets and bridges, and public utilities and facilities such as sewer, gas, electrical and water systems;

g. The expected heights, velocity, duration, rate of rise and sediment transport of the flood waters and the effects of wave action, if applicable, expected at the site;

h. The necessity to the facility of a waterfront location, where applicable;

i. The availability of alternative locations, not subject to flooding or erosion damage, for the proposed use;

j. The relationship of the proposed use to the comprehensive plan for that area.


SECTION D. VARIANCE PROCEDURES

(1) The appeal Board as established by the community shall hear and render judgement on requests for variances from the requirements of this ordinance.

(2) The Appeal Board shall hear and render judgement on an appeal only when it is alleged there is an error in any requirement, decision, or determination made by the Floodplain Administrator in the enforcement or administration of this ordinance.

(3) Any person or persons aggrieved by the decision of the Appeal Board may appeal such decision in the courts of competent jurisdiction.

(4) The Floodplain Administrator shall maintain a record of all actions involving an appeal and shall report variances to the Federal Emergency Management Agency upon request.

(5) Variances may be issued for the reconstruction, rehabilitation or restoration of structures listed on the National Register of Historic Places or the State Inventory of Historic Places, without regard to the procedures set forth in the remainder of this ordinance.

(6)   Variances may be issued for new construction and substantial improvements to be erected on a lot of one-half acre or less in size contiguous to and surrounded by lots with existing structures constructed below the base flood level, providing the relevant factors in Section C(2) of this Article have been fully considered.  As the lot size increases beyond the one-half acre, the technical justification required for issuing the variance increases.

(7)   Upon consideration of the factors noted above and the intent of this ordinance, the Appeal Board may attach such conditions to the granting of variances as it deems necessary to further the purpose and objectives of this ordinance (Article 1, Section C).

(8)   Variances shall not be issued within any designated floodway if any increase in flood levels during the base flood discharge would result.

(9)   Variances may be issued for the repair or rehabilitation of historic structures upon a determination that the proposed repair or rehabilitation will not preclude the structure's continued designation as a historic structure and the variance is the minimum necessary to preserve the historic character and design of the structure.

(10)   Prerequisites for granting variances:
    a.   Variances shall only be issued upon a determination that the variance is the minimum necessary, considering the flood hazard, to afford relief.

    b.   Variances shall only be issued upon, (i) showing a good and sufficient cause; (ii) a determination that failure to grant the variance would result in exceptional hardship to the applicant, and (iii) a determination that the granting of a variance will not result in increased flood heights, additional threats to public safety, extraordinary public expense, create nuisances, cause fraud on or victimization of the public, or conflict with existing local laws or ordinances.

    c.   Any application to whom a variance is granted shall be given written notice that the structure will be permitted to be built with the lowest floor elevation below the base flood elevation, and that the cost of flood insurance will be commensurate with the increased risk resulting from the reduced lowest floor elevation.

(11) Variances may be issued by a community for new construction and substantial improvements and for other development necessary for the conduct of a functionally dependent use provided that (i) the criteria outlined in Article 4, Section D(1)-(9) are met, and (ii) the structure or other development is protected by methods that minimize flood damages during the base flood and create no additional threats to public safety.

# ARTICLE 5

## PROVISIONS FOR FLOOD HAZARD REDUCTION

### SECTION A.  GENERAL STANDARDS

In all areas of special flood hazards the following provisions
are required for all new construction and substantial
improvements.

(1)  All new construction or substantial improvements shall
be designed (or modified) and adequately anchored to prevent
flotation, collapse or lateral movement of the structure
resulting from hydrodynamic and hydrostatic loads, including the
effects of buoyancy;

(2)  All new construction or substantial improvements shall
be constructed by methods and practices that minimize flood
damage;

(3)  All new construction or substantial improvements shall
be constructed with materials resistant to flood damage;

(4)  All new construction or substantial improvements shall
be constructed with electrical, heating, ventilation, plumbing,
and air conditioning equipment and other service facilities that
are designed and/or located so as to prevent water from entering
or accumulating within the components during conditions of
flooding.

(5)  All new and replacement water supply systems shall be
designed to minimize or eliminate infiltration of flood waters
into the system;

(6)  New and replacement sanitary sewage systems shall be
designed to minimize or eliminate infiltration of flood waters
into the system and discharge from the systems into flood waters;
and,

(7)  On-site waste disposal systems shall be located to avoid
impairment to them or contamination from them during flooding.


### SECTION B.  SPECIFIC STANDARDS

In all areas of special flood hazards where base flood elevation
data has been provided as set forth in (i) Article 3, Section B,
(ii) Article 4, Section B(8), or (iii) Article 5, Section C(3),
the following provisions are required:

(1) Residential Construction - new construction and substantial improvement of any residential structure shall have the lowest floor (including basement), elevated to or above the base flood elevation. A registered professional engineer, architect, or land surveyor shall submit a certification to the Floodplain Administrator that the standard of this subsection as proposed in Article 4, Section C(1)a., is satisfied.

(2) Nonresidential Construction - new construction and substantial improvements of any commercial, industrial or other nonresidential structure shall either have the lowest floor (including basement) elevated to or above the base flood level or together with attendant utility and sanitary facilities, be designed so that below the base flood level the structure is watertight with walls substantially impermeable to the passage of water and with structural components having the capability of resisting hydrostatic and hydrodynamic loads and effects of buoyancy. A registered professional engineer or architect shall develop and/or review structural design, specifications, and plans for the construction, and shall certify that the design and methods of construction are in accordance with accepted standards of practice as outlined in this subsection. A record of such certification which includes the specific elevation (in relation to mean sea level) to which such structures are floodproofed shall be maintained by the Floodplain Administrator.

(3) Manufactured Homes -

Require that all manufactured homes to be placed within Zone A on a community's FHBM or FIRM shall be installed using methods and practices which minimize flood damage. For the purposes of this requirement, manufactured homes must be elevated and anchored to resist flotation, collapse, or lateral movement. Methods of anchoring may include, but are not limited to, use of over-the-top or frame ties to ground anchors. This requirement is in addition to applicable State and local anchoring requirements for resisting wind forces.

SECTION C.   STANDARDS FOR SUBDIVISION PROPOSALS

(1) All subdivision proposals including the placement of manufactured home parks and subdivisions shall be consistent with Article 1, Sections B, C, and D of this ordinance.

(2) All proposals for the development of subdivisions including the placement of manufactured home parks and subdivisions shall meet Development Permit requirements of Article 3, Section C; Article 4, Section C; and the provisions of Article 5 of this ordinance.

-17-

(3) Base flood elevation data shall be generated for subdivision proposals and other proposed development including the placement of manufactured home parks and subdivisions which is greater than 50 lots or 5 acres, whichever is lesser, if not otherwise provided pursuant to Article 3, Section B or Article 4, Section B (8) of this ordinance.

(4) All subdivision proposals including the placement of manufactured home parks and subdivisions shall have adequate drainage provided to reduce exposure to flood hazards.

(5) All subdivision proposals including the placement of manufactured home parks and subdivisions shall have public utilities and facilities such as sewer, gas, electrical and water systems located and constructed to minimize or eliminate flood damage.

## CERTIFICATION

It is hereby found and declared by ___Maverick County___
                                        (local unit)

that severe flooding has occurred in the past within its
jurisdiction and will certainly occur within the future; that
flooding is likely to result in infliction of serious personal
injury or death, and is likely to result in substantial injury or
destruction of property within its jurisdiction; in order to
effectively comply with minimum standards for coverage under the
National Flood Insurance Program; and in order to effectively
remedy the situation described herein, it is necessary that this
ordinance become effective immediately.

Therefore, an emergency is hereby declared to exist, and this
ordinance, being necessary for the immediate preservation of the
public peace, health and safety, shall be in full force and
effect from and after its passage and approval.

APPROVED; _____
              (community official)
          Rogelio Escobedo
          Maverick County Judge

PASSED: __August 12, 1996__
              (date)

I, the undersigned, __Sara Montemayor-County Clerk__, do hereby
certify that the above is a true and correct copy of an ordinance
duly adopted by the __Honorable Commissioners' Court__, at a regular
meeting duly convened on __August 12, 1996__.

_____
(Secretary or responsible person)

(SEAL)

THE STATE OF TEXAS
COUNTY OF MAVERICK


I, Sara Montemayor, Clerk of the County Court of Maverick County, Texas, do hereby certify that the following is a true and correct EXCERPT taken from the minutes of the Hon. County Commissioners' Court meeting of August 12, 1996, a quorum thereof being present, to-wit:


ITEM - 26 APPROVAL OF RESOLUTION FOR THE NATIONAL FLOOD INSURANCE PROGRAM


A motion was duly made by Commissioner Martinez, seconded by Commissioner Ibarra, and unanimously carried to approve resolution for the National Flood Insurance Program.


WITNESS my hand and seal of said office, at Eagle Pass, Texas, this the 15th of August, 1996.

Sara Montemayor
County Clerk
Maverick County, Texas

THE STATE OF TEXAS
COUNTY OF MAVERICK


I, Sara Montemayor, Clerk of the County Court of Maverick
County, Texas, do hereby certify that the following is a true and
correct EXCERPT taken from the minutes of the Hon. County
Commissioners' Court meeting of August 12, 1996, a quorum thereof
being present, to-wit:


ITEM - 27 APPROVAL TO ADOPT AND CERTIFY A LEGAL AND
ENFORCEABLE ORDINANCE WHICH MEETS OR EXCEEDS THE MINIMUM
STANDARD CRITERIA AS STATED IN SECTION 60.3 OF THE NATIONAL
FLOOD INSURANCE PROGRAM REGULATIONS


A motion was duly made by Commissioner Martinez, seconded by
Commissioner Ibarra, and unanimously carried to approve to adopt
and certify a legal and enforceable ordinance which meets or
exceeds the minimum standard criteria as stated in Section 60.3
of the National Flood Insurance Program Regulations.


WITNESS my hand and seal of said office, at Eagle Pass, Texas,
this the 15th of August, 1996.

Sara Montemayor
County Clerk
Maverick County, Texas

# TAB 4



# COUNTY OF MAVERICK

## Office of the County Judge
### David R. Saucedo

April 3, 2014

RECEIVED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
12/22/2014 3:27:24 PM
DORIAN E. RAMIREZ
Clerk

Dos Republicas
415 Madison Street
Eagle Pass, Texas 78852

RE:  Supplemental Floodplain Analysis
Dos Republicas Coal Partnership:  Eagle Pass Mine
Request for Floodplain Permit

Dear Floodplain Administrator:

I am in receipt of Dos Republicas Request for Floodplain Permit.  After reviewing the Request, I am hereby denying it.

Sincerely,

David R. Saucedo
County Judge

cc: Rolando Salinas- Attorney
    Claudio Heredia- Attorney

EXHIBIT
4
ARL
10/09/14

500 Quarry Street Suite 3 • Eagle Pass, Texas, 78852 • Tel. (830) 773-3824 • Fax (830) 773-6450
e-mail: david.saucedo@co.maverick.tx.us

Plaintiff Exhibit 4

# TAB 5

## EXECUTIVE SUMMARY

Multatech Engineering, Inc. (Multatech) was contracted to evaluate the hydrologic and hydraulic effects resulting from the construction of the Eagle Pass Mine, and its associated ponds, access road, haul roads, collection ditches, railroad loop, loading facility, and mining activity, where it encroaches three existing Zone A floodplains as delineated on the current FEMA DFIRM map 48323C0350D dated April 4, 2011 (see Figure 2). Surface mining is a temporary use of the land; the land will be reclaimed after mining, to approximate original Contours per the requirements of the Railroad Commission of Texas.

The proposed mining activities and improvements are located within the Elm Creek drainage basin, west of Elm Creek and west of the existing Union Pacific Railroad (see Figure 1). The three Zone A floodplains are: the Unnamed Tributary "A" of Elm Creek (previously studied by Wilson & Company, Inc.), the Unnamed Tributary "B" of Elm Creek, and the existing floodplain of Elm Creek which tops the Union Pacific Railroad and encroaches into Mined Area "B" west of the railroad tracks.

Dos Republicas Coal Partnership has received permit approval from the Texas Railroad Commission to proceed with mining activities and now requests issuance of a floodplain development certificate from Maverick County to proceed with the proposed construction.

### Previous Wilson Study of Unnamed Tributary "A"

An earlier study prepared by Wilson & Company, Inc. in 2011 evaluated the channelization of the Unnamed Tributary "A" of Elm Creek, located at the northern portion of the site. Multatech evaluated the study to determine if any updates were necessary as a result of the latest FEMA information available. The Wilson study was found to be satisfactory and complete for adequately modeling the conveyance of the 100-year flood event through the proposed D-1 diversion channel. No modifications to the model or analysis were found to be necessary. The Wilson study is sufficient to demonstrate no adverse impact will result from the proposed improvements.

### Elm Creek/ CD-2 Analysis

The CD-2 collection ditch runs parallel to and west of the existing railroad (see Figure 4). This collection ditch has been designed and located to intercept sediment laden runoff from mined area "B" and convey it to the proposed sedimentation pond SP-1. The new DFIRM (Digital Flood Insurance Rate Map) dated April 4, 2011 shows the Elm Creek floodplain limits top the existing railroad tracks and extend along the railroad on the west side of the tracks where CD-2 is located. The previous FIRM from 1977 did not show the floodplain limits extending west of the tracks. Therefore Multatech analyzed the effects of the proposed CD-2 interception and conveyance of flow to re-delineate the floodplain limits in this area.

The existing drainage areas west of the Union Pacific Railroad that drain into CD-2 were delineated. Multatech determined the flow west of the track does contribute to the flood elevations and the fact that the Elm Creek 100-yr flood overtops the railroad tracks. The channelization of this drainage area eliminates the floodplain encroachment into mined area "B".

The proposed conditions model of CD-2 shows the current channel cross section will primarily convey the 100-year flood event within the channel banks as depicted in the Topographic Workmap. Where the 100-year flood event overtops the channel banks, the floodplain limits are contained within the Dos Republicas Coal Partnership site boundary. (The channel is designed for the 25-year event per TCEQ regulations and is not intended to convey the 100-year flood event). The conveyance capacity of the CD-2 channel dramatically decreases the extent of the floodplain limits of Elm Creek on the west side of the railroad.

### Unnamed Tributary "B" / CD-5 Analysis

The existing Unnamed Tributary "B" of Elm Creek is located in the southeastern portion of the site permit boundary (see Figure 6). Dos Republicas Coal Partnership is proposing to channelize onsite flow into CD-5 which discharges into sedimentation pond SP-3 as part of their erosion and sediment control plan for the site. CD-5 roughly correlates to the drainage basin of Unnamed Tributary "B". 165-acres of offsite flow is proposed to be diverted to the adjacent drainage basin to the west, the basin of Unnamed Tributary "C". Some of the runoff will be intercepted by channel D-3 and a proposed control levee will divert the remainder.

The existing conditions hydraulic model reveals the floodplain limits exceed the Zone A limits depicted on the existing DFIRM map and the floodplain was found to extend beyond the permit boundary to the northwest. Although the drainage area decreased, the 100-year runoff increased due to the change in curve number value.

The HEC-RAS model results for CD-5 show the proposed channel section will primarily convey the 100-year flood event within the channel banks (the channel is designed for the 25-year event per TCEQ regulations and is not intended to convey the 100-year flood event). Where the 100-year flood event overtops the channel banks, the floodplain limits are contained within the Dos Republicas Coal Partnership site boundary.

The diversion of offsite flow into the adjacent drainage basin of Unnamed Tributary "C" warranted additional analysis. The hydrologic evaluation revealed that although 165-acres of offsite area was being diverted from the Trib. "B" basin into the Trib. "C" basin, the net increase in drainage area was only 50.87-acres because the proposed CD-5 drainage area includes some of the existing Trib. "C" drainage area. The net gain in 100-year runoff equated to 75-cfs, which is about 5% of the total runoff for the basin. The Unnamed Tributary "C" model showed a negligible rise in the 100-year water surface elevation; the rise ranged from 0.04' to 0.14'. Please refer to the table below for a comparison of the existing and proposed water surface profile elevations. This analysis demonstrates that diversion of the offsite 165.1-acres will not cause an adverse impact.

### Conclusion

Multatech confirms that the Wilson study of the Unnamed Tributary "A" and this supplemental study of Unnamed Tributary "B" and Elm Creek/ CD-2 are sufficient to demonstrate no adverse impact will result from the proposed improvements. Dos Republicas Coal Partnership has permit approval from the Railroad Commission for surface mining activities. This Supplemental Floodplain Permit application is submitted to address the activities mentioned above. These studies and the application as supplemented, demonstrate compliance with the Ordinance in



order for Maverick County to issue a Floodplain Development Permit for this project. The details of the compliance with the Ordinance are set forth in the next part of this report.

*Summary of Compliance with the Maverick County Floodplain Development Ordinance:*

Article 4, Section C - Permit Procedures:

1.  Application for a Development Permit shall be presented to the Floodplain Administrator on forms furnished by him/her and may included, but not be limited to, plans in duplicate drawn to scale showing the location, dimensions, and elevation of proposed landscape alterations, existing and proposed structures, including the placement of manufactured home, and the location of the foregoing in relation to areas of special flood hazard. Additionally the following information is required:

    a.  Elevation (in relation to mean sea level), of the lowest floor (including basement) of all new and substanitally improved structures.

        ▪ **The floor elevation of the office/shop is 839.0-ft. The pad elevation of the coal handling facility is 808.0-ft. These are the lowest finish floor elevations on the site; these buildings are located west of Tributary "A", north and west of the railroad loop. These facilities are not located within the existing or proposed floodplain**

    b.  Elevation in relation to mean sea level to which any nonresidential structure shall be floodproofed.

        ▪ **Not applicable; no structures are located within the existing or proposed floodplain; no structures will require floodproofing.**

    c.  A certificate from a registered professional engineer or architect that the nonresidential floodproofed structure shall meet the floodproofing criteria of Article 5, Section B(2).

        ▪ **Not applicable; no structures are located within the existing or proposed floodplain; no structures will require floodproofing.**

    d.  Description of the extent to which any watercourse or natural drainage will be altered or relocated as a result of proposed development.

        ▪ **Please refer to the body of the report for detailed analysis and discussion. Note that all modifications occur within the property owned or leased by Dos Republicas Coal Partnership. Also following mining operations the property will be re-claimed and the floodplain will be restored as required by the Railroad Commission of Texas.**

e. Maintain a record of all such information in accordance with Article 4, Section (B)(1).

- **Dos Republicas Coal Partnership will work with Maverick County to ensure that all records relating to this Development Permit are available to the public in the offices of Maverick County.**

2. Approval or denial of a Development Permit by the Floodplain Administrator shall be based on all of the provisions of this ordinance and the following relevant factors:

a. The danger to life and property due to flooding or erosion damage.

- **Since the existing flood waters are being channelized into proposed sedimentation ponds there is a decreased risk of damage caused by flooding or erosion. There are no permanent structures located within the existing or proposed floodplain.**

b. The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner

- **Based on the channel HEC-RAS models, the 100-year flood waters will be primarily contained within the channels and there is very minimal risk of property damage or other damage to the property owner.**

c. The danger that materials may be swept onto other lands to the injury of others

- **Since the existing flood waters are being channelized into proposed sedimentation ponds, foreign debris is less likely to be swept downstream because the flow is contained within the channel.**

d. The compatibility of the proposed use with existing and anticipated development.

- **The proposed, and approved use, for the land is the development of a surface coal mine. However, surface mining is a temporary use for the land. The land will be reclaimed, after mining, to approximate original contours and to the current use of the land per the requirements of the Railroad Commission of Texas.**

e. The safety of access to the property in times of flood for ordinary and emergency vehicles.

- **Since the existing flood waters are being channelized into proposed sedimentation ponds safety of access to the property will likely be improved by the proposed drainage improvements. Culverts will be installed to allow for vehicular crossing of the propopsed channel.**

f. The costs of providing governmental services during and after flood conditions including maintenance and repair of streets and bridges, and public utilities and faciltiies such as sewer, gas, electrical and water systems.

- **Since the existing flood waters are being channelized into proposed sedimentation ponds there is a decreased risk of damage caused by flooding or erosion. Note that all floodplain modifications occur within the property owned or leased by Dos Republicas Coal Partnership.**

Also following mining operations the property will be re-claimed and the floodplain will be restored as required by the Railroad Commission of Texas.

g. The expected heights, velocity, duration, rate of rise and sediment transport of the flood waters and the effects of wave action, if applicable, expected at the site.

- Please refer to the body of the report for detailed analysis and discussion. Note that all floodplain modifications occur within the property owned or leased by Dos Republicas Coal Partnership. Also following mining operations the property will be re-claimed and the floodplain will be restored as required by the Railroad Commission of Texas.

h. The necessity to the facility of a waterfront location, where applicable.

- Not applicable.

i. The availability of alternative locations, not subject to flooding or erosion damage, for the proposed use.

- Due to the nature of the extraction of coal, from the Eagle Pass Mine, there are no feasible alternate locations for the structures shown in the attached Development Permit.

j. The relationship of the proposed use to the comprehensive plan for that area.

- As mentioned in (2) d. above, the proposed, and approved use, for the land is the development of a surface coal mine. Since the mine will only be a temporary use for the land, the comprehensive use includes not only mining but also the reintroduction of range, and grazing land, after the cessation of mining and the completion of reclamation activities, per the Railroad Commission of Texas regulations.

# Authorities

66 P.U.R.4th 140
Court of Appeals of Texas,
Austin.

AMTEL COMMUNICATIONS,
INC., et al., Appellants,
v.
PUBLIC UTILITY COMMISSION
OF TEXAS, Appellee.

Nos. 350,669, 14215.  |  Feb. 20, 1985.

Supplier of telephone-related equipment filed complaint against telephone company alleging that its tariff charges and certain of its business policies were discriminatory and anticompetitive. The Public Utility Commission denied relief, and supplier sought judicial review. The 250th Judicial District Court, Travis County, Harley Clark, J., affirmed, and supplier appealed. The Court of Appeals, Powers, J., held that: (1) Commission's findings demonstrated that it assessed implicit statutory criteria in arriving at decision that telephone company's exclusionary policy and tariff rates did not violate discrimination and anticompetitive provisions of the Public Utility Regulatory Act; (2) Commission's determination that telephone company's exclusionary policy and tariff system of equal rates based upon distance of concentrator from telephone company's main offices should not be altered was within zone of reasonableness; and (3) Commission's determination that supplier would suffer discrimination and anticompetitive disadvantage by reason of Commission's decision not to implement suggested remedies, but that effects were justified by contrary considerations was not outside zone of reasonableness.

Affirmed.

Gammage, J., filed concurring opinion.

**Attorneys and Law Firms**

 **\*97**  Brook Bennett Brown, McGinnis, Lochridge & Kilgore, Austin, for appellants.

Jim Mattox, Atty. Gen., Stephen J. Davis, Asst. Atty. Gen., Austin, for PUC.

Mike Willatt, Austin, for Texas Ass'n of Telephone Answering Services.

Robert J. Hearon, Graves, Dougherty, Hearon & Moody, Austin, for Southwestern Bell Telephone Co.

Before PHILLIPS, C.J., and POWERS and GAMMAGE, JJ.

**Opinion**

POWERS, Justice.

Amtel Communications, a supplier of telephone-related equipment, filed in the Public Utility Commission a complaint against Southwestern Bell Telephone Company, a public utility that supplies telecommunications services. In Amtel's complaint, it charged that the combined effects of Bell's tariff charges and certain of its business policies were discriminatory and anticompetitive, and therefore in violation of §§ 38, 45 and 47 of Tex.Rev.Civ.Stat.Ann. art. 1446c (Supp.1985), Public Utility Regulatory Act ("PURA"). Amtel requested **\*98** that the Commission amend Bell's tariffs and business policies, as necessary, to prevent the violations alleged. After a contested-case hearing, the Commission denied Amtel relief. Amtel sued for judicial review under PURA § 69. The district court affirmed the Commission's final order and this appeal ensued. We will affirm the judgment of the district court.

**THE CONTROVERSY**

Amtel manufactures and sells equipment that is purchased primarily by businesses engaged in providing a telephone-answering service for telephone subscribers. Among such equipment is a "concentrator." This article, when connected to link the telephones of a subscriber and his answering service, through Bell's telephone system, causes the telephones of the answering service and subscriber to ring simultaneously. After three rings, the absent subscriber's telephone may therefore be answered by his answering service. While Amtel successfully sells its concentrator in other States, it has been unsuccessful in selling them for use in Texas, owing, it is said, to the discriminatory and anti-competitive practices now to be described.

Bell owns and rents to answering services a make of concentrator it purchases from "Western Electric." Bell and Amtel thus compete in supplying concentrators to businesses that provide an answering service. Under Bell's business policies, it installs its concentrators adjacent to the "main frames" located in its central offices. Because of this

proximity, only very short connecting lines ("bridges") are required to connect the telephones of the subscriber and answering service through Bell's telephone system. On the other hand, another of Bell's business policies will not permit to be installed inside Bell's central offices any concentrator that Bell does not itself own and service. Consequently, if a telephone-answering service chooses to buy and use a concentrator supplied by Amtel, in lieu of renting one supplied by Bell, various and lengthy lines must be put in place *outside* the central office housing Bell's "main frame." The cost of doing so must be borne by the answering service electing to use an Amtel concentrator; but the cost does not arise at all if the answering service elects to rent a concentrator supplied by Bell, for no external lines need be installed in that case.

Whether the shorter internal lines are utilized for installation of a Bell concentrator, or the longer external lines required for an Amtel concentrator, the lines are put in place by Bell. Under Bell's tariff, on file with the Commission, the company is entitled to recover for the installation a sum determined by the length of line installed. Similarly, under the tariff Bell is entitled to recover for *use* of the lines a sum determined by their length. In the words of the parties, the charges for installation and use of the lines are therefore "distance sensitive" and work to increase considerably the cost of installing and using an Amtel concentrator, owing to the much longer external lines required for that make.

In summary, Amtel's concentrator may be used by an answering-service enterprise only if it is willing to bear the much higher cost associated with the installation and use of a concentrator supplied by Amtel. The result, of which Amtel complains, is a distinct competitive advantage enjoyed by Bell in supplying its make of concentrator to the answering-service market.

It is argued by Amtel that Bell's competitive advantage may be terminated in either of the following ways: (a) revising Bell's tariff charges to delete therefrom the "distance sensitive" charges, permitting instead a system of artificially equal charges for all makes of concentrators, a remedy the parties refer to as "parity"; or (b) requiring a change in Bell's business policies to permit concentrators not owned by Bell to be installed in its central offices adjacent to the "main frame", or perhaps requiring Bell to install its concentrators outside its central offices. These were urged as alternative remedies in the administrative proceedings we now review.

## *99  THE ADMINISTRATIVE PROCEEDINGS

After Amtel filed its complaint against Bell, the latter filed in the Commission a request that its tariffs be revised in certain particulars, including a request by Bell that the Commission establish a "parity" of pricing for the installation and use of the lines associated with concentrators, whatever their make. This independent proceeding was consolidated with that initiated by Amtel's complaint. After hearing, the Commission sustained Bell's request for tariff revisions, save for the "parity" pricing request, and denied Amtel relief under its complaint. Finding no violations of PURA §§ 38, 45 and 47, the agency refused to alter the "distance-sensitive" charges associated with the installation and use of concentrators; and, it refused to order a change in that aspect of Bell's business policies which permits only its own concentrators to be installed in its central offices adjacent to the "main frame."

The Commission's decision was based upon findings of fact and conclusions of law set forth and adopted in the Commission's final order. These may be summarized broadly as follows: (1) Bell's exclusionary policy rests upon valid business grounds and decisions with which the Commission should not interfere; (2) the cost-based system of "distance-sensitive" charges should not be revised in favor of "parity" owing to certain practical difficulties that make "parity" pricing unreasonable; and (3) under "parity" Bell would be permitted either an excessive recovery or an insufficient recovery. The latter theory—that Bell would recover too much or too little under "parity"—is apparently based upon a rationale that Bell's actual costs are unequal for the two classes of concentrator; therefore, the actual sums recoverable by Bell under a system of artificially equal charges ("parity") would allow Bell a sum far in excess of its lawful rate in the case of its own concentrators, and far below its lawful rate in the case of other makes of concentrators. The agency's findings, here summarized, will be discussed below at greater length.

## THE COMPETING PUBLIC POLICIES OF PURA

To properly understand Amtel's contentions on appeal, and our resolution of those contentions, it is essential to observe that PURA embodies distinctly contrary public policies which the Commission is charged to effectuate in its administration of that statute.

First, PURA requires that the Commission implement a public policy that the monopoly power of a public utility shall be held only under State license and exercised under State regulatory control. The statute requires, concurrently, that the agency implement a contrary public policy in favor of competition. Second, the Commission must under PURA implement a public policy against discrimination in utility services while, in some instances and in some degree, the agency may implement a policy of discrimination based upon the public interest.

These competing public policies are, in the present case, interwoven to a substantial degree. Their accommodation or adjustment is, of course, a matter charged initially and primarily to the special knowledge, experience, discretion, and well-considered policies of the Commission as it pursues all the legislative purposes implicit in PURA. *See generally* Patillo & Fields, *Antitrust and PURA: Look Before You Leap!,* 28 Baylor L.Rev. 1029 (1976); Zimmerman, *Overview: Competitive Principles in Regulated Industries,* 39 Antitrust L.J. 427 (1970); Hale & Hale, *Competition or Control V: Production and Distribution of Electric Energy,* 110 U.Pa.L.Rev. 57 (1961). Although the various public policies are interwoven in the present case, we shall separate them for purposes of discussion.

### *Monopoly Power vs. Competition*

The regulatory powers granted the Commission under PURA are quite extensive and are based upon the political decision that various utility services shall be supplied **\*100** the public under a government-regulated monopoly system (§ 2). The Commission's power extends to the fixing of just and reasonable rates for such services (§§ 38, 39), which itself necessitates that the Commission "fix proper and adequate ... methods of depreciation, amortization, or depletion of the several classes of property of each public utility" (§ 27(b)). The agency's power extends further to such matters as the fixing of standards, classifications, regulations, and practices dealing with the supplying of utility services (§ 35(b)); the general power "to ensure compliance with the obligations" of public utilities as set out in PURA (§ 37); the issuance of certificates of convenience and necessity, authorizing the rendition of utility service after considering certain factors (§ 54); the power to disallow a public utility's sale of its property or its contemplated merger with another public utility, depending upon where the Commission determines

the public interest lies (§ 63); and the power to cause the attorney general to enforce, by civil penalties or injunctions, any violation by a public utility of the prohibitions contained in PURA, or in any rule, regulation, or order promulgated by the agency (§§ 72–77).

The central assumption that utility services shall be provided under a publicly controlled monopoly is justified in PURA § 2, where it is stated that a public utility is, "by definition", a monopoly in respect of which "the normal forces of competition" do not operate to regulate the utility's prices and practices, necessitating that regulatory control "substitute for such competition." Consequently, the rates charged by a public utility are fixed not by it but by the Commission, and it is unlawful for the utility to charge, collect, or receive any sum except that allowed by the legal or official rate set by the Commission (§ 27). Similarly, the utility's services, instrumentalities, and facilities must be "safe, adequate, and reasonable" according to what the Commission fixes as "just and reasonable" (§ 35(a)). The central theme logically requires that competitive forces not be permitted to derange the official regulatory system of control. It is accordingly provided that the Commission may not issue a certificate of convenience and necessity to another public utility without first considering and assessing the effect such issuance might have "on any public utility of the same kind already serving the proximate area...." (§ 54(c)).

On the other hand, PURA contains other provisions that are distinctly "antitrust" in nature and reflect a definite public policy *in favor of competition* as a regulating or controlling force applicable to public utilities. In these particular instances, it is plain that PURA does *not* insulate a public utility from the forces of competition and, indeed, prohibits anticompetitive practices by the utility. For example, in the case of telecommunications utilities, PURA provides as follows in § 18:

> (a) It is the policy of this state to protect the public interest in having adequate and efficient telecommunications service available to all citizens of the state at just, fair and reasonable rates. The legislature finds that the telecommunications industry through technical advancements, federal, judicial and administrative actions, and the formulation of new communications enterprises has become and will continue to be in

many and growing areas a *competitive industry which does not lend itself to traditional public utility regulatory rules, policies, and principles; and that therefore, the public interest requires that new rules, policies, and principles be formulated and applied to protect the public interest and to provide equal opportunity to all telecommunications utilities in a competitive market place. It is the purpose of this section to grant to the commission the authority and the power under this Act to carry out the public policy herein stated* (emphasis supplied).

And in reference to *all* public utilities coming within the terms of the statute, § 47 of PURA specifically provides as follows:

> No public utility may discriminate against any person or corporation that **\*101** sells or leases equipment or performs services in competition with the public utility, *nor may any public utility engage in any other practice that tends to restrict or impair such competition* (emphasis supplied).

 **[1]**    Given these rather definite and clear pronouncements of competing policies, it cannot reasonably be doubted that the Legislature intended the Commission to make, where necessary and desirable in the particular case, whatever adjustments and accommodations it considers necessary to effectuate the public interests underlying *both* competition and monopoly power. They may conflict in the process of considering the issuance of a certificate of convenience and necessity under § 54; in the process of regulating "operations" and "services" under § 18(b); in enforcing the prohibition of § 47 through an action by the attorney general under §§ 71 and 72; or they may arise, as in the present case, in the complaint process authorized by § 83 of PURA, where they are interwoven with Bell's request for a revision of its tariffs. In whatever context they arise, it is the Commission's task to assess the competing policies and decide where the *public* interest lies, for nothing in PURA suggests a legislative intention to protect any utility's *private* interest against competition.

## Discrimination vs. Equal Treatment

 **[2]**    In a similar way, PURA demonstrates a central purpose that the Commission shall generally effectuate a public policy against discrimination, particularly in basic utility services. Other provisions imply, on the other hand, that in some circumstances discrimination may be in the public interest and there is, in such circumstances, actually a public policy in favor of discriminatory practices by a public utility regulated under the statute, even with regard to basic utility services.

There can be no doubt that PURA embraces the time-honored public policy *against* discrimination by a public utility in the services it provides. This is clearly seen in § 38 which provides as follows:

> It shall be the duty of the [Commission] to insure that every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable. Rates shall not be unreasonably preferential, prejudicial, or *discriminatory,* but shall be sufficient, equitable, and consistent in application to each class of consumers (emphasis supplied).

In § 42, it is provided that the Commission, if it finds that a utility's rates are discriminatory and therefore "in violation of [a] provision of law," shall determine a just and reasonable rate, to be thereafter the legal rate the utility may charge. Under § 45, a public utility is prohibited from making or granting "any unreasonable preference or advantage to any corporation within any classification, or subject any corporation or person within any classification to any unreasonable prejudice or disadvantage"; and, moreover, a public utility subject to PURA may not maintain or establish "any unreasonable differences as to rates or service either as between localities or as between classes of service." Finally, § 47 provides that a public utility may not "discriminate against any person or corporation that sells or leases equipment or performs services in competition with the public utility...."

 **[3]**    On the other hand, it is implicit in the Commission's power of *reasonable* classification granted in section 37, among other provisions, that *some* degree of discrimination may be in the public interest in *some* circumstances; and in such instances unequal treatment is neither a violation

of PURA nor a basis for invalidating agency actions and decisions. For example, in the matter of public utilities providing telecommunication services, the Commission must under § 18 decide *when* "traditional public utility regulatory rules, policies, and principles" do not lend themselves to regulating a competitive aspect of the operations, services, or practices of those particular utilities. Under §§ 37, 38, 40 and 45, the Commission must decide *when* different rates, preferences, or advantages become *unreasonable* **\*102** as between classes or within a class, and therefore unlawful. Under § 44, the Commission must decide *when and under what conditions* it will approve a difference between municipal and rural rates in excess of the 115% differential set by that section.

 **[4]**    **[5]**    The antidiscriminatory principle is not only statutory, it is a common law principle as well. *City of Texarkana v. Wiggins,* 151 Tex. 100, 246 S.W.2d 622 (1952). *But the principle includes a permissible range of unequal treatment which, while literally discriminatory, is not unlawfully so.* The dividing line is generally that drawn by the rule of reasonableness, for mere inequality is not itself unlawful discrimination. That is to say, the different treatment practiced by the public utility must be founded upon a substantial and reasonable ground of distinction between the favored and disfavored classes or individuals. *United Gas Corporation v. Shepherd Laundries Co.,* 144 Tex. 164, 189 S.W.2d 485 (1945). The ground of distinction may rest upon such factors as:

> the cost of service, the purpose for which the service or product is received, the quantity or amount received, the different character of the service furnished, the time of its use or any other matter which presents a substantial difference as a ground of distinction.

*Caldwell v. City of Abilene,* 260 S.W.2d 712, 714 (Tex.Civ.App.1953, writ ref'd), quoted with approval in *Texas Alarm & Signal Ass'n v. Public Utility Comm'n,* 603 S.W.2d 766, 772 (Tex.1980). "There is no rule of thumb by which to determine whether the conditions of utility service are similar or dissimilar. It is a question of fact to be determined from the testimony in each case, and the burden of proof is on the complaining party." *Ford v. Rio Grande Valley Gas Co.,* 141 Tex. 525, 174 S.W.2d 479, 480 (1943).

Within the range of possible distinguishing factors, there is included to some extent the achievement of social policies through utility regulation. In *Ford v. Rio Grande Valley Gas Co., supra,* the regulatory authority (a city) was permitted to make a valid distinction when it included canneries among its class of low-rate customers for the purpose of attracting new industry to the city. Notwithstanding a statutory prohibition against rate discrimination between consumers similarly situated or receiving the same kind of service, it has been held or recognized that a public utility may validly discriminate in favor of low-income or elderly persons. Rosenhouse, *Public Utilities: Validity of Preferential Rates for Elderly or Low-Income Persons,* Annot., 29 A.L.R.4th 616–18 (1984).

In addition to the rates charged by a utility for its services, discrimination may possibly be found in certain other practices of the utility wherein it may depart from the standard of impartial treatment. These practices include the utility's granting exclusive rights and privileges within the scope of its public duties; its requiring security deposits of some customers, but not all; and its affording different treatment in extending credit. *See generally* 64 Am.Jur.2d *Public Utilities* §§ 38–41 (1972). The various practices may or may not constitute *unlawful* discrimination according to the facts of the case. *Id.*

 **[6]**    In any case, the validating or invalidating criterion is generally that of *reasonableness* applied to the distinguishing feature relied upon as a justification for departing from equal treatment. Under PURA, the Commission is entitled to make the first evaluation, subject to judicial review, in an exercise of its judgment, special knowledge, and experience. *Texas Alarm & Signal Ass'n v. Public Utility Comm'n, supra,* at 772–73.

 **[7]**    **[8]**    Implicit in all of the foregoing is this: the principles of monopoly, competition, equal treatment, and discrimination are not absolute, but only relative and abstract principles evidencing competing public policies which PURA implicates in varying ways in the several functions of the Commission, such as ratemaking, the issuance **\*103** of certificates of convenience and necessity, and the enforcement of the mandates or prohibitions contained in PURA or in the rules or orders of the Commission. Such principles acquire meaning only in a particular factual context. It is not enough simply to show that a given utility practice results in unequal treatment. Bearing in mind these propositions, we turn to the specific points of error assigned by Amtel in the present appeal.

**AMTEL'S POINTS OF ERROR**

1. *The findings of fact upon which the Commission's final order rests are insufficient in that they do not include findings on the statutory criteria dispositive of the issues raised in the agency proceedings.* Amtel argues that the set of fact findings made by the Commission do not include findings responsive to the criteria implicit in PURA §§ 38, 45 and 47. We shall first state the criteria as we understand them.

Section 45 prohibits unreasonable discrimination by a utility as to rates or services and forbids a public utility to subject any corporation or person "to unreasonable prejudice or disadvantage." It is, in our view, primarily a prohibition against discriminatory practices by a public utility in the matter of rates or services.

 **[9]**   Section 47 forbids discrimination by a public utility against competing suppliers of equipment or services *and* prohibits "any other practice that tends to restrict or impair such competition." In our view, this section is rather plainly a prohibition against discrimination or any other practice that tends to restrict or impair competition between a public utility and the supplier of competing equipment or services. It is, therefore, primarily an antitrust provision applicable in the area of competing equipment and services, which may lie outside the area of basic utility services.

Section 38 imposes upon the Commission a duty to insure that its rates are just and reasonable and not unreasonably discriminatory. It is, therefore, primarily a standard applicable to the Commission in its setting of the rates permitted to be charged by a public utility.

Amtel complained to the Commission that Bell had, by the combined effect of its tariff rates and its business policies relative to concentrators, violated §§ 45 and 47; and if the Commission allowed Bell to maintain the discrimination or competitive disadvantage suffered by Amtel, in the tariff amendments requested by Bell, the Commission would violate its duty under § 38 to insure that Bell's rates were just and reasonable and not unreasonably discriminatory.

From PURA §§ 38, 45 and 47, we therefore infer the following "criteria" to which Amtel refers in its contention that they should have been the subject of agency findings of fact: (a) whether Bell's exclusionary policy and its tariff rates

constituted unreasonable discrimination (§ 45); (b) whether they constituted an unlawful restriction or impairment of competition (§ 47); and (c) whether the "distance-sensitive" charges permitted Bell resulted in rates that were unjust, unreasonable, and unreasonably discriminatory (§ 38).

The Commission's final order includes the following under the heading "conclusions of law":

(a) There was under the evidence adduced a reasonable basis for the difference in "rates" associated with the respective makes of concentrator. (Presumably the word "rates" refers to the *charges* permitted by Bell based upon length of line installed and used, derived from the rate applied thereto.)

(b) "The evidence ... shows that [Bell] has legitimate reasons for refusing open access to its central offices."

(c) The disparity in charges occasioned by Bell's exclusion policy and the "distance-sensitive" charges permitted by its tariffs do not "indicate" a violation of PURA §§ 38, 45 or 47, or any other provision of PURA.

(d) The "rates" charged the answering service for either make of concentrator,  **\*104**  and those charged "the ultimate customer," are "cost-based."

(e) "Setting rates at parity in this case would result in unreasonable rates which would discriminate against a class of customers by charging the class more than a service is worth."

(f) "To the extent parity pricing is allowed, it is inevitable that [Bell] will either under or overrecover its costs, and certain customers will pay more than their fair share, or will be subsidized by other customers...."

(g) If parity pricing is allowed, Bell "will also under or overrecover its authorized rate of return, which is prohibited by Sections 39 and 40(a) of" PURA.

(h) The portion of Bell's proposed tariff amendment requesting that "rates be set at parity for recurring charges is unreasonable, causes discrimination between classes, is not based on costs, and should be rejected ..."; and, it "is unnecessary and improper because of the previous conclusions of law that rates need not be set at parity in this docket."

The foregoing are obviously findings of ultimate fact quite properly classified by the Commission as "conclusions of law."

Under the heading "findings of fact", the Commission's final order sets forth the following, among others:

(a) Bell's exclusionary policy is justified by reasons of "security, control over persons not employed by [Bell] who may not be properly trained, damage to equipment caused by these employees, work rules dealing with safety, and fire codes"; and the cost of overcoming these should be borne by the customer providing a concentrator to be installed in a Bell building.

(b) The "Commission should neither require nor prohibit [Bell] from permitting the location of customer-owned concentrators or other equipment in [Bell's] buildings in order to leave the matter open for negotiation during the period of divestiture."

(c) "If parity pricing were to be required in this case, it would be necessary to establish a 'phantom' rental rate so as to treat all equipment as if it were the same."

These conclusory inferences, while denominated "findings of *fact*," appear rather plainly to be findings of *ultimate* fact because they too clearly imply the Commission's exercise of "discretion or judgment ... based on a multitude of factors." *Lewis v. Gonzales County Savings and Loan Ass'n,* 474 S.W.2d 453, 457 (Tex.1971). That is to say, they imply judgments reached by the agency as to the validity of Bell's exclusionary policy, whether the Commission should interfere with that policy, and why "parity" should not be ordered as a remedy to the complaint made by Amtel.

From the totality of these findings of ultimate fact, whatever the heading employed, it is evident that the Commission assessed and acted upon the statutory "criteria" we have extracted from PURA §§ 38, 45 and 47. In other words, it is manifest that the Commission *did* assess the criteria of (1) unreasonable discrimination, (2) anticompetitive practices, and (3) unjust, unreasonable, and unreasonably discriminatory rates, to conclude ultimately that no violation of PURA §§ 38, 45 and 47 was "indicated."

Nevertheless, we agree that these findings by the Commission do suggest, in our inexpert view of the matter, some defects in reasoning by the agency. For example, we do not understand

the finding that "parity" rates would either prevent Bell from recovering its costs or enable it to recover more than its costs. As we understand the theory of "parity" as advanced by the parties, it *would* allow Bell to recover the *aggregate* of its *actual* costs, notwithstanding that any artificially equal charges assigned both makes of concentrator might be high or low as compared to Bell's actual cost for installation and use of a particular make. The same may be said of the Commission's finding that "parity" charges would be "unreasonable." It can be so only in relation to some assumed premise or standard that is not stated explicitly as the basis for that conclusion. And when **\*105** we look at the findings of *basic* fact made by the agency and set forth in its final order, we find very little indeed to support the Commission's judgmental inference that an artificially equal charge is bad administrative policy in the circumstances and why it would result in unreasonably discriminatory rates "by charging [a] class more than a service is worth," as opposed to what the service costs. The word "worth" implies a value judgment, of course, in comparison to a standard that is not stated. We particularly do not find in the order any findings of basic fact suggesting a fair and reasonable support for the intriguing conclusion that the "Commission should neither require nor prohibit [Bell] from permitting the location of customer-owned concentrators or other equipment in [Bell's] buildings *in order to leave the matter open for negotiation during the period of divestiture*" (emphasis added). This conclusion suggests that the agency's deference to Bell's policy is in the nature of a temporary expediency not described in the agency's findings of basic fact.

In light of such defects, we would prefer at this point to remand the case to the agency in order that it might exercise its discretion, experience, special knowledge and administrative judgment in resolving these apparent defects in the set of ultimate facts which it found and upon which it apparently based its decision in the case. We are not reasonably satisfied that the Commission would have made the same decision based upon its remaining findings of ultimate fact.

We do not, however, write on a clean slate. We must explicitly and in good faith attempt to follow the precedent set by the Supreme Court of Texas in *Texas Health Fac. v. Charter Medical-Dallas,* 665 S.W.2d 446 (Tex.1984), even though we do not approve the reasoning and result of that opinion. An explanation is required.

The transcending aspects of the controversy in *Charter Medical* were that three applicants sought the agency's

authorization to erect and operate a health-care facility; each facility was proposed to be erected in the same vicinity north of Dallas; and all three proposed to provide substantially the same health-care services. Under applicable law, the agency was required to evaluate the competing applications by reference to five criteria: (1) whether the area population and health-care requirements demonstrated a "public need" for the proposed facility; (2) the economic feasibility of the proposed facility; (3) its relationship to existing services and facilities; (4) whether it would affect adversely any existing facility; and (5) whether there existed less expensive, more effective, or more appropriate alternatives to the proposed facility. *See Charter Medical-Dallas v. Texas Health Fac., 656 S.W.2d 928, 931–34 (Tex.App.1983),* rev'd 665 S.W.2d 446 (Tex.1984).

The agency determined that the facilities proposed by two of the applicants satisfied every criterion, but that the facility proposed by Charter Medical satisfied none of them. In its review of the grounds for such determinations, as expressed in the findings of fact made by the agency, the Supreme Court expressed doubt that the findings were sufficient to sustain the agency's conclusions on four of the five criteria as they related to its decision refusing to authorize the Charter Medical facility. 665 S.W.2d at 453. Nevertheless, the Supreme Court sustained the agency's decision because it felt that seven of the agency's 213 findings of fact relating to the criterion of "public need" justified *by themselves* the agency's determination that no such need existed for the facility proposed by Charter Medical. Only three of the seven findings of fact referred to by the Supreme Court were thought *by the agency* to relate to the "public-need" criterion: that the Charter Medical facility would not be near a general hospital; that it would be accessible only by private automobile and ambulance, but not public transportation; and that the "recreational facilities" which would form a part of the facility might not be built. *Cf.,* 665 S.W.2d at 453 and 656 S.W.2d at 939–44. The remaining four findings were: the Charter Medical **\*106** facility would not be near a general hospital; the evidence did not show a physician interest in the Charter Medical facility "similar to the interest expressed in the other two facilities ..."; the Charter Medical facility would duplicate the services of the other two facilities if they were authorized; and the projected occupancy rates for Charter Medical were not supported by competent evidence. 665 S.W.2d at 453. These four findings, *in the opinion of the agency,* bore not upon "public need" but upon the criteria of economic feasibility and the relation of the proposed facility to existing facilities and services. 656 S.W.2d at 945, 948.

The Supreme Court obviously considered the agency order to have serious logical deficiencies. Nothing in the agency order explained the apparently contradictory findings of ultimate fact that a "public need" existed for the two favored facilities but not for the third, when all three were proposed to offer the same services in the same vicinity. 665 S.W.2d at 452, 453. The Court's examination of the agency's findings of ultimate fact relative to the *other* four governing criteria resulted in grave doubt that these could support the agency's decision. 665 S.W.2d at 453. Only three of the 213 findings of basic fact which bore upon "public need" were considered valid by the Court, along with four others which the Court felt could relate to "public need" even though the agency felt they bore upon other criteria. The Court chose, nevertheless, not to remand the case but to *affirm* the agency order on a basis that the Court itself could construct a saving rationale from the seven valid findings of basic fact alone. *Id.* This necessarily overruled the holding of the Court of Appeals that a reviewing court could not affirm the order on such a basis; and it abrogates several generally accepted rules that apply to the judicial review of an administrative order which embodies a decision that the agency alone is authorized to make under applicable law— for example, a determination to issue a license, to set a utility rate, or to act on a complaint about utility services.

The first such rule is that a reviewing court "must judge the propriety of [agency] action solely by the grounds invoked by the agency." *Securities and Exchange Com. v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1946). If *those* grounds are improper, the reviewing court may not uphold the agency order on a theory that the agency's determination may be sustained on valid grounds not invoked by the agency in its order—for example a fragment of its findings of fact or a theory not expressed in the order. For the court to affirm the agency order on grounds or a theory not expressly invoked by the agency constitutes an intrusion by the court into the exclusive domain of the agency, that is, its right and duty to make the relevant determinations on grounds and a rationale considered sufficient *by the agency. Id.*

[10]  [11]  The second rule is a corollary of the first. The agency's order must clearly and explicitly set forth the ground upon which its determinations is based so that a reviewing court may know and understand that basis.

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying

the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States v. Chicago, M. St. P. & P.R. Co.,* 294 U.S. 499, 511 [55 S.Ct. 462, 467, 79 L.Ed. 1023] ...

*Securities and Exchange Com. v. Chenery Corp., supra,* at 196–97, 67 S.Ct. at 1577–78. *See generally* Davis, Administrative Law Text §§ 16.05–16.07 (1972). [1]

**\*107** **[12]** The agency order being *silent* as to the grounds upon which the agency acted in finding a "public need" for two of the facilities, but not the third, when all were proposed to provide substantially the same services in the same vicinity, the Supreme Court was not, under the general rule, free to supply the missing rationale. But it necessarily did so—and without revealing what the rationale was. Moreover, the Court's essential method of review in *Charter Medical* is unquestionably to the effect that the agency order must be upheld if the reviewing court is able to construct from any of the agency's *individual* findings of fact any ground or set of grounds which *the court* believes sufficient to "support" in a general way the determinations reached by the agency, even though the agency's order does not clearly and explicitly state those grounds or rationale in a way that is sufficient for the reviewing court to understand them, even though those "supporting" grounds be only a fragment of the whole set of grounds upon which the agency acted in the case, and even though other of the correlative grounds upon which the agency acted are of doubtful validity. We shall, therefore, attempt to apply in our evaluation of the present appeal the rather generalized style of judicial review laid down by the Supreme Court in its *Charter Medical* opinion. We nevertheless respectfully request the Supreme Court to reassess its views in these matters for they are of supervening importance to judicial review of the orders of Texas administrative agencies.

**[13]** Turning to the particulars of Amtel's first point of error, we observe that it is incorrect of Amtel to say that the Commission's final order does not *include* findings on the statutory criteria implicit in PURA §§ 38, 45 and 47. The Commission indeed *expressly* found that the prohibitions and requirements of those statutory provisions were *not* violated. Moreover, the general tenor of the remaining findings of ultimate fact is to explain in greater detail the validity of that conclusion.

Implicit in what we have said above is the proposition that the antidiscrimination and antitrust provisions of PURA are not absolute; nor, of course, are their opposites. Here, the Commission's findings of ultimate fact apparently reflect an agency theory, policy, or conclusion that the discrimination and competitive disadvantage suffered by Amtel are not unreasonable or unlawful *in light of other factors* clearly implicit in the findings made by the Commission:

(a) "Parity" is not an acceptable remedy for the discrimination and competitive disadvantage suffered by Amtel because it would, in the Commission's judgment, result in rates that are unreasonable, discriminatory, excessive, or insufficient with respect to one or the other class of concentrator users;

(b) The Commission should not interfere in regard to Bell's exclusionary policy in order to leave the matter "open for negotiation during the period of divestiture";

**\*108** (c) Bell's exclusionary policy is justified by reasons of safety, training, work rules and fire codes, which the Commission impliedly found to outweigh the contrary considerations of competition and discrimination;

(d) The difference in charges associated with the two makes of concentrator is based upon length of line installed and used, which is a reasonable ground of distinction in the Commission's judgment; and

(e) "Parity" would be an unreasonable remedy for the anticompetitive and discriminatory effects of which Amtel complains. (This finding apparently has reference to an exposition included by the agency in its final order, setting forth at length the agency's rationale. A part of that rationale includes the judgments that setting rates at "parity" would be a difficult administrative process given all the possible variables involved; "parity" can in any event be only a rough approximation and one of questionable value given the administrative effort and cost involved; and "parity" raises the spectre of "an unending cycle of proceedings to adjust [the applicable] rates to achieve parity where parity is not required" as an administrative policy under PURA.)

In summary, these findings are to the effect that sufficient grounds exist in the Commission's judgment for Bell's exclusionary policy and for not departing from the administrative policy of "distance-sensitive" rates. Even though there are logical defects in several of these findings,

they reflect that the Commission did assess the criteria implicit in PURA §§ 38, 45 and 47, to arrive ultimately at a decision that Bell's exclusionary policy and its tariff rates did not combine to constitute a violation of the prohibitions and directives contained in those sections of PURA. Notwithstanding the logical defects, no more was required of the Commission under the opinion of the Supreme Court in *Charter Medical.* We must therefore overrule Amtel's first point of error.

 [14]    2. *The Commission's final order rests upon policy considerations as opposed to the statutory criteria stated in PURA §§ 38, 45 and 47.* Before turning to the particulars of Amtel's arguments under its second point of error, we should observe generally that "administration" *is ordinarily defined* by the very fact that an agency *is* effectuating policy, primarily the policies settled upon and declared by a legislative body. These legislative policies are commonly expressed, of necessity, in the broadest possible terms, as in PURA § 38 where the Commission is enjoined to "insure that every rate made ... shall be just and reasonable." This is an expression typical of many where the legislature cannot itself make a choice between all possible lines of policy in all possible circumstances that may arise, and it therefore delegates to the agency, by necessary implication, a power to make the final detailed choices by *administrative policies* made within any general policy limits set by the legislature and the purposes behind the statute. Allowing administrative agencies to make and apply policies in its determination of contested cases has both advantages and disadvantages, but it is not forbidden so long as the agency acts within constitutional and statutory limits. *See generally* Landis, *The Administrative Process,* Ch. II, "The Framing of Policies: the Relationship of the Administrative and Legislative" (Greenwood Press 1974); Blachly and Oatman, *Administrative Legislation and Adjudication,* Ch. X, "Advantages of Administrative Adjudication" (Brookings Institution 1934); Jaffe, *Judicial Control of Administrative Action,* at 20–25 (Little, Brown & Co. 1965). Therefore, we must view Amtel's contentions as raising the issue of whether the Commission's final order is within the limits allowed by PURA §§ 38, 45 and 47. (It is not contended that the policies are unconstitutional.)

 [15]    Amtel argues the following: (a) the Commission's findings of fact demonstrate that its decision was based on a Commission policy favoring "distance-sensitive" rates over average rates ("parity") and not upon an analysis of "the evidence  **\*109**  ... according to the criteria set out

in Sections" 38, 45 and 47; (b) "cost is not a controlling criteria [sic] in setting rates", but the agency assigned controlling effect to that criterion in the present case; and (c) "[t]he Commission does not have discretion to ignore the statutory guidelines" established in PURA §§ 38, 45 and 47. One must agree, of course, with the last named proposition—the Commission was not free to "ignore" the criteria of PURA §§ 38, 45 and 47. One may agree as well with the second proposition that "cost" is not the sole criterion applicable to the case, for the exaggeration of a single criterion of several applicable to the case would constitute reversible error. *Federal Communications Commission v. RCA Communications,* 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953) (cause remanded to agency for further consideration where its decision rested solely on erroneous theory that competition was the controlling factor in determining "public interest", when competition is feasible).

We are then left with determining whether the Commission considered the factors implicit in PURA §§ 38, 45 and 47; whether it erred in favoring a policy of "distance-sensitive" rates; and whether it exaggerated the cost factor by giving it controlling effect when other factors were made applicable by PURA §§ 38, 45 and 47. We hold the Commission's final order demonstrates that the agency did assess the factors made relevant by those sections of PURA; it did not exaggerate the cost factor; and it acted on a demonstrably reasonable basis in not altering the system of "distance-sensitive" charges for installation and use.

As mentioned previously, the antidiscrimination and antitrust criteria of PURA §§ 38, 45 and 47 are not absolute. The Commission is allowed discretion and judgment in such matters for it is also required under the statute to implement the contraries of those public policies, as discussed at length in the first part of this opinion. Implicit in the Commission's findings of ultimate fact is the proposition that the agency's decision rests upon its considered judgment in adjusting the competing policies in the circumstances of the case.

 [16]    [17]    As correctly pointed out by Amtel, the Commission may make classifications, in a rate proceeding at least, based upon such factors as "the cost of service, the purpose for which the service or product is received, the quantity or amount received, the different character of the service furnished, the time of its use *or any other matter which presents a substantial difference as a ground of distinction.*" *Caldwell v. City of Abilene, supra,* (emphasis

added); *Texas Alarm & Signal Ass'n v. Public Utility Comm'n, supra.* We may assume that the same principle of *reasonable* classification implies that substantial differences may furnish a basis for other agency action which applies different treatment to different classes or individuals—here Bell and Amtel as competing suppliers of concentrators to telephone-answering services. We will further assume that where substantial differences *do* exist, as grounds of distinction, it is possible that an unreasonable application of the *same* rates may be discriminatory. *See State ex rel. Utilities Commission v. Edmisten,* 291 N.C. 424, 230 S.E.2d 647 (1976). That is, in our view, the issue made by Amtel's contentions in the present case. But *within the zone of reasonableness,* the application of the same rates to those in different circumstances would not be prohibited by any provision of PURA suggested to us.

 **[18]**    Here, the agency's findings of ultimate fact include those to the effect that: (a) "parity" would be an unreasonable remedy for reasons pointed out in another part of the agency's final order; and (b) Bell's exclusionary policy is founded upon valid business grounds. Together these suggest in the Commission's judgment that neither Bell's exclusionary policy nor the tariff system of equal rates based upon distance should be altered by the Commission. Such judgments are, of course, committed to agency discretion in the first instance and we are unable to say that the Commission's judgment in such matters lies outside the zone of reasonableness. It presumably **\*110** considered that the anticompetitive and discriminatory effects were offset by the deleterious administrative effects of "parity" rates and an administrative requirement that Bell immediately discontinue its exclusionary policy. We overrule Amtel's second point of error.

 **[19]**    3. *The Commission's final order is not supported by substantial evidence, and is contrary to law, insofar as it rests upon a determination that the remedies proposed by Amtel would be unlawful.* The "remedies" referred to in this point of error are three alternative suggestions made by Amtel as a means of removing the discrimination and competitive disadvantage suffered by Amtel: (a) "parity" of installation and use charges for the two makes of concentrators; (b) revision of Bell's exclusionary policy to permit the installation of other makes of concentrator in Bell's central offices; or (c) requiring Bell to place its concentrator's outside its central offices. The determination referred to is the Commission's conclusion of law that such remedies would result in rates that

are unreasonable, discriminatory, excessive, or insufficient. While Amtel states that this determination is not supported by "substantial evidence," its argument is not "evidentiary" at all. Rather, Amtel argues that the suggested remedies *would not, as a matter of law, have the unlawful effect* attributed to them by the Commission; and, in any event, no findings of basic fact demonstrate such unlawful effect.

Again, we find ourselves controlled by the rather generalized method of judicial review expressed and implied by the decision in *Charter Medical, supra.* We find that the Commission's final order contains findings of ultimate fact implying that Amtel *will* suffer discrimination and competitive disadvantage by reason of the agency's decision not to implement the remedies suggested by Amtel. But, in the agency's view, these ill effects are justified by contrary considerations established by *other* findings of ultimate fact. Again, we may not say that the agency's determination in that regard is outside the zone of reasonableness. We have discussed the same matters above and need not repeat them here. We overrule Amtel's point of error.

Finding no error as assigned, we affirm the judgment of the district court.

PHILLIPS, C.J., not participating.

GAMMAGE, Justice, concurring.

I agree that sufficient grounds exist in the Public Utility Commission's findings to sustain its final order; that the Public Utility Commission assessed the relevant criteria established in PURA in arriving at its determination; that the Commission acted reasonably within its discretion based upon its findings regarding these criteria; and that the record of the Commission proceeding contains substantial evidence to support the Commission's finding that Bell's exclusionary policy and tariff rates did not discriminate unlawfully against AMTEL. This is all that is necessary to our review. *Charter Medical-Dallas v. Texas Health Facilities Commission,* 665 S.W.2d 446 (Tex.1984). I therefore concur only in the affirmance of the judgment.

**Parallel Citations**

687 S.W.2d 95, 1985-2 Trade Cases P 66,725

Footnotes

1    It is, for several reasons, an obvious truism that a reviewing court "has neither the right nor the authority to lay out a *precise* form of findings to be made by" an administrative agency in a contested case.  *Texas Health Fac. v. Charter Medical-Dallas, supra,* at 452 (emphasis added). But this truism cannot mean that a reviewing court is entirely powerless with regard to the content of an agency's final order when it is made the subject of a suit for judicial review. The reviewing court must have at minimum the power to require that an agency's findings of fact and conclusions of law be set out in a manner that is *understandable* to the court, which is probably not technically trained in the area of the agency's expertise and experience, and *sufficient* to enable the court to perform its statutory duty of judicial review. The latter most often includes, of course, the court's task of deciding: (1) whether the agency *could* have inferred its findings of basic fact from the evidence adduced in the agency and included in the record as a whole; and (2) whether the agency's findings of basic fact *fairly and reasonably support* its conclusions of law. Unless the reviewing court has this limited power over the form and content of an agency's final order, the court as a practical matter lacks the power of judicial review altogether. But the limited power is necessarily implied in the very grant of the power of judicial review, for the reviewing court "must know what a decision means before the duty [arises] to say whether it is right or wrong." *United States v. Chicago, M. St. P. & P.R. Co., supra.* Conversely, it is a ludicrous exercise for a court to attempt to judge the validity of the order when it is not understandable.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

806 S.W.2d 791
Supreme Court of Texas.

M.D. ANDERSON, Jr., et al., Petitioners,
v.
CITY OF SEVEN POINTS, Tx. & Walter
Talliaferro, Mayor Pro Tem., Respondents.

No. C–9682.  |  Feb. 20, 1991.  |
Rehearing Overruled April 17, 1991.

Citizens filed petition for writ of mandamus, seeking to require mayor to hold election on question of abolishing city's corporate existence. The District Court Number 173, Henderson County, Tommy Wallace, J., granted petition. On review, the Tyler Court of Appeals, Twelfth Supreme Judicial District, —— S.W.2d ——, reversed and rendered judgment denying petition. On appeal, the Supreme Court, Hightower, J., held that: (1) citizens were not required to prove that mayor's refusal to grant their petition and order election was arbitrary and unreasonable, and (2) evidence was legally sufficient to support trial court's finding that petition requesting mayor to order election was signed by at least two thirds of qualified voters.

Reversed and remanded.

**Attorneys and Law Firms**

**\*792** Ronald D. Hinds, Reyna, Hinds & Crandall, Dallas, for petitioners.

Ronald R. Waldie, Seven Points, for respondents.

**OPINION**

HIGHTOWER, Justice.

 **[1]**  **[2]**  This is an *appeal* in an action for a writ of mandamus initiated in the trial court.[1] In 1988, a petition requesting that the mayor order an election on the question of abolishing the corporate existence of the city of Seven Points was submitted to the mayor. After the mayor refused to order the election, a group of citizens filed a petition for writ of mandamus. The trial court granted the petition for writ of mandamus and ordered the mayor of the city of Seven Points to order the abolition election. The court of appeals reversed

the judgment of the trial court and rendered judgment denying the petition for writ of mandamus. 805 S.W.2d 791. We reverse and remand this cause to the court of appeals.

In March 1988, a group of citizens (citizens) submitted a petition requesting that the mayor order an election on the question of abolishing the corporate existence of the city of Seven Points to the mayor. The petition contained the signatures of 207 persons. The mayor appointed a committee of three persons to study and evaluate the petition. Approximately six days later, the committee filed a report with the mayor and the city council. The report concluded that the petition contained the signatures of 176 qualified voters and that there were 358 qualified voters in the city of Seven Points "as close as can be determined." Based upon the report, the mayor **\*793** refused to order the election. Subsequently the citizens filed a petition for writ of mandamus and requested that the trial court order the mayor to order the abolition election.

At trial, the court, without a jury, heard conflicting testimony concerning the number of qualified voters in the city of Seven Points. Several witnesses testified that the number of qualified voters was between 240 and 260. The chairman of the committee appointed by the mayor to study and evaluate the citizens' petition testified that the total number of qualified voters was 358. In its findings of fact, the trial court found that the number of qualified voters of the city of Seven Points was less than 400 and that a petition signed by at least two-thirds of the qualified voters was submitted to the mayor. The trial court granted the petition for writ of mandamus and ordered the mayor (and anyone performing his duties and responsibilities) and the city of Seven Points "to perform all legal requirements for the holding of a valid election on the question of the abolition of the municipal corporate existence of the City of Seven Points and such election is to be held on the 6th day of May, 1989." The court of appeals, stating that the citizens failed to discharge their burden to present evidence that demonstrated that the mayor's refusal to grant the petition and order the election was arbitrary and unreasonable, reversed the trial court and rendered judgment denying the petition for writ of mandamus. 805 S.W.2d 791.

The citizens argue that they were not required to prove that the mayor's refusal to grant their petition and order the election was arbitrary and unreasonable. We agree.

 **[3]**  **[4]**  A writ of mandamus will issue to compel a public official to perform a ministerial act. *Womack v. Berry,* 156

Tex. 44, 291 S.W.2d 677, 682 (1956); *Turner v. Pruitt,* 161 Tex. 532, 342 S.W.2d 422, 423 (1961). An act is ministerial when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion. *Depoyster v. Baker,* 89 Tex. 155, 34 S.W. 106, 107 (1896); *Parrish v. Wright,* 293 S.W. 659, 663 (Tex.Civ.App.—Amarillo 1927, writ ref'd); *Lampson v. South Park Ind. School Dist.,* 698 S.W.2d 407, 423–24 (Tex.App.—Beaumont 1985, writ dism'd). Furthermore, a writ of mandamus will not issue to compel a public official to perform an act which involves an exercise of discretion. However, this rule is not without exception—a writ of mandamus may issue in a proper case to correct a clear abuse of discretion by a public official. *Womack v. Berry,* 291 S.W.2d at 682; *Dykes v. City of Houston,* 406 S.W.2d 176, 183 (Tex.1966). This case, however, does not involve an abuse of discretion by a public official but involves the performance of a ministerial act by a public official.

 **[5]** The petition requesting that the mayor order an election on the question of abolishing the corporate existence of the city of Seven Points was filed pursuant to section 62.002 of the Texas Local Government Code which states:

> (a) *The mayor of the municipality shall order an election on the question of abolishing the municipality's corporate existence* if a petition requesting that the election be held is submitted to the mayor and is signed by at least 400 qualified voters of the municipality. However, *if a majority of the qualified voters of the municipality is less than 400, the petition must be signed by at least two-thirds of the qualified voters of the municipality.*
>
> (b) The mayor shall order the election to be held on the same date as the next general election at which the office of mayor is to be filled.

TEX. LOCAL GOV'T CODE ANN. § 62.002 (Vernon 1988) (emphasis added). Section 62.002 spells out the act to be performed by the mayor with sufficient certainty so that nothing is left to the exercise of discretion. Once the trial court determined that a majority of the qualified voters was less than 400 and the petition was signed by at least two-thirds of the qualified voters, the mayor had no discretion; therefore the act became ministerial and the trial court was required to grant the **\*794** petition for writ of mandamus and order an election on the question of abolishing the city's corporate existence. Thus, under the facts and circumstances of this case, we hold that the citizens were not required to

prove that the mayor's refusal to grant their petition and order the election was arbitrary and unreasonable.

The remaining issue before this court is whether the evidence is legally insufficient to support the trial court's finding that the petition was signed by at least two-thirds of the qualified voters. Before we consider this issue, however, we must determine whether the trial court's finding that the petition was signed by at least two-thirds of the qualified voters is reviewable for legal sufficiency of the evidence.

 **[6]**   **[7]**   In its findings of fact, the trial court found, among other things, that the number of qualified voters of the city of Seven Points was less than 400 and that a petition signed by at least two-thirds of the qualified voters was submitted to the mayor. In the court of appeals, the city of Seven Points asserted a point of error complaining that the evidence is legally insufficient to support the trial court's finding that the petition was signed by at least two-thirds of the qualified voters. Findings of fact in a case tried to the court have the same force and dignity as a jury's verdict upon questions. *L.R. French v. Diamond Hill Jarvis Civic League,* 724 S.W.2d 921, 922 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.); *Reyes–Retana v. PTX Food Corp.,* 709 S.W.2d 695 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.). The trial court's findings of fact are reviewable for legal (and factual) sufficiency of the evidence by the same standards as applied in reviewing the legal (and factual) sufficiency of the evidence supporting a jury's finding. *Creative Mfg., Inc. v. Unik, Inc.,* 726 S.W.2d 207, 210 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.); *Okon v. Levy,* 612 S.W.2d 938, 941 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.). Under these circumstances, we are unable to ascertain why a trial court's finding of fact in a petition for writ of mandamus should be subject to a different standard of review than any other finding of fact by a trial court. Therefore, we hold that the trial court's finding that the petition was signed by at least two-thirds of the qualified voters is reviewable for legal sufficiency of the evidence. [2]

 **[8]**   We now consider whether the evidence is legally insufficient to support the trial court's finding that the petition was **\*795** signed by at least two-thirds of the qualified voters. In making this determination, we consider only the evidence and inferences tending to support the trial court's finding and disregard all evidence to the contrary. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). If there is any evidence of probative value to support the trial court's finding that the petition was signed by at least two-thirds of the

qualified voters, we must find that the evidence is legally sufficient. *In re King's Estate,* 150 Tex. 662, 664–65, 244 S.W.2d 660, 661–62 (1951). [3]

 **[9]**  At trial, the court heard conflicting testimony concerning the number of qualified voters in the city of Seven Points. Several witnesses for the citizens testified that the number of qualified voters was between 240 and 260. Mr. M.D. Anderson, Jr., a former city councilman and a resident of the city since 1975, has actively campaigned for a local option election and for several city council elections. Mr. Anderson has gone door-to-door during these elections and has looked at every piece of property in the city. He testified that the total number of qualified voters when the petition was submitted to the mayor was between 240 and 260. Ms. Virginia Springer has been a resident of the city since 1973. Based upon her comparison of voter registration lists from former municipal elections and current voter registration information from certain precincts in the city, she testified that the total number of qualified voters in the city was between 247 and 250. The petition submitted to the mayor contained the signatures of 207 persons. However, the mayor's report concluded that the petition contained the valid signatures of 176 qualified voters and the court of appeals concluded that the petition contained the valid signatures of 198 qualified voters. Under these facts and circumstances, we hold that there is some evidence that the petition was signed by at least two-thirds of the qualified voters.

The City of Seven Points also asserted a factual insufficiency point of error in the court of appeals; however, the court of appeals sustained the point based upon its erroneous conclusion that the citizens failed to discharge their burden to present evidence that demonstrated that the mayor's refusal to grant the petition and order the election was arbitrary and unreasonable. Since we hold that the citizens were not required to prove that the mayor's refusal to grant their petition and order the election was arbitrary and unreasonable, we remand the cause to the court of appeals for reconsideration of the factual insufficiency point of error.

For the reasons explained herein, we reverse and remand this cause to the court of appeals.

## Footnotes

1    This is an appeal from an original proceeding for a writ of mandamus initiated in the trial court which is different from an original proceeding for a writ of mandamus filed in an appellate court. An original proceeding for a writ of mandamus initiated in the trial court is a civil action subject to trial and appeal on substantive law issues and the rules of procedure as any other civil suit:

> The relief sought to be effected through its aid is asked, as in any other case, by a petition alleging the facts by virtue of which it is claimed, with a prayer for such judgment as the facts warrant. The defendant is served and required to answer as in any other suit, and the case proceeds to trial and judgment as any other action, and there is no distinguishable difference in principle in the course of proceeding and result attained in it and any other suit in the District Court. When the judgment is rendered by the court, unless superseded or suspended by writ of error or appeal, it is carried into effect by the appropriate writ....

> * * * * * *

> And as this court has appellate jurisdiction in all manner of pleas, plaints, motions, causes and controversies, which may be brought before it from the District Court, we think it clear that the right of this court to review the judgment of the District Court cannot be denied. It must follow, as no distinction is made by the law authorizing an appeal in this and other cases, that the judgment of the District Court may be superseded by an appropriate bond for this purpose, pending the appeal in this court.

> *Griffin v. Wakelee,* 42 Tex. 513, 516 (1875). *See Hughes v. McDonald,* 122 S.W.2d 366, 370 (Tex.Civ.App.—Austin 1938), *rev'd on other grounds,* 137 Tex. 21, 152 S.W.2d 327 (1941). An original proceeding for a writ of mandamus filed in an appellate court is governed by the unique requirements of Rule 121 of the Texas Rules of Appellate Procedure. TEX.R.APP.P. 121. *See Jannise v. Cain,* 759 S.W.2d 958, 960 (Tex.App.—Beaumont 1988, no writ). Furthermore, the granting of a writ of mandamus by a court of appeals may not be appealed to this court but is reviewable by writ of mandamus filed in this court. *See Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917–18 (Tex.1985).

2    Relying upon *Deal v. Bonner,* 700 S.W.2d 721 (Tex.App.—Beaumont 1985, no writ), the citizens argue that the standard of review on appeal in this case is whether the trial court abused its discretion in granting the petition for writ of mandamus. We disagree. Once the trial court determined that a majority of the qualified voters was less than 400 and the petition was signed by at least two-thirds of the qualified voters, the mayor had no discretion and the act became ministerial. Furthermore, under these circumstances, the trial court had no discretion and was required to grant the petition for writ of mandamus. If the trial court had not granted the petition for writ of mandamus, it would have committed reversible error. Similarly, if the trial court determined that a majority of the qualified voters was less than 400 and the petition was *not* signed by at least two-thirds of the qualified voters, the trial court would have no

discretion and would be required to deny the petition for writ of mandamus. Under those circumstances, if the trial court had not denied the petition for writ of mandamus, it would have committed reversible error.

In *Deal v. Bonner,* a petition requesting an election on the question of abolishing the corporate existence of the city of Hudson was submitted to the mayor. After the mayor refused to order the election, a group of citizens filed a petition for writ of mandamus. After finding that the citizens' petition requesting an election was signed by more than 400 qualified voters, the trial court granted the petition for writ of mandamus and ordered the mayor to order the abolition election. 700 S.W.2d at 722. Among other things, the court of appeals, in dicta, stated "that appellate courts were reluctant to overturn district judges, either in the granting or refusing of a writ of mandamus, unless a clear abuse of the trial judge's discretion was lucidly demonstrated." *Id.* at 724. Since we are unable to ascertain why a trial court's finding of fact in a petition for writ of mandamus should be subject to a different standard of review than any other finding of fact by a trial court and we hold that the trial court's finding that the petition was signed by at least two-thirds of the qualified voters of the city of Seven Points is reviewable for legal sufficiency of the evidence, we disapprove *Deal v. Bonner* to the extent that it conflicts with this opinion.

3     Legal insufficiency challenges may only be sustained when the record discloses (1) a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, and (4) the evidence established conclusively the opposite of the vital fact. *See* Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX.L.REV. 361, 362–63 (1960).

---

     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

32 S.W.2d 685
Court of Civil Appeals of Texas, Austin.

CITY OF AUSTIN ET AL.

v.

DEATS. [a1]

No. 7500.   |   Oct. 29, 1930.   |
Rehearing Denied Nov. 19, 1930.

Appeal from District Court, Travis County; George Calhoun, Judge.

Suit by Paul M. Deats against the City of Austin and others. From a decree for plaintiff, defendants appeal.

Affirmed.

**Attorneys and Law Firms**

**\*686** J. Bouldin Rector, A. L. Love, and Geo. E. Shelley, all of Austin, for appellants.

Jno. W. Hornsby and Stanley C. Hornsby, both of Austin, for appellee.

**Opinion**

BLAIR, J.

An ordinance passed by the city of Austin reads, in part, as follows:

"Sec. 1. That it shall be unlawful for any person to erect, construct, build, operate or maintain any gasoline filling station within the corporate limits of the City of Austin without having first obtained a permit for such purpose from the City Council.

"Section 2. That the term 'gasoline filling station' as used in Sec. 1 of this ordinance is hereby defined to be a place or building where gasoline or other explosive oils are sold to the public or supplied to owners or drivers of automobiles from such place or filling station.

"Section 3. That in granting or refusing the permit provided for in Sec. 1 of this ordinance, the City Council shall take into consideration the place where such filling station is proposed to be established, its contiguity to other buildings and residences, the explosive character of the gasoline and oils to be used or sold at such filling station, the location of public buildings, schools and places of public resort with reference to the location of such filling station, the character and condition of public traffic on the streets immediately contiguous and in the neighborhood of such proposed station, the hazards presented by the use of the sidewalks as a means of ingress and egress to such filling station, the liability of such filling station to become a nuisance or offensive to the inhabitants or occupants of buildings or residences adjacent thereto or in the neighborhood thereof, the length of time that existing filling stations have been in operation and the consent to or acquiescence in and location by the occupants or owners of the adjacent buildings or residences.

"Section 4. That any person who may violate any provisions of this ordinance shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined any sum not less than $10.00 nor more than $200.00 and each day's violation of any of the terms of this ordinance is hereby declared to be a distinct and separate offense and punishable as such."

Appellee made various applications for a permit to construct a gasoline filling station on his property at the intersection of Rio Grande and Nineteenth streets, which were refused; and he instituted this proceeding for a mandamus to compel the issuance of the permit and to enjoin the city and its officials from interfering with him in the construction and operation of the gasoline filling station, alleging: (a) That, assuming the ordinance to be valid, the refusal of his permit under the facts was arbitrary and constituted an unfair and unjust discrimination against him; and (b) that the ordinance deprived him of his property without compensation and took it without due process of law, and denied him equal protection of law, in violation of both federal and state Constitutions.

The case was tried without a jury and the trial court found: (a) That appellants acted arbitrarily in refusing appellee's permit, and were "guilty of an unfair and unjust discrimination" against him under the facts; and (b) that the ordinance was invalid on its face, "for the reason that said ordinance attempts to authorize and empower said city council to prejudge and declare a legitimate business a nuisance per se, without regard to whether it was in fact, and before such business has come into existence; and because such ordinance would deprive the plaintiff of the lawful use of his property, which is a deprivation of the property itself, without due process of law guaranteed under both the federal and state constitutions." Appellee was awarded a permanent injunction against appellants as prayed; hence this appeal.

The evidence shows that appellee first made application for the permit April 27, 1927, about three months prior to the enactment of the ordinance; and since its enactment he has made several applications for the permit; all of which have been refused by the city council without any reason being given for such refusal; and in some instances the city council delayed passing upon the applications without any excuse for such delay. The city council did not give to appellee a hearing on any of his applications. The evidence is also undisputed that the city council had both before and after the passage of the ordinance granted several permits to other persons to locate gasoline filling stations of a type similar to that appellee desired to construct on the same street and at points which came more nearly within the inhibitions specifically enumerated in the ordinance. The same was also shown to be true with respect to permits granted to other persons on other streets in the city, both before and after the passage of the ordinance. The city council was not shown to have at any time heard any evidence concerning the question of whether the operation of appellee's filling station might be reasonably expected to constitute a nuisance; nor was it shown that any person owning a residence or business in the immediate vicinity of appellee's property ever **\*687** protested or made any complaint with regard to the construction of the filling station; and the only evidence appellants offered on the trial of the case in the district court was that of its city engineer, who testified that the construction of the filling station at the point in question would tend to increase traffic hazards; but admitted that the city council had granted permits to others on the same street, which, as regards traffic hazards, were "in a more aggravated form." Appellee's witness controverted the city engineer's testimony on the issue of increased traffic hazards. The evidence also shows that appellee offered to set his property line or curb back ten feet in order to offset traffic hazards. The evidence showed that appellee's property was of greater value for a filling station than for a residence, for which purpose it had been theretofore used. The agreed facts showed that on Nineteenth street, beginning on the block where appellee's property was situated and extending east six contiguous blocks, there were thirteen various business institutions, including several filling stations of the kind appellee proposed to construct and operate. A real estate agent of long standing and familiar with the conditions in Austin, testified that Nineteenth street was now practically a business street within the distance of the six blocks, and that it would eventually become so entirely.

**[1] [2]** Appellant's first contention is that the evidence above detailed fails to show that the refusal of the permit was arbitrary or discriminatory; but to the contrary shows that its

refusal was a reasonable exercise of the discretionary powers vested in the city council, as regards such matters; and that this is especially true, in view of the rule that the exercise of such discretionary powers by the city council is not subject to judicial review, in absence of clear evidence that such discretion has been abused. We have reached the conclusion that the evidence supports the findings of the trial court that the action of the city council in refusing the permit was arbitrary and constituted an unfair and unjust discrimination against appellee; and that these findings are binding upon this an appellate court. Cain v. City of San Antonio (Tex. Civ. App.) 28 S.W.(2d) 190. The city council dilly-dallied with appellee's applications for the permit, and then refused them without giving any reason for the action. It granted permits to other persons to locate gasoline filling stations on the same street and at points which come more nearly within the inhibitions specifically enumerated in the ordinance, and at no time gave appellee a hearing on his applications. The evidence detailed supports the trial court's findings, and was sufficiently clear to show an abuse of the council's discretion in the matter.

**[3]** Nor do we sustain appellants' contention in this connection that the acts of the city council are immaterial in granting permits to other persons at points on the same street and on other streets, on the question of whether the city council acted arbitrarily in the matter. Appellants cite, in support of this contention, the case of Zucht v. King (Tex. Civ. App.) 225 S. W. 267; Riggs v. City of Hot Springs, 181 Ark. 377, 26 S.W.(2d) 70; Chimene v. Baker, 32 Tex. Civ. App. 520, 75 S. W. 330. But these cases are not in point; they simply hold that the acts of the city council in granting or refusing such permits are not to be considered in arriving at the validity or invalidity of a particular city ordinance. The question here is the authority of the courts to review the action of a municipal corporation exercising its police power to determine whether it has acted reasonably or arbitrarily in the premises.

Appellants' second contention is that the various acts of the city council in refusing appellee's application for a permit and in granting the permits to others similarly situated to appellee were immaterial, and afforded no reason for the granting of the injunction, if in fact the council's action was a reasonable exercise of its discretionary powers. This proposition merely states the question above discussed in another way. However, it is based upon appellants' special answer that, because of the construction and operation of the particular filling station at the point in question, it would tend to increase traffic hazards;

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

to interfere with lighting of the streets; to obscure the view of persons traveling on the streets; create additional violations of the traffic laws; interfere with citizens in the use of their nearby residences; increase the fire hazard by storage of oil and gasoline and other inflammables on the premises, thereby creating a nuisance, which the city under its police power had the right to regulate and control, in aid of and as promoting the public health, safety, or welfare of its inhabitants.

The trial court specifically found on all these issues contrary to appellants' contention, and that the construction and operation of the gasoline filling station under the evidence adduced did not create a nuisance, nor interfere with the public health, safety, nor welfare of the citizens of Austin, as alleged by appellants. In this connection, appellants further contend that, since there was a conflict in the evidence as to whether the construction and operation of the filling station would constitute a nuisance, the action of the city council in the matter was conclusive upon the courts, unless the acts of the city council were clearly arbitrary. We have already disposed of the question that the council acted arbitrarily. As supporting this contention, appellants cite the cases of Heckman v. City of Independence, 127 Kan. 658, 274 P. 732; Huddleston v. Burnett, 172 Ark. 216, 287 S. W. 1013; **\*688** Wood v. City of Chickasha, 125 Okl. 212, 257 P. 286. A careful examination of these cases shows they merely hold that, while a city may not declare by ordinance a lawful business to be a nuisance per se, it may do so upon proof that it may reasonably become a nuisance by operation; and that neither a trial court nor an appellate court, reviewing the action of a municipal corporation exercising police power upon sufficient evidence that a business may reasonably become a nuisance by operation, will disturb the action of the municipal corporation. In other words, these

cases follow the well-settled rule announced in 7 R. C. L. (permanent supplement) 4714, § 112, as follows: "The judicial department of the government has authority to review the action of a municipal corporation exercising the police power, and restrict it to what is reasonable. Pearson v. Twohy Bros. Co., 113 Oregon, 230, 231 P. 129, 36 A. L. R. 1113." See also Ex parte Adlof, 86 Tex. Cr. R. 13, 215 S. W. 222; Invader Oil Co. v. Ft. Worth (Tex. Civ. App.) 229 S. W. 616; Bowie v. Painter (Tex. Civ. App.) 255 S. W. 498.

A complete answer of this contention of appellant will also be found in the fact that the city council did not base their refusal of the permit upon any hearing or evidence which tended to show that the filling station would reasonably become a nuisance by operation.

Our above holding that the city council acted arbitrarily and unreasonably in refusing appellee's permit to construct the filling station disposes of the entire case, and it is not necessary that we pass upon the constitutionality of the ordinance in question. However, in passing, we find that similar ordinances have been upheld in numerous cases by the Courts of Civil Appeals in this state and by courts in other states. The following cases are now pending in the Supreme Court on writ of error involving the constitutionality of ordinances similar to the one in question: City of San Antonio v. Thompson (Tex. Civ. App.) 23 S.W.(2d) 796; City of Wichita Falls v. Continental Oil Co. (Tex. Civ. App.) 5 S.W.(2d) 561.

We find no error in the trial court's judgment, and it is affirmed.

Affirmed.

Footnotes

a1    For opinion denying second motion for rehearing, see 34 S.W. (2d) 917.

---

45 S.W.2d 692
Court of Civil Appeals of Texas, Austin.

CITY OF AUSTIN

v.

NELSON.

No. 7628.    |    Nov. 4, 1931.

Appeal from District Court, Travis County; George Calhoun, Judge.

Suit by J. H. Nelson against the City of Austin. Judgment for plaintiff, and defendant appeals.

Affirmed.

**Attorneys and Law Firms**

**\*692**  J. Bouldin Rector, A. L. Love, and Geo. E. Shelley, all of Austin, for appellant.

Hart & Patterson, of Austin, for appellee.

**Opinion**

BLAIR, J.

This litigation arose out of the following facts: Section 1 of an ordinance of the city of Austin makes it unlawful for any person to erect, maintain, and operate any gasoline filling station within its corporate limits without first obtaining a permit from the city council. Section 2 defines the term "gasoline filling station" as used in the ordinance. Section 3 reads as follows: "That in granting or refusing the permit provided for in Section 1 of this ordinance, the City Council shall take into consideration the place where such filling station is proposed to be established, its contiguity to other buildings and residences, the explosive character of the gasoline and oils to be used or sold at such filling station, the location of public buildings, schools and places of public resort with reference to the location of such filling station, the character and condition of public traffic on the streets immediately contiguous and in the neighborhood of such proposed station, the hazards presented by the use of the sidewalks as a means of ingress and egress to such filling station, the liability of such filling station to become a nuisance or offensive to the inhabitants or occupants of buildings or residences adjacent thereto or in the neighborhood thereof, the length of time that existing filling stations have been in operation and the consent to or acquiescence in and location by the occupants or owners of the adjacent buildings or residences."

Section 4 prescribed the penalties for violation of the ordinance.

Appellee applied to the city council for a permit to erect, maintain, and operate a gasoline filling station on his property at the intersection of Rio Grande and Nineteenth streets, the station to be erected under the usual, ordinary, proper, and reasonable regulations and directions of the city council with respect to plans and specifications, and the kind and character of material; and to be constructed in accordance with the usual and customary regulations for protection against hazards of the filling station business; and in all respects and details complying with  **\*693**  the rules and regulations of the city of Austin for the erection and maintenance of a gasoline filling station. At a regular meeting of the city council, the application was "read and referred to the Safety Committee for their recommendations." This committee was composed of the captain of traffic police, the fire chief, the fire marshal, and the city engineer. The captain of traffic police made a written report of his investigation to the city engineer, and recommended that the permit be not granted because the intersection of the two streets in question was irregular and "on a sloping hill" and "detrimental to traffic, and creates a hazard to a certain degree * * * due to the street car line being on Rio Grande, and the narrow width of Rio Grande north of 19th and the destruction to the view of traffic which is going east on 19th, turning north on Rio Grande, * * * the hazard would be created in cars entering and leaving the station." The fire chief and fire marshal made the following report of their investigation to Adam R. Johnson, city manager: "We cannot recommend the granting of this permit, as the location is in a strictly residential district, and that it is a recognized fact that where gasoline is handled or stored, that there always exists a fire hazard as well as the chance of an explosion, even with the best of approved appliances. We do not think that this type of business should be carried on in a district that is strictly residential."

The city engineer made the following report to Adam R. Johnson, city manager: "As a member of the Safety Committee I do not recommend the granting of a permit for a filling station at the northeast corner of Nineteenth and Rio Grande Streets on account of the increased hazard which will be caused by the proposed use of the property."

On May 22, 1930, the chief clerk of the city of Austin wrote appellee as follows: "This is to advise that your application to erect gasoline filling station on Lot 6, Outlot 23, Division 'D', was read at the Council meeting this morning, and, as is the rule in such matters, same will lie over for one week before being acted upon."

On May 29, 1930, the city council passed the following order: "The Mayor laid before the Council reports of the Safety Committee upon the application of J. H. Nelson to erect a gasoline filling station at the northeast corner of Nineteenth and Rio Grande Streets, and Councilman Pannell moved that in view of the adverse report of said Committee, permit for said gasoline filling station be denied. Motion was seconded by Councilman Steck, and same prevailed by the following vote: Ayes, Mayor McFadden, Councilmen Pannell, and Steck, 3; nays, none; Councilmen Mueller and Reed absent."

On May 29, 1930, the chief clerk wrote appellee as follows: "The City Council, at its meeting today, voted to deny your application for a filling station at 19th and Rio Grande Streets on account of same being in a residential district, and also the hazard to traffic that would be created at this point."

Upon receipt of this notice, appellee instituted this suit for a mandatory injunction to require the city council to issue him a permit to erect, maintain, and operate a gasoline filling station on his lot of land at the corner of Rio Grande and Nineteenth streets, and to perpetually restrain and enjoin the city of Austin, its officers, agents and employees, from interfering in any manner with appellee or his agents and employees in the construction, maintenance, and operation of the proposed gasoline filling station, alleging: (a) That the refusal of his permit under the facts pleaded was arbitrary, and constituted an unfair and unjust discrimination against him; and (b) that the ordinance in question deprived him of his property without compensation, and took it without due process of law, and denied him equal protection of law, in violation of both federal and state Constitutions.

The trial was to the court without a jury, and the court found and concluded: (a) That the city council acted arbitrarily in refusing appellee's permit, and was guilty of an unfair and unjust discrimination against him under the facts pleaded and proved; and (b) that the ordinance was invalid on its face, in that it authorized and empowered the city council to prejudge and declare a legitimate business a nuisance per se without regard to whether it was so in fact, and before the business had come into existence; and because such ordinance deprived appellee of the lawful use of his property without due process

of law; and appellee was awarded a permanent injunction against the city of Austin and its officers, servants and agents, from interfering in any manner with appellee or his agents, servants and employees, in the erection, maintenance, and operation of the proposed gasoline filling station in compliance with all the legal and valid building ordinances of the city of Austin; hence this appeal.

On the issues of whether in refusing appellee's permit the city council acted arbitrarily and unfairly and unjustly discriminated against him, the trial court made the following findings of fact:

"The Court finds as a fact that the defendants, acting as City Councilmen of the City of Austin arbitrarily refused the application of the plaintiff, J. H. Nelson, for a permit to erect and operate a filling station on his property at the Northeast corner of West 19th and Rio Grande Streets in the City of Austin, Texas, * * * said property and premises being known as No. 606 West 19th Street, Austin, Texas.

**\*694** "The Court further finds that said 19th Street between Congress Avenue and Rio Grande Street is a business street in that there are a number of filling stations and other business houses on said 19th Street between the points stated, and that the particular location on which the plaintiff seeks to erect a filling station is not more hazardous, but that the traffic hazards at said point are less than the traffic hazards at other places for which filling station permits have been granted.

"The Court further finds that the erection of a filling station on plaintiff's property at the intersection of said 19th and Rio Grande Streets according to the plans and specifications of said filling station submitted by plaintiff to the defendants will lessen the traffic hazards at the intersection of said streets.

"The Court further finds that the traffic at the corner of 19th Street and Rio Grande Street is not as heavy as the traffic at the corner of 19th and Congress Avenue, 19th and Lavaca Streets, and 19th and Guadalupe Streets, and that the City Council has granted permits for filling stations and other businesses at said street intersections.

"The Court further finds that the location at the corner of 19th Street and Rio Grande Street is not as near to residences and is not as near to public buildings, schools, or places of public resort, and that the traffic conditions contiguous to and in the neighborhood of the said lcation are not greater but less than at some other filling stations for which said City Council has granted permits.

"The Court further finds that the offset in Rio Grande Street does not seriously interfere or prevent persons using said street from observing other persons coming from opposite direction, and that the trees at said intersection, the grades of said streets nor the sidewalks seriously obstruct the view of traffic at said place, and that the traffic which now uses said streets, with such traffic as might be added thereto by the erection of a filling station thereon, would not constitute a public nuisance.

"The Court further finds that the motor vehicle using said filling station and entering at an angle as is generally done at other filling stations for which permits have been granted by the said City Council and the manner said filling station is to be construced, does not render this particular location any more hazardous than other filling stations similarly located, and that the erection and construction of said filling station in the manner proposed will lessen the traffic hazard at said location.

"The Court further finds that the erection of a filling station upon the location specified will not increase the fire hazards any more than does other filling stations generally located throughout the City of Austin and would not constitute this particular filling station a public nuisance, and that the erection and operation of a filling station at said location would not increase the violations of the traffic laws any more than other filling stations similarly located in the City of Austin, and that by reason of these facts the City Council of the City of Austin has been guilty of an unfair and unjust discrimination against the plaintiff."

"The Court further finds that Rio Grande Street is paved, has upon it a street railway and the property abutting thereon from 6th to 19th Street is occupied by residences, business and boarding houses; that the property abutting on 19th Street from Congress Avenue to Rio Grande Street is occupied by filling stations, other business houses, residences and boarding houses; and that plaintiff's property by reason of its location and close proximity to other filling stations and business houses on 19th street has a special business value and is of much greater value for business purposes than for residence purposes."

[1]    The city of Austin contends that the evidence shows that it did not act arbitrarily or discriminatorily in refusing appellee a permit; but to the contrary shows that the city council fairly and reasonably exercised its discretionary power to enforce the valid ordinance in question, in view of the facts and investigation upon which the action was based, and the rule that the exercise of such discretionary power by the city council is not subject to judicial review, in absence of clear evidence that such power has been abused. The question, however, is, not whether the city council is vested with discretionary power to enact and enforce a proper and legal ordinance regulating the issuance of permits to erect and operate gasoline filling stations, but is, assuming the ordinance to be valid, whether the city council in enforcing it and in refusing appellee's permit acted arbitrarily and discriminatorily, and that such action is reviewable by the courts is well settled. Such was the holding of the Supreme Court of the United States in Holden v. Hardy, 169 U. S. 366, 18 S. Ct. 383, 42 L. Ed. 780, where it is held: "But the exercise of the police power is subject to judicial review, and property rights cannot be wrongfully destroyed by arbitrary enactment. It was averred that the works would be so constructed as not to interfere with the health or safety of the people. No reasonable explanation for the arbitrary exercise of power in the case is suggested."

This case was cited and the principle followed by the Supreme Court of Texas in Houston & T. C. Ry. Co. v. City of Dallas, 98 Tex. 396, 84 S. W. 648, 653, 70 L. R. A. 850, where it is held as follows: "The power is not an arbitrary one, but has its limitations. *695 It is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort, and convenience as consistently as may be with private property rights. As those needs are extensive, various, and indefinite the power to deal with them is likewise broad, indefinite, and impracticable of precise definition or limitation. But as the citizen cannot be deprived of his property without due process of law, and as a privation by force of the police power fulfills this requirement only when the power is exercised for the purpose of accomplishing, and in a manner appropriate to the accomplishment of, the purposes for which it exists, it may often become necessary for courts, having proper regard to the constitutional safeguard referred to in favor of the citizen, to inquire as to the existence of the facts upon which a given exercise of the power rests, and into the manner of its exercise, and if there has been an invasion of property rights under the guise of this power, without justifying occasion, or in an unreasonable, arbitrary, and oppressive way, to give to the injured party that protection which the Constitution secures. It is therefore not true, as urged by plaintiff, that the judgment of the legislative body concludes all inquiry as to the existence of facts essential to support the assertion of such a power as that now in question. If this were true, it would always be within legislative power to disregard the constitutional

provisions giving protection to the individual. The authorities are practically in accord upon the subject. * * *

"The reasonableness or unreasonableness of many ordinances will appear on their faces, and the court may, upon mere inspection, pronounce them to be valid or invalid. In others the question may depend upon their operation upon particular persons or conditions of fact which cannot be known to the court until made to appear by evidence. Their effect may be just and reasonable in general, but in particular instances may be arbitrary and oppressive to the extent of invading fundamental rights."

Again, in the cases of Stockwell v. State, 110 Tex. 550, 221 S. W. 932, 12 A. L. R. 1116; City of Texarkana v. Reagan, 112 Tex. 317, 247 S. W. 816; and Crossman v. City of Galveston, 112 Tex. 303, 247 S. W. 810, 813, the Supreme Court held in substance that, before the state or a municipality in the exercise of police power could find or declare a building or business a nuisance per se, or that by use or operation it became a nuisance so as to prohibit its maintenance or operation, it must be so in fact; that whether a business or its operation was a nuisance per se, or a nuisance depending on its operation, is a justiciable question, determinable only by courts of competent jurisdiction; and that the burden of proof as to whether a building or business was a nuisance per se, or by operation, was on the city in an action to enjoin it from declaring and treating such building or business as a nuisance; the court holding in the last case cited as follows: "It can only become a nuisance by the use to which it is put or the state of repair in which it is maintained; but as to whether or not it is, even in those events, a nuisance is a justiciable question, determinable only by a court of competent jurisdiction. The mere declaration of the city commissioners that the building or its use constitutes a nuisance does not make it so. * * * The right of abatement is made to rest alone upon the findings of the city commissioners. They are made court, jury, and executive authority, all in one. * * * Such arbitrary authority cannot, under our form of government, be conferred upon the city commissioners. The citizen's property, not a nuisance within itself or under the common law, cannot be destroyed without the judgment of a court finding that it is in fact a nuisance. The opinion of the city commissioners that the property of plaintiffs in error is a nuisance is not due process. It is not process at all. It has no more vitality than the opinion of other citizens are against the consent of plaintiffs in error. * * * In this proceeding the burden is of the city to allege and establish the contention that the building involved is in fact a nuisance."

We followed this principle of law in the recent case of City of Austin v. Deats (Tex. Civ. App.) 32 S.W.(2d) 686 (writ of error refused), and in which we held that the city council acted arbitrarily and unfairly, and unjustly discriminated against Deats in refusing to grant him a permit to erect a gasoline filling station on his lot at the intersection of Rio Grande and Nineteenth streets, directly across the street from where appellee's lot here involved is located; and the evidence on the issues of whether the city council acted arbitrarily and discriminatorily in this case is more fully developed and is much stronger than in the Deats Case.

In substance, the numerous cases cited in appellee's brief hold that, while it is true that a city council has the right to enact and enforce in a lawful manner proper regulatory ordinances for public health, safety, and comfort, still it is equally true that courts may review unwarranted and arbitrary interference with lawful property rights or business by a city council under the guise of enforcing police regulations for the public health, safety, and comfort; and that the city council, in the exercise of its police power with respect to declaring a business a nuisance, must perform the duty in a reasonable manner and in conformity to constitutional safeguards relating to private property rights, and so as to give the injured party that protection which the Constitution secures.

**\*696** **[2]** The city council adjudged appellee's proposed gasoline filling station to be a nuisance per se before it came into existence, and refused a permit for its erection. No zoning ordinance prohibited its erection at the location in question. The plans and specifications and material to be used were admitted to be in compliance with all building rules and regulations required for gasoline filling stations. The city council had issued permits for similar stations in numerous similar locations throughout the city. In allowing or disallowing permits for filling stations, Mayor McFadden testified, as follows: "In passing on these applications, there has been no official action by the council, separating the city into residential districts in which they will not grant permits, and others that they have termed 'quasi business locations,' as you say, and grant permits there, and that that is the rule or test in the council's mind. There has been no official action. That is a matter of discretion with us, or we claim it to be. We have designated actually in the minds of the council, certain streets that we call business streets, and other certain streets, or locations that we call residence sections. That is true. And, that is the underlying principle upon which we either permit or decline a permit for a filling station."

This "unofficial action" on the part of the city council, regardless of their good intentions, cannot be upheld, and similar action on the part of the city council of San Francisco was condemned by the Supreme Court of the United States in the case of Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 1071, 30 L. Ed. 220, as follows: "For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself."

The following and numerous other authorities hold that gasoline filling stations erected according to modern approved methods, like the one in question was proposed to be erected, are not nuisances per se, that their erection in a residence district does not constitute a nuisance per se, and that under the Constitution arbitrary power cannot be conferred upon a city council to declare a filling station a nuisance, unless it is so in fact. They further hold that a city council may by reasonable ordinance establish zoning districts or define how gasoline filling stations may be constructed and operated, "but arbitrary power to allow a gas filling station on one man's property and disallow it to another, without any definite rule by which the city council is to be governed, cannot be conferred, for this would be to give it power to deny equal rights to all the citizens." Slaughter v. Post, 214 Ky. 175, 282 S. W. 1091, 1092; City of Electra v. Cross (Tex. Civ. App.) 225 S. W. 795; Marshall v. City of Dallas (Tex. Civ. App.) 253 S. W. 887; Gulf Refining Co. v. Dishroon (Tex. Civ. App.) 13 S.W.(2d) 230.

 [3]  [4]  The city engineer admitted that appellee's station was to have been erected subject to the usual, ordinary, proper, and reasonable regulations and directions of the city council with respect to plans and specifications, and the kind and character of material; and to be constructed in accordance with the usual regulations for protection against fire and traffic hazards, and in all respects and details complying with the rules and regulations of the city of Austin for the erection and maintenance of a gasoline filling station. The evidence is undisputed that the city council has heretofore issued permits for the erection and where there are now being operated filling stations of similar character at points on Nineteenth street near appellee's location, and at points throughout the city of Austin, which create greater traffic hazards than appellee's station would create; and that appellee's station would create no greater fire hazard than the other stations have created with respect to their locality. Clearly this evidence shows that the city council unfairly and unjustly discriminated against the business of appellee. In fact, there was much positive testimony that the erection and maintenance of appellee's station in the manner proposed would relieve traffic hazards at that point instead of increasing them; and the trial court's finding that traffic hazards would be decreased is fully supported by the evidence. At most, the city's testimony only showed that traffic hazards would be increased "to a degree," or slightly increased, and that "where gasoline is handled or stored, there always exists a fire hazard as well as the chance of an explosion." These same conditions even to a greater degree were shown to exist as to other points on the same street near appellee's location and at other similar locations where the city council had issued permits; and that this character of testimony was admissible and material as showing discrimination was settled in the Deats Case, supra.

In the recent case of Continental Oil Co. v. City of Wichita Falls, by the Commission of Appeals, 42 S.W.(2d) 236, it was held that the finding of the trial court that the "extra hazard to school children or pedestrians was not material" was binding upon the appellate courts; and the fact that a filling station in a purely residential district would depreciate the values of the residential property or create a fire hazard "no more than would necessarily" follow in similar locations where no zoning ordinance existed would not authorize a denial of a permit for the filling station any more than for any other lawful business.

 *697  [5]  [6]  Nor is there any basis for the contention that, because the streets at the point in question approached each other irregularly, and because of a slight slope in the ground, there was a basis for distinction or classification between the location of appellee's station and other stations. The evidence was undisputed that, with the exception of the streets being slightly narrower at appellee's location, other locations were similar, and that violation of traffic rules in egress and ingress to the station would be the same at all locations. So there could be no basis for a different classification of appellee's property in these regards, even if the ordinance permitted it. Or, as was held by the Supreme Court of the United States, in Frost v. Corporation Commission, 278 U. S. 515, 49 S. Ct. 235, 238, 73 L. Ed. 483, there must be some substantial difference to justify treating one person's property differently from another's property of the kind, and mere difference is not enough, but the classification must rest upon some reasonable and just difference and related to the act or thing with respect to which the discrimination is made, and "can never be made arbitrarily and without any such basis."

In view of our above holding, the constitutionality of the ordinance need not be passed upon, and the trial court's judgment will be affirmed.

Affirmed.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

182 Colo. 324
Supreme Court of Colorado, En Banc.

Mervin L. BAUER and Shirley
J. Bauer, Plaintiffs-Appellees.
v.
CITY OF WHEAT RIDGE, a municipal
corporation, et al., Defendants-Appellants.

No. 25980.  |  Aug. 20, 1973.

The District Court, Jefferson County, George J. Priest, J., found that city council had acted arbitrarily in denying 'special exception' for construction of apartment house on floodplain, and the council appealed. The Supreme Court, Hodges, J., held that denial of 'special exception' even though proposed apartment house met all qualifications under the floodplain ordinance and the general zoning ordinances of the city was arbitrary and capricious; and that city council should have made specific findings of fact as to what factors were or were not established.

Affirmed.

Pringle, C.J., and Groves, J., did not participate.

**Attorneys and Law Firms**

**\*326 \*\*204** Holley, Boatright & Villano, David C. Deuben, George Alan Holley, Wheat Ridge, for plaintiffs-appellees.

Maurice F. Fox, Wheat Ridge, for defendants-appellants.

**Opinion**

HODGES, Justice.

The Plaintiffs Mr. and Mrs. Bauer own real property in the City of Wheat Ridge. The property is located in an area designated by ordinance as a flood plain. As zoned, the Bauers could build an apartment house on this property, provided they met the criteria in the flood plain ordinance for a 'special exception.' Bauers' application for the 'special exception' was denied by the city council.

Bauers appealed the city council's denial to the district court pursuant to C.R.C.P. 106(a)(4). The district court found that the council had acted arbitrarily in denying the 'special exception' permit and entered a judgment ordering the council to issue the permit. From that judgment, the city council appealed to this court. We affirm the district court's judgment.

As provided in C.R.S.1963, 139-60-1, Wheat Ridge, a statutory city, enacted a flood plain ordinance. The city council performed a legislative function when it adopted this ordinance. In deciding whether or not to grant a 'special exception' permit under the ordinance, the city council acted in an adjudicative capacity.

[1] The flood plain ordinance establishes the criteria upon which the 'special exception' will be granted. If the council believes that other reasons should be used in denying an application, then the appropriate procedure is to amend the flood plain ordinance. Once an applicant applies under the ordinance, only those factors which apply generally to all applicants may be considered. Western Paving Construction Co. v. Board of County Commissioners, Colo., 506 P.2d 1230 (1973).

**\*327** [2] After reviewing the record and exhibits in this case, we believe the district court correctly characterized the city council's action when it ruled:

> 'In this case it appears that the council denied this permit solely because of the type of building that was to be placed on the ground even though it met all qualifications under the flood plain ordinance and the general zoning ordinances of the City of Wheat Ridge. This the court believes to be an arbitrary and capricious act.'

[3] Under C.R.C.P. 106(a)(4), the role of review of the district court '. . . shall not be extended further than to determine whether the inferior tribunal has exceeded its jurisdiction or abused its discretion.' The proper function of the district court is to affirm the council where there is 'any competent evidence' to support the council's decision. **\*\*205** Civil Service Commission v. Doyle, 174 Colo. 149, 483 P.2d 380 (1971).

The findings which the city council made when it denied the permit were very brief, and were extremely vague as to any substantial reason for its action. The flood plain ordinance clearly lists certain mandatory factors which must be met

by the permit applicant under Section 4.52 of the ordinance. Certain permissive factors are found in Section 1.11 through Section 1.14, and references thereto are made in Section 5.43.

 **[4]** Where the city council is acting in an adjudicative capacity, the following would be required to sustain a denial of this permit: If there is a lack of evidence to show that certain of the required factors existed, or if the evidence is in dispute as to one or more of these factors, and the city council determines the permit should be denied, then it would have to make specific findings of fact as to what factors were or were not established. Where a record supports the findings, a reviewing court must uphold the city council's action. Civil Service Commission v. Doyle, supra; Marker v. Colorado Springs, 138 Colo. 485, 336 P.2d 305; Civil Service Commission v. Hazlett, 119 Colo. 173, 201 P.2d 616; and Civil Service Commission v. Hoag, 88 Colo. 169, 293 P. 338.

The evidence before the city council is uncontradicted that **\*328** the applicant complied with the mandatory requirements of Section 4.52 of the flood plain ordinance.

 **[5]** We find no merit in the council's argument that the district court action should have been dismissed for failure to name the Mayor as a party. Since the district court's decision ordering the issuance of the special exception is affirmed, it is unnecessary to decide or discuss whether this denial by the city council of Bauers' application constitutes an unconstitutional taking of property.

Judgment affirmed.

PRINGLE, C.J., and GROVES, J., do not participate.

**Parallel Citations**

513 P.2d 203

---

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4225576
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Corpus Christi-Edinburg.

Reginald BRACK, Appellant,
v.
ISLAND PARK ESTATES, LLC., Blue Water Marina,
LLC., Kevin B. Dean, and Emile L. Clavet, Appellees.

No. 13-06-698-CV. | Nov. 29, 2007.

On appeal from County Court at Law No. 3 of Nueces County,
Texas, Marisela Saldana, Judge.

**Attorneys and Law Firms**

Arnold Gonzales, Jr., Audrey Mullert Vicknair, Corpus
Christi, for appellant.

Charles W. Zahn, Port Aransas, Rene Luna, Corpus Christi,
for appellees.

Before Chief Justice VALDEZ and Justices GARZA and
VELA.

**MEMORANDUM OPINION**

Memorandum Opinion by Justice VELA.

 **\*1**  In this interlocutory appeal, Reginald Brack ("Brack")
complains that the trial court erred in denying his special
appearance on the basis of both general and specific
jurisdiction. We affirm.

Brack is a resident of New York. On October 4, 2004, he,
along with Texas resident Kevin Dean ("Dean"), and Maine
resident Emile Clavet ("Clavet"), formed a Maine limited
liability company known as Blue Water Marina, LLC ("Blue
Water"). The company was formed to purchase a tract of land
known as Island Moorings Marina located in Port Aransas,
Texas. On the date of Blue Water's formation, it purchased
Island Moorings, which was subject to foreclosure. Brack
was personally present at the Nueces County courthouse for

the purchase. After the sale, Brack and Dean went to the
Island Moorings property and served a "forcible entry and
detainer" petition on the former owner. Brack and Dean then
went to a local restaurant to specifically recruit the owner
to build a restaurant on the Island Moorings property. After
the restaurant was built, Brack took charge of running the
Island Moorings restaurant, including naming the restaurant,
creating a logo, hiring and firing employees, developing a
menu, and installing a computer system and inventory.

On September 2, 2005, Dean formed a Texas limited liability
company known as Island Park Estates, LLC ("Island Park"),
in which he was the sole member/manager. On September 21,
2005, Island Park entered into a loan agreement with Frost
National Bank for the purpose of acquiring property known
as Island Park Estates, also in Port Aransas, to create a single
family subdivision. Brack and Dean negotiated a loan from
Frost National Bank for the purchase of Island Park Estates.
Brack, Dean and Clavet guaranteed a $4,080,211 .75 note for
the purchase of Island Park Estates.

On December 9, 2005, Brack sold his membership interests
in Blue Water to Dean and Clavet. On December 22, 2005,
Blue Water (consisting of the remaining members Dean
and Clavet) entered into a commercial note, executed by
Dean, payable to Brack in the amount of $3,500,000-the
total purchase price of Brack's membership interests in
Blue Water. Blue Water and Brack entered into a pledge
agreement, effective that same day, to secure Blue Water's
payment and performance of the commercial note. The
agreement also provided that Blue Water would obtain the
release of Brack's personal guarantee of the $14,080,211.75
loan with Frost National Bank. On December 22, 2005,
Blue Water entered into a commercial note in the amount
of $3,500,000 payable to Brack. Blue Water subsequently
paid Brack $1,750,000 pursuant to the parties' agreement. The
pledge agreement, dated December 22, 2005, was amended
and a second commercial note was created to reflect that Blue
Water owed Brack $1,750,000.

Later, Blue Water defaulted on the note. Brack demanded
payment and performance on August 8, 2006. On August
22, 2006, Brack filed a "Memorandum of Rights Relating
to Assets" in the official public records of real property
in Nueces County to provide notice of his rights as a
secured party under the pledge agreement. Brack, through his
attorney, also sent letters to all purchasers of lots in the Island
Park subdivision, attaching a copy of the memorandum of
interest, informing the purchaser:

**\*2** I represent Reginald Brack. The Memorandum of Rights (a copy of which is enclosed with this letter) gives notice to the public that Mr. Brack's consent must be obtained for Island Park Estates, L.L.C. ("Seller") to transfer any of its assets.

The Memorandum of Rights was filed for public record on August 22, 2006. Your deed (a copy of which is enclosed with this letter) was filed on September 6, 2006,.... No request has been made for Mr. Brack to consent to the transfer of the Property to you. Mr. Brack has not consented to the transfer of the referenced property. Therefore, the transfer to you was an unauthorized transaction, and as such is subject to being voided and rescinded.

Unless the seller makes a written and signed consent agreement with Mr. Brack, within twenty days from the letter of this date, I will recommend to Mr. Brack *that a suit be filed against the Seller and you seeking to void and rescind the transfer of the Property,* and seeking to recover any other appropriate relief to which the plaintiff may be lawfully entitled.

Mr. Brack regrets the inconvenience, expense and potential loss to you because of this situation; however, because the Seller has failed to honor Mr. Brack's legal contractual rights, Mr. Brack has no choice but to enforce those rights in this manner.

(emphasis added).

One month later, Brack, through another attorney, wrote the purchasers another letter, essentially stating the same, but further notifying the purchaser that the sale of the property was "void or voidable" and that Brack had

no choice but to seek court intervention to rescind the *unauthorized* and improper transfer of the Property from the seller to you. *You will certainly be made a party to the action to rescind the transfer.*Therefore, I suggest that you immediately contact your title insurance company regarding the Memorandum. I also strongly suggest that you seek legal counsel regarding your rights.

(emphasis added).

On August 28, 2006, Brack filed a lawsuit against Blue Water and Dean in Maine. Blue Water and Dean answered the lawsuit on September 16, 2006. Blue Water, Dean and Clavet filed this suit in Texas on October 16, 2006, for slander of title, tortuous interference with contracts, and fraud in the inducement.

Brack filed a special appearance, alleging that he did not have sufficient minimum contacts in Texas to justify being sued in this state. A hearing on Brack's special appearance was held on December 20, 2006. The trial court found that it had both general and specific jurisdiction over Brack and entered findings of fact and conclusions of law supporting its decision.

## I.

### Standard of Review

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). However, the trial court must frequently resolve fact questions before deciding the jurisdictional question. *Id.* The plaintiff has the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007). A defendant must then negate all bases for personal jurisdiction alleged by the plaintiff.*Id.*

**\*3** If a trial court issues findings of fact and conclusions of law in ruling on the special appearance, the appellant may challenge the legal and factual sufficiency of the evidence to support the findings and the appellate courts may review the legal and factual sufficiency challenge to support the findings. *See BMC Software,* 83 S.W.3d at 794. A legal sufficiency challenge to the findings of fact will not be sustained if there is more than a scintilla of evidence to support the findings. *Id. at 795.*In conducting a factual sufficiency review, appellate courts may set aside a trial court's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Hoffmann v. Dandurand,* 180 S.W.3d 340, 345 (Tex.App.-Dallas 2005, no pet.).

We review the trial court's legal conclusions de novo. *BMC Software,* 83 S.W.3d at 794. Specifically, we review the trial court's legal conclusions drawn from the facts to determine their correctness. *Id.* If the appellate court determines a conclusion of law is erroneous, but the trial court rendered a proper judgment, the erroneous conclusion of law will not require reversal.*Id.*

## II.

### Specific Jurisdiction

By his second issue, Brack argues that the trial court erroneously denied his special appearance on the basis of specific jurisdiction because the evidence is not sufficient to support the trial court's findings of fact and conclusions of law. Brack claims that he could not reasonably anticipate being haled into a Texas court and did not purposefully avail himself of the benefits of Texas law. We disagree.

Texas courts may assert in personam jurisdiction over a non resident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state due-process guarantees. *Moki Mac,* 221 S.W.3d at 574;*see also Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990). Our long-arm statute describes what "[i]n addition to other acts," may constitute doing business in this state. *Moki Mac,* 221 S.W.3d at 574.

The long-arm statute's broad doing-business language allows the statute to reach as far as the federal constitutional requirements of due process will allow. *Moki Mac,* 221 S.W.3d at 575; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C .,* 815 S.W.2d 223, 226 (Tex.1991). Thus, the requirements of the Texas long-arm statute are satisfied if an assertion of jurisdiction accords with federal due-process limitations. *Moki Mac,* 221 S.W.3d at 575.

Federal due-process requirements limit a state's power to assert personal jurisdiction over a nonresident defendant. *Id; see also Guardian Royal,* 815 S.W.2d at 226. Personal jurisdiction is proper when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice."*Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In *Michiana Easy Livin' Country, Inc., v. Holten,* the

court reiterated the purposeful availment requirement for the exercise of jurisdiction, by stating:

> **\*4** For half a century, the touchstone of jurisdictional due process has been 'purposeful availment.' Since *Hanson v. Denckla,*'it is essential in each case that there be some act by which the *defendant purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'

*Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d at 777, 784 (Tex.2005).

The supreme court also recently explained, in *Michiana,* that there are three parts to a "purposeful availment" inquiry. *Id.* at 785.First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person. *Id.* at 785.Second, the contacts relied upon must be purposeful rather than random, isolated or fortuitous. *Id.; see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1980). Thus, "[s]ellers who 'reach out beyond one state and create continuing relations and obligations with citizens of another state' are subject to the jurisdiction of the latter in suits based on their activities."*Michiana,* 168 S.W.3d at 785. Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction. *Michiana,* 168 S.W.3d at 785.

When specific jurisdiction is alleged, courts focus the minimum contacts analysis on the relationship among the defendant, the forum, and the litigation. *Guardian Royal,* 815 S.W.2d at 228 (citing *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Schlobohm,* 784 S.W.2d at 357). Specific jurisdiction is established if the defendant's alleged liability "aris[es] out of or [is] related to" an activity conducted within the forum. *Helicopteros,* 466 U.S. at 414 n. 8.

In *Moki Mac,* our supreme court noted that the United States Supreme Court has provided relatively little guidance on the "arise from or relate to" requirement, and noted that it had not had occasion to examine the strength of the nexus required to establish specific jurisdiction. *Moki Mac,* 221 S.W.3d at 579. The court held that Moki Mac had sufficient purposeful contacts with Texas to satisfy the first prong of jurisdictional due process, but determined that purposeful availment alone will not support an exercise of specific jurisdiction:

> Specific jurisdiction analysis has two co-equal components. For specific-jurisdiction purposes, purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contacts.

*Id.* Our supreme court concluded that for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation. *Id.* at 585.

### III.

### Jurisdictional Analysis

We turn now to the issue of whether there is specific jurisdiction in this case. For a Texas forum to properly exercise specific jurisdiction in this case: (1) Brack must have had minimum contacts with Texas by purposefully availing himself of the privilege of conducting activities here; and (2) Brack's liability must have arisen from or be related to those contacts. *See Moki Mac,* 221 S.W.3d at 576.

### A. Purposeful Availment

 **\*5**  As stated in *Michiana,* the contacts of persons who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are purposeful rather than fortuitous. *Michiana,* 168 S.W.3d at 785. Purposeful availment requires that "a defendant must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction."*Id.* at 785.The notion necessarily implies that the nonresident submit to suit in the forum, and that the nonresident may avoid being haled into court in a particular forum by purposefully conducting business so as not to derive benefit or profit from a forum's laws. *Id.*

Here, Brack created a corporation, albeit in Maine, for the specific purpose of purchasing a property in Port Aransas, Texas. He personally guaranteed a note with a Texas bank for the purchase of Island Moorings, and was physically present on the Texas county courthouse steps when the purchase was made. He personally delivered a "forcible entry and detainer" document to the previous owner of the foreclosed property,

and was intricately involved in developing, designing, and managing a restaurant for the property. His conduct included hiring and firing of employees, developing a logo and menu, and organizing the operating procedures of the restaurant. He planned and made all arrangements for the opening of the Island Moorings Marina. Moreover, and crucial to the specific jurisdiction requirement underlying this particular action, he personally guaranteed a note for over four million dollars for a Texas company, for the purpose of acquiring Texas property. Despite the fact that he ultimately sold his shares, he maintained an interest in the Texas company. He also sent two letters to purchasers of the Island Park lots, maintaining that he had an interest in the Texas properties, and, he threatened these Texas property purchasers with litigation if his demands were not met. Certainly, Brack reached out beyond one state and created continuing relationships and obligations with citizens from another state, acts which were purposeful and not merely fortuitous. By taking these actions, Brack could reasonably anticipate being haled into court and purposefully availed himself of Texas law.

### B. Relatedness Requirement

The "arise from or relate to" requirement lies at the heart of a specific jurisdiction by defining the required nexus between the nonresident defendant, the litigation, and the forum. *Moki Mac,* 221 S.W.3d at 579. In *Moki Mac,* the supreme court held that for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation.*Id.* at 585.In *Moki Mac,* the relationship between Moki Mac's contacts with Texas and the operative facts of the litigation-the guides' conduct on the rafting trip and whether they exercised reasonable care in supervising the child-were too attenuated to satisfy specific jurisdiction. *Id.* at 585, 588.The operative facts, in *Moki Mac,* concerned the guides' conduct on the hiking trip and whether they exercised reasonable care in supervising the decedent. *Id.* at 585.The alleged misrepresentation in the brochures was not the subject of the case. *Id.*

 **\*6**  Here, in contrast, Brack purposefully came to Texas to do business and did business in Texas. *See*TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). He purchased property in Texas and entered into business relationships for the purpose of buying property in Texas. Brack suggests in his correspondence to the potential buyers that he had an interest in the Texas property they were attempting to purchase and that he would be forced to file suit against them to void the sale or transfer of any property. Brack's conduct suggests

that he availed himself of the privileges of doing business in Texas and that he would utilize the court system, if necessary. The evidence supports the trial court's determination that Brack's actions invoked the benefits and protections of Texas law. Likewise, his liability, if any, relates to his contacts with Texas. We believe that the minimum contacts prong of personal jurisdiction has been satisfied.

## C. Fair Play and Substantial Justice

Having found that Brack purposefully established minimum contacts with Texas, we must consider whether the exercise of personal jurisdiction over him comports with traditional notions of fair play and substantial justice. *Guardian Royal Exch.,* 815 S.W.2d at 231. The following factors are considered: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *Id.* Only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident has established minimum contacts with the forum state. *Id.*

Appellant urges that because Brack filed suit in Maine and thereafter the appellees filed a similar suit against him in Texas, traditional notions of fair play and substantial justice are affected. The case law is clear that if we determine that the nonresident has established minimum contacts only in rare cases will the exercise of jurisdiction fail to comport with fair play and substantial justice. We do not see how maintaining jurisdiction offends traditional notions of fair play and substantial justice when Brack clearly availed himself of Texas business opportunities, property and its laws. Because we find that the trial court had specific jurisdiction over Brack, his second issue is overruled. We do not address appellant's general jurisdiction argument. TEX.R.APP. P. 47.1.

## IV.

### Conclusion

The judgment of the trial court is affirmed.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Cavazos v. Board of Governors of Council of Co-Owners..., Not Reported in...

2013 WL 5305237

2013 WL 5305237
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Corpus Christi–Edinburg.

Juan Luis CAVAZOS, Aliza Marie Cavazos,
Nirav Desai and Janki Desai, Appellants,
v.
BOARD OF GOVERNORS OF THE
COUNCIL OF CO–OWNERS OF THE
SUMMIT CONDOMINIUMS, Appellee.

No. 13–12–00524–CV.    |    Sept. 19, 2013.

On appeal from the 107th District Court of Cameron County,
Texas. Benjamin Euresti Jr., Judge.

**Attorneys and Law Firms**

Michael M. Fulton, Law Offices of Michael M. Fulton, San
Antonio, TX, Frank Costilla, Attorney At Law, Brownsville,
TX, for Appellants.

Mike Mills, Lisa Powell, Atlas, Hall & Rodriguez, McAllen,
TX, for Appellees.

Before Justices GARZA, BENAVIDES, and PERKES.

**MEMORANDUM OPINION**

Memorandum Opinion by Justice BENAVIDES.

**\*1** By two issues, appellants Juan Luis Cavazos, Aliza Marie
Cavazos, Nirav Desai, and Janki Desai argue that the trial
court erred in denying appellants' request for declaratory
judgment because: (1) appellee's, the Board of Governors of
the Council of Co–Owners of the Summit Condominiums
("Board of Governor's"), amendment to prohibit leasing
or renting for less than thirty days is beyond the power
and authority of the Board of Governors; and (2) Texas
Property Code section 81.102(a)(8) prohibits the adoption of
an amendment to a Condominium Declaration that alters or
destroys the ownership rights of a unit owner affected by an
amendment without the unit owner's consent. We affirm.

**I. BACKGROUND**

Appellants were owners of condominium units at The Summit
Condominiums located on South Padre Island, Texas. The
Summit is a 64–unit building built in 1982. The Summit has
a Condominium Declaration (the "Declaration") and Bylaws,
both of which are recorded in the Cameron County Clerk's
office.

Prior to 2011, the Declaration had the following provision,
Article 6.2, regarding the leasing and renting of condominium
units:

> The owners of the respective
> apartment units shall have the absolute
> right to lease or rent same or
> part thereof, not to exceed two
> (2) years, furnished or unfurnished,
> provided that said lease or tenancy
> is made subject to the covenants
> and restrictions contained in this
> Declaration and further subject to the
> Bylaws of this Condominium.

In 2011, owners voted on the following amendment (the
"Amendment") to Article 6.2 of the Declaration:

> The owners of the respective
> apartment units shall have the right to
> lease or rent same or part thereof, for
> no less than thirty (30) days, furnished
> or unfurnished, provided that said
> lease or tenancy is made subject to the
> covenants and restrictions contained in
> this Declaration and further subject to
> the Bylaws of this Condominium.

A similar change regarding the leasing and rental policy
was adopted to the Bylaws. [1] In order for these amendments
to pass, they had to be agreed upon by two-thirds of the
owners. [2] The owners of 53 of the 64 units, or approximately
83% of the owners, consented to the adoption of the
Amendment in writing. The only non-consenting unit owners
were appellants.

Appellants sued, challenging the adoption of the
Amendments to the Declaration and Bylaws. During the

Cavazos v. Board of Governors of Council of Co-Owners..., Not Reported in...

2013 WL 5305237

bench trial, appellants argued that the Amendments violated section 81.102(a)(8) of the Texas Property Code, which provides that "an amendment of the declaration may not alter or destroy a unit or a limited common element without the consent of the owners affected and the owners' first lien mortgagees."TEX. PROP.CODE ANN. § 81.102(a)(8) (West 2007). Appellants contended that the Amendment "altered or destroyed" their absolute ownership right to lease their personal property. The Board of Governors countered by arguing that section 81.102 referred to alteration or destruction of physical aspects of a unit, such as the removal of a wall.

**\*2** At the conclusion of the bench trial, the trial court ruled in favor of the Board of Governors and denied appellants' request for declaratory judgment to declare the Amendment invalid and unenforceable. On appellants' request, the trial court also issued formal findings of fact and conclusions of law. This appeal ensued.

## II. STANDARD OF REVIEW
## AND APPLICABLE LAW

### A. Standard of Review

Findings of fact in a bench trial have the same force and dignity as a jury verdict and are reviewable for legal and factual sufficiency of the evidence by the same standards as applied in reviewing a jury's findings. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991). In reviewing for legal sufficiency, we consider only the evidence and inferences supporting the finding. *Minnesota Mining and Mfg. Co. v. Nishika Ltd.,* 953 S.W.2d 733, 738 (Tex.1997). If more than a scintilla of probative evidence supports the finding, the no evidence challenge fails. *Id.* More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). In reviewing for factual sufficiency, we weigh all of the evidence in the record and overturn the finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.*Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996).

We review a trial court's challenged conclusions of law as legal questions.*BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). Accordingly, we apply a de novo standard. *In re Humphreys,* 880 S.W.2d 402, 404

(Tex.1994). An appellant may not challenge a trial court's conclusions of law for factual sufficiency. *BMC Software,* 83 S.W.3d at 794. However, we determine the correctness of the trial court's legal conclusions drawn from the facts. *Id.* If we determine that a conclusion of law is not correct, but the trial court rendered the proper judgment, the incorrect conclusion of law does not require reversal. *Id.*

### B. Applicable Law

Chapter 81 of the Texas Property Code is entitled the "Texas Condominium Act." *See*TEX. PROP.CODE ANN. § 81.001–.210 (West 2007). It applies to "condominium regime[s] created before January 1, 1994," like The Summit. Chapter 82 of the Texas Property Code is called the "Texas Uniform Condominium Act," *id.* § 82.001 (West 2007), and it applies to "all commercial, industrial, residential, and other types of condominiums in this state for which the declaration is recorded on or after January 1, 1994."*Id.* § 82.002(a) (West 2007). Chapter 82 does, however, have some applicability to condominiums built prior to 1994 in certain instances:

> This section and the following sections apply to a condominium in this state for which the declaration was recorded before January 1, 1994: Section 82.005, 92.006, 82.007, 82.053, 82.054, 82.102(a)(1)-(7) and (12)-(22), 82,108, 82.111, 82.113, 82.114, 82.116, 82.157, and 82.161. The definitions prescribed by Section 82.003 apply to a condominium in this state for which the declaration was recorded before January 1, 2004, to the extent the definitions do not conflict with the declaration. The sections listed in this subsection apply only with respect to events and circumstances occurring on or after January 1, 1994, and do not invalidate existing provisions of the declaration, bylaws, or plats or plans of a condominium for which the declaration was recorded before January 1, 1994.

**\*3** *Id.* § 82.002(c) (West 2007).

"Courts have recognized the unique nature of condominium ownership and its problems."*Gulf Shores Council of Co–*

*Owners, Inc. v. Raul Cantu No. 3 Family Ltd. P' ship.,* 985 S.W.2d 667, 670 (Tex.App.-Corpus Christi 1999, pet. denied). "The owners make up a democratic subsociety more restrictive in the use of condominium property than property owners might accept in traditional forms of property ownership." *Id.*"Each owner must give up some historic rights of property ownership and the freedom of use of the property and subordinate those traditional ownership rights when electing to own a condominium unit."*Id.; see Sea Council of Co–Owners, Inc. v. Sondock,* 644 S.W.2d 774, 780 (Tex.App.-Corpus Christi 1982, writ ref'd n.r.e.).

### III. ANALYSIS

#### A. The Scope of Authority of The Summit's Board of Governors

By their first issue, appellants argue that the Board of Governors acted outside its scope of authority when it prohibited the rental of condominiums for less than thirty days. Article 3 of the Bylaws, which addresses the Board's powers, provides that, "The Board shall manage and administer the affairs of the Council and shall have all such duties, rights, powers, and authority given to it by the Act, the Declaration or Bylaws."Article 3 outlines specific tasks for the Board of Governors, such as keeping sufficient books, engaging the services of a manager, and formulating and enforcing appropriate policies to maintain the common elements of The Summit, such as the parking garage, pool, lobby, and elevator. Subparagraph (k) elaborates as follows:

> In general, the Board shall have all such duties, rights, and authority to do all such acts and things as are not by the Act, Declaration or these Bylaws directed to be done or exercised exclusively by the unit owners or council which shall be necessary or reasonably required for the successful and orderly administration, management, and operation of the Condominium Regime established by the Declaration to which these Bylaws pertain.

Appellants contend that the Board of Governors completely prohibited appellants' ability to rent, which was outside the scope of the Board's authority. Appellants argue that "a regulation or restriction is not reasonable as a matter of law

if it prohibits something" completely. *See generally Murphy v. Wright,* 115 S.W.2d 448 (Tex.Civ.App.-Fort Worth 1938, no writ) (concluding that where a city ordinance was not merely a regulation, but an absolute prohibition, it exceeded the authority of a city council's rulemaking powers).

We disagree with appellants that the Amendment completely prohibited the owners' ability to rent. By adopting the Amendment, the Board placed a minimum-stay provision, limiting the minimum amount of time a unit owner can rent its condominium unit, similar to the previous two-year maximum limit already set forth in the Declaration. This limit was agreed to by more than eighty percent of the owners. In *Gulf Shores Council of Co–Owners, Inc.,* we held that the right to lease or rent "does not give an owner an absolute right to lease his unit without any restrictions; but rather the right is subject to all provisions and restrictions applicable."985 S.W.2d at 670 (internal emphasis and quotations omitted). Based on The Summit's Bylaws and our precedent, we hold that the Board of Governors acted within its authority to pass the Amendment and set a reasonable rental restriction. We overrule appellants' first issue.

#### B. Section 81.102(a)(8) of the Texas Property Code

**\*4** By their second issue, appellants assert that the Amendments to the Declaration and Bylaws, which prohibit the leasing or renting of units at The Summit for no less than thirty days, violate section 81 .102(a)(8) of the Texas Condominium Act. This statute provides that "an amendment of the declaration may not alter or destroy a unit or a limited common element without the consent of the owners affected and the owners' first lien mortgagees."TEX. PROP.CODE ANN. § 81.102(a)(8).

Appellants testified by affidavit that ninety percent of the rentals for their condominium units are for periods of less than thirty days. Appellants rent their units "to help cover the property taxes, association fees, assessments and their mortgage payments."Thus, according to appellants, this restriction on their ability to rent "alters or destroys" an ownership interest without their consent. To buttress this argument, appellants cite the Declaration's definition of "unit":

> 2.5 *Condominium Unit.*A Condominium Unit shall include the ownership of an apartment and certain interests which are appurtenant to the apartment, including, but not limited to the following items:

(a) *General Common Elements.* The ownership of an undivided interest in the general common elements, the same being shown on Exhibit "E" attached hereto and made a part hereof for all purposes;

(b) A membership in the Council and an undivided interest in the funds and assets held by the Council, proportionate to the interest owned in the general common elements;

(c) Exclusive use of one (1) covered parking space, patio, balcony, porch or deck attached to the individual condominium apartment.

The unfettered ability to rent their condominiums, appellants argue, is a "certain interest appurtenant" to their units.

The Summit's Board of Governors, on the other hand, contends that section 81.102(a)(8) refers to the "alteration" or "destruction" of a physical aspect of the unit, such as removing a wall. The few cases we found that cite this statute only refer to physical changes, too. *See Dickerson v. Debarbieris,* 964 S.W.2d 680, 686 (Tex.App.-Houston [14th Dist.] 1998, no pet.) (citing the statute to contest the installation of a gate system as a common element to the condominium complex); *W. Campus Ramsey Props., Ltd. v. Encinal Condo. Owners' Ass'n,* No. 03–09–00146–CV, 2009 Tex.App. LEXIS 9863, at ——11–15, 2009 WL 5149935 (Tex.App.-Austin Dec. 30, 2009, pet. filed) (mem.op.) (citing section 81.102(a)(8) for authority to remove a wall that split a common terrace between two units).

We note that chapter 82 of the Texas Property Code defines a condominium unit as "a *physical* portion of the condominium designated for separate ownership or occupancy." TEX. PROP.CODE ANN. § 82.003(23) (West 2007) (emphasis added). Although chapter 81 applies to The Summit because it was built prior to 1994, the definitions contained in section 82.003 apply "to the extent the definitions do not conflict with the declaration." TEX. PROP.CODE ANN. § 82.002(c).

The Declaration, as noted earlier, defines "unit" as ownership of an apartment and "certain interests which are appurtenant to the apartment," such as the general common elements like the pool, elevators, parking spaces, a membership in the Council, and an undivided interest in the funds in the Council's budget. Appellants do not cite to anything in the record, and we find nothing, showing that the Declaration's definition of "interests appurtenant" refers to an ownership interest such as leasing or renting.

**\*5** The trial court apparently agreed with appellees' interpretation when it made the following conclusions:

37. The Amendment does not alter or destroy a unit as reference[d] in § 81.102(a)(8).

38. Under the Declaration and Chapters 81 and 82, "apartment" and "unit" mean and refer to only the physical characteristics of a unit or apartment, not the right to rent or lease or any aspect of such right. The Amendment, therefore does not alter or destroy a unit.

Our standard of review requires us to determine the correctness of the trial court's legal conclusions drawn from the facts. *BMC Software,* 83 S.W.3d at 794. Here, the facts and supporting case law support the conclusion that section 81.102(a)(8) refers to the "alteration" or "destruction" of a physical aspect of a condominium unit, not the "alteration or destruction" of ownership rights like leasing or renting. *See* TEX. PROP.CODE ANN. § 81.102(a)(8).

In light of the foregoing, we overrule appellants' second issue.

## IV. CONCLUSION

Having overruled both of appellants' issues, we affirm the trial court's judgment.

Footnotes

1   The proposed change to the Bylaws stated as follows:

(9) No apartment of part thereof may be leased or rented for less than thirty days. The owner and/or rental agent must inform the Summit manager of his or her intent to lease or rent the specific unit. Further, prior to the lease or rental of any apartment unit or part thereof, the owner and/or rental agent must contact the Summit manager and provide them with the unit number and the name, number of occupants, phone number, arrival date and departure date of the lessor [lessee] or renter.

2   Article 8.1 of the Declaration provided that, "This Declaration shall not be changed or amended except with the written consent of two-thirds (2/3) of the total ownership of the condominium units and the written consent of all mortgagees of such condominiums units."

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

232 S.W.3d 238
Court of Appeals of Texas,
Fort Worth.

CITY OF ARLINGTON, Texas and the
License and Amortization Appeal Board
of the City of Arlington, Appellants,
v.
CENTERFOLDS, INC. and
Steven William Craft, Appellees.

No. 2–06–080–CV.    |    June 14, 2007.
|    Rehearing Overruled July 12, 2007.

**Synopsis**
**Background:** Operator of a sexually oriented business sought review of decision of city's license and amortization appeal board denying application for a location exemption. The District Court, Tarrant County, Bonnie Sudderth, J., granted operator summary judgment. City and board appealed.

**Holdings:** The Court of Appeals, Terrie Livingston, J., held that:

[1] operator had standing to challenge decision by city's license and amortization appeal board denying application;

[2] operator was denied due process in administrative hearing on application; and

[3] board's decision was arbitrary and capricious.

Affirmed.

**Attorneys and Law Firms**

*241 Fanning, Harper & Martinson, Thomas P. Brandt, Joshua A. Skinner, and John F. Roehm III, Dallas, for Appellants.

Quaid & Quaid, L.C., Charles Joseph Quaid, Dallas, for Appellees.

Panel B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

**OPINION**

TERRIE LIVINGSTON, Justice.

This is an appeal from the trial court's summary judgment in favor of appellees Centerfolds, Inc. and Steven William Craft on procedural due process grounds with regard to the denial of appellees' application for a location exemption for a sexually oriented business (SOB) in Arlington, Texas. In four issues, appellants the City of Arlington, Texas and the License and Amortization Appeal Board of the City of Arlington contend that (1) this case should be dismissed because appellees do not have standing, (2) appellees waived their due process claims by failing to raise them at the hearing before the Board, (3) appellees failed to establish their due process claims, and, alternatively, (4) a genuine issue of material fact precludes summary judgment. We affirm.

**Background Facts**

Appellee Craft is Vice President of appellee Centerfolds, which leases property *242 on West Division Street in Arlington. Since 1988, Centerfolds has operated several SOBs at that location. In July 2003, Centerfolds was operating an SOB named La Bare at the location, which featured male dancers and catered to female patrons. In July and August 2003, appellees closed La Bare and began renovating the premises to start a new SOB, Chicas Locas, which featured female dancers and catered to mostly Hispanic male customers. Centerfolds did not open Chicas Locas to customers until late August 2003.

In 1992, the City passed an ordinance prohibiting the operation of an SOB within 1,000 feet of a residence, thus making Centerfolds' operation a nonconforming use under the new ordinance. ARLINGTON, TEX., CODE, SEXUALLY ORIENTED BUSINESS ORDINANCES art. III, §§ 3.01–.02(A) (2004). SOBs that were already in operation when the ordinance was passed and that are considered nonconforming uses under the ordinance are allowed to apply for an exemption to the location restrictions each year. *Id.* § 3.02(A). The building in which Chicas Locas is located is within 1,000 feet of two residential areas.

To obtain a location exemption, an SOB must prove its entitlement to the exemption by a preponderance of the

evidence at a hearing before the Board. *Id.* art. IV, § 4.11. Section 4.11(E) of the ordinance provides that the Board may grant the exemption if it makes the following findings:

1. That the location of the [SOB] will not have a detrimental effect on nearby properties or be contrary to the public safety or welfare;

2. That the location of the [SOB] will not downgrade the property values or quality of life in the adjacent areas or encourage the development of urban blight;

3. That the location of the [SOB] in the area will not be contrary to any program of neighborhood conservation, nor will it interfere with any efforts of urban renewal or restoration; and

4. That all other applicable provisions of [the SOB ordinance] will be observed.

*Id.* § 4.11(E). Beginning "a couple of years" after the passage of the new SOB ordinance, Centerfolds applied for, and the Board granted, such an exemption each year.

On September 22, 2003, after Centerfolds had converted its business to Chicas Locas from La Bare, appellees applied to renew their location exemption for 2004. The chief of police denied the application because of the club's proximity to a residential area. After a hearing at which appellees and the City both presented evidence, the Board denied the exemption application on January 20, 2004. Appellees appealed the Board's decision to the district court. *Id.* § 4.09.

Appellants filed a motion for partial summary judgment contending that the Board's decision must be affirmed based on the substantial evidence standard of review.[1] In their response, appellees contended that the Board's decision could not be upheld on substantial evidence grounds **\*243** because they were denied procedural due process during the hearing before the Board. Specifically, appellees contended, among other things, that they were not allowed to cross-examine members of the public who made remarks to the Board in a public comment session held before the hearing, that Board members impermissibly considered the unexamined public comment in deciding to deny appellee's request for a location exemption, that appellees were denied full and effective cross-examination of witnesses at the hearing because they were not allowed to re-examine witnesses after Board members asked questions of them, and that the Board

failed to file required findings of fact and conclusions of law in support of its decision.

The trial court denied appellants' motion for summary judgment because of the procedural due process concerns; however, because appellees had failed to file their own motion for summary judgment, the trial court could not grant them the relief they had asked for in their response: for the case to be remanded to the Board for a new hearing. Appellees then filed a motion for summary judgment raising the same procedural due process grounds.[2] The trial court granted the summary judgment motion without specifying any particular grounds, vacated the Board's order denying appellants' application for a location exemption for 2004, and remanded the case to the Board for a trial de novo on appellees' application for a location exemption.

## Standard of Review

A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* TEX.R. CIV. P. 166a(a), (c); *MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004). Questions of law are appropriate matters for summary judgment. *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999); *Westchester Fire Ins. Co. v. Admiral Ins. Co.,* 152 S.W.3d 172, 178 (Tex.App.-Fort Worth 2004, pet. filed) (op. on reh'g). Summary judgment is proper in an appeal to the trial court pursuant to the substantial evidence review because the only issue before the trial court is a question of law. *In re Edwards Aquifer Auth.,* 217 S.W.3d 581, 587 (Tex.App.-San Antonio 2006, orig. proceeding); *Parks v. Harris County Civil Serv. Comm'n,* 225 S.W.3d 246, 250 (Tex.App.-El Paso, 2006, no pet.); *Arrellano v. Tex. Employment Comm'n,* 810 S.W.2d 767, 770–71 (Tex.App.-San Antonio 1991, writ denied).

## Standing

In their first issue, appellants contend that appellees lack standing to challenge the Board's decision because they did not fulfill the requirements to apply for an exemption. According to appellants, under section 3.02 of the City's SOB

ordinance, only an SOB that has "continuously operated" has standing to apply for an exemption under section 4.11. Although the City did not plead the matter at trial, it contends that it may raise the matter for the first time on appeal because standing implicates the trial court's subject matter jurisdiction.

**\*244 Applicable Law**

 [1]    [2]    [3]    A plaintiff must have both standing and capacity to bring a lawsuit. *Austin Nursing Ctr., Inc. v. Lovato,* 171 S.W.3d 845, 848 (Tex.2005); *Coastal Liquids Transp., L.P. v. Harris County Appraisal Dist.,* 46 S.W.3d 880, 884 (Tex.2001). The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a justiciable interest in its outcome. *Lovato,* 171 S.W.3d at 848. Standing, therefore, focuses on *who* may bring an action, *M.D. Anderson Cancer Ctr. v. Novak,* 52 S.W.3d 704, 708 (Tex.2001); *In re Guardianship of Archer,* 203 S.W.3d 16, 23 (Tex.App.-San Antonio 2006, pet. denied), and is concerned with whether the claimant has a particularized injury distinct from that suffered by the general public. *Bland ISD v. Blue,* 34 S.W.3d 547, 555–56 (Tex.2000); *All Seasons Window & Door Mfg., Inc. v. Red Dot Corp.,* 181 S.W.3d 490, 497 (Tex.App.-Texarkana 2005, no pet.).

 [4]    [5]    [6]    Standing requires that there be a real controversy between the parties that will actually be determined by the judicial declaration sought. *Lovato,* 171 S.W.3d at 849. This means that litigants must be "properly situated to be entitled to [a] judicial determination." *Id.* (quoting 13 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2D § 3531, at 338–39 (2d ed.1984)). Without standing, a court lacks subject matter jurisdiction to hear the case. *Id.; Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 443 (Tex.1993). Thus, the issue of standing may be raised for the first time on appeal. *Lovato,* 171 S.W.3d at 849.

The issue of capacity, however, "is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate." *Id.* at 848 (quoting 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1559, at 441 (2d ed.1990)). Our supreme court has distinguished between standing and capacity, stating that "[a] plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless

of whether it has a justiciable interest in the controversy." *Nootsie, Ltd. v. Williamson County Appraisal Dist.,* 925 S.W.2d 659, 661 (Tex.1996). In contrast to a challenge to standing, a challenge to a party's capacity must be raised by a verified pleading in the trial court. TEX.R. CIV. P. 93(1)-(2); *Lovato,* 171 S.W.3d at 849.

**Analysis**

Section 3.02(A) of the City's SOB ordinance provides that

> [a]ny [SOB] lawfully operating prior to the effective date of Ordinance No. 92–117 [the SOB ordinance], that is in violation of Section 3.01 [setting forth the zoning and location restrictions for SOBs] *and has continuously operated and maintained* a valid and effective [SOB] *license at such location,* shall be deemed a nonconforming [SOB].... Any nonconforming status shall terminate if the [SOB] voluntarily *discontinues operating* as a[n][SOB] *or abandons* such use at such location for thirty (30) days or more, or if there has been a final administrative determination ... denying an application for such business at such location without further appeal, or a judicial determination upholding such denial.

ARLINGTON, TEX., CODE, SEXUALLY ORIENTED BUSINESS ORDINANCES art. III, § 3.02(A) (emphasis added). According to appellants, an SOB that has failed to continuously operate is not entitled to request an exemption from the location restrictions.

 **\*245** The evidence at the Board hearing showed that appellees had shut down La Bare for at least part of July and August 2003 for the purpose of renovating the building and hiring new staff in preparation for opening Chicas Locas. It is undisputed that the club was not open for business during that time. Appellants contend that this means the club was not continuously operated and therefore lost its nonconforming use status, thereby losing standing to pursue an exemption and maintain this subsequent appeal. Appellees, however, contend that although the club was not open for business during parts of July and August, they were nevertheless continuing to operate an SOB at that location by renovating

the club, hiring new employees, and otherwise preparing for the changed format. They also contend that whether or not they were in continuous operation under the statute is not a matter of standing but of capacity.

 [7]    We agree with appellees' latter contention. We need not interpret whether the club here was "continuous[ly] operated" under the facts as applied to this ordinance. [3] It is clear that here appellees are personally aggrieved by the Board's decision; regardless of whether they were qualified to apply for the exemption under the ordinance, they did file an application, which was rejected on the ground that the SOB violated the ordinance's location restrictions, not because the club was no longer considered a nonconforming use by virtue of its failure to continuously operate. Section 3.02 refers to the nonconforming use designation as a "status," which speaks more to appellees' *authority* or *capacity* to challenge the Board's decision rather than whether appellees have a justiciable interest in the controversy. If the City had alleged that the exemption should be denied on the ground that appellees had not continuously operated as required under section 3.02, and if the Board had rejected the application on that basis, appellees would have had standing to appeal that decision because they would have been personally aggrieved by it, i.e., they would not have been able to continue to operate their business. Here, the result is the same: the Board's decision bars appellees from operating their business. Therefore, we conclude and hold that whether the club was continuously operated does not affect appellees' standing to challenge the Board's decision here; rather it is an issue of capacity that appellants should have raised as an affirmative defense in their pleadings below. *See* TEX.R. CIV. P. 93(1)-(2); *Lovato,* 171 S.W.3d at 849; *Coastal Liquids,* 46 S.W.3d at 884 (holding that whether foreign corporation's failure to properly register with Secretary of State barred corporation's claim was issue of capacity rather than standing). We overrule appellants' first issue.

### Preservation of Error

In their second issue, appellants contend that appellees waived their procedural due process claims by failing to assert them before the Board. Appellees argue that they were not required to preserve their claims before the Board, but even if they were, they did so.

### Applicable Facts

As grounds for their summary judgment motion in the trial court, appellees alleged that they were denied due process of law in the proceedings before the Board because

> **\*246**    (A) [they were] denied cross[-]examination of witnesses and evidence in two (2) particulars: (1) individual citizens were allowed to give opening statements which were reportedly not to be part of the underlying administrative record or evidence being considered by the Board (and therefore not subject to cross[-]examination) but such testimony and comments by such citizens were specifically referenced by Board members as part of the basis for their denial of the exemption; and (2) the refusal of the [administrative law judge (ALJ) ] to allow further examination or cross[-]examination of witnesses after the completion of questioning of such witnesses by the very Board members who were sitting in judgment; and (b) [sic] the [Board] fail[ed] to make findings of fact and conclusions of law. [Citations omitted.]

The hearing took place before the Board, with an ALJ, who was not a member of the Board, presiding. The first part of the hearing consisted of commentary from members of the general public who attended the hearing. According to section 5.02(A) of the Board's rules of procedure, this commentary was not to be considered as evidence for purposes of the hearing. License & Amortization Appeal Bd. Rules of Procedure § 5.02(A) (Dec. 16, 2002). Six citizens voluntarily spoke during the public comment portion of the hearing, and the City later called three of these as witnesses during the evidentiary portion of the hearing. All six were opposed to appellees' being granted an exemption. The record shows that some of the public comment was met with audible applause.

After the first person spoke during the public comment part of the hearing, the following exchange occurred:

  [APPELLEES' COUNSEL]: It's my understanding I'm not allowed to cross [-]examine people that—

  [ALJ]: No. This is not evidence.

[APPELLEES' COUNSEL]: I just wanted to make sure.

After the public comment section of the hearing concluded, the evidentiary part of the hearing began. Appellees, who had the burden to prove entitlement to the exemption by a preponderance of the evidence, presented their witnesses first. ARLINGTON, TEX., CODE, SEXUALLY ORIENTED BUSINESS ORDINANCES art. III, § 4.11(G); License and Amortization Appeal Bd. Rules of Procedure § 5.01. The ALJ, in keeping with the Board's written procedures, allowed the City, through its counsel, to cross-examine each witness; he also allowed the parties to redirect and recross. *See* License and Amortization Appeal Bd. Rules of Procedure § 5.02(D)-(G). However, after both sides were finished, the ALJ also allowed the Board members themselves to ask questions of the witnesses. [4] However, after the Board members questioned the witnesses, the ALJ refused to allow appellees' counsel to further question witnesses to clarify matters raised in response to the Board's questions.

**\*247** Specifically, after the evidentiary part of the hearing began and after several Board members had questioned one of appellees' witnesses, appellees' counsel asked if he could clarify some matters with that witness:

[ALJ]: Any further questions from the Board? The witness may be excused. Thank you.

[APPELLEES' COUNSEL]: Some questions, some of the things I—

[ALJ]: I beg your pardon?

[APPELLEES' COUNSEL]: Because of some of the questions [from the Board], I have some additional questions for the witness if that's appropriate to clarify.

[ALJ]: I don't think that's necessary for this witness. You've had two opportunities to examine the witness.

[APPELLEES' COUNSEL]: I'd also like the record to reflect that the testimony was coming from the general public in the answer to some of the questions. [5]

[ALJ]: The Board cannot accept testimony from the general public.

My instructions to it will be that they accept only testimony that I've admitted into evidence.

At the conclusion of testimony from another witness, appellees' counsel stated,

[APPELLEES' COUNSEL]: Just a clarification. I assume all witnesses, once the Board asks questions, we're not asking further questions.

[ALJ]: Right.

[APPELLEES' COUNSEL]: Thank you.

## Analysis

Ordinarily, to preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. TEX.R.APP. P. 33.1(a); *see also* TEX.R. EVID. 103(a)(1). Here, appellees raised their due process arguments in the trial court; however, appellants claim that appellees waived them by failing to raise them at the Board hearing.

**[8]** In appeals from state agency contested case hearings under the Administrative Procedure Act (APA), an appellant waives any arguments not set forth in a timely motion for rehearing except for agreed appeals and appeals from decisions in emergency cases. TEX. GOV'T CODE ANN. §§ 2001.144(a)(3)-(4), .145(a) (Vernon 2000); *Entergy Gulf States, Inc. v. Pub. Util. Comm'n,* 173 S.W.3d 199, 210 (Tex.App.-Austin 2005, pet. denied). This requirement ensures that the aggrieved party has exhausted all administrative remedies before seeking judicial review of the agency's decision. *Lindsay v. Sterling,* 690 S.W.2d 560, 563 (Tex.1985); **\*248** *Brown v. Tex. Dep't of Ins.,* 34 S.W.3d 683, 687 (Tex.App.-Austin 2000, no pet.). The purpose of a motion for rehearing is to put the agency on notice as to the errors alleged by the party seeking judicial review. *Suburban Util. Corp. v. Pub. Util. Comm'n,* 652 S.W.2d 358, 364 (Tex.1983); *Brown,* 34 S.W.3d at 687.

**[9]** But the APA applies only to *state agency* hearings; it does not govern hearings of the Board pursuant to the City's SOB ordinance. *See* TEX. GOV'T CODE ANN. §§ 2001.001, .003(7) (Vernon 2000 & Supp.2006) (providing that the APA is meant to provide uniform procedures for state agencies, which are defined as parties with statewide jurisdiction that make rules or determine contested cases). The SOB ordinance does not provide for any rehearing by the Board; it provides only for an appeal from the Board's

decision to the district court. ARLINGTON, TEX., CODE, SEXUALLY ORIENTED BUSINESS ORDINANCES art. III, §§ 4.08(B)-(C), 4.09. Thus, appellants exhausted all of the administrative remedies available to them before seeking judicial review of the Board's decision.

Moreover, appellees' counsel did seek confirmation from the ALJ that he would not be able to cross-examine members of the public who made remarks during the public commentary; he also requested to ask further questions of at least one witness after Board members had questioned that witness, and he also confirmed with the ALJ that he would not be able to ask follow-up questions of any other witnesses after similar questioning of that witness by the Board. It was clear that the ALJ understood appellants' concerns because he specifically instructed the Board that the public commentary was not to be considered as evidence. *See* TEX.R.APP. P. 33.1(a)(1) (A); *cf. Hassan v. Greater Houston Transp. Co.,* No. 01–05–00494–CV, 2007 WL 495242, at *4 (Tex.App.-Houston [1st Dist.] Feb. 15, 2007, no pet. h.) (holding that complaint about jury charge was preserved when trial court clearly understood complaint and ruled on it). Section 5.02(A) of the Board's rules of procedure specifically provides that public comment will be taken before a Board hearing, and those same procedures do not provide for applicants to challenge the Board's procedures. License and Amortization Appeal Bd. Rules of Procedure § 5.02(A). Accordingly, we hold that appellants did not waive the contentions in their motion for summary judgment that the Board's decision could not be upheld because of due process concerns related to the public comment portion of the Board hearing and the ALJ's refusal to allow appellants to requestion witnesses after the Board members asked questions of those witnesses.

Accordingly, we hold that appellees did not waive their complaints upon which the trial court granted them summary judgment. We overrule appellants' second issue.

### Procedural Due Process

In their third issue, appellants claim that appellees failed to establish their entitlement to summary judgment on their due process claims because (1) they had no liberty or property interest in the operation of an SOB in the specific location, (2) they were given a sufficient opportunity to cross-examine all adverse witnesses, and (3) they cannot prove harm.

### Whether Appellees Have Property or Liberty Interest Entitling Them to Procedural Due Process

 [10]    [11]    The Fourteenth Amendment to the United States Constitution provides, in pertinent part, that no state may deprive any person of life, liberty, or property, without due process of law. U.S. CONST. amend. XIV. Procedural due process requires that a governmental entity's **\*249** deprivation of life, liberty, or property, even if consistent with substantive due process, must "be implemented in a fair manner." *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987). The first inquiry in any due process claim under the United States Constitution is whether the plaintiff has been deprived of a protected property or liberty interest. *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 59, 119 S.Ct. 977, 989, 143 L.Ed.2d 130 (1999).

Appellants argue that appellees had no constitutionally protected liberty or property interest requiring procedural due process by virtue of their nonconforming use status; in other words, because appellees could validly operate only by virtue of a location exemption, they were not entitled to due process protections in the exemption hearing. *See Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 460–62, 109 S.Ct. 1904, 1908–09, 104 L.Ed.2d 506 (1989) (holding that protected liberty interests may arise from the Due Process Clause itself or the laws of the states and that a state creates a protected liberty interest by placing substantive limits on official discretion, such as "mandating the outcome to be reached upon a finding that the relevant criteria have been met"); *City of Univ. Park v. Benners,* 485 S.W.2d 773, 778 (Tex.1972) ("[P]roperty owners do not acquire a constitutionally protected vested right in property uses once commenced or in zoning classifications once made."). [6]

 [12]    However, appellants do not address appellees' reliance on *Lewis v. Metropolitan Savings and Loan Association*— a Texas Supreme Court case holding that an administrative decision fails for arbitrariness if it does not comply with procedural due process—rather than the Due Process Clause. 550 S.W.2d 11, 16 (Tex.1977). In *Lewis,* the appellees contended that the appellant, the Savings and Loan Commissioner, denied them procedural due process during an administrative hearing by excluding "competent and material evidence" proffered by the appellees. *Id.* at 12. The Commissioner contended that the administrative decision could not be considered arbitrary if it was supported by substantial evidence, so any procedural irregularities were

irrelevant as long as substantial evidence existed to support his decision. *Id.* at 13.

 **[13]**    The supreme court recognized that there can be evidence in the administrative record that qualifies as substantial, yet the parties may have also been denied due process and the rudiments of fair play in the conduct of the proceeding. *Id.* at 13–14. The court also noted that in that case in particular and in similar administrative cases in which the decision maker is also a fact-finder, it was difficult or impossible to tell whether the improper exclusion of evidence (and, hence, the denial of due process) affected the result of the proceeding. *Id.* at 15. Accordingly, the court concluded and held that "arbitrary action of an administrative agency cannot stand [regardless of whether there is substantial evidence supporting the agency's decision]. There is arbitrariness where the treatment accorded parties in the administrative process denies them due process of law." *Id.* at 16.

Under Texas law regarding administrative hearings, appellees in this case were entitled to procedural due process during **\*250** the administrative hearing before the Board. *See id.* at 13; *J.B. Adver., Inc. v. Sign Bd. of Appeals of the City of Carrollton, Tex.,* 883 S.W.2d 443, 448–49 (Tex.App.-Eastland 1994, writ denied); *Closs v. Goose Creek Consol. ISD,* 874 S.W.2d 859, 874 (Tex.App.-Texarkana 1994, no writ). Accordingly, we reject appellants' argument that the Board's decision was not subject to reversal for failure to comply with procedural due process.

## Denial of Opportunity to Fully Examine Witnesses

Appellants next contend that appellees had no due process right to cross-examine or re-examine witnesses after the Board members individually questioned them upon the completion of appellants' and appellees' direct and cross-examinations.

 **[14]    [15]    [16]    [17]**    At a minimum, due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976); *see Univ. of Tex. Med. Sch. at Houston v. Than,* 901 S.W.2d 926, 930 (Tex.1995). Exactly what process is due in a given situation is measured by a flexible standard that depends on the practical requirements of the circumstances. *Mathews,* 424 U.S. at 334, 96 S.Ct. at 902; *see Than,* 901 S.W.2d at 930. The flexible standard balances the following three factors: (1) the private interest affected by the state action; (2) the

risk of erroneous deprivation of a constitutionally protected interest under the procedures used and the likely benefit of any additional procedures; and (3) the government's interest, including the fiscal and administrative burdens that additional procedural requirements would entail. *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903; *see Than,* 901 S.W.2d at 930. "Basic due process requires that when a decision maker is called upon to make a decision grounded on evidence, the parties involved should be provided fair notice and a meaningful opportunity to present their evidence." *United Copper Indus., Inc. v. Grissom,* 17 S.W.3d 797, 805 (Tex.App.-Austin 2000, pet. dism'd as moot).

 **[18]    [19]**    In administrative proceedings, due process requires that parties be accorded a full and fair hearing on disputed fact issues. *City of Corpus Christi v. Pub. Util. Comm'n,* 51 S.W.3d 231, 262 (Tex.2001); *Hammack v. Pub. Util. Comm'n,* 131 S.W.3d 713, 731 (Tex.App.-Austin 2004, pet. denied). At a minimum, it requires that the "rudiments of fair play" be observed. *Hammack,* 131 S.W.3d at 731 (quoting *State v. Crank,* 666 S.W.2d 91, 94 (Tex.1984) (op. on reh'g)). This is not to say that administrative hearings must measure up to judicial standards, but even they cannot be arbitrary or inherently unfair. *City of Corpus Christi,* 51 S.W.3d at 262 (citing *Bexar County Sheriff's Civil Serv. Comm'n v. Davis,* 802 S.W.2d 659, 664 (Tex.1990), *cert. denied,* 502 U.S. 811, 112 S.Ct. 57, 116 L.Ed.2d 34 (1991)). Moreover, the Board's own rules of procedure provide that the City may cross-examine any witnesses called by the applicant and that the applicant, in turn, may cross-examine any witnesses called by the City. License and Amortization Appeal Bd. Rules of Procedure § 5.02(E), (G).

 **[20]    [21]    [22]    [23]**    "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970). Cross-examination is a safeguard essential to a fair trial and a cornerstone in the quest for truth; longstanding principles of our jurisprudence recognize the right and necessity of full and complete cross-examination. *Davidson v. Great* **\*251** *Nat'l Life Ins. Co.,* 737 S.W.2d 312, 314 (Tex.1987). The right to cross-examine a witness is a substantial one, and it is error to so restrict it as to prevent the cross-examining party from going fully into all matters connected with the examination in chief. *Id.* "The right to cross[-] examine adverse witnesses *and to examine and rebut all evidence* is not confined to court trials, but

applies also to administrative hearings." *Richardson v. City of Pasadena,* 513 S.W.2d 1, 4 (Tex.1974) (emphasis added).

 **[24]**     In addition, the limitation of redirect can limit a party's rights:

> Re-direct is intended to permit the witness to explain answers given on cross-examination and to amplify new material elicited for the first time. The intent is to prevent the jury from being left with a false and incomplete picture created by the latitude counsel is afforded on cross-examination and counsel's ability to use leading questions. It is sometimes said that re-direct examination for this purpose is a matter of right.

*Sims v. Brackett,* 885 S.W.2d 450, 455 (Tex.App.-Corpus Christi 1994, writ denied).

 **[25]**     The Texas Rules of Evidence give the trial court "reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to [among other things] (1) *make the interrogation and presentation effective for the ascertainment of the truth ....*" TEX.R. EVID. 611(a) (emphasis added). [7] A fair opportunity for the parties to prove their respective cases is essential to an administrative hearing comporting with due process. *J.B. Adver.,* 883 S.W.2d at 449. Denial of such an opportunity affects the ability of the fact-finder to ascertain the truth of the dispute. *See* TEX.R. EVID. 102 (providing that the rules of evidence "shall be construed to secure fairness in administration, ... to the end that the truth may be ascertained and proceedings justly determined"); *Sims,* 885 S.W.2d at 455.

 **[26]**     Here, appellees were afforded an opportunity to perform direct examinations of their own witnesses and to cross-examine the City's witnesses. However, appellees were denied the right to redirect or recross witnesses after the Board members themselves had asked those witnesses questions. Some of the Board members' questions raised matters not explored by either party on direct examination or cross-examination; however, the ALJ refused to allow appellees to ask further questions even after new matters were raised by Board members.

For example, after an extensive direct, cross, redirect, and recross of Al Lozano, the general manager of Chicas Locas,

the following exchange occurred when the Board was allowed to question Lozano:

Q. Okay. Who is Alan Fitzgerald?

A. One of the managers.

Q. Is he bilingual?

A. No, he's not.

Q. Were you on duty on December 19th about midnight, when they had the big fight in the parking lot?

A. No, I was not.

 **\*252**  Q. Alan Fitzgerald was the manager on duty, right?

A. Yes.

Q. You're aware, I'm sure, that under the Ordinance it clearly states that the licensee, which you know, is the manager, also, who represents the licensee, has to be fully in possession and control of the premises and activities that go on at all times.

If you've got a 99 percent male, 80 percent Hispanic patronage, and you[r] manager at midnight doesn't speak Spanish, how do you maintain control?

A. He's not the only manager. We don't—we have more than one manager at all times in a night shift.

Q. But ultimately, somebody is in control.

He's in charge, right?

I mean, you know, you can't—somebody has got to be the man.

A. We delegate different responsibilities for different managers. I don't have one that's just totally over the night shift.

Q. Well, who's in charge of parking lot fights?

A. We don't have anybody in charge of parking lot fights.

Q. But, you see my point. You had an issue there, you've got a bad problem with—the police had to respond to it, you had a fight in the parking lot.

And nobody was real sure what happened because one of the reasons is, the manager couldn't communicate with the customers who were having the fracas.

Would that be an accurate observation?

A. Yes.

The fight referenced by the Board member was not raised by either party in their direct or cross-examinations. Other Board members asked Lozano questions about matters not raised in either the direct or cross-examinations.

In addition, after appellants' final re-cross of Lozano but before the Board members' questioning, the ALJ stated that he was going to "limit recross and redirect to issues that were explicitly raised in the previous testimony." However, the ALJ placed no such limitations upon the Board members' questions.

Another example of this limitation occurred after appellees and appellants finished questioning Dave Hardin, appellees' property values expert; the Board members then questioned him extensively. After Hardin testified about the club's lack of impact on property values, Board member Knezek noted that very few of the properties that Hardin had examined in determining that the club did not have an impact on surrounding property values had increased in value; thus, it appeared that the area around the club was stagnant and that the operation of the club could have no effect on surrounding property values. Hardin responded, "Oh no, ... I wouldn't form that conclusion, no, ma'am. It could—you could have a stagnant area and an adult entertainment facility actually harm the area. You sure could." When Board member Knezek asked if that meant that the commercial area was "on its way down," Hardin responded that, yes, the appraisal board had reduced values on all commercial properties in the area on which the owners had protested their appraised values.

Another Board member quizzed Hardin about whether lights and noise from the club could be seen from a nearby residential property. The only reference to noise made before this question was by two citizens during the nonevidentiary public comment portion of the hearing. Hardin answered that as to lights, "I would think **\*253** you could, yes, sir." But with respect to noise, he said he wouldn't know how to answer that. Finally, a third Board member got Hardin to admit that the appraised value data he had testified about would apply solely to La Bare since appraised values for

surrounding properties had been set before Chicas Locas was opened that year. After the Board's questioning of Hardin, appellees' counsel made his initial request to ask additional questions for clarification purposes, which the ALJ denied.

The tenor of the Board members' questions to these two witnesses was, at times, confrontational, as if the Board members had placed themselves in an adversarial role, conducting cross-examination instead of neutrally gathering information to assist in their fact-finding role. *See Tex. State Bd. of Med. Exam'rs v. Nacol,* 696 S.W.2d 687, 688 (Tex.App.-Beaumont 1985, writ ref'd n.r.e.) (holding that Board of Medical Examiners' decision was "made upon unlawful procedure" because, among other things, "[t]he Board acted like prosecutors rather than fact[-]finders and, in voting, used the word 'guilty' to the allegations, rather than 'true.' "). Although the cases involving due process rights speak mostly to the preservation of the right of cross-examination, here, even though appellees were allowed to initially examine and cross-examine witnesses, they were deprived of the opportunity to fully explore all factual issues, including new issues, raised by the Board's questions during appellees' case-in-chief and the City's case-in-chief. *See J.B. Advertising,* 883 S.W.2d at 449 (holding that procedure by which the appellant's attorney was allowed to present questions to Chair of Board, who then referred those questions to the witness, denied the appellant the right to cross-examination of witnesses, thus denying appellant due course of law). Thus, the ALJ's refusal to allow appellees the opportunity to further redirect after the Board members' questions was in contravention of the truthseeking nature of an adversarial, evidentiary hearing and could have affected the fact-finder's ability to ascertain the truth in this case. We conclude and hold that the ALJ denied appellees the procedural due process that they were entitled to during the hearing by refusing to allow appellees to re-examine witnesses after the Board members had asked questions of those witnesses.

It is difficult if not impossible to gauge the effect of this restriction on the result of the proceeding because we do not know what testimony may have been elicited had the ALJ not denied appellees the right to re-examine the witnesses. *See Lewis,* 550 S.W.2d at 15–16. This difficulty is compounded by the difficulty in determining the effect, if any, of the public comment portion of the hearing on the Board members. Although the commentary is supposed to be nonevidentiary and the ALJ specifically told the Board not to consider it, at least one Board member asked a question of one of

appellees' witnesses that could have been based on the public comments. [8]

 **[27]** Appellants point to the fact that the APA provides for public comment in state agency hearings. *See* TEX. GOV'T CODE ANN. § 2001.029. However, the APA does not apply here because the City and Board are not state agencies. *See id.* § 2001.003(7). In addition, this section of the APA applies to rulemaking hearings, not to contested case hearings. *Id.* § 2001.029. Rulemaking hearings are different from contested case hearings in that **\*254** "rulemaking procedures maximize 'public participation in the rulemaking process,' a stated purpose of the APA, while contested case procedures limit participation to those directly affected by the dispute." *R.R. Comm'n of Tex. v. WBD Oil & Gas Co.,* 104 S.W.3d 69, 77 (Tex.2003) (footnote omitted). Here, the Board hearing is akin to a contested case, which the APA defines as "a proceeding, ... in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for an adjudicative hearing." TEX. GOV'T CODE ANN. § 2001.003(1). Thus, the APA does not support the practice of allowing unsworn public comment that is not subject to cross-examination in an adjudicative proceeding such as this one.

 **[28]** Based on our review of the entire record, [9] we hold that appellees' procedural due process rights were violated by the restrictions on appellees' full and complete examination of public commentators and witnesses at the hearing. The active, almost prosecutorial tone of the Board's comments, when combined with the inability to discern whether the Board impermissibly took into account public commentary that was not available for cross-examination, leaves the impression that the hearing was inherently unfair to appellees. Therefore, appellees conclusively proved that the Board's decision could not be upheld because it is arbitrary and capricious. *See Lewis,* 550 S.W.2d at 16. Because an arbitrary decision cannot be upheld even if supported by substantial evidence, there are no fact issues that would preclude summary judgment and require a remand, as urged by appellees. [10] *See id.* We overrule appellants' third and fourth issues.

### Conclusion

Having overruled appellants' four issues, we affirm the trial court's judgment.

Footnotes

1    *See id.* § 4.09(B) ("The substantial evidence standard of review shall apply to such appeal."). The substantial evidence standard of review is deferential; it is generally described as a "limitation on the power of the courts to overturn a decision of an administrative agency .... [unless it] is illegal, arbitrary or capricious; that is, that it is not reasonably supported by substantial evidence." *Bd. of Firemen's Relief & Ret. Fund Trs. of Houston v. Marks,* 150 Tex. 433, 242 S.W.2d 181, 182–83 (1951); *Peaster ISD v. Glodfelty,* 63 S.W.3d 1, 5 (Tex.App.-Fort Worth 2001, no pet.).

2    Appellees acknowledge in their brief that they advanced the no-findings-of-fact ground only in the alternative; therefore, our review of the trial court's decision is limited solely to the cross-examination issues.

3    Accordingly, we also need not decide appellants' contentions regarding the construction of section 3.02.

4    Section 5.02(M) of the Board's rules of procedure provides that "Board members may ask questions of the *participants* in the hearing at any point in the proceedings." License and Amortization Appeal Bd. Rules of Procedure § 5.02(M). But "participants" is not defined, so it is unclear to whom this term refers: to the parties, attorneys, or witnesses only, or to any person participating in the proceedings? If we assign "participants" its ordinary meaning of "one that participates" in the proceedings, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1646 (2002), then presumably it applies even to those citizens who participate in the public comment section of the hearing, even though that public comment is supposed to be nonevidentiary in nature and, therefore, not for consideration by the Board.

5    It is not clear from the record whether testimony "was coming from the general public in the *answer* to some of the questions." [Emphasis added.] The record does show that Craft, who was not testifying at the time, volunteered an answer about whether nearby property was occupied; however, his answer did not appear to be related to anything said in the public comment section of the hearing. If a member of the public who was not a witness at the evidentiary part of the hearing volunteered testimony at that time, it is not shown in the record. However, counsel's comment for the record—made after requesting to ask additional questions of the witness after the individual Board members questioned that witness—can also be construed as a complaint that some of the Board members' questions appeared to presume facts stated in some of the citizens' remarks made during the public comment portion of the hearing.

6    *See also Hang On III, Inc. v. Gregg County,* 893 S.W.2d 724, 726 (Tex.App.-Texarkana 1995, writ dism'd by agmt.) (citing *Benners* for proposition that landowner has no constitutionally protected right to operate an SOB); *Smith v. Copeland,* 787 S.W.2d 420, 422 (Tex.App.-San Antonio 1990, no writ) (holding same); *City of Houston v. MEF Enters., Inc.,* 730 S.W.2d 62, 63 (Tex.App.-Houston [14th Dist.] 1987, no writ) (holding same).

7    The Board's rules of procedure provide that "[t]hese Rules of Procedure shall govern the proceedings of the Board in all cases. Robert's Rules of Order Revised shall govern only when these rules are silent." License and Amortization Appeal Bd. Rules of Procedure § 2.04. The rules do not incorporate the Texas Rules of Evidence; however, they do address certain evidentiary matters by providing that the public comments are not evidentiary, that a party's evidentiary documents will not be admitted except for good cause unless timely filed according to the Board's rules, and that certain evidence may be excluded upon a party's motion. *Id.* §§ 4.04, 5.02(A), 5.03.

8    One of the Board members asked Hardin about whether noise from the club could be heard from one of the residential properties near the club.

9    *See, e.g., Lewis,* 550 S.W.2d at 15 (stating that court's determination of whether administrative agency has discharged its duty to fully consider all surrounding facts and circumstances in fairness and justice to the competing parties "requires an examination of the whole record").

10   Our holding should not be read as determining whether substantial evidence exists to support the Board's ruling. The trial court's order simply provides appellees with another opportunity to present their evidence to the Board in a fair and adequate hearing.

---

**End of Document**                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

436 S.W.2d 923
Court of Civil Appeals of Texas.
Corpus Christi.

CITY OF CORPUS CHRISTI, Appellant,

v.

UNITARIAN CHURCH OF
CORPUS CHRISTI, Appellee.

No. 339.    |    Dec. 31, 1968.    |
Rehearing Denied Feb. 13, 1969.

After city council withheld approval of plat filed by church seeking building permit to improve its property for church purposes, church filed suit seeking declaratory judgment and writ of mandamus. The 28th District Court, Nueces County, Horace Young, J., granted writ of mandamus and ordered approval of plat as submitted and appeals were taken. The Court of Civil Appeals, Nye, J., held that city council's withholding of building permit sought by church to improve its unplatted property, which had been annexed to city, for church purposes on condition that 15% Of church's property be dedicated to complete street extension, one-half of which had been dedicated by owners of adjacent tract, was unauthorized where church wished to obtain building permit to build in connection with entire lot, with understanding that such lot would never, under proposed plat, be subdivided into two or more lots, and ordinances and statutes under which city council sought to justify condition contemplated subdivision for subdivision development purposes.

Affirmed.

**Attorneys and Law Firms**

**\*925**  I. M. Singer, City Atty., Thomas D. McDowell, Asst. City Atty., Corpus Christi, for appellant.

Boone, Davis, Cox & Hale, Owen D. Cox, Corpus Christi, for appellee.

**OPINION**

NYE, Justice.

The Unitarian Church of Corpus Christi as the owner of certain property, applied to the City of Corpus Christi for a building permit to improve its property for church purposes. The Church was told by a city department employee that the church property would have to be platted prior to the issuance of the permit. The Church prepared a plat of the property, outlining the boundaries of its lot, designating utility easements and submitted it to the City Planning Commission for approval. After a hearing on the church's application, the Commission conditionally approved the church's plat . Approval was subject to the church dedicating a strip of their land, 25 feet by 630 feet for the purpose of widening an easement so that an existing street could be extended. The church was dissatisfied and appealed this decision to the City Council seeking approval of their plat without the requirement of street dedication. After a hearing, the City Council denied the relief sought by the church. The church then filed suit in the district court seeking a declaratory judgment: that the City had no authority under the applicable statutes, charters, and ordinances to require the church to file a map or plat of its property as a condition to granting the building permit. The church sought additionally, the issuance of a writ of mandamus to compel the City to approve their submitted plat. The trial was had before the court without a jury, resulting in a judgment granting the writ of mandamus against the City and ordering approval of the plat as submitted by the Church. The City has perfected its appeal. The Church, although not dissatisfied with the judgment of the court, files its cross appeal from the order of the court denying all other relief which included the City's right to require the Church to file for approval, any plat of the lot involved.

The Unitarian Church of Corpus Christi is a non-profit religious corporation which acquired title to a certain lot which is a 2 1/2  **\*926**  acre tract of land. The church's lot was a portion of lot 6 in Section 'B' of the Paisley Subdivision which was originally platted into lots and blocks in 1896. Lot 6 of this subdivision was further subdivided prior to the time the Paisley subdivision was annexed into the City of Corpus Christi. The church's grantor purchased one of these re-subdivided lots or tracts prior to its annexation, although the church itself purchased the subject lot, after the same was brought into the city limits. Situated on the lot is a small existing building which the church sought to improve as a part of its building program. The church's lot faces a major dedicated city street (Carroll Lane) on the southeast side. The lot was and is presently served with public utilities. Adjoining the church's property on the northeast side is a tract of land (also 2 1/2 acres) called the Hancock Tract which has heretofore been platted. The owners of the Hancock Tract had dedicated to the City a strip of land 25 feet by 630 feet, being

one hafl of the proposed extension of Kay Street.[1] The City by its present action would require the Church to dedicate the other half of the Kay Street extension as a condition to the approval of the plat and the subsequently granting of a building permit. See the following diagram.



[1] [2] [3] The Church is the owner of the property within the City that is not now platted into lots and blocks. The charter of the City of Corpus Christi provides that the City '* * * shall never grant any permit to construct or repair any house or structure **\*927** within such area (unplatted property) until such map shall be so approved and filed * * *.' It follows as we discuss this point in more detail later, that it would be necessary that as a condition precedent to the granting of a building permit by the City, that the Church must file a plat of its unplatted property. It is likewise proper for a city to require a property owner to obtain a building permit prior to the erection of a building. This requirement is a valid exercise of a municipality's police power. The Church's cross points in regard to the requirement of filing a plat to obtain a building permit are overruled. The granting of the building permit is a governmental function. The permit must be granted, however, where the applicant has fulfilled all the requirements required by law. Mandamus will issue to compel the issuing of building permit that has been withheld without lawful reason. 40 Tex.Jur.2d, s 364, Municipal Corporations, p. 48.

This is a limited type law suit involving a single lot owner whose unplatted property was annexed into the City. The property owner wishes to obtain a building permit to build in connection with the entire lot, understanding that such lot would not now or ever, under its proposed plat, be subdivided into two or more lots.

[4] If the statutes, charter provisions or ordinances pertaining to the City of Corpus Christi do not impose upon the Church a legal obligation to dedicate a portion of its land for street purposes under these facts, or if such statutes, charter provisions or ordinances do not authorize the City to require a property owner to make such dedication, then

the issuance of a mandamus will be proper . Where the church has done all that the statutes and law demands, the authorized granting of a building permit becomes a mere ministerial duty, the performance of which may be compelled by mandamus. Thus where the City itself or by and through its planning commission, in its construction of the law, deprives a citizen of an unquestionable legal right and there is no other adequate remedy, the court having power to issue mandamus may review the matter. Commissioners Court v. Frank Jester Development Co., 199 S.W.2d 1004 (Tex.Civ.App.—Dallas 1947, n. r. e.)

 [5]   [6]   [7]   The charter and ordinances of a home rule city must be construed in light of constitutional and statutory provisions as they pertain to the charter provisions relating thereto. No home rule charter or ordinance passed under the home rule statute shall contain any provision inconsistent with the general laws of the state. Such a home rule city possesses powers not denied by the statute or the constitution so long as the City has incorporated those powers in its charter. Zachry v. City of San Antonio, 157 Tex. 551, 305 S.W.2d 558 (1957, affirming Tex.Civ.App. 296 S.W.2d 299).

Therefore, if the City of Corpus Christi has such power, it must be found within the following provisions of its charter, the statutes or authorized ordinances. Article V, Section 6 of the charter of the City of Corpus Christi provides in part as follows:

'Any property within the City * * * Not now platted into blocks and lots, shall be platted * * * to conform to the requirements of * * * (the) * * * Department of Public Works and Zoning and Planning Commission. Its owners, before such property is laid off and Subdivided shall file * * * a correct map thereof. The City shall never pay for the property used for streets * * * within any such subdivision, * * *' (emphasis supplied)

'* * * After approval such map shall be filed in the office of the County Clerk in the manner provided by law. The head of the engineering * * * (Department) * * * shall never grant any permit to construct or repair any house or structure within such area until such map shall be so approved and filed * * *.'

 *928  The City, by ordinance adopted in part the rules and regulations governing the platting of land into subdivisions as provided in Art. 974a, Vernon's Ann.Civ.St. Section 1 of such article provides in part as follows:

'Hereafter every owner of any tract of land situated within the corporate limits * * * who may hereafter Divide the same in two or more parts For the purpose of laying out any subdivision of any tract of land or any addition to any * * * city, or for laying out suburban lots or building lots, * * * shall cause a plat to be made thereof * * *.' (emphasis supplied).

The City's ordinance above referred to defined a subdivision as follows:

'C. SUBDIVISION. A subdivision Is the division of any lot, tract or parcel of land Into two or more parts, lots or sites, For the purpose, whether immediate or future Of sale or division of ownership. This definition also includes the resubdivision of land or lots which are a part of a previously recorded subdivision * * *.' (emphasis supplied)

'D. SUBDIVIDER AND/OR DEVELOPER. The terms 'subdivider' and 'developer' are synonymous and used interchangeably, and shall include any person, * * * who does, or participates in the Doing of, any act toward the subdivision of land within the intent, scope, and purview of this ordinance. The singular shall include the plural, and the plural shall include the singular.' (emphasis supplied).

 [8]   The language of Section 1 of Art. 974 is plural and relates to a division of property into parts. The same is true of the City charter and the applicable provisions of its ordinances. It contemplates subdivision for subdivision development purposes. The City's argument that the singular and plural include each other is not applicable to the provisions. A municipal charter is to be read as a whole and every word, phrase, and expression must be considered and interpreted as if deliberately chosen and used for a purpose. 39 Tex.Jur.2d, s 45, Municipal Corporations, p. 397. The Church does not propose to divide its property into two or more parts or to lay out a subdivision as stated in Art. 974a and the City's charter.

 [9]   [10]   We believe that the applicability of the language in Art. 974a is controlled by the word 'divide'. The statute states that 'every owner of any tract of land * * * who may hereafter Divide the same in two or more parts * * *' controls the disposition of those who are affected thereby.

The City relies upon the case of Ayres v. City Council of Los Angeles, 34 Cal.2d 31, 207 P.2d 1, 11 A.L.R.2d 503 (1949) and Southern Pacific Company v. City of Los Angeles, 242 Cal.App.2d 38, 51 Cal.Rptr. 197 (1966). However, in each of

these cases an ordinance or statute gave the authority required of them.

It is urged upon us that since the City's platting ordinance provides that whenever a half street has already been provided for, adjacent to a tract 'to be subdivided,' the other remaining half street shall be platted in such Subdivision in accordance with Section VI-A of the ordinance. (emphasis supplied). This platting ordinance refers to subdivisions and the emphasis is on 'subdivide'. The City summarizes the record and contends that the overwhelming evidence shows that the trial court erred and abused its discretion in ordering a writ of mandamus to issue against the City to approve the Church's plat in the face of the statutes, charter and ordinance which govern the approval of such plats. This is not a discretionary matter. There is no statute, charter or ordinance which would require the Church as a single lot owner to dedicate a portion of its property for streets in order to get approval of its plat to obtain a building permit, where the Church does not propose to subdivide the lot into smaller lots or otherwise divide it into a subdivision.

 **\*929**  We have no quarrel with the trial court's judgment that the various articles and ordinances make the reasonable requirement that the Church must file a plat of its unplatted lot. However, the withholding of a building permit upon the condition that a portion (amounting to 15%) of the Church's property be dedicated to public use as a condition for the approval of such plat, is not by law authorized in this case.
 **[11]**  The Church, throughout its briefs, contends that the City is attempting to take the Church's property for public use without paying adequate compensation therefor, in violation of the Constitution of the State of Texas and the United States of America. Our Texas Supreme Court has held that city charter provisions and building code ordinances which require owners of land to plat their property into blocks and lots to conform with abutting streets are not unconstitutional and where the regulations appear to be reasonable and are made to promote the general convenience and public welfare, such requirements come within the police power of the city. Halsell v. Ferguson, 109 Tex. 144, 202 S.W. 317 (1918). The City contends that this is not a 'taking' since the Church is not required to build, hence not required to plat, and therefore does not have to make a street dedication. The City says that it has not made any formal request of the Church to dedicate anything; that the City has only informed the planning commission that a plat would not be approved unless it conforms with the plan of the City to the already established and existing street pattern. In this connection the City submits that its requirement of street dedication is reasonable and

necessary, and that a need for the street is created by the new use of land that is proposed by the owner.

 **[12]**  The City's own staff admitted that the Kay Street extension was not a part of the City's general plan. However, the City argues, that its planning ordinance, which adopted article 974a, V.A.T.S., comes within the police power of the City which would authorize the City of make such requirement of the Church. The ordinance recites as its purpose:

> '* * * The purpose of promoting health, safety, morals and general welfare of the citizens of the City of Corpus Christi and the area within five (5) miles of the corporate limits of the City of Corpus Christi and to lessen congestion in the proposed streets, and to provide adequate light and air, and to prevent overcrowding of land, and to avoid undue concentration of population, and to facilitate the adequate provision of water, sewerage, and other utilities, parks and other public requirements that a platting ordinance be promulgated * * *.'

Irrespective of such all inclusive declarations of a city's police powers, without specific lawful authorization effecting the factual situation of a particular property owner, a city is not permitted to withhold a plat upon the condition that a property owner make dedication of land for street purposes. The Supreme Court has said that:

'It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident, to the powers expressly granted; their, those essential to the accomplishment of the declared objects and purposes of the corporation—not simply convenient, but indispensable. * * *' Foster v. City of Waco, 113 Tex. 352, 255 S.W. 1104 at 1105 (1923).

 **[13]**  **[14]**  Without constitutional, statutory or charter authorization it would not be a proper police function to require a property owner to dedicate its property for a public purpose without compensation. Such action would be contrary to the guarantee of the Federal and State Constitutions **\*930** in that regard.[2] In subdivision

development, a city by statute and charter and/or ordinance is authorized to require the dedication of streets, alleys and utility easements as a part of the orderly development of a city proper. There is a difference concerning the statutorily authorized dedication of streets in subdivisions, and the exercise of the police power to take private property for street purposes without compensation. In subdivision development, the city is not taking private property for public use without compensation, but is merely regulating the use thereof. This distinction has been brought out in DuPuy v. City of Waco, 396 S.W.2d 103 at 107 (Tex.Sup.1965):

"The distinguishing characteristic between eminent domain and the police power is that the former involves the taking of property because of its need for the public use while the latter involves the regulation of such property to prevent the use thereof in a manner that is detrimental to the public interest. The police power may be loosely described as the power of

the sovereign to prevent persons under its jurisdiction from conducting themselves or using their property to the detriment of the general welfare. * * * However, it is universally conceded that when land or other property is actually taken from the owner and put to use by the public authorities, the constitutional obligation to make just compensation arises, however much the use to which the property is put may enhance the public health, morals or safety.' 1 Nichols, Eminent Domain ss 1.42, 1.42(1) (3d 1964).'

We have considered all of appellant's points of error and they are overruled.

The judgment of the trial court is affirmed.

SHARPE, J., concurs in the result.

Footnotes

1    The easement along the Hancock Tract has never been opened to the public as a street. The record does not reveal whether the Hancock Tract was divided into lots when it was platted.

2    See Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W.2d 475 (1934) for an excellent discussion of the exercise of the police power by a municipal corporation).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

268 S.W.3d 653
Court of Appeals of Texas,
Dallas.

CITY OF DALLAS, Appellant

v.

Dora SAUCEDO–FALLS, Brigitte Gassaway,
Shirley Gray, John Martinez, Troy McClain,
Mona Neill, Floyd Simpson, William Turnage,
Cynthia Villareal, Ron Waldrop, Thomas Tanksley,
Michael Pruitt, and Larry Anderson, Appellees.

No. 05–08–00029–CV.    |    Aug. 18,
2008.    |    Rehearing Overruled Nov. 18, 2008.

**Synopsis**

**Background:** Police officers and firefighters brought suit against city, after they were not granted five-percent pay increase pursuant to resolution passed by city. The 193rd Judicial District Court, Dallas County, David Evans, J., denied city's plea to jurisdiction. City appealed. The Court of Appeals, 172 S.W.3d 703, affirmed. City petitioned for review. The Supreme Court, 218 S.W.3d 79, reversed and remanded. The District Court granted city's plea to jurisdiction in part. City appealed.

**Holdings:** The Court of Appeals, Lang-Miers, J., held that:

[1] "taking" claims were not ripe;

[2] city was not federal actor subject to Due Process Clause of Fifth Amendment;

[3] plaintiffs did not have property interest in pay raises set forth in language in resolution that was never adopted by city; and

[4] ordinance did not create property right in specific pay increases; but

[5] plaintiffs were entitled to opportunity to replead to cure defect in Fourteenth Amendment due process claim.

Reversed and remanded in part, and reversed and rendered in part.

**Attorneys and Law Firms**

**\*656** Barbara E. Rosenberg, Thomas P. Perkins, Janice S. Moss, James Pinson, City of Dallas Attorney's Office, Dallas, TX, for Appellant.

Robert Charles Lyon, Robert Lyon & Associates, Rowlett, TX, Bob Gorsky, Christopher David Livingston, Lyon, Gorsky, Haring, and Gilbert, LLP, Dallas, TX, for Appellees.

Before Chief Justice THOMAS and Justices FITZGERALD and LANG–MIERS.

**OPINION**

Opinion by Justice LANG–MIERS.

This is an interlocutory appeal of the trial court's order granting in part and denying in part the City of Dallas's plea to the jurisdiction. We reverse and render in part and reverse and remand in part for further proceedings.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

In February 2002, a coalition of police officers and firefighters presented the City with a signed petition seeking a special election on a pay increase for the City's sworn police officers and firefighters equal to 17% of their base salary. The City's secretary approved the petition and submitted it to the City Council. Negotiations for a salary increase between the City and representatives of the police and fire departments failed, and the City Council called for a special election on the pay increase for May 4, 2002. In the meantime, on March 20, 2002, the City Council passed Resolution No. 02–0982 (the March 2002 Pay Resolution), which approved a 5% pay increase in the base salary of each sworn employee of the police and fire departments for fiscal year (FY) 2002–03, with a similar pay increase for the next two fiscal years. The March 2002 Pay Resolution provided that it would become effective on October 1, 2002 if the voters did not approve the 17% pay increase in the May special election. The voters did not approve the pay increase. On September 30, 2002, one day before the March 2002 Pay Resolution was to become effective, the City Council passed another resolution; this one authorized a 5% pay increase for uniformed employees below the rank of deputy chief only, not for all sworn employees, and was to become effective October 29, 2002 (the September 2002 Pay Resolution). The City Council

passed an appropriations ordinance adopting the FY 2002–03 budget containing the revised pay increase approved in the September 2002 Pay Resolution.

Appellees are City police officers and firefighters currently or formerly employed in the ranks of deputy chief or above who did not receive a pay increase pursuant to the September 2002 Pay Resolution. They sued the City for back pay and benefits they contend were required by the March 2002 Pay Resolution. The City filed a plea to the jurisdiction, which the trial court denied. The City appealed. Relying on *Reata Construction Corp. v. City of Dallas,* No. 02–1031, 2004 WL 726906 (Tex. Apr.2, 2004) (per curiam), *withdrawn on reh'g,* 197 S.W.3d 371 (Tex.2006), we affirmed the denial of the plea to the jurisdiction, concluding that the City waived its immunity from suit by asserting a counterclaim for attorney's fees. **\*657** *City of Dallas v. Saucedo–Falls,* 172 S.W.3d 703, 709 (Tex.App.-Dallas 2005), *rev'd on other grounds,* 218 S.W.3d 79 (Tex.2007). The City filed a petition for review in the Texas Supreme Court. While the petition was pending, the Texas Supreme Court granted rehearing in *Reata,* withdrew its original opinion, and substituted a new opinion in its place. *See Reata Constr. Corp. v. City of Dallas,* 197 S.W.3d 371 (Tex.2006). The Texas Supreme Court noted that our opinion in this case relied on the withdrawn and replaced *Reata* opinion. *See City of Dallas v. Saucedo–Falls,* 218 S.W.3d 79, 79 (Tex.2007). As a result, the court granted the City's petition for review, reversed our judgment, and remanded this case to the trial court for further proceedings. *Id.* at 80.

On remand to the trial court, appellees filed their fourth amended petition, asserting state law claims for breach of contract, unjust enrichment, declaratory judgment, and mandamus and injunctive relief. Appellees also alleged, for the first time, a claim under section 1983. *See* 42 U.S.C. § 1983 (2003). They alleged that they had a property right to the 5% pay increase contained in the March 2002 Pay Resolution and that the City deprived them of that property right without due process, in violation of the constitution and laws of the United States. They further alleged that the City's failure to give them the pay increase violated Ordinance No. 16084 enacted by the City in 1979 (the 1979 Ordinance). They contend that the 1979 Ordinance required the City to maintain a certain percentage pay differential between grades in the sworn ranks of the police and fire departments, and the City's failure to give them the 5% pay increase in accordance with the March 2002 Pay Resolution violated the 1979 Ordinance because it modified the pay differential between the ranks that existed before the September 2002 pay increase.

In response, the City filed a second plea to the jurisdiction seeking dismissal of appellees' claims. The trial court granted the City's plea to the jurisdiction on the state law claims, but denied it on the section 1983 claim. The City appeals. [1]

## II. PLEA TO THE JURISDICTION

### A. Propriety of Plea to Challenge Validity of Claim

Appellees initially contend that a plea to the jurisdiction is not the appropriate procedure by which to challenge their section 1983 claim. They argue that the City does not have immunity for a section 1983 claim and that the trial court should not consider the merits of the claim when it decides a plea to the jurisdiction. They argue that the proper procedure to test the merits of the claim is by a motion for summary judgment. But the City contends that appellees' pleadings were not sufficient to allege a valid section 1983 claim and that, because it is not a valid claim, the pleadings do not invoke the trial court's jurisdiction over that claim. It argues that a plea to the jurisdiction is the proper procedure for such a challenge. We agree with the City.

 [1]    A party may challenge the trial court's subject matter jurisdiction by filing a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225–26 (Tex.2004). Texas courts have considered the issue in other cases in which a governmental unit used the plea to the jurisdiction procedure to challenge the validity of a section 1983 claim. *See, e.g.,* **\*658** *Myers v. Adams,* 728 S.W.2d 771, 772 (Tex.1971) (affirming trial court's judgment of dismissal of prison inmate's section 1983 claim because prisoner did not assert meritorious claim); *Gomez v. Hous. Auth. of the City of El Paso,* 148 S.W.3d 471, 476–82 (Tex.App.-El Paso 2004, pet. denied), *cert. denied,* 546 U.S. 872, 126 S.Ct. 379, 163 L.Ed.2d 166 (2005); *City of Fort Worth v. Robles,* 51 S.W.3d 436, 443–44 (Tex.App.-Fort Worth 2001, pet. denied), *disapproved of on other grounds by City of Grapevine v. Sipes,* 195 S.W.3d 689, 695 & n. 5 (Tex.2006).

 [2]    [3]    [4]    When the plea to the jurisdiction challenges the existence of jurisdictional facts, the court considers the relevant evidence submitted by the parties when it is necessary to resolve the jurisdictional issue. *Id.* at 227. This procedure generally mirrors that of a summary judgment under rule of civil procedure 166a(c). *Id.* at 228. The plaintiff has the burden to plead facts affirmatively showing the

trial court has subject matter jurisdiction. *Id.* at 226. The governmental unit then has the burden to assert and support its contention, with evidence, that the trial court lacks subject matter jurisdiction. *Id.* at 228. If it does so, the plaintiff must raise a material fact issue regarding jurisdiction to survive the plea to the jurisdiction. *Id.* at 228. [2]

**B. Standard of Review**

 **[5]**    **[6]**    **[7]**    **[8]**    **[9]**    Whether the trial court has subject matter jurisdiction is a question of law which we review de novo. *Miranda,* 133 S.W.3d at 226. In conducting our review, we construe the pleadings liberally in favor of the plaintiff and look to the plaintiff's intent. *Id.* at 226–27. We consider the pleadings and the evidence pertinent to the jurisdictional inquiry. *Id.*; *City of Dallas v. First Trade Union Sav. Bank,* 133 S.W.3d 680, 686 (Tex.App.-Dallas 2003, pet. denied). If the evidence creates a fact issue concerning jurisdiction, the plea to the jurisdiction must be denied. *Miranda,* 133 S.W.3d at 227–28. If the evidence is undisputed or fails to raise a fact issue concerning jurisdiction, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228. This standard "protect [s] the plaintiffs from having to 'put on their case simply to establish jurisdiction.' " *Id.* (quoting *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000)).

### III. SECTION 1983

 **[10]**    Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. A claim under section 1983 must allege two essential elements: (1) the conduct complained of was committed by a person acting under color of state **\*659** law, and (2) the conduct deprived a person of a federally protected right. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d

662 (1986). The City does not dispute that municipalities are included within the definition of "person" for purposes of a section 1983 claim. *See Monell v. Dep't of Soc. Servs. of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

 **[11]**    **[12]**    **[13]**    **[14]**    The first step in analyzing appellees' claim under section 1983 is to determine whether they have alleged a property right recognized by federal law. *See Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Section 1983 does not create substantive rights; it provides a remedy for a violation of a federal right created elsewhere. *Albright,* 510 U.S. at 271, 114 S.Ct. 807. Therefore, appellees must allege a property right created by a statute, ordinance, or regulation. *See Roth,* 408 U.S. at 577, 92 S.Ct. 2701 (property rights "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits"). The "hallmark" of a property right is "an individual entitlement grounded in state law which cannot be removed except 'for cause.' " *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (citing *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 11–12, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); *Goss v. Lopez,* 419 U.S. 565, 573–74, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); and *Roth,* 408 U.S. at 576–78, 92 S.Ct. 2701).

Appellees' pleadings allege a section 1983 claim encompassing violations of the Due Process Clause of the Fourteenth Amendment and the Just Compensation Clause of the Fifth Amendment, as applied to the states through the Fourteenth Amendment. [3] *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 175 n. 1, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

**A. Fifth Amendment "Takings" Claim**

 **[15]**    The trial court rendered a supplemental order in which it denied the City's plea to the jurisdiction on appellees' "claims of a taking under the Fifth Amendment and 42 U.S.C. § 1983...." The City contends that appellees' takings **\*660** claim under the Fifth Amendment is not ripe because they have not pursued a state takings claim. To the extent appellees' pleadings allege a violation of the Just Compensation Clause of the Fifth Amendment, we agree. *See City of Dallas v. VRC LLC,* 260 S.W.3d 60, 67 (Tex.App.-

Dallas 2008, no pet. h.) (citing *Williamson County Reg'l Planning Comm'n,* 473 U.S. at 195, 105 S.Ct. 3108).

Accordingly, we reverse the trial court's denial of the City's plea to the jurisdiction on appellees' Fifth Amendment takings claim and render judgment for the City on that claim.

**B. Claims for Violation of Due Process**

 **[16]**    Appellees also alleged that the City violated their due process rights guaranteed by the Fifth and Fourteenth Amendments. U.S. CONST. amend. V, XIV, § 1. The Due Process Clause of the Fifth Amendment to the United States Constitution applies only to violations of constitutional rights by the United States or a federal actor. *See Jones v. City of Jackson,* 203 F.3d 875, 880 (5th Cir.2000). Appellees' pleadings affirmatively negate that the City is a federal actor. As a result, the trial court erred by denying the City's plea to the jurisdiction on this ground.

We reverse the trial court's denial of the City's plea to the jurisdiction on appellees' claim for violation of the Due Process Clause of the Fifth Amendment and render judgment for the City on this claim.

 **[17]    [18]    [19]    [20]    [21]**    The Due Process Clause of the Fourteenth Amendment encompasses both substantive and procedural due process. *See Byers v. Patterson,* 219 S.W.3d 514, 524–26 (Tex.App.-Tyler 2007, no pet.). Appellees do not allege which of these they contend the City violated. A violation of substantive due process occurs when the government deprives individuals of constitutional rights by an arbitrary use of its power. *Id.* at 525. A procedural due process violation occurs when a government makes decisions without appropriate safeguards. *Id.* at 526. Procedural due process requires an opportunity for a hearing appropriate to the nature of the case. *Id.* Under either claim, appellees must allege a constitutionally protected property right.

**1. Claim that the March 2002 Pay Resolution created a property right**

Appellees initially contend that the March 2002 Pay Resolution was final and binding on the City and required the City to provide all sworn police officers and firefighters a 5% pay increase regardless of rank. They argue that the City deprived them of that property right by not implementing the pay increase. The City argued in its plea to the jurisdiction that appellees never had a property right to the 5% pay increase and that the March 2002 Pay Resolution only announced the

intent to provide a pay increase. It argued that the March 2002 Pay Resolution directed the city manager to submit an increase in the budget but did not require the City Council to pass the increase. The City argues that appellees' pleadings do not allege a valid section 1983 claim because they did not have a property right to the pay increase contained in the March 2002 Pay Resolution.

**March 2002 Pay Resolution**

The March 2002 Pay Resolution provides, in relevant part:

**SECTION 1.** That the City Manager is directed to include in the budget for fiscal year 2002–03 a five percent increase in the base salary of each sworn employee of the Police and Fire Departments of the City, to be effective October 1, 2002.

**SECTION 2.** That it is the intent of the City Council that a five percent increase **\*661** in the base salary of each sworn employee of the Police and Fire Departments also be included in the budget for fiscal year 2003–04, to be effective October 1, 2003, and the budget for fiscal year 2004–05, to be effective October 1, 2004.

**SECTION 3.** That, if a police and fire pay proposition is submitted to the qualified voters of the City of Dallas at a May 4, 2002 special election and the proposition is not approved by the qualified voters participating in the election, then this resolution will take effect on May 8, 2002, after the City Council's canvassing of the results of the May 4, 2002 election. If, however, a police and fire pay proposition is submitted at a May 4, 2002 special election and is approved by the qualified voters participating in the election, then this resolution will have no effect, and it is accordingly so resolved.

 **[22]    [23]**    The City, as a home rule city, derives it power to legislate from the Texas Constitution and the local government code. *See* TEX. CONST. art. XI, § 5; TEX. LOCAL GOV'T CODE ANN. § 51.072 (Vernon 2008); *Int'l Ass'n of Fire Fighters, Local 1173 v. City of Baytown,* 837 S.W.2d 783, 788 (Tex.App.-Houston [1st Dist.] 1992, writ denied). The power of a home rule city is subject to and may be limited only by its charter, the constitution, or by general law. *Local 1173,* 837 S.W.2d at 788. Under Texas law, the governing body of a home rule city may set the amount of compensation for its employees. TEX. LOCAL GOV'T CODE ANN. § 141.004 (Vernon 2008).

**[24]** The City establishes its standards for compensation in its charter and code. *See, e.g.,* DALLAS, TEX., CHARTER ch. XXIV, § 18 (2006); DALLAS CITY CODE §§ 34–15–34–16 (1997). The City Council must approve all City employee position classifications and their corresponding pay rates. DALLAS CITY CODE § 34–4(39) (1997) (defining Salary and Classification Schedule as "a city council-approved resolution that establishes all position classifications for city employment and the corresponding pay rates"). The City Charter addresses the procedure by which appropriations for pay increases are approved. *See* DALLAS, TEX., CHARTER ch. XI, § 3 (2006). It requires the city manager to submit an estimated budget to the City Council on August 15 for the next fiscal year beginning October 1. The City Council then must pass an appropriations ordinance on first reading; conduct a public hearing on the proposed budget; publish the ordinance, noting items in the city manager's estimate that were omitted or changed by the City Council; and, after ten days, pass the appropriations ordinance on final reading. After final passage, the appropriations become effective immediately and the funds are appropriated effective October 1. The only authorized City expenditures are those made through the City Council-approved appropriations ordinance. *See id.* § 6 (2006) ("No money shall be drawn from the city treasury, nor shall any obligation for the expenditure of money be incurred, except in pursuance of appropriation made by the council ....") & ch. XXIV § 18 ("The wages, hours and conditions of employment of any and all of the city employees shall be fixed and approved by the city council.").

When the City Council passed the appropriations ordinance for the FY 2002–2003 budget, the City Council did not approve the pay raise contained in the March 2002 Pay Resolution. Instead, it approved a 5% pay increase for sworn employees below a specified rank only. Although appellees argue that the March 2002 Pay Resolution is binding on the City Council, they have not cited any authority to support **\*662** that contention, and we have not found any authority stating that the City Council does not have the power to modify or rescind its resolutions.[4] Additionally, appellees have not cited any authority stating that the March 2002 Pay Resolution was exempted from the procedure required by the City Charter for implementing a pay increase for the next fiscal year. And the language of the March 2002 Pay Resolution contemplates that the procedure would be followed.

Consequently, we conclude that the City Council acted within its legislative authority when it did not approve the pay increase contained in the March 2002 Pay Resolution. *See Local 1173,* 837 S.W.2d at 788. And, as a result, we also conclude that appellees have not alleged "an individual entitlement grounded in state law which cannot be removed except 'for cause' " created by that pay resolution. *See Logan,* 455 U.S. at 430, 102 S.Ct. 1148; *City of Beaumont v. Bond,* 546 S.W.2d 407, 410–11 (Tex.Civ.App.-Beaumont 1977, writ ref'd n.r.e.). At most, appellees alleged that they had an expectation of a pay increase. *See Roth,* 408 U.S. at 577, 92 S.Ct. 2701; *Jackson v. Houston Indep. Sch. Dist.,* 994 S.W.2d 396, 399–400 (Tex.App.-Houston [14th Dist.] 1999, no pet.). But because appellees have not alleged a vested property right entitling them to federal protection pursuant to the March 2002 Pay Resolution, they did not allege a valid section 1983 claim based on that resolution. *See Byers,* 219 S.W.3d at 526.

## 2. Claim that the 1979 Ordinance created a property right

Appellees also argue on appeal that the City's decision to deny them a 5% pay increase by passing the September 2002 Pay Resolution violated the percentage pay differential requirement contained in the 1979 Ordinance, and, as a result, deprived them of a constitutionally protected property right. They contend that the 1979 Ordinance requires the City to maintain the current percentage pay differential and, by implementing the FY 2002–2003 budget, the City created an ongoing disparity in their salaries that will be renewed and increased each time the City implements a pay increase. The City argues that appellees did not plead a property right because whether government employees receive a pay increase is a legislative determination and not a protected property right. It contends that appellees were never entitled to a 5% increase and the 1979 Ordinance does not provide an enforceable right.

### The 1979 Ordinance

**[25]** In a special election held on January 20,1979, the voters of Dallas approved two propositions concerning the pay of employees in the police and fire departments. The City passed the 1979 Ordinance implementing those voter-approved propositions. The relevant portion of the 1979 Ordinance provides:

> Be it ordained that: ... (2) The current percentage pay differential between grades in the sworn ranks of the Dallas

Police Force and the Fire Fighter and Rescue Force shall be maintained....

Because the 1979 Ordinance was implemented following a voter-approved special election, the City Charter states that the **\*663** ordinance is binding on the City and cannot be repealed or amended except by a vote of the people:

> If a majority of the qualified electors voting on said proposed ordinance shall vote in favor thereof, such ordinance shall thereupon become a valid and binding ordinance of the city, and any ordinance proposed by petition, or which shall be adopted by a vote of the people, cannot be repealed or amended except by a vote of the people.

DALLAS, TEX., CHARTER ch. XVIII, § 14. It is undisputed that this ordinance has not been repealed or amended.

In their live pleading, appellees alleged, "By omitting those holding the rank of Deputy Chief and above from the FY 2002–2003 budgeted pay raise, the pay differential between the ranks as they existed before the raise has been modified in violation of the 1979 Ordinance 16084." They later alleged, "Plaintiffs would show that pursuant to the [1979] Ordinance and the [March 2002 Pay] Resolution that they had a property interest in receiving their 5% raise and that the City has deprived them of their property interest, without due process, by not paying them their raise."

 [26]   We construe these pleadings to state that the 1979 Ordinance created a property right to the 5% pay increase because the ordinance required the City to maintain the percentage pay differential, and the pay increase that was passed, the September 2002 Pay Resolution, modified that required percentage pay differential. State law sources for property interests include municipal ordinances. *See Roth,* 408 U.S. at 577, 92 S.Ct. 2701.

 [27]   We agree with the City that the 1979 Ordinance did not create a property right to a specific pay increase, in this case, a 5% pay increase. Additionally, this Court has previously held that the 1979 Ordinance is ambiguous about whether the parties intended the percentage pay differential language to apply to all pay resolutions passed after 1979. *See Arredondo v. City of Dallas,* 79 S.W.3d 657, 668 (Tex.App.-Dallas 2002, pet. denied). In *Arredondo,* we concluded that

the 1979 Ordinance was reasonably susceptible to more than one meaning, and we remanded the issue to the trial court for resolution by the fact-finder. *Id.* That issue has not been resolved on remand. *See City of Dallas v. Albert,* 214 S.W.3d 631 (Tex.App.-Dallas 2006, pet. filed). However, because the 1979 Ordinance is binding on the City until it is amended or repealed by the voters, it arguably created a right to the maintenance of a certain percentage pay differential that was violated when the City passed the September 2002 Pay Resolution limiting the pay increase to officers of a certain rank. As a result, we conclude that appellees' pleadings allege sufficient facts to raise a fact issue about whether they have a constitutionally protected property right. *See Logan,* 455 U.S. at 430, 102 S.Ct. 1148; *Roth,* 408 U.S. at 577, 92 S.Ct. 2701; *City of Beaumont,* 546 S.W.2d at 410–11.

**3. Claim that City's conduct violated Due Process Clause**

In addition to alleging a constitutionally protected property right, appellees were also required to allege sufficient facts to raise a fact issue about whether the City deprived them of that property without due process. *See Patterson,* 219 S.W.3d at 525–26. On appeal, appellees argue that "final policymakers of the City decided to deny Plaintiffs a 5% raise. This denial occurred in direct contradiction to the Ordinance and the Resolution." They contend that this is sufficient to meet the pleading requirements. However, appellees did not allege what process they were due, or that the City's action in denying **\*664** them the pay increase was arbitrary and capricious or denied them an opportunity to be heard. *See Logan,* 455 U.S. at 428–35, 102 S.Ct. 1148; *Patterson,* 219 S.W.3d at 525–26.

We conclude that appellees' pleadings do not affirmatively demonstrate the trial court's jurisdiction on their Fourteenth Amendment due process claim, but also do not affirmatively demonstrate incurable defects in jurisdiction. *Miranda,* 133 S.W.3d at 226–27. As a result, *Miranda* requires that appellees be given an opportunity to replead to cure the pleading defect. *Id.* Accordingly, we reverse the trial court's denial of the City's plea to the jurisdiction on appellees' Fourteenth Amendment due process claim and remand to that court for further proceedings consistent with this opinion.

### IV. CONCLUSION

We reverse the trial court's order denying the City's plea to the jurisdiction on appellees' takings and due process

claims under the Fifth Amendment and section 1983 and render judgment for the City on those claims. We reverse the trial court's order denying the City's plea to the jurisdiction on appellees' due process claim under the Fourteenth Amendment and section 1983 and remand that claim for further proceedings consistent with this opinion.

Footnotes

1    Appellees originally cross-appealed the trial court's order granting the City's plea to the jurisdiction on the state law claims, but they moved to dismiss the appeal on those claims. We granted the motion, and those claims are not before us.

2    Appellees argue that *Howlett v. Rose,* 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990), holds that a trial court must exercise jurisdiction over a section 1983 action and cannot grant a plea to the jurisdiction dismissing that claim. We do not agree. *Howlett* held that a state court could not refuse to entertain a section 1983 claim on the ground that the claim was barred by sovereign immunity. *See id.* at 356, 110 S.Ct. 2430. It held that a state court could apply its own neutral procedural rules to federal claims, unless those rules are preempted by federal law. *Id.* at 372, 110 S.Ct. 2430. The plea to the jurisdiction procedural rule is such a neutral state procedural rule. *See Thomas v. Allen,* 837 S.W.2d 631, 632–33 (Tex.1992); *Myers,* 728 S.W.2d at 772.

3    Appellees' live pleading states, "the City has deprived [appellees] of their property interests, without due process, by not paying them their raise." Appellees' trial brief states that "the City decided to deny [appellees] a 5% raise. This denial occurred in direct contradiction to the 1979 Ordinance and the Resolution." At the hearing on the plea to the jurisdiction, counsel for appellees stated
the City passed the resolution that said, well, we're giving [the raise] to all the sworn employees except for you. And that's a property right. It's clear. It's constitutional. And it's not an adverse—or it's not—yeah, it's not an adverse [sic] condemnation, it's *not a taking,* it's a due process right (emphasis added).
Later, when the trial court asked counsel to explain the distinction between appellees' Fifth Amendment and Fourteenth Amendment claims, he said, "I think what we're trying to do is tie that 14th Amendment—or tie the 5th Amendment in with the 14th Amendment." Although the record appears to indicate that appellees did not allege a taking claim under the Fifth Amendment, the trial court's supplemental order denying the plea to the jurisdiction references appellees' "claims of a taking under the Fifth Amendment and 42 U.S.C. § 1983" and specifically states that the claim is "allowed to go forward."

4    We note that the Dallas City Charter appears to make a distinction between resolutions or ordinances passed by the City Council and ordinances passed by voter propositions. In the latter situation where voters have passed a proposition approving an ordinance, the ordinance is a "valid and binding ordinance of the city, and ... cannot be repealed or amended except by a vote of the people." DALLAS, TEX., CHARTER ch. XVIII, § 14 (2006).

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

851 S.W.2d 896
Court of Appeals of Texas,
Austin.

CITY OF EL PASO and Public
Utility Commission of Texas,
v.
EL PASO ELECTRIC COMPANY.

No. 3–92–038–CV.  |  March 10, 1993.
| Rehearing Overruled May 26, 1993.

Electric company and city sued for judicial review of final order issued by public utility commission in fuel reconciliation proceeding. The 147th Judicial District Court, Travis County, F. Scott McCown, J., affirmed agency order in one part and reversed it in another, remanded case to commission, and commission and city appealed. The Court of Appeals, Powers, J., held that: (1) commission was required to provide explanation for choice of meaning it assigned to word "prospectively" which produced inconsistent treatment of capacity costs in two back-to-back reconciliation periods, and (2) commission was not obliged to deduct all profit from off-system sales in calculating company's known and reasonably predictable fuel costs.

Affirmed.

**Attorneys and Law Firms**

**\*897** Norman J. Gordon, Diamond, Rash, Gordon & Jackson, P.C., El Paso, for City of El Paso.

Dan Morales, Atty. Gen., Mary A. Keeney, Asst. Atty. Gen., Austin, for Public Utility Com'n of Texas.

John F. Williams, Clark, Thomas, Winters & Newton, Austin, for El Paso Elec. Co.

Before POWERS, ABOUSSIE and B.A. SMITH, JJ.

**Opinion**

POWERS, Justice.

El Paso Electric Company and the City of El Paso sued for judicial review of a final order issued by the Public Utility Commission in a contested case, a "fuel-reconciliation proceeding" initiated by the Company in which the City

intervened. *See* Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c, § 69 (West Supp.1993); Texas Administrative Procedure and Texas Register Act (APTRA), Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19 (West Supp.1993). In its final judgment, the district court affirmed the agency order in one part and reversed it in another, remanding the case to the Commission. The Commission and the City appeal. *See* APTRA § 20. We will affirm the district-court judgment.

**FUEL–RECONCILIATION PROCEEDINGS**

An electric utility is generally entitled to recover through its rates any sums expended for reasonable and necessary operating expenses, including the cost of fuel and fuel-related items. PURA § 39(a). A utility incurs these fuel costs directly when it generates its own electric power; it incurs them indirectly, as an element of the price paid, when the utility buys electric power from another. Although the Company generates its own electric power, it also purchases electric power under a contract with Southwestern Public Service Company.

Before 1983, the Commission calculated an electric utility's operating expenses (and hence the utility's rates) based on actual fuel costs, authorizing the utility to "pass through" automatically to its customers any increases or decreases in such costs. [1] The legislature forbade the practice in 1983. [2] To accommodate the new legislation, **\*898** the Commission promulgated a set of rules known collectively as the "fuel rule." 8 Tex.Reg. 3540 (1983) (16 Tex.Admin.Code § 23(b), since amended).

As a practical matter, the Commission cannot embark upon and decide a new rate case with each variation in fuel prices. The agency therefore adopted, for its ratemaking, the device of a "fixed fuel factor." This factor is the sum of a utility's "known costs" for fuel plus its "reasonably predictable fuel costs." The latter element renders the sum a mere estimate of the utility's fuel costs. Nevertheless, the estimate is fixed for ratemaking purposes as the utility's hypothetical fuel cost; it is used in calculating the utility's total operating expenses and, ultimately, the rates the utility is permitted to charge its customers. 16 Tex.Admin.Code §§ 23.23(b)(2)(B), 23.23(c). Because actual fuel costs may vary from the estimate, after the rates go into effect, the utility may recover through its rates more or less than the net income its rates were designed to produce. Consequently, the fuel rule provides for periodic

adjustments or "reconciliations" of the difference between actual fuel costs and the hypothetical cost represented by the fixed-fuel factor. 16 Tex.Admin.Code § 23.23(b)(2)(H). The reconciliation may be part of a general rate case or an independent reconciliation proceeding. *Id.* Depending on the result of the reconciliation, the utility may be required to refund to its customers an over-recovery of fuel costs or it may be permitted to recoup an under-recovery through surcharges to its customers. 16 Tex.Admin.Code §§ 23.23(b)(2)(B), (F), (G).

## PURCHASED–POWER CAPACITY COSTS

Not every fuel-related cost is includable in a utility's fixed-fuel factor; consequently, not every fuel-related cost is recoverable through the reconciliation process. One excludable item is denominated "purchased power capacity costs." The term "capacity costs" refers to one element of the price charged by a seller of electric power—an element that represents the seller's fixed costs in generating the power. (Another element, denominated "energy charges," represents the seller's variable costs in generating the power—the cost of fuel, for example). A Commission regulation presently excludes from a utility's fixed-fuel factor the capacity-cost element of purchased power "unless the utility demonstrates that such treatment is justified by special circumstances." 16 Tex.Admin.Code § 23.23(b)(2)(B)(ii). The Commission's regulations did not always allow for exceptions when "justified by special circumstances." Before the regulation was adopted, the Commission issued its final order in an earlier contested case under the agency's docket number 6350.

### Docket Number 6350

Docket number 6350 was a general rate case that included a reconciliation proceeding. The Company satisfied the Commission that special considerations justified reconciliation treatment of the capacity costs the Company paid to Southwestern, during the period March 1984 through July 1985, even though such costs would *not* ordinarily be entitled to such treatment. The Commission's final order in docket number 6350 demonstrates that the special considerations were "equitable" in nature: (1) the purchases of power from Southwestern had benefitted the Company's customers; (2) capacity costs were a necessary element of the Southwestern charges; and (3) it would be inequitable to penalize the Company for successfully

reducing its customers' bills by purchasing cheaper power from Southwestern. The Commission's decision in this earlier case preceded by about nine months the amendment of the fuel rule to allow expressly for the reconciliation of capacity costs upon a demonstration of "special circumstances"; that is to say, the Commission viewed the equitable considerations as amounting to an *implied* exception to a general rule that capacity costs were non-reconcilable. It appears to **\*899** us self-evident, therefore, that "equitable" considerations could come within the *express* exception presently made by section 23.23(b)(2)(B)(ii) for "special circumstances." No argument is made to the contrary in the present appeal.

The Commission's final order in docket number 6350 also adopted a part of the examiner's report wherein he stated that he agreed with a witness's view that the capacity costs paid to Southwestern "should be treated as a non-reconcilable expense *prospectively.*" This gives rise to a part of the present controversy.

### Docket Number 8588

The contested case now before us on appeal was conducted under the Commission's docket number 8588. It is not a rate case but rather an independent reconciliation proceeding. In this proceeding, the Company requested reconciliation of $4,202,090 in capacity costs paid to Southwestern between July 31, 1985, and April 25, 1986, a period of about nine months. The period is the interval between the last day of the reconciliation period covered in docket number 6350 (July 31, 1985) and the effective date of the new rates established in that contested case (April 25, 1986). As special circumstances justifying reconciliation of the capacity costs paid in that period, the Company pointed to the Commission's final order in docket number 6350, wherein the agency had declared that capacity costs should be treated as non-reconcilable "prospectively." The word "prospectively" meant, according to the Company, from and after the effective date (April 25, 1986) of the new rates established in docket number 6350. Hence, by force of that order, the Company was entitled to reconciliation of capacity costs paid in the nine-month interval before the new rates became effective.

In its finding of fact 14 in docket number 8588, the Commission rejected the Company's contention, stating simply that the Company had "failed to show special circumstances warranting inclusion" of such capacity costs in the reconciliation. The sole basis for this conclusion is found

in a portion of the examiner's report, which the Commission adopted in its final order: The word "prospectively," as used in the final order in docket number 6350, meant from and after July 31, 1985—the end of the reconciliation period covered in docket number 6350—as opposed to the Company's contention that the word meant from and after April 25, 1986, the effective date of the rates set in the Commission's final order in docket 6350.

The Company sued for judicial review of this aspect of the Commission's final order in docket number 8588. The district court reversed the agency order on the ground that it was arbitrary and capricious in failing adequately to explain why the capacity charges were admitted to reconciliation in the one period and denied reconciliation in the next succeeding period. The court remanded the case to the Commission to supply an explanation. In the Commission's only point of error and in the City's first point of error, they complain of this aspect of the district-court judgment.

### Discussion and Holdings

 **[1]**    In its final order in the present case, the Commission gave a *single* ground for its decision regarding capacity costs: the Company failed to demonstrate the requisite "special circumstances" because the word "prospectively," as used in the final order adjudicating docket number 6350, meant from and after July 31, 1985. The final order in the present case, excluding capacity costs from reconciliation, must stand or fall on that basis. We are not at liberty to sustain the order on some other basis *we* might imagine as being sufficient for the different treatment in the two cases—for example, an apparent difference in the material factual circumstances as between the two proceedings. We may judge the sufficiency of the Commission's order solely on the basis given by the agency itself for its decision; to do otherwise would constitute an invasion of the agency's province. *Morgan Drive Away, Inc. v. Railroad Comm'n,* 498 S.W.2d 147, 152 (Tex.1973); **\*900** *Professional Mobile Home Transp. v. Railroad Comm'n,* 733 S.W.2d 892, 904 (Tex.App.—Austin 1987, writ ref'd n.r.e.).

 **[2]**    We note first that the examiner's purported explanation—that the word "prospectively" meant from and after July 31, 1985—adds nothing to enlighten the Commission's naked conclusion that the Company had failed to demonstrate the necessary special circumstances. Both the conclusion and the purported explanation are equally opaque. The word

"prospectively" was ambiguous in context, and nothing in the record before us suggests why the Commission preferred one date over another. We are left ultimately with the stark conclusion that "prospectively" means from and after July 31, 1985, *merely because that is what the examiner in docket number 8588 decided it meant.* Was the Commission legally obliged to supply an actual reason or explanation for its choice of meanings? We believe it was.

We cannot find that the legislature has imposed upon the Commission, by an explicit statutory enactment, a duty to supply an explanation or reason for its action. But such a requirement need not have a statutory origin. It is preeminently a concomitant of a court's duty of judicial review, a duty assigned the trial court and this court in PURA § 69. This statute contemplates meaningful judicial review, not a charade of the real thing; therefore it implies a power to require the Commission to supply any reasons or explanations necessary for the reviewing court to understand the Commission's final order.

> If the administrative action is to be tested by the basis upon which it purports to rest, that must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "*We must know what a decision means before the duty becomes ours to say whether it is right or wrong.*"

*S.E.C. v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (emphasis added) (citations omitted); *see also S.E.C. v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("[T]he orderly functioning of the process of review *requires* that the grounds upon which the administrative agency acted be *clearly disclosed* and adequately sustained.") (emphasis added); *see generally* Bernard Schwartz, *Administrative Law* § 7.29, at 429 (2d ed. 1984); Kenneth C. Davis, *Administrative Law Text* § 16.07, at 326 (3d ed. 1972). The requirement of explanations or reasons is frequently imposed when it appears to the reviewing court that an agency has departed from its earlier administrative policy or there exists an apparent inconsistency in agency determinations. Louis Jaffe,

*Judicial Control of Administrative Action* 587 (1965); *see, e.g., Atchison, T. & S.F. Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973); *Secretary of Agric. v. United States,* 347 U.S. 645, 653, 74 S.Ct. 826, 831, 98 L.Ed. 1015 (1954). The requirement for explanatory "reasons" should not be confused with a statutory requirement that binds an agency to supply findings of fact in support of its conclusions of law, as in APTRA § 16(b). "Reasons differ from findings in that reasons relate to law, policy, and discretion rather than to facts." Davis, *supra,* at 326. Nevertheless, agencies frequently use findings of fact to explain the conclusions which express their choices in matters of discretion, law, and policy. Schwartz, *supra,* at 428–30.

 **[3]**    We believe the Supreme Court of Texas, in *Public Utility Commission v. Gulf States Utilities,* 809 S.W.2d 201, 212 (Tex.1991), adopted a requirement that agencies must supply explanations or reasons when these are necessary to an intelligent understanding of their final orders. There, the court reversed a Commission decision because the agency record revealed that the Commission had apparently considered only a *single* factor in taking a particular discretionary action (dividing between a utility and its ratepayers the benefit of proceeds received from the sale of a utility asset). The court noted that numerous *other* factors, including equitable considerations, **\*901**  appeared applicable to the agency's decision in the matter. In reversing the Commission's final order, the court wrote that the agency "ignored" the other, apparently applicable factors, while referring only to the testimony of two witnesses whose conclusions were not explained in the record, and "the Commission did not articulate its reasons for" deciding the issue based on the single factor alone. In its remand, the court refrained from instructing the Commission to consider particular factors and from prohibiting its consideration of other factors, leaving the agency free to choose and "set forth the factors it considers relevant" together with an explanation of "how these factors are evaluated in the present case." *Id.* at 211–12. While the court nominally reversed the agency order for a want of "substantial evidence," it is readily apparent that the court did so only because of the rather peculiar meaning "substantial evidence" bears in Texas administrative law—a meaning that generally incorporates into a single legal precept both arbitrary and capricious agency action under APTRA § 19(e)(6) and a true want of substantial evidence under APTRA § 19(e)(5). *See generally* Kerry McGrath, *Substantial Evidence Review in Texas—Still Insubstantial After All These Years,* 44 Baylor L.Rev. 223 (1992).

We hold, therefore, that the Commission's final order erroneously omitted to supply a necessary explanation for the choice of meaning it assigned to the word "prospectively," producing thereby the inconsistent treatment of capacity costs in the two back-to-back reconciliation periods. As in *Gulf States,* the agency order in docket number 8588 referred only to the statement of an individual (the hearing examiner in docket number 6350) whose naked conclusion was not explained in the record. We agree with the trial court that the failure to supply the necessary explanation was an abuse of discretion under APTRA § 19(e)(6); it is immaterial that under the peculiar Texas view of "substantial evidence" the omission would also amount to a want of "substantial evidence" under APTRA § 19(e)(5).

The City and the Commission raise several arguments to the contrary. They first complain the Company offered no "evidence" of special circumstances. It is clear from the record, however, that the Company was not relying upon evidentiary grounds for its contention that such special circumstances existed in docket number 8588, the case we now review. Rather, the Company was relying upon legal grounds—that the final order in docket number 6350, properly construed, encompassed the nine months for which reconciliation was requested in docket number 8588. Indeed, the Commission in docket number 8588 rejected the claim for reconciliation *on legal grounds,* not evidentiary or factual grounds, by basing the agency ruling on a construction of the previous order, albeit in a manner contrary to that advocated by the Company. We do not understand that the term "special circumstances" means evidentiary grounds exclusively, and no party suggests that it does.

The City and the Commission argue next that the examiner's report in docket number 6350 was "clear" in *affirmatively* and *expressly prohibiting* "prospective recovery of capacity charges," meaning "all capacity charges not placed in issue in that docket." We disagree.

The relevant part of the examiner's report declares: (1) the examiner agreed that capacity costs "should be treated as a non-reconcilable expense prospectively"; (2) however, that would be inequitable (for specified reasons) with respect to "past payments" of such costs; (3) therefore, the examiner recommends that "prior" capacity-cost expenses be included "in the reconciliation balance." These declarations *are* clear on one point—capacity costs paid before July 31, 1985, the end of the reconciliation period in docket number 6350, would be reconcilable expenses under the

examiner's recommendation. The declarations are *not* clear in the sense urged by the City and the Commission—that they *affirmatively* and *expressly prohibit* reconciliation of the capacity costs presently in dispute. In fact, the City offers no argument in support of its conclusion that the declarations are "clear" in excluding *these* capacity **\*902** costs from reconciliation; the Commission offers only the opaque generality that an administrative agency's interpretation of its order is entitled to judicial deference.

We find in the declarations nothing to suggest that the Commission, by adopting its examiner's report in docket number 6350, prohibited reconciliation of capacity-cost expenses in the period July 31, 1985—April 25, 1986. Indeed, the examiner's declarations reasonably imply in context that capacity costs paid in the period were entitled to the same equitable justification because April 25, 1986, was the date when the examiner's declarations first acquired legal force and effect by the Commission's adoption of them. The terms of the examiner's recommendation do not suggest that the equitable considerations became inoperable on July 31, 1985, or that the expressions "past payments" and "prior" capacity-cost expenses referred to a date other than the effective date of the order in docket number 6350.

The City and the Commission argue that the Company's contention amounts to no more than a complaint of "regulatory lag" during the nine months between the end of the reconciliation period in docket number 6350 and the effective date of the final order in that contested case. And, they properly point out, losses occasioned merely by regulatory lag are not recoverable by a utility. We disagree with the theory. "Regulatory lag" refers to delay in the "decisional process" of a regulatory agency. *Railroad Comm'n v. Lone Star Gas Co.,* 656 S.W.2d 421, 423 (Tex.1983). The Company does not complain of any delay in the "decisional process" in docket number 6350. It complains instead of the apparently arbitrary meaning assigned *in the present case* to the word "prospectively" as that word was adopted in the Commission's final order in docket number 6350. That choice of meaning, and not any delay in the "decisional process," fixed the time period in dispute.

Finally, the City and the Commission argue that the phrase "arbitrary and capricious," recited in the district-court judgment as the basis for reversing the Commission's final order, does not encompass the agency's failure to explain its different treatment of capacity costs as compared to docket number 6350. Hence, they contend, apparently, that the

Commission's final order could not be reversed on the ground that it was "arbitrary and capricious." In support of their argument, the City and the Commission cite judicial decisions that *were* decided on arbitrary and capricious grounds on an apparent theory that these exhaust the possibilities and define the limits of arbitrary and capricious action under APTRA § 19(e)(6). *See Lewis v. Metropolitan Sav. and Loan Ass'n,* 550 S.W.2d 11 (Tex.1977); *Railroad Comm'n v. Alamo Express,* 158 Tex. 68, 308 S.W.2d 843 (1958); *Public Util. Comm'n v. South Plains Elec. Coop.,* 635 S.W.2d 954 (Tex.App.—Austin 1982, writ ref'd n.r.e.). We disagree with the theory. In any case, we are obliged to affirm the district-court judgment if it is correct on any legal ground. We have discussed those grounds above.

For the reasons given, we overrule the Commission's only point of error and the City's first point of error.

## OFF–SYSTEM SALES REVENUES

Section 23.23(b)(2)(A) requires that a utility maintain and provide the Commission information showing, among other things, the utility's "off-system sales revenues." These are revenues derived from a utility's sales of excess electric power to other utilities. Under § 23.23(b)(2)(B)(i), the net revenues from these sales may be set off against costs in calculating, for reconciliation purposes, a utility's "known or reasonably predictable fuel costs."

In the reconciliation period of docket number 8588, the case we now review, the Company received from off-system sales a net revenue equal to $3,099,564 above its costs for fuel and fuel-related items. In its final order, the Commission declined to deduct any part of this sum in calculating the Company's known or reasonably predictable fuel costs. The agency noted in its order, however, that in future reconciliation periods the agency would deduct 75 **\*903** percent of such revenues in calculating known or reasonably predictable fuel costs. [3] In its finding of fact 11, the Commission stated: (1) profits from off-system sales result jointly from the Company's efforts to make such sales and from the availability of electric power generated from facilities paid for, in effect, by the Company's customers; (2) consequently, in future reconciliation periods the Commission would assign 75 percent of the profits to the customers' benefit and 25 percent to the Company's benefit to encourage the Company to continue making such sales; and (3) for the reconciliation period covered in docket number

8588, however, the profits from off-system sales would continue to be excluded from the reconciliation calculations.

In its second point of error, the City argues the Commission erred by not deducting *all* off-system sales revenues from the Company's known and reasonably predictable fuel costs and contends the district court erred in affirming this aspect of the agency order.

### Discussion and Holdings

 **[4]**    The City argues the Commission was obliged to deduct *all* profits from off-system sales, in calculating the Company's known and reasonably predictable fuel costs, because the agency lacked the power to divide such profits and to assign one part to the Company's benefit and another part to its customers' benefit. The City bases its argument on PURA § 41(c) which defines the "net income" factor used to fix a utility's rates under PURA § 39(a). [4]  PURA § 41(c) defines "net income" as "the *total revenues* of the public utility less all reasonable and necessary expenses as determined by the Commission." (emphasis added). The substance of the City's argument is that the statutory term "total revenues" implies an entirety; hence it is not divisible in an agency proceeding that pertains to ratemaking. We disagree.

In PURA the Commission received from the legislature powers that are broad and flexible:

> The commission has the general power to regulate and supervise the business of every public utility within its jurisdiction and to do all things, whether specifically designated in this Act or implied herein, necessary and convenient to the exercise of this power and jurisdiction. [PURA § 16(a) ]

> The commission is hereby vested with all authority and power ... to insure compliance with the obligations of public utilities in this Act. [PURA § 37]

> It shall be the duty of the [commission] to insure that every rate ... shall be just and reasonable. [PURA § 38]

> In fixing a reasonable return on invested capital, the [commission] shall consider ... the efficiency of the utility's operations, and the quality of the utility's management. [PURA § 39(b) ].

The breadth of discretion implied by these statutory expressions is contradicted absolutely by the straightjacket theory that the City erects upon an implication imputed to the term "total revenues." Granted that some more particular provision in PURA might have denied the Commission discretion to apportion net revenues from off-system sales, expressly or by necessary **\*904**  implication, we believe the term "total revenues" is not such a provision. We believe, for example, that the legislature did not intend that any implication imputed to the term "total revenues" should deny the Commission discretion to divide such revenues if the division was necessary to insure a rate that is "just and reasonable" or to secure "efficiency" in utility operations and an acceptable "quality" in utility management. And we point out that efficient operations and high-quality management were the Commission's express objectives in choosing to apportion sales revenues in this case.

The City suggests no general principle which prohibits the division and apportionments made in the present case; the City relies solely upon the implication it attributes to the term "total revenues." This implication is not the Commission's interpretation of that expression, for section 23.23(b)(2)(B)(i) of that rule contemplates consideration of other "conditions or events" that bear upon a utility's fuel and fuel-related costs in the reconciliation context. The division and apportionment of future revenues in this case amounts to an agency interpretation of the fuel rule. We see nothing unreasonable or *ultra vires* in that interpretation, and the fuel rule pertains ultimately to a utility's operating *expenses,* not its *revenues.*

We, therefore, overrule the City's contention that the Commission exceeded its power and discretion when it apportioned the off-system sales revenues.

The City contends there was insufficient evidence adduced in the agency proceeding to support a reasonable conclusion that an allocation of a part of the benefit to the Company would provide an incentive to make future sales of a like kind for the ultimate benefit of its customers. The argument refers to that part of the Commission's finding of fact 11 which stated the agency's reason for allocating 25 percent of the profits to the benefit of the Company in the future. The Commission's declaration merely explained why the agency made the allocation; it does not purport to be the declaration of a fact inferred by the agency from evidence adduced in the contested case. *See* Davis, *supra.* We overrule the City's contention.

**[5]** The City contends finally that providing the Company an incentive to make off-system sales was not a relevant statutory factor in establishing reconcilable fuel costs; consequently, the Commission's decision on that basis amounted to an abuse of discretion under *South Plains Electric Cooperative,* 635 S.W.2d at 957. We disagree.

In promulgating the fuel rule, the Commission responded to the legislative prohibition against fuel-adjustment "pass-throughs." It has not been suggested that the fuel rule, based in part upon predicted fuel costs with periodic reconciliations to actual costs, is an unreasonable rule or one out of harmony with PURA. We have held that the rule lay within the Commission's statutory power to enact at its discretion. The rule establishes, at bottom, an arrangement by which

a hypothetical cost of fuel may be used to calculate a utility's "reasonable and necessary operating expenses" for purpose of PURA § 39(a), while allowing concurrently for a consideration of some of the stated factors listed in PURA § 39(b) "in addition to other applicable factors." If nothing else, the allocation refers directly to "the efficiency of the utility's operation." In the words of PURA § 39(a), it is at least another "applicable factor." We overrule the City's contention.

For the reasons given, we overrule the City's second point of error.

Finding no error, we affirm the district-court judgment.

---

Footnotes

1  *See* 16 Tex.Admin.Code § 23.23(b)(2)–(8) (1981, since amended).

2  PURA § 43(g)(1) provides that "[a] rate or tariff set by the commission shall not authorize a utility to automatically adjust and pass through to its customers changes in fuel or other costs of the utility." The provision was added by Acts 1983, 68th Leg., p. 647, ch. 146, § 2, effective August 29, 1983.

3  No party suggests that the futurity aspect of this part of the agency order should preclude judicial review. We see no reason why it should. *See* Bernard Schwartz, *Administrative Law* § 9.1, at 522–25 (2d ed. 1984).

4  In a determination of allowable fuel costs, the original version of the Fuel Rule listed six costs to be considered, plus "other costs associated with generated and purchased power." 8 Tex.Reg. 3540 (1983) (16 Tex.Admin.Code § 23.23(b)(2)(B), since amended). The rule further instructed that "the commission shall consider revenues and costs from these other activities, *including off-system sales,* to assure that the ratepayers receive an appropriate *portion* of benefits associated with such revenues." *Id.* (emphasis added). Nothing in PURA or in the Commission's current regulations deals explicitly with the calculation of off-system sales in the reconciliation of fuel costs.

   Although the current version of the Fuel Rule does not contain specific reference to off-system sales, the general language has been amended to require consideration of "other costs *and revenues* associated with generated or purchased power." 16 Tex.Admin.Code § 23.23(b)(2)(B)(i) (emphasis added).

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

883 S.W.2d 179
Supreme Court of Texas.

CITY OF EL PASO, The State of Texas, and
Office of Public Utility Counsel, Petitioners,
v.
PUBLIC UTILITY COMMISSION OF TEXAS
and El Paso Electric Company, Respondents.

No. D–3053.　|　Argued Sept. 13,
1993.　|　Decided June 22, 1994.
|　Rehearing Overruled Oct. 6, 1994.

Electric utility applied for rate increase. The Texas Public Utility Commission set rate, and judicial review was sought. The 250th District Court, Travis County, Paul R. Davis, Jr., J., upheld Commission's decision, and appeal was taken. Withdrawing prior opinion, the Austin Court of Appeals, J. Woodfin Jones, J., 839 S.W.2d 895, affirmed in part, reversed in part, and writ of error was sought. The Supreme Court, Enoch, J., held that: (1) Commission acted within its discretion by basing its final order, in part, on nonunanimous stipulation agreement, and (2) inclusion of deferred costs in electric utility's rate base did not violate test year requirement.

Affirmed in part and reversed in part.

Spector, J., dissented and filed opinion in which Gonzalez, Doggett and Gammage, JJ., joined.

**Attorneys and Law Firms**

 **\*181** Norman J. Gordon, El Paso, James G. Boyle, Austin, Nanette G. Williams, David C. Caylor, El Paso, Luis A. Wilmot, San Antonio, Stephen Fogel, William L. Magness, W. Scott McCollough, Dan Morales, Joe K. Crews and Richard A. Muscat, Austin, for petitioners.

James W. Checkley, Alan Holman, Austin, Thomas S. Leatherbury, Ferd C. Meyer, Jr., Kenneth C. Raney, Jr., Dallas, R. Eden Martin, Chicago, IL, Barry Bishop, John F. Williams, Austin, Harry M. Reasoner, Houston, Walter Demond, Austin, Alton J. Hall, Jr., Houston, Norma K. Scogin, Dan Morales, Joe N. Pratt, and Davison W. Grant, Austin, for respondents.

**Opinion**

Justice ENOCH delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justices HIGHTOWER, HECHT, and CORNYN join.

This is an administrative appeal from an order of the Public Utility Commission (Commission) setting rates to be charged by El Paso Electric Company (EPEC). [1] The order was consistent with a non-unanimous stipulation between EPEC and several parties, including the Commission General Counsel. In its final order, the Commission authorized EPEC to capitalize and include in rate base deferrals associated with certain post-in-service carrying costs and operating costs related to its investment in the Palo Verde Nuclear Generating Station (Palo Verde). The questions presented by this appeal are first, whether the Commission acted within its discretion by basing its final order, in part, on the nonunanimous stipulation agreement, and second, whether the Commission has the authority under the Public Utility Regulatory Act (PURA) [2] to allow a public utility to include in a utility's rate base certain costs incurred during the "regulatory lag" period. [3] We answer both issues yes, and consequently affirm the judgment of the court of appeals in part and reverse in part.

In April 1987, EPEC filed an application for a rate increase with the Commission seeking to recover costs associated with its investment in the Palo Verde Project. EPEC sought rate treatment related to its investment in the two units which had started commercial operation, Palo Verde Units 1 and 2. [4] On October 22, 1987, during the course of the hearing on EPEC's application, certain industrial intervenors and the Commission General Counsel announced and filed a stipulation agreement intended to resolve the case. [5] The Examiners scheduled an additional phase of the hearing to consider the stipulation, and eventually recommended to the Commission that the stipulation be rejected. The Commissioners modified the proposed stipulation and, as modified, adopted its terms in its final order.

As part of its request for a rate increase, EPEC requested that its rate base be increased **\*182** by the amount of carrying costs and operating and maintenance costs it incurred during the "regulatory lag" period. The utility had deferred these types of costs for Units 1 and 2, aggregating each type of cost for each unit into a separate capital account. EPEC obtained the Commission's prior permission to defer Unit 1 costs. [6] The Commission reserved the right, however, to

refuse subsequently to include the deferred costs in the rate base to the extent they were unreasonable, related to plant not used and useful, or were spent or incurred imprudently. Although EPEC did not obtain prior permission to defer its post-in-service costs for Unit 2, it nevertheless deferred them. After the hearing, the Commission granted EPEC's request to include the deferred costs for both units in the rate base.

The City of El Paso (City), the State of Texas (on behalf of various state agencies located in western Texas) (State), and the Office of Public Utility Counsel (OPUC) sought judicial review of the Commission's order, contending that the Commission erred by basing its order, in part, on the non-unanimous stipulation. The City, State, and OPUC also argued that the Commission lacked the authority to permit EPEC to defer post-in-service costs, and subsequently to include the deferrals in the utility's rate base.

The trial court upheld the Commission's order. The court of appeals affirmed the portion of the trial court's judgment which affirmed the Commission's order allowing the inclusion of capitalized post-in-service operating costs in the utility's rate base. 839 S.W.2d 895, 934 (1991). The court of appeals reversed the portion of the trial court's judgment which affirmed the Commission's order allowing the deferral of post-in-service carrying costs. *Id.* [7] All parties filed applications for writ of error to this court. For the reasons stated below, we reverse the judgment of the court of appeals to the extent that it disallows the deferral of post-in-service carrying costs. In all other respects, the judgment of the court of appeals is affirmed.

### I.

### The Non–Unanimous Stipulation

The City and OPUC make several arguments supporting their position that the Commission erred by basing its order, in part, on a non-unanimous stipulation. They ask this Court to reverse the judgment of the court of appeals, contending that its holding affirms an action of the Commission that is not supported by substantial evidence, not consistent with Texas law, arbitrary and capricious and characterized by an abuse of discretion. We do not accept the City's or OPUC's arguments.

### A.

### Reliance on the Non–Unanimous Stipulation

The City and OPUC contend that where no evidence existed to support its decision, the Commissioners erroneously relied on the stipulation itself as a substitute for the evidence. The City argues that by relying on the stipulation as opposed to the evidence, the Commissioners violated the statutory requirement that every finding be based exclusively on the evidence. TEX.GOV'T CODE ANN. § 2001.141 (Vernon Pamphlet 1994). The City analogizes the present case to a civil cause in which the court renders an agreed judgment without consent of all the parties. It contends that in adopting the stipulation as a resolution of the case, the Commission improperly imposed the terms of the settlement on the non-signing parties.

We reject the City's analogy. In *Mobil Oil Corp. v. Federal Power Commission,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974), the Supreme Court upheld the Federal Power Commission's final order establishing a rate structure that was based, in part, on a non-unanimous stipulation. The Court emphasized **\*183** the importance of considering a non-unanimous proposal "on its merit:"

> If a proposal enjoys unanimous support from all of the immediate parties, it could certainly be adopted as a settlement agreement if approved in the general interest of the public. But even if there is a lack of unanimity, it may be adopted as a resolution *on the merits,* if FPC makes an independent finding supported by 'substantial evidence on the record as a whole' that the proposal will establish 'just and reasonable' rates for the area.

417 U.S. at 314, 94 S.Ct. at 2348–49 (quoting *Placid Oil Co. v. Federal Power Comm'n,* 483 F.2d 880, 893 (5th Cir.1973)) (emphasis in original).

In Docket No. 7460, the Commission's order provided, in part:

> 4. Even where some parties to a proceeding do not agree to a stipulated result, it is reasonable to adopt such a stipulation if:
>
> (a) The parties opposing the stipulation have notice that the stipulation may be considered by the Commission and an

opportunity to be heard on their reasons for opposing the stipulation;

*(b) The matters contained in the stipulation are supported by a preponderance of the credible evidence in the case;*

(c) The stipulation is in accordance with applicable law;

(d) The stipulation results in just and reasonable rates; and;

(e) The results of the stipulation are in the public interest, including the interest of those customers represented by parties opposing the stipulation.

Docket No. 7460, *supra* note 1, at 1202–03 (emphasis added). [8] The Commission's order continued to conclude that:

5. Pursuant to the Findings of Fact and Conclusions of Law set forth below, the Commission finds the Amended and Restated Stipulation, as modified, is a reasonable basis for resolution of the issues in this case and that adoption of the Amended and Restated Stipulation, as modified, as the basis of the Commission's Order in this proceeding is in the public interest.
Finding of Fact No. 237 provided:

> 237. The provisions of the Amended and Restated Stipulation are reasonable and supported by a preponderance of the credible evidence in this record and should be adopted. [9]

 **[1]**    It is clear from the Commission's order that, consistent with *Mobil Oil,* the Commission's decision in Docket No. 7460 was based on the merits; it was not simply an adoption of a non-unanimous "settlement." The Commission made an independent finding that the non-unanimous stipulation was supported by a preponderance of the record evidence and resulted in just and reasonable rates. [10] Thus, contrary to the City's arguments, the Commission's final order was consistent with the requirement that every finding be based exclusively on the evidence.

In addition to considering the non-unanimous stipulation on its merits, the Commission provided all parties, including non-signatories, **\*184** the opportunity to be heard on the merits of the stipulation. As the court of appeals notes, the Commission added an additional phase to the proceedings devoted exclusively to receiving evidence and argument on

the propriety of using the stipulation as a basis for resolving the contested issues. 839 S.W.2d at 903. Thus, we reject the City's argument that the substantial rights of the City and other non-signatory parties were in some way prejudiced by the Commission's adoption of the non-unanimous stipulation.

The OPUC independently argues that the Commission's reliance on the non-unanimous stipulation agreement was arbitrary and capricious because the Commission failed to follow its own standards in relying on the stipulation. Specifically, the OPUC notes that the court of appeals concluded that the inclusion of deferred post-in-service carrying costs violates PURA section 41(a); and, because the stipulation included provisions concerning treatment of deferred carrying charges, the stipulation violates the Commission's own standard, *see supra* text above, that the stipulation be "in accordance with applicable law." As a result, the OPUC argues that the court of appeals should have reversed and remanded the Commission's final order *in toto.* Because we conclude that the inclusion of deferred post-in-service carrying costs does not violate PURA section 41(a), *see infra* IV., the OPUC's argument on this point is moot.

 **[2]**    An agency's decision is arbitrary or results from an abuse of discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result. *Gerst v. Nixon,* 411 S.W.2d 350, 360 n. 8 (Tex.1966). We agree with the court of appeals that the City and OPUC have failed to establish that the use of the stipulation as a partial basis for the final order involves consideration of factors other than those the legislature has directed the Commission to consider. 839 S.W.2d 895, 903–04.

**B.**

**Section 21.151**

 **[3]**    Section 21.151 of the Public Utility Commission's Rules of Practice and Procedure provides:

> After the expiration of the time for filing exceptions and replies thereto, the examiner's report and proposal for decision will be considered by the commission and either adopted,

modified and adopted, or remanded to the examiner....

16 TEX.ADMIN.CODE § 21.151 (West 1990). The City and the OPUC argue that the Commission violated section 21.151 by basing its final order on a modified stipulation over the examiner's recommendation. This argument is without merit. First, section 21.151 does not speak to the Commission's ability to consider non-unanimous stipulations in reaching its orders. Second, the Commission is free to accept or reject the examiner's recommendations. *See Ross v. Texas Catastrophe Prop. Ins.,* 770 S.W.2d 641, 642 (Tex.App.—Austin 1989, no writ). Section 21.151 does not require the Commission to accept or reject the examiner's report in its entirety. Rather, the Commission may repudiate part of the examiner's report and modify it by deletion as it did in this case.

### C.

### Findings of Facts/Substantial Evidence

In a final challenge to the Commission's use of the non-stipulation agreement, the City argues that "[t]he non-unanimous 'stipulation' used by the Commission ... is not supported by substantial evidence and key findings of fact drafted to support the final order are inadequate to satisfy statutory requirements." We will discuss the City's specific substantial-evidence and finding-of-fact challenges. *See infra II–III.* However, to the extent the City makes a general complaint against the stipulation, we agree with the court of appeals that the City has waived any argument on this point as its point and argument are too general to preserve error. The City provides no substantive argument to support its legally conclusory statements.

### *185 II.

### Substantial Evidence—"Decisional" Imprudence Disallowance [11]

The Commission concluded that due to imprudent decisions, $32 million of EPEC's costs should not be included in rate base. Both the City and OPUC argue that the disallowance is unsupported by substantial record evidence, claiming that the amount disallowed should have been greater.

**[4] [5]** At its core, the substantial evidence rule is a reasonableness test or a rational basis test. *Railroad Comm'n of Texas v. Pend Oreille Oil & Gas Co.,* 817 S.W.2d 36, 41 (Tex.1991). The reviewing court, then, concerns itself with the reasonableness of the administrative order, not the correctness of the order. *Id.* In applying this test, we may not substitute our judgment as to the weight of the evidence for that of the agency. *Id.* (the substantial evidence rule "prevents the court from 'usurping the agency's adjudicative authority even though the court would have struck a different balance' ").

Although substantial evidence is more than a mere scintilla, the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex.1984). The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. *Id.* The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Id.* at 453; *Imperial American Resources Fund, Inc. v. Railroad Comm'n,* 557 S.W.2d 280, 286 (Tex.1977); *City of San Antonio v. Texas Water Comm'n,* 407 S.W.2d 752, 758 (Tex.1966).

The City argues that although the City, EPEC, and the Commission staff each offered expert testimony on the decisional imprudence issue, the evidentiary record contains no specific reference to amount. Further, the City contends that the court of appeals erred by relying, in part, on matters included in the non-unanimous stipulation to conclude that the Commission's decision was supported by substantial evidence because the matters relied on were not independently supported by a preponderance of the evidence.

In the Findings of Fact, the Commission provided:

101. The Company was not entirely prudent in its planning and management of its participation in the Palo Verde project.

102. There is evidence in the record of imprudence in the Company's continuing evaluation of the level of its participation in the Palo Verde Project. The parties to the Amended and Restated Stipulation have quantified The [sic] cost of such imprudence as $22 million as applied to Units 1 and 2. The Company has conceded an additional

$10 million disallowance to be applied to PVNGS Units 1 and 2.

103. Quantification of the effects of imprudence requires the exercise of judgment based upon the evidence. In light of the evidence relating to prudence and the difficulties in quantification, the quantification of decisional imprudence at $32 million for Units 1 and 2 is reasonable and appropriate.

Docket No. 7460, *supra* note 1, at 1250.

The record before this Court is extensive and contains substantial information relevant to the Commission's inquiry on this issue. The evidence includes expert testimony offered by the City, EPEC, and the Commission staff. The City's witness, Ben Johnson, stated that in his opinion the EPEC had made several imprudent decisions and that, as a result, the Commission should disallow 50% of its costs.[12] EPEC testified that there **\*186** should be a zero disallowance because there simply was no decisional imprudence. The Commission staff offered testimony that certain aspects of the Company's decision making process were imprudent. However, the Commission's witnesses did not conclude that the decision to participate in the project was itself imprudent. Rather, they focused on the perceived errors associated with EPEC's decision making process. The Commission's witnesses noted that they were unaware of any theory that would enable them to recommend any specific disallowance of project costs or capacity based on their conclusions.[13]

The evidence before the Commission therefore ranged from expert testimony that no imprudence disallowance should be imposed, to testimony that a 50% imprudence disallowance should be imposed, and finally to testimony that there is no known theory to quantify the flaws in EPEC's decision making process giving rise to its investment. In other words, several experts had significant differences of opinion on the proper method to determine and the proper amount of EPEC's imprudence disallowance. These differences are understandable when considering the enormous complexity involved in a utility's decision to construct or purchase new generating capacity.

 **[6]**  In conducting a substantial-evidence review, we must determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *Texas State Bd. of Dental Examiners v. Sizemore,* 759 S.W.2d

114, 116 (Tex.1988), *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 662 (1989). The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex.1984). We agree with the court of appeals that the record contains substantial evidence to support a disallowance figure of zero for decisional imprudence; and, the record contains substantial evidence to support a Commission finding that 50 percent of EPEC's costs should have been disallowed. *See* 839 S.W.2d at 907. Thus, because of the admitted complexity in valuing the decisional imprudence in this case, we hold that there is a reasonable basis for the Commission to, in its discretion, select an amount within the range of figures provided by expert testimony of the parties.[14] Moreover, the City and OPUC have failed to explain why any one amount within that range is more reasonable or better supported by the evidence than the $32 million figure eventually reached by the Commission. The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex.1984); *Imperial American Resources Fund, Inc. v. Railroad Comm'n,* 557 S.W.2d 280, 286 (Tex.1977); *City of San Antonio v. Texas Water Comm'n,* 407 S.W.2d 752, 758 (Tex.1966). We do not accept that the City and OPUC have met their burdens to overcome the presumption in this case.

**\*187  III.**

**Final Revenue Requirement**[15]

The City complains generally about the revenue requirement determination and then makes specific contentions concerning particular components of the revenue requirement. The City argues that the final revenue requirement of the Commission was based solely on the non-binding stipulation agreement and not on the record evidence. According to the city, the findings and conclusions adopted by the Commission do not allow this Court to analyze the decision because the agreement between the parties is not evidence and not a statutory standard for review. We disagree.

Finding of Fact No. 152 provides:

> The preponderance of the evidence establishes that the company has a total revenue requirement with components as set forth in Exhibit B of the Amended and Restated Stipulation.

Docket No. 7460, *supra* note 1, at 1260. This finding is supported by twenty-five underlying findings of fact addressing the components of the total revenue requirement, with each finding supported by record evidence. *Id.* at 1260–1265 (Findings of Fact 153–87). Except for the specific challenges to three of the components making up the total revenue requirement, the City does not complain specifically that any particular underlying finding supporting Finding of Fact No. 152 is not supported by substantial evidence. We presume that the Commission's decision is supported by substantial evidence. *Charter Medical,* 665 S.W.2d at 453.

 **[7]**    In addition, we reject the City's argument that the Commission applied no statutory standard in determining revenue requirements. As the City recognizes, the statutory standard that controls revenue requirement determinations is that rates be fixed to permit the utility a reasonable opportunity to earn a reasonable return on its invested capital plus "reasonable and necessary" operating expense to provide service. TEX.REV.CIV.STAT.ANN. art. 1446c, § 39(a). The Commission's determination of the revenue requirement is supported by findings which detail the Commission's resolution of contested issues regarding the Company's "reasonable and necessary" operating expenses. Thus, the statutory standard for determining the revenue requirement was met.

The City makes numerous challenges to three components of the final revenue requirement, including (1) Operating and Maintenance expenses; (2) Employee Benefits; and (3) Taxes other than Federal Income Taxes. After reviewing the opinion of the court of appeals, the briefs of the parties, and the record, we conclude that the City's arguments on these issues are without merit. The court of appeals correctly articulates the error in the City's claims. 839 S.W.2d at 927–31.

## IV.

## Deferrals

The City, OPUC, and State make several arguments contesting the Commission's authority to permit the deferral of post-in-service costs, and the inclusion of the deferred costs in the utility's rate base. [16] In *State of Texas v. Public Utility Commission,* 883 S.W.2d 190 (Tex.1994), we held that the Commission possesses the authority to allow a utility to defer post-in-service costs in order to protect the utility's financial integrity. We further held that the subsequent inclusion of the deferred costs in the utility's rate base did not violate PURA section 41(a), nor did it violate the rule against retroactive ratemaking. As a result we reject the arguments of the City, OPUC and State on these issues. We will address only those issues that were not addressed in *State of Texas v. Public Utility Commission.* [17]

## *188  A.

## Test Year Requirement

 **[8]**    PURA requires utilities to file for a rate increase by presenting revenue and expense data from the same 12–month period using an historical test year. TEX.REV.CIV.STAT.ANN. art. 1446c, § 3(t); 16 TEX.ADMIN.CODE § 23.21(a); *Suburban Utility Corp. v. Public Utility Comm'n,* 652 S.W.2d 358, 366 (Tex.1983). In *State of Texas v. Public Utility Commission,* we held that an accounting order authorizing deferred accounting treatment does not violate the test year requirement because there is no requirement in PURA or the Commission's procedures that the Commission must follow a test year when determining accounting policy. However, in the context of a rate case, the test year requirement applies. Thus, we must address the argument that the actual inclusion of deferred costs in a utility's rate base violates the test year requirement.

The State argues that post-in-service costs were deferred for up to 25 months and thus, the inclusion of such rates in EPEC's rate base violated the test year requirement. [18] However, the Commission may, in its discretion, go outside the test year when necessary to achieve just and reasonable rates. In *Suburban Utility Corp. v. Public Utility Commission,* 652 S.W.2d 358, 366 (Tex.1983), we stated that "[c]hanges occurring after the test period, if known, may be taken into consideration by the regulatory agency to help mitigate the effects of inflation and in order to make the test year data as representative as possible of the cost situation that is apt to prevail in the future." Because it ordered the deferral of post-

in-service costs, the Commission understood the impact of deferring post-in-service costs on the test year. It is within the discretion of the Commission to consider expenditures that occur outside the test year if such consideration will assist the Commission in making the test year as representative as possible to the cost situation expected in the future.

**B.**

**Standards Applied**

The Commission granted EPEC's request to defer post-in-service costs for Unit 1 based upon a "financial integrity and viability" standard. Docket No. 6350, *supra* note 6, at 1239–41. However, the Commission granted EPEC's unit 2 request for deferred accounting based on a "measurable harm" standard. Docket No. 7460, *supra* note 1, at 1079. The City argues that the use of two different standards is arbitrary and capricious because the Commission has created new standards for each decision concerning deferred accounting.[19] We disagree.

 **[9]**    In determining whether to allow a particular utility to defer post-in-service costs, the Commission has discretion to proceed on an *ad hoc* or "case-by-case" basis. *See, e.g., [Securities and Exch. Comm'n v. Chenery Corp.,](...) 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); [National Labor Relations Bd. v. Wyman–Gordon Co.,](...) 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969);* **\*189** *[Southwestern Bell Tel. Co. v. Public Util. Comm'n,](...) 745 S.W.2d 918, 926 (Tex.App.—Austin 1988, writ denied).* In *[SEC v. Chenery Corp.,](...) 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947),* the Court stated that *ad hoc* adjudication may be preferable to a formal rulemaking proceeding where "the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule;" and where the problem is so "specialized and varying in nature as to be impossible of capture within the boundaries of a general rule." Both of the foregoing considerations apply in the Commission's early attempts to define the proper standard to apply to deferred accounting cases.[20]

Early in the process, the Commission was faced with numerous complex problems presented by the recent arrival of nuclear generation plants. While remaining within the statutory framework of PURA, the Commission had to

balance the interests of consumers with the complex financial consideration created by public utilities investing large amounts of capital in nuclear plants. Proceeding on an *ad hoc* or "case-by-case" basis is fully understandable in the context of a newly created competitive market that involves complex technical considerations and competing statutory objectives. *See [Southwestern Bell Tel. Co. v. Public Util. Comm'n,](...) 745 S.W.2d 918, 926–27 (Tex.App.—Austin 1988, writ denied); see also [Securities and Exch. Comm'n v. Chenery Corp.,](...) 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947).* As a result, we hold that the Commission was within its discretion in proceeding on a "case-by-case" or *ad hoc* basis and applying different standards in different proceedings.[21]

**V.**

**Conclusion**

We hold that the Commission did not err by basing its final order, in part, on a non-unanimous stipulation. Further, based on our holding in *[State of Texas v. Public Utility Commission,](...) 883 S.W.2d 190 (Tex.1994),* we hold that the Commission has the authority under PURA to include deferred post-in-service costs in a utility's rate base. Further, the Commission did not abuse its discretion by applying different standards in determining whether to allow deferred accounting treatment for Palo Verde Units 1 and 2. We reverse the court of appeals to the extent that it disallows the deferral and inclusion in rate base of deferred post-in-service carrying costs. In all other respects, the judgment of the court of appeals is affirmed.

Justice SPECTOR, joined by Justice [GONZALEZ](...), Justice DOGGETT, and Justice [GAMMAGE](...), dissenting.

This case demonstrates the weakness of the safeguards relied upon today in *[State of Texas v. Public Utility Commission,](...) 883 S.W.2d 190 (Tex.1994).* In that case, the majority defends its approval of deferred accounting treatment on the ground that deferred cost assets will be included in rate base only to the extent that they are deemed "prudent, reasonable and necessary." *[Id.](...) at 197–198 n. 12.* In the present case, however, the majority approves the Public Utility Commission's application of a similar standard, despite a total lack of evidence supporting the Commission's findings. I dissent.

At the rate hearings below, the City of El Paso presented extensive evidence concerning the imprudence of El Paso Electric Company's decisions to become involved in the Palo Verde Project and to remain involved at the 15.8 percent participation level. *See* Tex. Pub. Utils. Comm'n, **\*190** *Application of El Paso Electric Company for Authority to Change Rates,* Docket No. 7460, 14 TEX.P.U.C.BULL. 932, 965–84 (June 16, 1988). The City's expert testimony concluded that 50 percent of the cost of all three Palo Verde units should be disallowed as imprudent. *Id.* at 983. Using this figure, some $350 million should have been disallowed for Unit 1 alone.

The Commission agreed that El Paso Electric was "not entirely prudent" in planning and managing its participation in the Palo Verde project. *Id.* at 1250. In determining the amount of the disallowance, however, the Commission chose not to rely on the evidence presented; instead, it seized upon a figure of $32 million that had been discussed in the course of settlement negotiations. *Id.* at 1250–51. El Paso Electric's own expert testified, in regard to the settlement amount, "I don't think it really relates to anything." The $32 million figure has no basis in reality; it resulted solely from the parties' efforts to buy peace.

The majority cites no evidence in support of the $32 million disallowance, because none exists. Nonetheless, the majority upholds the Commission's findings as supported by substantial evidence. *Supra* at 186.

With the standard of review applied today, it is difficult to imagine any Commission decision relating to prudence that would be set aside by the Court. This lack of review will be especially pernicious in the context of deferred cost assets. Valuing the prudence of such assets will involve the same degree of complexity as valuing the imprudence in this case. Thus, in approving deferred amounts for inclusion in rate base, the Commission may arbitrarily select a figure within a wide range, and its decision will effectively be immune from judicial review. Judging by the example of this case, the figure selected will typically be much closer to the utility's recommended figure than it is to the ratepayers'.

I would hold that the disallowance for decisional imprudence must be based on the evidentiary record. Additionally, for the reasons stated in my dissenting opinion in *State of Texas v. Public Utility Commission,* 883 S.W.2d at 205–209, I would hold that no expenses incurred after the beginning of commercial operation may be capitalized and included in rate base. Accordingly, I would remand this cause to the Commission for a determination of rates in keeping with traditional standards.

**Parallel Citations**

Util. L. Rep. P 26,411

Footnotes

1    Tex. Public Utils. Comm'n, *Application of El Paso Electric Company for Authority to Change Rates,* Docket No. 7460, 14 TEX.P.U.C.BULL. 932, 1202 (June 16, 1988) (Docket No. 7460).

2    TEX.REV.CIV.STAT.ANN. art. 1446c (Vernon Supp.1994).

3    Generally, regulatory lag is the delay between the time when a utility's profits are above or below standard and the time when an offsetting rate decrease or rate increase may be put into effect by commission order or otherwise. This delay is due to the inherent inability in the regulatory process to allow for immediate rate decreases or increases. For purposes of this opinion, "regulatory lag" is the period between the date a new plant begins commercial operation (the "in-service" date) and the effective date of the new rates that result from including the new plant's costs in the rate base. *See* JAMES C. BONBRIGHT ET AL., PRINCIPLES OF PUBLIC UTILITY RATES 96 (2d ed. 1988).

4    EPEC and four other utility companies agreed to partially fund and otherwise assist in building one or more nuclear steam electric generating units, with attendant common facilities. Construction is complete on the common facilities and two of the five units originally planned (Palo Verde Units 1 and 2). After construction began, EPEC modified its ownership interest in the units. Originally, EPEC owned an undivided interest in each of the units as a tenant in common with the other four project participants. Although EPEC retains its undivided interest in Unit 1, the company has sold its interest in Unit 2 and made arrangements to lease the unit back for the duration of EPEC's involvement in the project.

5    EPEC, the Commission staff, and four corporate intervenors which purchased significant amounts of electricity from EPEC all signed the stipulation.

6    The Commission authorized deferred accounting treatment for Unit 1 in Tex. Public Utils. Comm'n, *Application of El Paso Electric Company for Authority to Change Rates,* Docket No. 6350, 13 TEX.P.U.C.BULL. 1091, 1239–41 (1986).

The court of appeals separated the costs into two categories: (1) operating and maintenance costs, and (2) carrying costs. Our holding makes no distinction between these costs.

We note that the Commission has used these same standards to evaluate non-unanimous settlements in several other dockets. *See, e.g.,* Tex. Public Utils. Comm'n, *Application of El Paso Electric Company to Declare Palo Verde Unit 1 in Service,* Docket No. 6764, 12 TEX.P.U.C.BULL. 1533, 1534–35 (November 14, 1986).

In addition to the recitations above, Conclusion of Law No. 28 stated: "The Amended and Restated Stipulation, as modified per Finding of Fact No. 6, represents a reasonable resolution of the contested issues in this docket, is supported in the record, is in the public interest, and should therefore be adopted, as the basis for the Commission's order in this case." Docket No. 7460, *supra* note 1, at 1280.

We note that the Commission's Final Order included 237 separate, specific Findings of Fact concerning the rate increase. The Commission specifically considered the amended and restated stipulation in the context of these findings as a whole. *See* Docket 7460, *supra* note 1, at 1233–74. Thus, contrary to the City's and OPUC's contentions, the Commission's findings supporting its reliance on the non-unanimous stipulation were not "wholly conclusory." Further, because the Commission explicitly provided that it was based on a review of the evidence in the record as a whole, we reject the City's contention that the Commission acted arbitrarily and abused its discretion as a fact finder and decision maker by adopting a contested settlement "without a review of the record or support in the evidentiary record."

"Decisional" imprudence refers to EPEC's decisions to become involved in the Palo Verde Project, the extent of its involvement and its decisions to remain in the project at the 15.8% participation level.

Although not clear from Mr. Johnson's testimony, under his suggested approach, the imprudence disallowance would have exceeded $350 million.

We note that the Examiner likewise recognized flaws in EPEC's decision making process. However, the Examiner noted that "it is too much to ask that one reconstruct the appropriate process fifteen years after the fact in order [to] find whether a decision made on an inappropriate basis might still have been made on an appropriate one." Docket No. 7460, *supra* note 1, at 981.

In affirming the Commission's order, the court of appeals relied in part on its determination that EPEC's agreement in the non-binding stipulation to a $32 million disallowance constituted a "quasi-admission." 839 S.W.2d at 907. The court of appeals concluded that "[b]ecause it is a statement contrary to EPEC's pecuniary interest, the concession has some evidentiary weight." *Id.* While we need not address whether the EPEC's agreement in the non-binding stipulation constituted a "quasi-admission," we note that it is debatable as to whether EPEC's acceptance of a $32 million figure was in fact a statement against its pecuniary interest, considering that the evidence could have supported a much higher disallowance. *See supra* note 12.

The final revenue requirement represents the total revenues needed by the utility in order to cover its reasonable and necessary operating expenses and receive a return on the rate base.

The Commission allowed EPEC to include $74,503,575 of deferrals in rate base. Docket No. 7460, *supra* note 1, at 1258 (Finding of Fact 144).

In *State of Texas v. Public Utility Commission,* 883 S.W.2d 190, we held that the Commission must consider to what extent the inclusion of the deferred cost assets in rate base is actually necessary to preserve the utilities' financial integrity. 883 S.W.2d at 201. We noted that such a determination should be made at the rate hearing. *Id.* Because no party argued that the Commission should have made such a determination in this case, any argument on this point is waived.

The deferral period for Palo Verde Unit 1 was twenty-five months and for Unit 2 was nineteen months.

We note that in *State of Texas v. Public Util. Comm'n,* 883 S.W.2d 190 (Tex.1994), we held that the Commission possesses the authority to authorize deferred accounting treatment of post-in-service costs. Further, we concluded that it was not an abuse of discretion for the Commission to apply a financial integrity standard to determine whether to authorize deferred accounting because that standard "ensured that the utilities will receive an opportunity to recover the minimum rates mandated by PURA." *Id.* at 197. However, in *Office of Public Utility Counsel v. Public Util. Comm'n,* 883 S.W.2d 190 (Tex.1994), we held that the measurable harm standard lacked "a foundation in the regulatory scheme provided by PURA" and, as a result, the Commission abused its discretion by applying the measurable harm standard to determine whether to allow deferred accounting. 883 S.W.2d at 196. We note that the City does not contest the Commission's decision as to Unit 2 on the grounds that it was based on a standard that was too speculative. Thus, we do not address that issue in this case.

In fact, the Commission ultimately concluded that the measurable harm standard was too speculative. *See, e.g.,* Tex.Public Utils. Comm'n, *Petition of Houston Lighting and Power Company for Approval of Deferred Accounting Treatment for Limestone Unit 2 and the South Texas Project Unit 1,* Docket No. 8230, 14 TEX.P.U.C.BULL. 2752, 2811 (April 19, 1989).

The Commission's discretion to proceed on a "case-by-case" basis is not absolute. When the underlying considerations that support *ad hoc* adjudication are no longer present, then the Commission will be bound to follow the formal rulemaking procedures set out

in the TEX.GOV'T CODE ANN. § 2001.141. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 745 S.W.2d 918, 926–27 (Tex.App.—Austin 1988, writ denied).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

111 S.W.3d 22
Supreme Court of Texas.

CITY OF SAN ANTONIO, Petitioner,
v.
CITY OF BOERNE, Respondent.

No. 01–1054.   |   Argued Sept. 18,
2002.   |   Delivered June 26, 2003.
|   Rehearing Denied Aug. 21, 2003.

City brought action for declaratory judgment and injunction against nearby city, seeking to establish which city's extraterritorial jurisdiction included certain contested areas of land. The 216th Judicial District Court, Kendall County, Stephen B. Ables, J., granted summary judgment in favor of plaintiff city. Nearby city appealed. The Court of Appeals, 61 S.W.3d 571, affirmed. Nearby city filed petition for review. The Supreme Court, Jefferson, J., held that: (1) the legislature's grant of general control over the roads does not include the power to petition a city to annex certain portions of a given county road, and (2) a county commissioners court is not entitled, as agent of the State, to petition a municipality for annexation.

Reversed and remanded.

Smith, J., concurred in the judgment only.

**Attorneys and Law Firms**

**\*23** Harvey L. Hardy, Law Office of Harvey Hardy, Donald S. Bayne, San Antonio City Attorney's Office, San Antonio, for Petitioner.

**\*24** Randall B. Richards, Law Offices of Randall B. Richard, Boerne, for Respondent.

**Opinion**

Justice JEFFERSON delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice OWEN, Justice O'NEILL, Justice SCHNEIDER, and Justice WAINWRIGHT joined.

In this municipal annexation dispute, we consider whether a county commissioners court may petition a city to include portions of its county's roads within that city's extraterritorial jurisdiction (i) pursuant to the Legislature's grant of "general

control over all roads," see TEX. LOC. GOV'T CODEE § 81.028(5), [1] or (ii) as agent of the State of Texas, see id. § 42.022(b). Because we hold that the Legislature has neither expressly nor impliedly conferred such power upon a commissioners court under either section 81.028(5) or 42.022(b), we reverse the court of appeals' judgment and remand the case to the district court for further proceedings consistent with this opinion.

## I

### BACKGROUND

**[1]**   The City of San Antonio and the City of Boerne stipulated to the relevant facts. On November 5, 1987, San Antonio's City Council passed an ordinance (the "San Antonio Ordinance") annexing certain property located in San Antonio's extraterritorial jurisdiction. [2] On the December 31, 1987 effective date of this annexation, San Antonio's extraterritorial jurisdiction expanded to include property that was previously unincorporated by any city. *See id.* § 42.022(a).

After San Antonio passed its annexation ordinance, but before it became effective, a number of property owners in Kendall and Comal Counties petitioned Boerne to include their property within Boerne's extraterritorial jurisdiction. *See id.* § 42.022(b) ("The extraterritorial jurisdiction of a municipality may expand beyond the distance limitations imposed by Section 42.021 to include an area contiguous to the otherwise existing extraterritorial jurisdiction of the municipality if the owners of the area request the expansion."). However, the property of those petitioning owners was too dispersed to satisfy section 42.022(b)'s contiguity requirement. To overcome that obstacle, Boerne—which had agreed to coordinate the annexation process—accepted petitions from Kendall and Comal County commissioners courts to include various sections of their counties' roads within Boerne's extraterritorial jurisdiction. Boerne then passed a number of ordinances (the "Boerne Ordinances") extending its extraterritorial jurisdiction accordingly.

Boerne concedes that, without including county roads, much of the area is insufficiently contiguous to satisfy section 42.022(b). [3] By including these county roads, however, Boerne believes it properly acquired jurisdiction over an area that, **\*25** absent the Boerne Ordinances, would be within

the extraterritorial jurisdiction created by the San Antonio Ordinance. Thus, in contravention of Local Government Code section 42.022(c), San Antonio and Boerne effectively claimed authority over the same area. *See id.* § 42.022(c) ( "The expansion of the extraterritorial jurisdiction of a municipality through annexation, request, or increase in the number of inhabitants may not include any area in the existing extraterritorial jurisdiction of another municipality.").

In 1998, Boerne sued San Antonio, seeking a declaratory judgment that the overlapping extraterritorial jurisdiction belonged to Boerne, not San Antonio. Boerne also sought a permanent injunction prohibiting San Antonio from asserting jurisdiction over the contested land area. Based on stipulated facts, the trial court ruled that the overlapping property was validly within Boerne's extraterritorial jurisdiction before the San Antonio Ordinance went into effect. The trial court's judgment also provided that as of December 28, 1987, the effective date of the Boerne Ordinances, Boerne had exclusive control over the overlapping extraterritorial jurisdiction. The judgment "permanently enjoined [San Antonio] from asserting any jurisdiction or authority, or attempting to enforce its ordinances, rules and/or regulations, over the area [ ] declared to be the exclusive extraterritorial jurisdiction of [Boerne]."

San Antonio appealed the trial court's judgment and argued, among other things, that the Kendall and Comal County commissioners courts lacked authority to petition Boerne to include segments of their counties' roads within Boerne's extraterritorial jurisdiction.[4] The court of appeals affirmed the trial court's judgment, holding that "county commissioners, as agents for the State, were empowered to petition for inclusion in the extraterritorial jurisdiction of Boerne." 61 S.W.3d 571, 579. In this Court, San Antonio challenges the commissioners courts' authority to petition a city to annex county roads pursuant to Local Government Code sections 81.028 and 42.022. We granted San Antonio's petition for review to resolve this issue. 45 Tex. Sup.Ct. J. 621 (May 11, 2002).

## II

### STANDARD OF REVIEW

 [2]    [3]    [4]    [5]    We review matters of statutory construction *de novo. See City of Garland v. Dallas Morning*

*News,* 22 S.W.3d 351, 357 (Tex.2000); *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 312 (Tex.1999). In construing a statute, our objective is to determine and give effect to the Legislature's intent. *State v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002); *see also* TEX. GOV'T CODE § 312.005; *Am. Home Prods. Corp. v. Clark,* 38 S.W.3d 92, 95 (Tex.2000). We look first to the "plain and common meaning of the statute's words." *Gonzalez,* 82 S.W.3d at 327. If a statute's meaning is unambiguous, we generally interpret the statute according to its plain meaning. *Id.* We determine legislative intent from the entire act and not just its isolated portions. *Id.* (citing *Jones v. Fowler,* 969 S.W.2d 429, 432 (Tex.1998)). Thus, we " 'read the statute as a whole and interpret it to give effect to every part.' " *Id.* (quoting *Jones,* 969 S.W.2d at 432). **\*26** With these principles in mind, we now turn to the parties' arguments.

## III

### DISCUSSION

San Antonio and Boerne agree that the issue here is whether a county commissioners court may, either pursuant to powers set forth in Local Government Code section 81.028 or as the State's agent under Local Government Code section 42.022(b), petition to include portions of county roads within a given municipality's extraterritorial jurisdiction. *See* TEX. LOC. GOV'T CODEE §§ 42.022, 81.028. Boerne argues that the Legislature's reenactment of section 42.002—subsequent to section 81.028's enactment—establishes the Legislature's intent to give commissioners courts the authority to petition for annexation. San Antonio, on the other hand, contends that the statutes are unrelated and that our construction of one should not influence our construction of the other. Before analyzing these contentions, we briefly trace the historical background of extraterritorial jurisdiction and annexation in Texas and discuss the source of and limitations on a commissioners court's power.

### A

### Extraterritorial Jurisdiction

Extraterritorial jurisdiction refers to "the unincorporated area that is contiguous to the corporate boundaries of the municipality" and is located within a specified distance of

those boundaries, depending upon the number of inhabitants within the municipality. *Id.* § 42.021. The purpose of extraterritorial jurisdiction is "to promote and protect the general health, safety, and welfare of persons residing in and adjacent to the municipalities." *Id.* § 42.001.

Generally, a municipality's extraterritorial jurisdiction may not expand beyond legislatively prescribed limits. *See id.* § 42.021. If the owners of a particular area request an expansion, however, "[t]he extraterritorial jurisdiction of a municipality may expand beyond the distance limitations imposed by Section 42.021 to include an area contiguous to the otherwise existing extraterritorial jurisdiction of the municipality." *Id.* § 42.022(b). Boerne argues that the commissioners courts' petitions bring this case within section 42.022's exception permitting expansion beyond the legislatively prescribed extraterritorial limits.

## B

### Municipal Annexation and the Home Rule Amendment

 [6]    Before 1912, the Legislature created virtually all cities and municipal corporations. *See* TEX. CONST. art. XI, § 5 interp. commentary; *see also* Robert R. Ashcroft & Barbara Kyle Balfour, *Home Rule Cities and Municipal Annexation in Texas: Recent Trends and Future Prospects,* 15 ST. MARY'S L.J. 519, 520 (1984). At that time, Texas permitted annexation under only two circumstances: (i) pursuant to the general law, usually by majority vote of the annexed residents, or (ii) by special act of the Legislature granting or amending a specific city's charter. *See* TEX. CONST. art. XI, § 5 interp. commentary; Trueman O'Quinn, *Annexing New Territory: A Review of Texas Law and the Proposals for Legislative Control of Cities Extending Their Boundaries,* 39 TEX. L.REV. 172, 175 (1960). By adopting the Home Rule Amendment in 1912, Texas withdrew the Legislature's power to grant and change home rule city charters by special laws. [5] TEX. CONST. art. XI, § 5 **\*27** interp. commentary (citing *State ex rel. Wayland v. Vincent,* 217 S.W. 402, 405 (Tex.Civ.App.-Amarillo 1919), *aff'd,* 235 S.W. 1084, 1088 (Tex.1921)).

With the Home Rule Amendment, home rule cities acquired the authority to annex property without the property owners' consent and without first establishing a need for the new area. Texas Legislative Council, *Municipal Annexation: A*

*Report to the 57th Legislature* 4 (1960); O'Quinn, *supra,* at 172. The first municipality to begin annexation procedures on unclaimed territory obtained jurisdiction over that property. Texas Legislative Council, *supra,* at 5 (discussing first reading process); Ashcroft & Balfour, *supra,* at 523–24. This virtually unbridled annexation authority enabled cities to claim territory without incurring any obligation to provide new services or to formally annex the designated property. Texas Legislative Council, *supra,* at 38–40; Ashcroft & Balfour, *supra,* at 524. The result, as noted by one commentator, was that "cities were quick to engage in annexation wars and to stake [their] claim[s]." Ashcroft & Balfour, *supra,* at 524; *see also* Texas Legislative Council, *supra,* at 47 (discussing apparently "frivolous" and "spiteful" motivations for annexation); O'Quinn, *supra,* at 172 (stating that cities "turned annexation into a contest of communities").

## C

### The Municipal Annexation Act of 1963

 [7]    In 1963, reacting to these widespread annexation wars, the Legislature passed the Municipal Annexation Act. [6] TEX.REV.CIV. STAT. art. 970a, § 1 (1963). The Act was designed "to curb the virtually unlimited power of home rule municipalities to unilaterally annex territory." *Laidlaw Waste Sys., Inc. v. City of Wilmer,* 904 S.W.2d 656, 663 n. 1 (Tex.1995); *Sitton v. City of Lindale,* 455 S.W.2d 939, 941 (Tex.1970). The Act's main provisions limited cities' annexation powers by: (i) requiring cities to complete the annexation process within ninety days; (ii) restricting the annexed territory's size and shape; and (iii) prohibiting cities from annexing property that was not within the confines of their extraterritorial jurisdiction. TEX.REV.CIV. STAT. art. 970a, § 7 (1963). These limitations frame our discussion of a commissioners court's authority.

## D

### Commissioners Courts' Authority

 [8]    [9]    [10]    [11]    A commissioners court's primary function is to administer its county's business affairs. *Avery v. Midland County,* 406 S.W.2d 422, 426 (Tex.1966), *vacated* **\*28** *on other grounds,* 390 U.S. 474, 485–86, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). Though they are creatures of the

Texas Constitution, counties and commissioners courts are subject to the Legislature's regulation. *Orndorff v. State ex rel. McGill,* 108 S.W.2d 206, 210 (Tex.Civ.App.-El Paso 1937, writ ref'd). The powers the Legislature confers on counties and commissioners courts are duties rather than privileges. *Id.* at 209. Thus, a commissioners court may exercise only those powers expressly given by either the Texas Constitution or the Legislature. *Canales v. Laughlin,* 147 Tex. 169, 214 S.W.2d 451, 453 (1948). When the Constitution or Legislature imposes an obligation on a commissioners court, that commissioners court also has the implied authority to exercise the power necessary to accomplish its assigned duty. *Anderson v. Wood,* 137 Tex. 201, 152 S.W.2d 1084, 1085 (1941).

Turning now to the parties' contentions, we must determine whether the Legislature, in giving commissioners courts general control over the roads, expressly or impliedly conferred the authority to petition a city to annex portions of county roads.

# IV

## ANALYSIS

Boerne contends that, in enacting section 81.028, the Legislature intended to give commissioners courts broad power over "all things involving, relating to or applicable to [public] roads." Specifically, Boerne asserts that the statute's "general control" language shows that the Legislature authorized a commissioners court to voluntarily petition a city to include a county road within its extraterritorial jurisdiction. Boerne further argues that, pursuant to Local Government Code section 42.022(b), a commissioners court can, as the State's agent, exercise the State's power as owner to petition for annexation. San Antonio contends that neither section 81.028 nor 42.022(b) empowers a commissioners court to petition a municipality to annex county roads. As to section 81.028, San Antonio argues that the Legislature, in giving commissioners courts "general control" over the roads, intended only to exercise those powers required to serve the traveling public, such as regulating traffic and designing, constructing, repairing, and maintaining public roads. Moreover, San Antonio contends that, because the State does not own county roads, a commissioners court has no authority under section 42.022(b) to act as the State's agent in petitioning for annexation. [7]

## A

### General Control Over Roads

 **[12]**   The Legislature gave commissioners courts general control over the roads in 1876. *See* Act approved July 22, 1876, 15th Leg., R.S., ch. 55, § 4, 1876 Gen. Laws, *reprinted in* 8 H.P.N. GAMMEL, LAWS OF TEXAS 1882–1897, 887–88 (1898). At the time the parties' dispute arose, the relevant provision specifying a commissioners court's power provided:

> Each commissioners court may: (1) establish public ferries whenever the public **\*29** interest may require; (2) lay out and establish, change, discontinue, close, abandon, or vacate public roads and highways; (3) build bridges and keep them in repair; (4) appoint road overseers and apportion hands; (5) exercise *general control* over all roads, highways, ferries, and bridges in the counties....

TEX. LOC. GOV'T CODEE § 81.028 (emphasis added). Because the Legislature did not define "general control," we will use tools of statutory construction to determine its meaning. *Cf. Cail v. Serv. Motors, Inc.,* 660 S.W.2d 814, 815 (Tex.1983) ("If the disputed statute is clear and unambiguous extrinsic aids and rules of statutory construction are inappropriate.") (citation omitted).

 **[13]**   **[14]**   **[15]**   A fundamental rule of statutory construction is to ascertain and give effect to the Legislature's intent. *State v. Terrell,* 588 S.W.2d 784, 786 (Tex.1979); *Imperial Irrigation Co. v. Jayne,* 104 Tex. 395, 138 S.W. 575, 581 (1911). When general words (like "general control") follow specific and particularized enumerations of powers (like "establish public ferries" and "lay out and establish ... public roads"), we treat the general words as limited and apply them only to the same kind or class of powers as those expressly mentioned. *Stanford v. Butler,* 142 Tex. 692, 181 S.W.2d 269, 272 (1944). We employ this rule to construe specific terms no more broadly than the Legislature intended. *See id.* Moreover, the meaning of particular words in a statute may be ascertained by reference to other words associated

with them in the same statute. *County of Harris v. Eaton,* 573 S.W.2d 177, 179 (Tex.1978).

 **[16]** **[17]** Applying these canons of construction, we conclude that the Legislature's grant of general control over the roads does not include the power to petition a city to annex certain portions of a given county road. If, as Boerne contends, "general control" is read to include the power to petition for annexation, then there would have been no need for the Legislature to illustrate in subsections one through four the types of specific power a commissioners court may utilize pursuant to section 81.028. *See Spence v. Fenchler,* 107 Tex. 443, 180 S.W. 597, 601 (1915) ("It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative."). Because a commissioners court's power is limited to that which is expressly delegated to it by the Texas Constitution or Legislature, or necessarily implied to perform its duties, we will not read the Legislature's grant of general control to be more expansive than the type of powers set forth in section 81.028. *State ex rel. City of Jasper v. Gulf States Utils. Co.,* 144 Tex. 184, 189 S.W.2d 693, 698 (1945) (limiting commissioners courts' powers to those expressly conferred or necessarily implied); *Mo.-Kan.-Tex. Ry. Co. of Tex. v. Thomason,* 280 S.W. 325, 327 (Tex.Civ.App.-Austin 1926, writ ref'd) ("It has long been the rule of the courts to construe [exceptions to general rules] strictly."). Section 81.028, when construed as a whole, "clearly contemplate[s] that the commissioners court of each county shall regard [public transportation] as a system, to be laid out, changed, repaired, improved, and maintained, as far as practical, as a whole to the best interest and welfare of all the people of the county." *Canales,* 214 S.W.2d at 454–55. Therefore, when we construe a commissioners court's express power under section 81.028, we focus on the statute's transportation and safety aspects. In so doing, we hold that the Legislature intended to limit a commissioners court's authority under section 81.028 to matters relating to public travel. *See* TEX. LOC. GOV'T CODEE § 81.028.

 **\*30** A commissioners court's actions are thus sanctioned under section 81.028 only if related to its duty to protect the public's interest in transportation. *See Canales,* 214 S.W.2d at 456–57. Unless the power to petition for annexation is necessary for a commissioners court to carry out that function, we will not imply that it has such power. *See Gulf States Utils. Co.,* 189 S.W.2d at 698; *Terrell v. Sparks,* 104 Tex. 191, 135 S.W. 519, 521 (1911). Here, the power to petition

for inclusion in a city's extraterritorial jurisdiction is neither expressly conferred nor necessarily implied to enable a commissioners court to perform its delegated duty to provide safe roads for public travel. Accordingly, we reject Boerne's broad construction of the phrase "general control," and hold that a county's commissioners court is without authority to petition for annexation of its county roads under section 81.028.

### B

#### Commissioners Courts as Agents of the State

Although related to the parties' arguments about section 81.028, we analyze separately whether a county commissioners court, acting as the State's agent, can petition a municipality to annex portions of the county's roads. San Antonio and Boerne dispute whether the Legislature authorized commissioners courts to petition cities for annexation by enacting section 42.022, which provides:

> The extraterritorial jurisdiction of a municipality may expand beyond the distance limitations imposed by Section 42.021 to include an area contiguous to the otherwise existing extraterritorial jurisdiction of the municipality if the *owners* of the areas request the expansion.

TEX. LOC. GOV'T CODEE § 42.022(b) (emphasis added). Boerne focuses on the statute's reference to "owners." It argues that "[t]he Legislature, acting for the State, has primary and plenary power to control and regulate public roads and streets and it may delegate such powers to the counties in this state." Boerne then reasons that, because the Legislature gave commissioners courts general control over all roads in section 81.028, a commissioners court may—with respect to public roads within its jurisdiction—discharge the "owner's" prerogative by petitioning for annexation.

San Antonio repeats its earlier contention, which we have sustained, that the counties' "general control" over roads is not sufficient to give them the power to petition for inclusion in a municipalities' extraterritorial jurisdiction. San Antonio's position regarding the State's "ownership" of county roads, however, has changed. In its initial briefing, San Antonio did not dispute that the State owned those roads, but argued that

the counties were never granted specific authority to assert the State's ownership rights to petition for inclusion within a city's extraterritorial jurisdiction. Subsequently, at our request, the State filed an amicus brief in which it denied fee simple ownership of the roads. [8] San Antonio has now adopted the State's position and argues that, because the State is not fee simple owner of the roads in question, the commissioners courts cannot exercise the State's "ownership" right to petition for inclusion in Boerne's extraterritorial jurisdiction.

 [18]    Boerne correctly asserts, however, that the record in this case does not reflect title to the roads, whether fee simple, easement or otherwise. We note that while the State is not precluded from owning  **31**  county roads in fee simple, [9] we have generally held that unless otherwise provided in the grant or conveyance, the owner of land abutting a street, alley, or public highway owns the fee to the center of the road, subject only to the easement in favor of the public to a right of passage. [10] From the record presented on appeal, we can neither determine who "owns" the county roads nor the nature of that ownership. But we need not ascertain the exact nature of the State's interest to determine whether a county is authorized to petition a municipality for annexation on the State's behalf. Nothing in section 42.022(b) clearly permits a commissioners court, purportedly acting on behalf of the State, to advance purely provincial concerns for a subset of the counties' landowners. Because a commissioners court has only those powers expressly conferred or those powers necessarily implied from other grants of power, we hold that a commissioners court is not entitled, as agent of the State, to petition a municipality for annexation. *See Canales,* 214 S.W.2d at 453.

Finally, we note that the parties' assumption regarding ownership may affect the result of this case on remand. As outlined above, at the time they stipulated to exhibits concerning extraterritorial boundaries, the parties were operating under what may have been an incorrect assumption regarding ownership of the roads at issue. For example, Boerne asserts that, if abutting property owners have fee simple title to the centerline of the road, Boerne's extraterritorial jurisdiction may be greater than its stipulations at trial. The merit of Boerne's argument should be addressed

by the trial court in the first instance, and therefore we express no opinion on the subject. Accordingly, we remand the case to the trial court to determine San Antonio and Boerne's extraterritorial boundaries in light of our decision and to permit the parties to withdraw stipulated exhibits if warranted. TEX.R.APP. P. 60.2(d), 60.3; *Members Mut. Ins. Co. v. Tapp,* 469 S.W.2d 792, 793 (Tex.1971) (remanding in the interest of justice because party misunderstood the effect of a trial stipulation).

## V

## CONCLUSION

 [19]    Commissioners courts have limited authority. They possess only those powers expressly conferred by the Texas Constitution and the Legislature, and those necessarily required to perform their delegated duties. By granting commissioners courts general control over the roads, the Legislature imposed on them a duty to make the roadways safe for public  **32**  travel. Simultaneously, the Legislature limited their powers to those expressly given or necessary to fulfill their obligations to the traveling public. Petitioning a municipality to annex portions of county roads is unrelated to a commissioners court's specific duty to ensure safe travel. And, because neither the Texas Constitution nor the Legislature delegated any power the State may have to petition a city for annexation to commissioners courts, those courts cannot—on the State's behalf—petition a city to include county roads within that city's extraterritorial jurisdiction.

We reverse the court of appeals' judgment and remand the case to the district court for further proceedings consistent with this opinion.

Justice SMITH concurred in the judgment only.

**Parallel Citations**

46 Tex. Sup. Ct. J. 848

Footnotes

1    Subsequent to this litigation, the Legislature recodified section 81.028 in the Transportation Code. *See* TEX. TRANSP. CODEE ch. 251. Because there is no substantive change in the statute, we refer to section 81.028—the statute in effect at the time the parties' dispute arose.

2    Extraterritorial jurisdiction is an unincorporated land area that is contiguous to a municipality's corporate boundary. *See* discussion *infra* Part III.A.

3    Neither San Antonio nor Boerne contend that, even considering the disputed county roads, the area that Boerne seeks to annex is not "contiguous to the otherwise existing extraterritorial jurisdiction of the municipality." TEX. LOC. GOV'T CODEE § 42.022(b).

4    San Antonio also challenged whether, after it passed its ordinance upon "first reading," Boerne could acquire jurisdiction over the same property. The court of appeals held that the first city to actually complete the annexation process acquired jurisdiction over the property. 61 S.W.3d 571, 576. Because San Antonio did not contest that holding here, we express no opinion on its merits.

5    Under the Home Rule Amendment, cities having more than five thousand inhabitants may adopt a home rule charter. *See* TEX. CONST. art. XI, § 5. "Adopted in 1912, the home rule amendment 'altered the longstanding practice of having special charters individually granted and amended by the legislature' for the State's larger cities." *Black v. City of Killeen,* 78 S.W.3d 686, 692 (Tex.App.-Austin 2002, pet. denied) (quoting 22 David B. Brooks, *Texas Practice: Municipal Law and Practice* § 1.17 (2d ed.1999)). The amendment effectively created home rule cities as "mini-legislatures." *Id.* Cities adopting a home rule charter have the full power of self government and look to the Legislature only for limitations on their power. *Id.* (citing *Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas,* 852 S.W.2d 489, 490–91 (Tex.1993)). Nonetheless, the Legislature retained the authority to prescribe limitations on how cities exercised their annexation powers. *Forwood v. City of Taylor,* 147 Tex. 161, 214 S.W.2d 282, 286 (1948) ( "The result [of the Home Rule Amendment] is that now it is necessary to look to the acts of the legislature not for grants of power to such cities but only for limitations on their powers.").

6    The Municipal Annexation Act is currently codified at chapters 42 and 43 of the Local Government Code.

7    As discussed more fully in section IV.B *infra,* the parties originally assumed that the State owned the county roads at issue and stipulated accordingly to proposed boundaries. Based on San Antonio's original construction of section 42.022(b), San Antonio argued that, although the State owned such roads, it did not specifically delegate its power to petition for annexation to commissioners courts; thus, absent this express delegation, a commissioners court could not exercise the State's authority as owner to petition for annexation. *See* discussion *supra* Part III.B.

8    The State contends that "[t]he parties and the court of appeals' assumption that the State is the fee simple 'owner' of the strips of land occupied by the county roads is incorrect" and that "the State owns only easements for the roads at issue."

9    *See* TEX. LOC. GOV'T CODEE § 251.001(b) ("A municipality condemning land under this section may take a fee simple title to the property if the governing body expresses the intention to do so.").

10   *Angelo v. Biscamp,* 441 S.W.2d 524, 526 (Tex.1969) ("[A] deed to land abutting on a railroad right-of-way conveys title to the center of the right-of-way unless a contrary intention is expressed in the instrument."); *State v. Williams,* 161 Tex. 1, 335 S.W.2d 834, 836 (1960) ("When a conveyance is made of a piece of property abutting upon a public highway, it is natural to assume, in the absence of an express reservation to the contrary, that the grantor intended to convey the same with all of the beneficial rights enjoyed by him in its use."); *Humble Oil & Refining Co. v. Blankenburg,* 149 Tex. 498, 235 S.W.2d 891, 893 (1951) (dedication of plazas, parks, streets and alleys to the use and benefit of the public created an easement, not fee simple title); *Cox v. Campbell,* 135 Tex. 428, 143 S.W.2d 361, 362 (1940) ("The established doctrine of the common law is, that a conveyance of land bounded on a public highway, carries with it the fee to the centre of the road, as part and parcel of the grant. Such is the legal construction of the grant, unless the inference that it was so intended, is rebutted by the express terms of the grant.").

**End of Document**                                             © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext® © 2015 Thomson Reuters. No claim to original U.S. Government Works.                    7

940 S.W.2d 77
Supreme Court of Texas.

The COMMISSIONERS COURT OF
TITUS COUNTY, Texas and Carl
Johnson, County Auditor, Petitioners
v.
Cynthia AGAN, County Treasurer of
Titus County, Texas, Respondent.

No. 96–0683. | Argued Nov.
21, 1996. | Decided Feb. 21, 1997.

County treasurer brought declaratory judgment action against county commissioners court and county auditor to challenge decision by commissioners court to assign payroll functions to auditor. The 76th Judicial District Court, Titus County, Joe D. Clayton, sitting by assignment, granted summary judgment in favor of county commissioners court. County treasurer appealed. The Court of Appeals, Grant, J., 922 S.W.2d 640 reversed. On application for writ of error, the Supreme Court, Baker, J., held that: (1) commissioner's court could assign payroll responsibility to auditor, and (2) commissioners court improperly assigned to auditor county treasurer's functions of making bank and child support deposits, depositing payroll funds, and paying insurance premiums.

Reversed in part and affirmed in part.

**Attorneys and Law Firms**

*78 Charles J. Hlavinka, Robert W. Weber, Texarkana, for petitioners.

Gary Shaver, Gregory P. Grajczyk, Longview, for respondent.

**Opinion**

BAKER, Justice.

The issue in this case is whether the Commissioners Court of Titus County may divest the County Treasurer of payroll preparation responsibilities and transfer these responsibilities to the County Auditor. The County Treasurer filed a declaratory judgment action challenging the Commissioners Court's action. Both parties moved for summary judgment. In addition to their summary judgment evidence, the parties filed

a joint stipulation of uncontested facts. The trial court denied the County Treasurer, Cynthia Agan's (Agan), summary judgment and granted the Commissioners Court's summary judgment. The trial court denied the Commissioners Court recovery of attorneys' fees. The court of appeals reversed the trial court's judgment and rendered judgment for the County Treasurer. That court also ordered the Commissioners Court to return the payroll preparation responsibilities to the treasurer's office and to adequately fund the treasurer's office. The court of appeals affirmed the trial court's denial of attorneys' fees for the Commissioners Court.

We conclude the Commissioners Court did not abuse its discretion when it transferred the payroll preparation duties from the County Treasurer's office to the County Auditor's office. However, we find that the Commissioners Court exceeded its authority by transferring certain other functions from the County Treasurer to the County Auditor's office. These functions belong to the County Treasurer's office. We affirm the court of appeals' denial of attorneys' fees to the Commissioners Court. Accordingly, we affirm in part and otherwise reverse the court of appeals' judgment and render judgment accordingly.

**I. FACTS**

The summary judgment evidence and the stipulated uncontested facts show that Agan is the elected County Treasurer in Titus County. In 1987, Titus County hired a part- *79 time assistant County Treasurer, or payroll clerk, whose primary duty was preparing the county payroll. From 1987 until 1994, Agan and her assistant prepared the county payroll. In 1994, the Titus County Commissioners Court amended the county budget to combine administrative duties involving county payroll, the insurance program, personnel, and receiving purchase orders and their payment into one full-time position assigned to the County Auditor's office. These responsibilities had previously been divided between the payroll clerk in the County Treasurer's office and a part-time employee in the County Auditor's office, who had recently resigned. The County Treasurer's payroll clerk transferred to the County Auditor's office to fill this new position. The effect of these changes is to remove payroll preparation responsibilities from Agan and transfer them to the County Auditor's office.

As a County Auditor employee, the payroll clerk performs the same functions as she did in the County Treasurer's

office. Her duties include: (1) collecting timesheets from all county departments, entering timesheet data into the county computer system to generate payroll deductions for FIT, FICA, Medicare, insurance, retirement, and child support payments; (2) making FIT deposits with bank; (3) making child support deposits with appropriate offices; (4) depositing payroll funds; (5) paying insurance premiums; (6) preparing insurance claims; (7) wiring payments to third party administrators; (8) answering questions about insurance claims or payments; (9) preparing and transmitting W–2's and 1099's; and (10) preparing payroll checks. After the payroll clerk completes these functions, she delivers the payroll checks with the timesheets to the County Treasurer, Agan, for verification, signature, and disbursement. As a result, Agan's payroll preparation responsibilities are diminished and she is the only person in her office.

## II. PROCEDURAL HISTORY

In response to the Commissioners Court's actions, Agan sued the Commissioners Court seeking to declare the decision illegal and to order the payroll function back to her office. The trial court granted the Commissioners Court's motion for summary judgment and denied Agan's motion for summary judgment. The trial court held that the Commissioners Court could legally give the auditor's office the payroll responsibilities. However, the trial court refused to award the Commissioners Court attorney's fees. Agan appealed.

The court of appeals reversed the trial court and rendered judgment for Agan. The court of appeals rested its decision on two Attorney General decisions, Op.Tex. Att'y Gen. No. JM–911 (1988) and Op.Tex. Att'y Gen. No. JM–986 (1988). These opinions reason that the County Treasurer must prepare the county payroll because the payroll functions are so intimately linked that the payroll functions cannot be divorced from preparing the checks. Following this logic, the court of appeals decided that payroll preparation responsibilities must rest with the County Treasurer. The court of appeals affirmed the trial court's decision to deny the Commissioners Court its attorney's fees. The Commissioners Court appealed.

## III. STANDARD OF REVIEW

 [1]    Our Constitution establishes the Commissioners Court as the county's principal governing body. TEX. CONST. art. V, § 18. The powers and duties of the Commissioners Courts

include aspects of legislative, executive, administrative, and judicial functions. *Avery v. Midland County,* 390 U.S. 474, 482, 88 S.Ct. 1114, 1119, 20 L.Ed.2d 45 (1968); *Ector County v. Stringer,* 843 S.W.2d 477, 478 (Tex.1992).

Our Constitution vests appellate jurisdiction and general supervisory control over a County Commissioners Court with the district court subject to such exceptions and under such regulations as the law may prescribe. TEX. CONST. art. V, § 8. With a few narrow exceptions, the Legislature has not prescribed procedures for the district court's exercise of this appellate jurisdiction or supervisory control. *Ector County,* 843 S.W.2d at 479. The enabling legislation empowering the district court repeats the Constitution's terms. TEX. GOV'T CODE § 24.020; *see also* 35 DAVID BROOKS, COUNTY & SPECIAL DISTRICT LAW § 5.11 (Tex. Practice 1989).

 [2]    **\*80** Case law defines the scope of the district court's jurisdiction. A party can invoke the district court's constitutional supervisory control over a Commissioners Court judgment only when the Commissioners Court acts beyond its jurisdiction or clearly abuses the discretion conferred upon the Commissioners Court by law. *Ector County,* 843 S.W.2d at 479 (*citing Tarrant County v. Shannon,* 129 Tex. 264, 104 S.W.2d 4, 9 (1937)).

 [3]    [4]    If the Commissioners Court acts illegally, unreasonably, or arbitrarily, a district court may so adjudge. *Ector County,* 843 S.W.2d at 479 (*citing Lewis v. City of Fort Worth,* 126 Tex. 458, 89 S.W.2d 975, 978 (1936)). However, in reviewing a Commissioners Court judgment for abuse of discretion, the district court has no right to substitute its judgment and discretion for that of the Commissioners Court. *Ector County,* 843 S.W.2d at 479 (*citing Lewis,* 89 S.W.2d at 978).* The district court may order the Commissioners Court to exercise its discretion, but cannot tell the Commissioners what decision to make. *Ector County,* 843 S.W.2d at 479. Once the Commissioners Court exercises its discretion, the district court may review the order for abuse of discretion. *Ector County,* 843 S.W.2d at 479.

## IV. APPLICABLE LAW

Our Constitution creates the County Treasurer's office:

> Except as otherwise provided by this section, the Legislature shall prescribe the duties and provide for the election

by the qualified voters of each county in this State, of a County Treasurer and a County Surveyor, who shall have an office at the county seat, and hold their office for four years, and until their successors are qualified; and shall have such compensation as may be provided by law.

TEX. CONST. art. XVI, § 44(a). This section establishes the County Treasurer's office, but gives the Legislature the responsibility to prescribe the treasurer's duties.

The Legislature established the County Treasurer's duties in § 113 of the Local Government Code. The County Treasurer's enumerated functions include:

The county treasurer, as chief custodian of county funds, shall keep in a designated depository and shall account for all money belonging to the county.

TEX. LOC. GOV'T CODEE § 113.001.

The county treasurer shall keep an account of the receipts and expenditures of all money that the treasurer receives by virtue of the office and of all debts due and owed by the county. The treasurer shall keep accurate, detailed accounts of all the transactions of the treasurer's office.

TEX. LOC. GOV'T CODEE § 113.002.

The county treasurer shall receive all money belonging to the county from whatever source it may be derived.

TEX. LOC. GOV'T CODEE § 113.003.

The county treasurer shall disburse the money belonging to the county and shall pay and apply the money as required by law and as the commissioners court may require or direct, not inconsistent with law.

TEX. LOC. GOV'T CODEE § 113.041(a). Enumerated or core functions are fundamental to the County Treasurer's office and the Commissioners Court cannot take core

functions from the County Treasurer. The Commissioners Court may provide funds for adequate personnel and supplies, if necessary, to permit the County Treasurer to perform the functions of the office. TEX. LOC. GOV'T CODEE § 83.006.

[5] [6] Several other statutes apply to the County Treasurer, but do not grant the County Treasurer exclusive power to perform specific functions. For example, § 155.021 considers deductions. That section states, "[t]he County Treasurer or, *if another officer is specified by law,* that other officer shall make deductions from, or take other similar actions with regard to, the compensation of county employees...." TEX. LOC. GOV'T CODEE § 155.021 (emphasis added). If the statutory language is clear and unambiguous we give the statute its common everyday meaning. *Cail v. Service Motors, Inc.,* 660 S.W.2d 814, 815 (Tex.1983). This statute's ordinary meaning allows the County Treasurer or another county official to conduct **\*81** the described function. Consequently, the Commissioners Court does not abuse its discretion when it delegates a function the Legislature has not exclusively delegated to the County Treasurer to another appropriate county official.

[7] [8] The Texas Uniform Declaratory Judgments Act allows the trial court to award reasonable and necessary attorney's fees and costs as are equitable and just. *See* TEX.CIV.PRAC. & REM.CODE § 37.009. The decision to grant or deny attorney's fees and costs is within the trial court's sound discretion. *Oake v. Collin County,* 692 S.W.2d 454, 455 (Tex.1985). We do not reverse the trial court's denial of attorney's fees unless the complaining party shows a clear abuse of discretion. *Oake,* 692 S.W.2d at 455.

## V. APPLICATION OF LAW TO FACTS

[9] [10] When, as here, both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review the summary judgment evidence presented by both sides and determine all questions presented. *See Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex.1988). The reviewing court should render such judgment as the trial court should have rendered. *Jones,* 745 S.W.2d at 900. If a party brings the case to this Court and we reverse the court of appeals, we should render the judgment that the court of appeals should have rendered. *Tobin v. Garcia,* 159 Tex. 58, 316 S.W.2d 396, 400–01 (1958).

[11] Our Constitution does not specifically designate the county office which must prepare the payroll. Instead, it leaves this task to the Legislature. The Legislature has not assigned payroll preparation responsibilities to any county official. Though the Legislature has enumerated several functions that cannot be taken away from the County Treasurer, preparing the payroll is not one of them.

The budgetary decision to transfer the payroll preparation responsibilities to the County Auditor's office is a legislative function for which the Commissioners Court receives broad discretion. *See generally* TEX.CONST. art. II, § 1 (discussing separation of powers). Because the Legislature has not assigned payroll preparation responsibilities, the Commissioners Court acting in its legislative capacity may delegate the responsibilities to an appropriate county official. The County Auditor is an appropriate county official. This is so because the County Auditor has the authority to perform the clerical functions associated with payroll preparation. *See* TEX.LOC. GOV'T CODE § 152.051 (stating that county payroll officer means County Auditor within this subchapter); TEX.LOC. GOV'T CODE § 155.002(a)(2) (requiring payroll deductions to be submitted to the County Auditor).

Another statute suggests that anyone the Commissioners Court authorizes has the authority to administer payroll. TEX.LOC. GOV'T CODE § 155.062(a)(2) (requiring insurance deduction requests to be submitted to county officer authorized by Commissioners Court to administer payroll deductions). Thus, the Commissioners Court did not exceed its authority in transferring the payroll preparation responsibilities to the County Auditor.

In reaching its contrary conclusion, the court of appeals relied on two Attorney General opinions, Op.Tex. Att'y Gen. No. JM–911 (1988), and Op.Tex. Att'y Gen. No. JM–986 (1988). JM–911 held that the County Treasurer is the only officer to whom the payroll function may be delegated because the County Treasurer is the official authorized to pay and apply county money under TEX.LOC. GOV'T CODE § 113.041(a). Op.Tex. Att'y Gen. JM–911 at 4144 (1988). The Attorney General decided that this responsibility is not constitutionally or legislatively mandated but falls within the penumbra of the treasurer's ministerial core functions. Op.Tex. Att'y Gen. JM–911 at 4143 (1988). JM–986 applied this rationale to counties with populations less than 190,000, holding: (1) the County Treasurer is the proper county officer to conduct county payroll deductions; (2) the Commissioners Court must approve the county payroll and issue warrants in payments of

salaries; and (3) the Commissioners Court can delegate the ministerial task of preparing salary warrants to the County Treasurer. Op.Tex. Att'y Gen. JM–986 at 3781 (1988).

[12] [13] **\*82** While Attorney General's opinions are persuasive they are not controlling on the courts. *Holmes v. Morales,* 924 S.W.2d 920, 924 (Tex.1996). We disagree with the Attorney General's conclusion that the payroll preparation functions fall within the County Treasurer's core functions because the Legislature has not mandated those functions to another county official. It is clear that the Legislature has mandated that the County Treasurer must receive all money belonging to the county from whatever source derived and the County Treasurer must disburse and apply county funds. *See* TEX.LOC. GOV'T CODE §§ 113.003 and 113.041(a). Conversely, we conclude the Commissioners Court may transfer any payroll responsibility to the County Auditor that the Legislature has not specifically delegated to the County Treasurer.

[14] Several of the transferred payroll responsibilities involve disbursing county funds. Specifically, the County Treasurer must: (1) make FIT deposits with the bank; (2) make child support deposits with appropriate offices; (3) wire insurance payments to third party administrators; (4) deposit payroll funds; and (5) pay insurance premiums. Because the Legislature has given the treasurer the exclusive power to disburse funds, the Commissioners Court acted beyond its authority in transferring these functions to the County Auditor. The Commissioners Court may properly assign the remaining payroll responsibilities to the County Auditor because they do not involve disbursement, payment, or application of county funds. However, the Commissioners Court must allow the County Treasurer to perform those functions legislatively delegated to her. There is no indication in the record before us that the County Treasurer will require additional personnel or funding to perform these functions.

The trial court rendered judgment for the Commissioners Court but refused to grant the Commissioners Court attorney's fees. The trial court has the discretion to deny attorney's fees in declaratory judgment actions. *See Oake,* 692 S.W.2d at 455. The record does not show that the trial court abused its discretion.

## VI. CONCLUSION

 **[15]** **[16]** The Legislature has assigned the County Treasurer certain core functions. The Commissioners Court cannot allocate the County Treasurer's core functions to any other officer, including the County Auditor. If the Legislature does not specifically assign a duty to the County Treasurer, that duty is not one of the County Treasurer's core functions. The Commissioners Court may, within its discretion, assign those non-core functions to other county officials the Legislature authorizes to perform those functions.

Because payroll preparation responsibilities are non-core functions of the County Treasurer's office, the Commissioners Court can assign the payroll preparation responsibilities to the County Auditor's office. However, the Commissioners Court cannot delegate to the County Auditor any payroll responsibility which requires actual disbursement, payment, or application of county funds. These duties are core functions of the County Treasurer's office.

Therefore, we hold the Commissioners Court properly transferred the payroll preparation responsibilities to the County Auditor. We hold the Commissioners Court exceeded its authority and improperly transferred to the County Auditor the functions of: (1) making FIT deposits with the bank; (2) making child support deposits with appropriate offices; (3) wiring insurance payment to third party administrators; (4) depositing payroll funds; and (5) paying insurance premiums because they involve actual disbursement, payment, or application of county funds. However, this does not preclude the County Auditor's office from preparing the documents necessary to deposit, disburse, pay, or apply county funds, subject to the County Treasurer's approval, just as the County Auditor prepares payroll checks subject to the County Treasurer's approval.

We reverse the court of appeals' judgment for Agan, and render judgment that the Commissioners Court properly transferred payroll preparation responsibilities to the County Auditor's office. We further render **\*83** judgment that the Commissioners Court improperly transferred functions that require disbursement, payment, or application of county funds. These responsibilities must remain in the County Treasurer's office. We affirm the court of appeals' judgment denying attorney's fees to the Commissioners Court.

**Parallel Citations**

40 Tex. Sup. Ct. J. 355

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

774 S.W.2d 719
Court of Appeals of Texas,
Austin.

CONSUMERS WATER, INC., Appellant,

v.

PUBLIC UTILITY COMMISSION
OF TEXAS, Appellee.

No. 14509. | June 28, 1989.

Utility appealed from the judgment of the 331st Judicial District Court, Travis County, Harley Clark, J., which sustained the order of the Public Utility Commission fixing utility's water and sewer rates. The Court of Appeals dismissed the appeal for lack of jurisdiction, 707 S.W.2d 129, The Supreme Court reversed and remanded the case to the Court of Appeals, 741 S.W.2d 348. The Court of Appeals, Gammage, J., held that the Commission's failure to consider adjusted value of invested capital in determining fair return, as required by statute, was arbitrary and capricious and constituted an abuse of discretion.

Reversed and remanded.

**Attorneys and Law Firms**

**\*720** Robert L. Burns, Sears and Burns, Houston, for appellant.

Jim Mattox, Atty. Gen., Stephen J. Davis, Asst. Atty. Gen., Austin, for appellee.

Before SHANNON, C.J., and GAMMAGE and ABOUSSIE, JJ.

**Opinion**

GAMMAGE, Justice.

Consumers Water, Inc. (Consumers) appeals from a district court judgment sustaining an order of the Public Utility Commission of Texas (the Commission) fixing Consumers' water and sewer rates; and ordering refunds to customers, various repairs and installations. We will reverse the judgment of the district court and remand the cause for further proceedings.

Consumers applied on October 5, 1982, for a 40% rate increase. On October 15, the Commission suspended the increase pursuant to the Public Utility Regulatory Act, Tex.Rev.Civ.Stat.Ann. art. 1446c, § 43(d) (Supp.1989) (PURA). On October 29, the Commission fixed interim rates at an approximately 14% increase. Subsequent hearings occurred on February 28, and March 1 and 2, 1983. Using base figures from a previous "docket," the hearings examiner filed her report on May 11, 1983, recommending denial of Consumers requested increase and recommending a decrease in monthly flat rates. The examiner also recommended Consumers be ordered to refund to its customers the difference between the interim rates and the suggested rates, and recommended that various improvements be ordered. The Commission adopted the examiner's report in its final order of June 1, 1983. On January 6, **\*721** 1984, the district court heard Consumers appeal and sustained the Commission's order on April 11, 1985.

Consumers appealed the district court judgment pursuant to PURA § 69, and the Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19(e) (Supp.1989) (APTRA). The Commission filed a cross-point suggesting the court lacked jurisdiction because Consumers failed to timely file a motion for rehearing in the agency. This Court dismissed the administrative appeal for lack of jurisdiction, 707 S.W.2d 129, and the Supreme Court reversed our judgment and remanded the case to this Court for disposition of the remaining points of error, 741 S.W.2d 348.

 **[1]** In its first and second points of error, Consumers complains of the Commission's omission of findings of fact in its final order on the factors of current cost of Consumers' property, adjustments for age and condition of such property, and adjusted value of invested capital. PURA § 41(a). Consumers contends the omission was arbitrary and capricious and, therefore, reversible error under APTRA § 19(e) (6). We agree. In determining whether an agency act or omission is arbitrary and capricious, a reviewing court must ascertain whether the agency abused its discretion by basing its decision on legally irrelevant factors, or by omitting to consider legally relevant factors—those the Legislature intended the agency to consider in reaching its decision in cases like the one in question. *Gerst v. Nixon,* 411 S.W.2d 350, 360, n. 8 (Tex.1966); *Starr County v. Starr Indus. Services, Inc.,* 584 S.W.2d 352 (Tex.Civ.App.1979, writ ref'd n.r.e.).

In PURA § 40(a), the Legislature prohibited the Commission to "prescribe any rate which will yield more than a fair return upon the adjusted value of invested capital used and useful in rendering service to the public." In PURA § 41, the Legislature explicitly prescribed the "rules" and factors to be considered by the agency in arriving at its estimate of adjusted value of invested capital:

Sec. 41. The components of adjusted value of invested capital *shall* be determined according to the following rules:

Adjusted Value of Invested Capital. Utility rates *shall* be based upon the adjusted value of property used by and useful to the public utility in providing service[,] including where necessary to the financial integrity of the utility[,] construction work in progress at cost as recorded on the books of the utility. The adjusted value of such property *shall* be a reasonable balance between original cost less depreciation and current cost less an adjustment for both present age and condition. The [Commission] shall have the discretion to determine a reasonable balance that reflects not less than 60% nor more than 75% original cost, that is, the actual money cost, or the actual money value of any consideration paid other than money, of the property at the time it shall have been dedicated to public use, whether by the utility which is the present owner or by a predecessor, less depreciation, and not less than 25% nor more than 40% current cost less an adjustment for both present age and condition. The [Commission] may consider inflation, deflation, quality of service being provided, the growth rate of the service area, and the need for the public utility to attract new capital in determining a reasonable balance.

PURA § 41(a) (emphasis added).

Consumers offered evidence of the adjusted value of invested capital (AVIC) and its elements. The hearings examiner rejected Consumers' calculation of AVIC, finding the calculation was not founded on reliable data and there was no showing that Consumers' replacement cost calculations took into account current technology; and because the company failed to show its method for determining AVIC was reasonable, adequate and based on sound regulatory theory. Although the Commission concedes that Consumers' failure to carry its burden of showing AVIC would permit the Commission to dismiss the application, the Commission, instead, chose to order a **\*722** rate decrease based on

evidence introduced by the agency's staff. The staff, however, provided evidence of only "total invested capital," rather than AVIC as required by PURA § 41(a), and the Commission determined only that factor in its final order.

**[2]** Because PURA requires that the Commission consider AVIC when determining what constitutes a fair return, we conclude the Commission's failure to do so was arbitrary and capricious and constituted an abuse of discretion.

**[3]** Furthermore, APTRA requires a final decision to "include findings of fact and conclusions of law, separately stated." APTRA § 16(b). "Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings." *Id.* This section is interpreted to require findings of underlying fact when an ultimate fact-finding embodies a mandatory fact-finding set forth in the relevant enabling act, or when the ultimate fact-finding represents a criterion the legislature has directed the agency to consider in performing its function. *Texas Health Fac. v. Charter Medical–Dallas,* 665 S.W.2d 446, 451 (Tex.1984); *Galveston County v. Texas Dept. of Health,* 724 S.W.2d 115, 125 (Tex.App.1987, writ ref'd n.r.e.).

**[4]** The Commission did not recite in its final order any findings on the statutorily required criteria of AVIC or its elements as set out in PURA § 41(a). We conclude the omission was arbitrary and capricious.

The Commission asserts that PURA was amended in 1983 to require a reasonable rate of return based on "invested capital," and argues that a remand to the agency would be futile because the statute would require the agency to find exactly what it already found. This argument is without merit.

**[5]** The 68th Legislature's amendments to PURA in 1983 contain a savings clause providing that the amendments apply "only to a proceeding in which the statement of intent or application is filed on or after the effective date of this Act." 1983 Tex.Gen.Laws, Ch. 274, § 2 at 1321. Because the amendments were effective on September 1, 1983, after Consumers' application of October 5, 1982, the Commission must follow the now-repealed provision requiring a finding of AVIC.

Consumers asserts in its seventh point of error that the Commission delayed this proceeding, resulting in a confiscation of property, and requests that this Court render

judgment. APTRA § 19(e), however, requires a reviewing court to *remand* a case to the agency when its final order is reversed on judicial review.

We sustain Consumers' first two points of error, overrule its seventh point of error, and need not reach its remaining points.

The judgment of the district court is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

843 S.W.2d 477
Supreme Court of Texas.

ECTOR COUNTY, Texas, Ector County
Commissioners Court; Jack Crider, Bryan
Henderson, Ricky Jorgensen, Joe Hernandez, Jan
Fisher, Bob Bryant, and Jim Jordan, Petitioners,
v.
Martin A. STRINGER, Respondent.
ECTOR COUNTY, Texas, Ector County
Commissioners Court; Jack Crider, Bryan
Henderson, Ricky Jorgensen, Joe Hernandez, Jan
Fisher, Bob Bryant, and Jim Jordan, Petitioners,
v.
Joe W. HILL, Respondent.

Nos. D–2313, D–2316. | Dec. 16,
1992. | Rehearing Overruled Jan. 20, 1993.

Constables brought action to obtain compensation and
expenses for services previously rendered. The 161st District
Court, Ector County, Tryon D. Lewis, J., determined that
it lacked jurisdiction. Constables appealed. The El Paso
Court of Appeals, Eighth Judicial District, 825 S.W.2d 180,
reversed and remanded. Review was granted. The Supreme
Court, Gonzalez, J., held that district court lacked jurisdiction
to make salary determination for constables for past or future
service.

Judgments of Court of Appeals reversed, and trial court
affirmed.

**Attorneys and Law Firms**

**\*477** Joel B. Locke, Richard Bonner, Odessa, for petitioner.

Will Hadden, Odessa, for respondent.

**OPINION**

GONZALEZ, Justice.

 **[1]**  The main issue in these consolidated cases is whether a
trial court has jurisdiction to determine the salary allegedly
owed two constables for services rendered in the past. In
each case, the trial court held that it lacked jurisdiction and
thus rendered a take-nothing judgment against the constables.

In both cases, the court of appeals reversed the judgment
of the trial court and remanded the causes to the trial court
for rendition of a judgment in favor of the constables for
past salary plus prejudgment interest and attorney's fees. 825
S.W.2d 180. We hold that a trial court lacks jurisdiction to
set a constable's salary. We thus reverse the judgments of the
 **\*478**  court of appeals and affirm those of the trial court.

*Ector County v. Stringer*

Martin Stringer served as a constable in Ector County from
January 1, 1985, to December 31, 1988. During this time,
he received a salary of $20 per month for the first forty-
five months and $100 per month for a subsequent three-
month period. In August 1989, Stringer filed suit requesting
additional reasonable compensation for the four-year period,
plus expenses and attorney's fees. He also sought an order
to require the Ector County Commissioners Court to set
reasonable compensation and normal fringe benefits during
the time he held office.

Following a bench trial, the trial court rendered a take-nothing
judgment as to past benefits based on a determination that the
court was without jurisdiction to set a salary. However, the
trial court made findings that "if the Court has the power to
determine the constable's salary," a reasonable salary would
have been a rate of $1,500 per month.

The court of appeals reversed the trial court's judgment
holding that the trial court had jurisdiction to consider the
claim. Based on the trial court's findings, the court of appeals
held that Stringer was entitled to recover judgment in the
amount of $80,373.47 for the 48–month period, after allowing
credit for the sum previously paid. The court of appeals also
held that Stringer was entitled to attorney's fees under Texas
Civil Practice and Remedies Code section 38.001(1).

*Ector County v. Hill*

Joe Hill is currently a constable in Ector County.
Commencing on January 1, 1985, he received a salary of
$20 per month for a period of 45 months and $100 per
month thereafter. In August 1989, he filed suit in district court
for additional compensation for the four and one-half year
period, plus expenses and attorney's fees. He also sought an
order requiring the Ector County Commissioners Court to set
reasonable compensation and normal fringe benefits in the

future for his services as constable. This suit was consolidated with the *Stringer* suit and after a trial before the court without a jury, the court rendered a judgment similar to the *Stringer* judgment. The trial court held that it lacked jurisdiction to determine what Hill's salary should have been for the period in question and correctly held that mandamus is the appropriate remedy to obtain a reasonable salary determination for the future. [1] Although the trial court denied a monetary recovery, the court found that a reasonable salary for the period in question was $1,500 per month and that the total amount that would have been owed Hill at this rate plus prejudgment interest, after credit for the amount previously paid, was $96,803.13.

The court of appeals reversed the judgment of the trial court and remanded the cause for rendition of judgment in conformance with the trial court's findings, plus prejudgment interest and attorney's fees. 825 S.W.2d 180. Because we hold that a trial court does not have jurisdiction to make salary determinations for constables for past or future service, we reverse the judgments of the court of appeals and affirm those of the trial court.

Article V, § 18 of the Texas Constitution establishes the commissioners court as the principal governing body of the county. The powers and duties of the commissioners courts include aspects of legislative, executive, administrative, and judicial functions. *Avery v. Midland County,* 390 U.S. 474, 482, 88 S.Ct. 1114, 1119, 20 L.Ed.2d 45 (1968).

**\*479** The constitution vests in the district court "appellate jurisdiction and general supervisory control over the County Commissioners Court, with such exceptions and under such regulations as may be prescribed by law." TEX. CONST. art. V, § 8. With a few narrow exceptions, the legislature has not prescribed procedures for exercising this appellate jurisdiction or supervisory control. The enabling legislation empowering the district court merely repeats the terms of the constitution. TEX.GOV'T CODE § 24.020. *See generally* 35 DAVID BROOKS, COUNTY & SPECIAL DISTRICT LAW § 5.11 (Texas Practice 1989).

The scope of the district courts' jurisdiction has been defined by case law:

> It is equally well settled that the supervisory power of the district court over the judgments of a commissioners' court, as authorized by

article 5, section 8, of the Constitution, and article 1908 of the Revised Civil Statutes [the predecessor of the Government code], **can only be invoked when it acts beyond its jurisdiction or clearly abuses the discretion conferred on it by law.**

*Tarrant County v. Shannon,* 129 Tex. 264, 104 S.W.2d 4, 9 (1937) (emphasis added). *Accord, Yoakum County v. Gaines County,* 139 Tex. 442, 163 S.W.2d 393 (1942); *Vondy v. Commissioners Court,* 714 S.W.2d 417, 420 (Tex.App.–San Antonio 1986, writ ref'd n.r.e.).

[2] [3] One of the duties the constitution entrusts to the discretion of the commissioners court is the setting of constables' salaries. TEX. CONST. art XVI, § 61. In *Vondy v. Commissioners Court,* 620 S.W.2d 104 (Tex.1981), we held that this provision imposes a mandatory, ministerial duty on the commissioners courts to set a reasonable salary. *Id.* at 109. Thus, while the district court may order the commissioners court to carry out its constitutional duty to set a reasonable salary, the district court cannot substitute its discretion for that of the commissioners by making that determination itself. *Id.* Once the commissioners court acts, the district court may review the commissioners' orders to determine if they are arbitrary, or otherwise constitute an abuse of discretion. *Id.* [2]

In the area of a governing body's fiscal policy, the district court's role is necessarily a limited one:

> [A] court has no right to substitute its judgment and discretion for the judgment and discretion of the governing body upon whom the law visits the primary power and duty to act. Of course, if such governing body acts illegally, unreasonably, or arbitrarily, a court of competent jurisdiction may so adjudge, but there the power of the court ends.

*Lewis v. City of Fort Worth,* 126 Tex. 458, 89 S.W.2d 975, 978 (1936).

[4] [5] In short, the district court may order the commissioners court to exercise its discretion, but cannot tell the commissioners what decision to make. [3] Once the commissioners court exercises its discretion, the district court

may review the order for abuse of discretion, but it cannot substitute its discretion for that of the commissioners court. [4]

**\*480** The court of appeals advanced a reason for distinguishing *Vondy v. Commissioners Court* on grounds that "[t]he present suit does not seek to have a reasonable salary set by the commissioners court, instead it seeks to have the district court render a judgment for services rendered in the **past,** and the standard by which to determine the amount due is 'a reasonable salary.' " 825 S.W.2d at 181 (emphasis added). The court of appeals held that because Stringer's claim is retrospective in nature, the claim is removed from the mandate of the Texas Constitution and the Texas Local Government Code. We disagree. An award of damages as requested here—in an amount determined by the trial court without deference to the commissioners court's authority to set a reasonable salary—necessarily involves substituting the district's discretion for that of the commissioners court.

The back-pay cases cited in the court of appeals' opinion do not change our analysis. For example, in *Mokwa v. City of Houston,* 741 S.W.2d 142 (Tex.App.–Houston [1st Dist.] 1987, writ denied), a police officer sought to recover back pay from the city for services rendered in a job classification at a higher pay rate than her regular job classification. *Id. at 143.* The court in *Mokwa* stated that a trial court has jurisdiction to determine the amount of back pay due. *Id. at 145.* However, the principal issue in the case was entitlement to compensation at a pay level for a higher classification, for which the amount had been previously established by the governing body. The issue was not that the pay levels had been established too low. Further, the back pay and debt cases cited by the court of appeals do not involve a constitutional provision and statutes which mandate that a reasonable salary be set only by the commissioners court. [5] Reclassifying compensation due for the past services of a constable as a debt is ineffective to circumvent the authority of the commissioners court to set the salary of a constable.

The court of appeals erred in holding that the trial court had jurisdiction to determine and award a reasonable salary for services rendered in the past by a constable and in awarding attorney's fees and prejudgment interest. Therefore, the judgments of the court of appeals in both of these cases are reversed and those of the trial court are affirmed. [6]

Footnotes

1     The trial court issued writs of mandamus to each county commissioner and the County Judge and
COMMANDED [them] to forthwith set, as the official act of Ector County and of the Ector County Commissioners Court, a reasonable salary, office and travel expense for Joe W. Hill as Ector County Constable of Precinct 4 for the Budget Year 1989–90. The trial court also commanded the defendants to appear at a certain date to show the court that they had complied with the court's order.

2     There may be other reasons why a commissioners court order could be an abuse of discretion. *See Vondy v. Commissioners Court,* 714 S.W.2d 417, 420 (Tex.App.–San Antonio 1986, writ ref'd n.r.e.) (" 'this supervisory jurisdiction can be invoked in a direct attack in the district court when it is alleged that the Commissioners Court order is voidable as being arbitrary, capricious, unsupported by substantial evidence or that the court has acted beyond its jurisdiction' ") (quoting *Mobil Oil Corp. v. Matagorda County Drainage Dist. No. 3,* 580 S.W.2d 634, 638 (Tex.Civ.App.–Corpus Christi 1979) *rev'd on other grounds,* 597 S.W.2d 910 (Tex.1980)).

3     We need not address whether mandamus is available to order the commissioners court to determine a reasonable salary for the constables' past services since such relief was not sought here.

4     In addition to the constitution, the Texas Local Government Code, section 152.011 states that "[t]he commissioners court of a county shall set the amount of the compensation, office, and travel expenses, and all other allowances for county and precinct officers and employees who are paid wholly from county funds." TEX.LOC.GOV'T CODE § 152.011 (1988). Section 152.011 has been amended since our decision in *Vondy v. Commissioners Court,* 620 S.W.2d 104 (Tex.1981). Act of May 1, 1987, 70th Leg., R.S., ch. 149, § 1, 1987 Tex.Gen.Laws 707, 927. When the legislature re-enacts a statute without material change, it may be considered to have acquiesced in our earlier statutory interpretation. Because the amendments to the Texas Local Government Code did not in any way alter our holding in *Vondy v. Commissioners Court,* our decision remains applicable. *See Robinson v. Central Texas MHMR Center,* 780 S.W.2d 169, 170 n. 4 (Tex.1989); *First Employees Ins. Co. v. Skinner,* 646 S.W.2d 170, 172 (Tex.1983).

5     Authorities relied upon by the court of appeals such as *Mokwa v. City of Houston,* 741 S.W.2d 142 (Tex.App.–Houston [1st Dist.] 1987, writ denied), and *City of Galveston v. Russo,* 508 S.W.2d 882 (Tex.Civ.App.–Houston [14th Dist.] 1974, writ ref'd n.r.e.), involve municipal employees not subject to article XVI, § 61.

6    The court of appeals awarded attorney's fees to Stringer and Hill under section 38.001 of the Texas Civil Practice and Remedies Code. This issue is irrelevant because a party must be successful in the suit to recover attorney's fees. *See Bomer v. Ector County Commissioners Court,* 676 S.W.2d 662 (Tex.App.–El Paso 1984, writ ref'd n.r.e.).

**End of Document**                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

568 S.W.2d 166
Court of Civil Appeals of Texas, Dallas.

GARY SAFE COMPANY, Appellant,
v.
A. C. ANDREWS CO., INC., Appellees.

No. 19537. | May 31, 1978. |
Rehearing Denied June 27, 1978.

Appeal was taken from a judgment of the 44th District Court, Dallas County, Joe Bailey Humphreys, J., granting recovery in action seeking sales commissions based upon an alleged contract. The Court of Civil Appeals, Akin, J., held that where no promises were made on behalf of plaintiff to perform any services, to refrain from competing, to compromise any disputes or to do or refrain from doing anything in return for defendant's alleged promise to pay sales commissions on sales plaintiff made to its established customer and defendant had legal right to sell directly to plaintiff's established customer without paying plaintiff any compensation, no consideration existed for defendant's alleged agreement to pay sales commissions so that there was no binding contract.

Reversed and rendered.

**Attorneys and Law Firms**

**\*167** Ralph I. Miller, Nancy L. Benoit, Thompson, Knight, Simmons & Bullion, Dallas, for appellant.

Wm. T. Andress, Jr., Dallas, for appellees.

**Opinion**

AKIN, Justice.

This is an appeal by Gary Safe Company from a judgment granting A. C. Andrews Co., Inc. recovery of $78,125.66 for sales commissions based upon an alleged contract. The judgment also provides that Andrews is entitled to future sales commissions on all sales made by Gary to the Southland Corporation. The trial court found that a letter sent by Gary to Andrews stating that Gary would pay $25 to Andrews for each unit sold Southland became a binding contract by tacit acceptance by Andrews. The court also found that under this contract Andrews was entitled to a commission of $25 per unit for the life of the relationship between Gary and Southland. Gary Safe attacks the judgment on the grounds that there

was no consideration on the part of Andrews and that even if consideration existed, Gary Safe could terminate the alleged contract at will. We hold that no consideration flowed to Gary Safe and that, consequently, no binding contract existed between the parties. Accordingly, we reverse and render.

Before the transaction now in question, Gary Safe, a manufacturer, had sold safes to Andrews Company for resale, although no agreement existed between Gary Safe and Andrews with respect to a designation of Andrews as a distributor or authorized dealer for safes manufactured by Gary. In the early 1960's, Andrews commenced selling floor safes to Southland Corporation for their convenience stores, using Gary Safe as the supplier. In 1972, Southland requested Andrews to make a particular under-the-counter safe with a money drop for use in Southland's stores. Gary Safe manufactured this particular safe, designated as Model 3421, according to specifications requested by Andrews. Between 1972 and 1973, Southland purchased 443 of these units through Andrews, with a gross profit to Andrews of $57.50 per unit.

In December 1973, Andrews learned that Gary Safe had contacted Southland proposing to sell safes directly to Southland. Andrew's president, A. C. Andrews, then protested in a letter to Gary that "one of the best ways to mess up a good deal for everybody is for different people from a producer-selling organization to call on personnel with a buying-using corporation." In response, Gary Safe gave assurance that it would not seek to deal with Southland directly. No contention is made by Andrews that these letters constitute a contract. In January 1974, however, Gary Safe wrote the following letter, which is now alleged to have resulted in a binding contract:
Mr. A. C. Andrews

A. C. Andrews Company

Dallas, Texas
Dear Doc:

Enclosed is a copy of a letter to Mr. Pobilatti of the Southland Corporation. After several telephone conversations he seemed to be satisfied with the prices quoted in our letter to him.

From the prices quoted we will pay you a commission as follows:

A flat $25.00 on each unit known as model 3421, now used by their stores. A commission of 5% For all other safe equipment, the 5% To be figured on the prices at which we sell Southland Corporation.

I have seen no other way to go on this, Doc, and I hope it works out alright.

Sincerely,

Gary Safe Company

Allen Royce

The trial court found that this letter was an offer which implied a "tacit understanding" that Andrews would not interfere with Gary's direct sales to Southland, and that when Andrews accepted the specified commissions it became a contract binding on Gary as long as Gary should sell safes to Southland. Nevertheless, the trial court also found that Andrews made no promises to perform service, to refrain from competing, or to do or refrain from doing anything as consideration for the commission payments. Additionally, the trial court found **\*168** that Gary Safe had the right to sell directly to Southland prior to the January 1974 letter and that all payments of commission were made by Gary Safe to Andrews through November 22, 1974 at which time Gary Safe terminated Andrews' commission payments.

 **[1]**   **[2]**   Appellant Gary Safe contends that the trial court erred in concluding that a "tacit understanding" that Andrews would not interfere with Gary's direct sales to Southland Corporation constitutes consideration for the January 21, 1974, letter because this tacit understanding is inconsistent with the trial court's finding of fact that no promises were made on behalf of Andrews to perform any services, to refrain from competing, to compromise any disputes, or to do or refrain from doing anything in return for these " commission" payments, and that there were no negotiations concerning the commission arrangement. Appellant concludes that these findings negate consideration flowing to Gary. We agree. In the absence of any benefit to the promisor or detriment to the promisee legally derived from the promise sought to be enforced, there is no consideration, and hence no contract. E. g., Champlin Petroleum Co. v. Pruitt, 539 S.W.2d 356, 361 (Tex.Civ.App. Fort Worth 1976, writ ref'd n. r. e.); Sanders v. Republic National Bank of Dallas, 389 S.W.2d

551, 555 (Tex.Civ.App. Tyler 1965, no writ). Therefore, the trial court's finding that no promises were made on behalf of Andrews is inconsistent with the conclusion that there existed a "tacit understanding" whereby Andrews would not interfere with Gary's direct sales to Southland. This finding of no promise on the part of Andrews is inconsistent also with the court's conclusion of law that the relinquishment by Andrews of its established customer, Southland, to direct sales by Gary, and the surrender of a varying profit in exchange for fixed commission constituted consideration for the commission arrangement. Indeed, Andrews could not point to any promise he made in return for the commission. Even if Andrews Company had some interest in selling to Southland that it could relinquish or surrender, no promise of relinquishment or surrender was given in return for the commission payments. Since the trial court's finding conflicts with the conclusions of law, the findings of fact must control, Howth v. French Independent School District, 115 S.W.2d 1036, 1039 (Tex.Civ.App. Beaumont 1938), aff'd, 134 Tex. 211, 134 S.W.2d 1036 (1940). Consequently, no consideration existed for Gary's agreement to pay commissions.

Finally, the trial court's conclusions of law are also inconsistent. The trial court correctly concluded that Gary Safe had a legal right prior to 1974 to sell directly to Southland Corporation without paying any compensation to the Andrews or Andrews Company but then erroneously concluded that Andrews Company relinquished its established customer when clearly Gary could have sold directly to Southland regardless of any agreement.
 **[3]**   The most that can be made of the alleged offer is that it showed an intention by Gary to pay the commission specified in order to induce Andrews not to compete in making direct sales to Southland, but that the arrangement should not bind either party. Any promise, either expressed or implied by Andrews not to compete in the future would have been of doubtful validity under the antitrust law, Tex.Rev.Civ.Stat.Ann. art. 7428 (Vernon 1960). Consequently, there was no consideration for any supposed obligation by Gary to continue paying the commissions.

For these reasons, we hold that the court erred in concluding that a binding contract existed. Accordingly, we reverse the judgment of the trial court on the counterclaim, and here render judgment that Andrews take nothing.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

253 Fed.Appx. 405
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Steven M. GRIGGS, Plaintiff–Appellant
v.
UNITED STATES of America,
et. al., Defendants–Appellees.

No. 04–10779.    |    Nov. 8, 2007.

**Synopsis**
**Background:** Defendant convicted on a plea of guilty to conspiracy to manufacture, distribute, and possess 100 grams or more of methamphetamine filed a habeas petition, seeking a one-year reduction in his sentence due to his participation in a residential drug abuse treatment program. The United States District Court for the Northern District of Texas, 2004 WL 1084816, denied relief, and the defendant appealed.

**Holding:** The Court of Appeals held that res judicata barred the Bureau of Prisons (BOP) from arguing that sentencing factors rendered defendant ineligible for a sentence reduction.

Vacated and remanded.

**Attorneys and Law Firms**

**\*405**  Steven M. Griggs, Fort Worth, TX, pro se.

**\*406**  Charles O. Dobbs, U.S. Attorney's Office, Northern District of Texas, Fort Worth, TX, for Defendants–Appellees.

Appeal from the United States District Court for the Northern District of Texas, USDC No. 4:04–CV–204A.

Before JOLLY, HIGGINBOTHAM, and DENNIS, Circuit Judges.

**Opinion**

PER CURIAM: [1]

Steven Griggs appeals the district court's denial of his habeas petition under 28 U.S.C. § 2241. In denying the petition, the district court held that Griggs had no protected liberty interest in his conditional release prior to the expiration of his sentence under 18 U.S.C. § 3621(e). For the reasons below, we VACATE and REMAND.

*Background*

**1.** *Statement of Facts*
In 1994, Steven Griggs plead guilty to conspiracy to manufacture, distribute, and possess 100 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846. He received a two-level enhancement at sentencing because he possessed a firearm during the offense; his ultimate sentence was 292 months of imprisonment. In November of 1995, he agreed to participate in the 500 Hour Residential Drug Abuse Program ("DAP") at the El Reno, Oklahoma Federal Correctional Institution. He entered the residential phase on December 29, 1995.

Four days later, on January 2, 1996, he was told he was ineligible for early release under the DAP guidelines because his crime was considered a crime of violence under 18 U.S.C. § 924(c)(3) and Program Statements 5162.02 and 5330.10. After completing the residential phase in January of 1997, Griggs filed a Request for Administrative Remedy seeking a one-year sentence reduction under 18 U.S.C. § 3621(e)(2)(B). The Bureau of Prisons ("BOP") denied the request on the ground that his drug conviction with a sentence enhancement for possession of a firearm, constituted a crime of violence, rendering him ineligible for early release. Griggs's administrative appeals were unavailing.

In January of 1998, Griggs filed a § 1983 suit in the United States District Court for the District of Columbia, challenging the BOP's ineligibility determination. The case was transferred to the United States District Court for the Western District of Oklahoma, as Griggs was then incarcerated at the Federal Transfer Center in Oklahoma City. In December of that year, the Oklahoma federal court dismissed his suit for failure to state: 1) a § 1983 claim because defendants were not state officials; 2) a claim for compensatory damages because defendants were entitled to

sovereign immunity; and 3) a due process claim because he had no protected liberty interest in his sentence reduction. The district court construed his request for injunctive or declaratory relief as a 28 U.S.C. § 2241 petition. The Oklahoma federal court adopted the Magistrate's Report and Recommendation, which concluded that Griggs "is entitled to be considered for a § 3621 sentence reduction ..." The Oklahoma court then "directed [the BOP] to consider ... whether Plaintiff should receive a sentence reduction under 18 U.S.C. § 3621 for his successful completion of the drug treatment program without reliance upon sentencing factors." In January **\*407** of 1999, the Government filed a response indicating that in October, 1998, prior to the Oklahoma court's judgment, "[p]laintiff's eligibility for early release pursuant to 18 U.S.C. § 3621(e) was reviewed and *granted* on October 20, 1998. Plaintiff's projected satisfaction date has been recalculated ...." (emphasis in the original).

By September of 2001, Griggs had been transferred to the Federal Medical Center in Fort Worth, Texas. At that time, he filed a motion in the Oklahoma district court seeking to compel the BOP to perform its duty. According to Griggs, after his transfer the BOP rescinded his eligibility for a sentence reduction. He alleged that the BOP's decision violated a constitutionally-protected liberty interest in his early release, created at the time the BOP determined that he was eligible under § 3621(e). The BOP, on the other hand, explained that its decision to rescind was based on a recent United States Supreme Court decision upholding the validity of the 1997 version of the regulations that permitted the BOP within its statutory discretion to consider sentencing factors. *See Lopez v. Davis,* 531 U.S. 230, 235, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001).

Ruling on Griggs' motion to compel, the Oklahoma federal court held that no liberty interest in a sentence reduction had been created, and that Griggs could not establish a violation of due process. In addition, the Oklahoma federal court determined that the BOP's decision did not constitute retroactive application of a new BOP policy because the BOP had always maintained that offenders with sentence enhancements for possession of a firearm at the time of the offense were ineligible for § 3621(e) early release. On appeal, the Tenth Circuit construed Griggs' motion to compel as a § 2241 petition and determined that the Oklahoma federal court lacked jurisdiction since Griggs was confined in Texas. The Tenth Circuit took a "quick look" at the merits of Griggs' claims, and "conclude[d] that plaintiff's claims have sufficient

merit to warrant a transfer to the Northern District of Texas." *Griggs v. U.S.,* 79 Fed.Appx. 359, 363 (10th Cir.2003).

Accordingly, the Tenth Circuit vacated the second Oklahoma federal court judgment on the motion to compel and remanded the case with instructions to transfer the case to the United States District Court for the Northern District of Texas. The Texas district court adopted the reasoning of the Oklahoma district court and denied the petition. Griggs timely appeals.

### 2. *Conditional Release under 18 U.S.C. § 3621(e)*

As incentive for inmate participation in substance abuse treatment programs, 18 U.S.C. § 3621(e)(2)(B) provides that prisoners convicted of "nonviolent offenses who complete [such a program] may apply for a sentence reduction of up to one year; the determination lies in the discretion of the director of the Bureau of Prisons ("BOP")." In May of 1995, the BOP promulgated 28 C.F.R. § 550.58, which defines "nonviolent offense" by excluding those offenders convicted of offenses that meet the definition of "crime of violence" in 18 U.S.C. 924(c)(4). *See Warren v. Miles,* 230 F.3d 688, 691 (5th Cir.2000). In July of 1995, the BOP issued Program Statement 5162.02, which defines "crime of violence" within the context of § 3621. *Id.* BOP's Change Notice CN–01 to Program Statement 5162.02, clarified the definition of "crime of violence" by listing examples of ineligible inmates and included inmates serving a sentence for drug conspiracy enhanced for possession of a firearm, like Griggs. *Id.* at 691– 92.

**\*408** We have held that, under the 1995 version of § 550.58, the BOP's "exclusion of ... drug convictions with enhanced sentences due to possession of a weapon from eligibility for early release after substance abuse treatment is consistent with the letter and spirit of the [BOP]'s authority as derived from [§ 3621(e) ]." *Venegas v. Henman,* 126 F.3d 760, 761–62 (5th Cir.1997). The Tenth Circuit, however, takes a different approach. Faced with the same question in 1998, that Circuit held that the language of the statute "does not permit resort to sentencing factors or sentencing enhancements attached to the nonviolent offense[ ]" and that the BOP's construction of the 1995 version of the regulations was therefore impermissible. *Fristoe v. Thompson,* 144 F.3d 627, 631 (10th Cir.1998). In essence, the 1995 regulations would not apply in the Tenth Circuit, thus rendering inmates, like Griggs, eligible for a sentence reduction; the regulations, however, would apply within the Fifth Circuit rendering inmates, like Griggs, ineligible.

The BOP published a new § 550.58 in 1997. While the new version of the regulation still excluded offenders in possession of a firearm during the offense, the 1997 regulation did not do so by defining "prisoner convicted of a nonviolent offense" or "crimes of violence." *Lopez,* 531 U.S. at 235, 121 S.Ct. 714. "Instead, the [1997] regulation relie[d] upon 'the discretion allotted to the Director of the Bureau of Prisons in granting a sentence reduction to exclude [enumerated categories of] inmates.' " *Id.* (quoting Drug Abuse Treatment and Intensive Confinement Center Programs: Early Release Consideration, 62 Fed.Reg. 53,690 (Oct. 15, 1997)). In 2001, the Supreme Court upheld the validity of the 1997 version of § 550.58. *See Lopez,* 531 U.S. at 244, 121 S.Ct. 714.

According to the BOP's Operations Memorandum,[2] an inmate who successfully completes the residential phase of a DAP in a Tenth Circuit Institution remains eligible for his sentence reduction even if he is later transferred out of the Tenth Circuit. The Memorandum states, however, that in order to maintain that eligibility "an inmate whose offense includes sentence enhancement factors must have completed the residential drug treatment program on or after April 28, 1998 in a Tenth Circuit institution." Griggs completed the residential program before April 28, 1998.

*Analysis*

On appeal,[3] Griggs argues 1) that the BOP violated his due process rights by retroactively applying a more restrictive version of 28 C.F.R. § 550.58, *i.e.,* the 1997 regulations, in deciding to rescind the early release; 2) that his due process rights were violated when the BOP rescinded the § 3621(e) sentence reduction without any written notification or opportunity to be heard and 3) his rights to the sentence reduction should be preserved as *res judicata* and/or collateral estoppel.

The Government responds with several arguments: 1) the conditions of the Operations Memorandum are not fulfilled, so Griggs did not maintain his eligibility when he was transferred from the Tenth to the Fifth Circuit; 2) the BOP official who denied **\*409** Griggs eligibility erroneously relied solely on *Lopez,* but should have relied on the Fifth Circuit's opinion in *Venegas,* which upheld the BOP's 1995 regulations; 3) even if the denial was based on *Lopez,* the BOP has always maintained that felons like Griggs are ineligible, and therefore the 1997 regulation as applied to Griggs was

no more restrictive than policies in existence when it granted Griggs eligibility; and 4) *res judicata* is not applicable to successive federal habeas petitions.

We agree with Griggs that *res judicata* bars the BOP from raising any arguments that Griggs must now be determined ineligible based on sentencing factors.[4] Since the BOP's asserted bases below and on appeal for rescinding Griggs' eligibility rely on the applicability of sentencing factors, we now reinstate Griggs' eligibility and order the BOP to comply with the previous court order and determine "whether Plaintiff should receive a sentence reduction under 18 U.S.C. § 3621 for his successful completion of the drug treatment program without reliance upon sentencing factors."

**1.** *Standard of Review*

We review issues of law related to a denial of habeas relief under § 2241 *de novo. Royal v. Tombone,* 141 F.3d 596, 599 (5th Cir.1998). We also review *pro se* briefs liberally. *Johnson v. Quarterman,* 479 F.3d 358, 359 (5th Cir.2007) (citing *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)).

**2.** *Res judicata Demands BOP Determine Griggs' Eligibility for a Sentence Reduction Without Considering Sentencing Factors*

The dispositive question in this appeal is whether the BOP can consider sentencing factors, such as the possession of a firearm during the commission of the crime, in determining Griggs' eligibility for a sentence reduction under 18 U.S.C. § 3621. This exact issue was already litigated between the parties. In the original action before the Oklahoma district court, the district court considered arguments from both Griggs and the BOP concerning the use of sentencing factors in determining Griggs' eligibility for a sentence reduction. *See Defendant's Motion to Dismiss and Brief to Support,* at R. 126–27 (May 26, 1998).

The district court granted Griggs habeas relief and fully adopted the Magistrate's **\*410** Report and Recommendation, which rejected BOP's use of sentencing factors to determine Griggs' eligibility and concluded, as a matter of law, that Griggs "is entitled to be considered for a § 3621 sentence reduction...." R. at 344. To implement this decision, the district court granted habeas relief "to the extent that the Bureau of Prisons is directed to consider ... without reliance on sentencing factors, whether plaintiff

should receive a sentence reduction under 18 U.S.C. § 3621." R. at 364a. The BOP never appealed the district court's adoption of the Magistrate's Report and Recommendation nor the order granting habeas relief; therefore the report and order are final judgments with *res judicata* effect. *Royal Ins. Co. of Am. v. Quinn–L Capital Corp.,* 960 F.2d 1286, 1293 (5th Cir.1992). We must now give full *res judicata* effect to this original final judgment. *United States v. Davenport,* 484 F.3d 321, 327 n. 10 (5th Cir.2007).

> "*Res judicata* is appropriate if (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded to a final judgment on the merits; and (4) the same claim or cause of action was involved in both suits.... If these conditions are satisfied *res judicata* prohibits either party from raising any claim or defense in the later action that was or could have been raised in support of or in opposition to the cause of action asserted in the prior action."

*Matter of Swate,* 99 F.3d 1282, 1286 (5th Cir.1996). The conditions for *res judicata* are fulfilled here. The parties are identical; the Oklahoma district court had competent jurisdiction over the original action; the prior action was concluded to a final judgment (not appealed) on the merits; and the same cause of action is asserted in both habeas petitions, *i.e.,* whether determining Griggs' eligibility using sentencing factors is appropriate.[5] *Res judicata* applies to any BOP argument that use of sentencing factors is now appropriate in considering whether to grant Griggs a sentence reduction.[6]

 **\*411** Since the BOP later rescinded Griggs' eligibility based on sentencing factors by citing to *Lopez* and *Venegas,* which are cases that upheld the BOP's use of sentencing factors in eligibility decisions, the BOP has failed to comply with the binding effect of the previous judgment barring the use of sentencing factors. We must now issue a remedy necessary to protect Griggs' judgment in the original district court decision. "Prevailing parties are entitled to the protection and fruits of the judgments which become final." *Cliett v. Hammonds,* 305 F.2d 565, 572 (5th Cir.1962).

The intervening transfer of the case from the Tenth Circuit to the Fifth Circuit does not affect the *res judicata* effect of the final Oklahoma court judgment. *See In re Korean Air Lines Disaster of Sept. 1, 1983,* 829 F.2d 1171, 1177 (D.C.Cir.1987) (Ginsburg, D.H., J., concurring) ("[T]here are some circumstances in which a federal court is bound to apply the decisions of another circuit, but they are the rare instances where a preclusion doctrine so requires. The doctrines of *res judicata,* collateral estoppel, and law of the case come to mind."); *Skil Corp. v. Millers Falls Co.,* 541 F.2d 554, 558 (6th Cir.1976) (applying *res judicata* effect to decision from the Seventh Circuit). Moreover, even if the original basis for the Oklahoma district court decision was erroneous based on changing intervening law, courts respect the finality of a previous judgment and accord the judgment full *res judicata* effect. *Fed. Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981) ("Nor are the *res judicata* consequences of a final, unappealed judgment on the merits altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case."); *RecoverEdge L.P. v. Pentecost,* 44 F.3d 1284, 1296 (5th Cir.1995) ("It is well settled, however, that even arguably erroneous judgments have preclusive effect if the requirements for collateral estoppel are satisfied.") (citing numerous Circuit cases for this proposition); *Matter of Teal,* 16 F.3d 619, 622 (5th Cir.1994) ("This conclusion comports with the well-known rule that a federal court may not abrogate principles of *res judicata* out of equitable concerns.... Indeed, it must give *res judicata* effect to a prior judgment even if it would be voidable on appeal because of legal error."); *In re* **\*412** *Atlas Sewing Centers, Inc.,* 437 F.2d 607, 614 (5th Cir.1971) ("[*Res judicata* ] does not allow parties to await the event and then to determine that a judgment acquiesced in earlier ought to have been challenged."). Therefore, even if the BOP may now challenge the basis for the district court decision as arguably wrong under Fifth Circuit case-law or subsequent Supreme Court decisions, the finality and binding effect of the decision is unaffected.

The *res judicata* analysis also renders irrelevant the Government's use of the Operations Memorandum as a basis to bar Griggs from maintaining his eligibility upon transfer outside of the Tenth Circuit.[7] The Operations Memorandum is irrelevant to his appeal, because *res judicata* preserves his eligibility after transfer. The Operations Memorandum offers Griggs a regulatory route to "maintain" his eligibility, but Griggs does not need this regulatory mechanism to maintain his eligibility. *Res judicata* provides an alternative and

sufficient mechanism that maintains his eligibility without the consideration of sentencing factors.

The Government's cited reasons for rescinding Griggs' eligibility are all based on Griggs' sentencing factors, which is a violation of the previous final court order from the Oklahoma district court. Therefore, we now GRANT Griggs habeas relief and REVERSE the Texas district court judgment and REMAND this case to the Texas district court for it to enforce the previous final court order and ensure

the BOP determines "whether Plaintiff should receive a sentence reduction under 18 U.S.C. § 3621 for his successful completion of the drug treatment program without reliance upon sentencing factors" consistent with this opinion and within a reasonable time period.

### Parallel Citations

2007 WL 3302379 (C.A.5 (Tex.))

Footnotes

1    Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

2    The Operations Memorandum states:

> To maintain eligibility upon transfer out of the Tenth Circuit, an inmate whose offense includes sentence enhancement factors must have completed the residential drug treatment program on or after April 28, 1998 [i.e., the date the Tenth Circuit issued its decision in *Fristoe* ], in a Tenth Circuit institution.

3    Griggs satisfied administrative exhaustion requirements. *See Griggs v. United States,* 2004 WL 1084816 *1 & n. 2 (N.D.Tex. May 13, 2004)* (unpublished).

4    We may apply *res judicata sua sponte. See Russell v. SunAmerica Sec., Inc.,* 962 F.2d 1169, 1172 (5th Cir.1992) (res judicata may be raised *sua sponte* because the court may not ignore the legal effect of uncontroverted facts or decline to consider application of controlling rules of law to dispositive facts). Moreover, in the pleadings below, the Government interprets Griggs' argument as raising *res judicata* and collateral estoppel issues, and presents a counterargument that the "law of the case" should be the applicable doctrine. The Government states in the record below:

> Plaintiff argues he has been eligible for early release for nearly three years, and the Bureau of Prisons cannot now, on a whim, take away that vested interest, essentially arguing the principle of *res judicata* or issue preclusion. Defendant counters that the "law of the case" doctrine, and not issue preclusion, is applicable to this case.

> *Defendant's Response to Plaintiff's Motion to Compel An Officer Or Agency Of the United States To Perform Its Duty,* R. 391, 393–94 (Sept. 21, 2001). We agree with Griggs. Griggs' claims below and on appeal are arguments based on the principles of *res judicata* to enforce a previous judgment and compel the satisfaction of that judgment. *See* "Motion To Compel An Officer or Agency Of The United States to Perform Its Duty." R. at 376. Construed liberally, Griggs' motion requests a federal court to enforce the previous order and grant of habeas relief.

5    We read the Magistrate's Report and Recommendation adopted by the district court as concluding that the use of sentencing factors in determining Griggs' eligibility is not appropriate. "The effect of a decree, as an adjudication conclusive on the parties, is not determined by isolated passages in opinion, but by examination of issues made and intended to be submitted and decided." *State of Okla. v. State of Texas,* 272 U.S. 21, 42–43, 47 S.Ct. 9, 71 L.Ed. 145 (1926).

6    The Government cites to *Patrasso v. Nelson,* 121 F.3d 297, 301 (7th Cir.1997) to argue that *res judicata* categorically does not apply to federal habeas petitions. The Government misconstrues *Patrasso* because it is clear that *Patrasso* is discussing the *res judicata* effect of a *state* post-conviction judgment on a federal habeas petition. *Id; Carter v. Estelle,* 677 F.2d 427, 442 n. 10 (5th Cir.1982). Here, we are discussing the *res judicata* effect of a federal court decision *on the same claim* in a subsequent federal habeas action urging the court to enforce the previous decision.

> The Government is partially correct in that the *res judicata* doctrine applies differently in the habeas context; however, any differences are not applicable in this case. "Modified" *res judicata* applies in the habeas context. *United States v. Orozco–Ramirez,* 211 F.3d 862, 867–68 (5th Cir.2000); *see also Schlup v. Delo,* 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (calling it a "qualified application of the doctrine of *res judicata.*") In this "modified" form, *res judicata* does not fully apply in the habeas context when a previous court decision *denies* habeas relief. *McCleskey v. Zant,* 499 U.S. 467, 480–81, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); *Sanders v. United States,* 373 U.S. 1, 7, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) ("At common law, the denial by a court or judge of an application for habeas corpus was not *res judicata.*").

> On the other hand, a judgment granting a petitioner habeas relief is *res judicata* on the issues of law and fact necessarily involved in the result. *Collins v. Loisel,* 262 U.S. 426, 430, 43 S.Ct. 618, 67 L.Ed. 1062 (1923); *Anselmo v. Hardin,* 253 F.2d 165, 169 (3d

Cir.1958); *Harris v. Biszkowicz,* 100 F.2d 854, 856 (8th Cir.1939); *see also Younan v. Caruso,* 51 Cal.App.4th 401, 59 Cal.Rptr.2d 103, 109 (1996) ( "While a final judgment granting habeas corpus relief is *res judicata.* ... an order denying the writ is not.") (internal citations omitted). An order granting habeas corpus, unlike a denial of habeas relief, is a "final judgment" and is *res judicata* on issues in subsequent habeas petitions, since the petitioner is now enforcing a final court order. *Compare Patterson v. Haskins,* 470 F.3d 645, 661 (6th Cir.2006); *In Re Moody,* 817 F.2d 365, 368 (5th Cir.1987) ("That further proceedings were necessary to enforce the judgment .... does not mitigate the effect of the order. A judgment becomes final despite the fact that it has not been executed. The finality of a decree is not impaired because some future order of the court may become necessary to carry it into effect."), *with Potts v. Zant,* 638 F.2d 727, 738 (5th Cir.1981) ("The doctrine of abuse of the writ has developed as a result of the familiar rule of law that a denial of an application for habeas corpus is not *res judicata* with respect to subsequent applications."). The case-law permits the application of *res judicata* to *successful* habeas petitions as part and parcel of the power of this court to enforce a final judgment in subsequent proceedings, whereas *unsuccessful* habeas petitions are subject to the "abuse of the writ" doctrine empowering federal courts to control the potentially endless successive petitions attacking the conviction after an initial denial of habeas relief. *Cf. In re Cain,* 137 F.3d 234, 235–36 & n. 1 (5th Cir.1998) (describing the federal court's "gate-keeping" function under AEDPA and the "abuse of writ" doctrine).

7    Moreover, the BOP concedes the agency decision to rescind Griggs' eligibility was based solely (and erroneously) on *Lopez.* Reference to other reasons for the decision to rescind Griggs' eligibility, including the Operations Memorandum, offered for the first time on appeal is a "*post hoc* rationalization" advanced by an agency seeking to defend past agency decision against attack. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; [*SEC. v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) ] requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself."). In *Chenery,* the Court concluded that:

> [A] simple but fundamental rule of administrative law ... is ... that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action....
>
> *Id.* We can also reject the Operations Memorandum argument and other *post-hoc* rationalizations on this ground.

**End of Document**                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

159 S.W.3d 212
Court of Appeals of Texas,
Austin.

HARTFORD CASUALTY
INSURANCE COMPANY, Appellant,
v.
The STATE of Texas, Appellee.

No. 03–04–00072–CV.   |   Feb. 17, 2005.

**Synopsis**
**Background:** State brought action against currency exchange, its owners, and exchange's surety to collect administrative penalty imposed without notice to surety and opportunity for hearing. The 345th Judicial District Court, Travis County, Margaret A. Cooper, J., ruled that the state could collect the penalty from the surety. It appealed.

**[Holding:]** The Court of Appeals, Bea Ann Smith, J., held that the surety had procedural due process right to notice and opportunity for hearing on Banking Commissioner's discretionary decision to collect penalty from bond proceeds, and, thus, the due process guarantees were implied in statute stating that the penalty may be paid and collected from the proceeds of a bond.

Reversed and rendered.

**West Codenotes**

**Limited on Constitutional Grounds**
V.T.C.A., Finance Code § 153.402(c).

**Attorneys and Law Firms**

**\*213** David W. Holman, Byron C. Keeling, Diana M. Sangalli, Holman & Keeling, **\*214** James D. Cupples, Bridget Chapman, Williams, Cupples & Chapman, LLP, Houston, for appellant.

Jim Hill, David Randell, Asst. Atty's, Gen., Bankruptcy, Collections Division, Austin, for appellee.

Before Chief Justice LAW, Justices B.A. SMITH and PEMBERTON.

*OPINION*

BEA ANN SMITH, Justice.

In this case, we construe finance code section 153.402(c) [1] to determine whether the phrase "may collect from the proceeds of a bond" allows the State [2] to collect from a surety an administrative penalty assessed against the surety's principal without first providing the surety with notice and opportunity for a hearing. Appellant, Hartford Casualty Insurance Company (Hartford), contends that since the statutory grant of authority regarding administrative penalties found in finance code section 153.402(c) is discretionary, its constitutional right to procedural due process entitles it as a surety to notice and opportunity for a hearing before it can be held liable for an administrative penalty assessed against its principal. The State argues that it would have been useless to provide Hartford with notice and a hearing because Hartford was not a target of the administrative penalty. The district court held that the penalty may be collected from Hartford.

In three issues on appeal, Hartford contends that (1) construing finance code section 153.402(c) to allow the State to collect from a surety, without notice or opportunity for a hearing, the administrative penalty assessed against its principal violates the due process clauses of both the United States and Texas Constitutions; (2) the trial court's order violates the Texas Administrative Procedure Act (the APA), Administrative Code, and Finance Code; and that (3) the trial court erred by awarding attorney's fees to the State. Because when possible we interpret a statute in a manner that renders it constitutional, we hold that notice and opportunity for a hearing are implied into finance code section 153.402(c). *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 873 (Tex.2000). Thus, Hartford was denied its right to procedural due process. We reverse and render judgment that the State cannot collect the administrative penalty from Hartford.

**Background**

In 1997, Ernesto and Aida Bolmey requested and obtained a license authorizing their company, Airport Exchange, to operate four currency exchange shops at various locations in Texas. To satisfy the licensing requirements, Airport Exchange had to post a $300,000 bond with the Commissioner. [3] Hartford agreed to furnish **\*215** the

bond and act as surety for Airport Exchange. The surety contract stated that the bond was "for the use and benefit of the Department and of any creditor of the applicant [Airport Exchange] for any liability incurred on any currency exchange or transmission conducted by the applicant as licensee."

In December 2001, Airport Exchange's counsel informed the Department that Airport Exchange had ceased doing business as a currency exchange company. He also admitted that Airport Exchange had failed to transmit funds that it had received from customers. He informed the Commissioner that Hartford, as surety, would have to fulfill the unmet obligations of his client. The day after receiving this information, the Commissioner, claiming a threat of immediate and irreparable harm, issued a cease and desist order against Airport Exchange and the Bolmeys. The Commissioner further ordered the Department to immediately seize all funds held in Airport Exchange's bank accounts. The Department determined that in 186 separate transactions Airport Exchange had accepted $83,433.52 from customers, which it failed to transmit. Ernesto Bolmey admitted that he instructed his business manager to stop transmitting the funds "so that they could use the money to help finance their business operations."

Airport Exchange appealed the Commissioner's cease and desist order to the Texas Finance Commission. The Commissioner filed a separate action with the Finance Commission seeking an administrative penalty against Airport Exchange and the Bolmeys. The Finance Commission referred both matters to an administrative law judge (the ALJ) who consolidated the two matters and scheduled a hearing. Hartford was not notified of the hearing.

The hearing was held on May 23, 2002. No representative of Airport Exchange or the Bolmeys appeared; likewise, Hartford sent no representatives since it did not know about the hearing. The only parties who appeared were the Department and the Commissioner. In his proposal for decision, the ALJ noted that Airport Exchange's failure to appear at the hearing was "some evidence supporting an adverse inference" against it. The ALJ found that Airport Exchange had violated multiple sections of the finance code and recommended that the appeal be denied. He also determined that the Commissioner had "the discretion to impose the requested penalty in the amount of $37,200." There was no finding that Hartford, as surety, had violated any section of the finance code. Indeed, the ALJ noted that

Hartford had assisted the Department in reimbursing all of the identified aggrieved parties. Other than that acknowledgment, Hartford is not mentioned in either the proposal for decision or the Commission's final order.

On January 27, 2003, the State sent a demand letter asking Hartford to pay the $37,200 administrative penalty that had been imposed against Airport Exchange. This letter was the first notice that Hartford had received regarding the administrative penalty. Hartford declined to pay the penalty. In May 2003, the State commenced the present action against Airport Exchange, its owners—Ernesto & Aida Bolmey— and Hartford, seeking payment of the penalty. The State argued to the trial court that finance code section 153.402(c) allows it to collect the penalty from the proceeds of the bond. Because neither Airport Exchange nor its owners responded to the State's petition, the trial court entered a default judgment against Airport Exchange and the Bolmeys. At **\*216** the conclusion of the bench trial, the trial court ruled that the State could collect the penalty from Hartford and further ordered Hartford to pay the State's attorney's fees. This appeal followed.

## Standard of Review

**[1]  [2]  [3]  [4]  [5]**  In this case, we are asked to construe finance code section 153.402(c) to determine whether it allows the State to collect from a surety an administrative penalty assessed against the surety's principal without first providing the surety with notice and opportunity for a hearing. Statutory construction is a matter of law, which we review *de novo. Johnson v. City of Fort Worth,* 774 S.W.2d 653, 656 (Tex.1989). When interpreting a statute, our primary task is to ascertain and effectuate the intent of the legislature. *Fleming Foods of Tex. v. Rylander,* 6 S.W.3d 278, 284 (Tex.1999); *Union Bankers Ins. Co. v. Shelton,* 889 S.W.2d 278, 280 (Tex.1994); *Sharp v. Clearview Cable TV, Inc.,* 960 S.W.2d 424, 426 (Tex.App.-Austin 1998, pet. denied). Disputed provisions are to be considered in context, not in isolation. *Texas Workers' Comp. Comm'n v. Continental Cas. Co.,* 83 S.W.3d 901, 905 (Tex.App.-Austin 2002, no pet.); *see also Fitzgerald v. Advanced Spine Fixation Sys.,* 996 S.W.2d 864, 866 (Tex.1999). Texas courts are to consider, among other factors, the language of the statute, legislative history, the nature and object to be obtained, and the consequences that would follow from alternative constructions, even when a statute is not ambiguous on its face. *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex.2001); *Union Bankers Ins.*

*Co.,* 889 S.W.2d at 280. We further presume that in enacting a statute the legislature intended to comply with the federal and state constitutions. Tex. Gov't Code Ann. § 311.021 (West 1998).

### Discussion

**Due Process**

**[6]** **[7]** **[8]** In its first issue, Hartford contends that assessing an administrative penalty against a surety without affording it notice and an opportunity for a hearing deprives it of a property right without the constitutionally guaranteed due process of law. *Texas Workers' Comp. Comm'n v. Patient Advocates,* 136 S.W.3d 643, 658 (Tex.2004). Individuals must be afforded both substantive and procedural due process. *Id.* Substantive due process protects against the arbitrary and oppressive exercise of government power, regardless of the fairness of the procedures. *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The procedural due process guarantee protects against arbitrary takings. *County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

**[9]** **[10]** **[11]** The due process clause in the state constitution requires the same level of due process as the federal constitution. *University of Tex. Med. Sch. at Houston v. Than,* 901 S.W.2d 926, 929 (Tex.1995); *see also Bell v. Texas Workers Comp. Comm'n,* 102 S.W.3d 299, 304 (Tex.App.-Austin 2003, no pet.) (stating that in matters of procedural due process, Texas courts traditionally follow federal due process interpretations and consider federal decisions on these matters persuasive authority). Questions of procedural due process require an analysis of (1) whether the plaintiff has a constitutionally protected property or liberty interest at stake, and (2) if so, what process is due to sufficiently protect that interest. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). At a minimum, due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. **\*217** *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Perry v. Del Rio,* 67 S.W.3d 85, 92 (Tex.2001); *University of Tex. Med. Sch. at Houston,* 901 S.W.2d at 930.

**[12]** **[13]** Finance code section 153.402(c) is silent regarding the procedural due process rights of a surety. However, if possible, we construe a statute in a manner that renders it constitutional. *FM Props. Operating Co.,* 22

S.W.3d at 873. Additionally, as we will discuss, Hartford was entitled to party status under the APA. Thus, we hold that the due process guarantees of notice and opportunity for a hearing are implied into finance code section 153.402(c).

Therefore, because there is no dispute that Hartford has a property interest in the $37,200 penalty assessed, we need only decide whether, under these circumstances, that interest was sufficiently protected. The State argues that Hartford received all of the due process to which it was entitled under Texas law. The State argues that (1) its interpretation of finance code section 153.402 does not violate Hartford's due process rights; (2) Hartford's presence at the administrative hearing would have been meaningless; (3) when a surety agrees to be liable for a particular judgment, notice is not necessary; and (4) Hartford's substantive due process rights were satisfied.

**Finance Code Section 153.402**

**[14]** **[15]** The liability of a surety is determined by the language of the bond. *Geters v. Eagle Ins. Co.,* 834 S.W.2d 49, 50 (Tex.1992); *Howze v. Surety Corp. of Am.,* 584 S.W.2d 263, 266 (Tex.1979). Additionally, a statute mandating the bond is made part of the bond contract, and is controlling. *Geters,* 834 S.W.2d at 50. Therefore, the State contends that the language of the bond, read in conjunction with finance code sections 153.109 and 153.402, provided Hartford with adequate notice that it was within the Commissioner's authority to collect the administrative penalty assessed against Airport Exchange from the bond proceeds.

Finance code section 153.109 requires a license holder to post a bond or irrevocable letter of credit in favor of the Department. Tex. Fin.Code Ann. § 153.109 (West Supp.2004–05). Finance code section 153.402(a) grants the Commissioner authority to order a license holder to pay an administrative penalty if it is found that the licensee violated finance code chapter 153 or any rule or order made pursuant to chapter 153. Tex. Fin.Code Ann. § 153.402(a)(1–3) (West 1998). Finance code section 153.402(c) states that "the penalty may be paid and collected from the proceeds of a bond, letter of credit, or deposit required under section 153.109." Tex. Fin.Code Ann. § 153.402(c) (West 1998).

**[16]** Hartford agrees that the language of sections 153.402(a) and (c) is implied into its bond with Airport Exchange. However, Hartford argues that the language in section 153.402(c) "may be paid and collected from the

proceeds of the bond" grants a discretionary right to collect an administrative penalty from a bond, not a statutory mandate to do so. Hartford claims that the mere possibility that the Commissioner may seek to collect the penalty from the bond proceeds is insufficient to adequately notify a surety that the Commissioner would do so in a particular case.

The word "may" creates a discretionary authority or grants permission or a power. Tex. Gov't Code Ann. § 311.016(1) (West 1998). Here, Hartford was on notice that the Commissioner *could* collect the penalty from the bond, but it had no knowledge that the Commissioner *would* attempt to do so in this case. It was known by all parties that Hartford was the surety for **\*218** Airport Exchange, yet no one notified Hartford of the administrative hearing. This lack of notice deprived Hartford of the opportunity to address the amount of the bond and to argue that, based on the facts of this case, the penalty should not be collected from Hartford. Therefore, we conclude that section 153.402(c) does not by itself or in conjunction with the bond agreement provide Hartford with adequate notice to protect its interest in the $37,200 sought by the State.

### Administrative Hearing

 [17]   The State contends that Hartford's presence at the administrative hearing would have been meaningless because the hearing concerned Airport Exchange's appeal of the cease and desist order, as well as the Commissioner's imposition of an administrative penalty. Therefore, the State suggests that Hartford's presence at the hearing was useless because the statute imposed the administrative penalty without regard to the surety's wrongdoing. *See Bell,* 102 S.W.3d at 305 (due process does not require a useless hearing when there are no factual issues to dispute).

The State's argument fails to address the discretion afforded to the Commissioner by the statute: Should an administrative penalty be assessed when it is clear that only the surety, not the wrongdoer, will have to pay, and if so, in what amount? Hartford contends that because the Commissioner had the discretion not to collect the penalty from the bond, Hartford was entitled to notice and an opportunity to advocate that position. We agree that the lack of notice deprived Hartford of an opportunity to protect its interest in the $37,200 sought by the State.

We are not swayed by the State's contention that the APA does not require notice in this case. Essentially, the State avers that if a person is not named as a party they cannot

ever gain party status. [4] The Finance Commission's rules of procedure for contested case hearings and appeals state, "[P]arty status is limited to persons or entities with a legal right, duty, privilege, power, or economic interest that may be directly affected by the outcome of the proceeding or who are entitled to be parties pursuant to a statute or regulation governing the particular proceeding." 7 Tex. Admin. Code § 9.15(b) (West 2004). The rules further state, "[P]arty status will not be conferred on persons or entities that seek to litigate issues that are not by statute or regulation made part of the administrative proceeding in which party status is sought." *Id.* § 9.15(c)(2). The State insists that the Commissioner's decision to collect the penalty from the bond was not an issue at the hearing. However, because the statutory right to collect from the proceeds of the bond was discretionary, the Commissioner's decision to do so or not was at issue. Thus, Hartford had an economic right that was directly affected by the outcome of the hearing, and the issue it was seeking to litigate was made part of the hearing by statute. Therefore, party status could have been properly conferred on Hartford.

### Particular Judgment Bonds

The State relies on *Howze v. Surety Corp. of America,* 584 S.W.2d at 265 to contend that Hartford was not entitled to notice of suits involving Airport Exchange. In *Howze,* the supreme court discussed the general rule in Texas that when a surety agrees to be liable for a particular judgment, then no notice need be given. *Id.* "However, when a surety contracts to be generally liable for all the undertakings of the principal, the surety must be given **\*219** notice and an opportunity to defend the case before it is bound by the judgment." *Id.* The State claims that the bond in this case is a particular judgment bond and consequently, Hartford was not entitled to notice. We are not persuaded that *Howze* controls this dispute.

Applying *Howze* to this case undermines the purpose of the general rule distinguishing particular judgment bonds from general undertaking bonds. The idea that it is unnecessary to provide notice to a surety who furnished a particular judgment bond is based on the notion that any notice would be redundant because the surety agreed to be liable for specifically enumerated acts of the principal. A surety who furnishes this type of bond can and should adjust the premiums based on the principal's potential liability for those specific acts. Here, neither the bond nor the relevant statute imposes liability for all administrative penalties. Section 153.402(c) only states that the administrative penalty *may* be collected from the bond. As we discussed earlier, the

Commissioner's right to collect from the bond proceeds is discretionary. As a result, Hartford did not have knowledge at the time it agreed to furnish Airport Exchange's bond that it would automatically be held liable for administrative penalties assessed against Airport Exchange. Therefore, we conclude that *Howze* does not control this case.

We conclude that notice and an opportunity to be heard were required before the Commissioner could collect the administrative penalty from Hartford. Failing that, Hartford's right to procedural due process was violated. *See Perry,* 67 S.W.3d at 92. We reverse the judgment of the trial court. [5]

**Attorney's Fees**

The State sought and received attorney's fees pursuant to government code section 2107.006. Tex. Gov't Code Ann. § 2107.006 (West 2000) (stating that attorney general may recover reasonable attorney's fees on behalf of state in any proceeding in which the state seeks to collect or recover a delinquent obligation or damages). Having reversed the trial court's judgment, we also reverse its award of attorney's fees.

**Conclusion**

Because we hold that Hartford's right to procedural due process was violated, we reverse the judgment of the trial court and render judgment that the State cannot collect the administrative penalty from Hartford.

Footnotes

[1]  Section 153.402(c) states that "the penalty may be paid and collected from the proceeds of a bond, letter of credit, or deposit required under section 153.109 or 153.110." Tex. Fin.Code Ann. § 153.402(c) (West 1998).

[2]  Here, the Attorney General represents the Finance Commission (the Finance Commission), the Department of Banking (the Department), and the Banking Commissioner (the Commissioner). The Department operates under the purview of the Finance Commission. Tex. Fin.Code Ann. § 11.301 (West 1998). Likewise, the Commissioner serves at the will of the Finance Commission. Tex. Fin.Code Ann. § 12.101(a) (West Supp.2004–05). For ease of reference, we will refer to these parties collectively as the State.

[3]  Finance code section 153.109 provides that a license holder shall post a bond with a qualified surety company or an irrevocable letter of credit issued by a qualified financial institution. Tex. Fin.Code Ann. § 153.109(a) (West Supp.2004–05). The amount of the bond or letter of credit are to be determined by the Commissioner. *Id.* § 153.109(b) (West Supp.2004–05).

[4]  Under the APA a "party" is "a person or state agency named or admitted as a party." Tex. Gov't Code Ann. § 2001.003(4) (West 2000).

[5]  Because we hold that Hartford's right to procedural due process was violated, we do not address Hartford's arguments regarding substantive due process and whether the trial court's order violated the Texas APA, Administrative Code, and Finance Code.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 2645111
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
San Antonio.

Bret Wayne HOOPER, Appellant
v.
GENERATIONS COMMUNITY
FEDERAL CREDIT UNION, Appellee.

No. 04–12–00080–CV.  |  June 12, 2013.

From the County Court at Law No. 7, Bexar County, Texas,
Trial Court No. 352061. David J. Rodriguez, Judge.

**Attorneys and Law Firms**

Martin W. Seidler, Law Offices Of Martin W. Seidler, San
Antonio, TX, for Appellant.

Robert P. Sims, Attorney At Law, San Antonio, TX, for
Appellee.

Sitting: KAREN ANGELINI, Justice, PATRICIA O.
ALVAREZ, Justice, LUZ ELENA D. CHAPA, Justice.

**MEMORANDUM OPINION**

Opinion by KAREN ANGELINI, Justice.

 **\*1** Bret Wayne Hooper appeals from a $20,600.36 judgment
against him in a suit to recover the balance due on a credit
card account. Because the evidence was legally insufficient
to support the judgment, we reverse and render a take-nothing
judgment.

**BACKGROUND**

Hooper was sued by Generations Community Federal Credit
Union, formerly known as the San Antonio City Employees
Federal Credit Union. The Credit Union alleged Hooper had
defaulted on a credit card agreement and, as a result, owed the
Credit Union $20,600.36 plus interest. Hooper answered the
suit, pleading various defenses and a counterclaim under the
Texas Debt Collection Act. Following a bench trial, the trial
court rendered judgment against Hooper and in favor of the
Credit Union in the amount of $20,600.36. The trial court also
rendered judgment that Hooper take nothing on his counter-
claim. Hooper appealed.

**DISCUSSION**

In Texas, collection of the amount due under a credit card
agreement is treated as a claim for a breach of contract.
*In re Tran,* 351 B.R. 440, 445 (Bankr.S.D.Tex.2006),
*aff'd,*369 B.R. 312 (S.D.Tex.2007); *see Tully v. Citibank
(South Dakota), N.A.,* 173 S.W.3d 212, 215–20 (Tex.App.-
Texarkana 2005, no pet.). To recover for breach of contract,
a plaintiff must show (1) the existence of a valid contract,
(2) the plaintiff performed or tendered performance, (3) the
defendant breached the terms of the contract, and (4) the
plaintiff suffered damages as a result of the defendant's
breach. *Transworld Leasing Corp. v. Wells Fargo Auto
Fin., LLC,* No. 04–12–00036–CV, 2012 WL 4578591, at
\*3 (Tex.App.-San Antonio 2012, pet. denied); *McLaughlin,
Inc. v. Northstar Drilling Tech., Inc.,* 138 S.W.3d 24, 27
(Tex.App.-San Antonio 2004, no pet.). Thus, in this case, the
Credit Union had the burden to prove each element of a breach
of contract claim at trial. *See Preston State Bank v. Jordan,*
692 S.W.2d 740, 744 (Tex.App.-Fort Worth 1985, no writ)
(affirming a take-nothing judgment in a suit to recover a credit
card debt when the bank failed to present evidence of the
contract between the bank and the credit card holder).

Parties form a binding contract when the following elements
are present: (1) an offer; (2) an acceptance in strict compliance
with the terms of the offer; (3) a meeting of the minds; (4)
each party's consent to the terms; and (5) the execution and
delivery of the contract with the intent that it be mutual
and binding. *Williams v. Unifund CCR Partners Assignee
of Citibank,* 264 S.W.3d 231, 236 (Tex.App.-Houston [1st
Dist.] 2008, no pet.). To be enforceable, a contract must be
sufficiently certain to enable a court to determine the rights
and responsibilities of the parties. *T.O. Stanley Boot Co., Inc.
v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992). The
material terms of a contract must be agreed upon before a
court can enforce the contract. *Id.* A breach of contract occurs
when a party to the contract fails or refuses to do something
he has promised to do. *West v. Triple B Services, LLP,* 264
S.W.3d 440, 446 (Tex.App.-Houston [14th Dist.] 2008, no
pet.).

**\*2** In his second issue, Hooper argues the evidence was legally and factually insufficient to support each of the elements of the Credit Union's breach of contract claim. In response, the Credit Union argues there was sufficient evidence of a credit card agreement. Notably, the Credit Union focuses on the first element of its breach of contract claim-the existence of a valid contract. The Credit Union does not explain how the evidence was sufficient to prove each of the remaining elements of its breach of contract claim.

We review challenges to the legal sufficiency of the evidence in a bench trial under the same standard used in reviewing the sufficiency of the evidence in a jury trial. *Rosas v. Comm'n for Lawyers Discipline,* 335 S.W.3d 311, 316 (Tex.App.-San Antonio 2010, no pet.). When reviewing a legal sufficiency or "no evidence" challenge, we determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."*City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005); *Rosas,* 335 S.W.3d at 316.If the appellant is challenging the legal sufficiency of the evidence to support a finding on which he did not have the burden of proof at trial, the appellant must demonstrate on appeal that no evidence exists to support the adverse finding. *Rosas,* 335 S.W.3d at 316.We sustain a legal sufficiency or "no evidence" challenge when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists.*Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. and Research Corp.,* 299 S.W.3d 106, 115 (Tex.2009).

At trial, the evidence was as follows. The Credit Union presented two documents that are relevant to our discussion. The first document, titled "Credit Line Account and Personal Loan Application," indicates that Hooper applied for a credit card, specifically a "Mastercard Platinum [\* \* \* \* \* \* \* \* \* \* \* \*]7844 9 .0%."This document appears to have been signed by Hooper as an "applicant" on March 22, 2007. This document states: "You agree and understand that if approved, [y]ou are contractually liable according to the applicable terms of the Credit Line Account Agreement and Disclosure. *You will receive a copy of that Agreement no later than the time of [y]our first credit advance and you promise to pay all amounts charged to [y]our [a]ccount according to*

*its terms.*" (emphasis added). Significantly, the "Agreement" referenced in the document was never offered into evidence.

The second relevant document, titled "Addendum to Platinum Mastercard Agreement," appears to have been signed by Hooper as the "Borrower/Cardholder" on March 21, 2007. This document states that Hooper was approved for an "Introductory Annual Percentage Rate of 3.90%" on balances transferred from other financial institutions or credit card issuers.

**\*3** The Credit Union also presented the testimony of two witnesses. First, the Credit Union called Hooper to testify. In his testimony, Hooper acknowledged that his signature appeared on both of the above-referenced documents. Hooper also confirmed that he had received a credit card from the San Antonio City Employees Federal Credit Union and that he made use of that credit card. Furthermore, Hooper stated that he had received statements from "Card Services" but he did not recall if they were for a San Antonio City Employees Federal Credit Union account. Hooper also stated he had made payments to "Card Services."

Second, the Credit Union called one of its employees, Lorie Garcia, to testify. Garcia testified that customers were given a copy of the Credit Line Account Agreement and Disclosure when they applied for credit. Garcia further stated that the Credit Line Account Agreement and Disclosure stated that credit cards were subject to a variable interest rate. Garcia stated that the current interest rate on Hooper's account was 18% because of the account's delinquent status. According to Garcia, the prior interest rate on Hooper's account was 9%. Finally, Garcia testified that the principal balance on Hooper's account was $20,600.36 and that the interest balance on Hooper's account was $4,080.30. No further evidence was presented.

Although there was some evidence that Hooper obtained a credit card from the Credit Union and that he used the credit card, there was no evidence establishing Hooper's specific obligations under the terms of an agreement. For example, there was no evidence regarding Hooper's obligation to repay the balance and interest on the account, including when his payments were due, where his payments were to be made, and what would transpire if he failed to make a payment in accordance with the terms of an agreement. Nor was there evidence indicating Hooper failed to comply with a particular term of an agreement, or otherwise failed to perform his obligations under an agreement. We conclude

the record discloses the complete absence of evidence of the third element of the Credit Union's breach of contract claim, *i.e.,* that Hooper breached the terms of an agreement with the Credit Union. In the absence of evidence that Hooper failed or refused to do something he promised to do under an agreement, the Credit Union failed to prove its breach of contract claim. *See Pioneer Land & Cattle Co. v. Collier,* No. 07–12–00320–CV, 2013 WL 2150814, at *6 (Tex.App.Amarillo 2013, no pet. h.)* (concluding the trial court did not err in granting a no-evidence summary judgment on the plaintiff's breach of contract claim when there was no evidence of the first, third, or fourth elements of the claim). We, therefore, hold the evidence was legally insufficient to support the trial court's judgment. Hooper's second issue is sustained.

**CONCLUSION**

Because Hooper's second issue is dispositive of this appeal, we need not address his first issue. *See*Tex.R.App. P. 47.1 (directing appellate courts to issue opinions that are as brief as practicable but also address every issue raised and necessary to the final disposition of the appeal). We reverse the judgment of the trial court, and render judgment that Generations Community Federal Credit Union take nothing by its suit.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

975 S.W.2d 430
Court of Appeals of Texas,
Waco.

In re John BAILEY.

No. 10–98–293–CV.  |  Sept. 15, 1998.

Members of the county sheriff's department sought writ of mandamus requiring county commissioners court to place a salary-increase proposal on election ballot. The Court of Appeals, Vance, J., held that county commissioners court did not have a clear duty to place proposal on election ballot, and mandamus would not lie to compel it to do so.

Petition denied.

**Attorneys and Law Firms**

 **\*430** R. John Cullar, Mills, Millar, Matkin & Cullar, Waco, for Relator.

James P. Allison, Allison, Bass & Associates, L.L.P., Austin, for Respondent.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## **\*431** OPINION

VANCE, Justice.

John Bailey and other members of the Navarro County Sheriff's Department seek a writ of mandamus to order the Navarro County Commissioners Court to place a salary-increase proposal on the November 3, 1998, election ballot as petitioned by 4,091 qualified voters under Local Government Code section 152.072. *See* Tex. Loc. Gov't.Code Ann. § 152.072 (Vernon 1988 & Supp.1998). We will deny relief.

### LOCAL GOVERNMENT CODE SECTION 152.072

Section 152.072 of the Local Government Code provides that "the qualified voters of a county with a population of more than 25,000 may petition the Commissioners Court of the county to increase the minimum salary of each member of the sheriff's department." *Id.* § 152.072(a). Such a petition must:

(1) state the amount of the proposed minimum salary for each rank, pay grade, or classification;

(2) state the effective date of the proposed salary increase;

(3) designate five qualified voters to act as a committee of petitioners authorized to negotiate with the commissioners court under Subsection (g);

(4) be signed by a number of qualified voters equal to at least 25 percent of the number of voters who voted in the most recent countywide election for county officers.

*Id.* § 152.072(b).

Once such a petition is filed, the statute gives the Commissioners Court three options. It may: 1) adopt the proposal as stated in the petition, 2) offer an alternative proposal, or 3) call an election on the proposal. *Id.* § 152.072(c). If it chooses to offer an alternative and the alternative is accepted by the committee of petitioners, no election is necessary. *Id.* § 152.072(g).

### FACTS

On May 11, 1998, a petition containing 4,091 signatures was submitted to the Commissioners Court. It is undisputed that this petition contains signatures from qualified voters equal to at least twenty-five percent of the number of voters who voted in the most recent county-wide election for county officers. On June 5, the Commissioners Court voted to offer an alternative salary proposal as contemplated in section 152.072(c). The committee of petitioners rejected the alternative proposal. On September 2, the Commissioners Court voted to place only a portion of the proposed salary plan on the ballot for the November 3 election. Bailey seeks to have the proposed plan placed on the ballot in its entirety.

### THE PROPOSAL

The petition's proposed minimum salary plan contains two sub-parts. The first sets a minimum salary for each member of the Navarro Sheriff's Department. The Commissioners Court has agreed to submit this portion of the proposal to the voters in the November 3 election. The portion to which the Commissioners Court objects and therefore refuses to place on the ballot seeks, in addition to the fixed salary

proposed, to mandate that each member of the Sheriff's Department receive "seniority pay" based on a specified "step plan." The Commissioners Court argues that the petition attempts to create a classification plan (*i.e.* step increases and longevity pay) where no such plan exists and, as such, is not contemplated by section 152.072's provisions providing for "minimum salaries" and an "effective date." Bailey, arguing that the Commissioners Court's duty is purely ministerial, urges that the Commissioners Court has no discretion but to put the proposed minimum salary plan on the ballot, regardless of whether it believes the proposal to be outside the bounds of section 152.072.

### LONGEVITY PAY

 **[1]**    The portion of the proposal at issue attempts to set longevity pay, which is not an existing method of compensation within the Sheriff's Department. The only issue is: does the Commissioners Court have any discretion about whether to place on the ballot that portion of the proposal which attempts to set longevity pay? Bailey relies on *Arenas* **\*432** *v. Board of Commissioners of the City of McAllen* to say that it has no discretion. *Arenas v. Board of Com'rs of the City of McAllen,* 841 S.W.2d 957 (Tex.App.—Corpus Christi 1992, *orig. proceeding* ). However, *Arenas* is distinguishable from the present case. In *Arenas,* the City Commissioners of the City of McAllen were petitioned under section 141.034 of the Local Government Code. The proposal provided for minimum salary increases for six personnel classifications within the Police Department in addition to longevity pay for three of the six. TEX. LOC. GOV'T.CODE ANN. § 141.034 (Vernon 1988). Believing the petition failed to comply with section 141.034, the City Commissioners refused to act. The Corpus Christi Court held that the respondents could not totally ignore the petition, even though the petition may have requested more than a "proposed minimum salary." The court went on to say that it would "express no opinion concerning whether the wording of the statute would bind respondents only to the proposed minimum base salary should the voters act favorably on the petition." *Arenas,* 841 S.W.2d at 959.

Although section 141.034 and section 152.072 of the Local Government Code are substantially similar, *Arenas* ' interpretation of section 141.034 must be read in conjunction with other sections of the Local Government Code—sections which place different obligations on municipalities and counties with regard to longevity pay. Although section 141.032 requires each municipality with a population of 10,000 or more to establish longevity pay for each member of the fire and police department, counties with a population under 150,000 do not have such an obligation. *Compare* TEX. LOC. GOV'T.CODE ANN. § 141.032 (Vernon 1988) *with* § 152.074 (Vernon 1988). The city of McAllen was already under an obligation to provide longevity pay; thus, the proposal did not "create" a compensation plan. Because Navarro County is not under an obligation to provide longevity pay, the proposal in this case arguably steps outside the bounds of section 152.072.

### IS MANDAMUS APPROPRIATE*?*

 **[2]**   **[3]**   **[4]**    Mandamus exists to command particular performance when there is a clear duty to perform. *See O'Connor v. First Court of Appeals,* 837 S.W.2d 94, 97 (Tex.1992). Mandamus will issue when there is a legal duty to perform a nondiscretionary, ministerial act, a demand for performance of that act, and a refusal. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 793 (Tex.1991)*; Doctors Hosp. Facilities v. Fifth Court of Appeals,* 750 S.W.2d 177, 178 (Tex.1988). An act is ministerial when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion. *Id.* Moreover, a writ of mandamus will not issue to compel a public official to perform an act which involves an exercise of discretion. *Id.*

Ordinarily, we have no jurisdiction in a mandamus proceeding against county officials. TEX. GOV'T CODE ANN. § 22.221(b) (Vernon Supp.1998). However, the question before us involves an election matter and the Legislature has broadly extended our mandamus jurisdiction to resolve election questions which, as here, are usually time-sensitive. *See* TEX. ELEC.CODE ANN. § 273.061 (Vernon 1986).

### CONCLUSION

Because it attempts to create a scheme for longevity pay which is neither required of Navarro County nor provided by the County, the petition in question arguably exceeds the limits of section 152.072. Because we cannot say that the Commissioners Court has a clear duty to act, mandamus will not lie.

The petition for writ of mandamus is denied.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 2346620
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas,
San Antonio.

The INTEGRITY GROUP, INC., Appellant,
v.
MEDINA COUNTY
COMMISSIONERS COURT, Appellee.

No. 04-03-00413-CV.  |  Oct. 20,
2004.  |  Rehearing Overruled Feb. 7, 2005.

**Synopsis**
**Background:** Developer brought action against the Medina County Commissioners Court, requesting injunctive and declaratory relief, as well as a writ of mandamus, after the Commissioners Court denied final approval of developer's plat application. The 38th Judicial District Court, Medina County, Antonio G. Cantu, J. (Assigned), granted the Commissioners Court's motion for summary judgment. Developer appealed.

**[Holding:]** The Court of Appeals, Sarah B. Duncan, J., held that Commissioners Court lacked authority to reject plat because of lot size.

Reversed and remanded.

Stone, J., concurred with opinion.

From the 38th Judicial District Court, Medina County, Texas, Trial Court No. 95-06-13409-CV; Antonio G. Cantu, [1] Judge Presiding.

**Attorneys and Law Firms**

David W. Ross, Law Office of Ralph Brown, P.C., San Antonio, for appellant.

George E. Hyde, Denton, Navarro, Rocha & Bernal, P.C., San Antonio, for appellee.

Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, PHYLIS J. SPEEDLIN, Justice.

**MEMORANDUM OPINION**

Opinion by SARAH B. DUNCAN, Justice.

**\*1** The Integrity Group, Inc. appeals the trial court's summary judgment in favor of the Medina County Commissioners Court. We hold the Commissioners Court is without authority to reject Integrity's plat because of the lot size and therefore reverse the trial court's judgment and remand the cause for further proceedings consistent with this opinion.

**[1]** In 1993 Integrity began the process of seeking approval to subdivide a 4.843-acre tract of land adjacent to Medina Lake. Part of the tract is located over the Edwards Aquifer Recharge Zone; and Integrity plans on employing on-site sewage systems. Ultimately, in 1995, the Medina County Commissioners Court denied final approval of Integrity's plat application "because the proposed plat does not meet Medina County's Subdivision Rules and Regulations and/or checklist and is, therefore, not in compliance." In response, Integrity sued the Commissioners Court for injunctive and declaratory relief, as well as a writ of mandamus. *See Medina County Comm'rs Court v. Integrity Group, Inc.,* 944 S.W.2d 6, 7-8 (Tex.App.-San Antonio 1996, no writ); *Medina County Comm'rs Court v. Integrity Group, Inc.,* 21 S.W.3d 307, 308-09 (Tex.App.-San Antonio 1999, pet. denied). The trial court granted the Commissioners Court's motion for summary judgment, which contends that the Commissioners Court is authorized-as an agent for what is now called the Texas Commission on Environmental Quality-to reject the plat because it fails to comply with the one-acre minimum lot requirement contained in the Subdivision Rules for Medina County for subdivisions over the Edwards Aquifer Recharge Zone. We disagree.

**[2]** "[A] commissioners court[ ] shall exercise such powers and jurisdiction over all county business, as is conferred by this Constitution and the laws of the State." TEX. CONST. art. V, § 18. "Texas courts have interpreted this to mean that, although a commissioners court may exercise broad discretion through implied powers in conducting county business, the legal basis for any action taken must be grounded ultimately in the Texas Constitution or statutes." *White v. Eastland County,* 12 S.W.3d 97, 100

(Tex.App.-Eastland 1999, no pet.). A commissioners court's power relative to the plat approval process is found in Chapter 232 of the Texas Local Government Code. Under section 232.002(a) of the Code, a commissioners court "may refuse to approve a plat if it does not meet the requirements prescribed by or under [chapter 232]or if any bond required under [chapter 232] is not filed with the county."TEX. LOC. GOV'T CODE ANN. § 232.002(a) (Vernon Supp.2003). On the other hand, if a developer meets the statutory requirements, the commissioners court's duty to approve the plat becomes ministerial. [2]

If the proposed plat is not located in a county near an international border, the plat requirements prescribed by chapter 232 are located in sections 232.001-.0032. Section 232.001(b) requires the plat to describe the subdivision by metes and bounds, locate the subdivision with respect to an original corner of the original survey of which it is a part, state the dimensions of the subdivision and each lot, street, or other part to be dedicated to public use, and be acknowledged by the owner or his agent and filed with the county clerk. *Id.* § 232.001(b). The subdivision requirements concern road development, drainage, and lot and block monumentation. *See id.* at § 232.003. Additionally, if the source of water for the subdivision is to be groundwater, section 232.0032 permits a commissioners court to require a statement "that adequate groundwater is available for the subdivision."*Id.* at § 232.0032. Chapter 232 thus does not require a plat to include planned water and sewer facilities unless the plat is located in a county near an international border. *See id.* at § 232.022; § 232.023(b)(6). In short, the only "authority" the Commissioners Court has cited, and the only authority we have found, that might permit a commissioners court to reject a plat because of lot size is this statement in the Summary of Facts in this court's opinion in *Medina County Comm'rs Court v. Integrity Group, Inc.,* 944 S.W.2d at 6:"Before the [Commissioners] [C]ourt grants a plat final approval, the subdivider must comply with [Medina County's] rule governing lot sizes...."*Id.* at 7. However, this statement is made in the Summary of Facts; it is not supported by authority; and it is clearly dicta since the opinion deals not with the plat approval process but with the Commissioners Court's and the individual commissioners' official immunity. *See id.*We therefore decline to give it weight in the plat approval context.

**\*2** Because there is no statutory authority authorizing the Commissioners Court to reject a plat because of lot size, the trial court erred in granting the commissioners court's motion

for summary judgment on this ground. We therefore reverse the trial court's judgment and remand the cause for further proceedings consistent with this opinion. [3]

CATHERINE STONE, Justice, concurring.

I concur with the court's judgment. I write separately, however, to address a contention presented by the Medina County Commissioners Court that is not directly answered in the majority opinion.

The Commissioners Court contends that the cases cited by Integrity (and relied upon by the majority) are not controlling because the cases do not address a situation in which the county has been given additional statutory authority to regulate plats beyond the basic regulations specified in TEX. LOC. GOV'T CODE ANN.. § 232.001-.0032 (Vernon Supp.2004). The Commissioners Court claims that as the authorized agent of the Texas Commission on Environmental Quality, it can impose a one-acre minimum lot size requirement when use of on-site sewage disposal facilities over the Edwards Aquifer Recharge Zone is contemplated. This authority is allegedly derived from Chapter 366 of the Texas Health and Safety Code and corresponding rules in the Texas Administrative Code. *See*TEX. HEALTH & SAFETY CODE ANN. § 366.001-.0924 (Vernon 2001 & Supp.2004); 30 TEX. ADMIN. CODE § 285. Indeed, section 285.40 of the Administrative Code provides that "[e]ach lot or tract of land on the recharge zone on which OSSFs [on-site sewage facilities] are to be located shall have an area of at least one acre ... per single family dwelling."30 TEX. ADMIN. CODE § 285.40(c)(1).

Recognizing that the Local Government Code does not contain the one-acre minimum size requirement, the Commissioners Court argues that rules of statutory construction should be employed to harmonize applicable provisions of the Local Government Code with the Health and Safety Code. When the provisions are harmonized, the Commissioners Court contends it can reject Integrity's plat because: (1) the land in question is over the Edwards Aquifer Recharge Zone; (2) use of OSSFs is contemplated; and (3) the plat does not provide for one-acre lots. The error in the Commissioners Court argument, however, is that the statutes relied upon by the Commissioners Court for authority to impose a one-acre minimum lot size do not pertain to the limited issue before the court at this time: the right of the Commissioners Court to accept or reject the tendered plat. The Health and Safety Code and Administrative Code

provisions relied upon by the Commissioners Court concern the permitting and construction of OSSFs. On the other hand, the Local Government Code provisions at issue concern a county's authority to accept and file a tendered plat. There is no need to employ rules of statutory construction to harmonize the statutes because we are not faced with conflicting statutory provisions.

 **\*3** The Commissioners Court has a ministerial duty to approve a plat that complies with the provisions of Chapter 232 of the Local Government Code. *See Elgin Bank v. Travis County,* 906 S.W.2d 120, 122-23 (Tex.App.-Austin 1995, writ denied). While at first blush it may seem more efficient to submit plats only if they can meet other requirements, such as the OSSF requirements, the two processes of accepting a plat and permitting an OSSF are separate. That the two processes remain separate does not diminish the Commissioners Court's role as an agent for the Commission on Environmental Quality. Whether the Commissioners Court, as an agent for the Commission on Environmental Quality, can ultimately regulate minimum lot sizes is a question for another day.

Footnotes

1    Sitting by assignment.

2    *See, e.g., Elgin Bank of Texas v. Travis County,* 906 S.W.2d 120, 123 (Tex.App.-Austin 1995, writ denied) (per curiam) ("Section 232.003 is the only authority upon which the county may base platting requirements."); *Projects American Corp. v. Hilliard,* 711 S.W.2d 386, 389 (Tex.App.-Tyler 1986, no writ.)("Under [the predecessor to chapter 232], the authority of the commissioners court to approve plats is not discretionary. If a plat submitted meets all statutory requirements, the commissioners court cannot impose additional requirements, but must approve such plat."); *Commissioners Court v. Frank Jester Dev. Co.,* 199 S.W.2d 1004, 1007 (Tex.Civ.App.-Dallas 1974, writ ref'd n.r.e.) ("When the platter has done all that the statute demands, [the commissioners courts duty to authorize the filing of the plat] becomes a mere ministerial duty, the performance of which may be compelled by mandamus."); *see also*Op. Tex. Att'y Gen. Nos. JM-789 (1987) ("[T]he statutory powers granted to the county over subdivisions are plainly limited to ordering certain standards to be applied to the physical dimensions and construction standards of streets and roads.... Thus, when a person who seeks to file and record a plat has complied with all of the statutory requirements outlined in chapter 232 of the Local Government Code, approval and filing of the plat becomes a mere ministerial duty."); JM-534 (1986) ("If a person who seeks to file and record a plat has complied with the statutory requirements outlined in [the predecessor to chapter 232], approval and filing of the plat becomes a mere ministerial duty."); JM-317 (1985) ("If the owner or owners of the tract of land subdivided in the plat follow the specified statutory procedure outlined in [the predecessor to chapter 232], the commissioners court is not authorized to reject the filing of the plat.").

3    We express no opinion as to whether the Commissioners Court may *effectively* regulate minimum lot size in other contexts, such as the building and sewage facility permitting processes.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

550 S.W.2d 11
Supreme Court of Texas.

W. Sale LEWIS, Savings and Loan
Commissioner, et al., Petitioners,

v.

METROPOLITAN SAVINGS AND LOAN
ASSOCIATION et al., Respondents.

No. B-5998. | March 9, 1977.
| Rehearing Denied May 25, 1977.

Competing savings and loan associations sought review of a decision by the Savings and Loan Commissioner approving charter application for the establishment of new savings and loan association in Gregg County. The 53rd Judicial District Court, Travis County, Mace B. Thurman, Jr., J., affirmed the Commissioner's order, and the contestants appealed. The Court of Civil Appeals, O'Quinn, J., 535 S.W.2d 35, reversed and remanded. Upon granting writ of error, the Supreme Court, Steakley, J., held that the Commissioner's approval order, was invalid for arbitrariness where the contesting parties were denied due process of law in the conduct of the administrative hearing, notwithstanding that under the record as made the order might be said to have reasonable factual support under the precepts of the substantial evidence rule.

Judgment affirmed as modified.

McGee, J., filed a dissenting opinion in which Greenhill, C. J., and Denton, J., joined.

**Attorneys and Law Firms**

*12 John L. Hill, Atty. Gen., Tom M. Pollan, Asst. Atty. Gen., McKay & Wash, John J. McKay, Austin, Kenley, Boyland, Hawthorn, Starr & Coghlan, Herbert Boyland, Longview, for petitioners.

Heath, Davis & McCalla, Dudley D. McCalla, Austin, for respondents.

**Opinion**

STEAKLEY, Justice.

This is an appeal from an order of the Savings and Loan Commissioner approving a charter for an additional savings and loan association in Longview, Gregg County, Texas. See

Tex.Rev.Civ.Stat.Ann. art. 852a. The applicant, to be known as the Gregg County Savings and Loan Association, is a petitioner here. The application was opposed by three existing savings and loan associations in Gregg County, known as Metropolitan Savings and Loan Association, Kilgore Savings and Loan Association, and Longview Savings and Loan Association. The trial court sustained the approval order of the Commissioner, also a petitioner here, but this judgment was reversed by the Court of Civil Appeals and the proceeding was remanded to the Commissioner with instructions to deny the charter application. 535 S.W.2d 35. We modify the judgment of the Court of Civil Appeals to the extent of instructing the Commissioner to proceed in accordance with this opinion.

[1] The Court of Civil Appeals determined that the contestants, respondents here, were denied due process by the hearing examiner in his exclusion from the administrative record of competent and material evidence proffered by the contestants.[1] We granted writ of error to resolve the question of whether an approval order of the Savings and Loan Commission is invalid for arbitrariness when the contesting parties are denied due process of law in the conduct of the administrative hearing, notwithstanding that under the record as made, the order may be said to have reasonable factual support under the precepts of the substantial evidence rule. We now answer this question in the affirmative.

*13 It is the basic contention of the Attorney General on behalf of the Commissioner, and of counsel for the applicant association, that the only test to be considered by the courts in determining the issue of arbitrariness vel non of an approval order of the Savings and Loan Commissioner is whether the order is supported by substantial evidence. The argument in effect is that a denial of due process in the administrative hearing becomes immaterial and beside the point if the order can be said to have reasonable evidentiary support in the administrative record.

[2] Broadly speaking, the substantial evidence rule is a court review device to keep the courts out of the business of administering regulatory statutes enacted by the Legislature; but it remains the business of the courts to see that justice is administered to competing parties by governmental agencies. As stated by Professor Davis in his Administrative Law Treatise, Vol. 4, s 29.01: "Although the scope of judicial review of administrative action ranges from zero to one hundred per cent, that is, from complete unreviewability to complete substitution of judicial judgment on all questions, the dominant tendency in both state courts

and federal courts is toward the middle position known as the substantial-evidence rule. Under this rule, the court decides questions of law but it limits itself to the test of reasonableness in reviewing findings of fact. Broadly, questions of law include not only common law, statutory interpretation, and constitutional law, but also questions of administrative jurisdiction, of fair administrative procedure, and of protection against arbitrary or capricious action or abuse of discretion."

[3]  [4]  [5]  In Texas, the substantial evidence rule had its origin in appeals from orders of administrative agencies under statutes requiring de novo review in court. In this type of appeal the evidence is heard anew by the court and the conduct of the administrative hearing, and the evidence heard by the agency, are of secondary, if any, importance. Trapp v. Shell Oil Company, 145 Tex. 323, 198 S.W.2d 424 (1946); Cook Drilling Company v. Gulf Oil Corporation, 139 Tex. 80, 161 S.W.2d 1035 (1942); Shupee v. Railroad Commission of Texas, 123 Tex. 521, 73 S.W.2d 505 (1934). In practical result, it has not taken much evidence under our decisions to qualify as substantial. In fact, the evidence may be substantial and yet greatly preponderate the other way. Cf. Gerst v. Goldsbury, 434 S.W.2d 665 (Tex.1968). Moreover, most contested administrative decisions are made in the context of disputed facts with evidence of a substantial nature on both sides. Even so, the proceedings of an administrative agency must meet the requirements of due process of law. Miller v. Railroad Commission, 363 S.W.2d 244 (Tex.1962); Railroad Commission v. Alamo Express, 158 Tex. 68, 308 S.W.2d 843 (1958); Francisco v. Board of Dental Examiners, 149 S.W.2d 619 (Tex.Civ.App.1941, error ref'd).

[6]  We recognized in Gerst v. Nixon, 411 S.W.2d 350 (Tex.1966) that Article 852a s 11.12, relating to judicial review of an order of the Savings and Loan Commissioner, does not provide for the application of the test or procedures usually employed in determining the validity of an administrative order; and further, that a hearing before a hearing officer of the Savings and Loan Commissioner is a different proceeding from the informal hearing considered by this Court in Cook Drilling Company v. Gulf Oil Corporation, supra. We also said that the effect of Article 852a was to adopt the rule that the Commissioner's order is to stand or fall upon the evidence adduced and matters noticed at the Commissioner's hearing and not upon evidence originally produced at a subsequent trial de novo in court. However, the method of review, i. e., under the substantial evidence rule, is unchanged. Gerst v. Oak Cliff Savings and Loan Association,

432 S.W.2d 702 (Tex.1968). What occurs, then, at the administrative hearing becomes of paramount importance in the statutory procedures established by Article 852a. If there is evidence in an administrative record that can be said to qualify as substantial, the parties may yet have been denied due process and the rudiments of fair play in the conduct of the *14 administrative hearing that produced the record upon which the agency acted. See Reavley, Substantial Evidence and Insubstantial Review in Texas, 23 S.W.L.J. 239 (1969); Berger, Administrative Arbitrariness and Judicial Review, 65 Colum.L.Rev. 55 (1965); Jaffe, The Right to Judicial Review, 71 Harv.L.Rev. 401 (1958).

[7]  As indicated earlier, our primary concern in granting writ of error was whether the parties opposing the charter application were denied due process by rulings of the hearing examiner that excluded competent and material evidence from the administrative record, thus precluding its consideration by the Commissioner in his decision process. This is particularly represented by the exclusion from the record of what is identified as Contestant's Exhibit 34, and for the reasons now to be stated we hold that the opposing parties were denied due process by this ruling.

The case of the applicant for a charter to establish a fourth savings and loan association in Longview, Gregg County, Texas, rested principally upon the testimony of Dr. Robert Branson of Bryan, Texas, as an economic-expert witness. It is evident from the approval order of the Commissioner that he was greatly influenced by the testimony of this witness in reaching his decision favorable to the application. It was shown that Dr. Branson had supported similar applications in prior proceedings and that in his testimony he had employed certain tests or standards in reaching his expert opinion regarding the need for additional savings and loan facilities. The methodology employed by Dr. Branson was demonstrated in Contestant's Exhibit 3 which was admitted into evidence by the hearing examiner for the purpose of showing "the procedure this expert witness has used in the past." Exhibit 3 contained a series of tables or ratios prepared by Dr. Branson in an earlier study in support of his testimony in a prior proceeding. Gregg County was utilized in this study as a comparable county.

The evidence identified as Contestant's Exhibit 34 was prepared by Dr. James R. Vinson, an expert witness for the contesting parties. The Exhibit was predicated upon the methodology of Dr. Branson as exhibited in Exhibit 3, with the economic information updated with respect to

Gregg County, Texas. This information was displayed in the manner previously used by Dr. Branson and Exhibit 34 demonstrated that on the basis of the update, Gregg County, Texas was at the opposite end of the scale from the tests or standards previously utilized by Dr. Branson. This witness had previously found a need for a new association in the fact that the existing associations had a high buying income per association, whereas Gregg County was shown to have the lowest buying income per association. Similarly, Dr. Branson had previously found a need for a new association because of a low assets per capita figure, whereas Gregg County was shown to have the highest assets per capita. Finally, Dr. Branson had previously found need because of a high ratio of income to assets, whereas Gregg County was shown to have the lowest ratio of income to assets.

In our view, the evidence reflected in Exhibit 34 was clearly competent and relevant and the error in its exclusion required the reversal by the Court of Civil Appeals of the judgment of the trial court and the remand of the proceeding to the Commissioner. From our study of the record we do not consider that Exhibit 34 was offered by the Contestants for the purpose of establishing a norm or standard, or criterion, as argued by petitioners. Nor do we regard the evidence as cumulative even if, as asserted by petitioners without record references, "all of the facts in Exhibit 34 pertaining to Gregg County were in evidence before the Commissioner." It is apparent to us that these arguments misconceive the evidentiary function and effect of Exhibit 34. The evidence in the Exhibit was proffered for the purpose of impeaching the testimony of Dr. Branson and might well have been viewed by the Commissioner as doing so. In such purpose and effect, the evidence also tended to weaken the evidentiary support for an additional savings and **\*15** loan association in Gregg County, Texas. Of course, we cannot determine what influence this excluded evidence might have had upon the Commissioner in his decision process. At the least, its exclusion may have affected the result, and in fairness to the opposing parties the Commissioner should have had such evidence before him. Moreover, this comports with the statutory directive of s 11.11(2) of Article 852a that "(O)pportunity shall be afforded any interested party to respond and present evidence and argument on all issues involved in any hearing held under any provision of this Act."

Professor Cooper in his treatise on state administrative law draws these conclusions:
The exclusion of proper evidence may vitiate the agency's decision, if it appears that its exclusion may have affected the result. State courts agree with decisions in the federal courts that refusal to receive competent and material evidence may be a denial of due process. The requirement that proper evidence be received is a necessary counterpart of the rule that the agency must give due weight to all the evidence before it; refusal to consider proper evidence which has been duly proffered falls within the condemnation that voids arbitrary administrative action.

If it appears that the excluded evidence could not materially have affected the outcome of the case if a remand to receive and consider the evidence improperly excluded would amount to nothing more than "a postponement of the inevitable," the error committed is not prejudicial. But normally it is impossible for a reviewing court to be assured that the outcome could not have been affected by the consideration of the excluded testimony, and in the usual case the necessary result of the exclusion of proper testimony is to void the administrative order. Cooper, State Administrative Law, Vol. I (1965) pp. 403, 404.

The governing rule was stated in Donnelly Garment Co. v. NLRB, 123 F.2d 215 (8th Cir. 1941), and restated with approval in NLRB v. Burns, 207 F.2d 434 (8th Cir. 1953), as follows:

> "That a refusal by an administrative agency such as the National Labor Relations Board to receive and consider competent and material evidence offered by a party to a proceeding before it, amounts to a denial of due process is not open to debate. * * * That the Board would or might have reached no different conclusion had the rejected evidence been received, is entirely beside the point. The truth is that a controversy tried before a court or before an administrative agency is not ripe for decision until all competent and material evidence proffered by the parties has been received and considered. . . ."

 **[8]** In the eyes of the law there is no hearing unless a fair opportunity is afforded the parties to prove their case before an administrative agency. People ex rel. Hirschberg v. Board of Supervisors, 251 N.Y. 156, 167 N.E. 204, 211 (1929). See also Gallant's Case, 326 Mass. 507, 95 N.E.2d 536 (1950); Prince v. Industrial Comm'n, 89 Ariz. 314, 361 P.2d 929 (1961).

 [9]    The decision of the Savings and Loan Commissioner is not governed by the precepts of the substantial evidence rule, and his responsibility is not one of determining if a particular result will be supportable by application of the rule to the administrative record. To the contrary, the decision of the Commissioner is to be in the public interest after full consideration of all the surrounding facts and circumstances, and in fairness and justice to the competing parties. Essential to the discharge of this responsibility is an administrative record that presents the relevant and material facts, and a determination by the courts of whether a particular administrative record fairly does so requires an examination of the whole record. Article 852a does not establish a self-contained administrative process unreviewable by the courts for arbitrariness if the administrative record, no matter how it came about, can be said to contain substantial evidence in support of the ultimate action of the Commissioner.

 *16    [10]    This is not to say that an order of the Commissioner is always insecure in court if the hearing examiner has made mistakes in the admission or exclusion of evidence, or in other respects. Nor is it to say that a hearing examiner, who may or may not be trained or experienced in the law, must measure up to judicial standards in the conduct of an administrative hearing.[2] But it is to say, as we said in Gerst v. Nixon, 411 S.W.2d 350 (Tex.1966) that arbitrary action of an administrative agency cannot stand. There is arbitrariness where the treatment accorded parties in the administrative process denies them due process of law. While we recognized in Gerst v. Nixon that the test generally applied by the courts in determining the issue of arbitrariness is whether or not the administrative order is reasonably supported by substantial evidence, we made clear in the original opinion and again on Motion for Rehearing that the record there did not present a question of procedural due process.

The judgment of the Court of Civil Appeals is modified so as to remand this proceeding to the Savings and Loan Commissioner for further proceedings consistent with this opinion; and as so modified, the judgment of the Court of Civil Appeals is affirmed. This modification will permit the Commissioner to order a reopening of the hearings and thereafter to reconsider his decision. See Article 852a s 11.12(6) and First Savings & Loan Ass'n of Del Rio, Texas v. Lewis, 512 S.W.2d 62 (Tex.Civ.App.1974, writ ref'd n.r.e.).

McGEE, J., dissents in an opinion in which GREENHILL, C. J., and DENTON, J., join.

McGEE, Justice, dissenting.

I respectfully dissent.

I read the majority opinion to hold that the contestants in this case, respondents herein, were denied due process of law, primarily because of the exclusion of contestants' Exhibit 34, regardless of the fact that the Commissioner's order is supported by substantial evidence.

I disagree with the majority opinion in its holding that the exclusion of Exhibit 34 was a violation of due process. There are situations where the wrongful actions of the hearing officer would be so detrimental to the presentation of a party's position that it would constitute a violation of due process, but the wrongful exclusion of Exhibit 34 was not the kind of error which would deny contestants due process of law. The majority states that excluding Exhibit 34 was harmful in that it could have impeached the testimony of Dr. Branson. I believe that Exhibit 34 was only cumulative of other evidence which sought to impeach Dr. Branson's testimony and its exclusion was harmless. Contestants offered Exhibit 3, a study done six years earlier by Branson which compared a different county, Bowie County, to eight other counties, one of which was Gregg County. Contestants' Exhibit 3 was admitted to show the prior methodology used by Branson and was admitted over the applicant's objection. The methodology used by Branson in the Gregg County study was substantially different than that used in the Bowie County study. Exhibit 3 had absolutely no relevance to the charter application in Gregg County. The contestants then sought to admit Exhibit 34 which used the methodology of Exhibit 3 with updated figures. Exhibit 34 was excluded by the  *17  hearing commissioner. The majority opinion states that the value of Exhibit 34 was its impeachment of Branson's testimony. Exhibit 34 could not impeach Branson as to the Gregg County study because the methodology used by Branson in the Gregg County study was different from that used in the Bowie County study. I disagree with the majority opinion which holds that the exclusion of Exhibit 34 was so harmful that it denied contestants due process of law. Remanding this case to receive and consider Exhibit 34 is nothing more than "a postponement of the inevitable." 1 Cooper, State Administrative Law, at 404 (1965).

The exclusion of Exhibit 34 was not reversible error because witnesses for contestants testified to what Exhibit 34 sought to show. The purpose for introducing Exhibit 34, other than impeachment, was to show that Gregg County was not a good location for an association because the source of savings deposits was small, there was effective participation by existing associations, and the potential for new customers was not great. Contestants' expert, Dr. Vinson, testified to the active participation and competition in the home loan business. The officers of the contestants testified that the source of savings deposits was small due to the number of associations and the competition for these loans. This could be the result sought to be shown by ratio one in Exhibit 34. The officers of the contestants and Dr. Vinson testified to the active participation by existing associations in securing deposits and in making loans. Ratio two in Exhibit 34 reflected this because Gregg County had a high ratio of savings and loan assets per capita. Ratio three of Exhibit 34 sought to show the potential for future customers by comparing the savings and loan assets with the effective buying income of Gregg County. The officers of contestants testified that the competition for customers was fierce and that there was not a great potential for new customers in Gregg County. While none of this evidence was presented in ratio form as it was in Exhibit 34, the things that Exhibit 34 sought to show were testified to and were before the Commissioner.

In Benson v. San Antonio Savings Association, 374 S.W.2d 423 (Tex.1963), the unsuccessful applicant alleged denial of due process because the trial court refused to allow him access to an investigative report of the Commissioner. This court held that although refusal to allow examination of the report was error, the case did not have to be remanded. The court stated:

"All of this, however, does not require a reversal and remand of this case. The investigative report, even if admissible in evidence in the trial court by reason of Art. 3731a, s 1, Vernon's Ann.Civ.Stat., is necessarily hearsay and whether favorable or unfavorable to San Antonio Association, could not serve to show that the Commissioner's rejection of the application was not supported by substantial evidence. From the record we must assume it was merely cumulative of the evidence introduced." 374 S.W.2d at 429.

See, Lewis v. Southmore Savings Ass'n, 480 S.W.2d 180, 184 (Tex.1972); Gerst v. Nixon, 411 S.W.2d 350, 357 (Tex.1966).

The holding of the majority opinion requires reversal of evidentiary errors made by hearing officers who are not required to be attorneys. The majority opinion states that not all evidentiary errors will require reversal and that the hearing examiner does not have to meet judicial standards in the conduct of a hearing. The standard which these hearing officers must meet is unannounced and the result of this opinion seems to indicate that mistakes by hearing officers will be grounds for reversal just as in a judicial proceeding. The majority's holding will cause appellate courts to review every case in which contested evidence was excluded at the hearing. I think this will result in hearing officers admitting all contested evidence due to fear of reversal. This will cause larger records of charter hearings, which are already voluminous, and raise the problem of placing incompetent evidence before the Savings and Loan Commissioner. The argument could then be asserted that reversal is required because the Commissioner considered incompetent evidence.

**\*18** I would reverse the court of civil appeals and affirm the order of the Commissioner granting the Savings and Loan Association charter.

GREENHILL, C. J., and DENTON, J., join in this dissent.

---

Footnotes

1    The Court of Civil Appeals also ruled that the fact findings of the Commissioner were not in compliance with the requirements of s 11.11(4) of Article 852a; and, further, that the approval order is not reasonably supported by substantial evidence. We do not reach either of these questions under our disposition of the appeal.

2    Much has been written about the problem of judicializing administrative procedures. See Friendly, "Some Kind of Hearing," 123 Pa.L.Rev. 1267 (1975); and the analysis by Professor Davis of the "residuum rule" that requires a reviewing court to set aside an administrative finding unless the finding is supported by evidence which would be admissible in a jury trial. Davis, Administrative Law Treatise, Vol. II, s 14.10 (1958). But see People v. Board of Supervisors, 251 N.Y. 156, 167 N.E. 204, 207 (1929) where it was said: "(D) ecision is intrusted to men who cannot be presumed to be learned in technical rules of law; common sense dictates the conclusion that they may not be required to apply rules which lie beyond what they may be presumed to know. Their decisions must, of course, be based upon a consideration of the relevant facts and a fair opportunity must be afforded to present to them such facts as should properly enter into their decisions."

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

675 F.3d 917
United States Court of Appeals,
Fifth Circuit.

LUMINANT GENERATION COMPANY, L.L.C.;
Oak Grove Management Company, L.L.C.; Big
Brown Power Company, L.L.C.; Luminant Mining
Company, L.L.C.; Sandow Power Company,
L.L.C.; Texas Association of Business; Texas
Association of Manufacturers; Texas Oil & Gas
Association; Chamber of Commerce of the United
States of America; State of Texas, Petitioners,
v.
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

No. 10–60891.    |    March 26, 2012.

## Synopsis

**Background:** State of Texas, among others, sought review of Environmental Protection Agency's (EPA) disapproval, more than three years after time within which it was statutorily required to act under Clean Air Act (CAA), of regulation promulgated by State providing for standardized permit for certain projects that reduced or maintained current emissions rates.

**Holdings:** The Court of Appeals, Jennifer Walker Elrod, Circuit Judge, held that:

[1] EPA's reliance on state law in disapproving regulation was arbitrary and capricious;

[2] it owed no deference to EPA's interpretation of CAA as embracing "similar source" requirement;

[3] it would not apply *Chevron* deference to EPA's interpretation of CAA as set forth in appellate brief;

[4] CAA did not authorize EPA to impose "similar source" requirement on minor new source reviews (NSR);

[5] EPA's imposition of "similar source" standard in disapproving regulation was arbitrary and capricious; and

[6] EPA's disapproval of regulation based on want of replicable limitations on discretion of Texas Commission on Environmental Quality (TCEQ) director was arbitrary and capricious.

Vacated and remanded.

## Attorneys and Law Firms

**\*920** Philip Stephen Gidiere, III, David R. Boyd, Steven G. McKinney, Balch & Bingham, L.L.P., Birmingham, AL, Harry Max Reasoner (argued), Vinson & Elkins, L.L.P., Houston, TX, John Aloysius Riley, Christopher Charles Thiele, Bracewell & Giuliani, L.L.P., Austin, TX, Eric Alan White, Vinson & Elkins, L.L.P., Washington, DC, for Petitioners Luminant Generation Co., L.L.C., Oak Grove Management Co., L.L.C., Big Brown Power Co., L.L.C., Luminant Mining Co., L.L.C., Sandow Power Co., L.L.C.

Samara Lackman Kline, Van Beckwith, Anika Christine Stucky, Baker Botts, L.L.P., Dallas, TX, Matthew G. Paulson, Baker Botts, L.L.P., Austin, TX, for Petitioners Luminant Mining Co., L.L.C., Sandow Power Co., L.L.C., Texas Ass'n of Business, Texas Ass'n of Manufacturers, Texas Oil & Gas Ass'n, Chamber of Commerce of the United States of America.

Jon Niermann (argued), Asst. Atty. Gen., Office of the Atty. Gen. for the State of Texas, John Reed Clay, Jr., Office of the Atty. Gen., Office of the Sol. Gen., Austin, TX, for Petitioner State of Texas.

Daniel Pinkston (argued), Sr. Lit. Atty., U.S. Dept. of Justice, Environmental Defense Section, Denver, CO, Scott Fulton, Lisa P. Jackson, EPA, Washington, DC, for Respondent.

On Petition for Review of an Order of the United States Environmental Protection Agency.

Before BARKSDALE, GARZA and ELROD, Circuit Judges.[*]

## Opinion

**\*921** JENNIFER WALKER ELROD, Circuit Judge:

This case requires us to review the EPA's disapproval, more than three years after the time within which it was statutorily required to act, of three regulations promulgated by the State of Texas. 30 Tex. Admin. Code §§ 116.610(a), 116.610(b),

and 116.617. Pursuant to Texas's duty under the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7401 *et seq.,* to adopt and administer a statewide plan for implementing federal air quality standards, those regulations provide for a standardized permit for certain projects that reduce or maintain current emissions rates. Because the EPA had no legal basis on which to disapprove those regulations, we VACATE the agency's disapproval of Texas's regulations and REMAND with instructions.

# I. BACKGROUND

## A. *Statutory Background*

**[1]** **[2]** An "experiment in cooperative federalism," *Michigan v. EPA,* 268 F.3d 1075, 1083 (D.C.Cir.2001), the CAA "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *BCCA Appeal Group v. EPA,* 355 F.3d 817, 821–22 (5th Cir.2003). The Act assigns responsibility to the EPA for identifying air pollutants and establishing National Ambient Air Quality Standards (NAAQS). 42 U.S.C. §§ 7408–7409. The states, by contrast, bear "the primary responsibility" for implementing those standards. *BCCA Appeal Group,* 355 F.3d at 822; *see also* § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within [its] entire geographic area."); § 7401(a)(3) ("[A]ir pollution prevention ... is the primary responsibility of States and local governments.").

**[3]** **[4]** To implement the NAAQS, the states must adopt and administer State Implementation Plans (SIPs) that meet certain statutory criteria. § 7410. The states have "wide discretion in formulating [their] plan[s]." *Union Elec. Co. v. EPA,* 427 U.S. 246, 250, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). "[S]o long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation." *Train v. Natural Res. Def. Council, Inc.* 421 U.S. 60, 79, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). With regard to implementation, the Act confines the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements. § 7410(k)(3) ( "[T]he [EPA] Administrator *shall* approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter." (emphasis added)); *see also Fla. Power & Light Co. v. Costle,* 650 F.2d 579, 587 (5th Cir.1981) ("The great flexibility accorded the states under the Clean Air Act is ... illustrated by the sharply contrasting, narrow role to be played by EPA."); *Michigan,* 268 F.3d at 1083 (the EPA's "overarching role is in setting standards, not in implementation"). This division of responsibility between the states and the federal government "reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government." *Fla. Power & Light Co.,* 650 F.2d at 581.

**[5]** Under the Act, SIPs are not supposed to be static. States must periodically revise their SIPs as necessary to ensure compliance with current NAAQS. 42 U.S.C. § 7410(a)(2) (H). With a narrow exception not relevant here, the EPA must review and approve or disapprove a SIP revision within 18 months of submission. §§ 7410(k)(1)(B), 7410(k)(2), and 7410(k)(3). The EPA shall disapprove a SIP revision only if "the revision would **\*922** interfere with any applicable requirement concerning attainment" of the NAAQS "or any other applicable requirement" of the Act. § 7410(*l* ). As with SIP plans, if the revision meets all of the applicable CAA requirements, the EPA must approve it. § 7410(k)(3) (The EPA "shall approve such submittal as a whole.").

Among other requirements, SIPs must include permitting programs for the construction or modification of stationary sources. The EPA has termed these required permit programs "New Source Review" (NSR). 74 Fed.Reg. 51,418, 51,421 (Oct. 6, 2009). For "major" NSR, which applies to the construction or modification of stationary sources that meet certain threshold emissions levels, the CAA sets forth the parameters for the permit programs in considerable detail. [1] *See* 42 U.S.C. §§ 7470–7503. The implementing regulations for major NSR are similarly extensive and complex, spanning 88 pages in the Code of Federal Regulations. *See* 40 C.F.R. §§ 51.165–51.166, pt. 51 appendix S.

In stark contrast, the CAA prescribes only the barest of requirements for "minor" NSR, which governs the construction or modification of stationary sources that do not meet the emissions thresholds for major NSR. For minor NSR, the Act requires simply that each SIP "include ... regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that [NAAQS] are achieved." 42 U.S.C. § 7410(a)(2)(C). The implementing regulations for minor NSR are likewise sparse, spanning less than two pages in the Code of Federal Regulations. *See* 40 C.F.R. §§ 51.160–51.164. The EPA has recognized that because "the Act includes no specifics regarding the structure or functioning of minor NSR

programs" and because the implementing regulations are "very general [,] ... SIP-approved minor NSR programs can vary quite widely from State to State." 74 Fed.Reg. 51,418, 51,421 (Oct. 6, 2009).

### B. Facts and Proceedings

The Texas standardized permit at issue here applies only to minor NSR, [2] and then only to pollution control projects (PCPs). The regulations governing this permit (the PCP Standard Permit) are found at 30 Tex. Admin. Code § 116.617. Those regulations authorize the standard permit for PCPs "that reduce or maintain currently authorized emission rates for facilities authorized by a permit." [3] § 116.617(a)(1). **\*923** Detailed registration requirements apply. *See §§* 116.617(d)(2)(A)-(F), 116.617(b)(1)(D) (incorporating the standard permit registration requirements of § 116.611). The PCP Standard Permit is also subject to Texas's general conditions for standard permits, which impose additional reporting, recordkeeping, and compliance requirements. *See* § 116.615. The executive director of the Texas Commission on Environmental Quality (TCEQ) has the negative discretion to disallow the use of any PCP standard permit if he "determines there are health effects concerns or the potential to exceed a [NAAQS] ... until those concerns are addressed by the registrant to the satisfaction of the executive director." § 116.617(a)(3)(B). A "registration must be submitted no later than 30 days after construction or implementation begins" only for replacement PCPs that yield "no increases in authorized emissions of any air contaminant." § 116.617(d)(1)(A). By contrast, registration for new PCPs and replacement projects that will yield any increase in emissions must be submitted 30 days before construction or implementation. § 116.617(d)(1)(B). Construction or implementation may not begin until 30 days after TCEQ receives the registration or until the executive director issues written acceptance. *Id.*

Texas's PCP Standard Permit is just one component of Texas's broader standard permits program. That program originated in 1993, when Texas promulgated standard permits for PCPs that reduce emissions of volatile organic compounds (VOCs) and nitrogen oxides (NOx). *See* 18 Tex. Reg. 8597 (Nov. 19, 1993) (VOC standard permit); 18 Tex. Reg. 3409 (May 28, 1993) (NOx standard permit). The next year, after notice and comment and a public hearing, Texas adopted regulations that set forth the general requirements for Texas's standard permits program. 19 Tex. Reg. 3055 (Apr. 22, 1994). In that same rulemaking, Texas expanded the availability of

standard permits to PCPs for any regulated pollutant. *Id.* at 3064–65. Texas amended its standard permit program several times in the following years and submitted those revisions to the EPA for approval into Texas's SIP. *See* 68 Fed.Reg. 64,543, 64,547 (Nov. 14, 2003) (listing several SIP revision submissions from 1994 to 2002 concerning Texas's standard permits program).

In 2003, the EPA finally approved the standard permits program into Texas's SIP, explaining that the program met the applicable requirements of the CAA and its implementing regulations. *See id.* at 64,546–64,547 (approving 30 Tex. Admin. Code §§ 116.601–116.606, 116.610, 116.611, 116.614, and 116.615). [4] The EPA explicitly declined to act on § 116.617, which allows for a standard permit for PCPs. *Id.* at 64,547. The EPA commented that approval of § 116.617 was "not necessary" to its approval of the standard permits program and that § 116.617 would "be addressed in a separate action." *Id.*

Texas amended § 116.617 in 2006 to limit the availability of standard permits for PCPs to minor NSR only. *See* 31 Tex. Reg. 515, 516 (Jan. 27, 2006). At the same time, Texas made necessary conforming amendments, as well as stylistic revisions, to SIP-approved §§ 116.610(a) and 116.610(b), which set forth general parameters for the applicability of Texas's standard permits program. *See id.; see also* 30 Tex. Reg. 6183, 6205 (Sept. 30, 2005) (proposed amendments). These amendments were necessary to bring Texas's PCP Standard Permit into compliance with federal standards after the D.C. Circuit vacated, as contrary to the CAA, an EPA rule that had altogether exempted PCPs **\*924** from major NSR. *New York v. EPA,* 413 F.3d 3, 40–42 (D.C.Cir.2005). After adopting these amendments through notice and comment rulemaking, on February 1, 2006, Texas resubmitted its newly amended versions of §§ 116.617, 116.610(a), and 116.610(b), among other provisions, to the EPA for approval into Texas's SIP. *See* 74 Fed.Reg. 48, 467, 48,471 (Sept. 23, 2009). Thus, pursuant to the Act's eighteen-month deadline, the EPA was required by statute to take action on Texas's submission by August 1, 2007, at the latest.

More than two years after the statutory deadline had passed, the EPA proposed disapproval of Texas's submission on September 23, 2009. *See id.* at 48,467. In proposing disapproval of Texas's PCP Standard Permit (§ 116.617), the EPA did not identify any provision of the CAA or its implementing regulations that Texas's program violated. *See* 74 Fed.Reg. at 48,475–76. Instead, the EPA asserted that

"each minor NSR SIP Standard Permit ... is required to be applicable to narrowly defined categories of emission sources rather than a category of *emission types.*" *Id.* at 48,476 (emphasis in original). The only authorities that the EPA cited for this purported requirement were several internal memoranda and guidance documents, and a handful of rulemakings in which the EPA took action or proposed action concerning the adoption of general permit programs into other states' SIPs. *Id.* at 48,476 n. 11. The EPA also stated that "another major concern is that this Standard Permit is designed for case-by-case additional authorization, source-specific review, and source-specific technical determinations." *Id.* at 48,476. The EPA explained its concern as follows: "There are no replicable conditions in the PCP Standard Permit that specify how the [TCEQ] Director's discretion is to be implemented for the individual determinations." *Id.* The EPA cited no authority to tether its concern to any applicable provision of the CAA. *See id.* Moreover, as the EPA conceded in its brief, it provided no explanation for why it proposed disapproval of §§ 116.610(a) and 116.610(b).

The EPA issued its final rule disapproving, *inter alia,* §§ 116.617, 116.610(a), and 116.610(b), on September 15, 2010, more than three years after the statutory deadline. 75 Fed.Reg. 56,424 (Sept. 15, 2010). Although the EPA averred in its opening "Summary" section that it disapproved Texas's PCP Standard Permit "because it does not meet the requirements of the CAA for a minor NSR Standard Permit program," *id.,* the EPA again failed to identify a single provision of the Act that Texas's program violated, let alone explain its reasons for reaching its conclusion. Instead, in its discussion of Texas's PCP Standard Permit, the EPA stated no less than five times that it was disapproving the permit because it "does not meet the requirements of the *Texas* Minor NSR Standard Permits Program." *Id.* at 56,447 (emphasis added); *see also id.* at 56,444; *id.* at 56,445 (twice expressing the same conclusion); *id.* at 56,447 (same). In other words, the EPA utilized Texas law as its benchmark in disapproving § 116.617, not the CAA or its implementing regulations. Indeed, even when responding to comments that discussed whether § 116.617 meets the requirements of the CAA, the EPA did not address that question, but instead concluded that the PCP Standard Permit does not meet the requirements of *Texas's* SIP-approved standard permits program. *See* 75 Fed.Reg. at 56,445 (EPA's response to Comments 2 and 3). The EPA also reiterated the objections from its proposed disapproval that § 116.617 "does not apply to similar sources" and "lacks the requisite replicable standardized permit terms

specifying how the Director's discretion is to be implemented for the case-by-case determinations." **\*925** *Id.* at 56,447. The EPA conceded in its brief that it again failed to provide any explanation for its disapproval of §§ 116.610(a) and 116.610(b).

Invoking our jurisdiction under 42 U.S.C. § 7607(b), numerous petitioners timely filed petitions for our review. [5] Only the EPA's disapproval of 30 Tex. Admin. Code §§ 116.610(a), 116.610(b), and 116.617 are presently before us.

## II. STANDARD OF REVIEW

[6] [7] When reviewing EPA action under the CAA, we apply the standard of review provided for in the Administrative Procedure Act (APA). *See Texas v. EPA,* 499 F.2d 289, 296 (5th Cir.1974). Under the APA, we must hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We must also set aside agency action that is "in excess of statutory ... authority." § 706(2)(C). Agency action

> is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Tex. Oil & Gas Ass'n v. EPA,* 161 F.3d 923, 933 (5th Cir.1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

[8] [9] We must disregard any *post hoc* rationalizations of the EPA's action and evaluate it solely on the basis of the agency's stated rationale at the time of its decision. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; *Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself." (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947))). "Review of agency action under § 706(2)'s 'arbitrary or capricious' standard is limited to the

record before the agency at the time of its decision." *Geyen v. Marsh,* 775 F.2d 1303, 1309 (5th Cir.1985); *see also Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

## III. DISCUSSION

The EPA concedes that it acted arbitrarily and capriciously by failing to supply any reason for its disapproval of §§ 116.610(a) and 116.610(b) and consents to vacatur. We therefore vacate the EPA's disapproval of these provisions and turn to § 116.617.

Petitioners contend that the EPA acted arbitrarily and capriciously and in excess of its statutory authority by applying three different incorrect legal standards in disapproving 30 Tex. Admin. Code § 116.617. First, Petitioners argue that the EPA improperly reviewed the PCP Standard Permit for compliance with Texas law, when the EPA's only authorized function was to **\*926** review the permit for compliance with the applicable requirements of the CAA. Second, Petitioners argue that the EPA's so-called "similar source" requirement does not exist in any of the CAA provisions governing minor NSR. Third, Petitioners argue that the applicable federal law imposes no "replicability" requirement and, therefore, the EPA had no basis on which it could have properly determined that the TCEQ Director's discretion under § 116.617 violated the Act. As we now explain, each of Petitioners' arguments is correct.

### A. The EPA's Reliance on Texas Law

 **[10]**     **[11]**     **[12]**     It is beyond cavil that the EPA may consider only the requirements of the CAA when reviewing SIP submissions. The Act provides that the EPA "shall approve [a SIP] submittal as a whole if it meets all of the applicable requirements of [the Act]." 42 U.S.C. § 7410(k)(3). This statutory imperative leaves the agency no discretion to do anything other than ensure that a state's submission meets the CAA's requirements and, if it does, approve it before the passage of its statutory deadline. Moreover, the provisions of the Act that govern minor NSR and the EPA's review of SIP revisions make no allowance for the EPA to evaluate the submission for compliance with state law. *See* § 7410(a)(2)(C) (the Act's only requirement for minor NSR is that each SIP "include ... regulation of the modification

and construction of any stationary source within the areas covered by the plan as necessary to assure that [NAAQS] are achieved"); § 7410(*l* ) (the EPA may disapprove a SIP revision only if "the revision would interfere with any applicable requirement concerning attainment" of the NAAQS "or any other applicable requirement of [the Act]"). As the EPA itself has recognized, nowhere does the Act authorize EPA review of SIP revisions for conformity with state law: "Section [7410(*l* )] requires us to evaluate proposed SIP revisions in relation to applicable requirements of the CAA, *not state rules.*" 73 Fed.Reg. 60,957, 60,961 (Oct. 15, 2008) (emphasis in original) (approving a revision to Alabama's SIP).

 **[13]**     In this case, the EPA overstepped the bounds of its narrow statutory role in the SIP approval process. As mentioned, on five separate occasions the EPA gave as its reason for disapproving the PCP Standard Permit that it "does not meet the requirements of the *Texas* Minor NSR Standard Permits SIP." 75 Fed.Reg. 56,424, 56,445 (Sept. 15, 2010) (emphasis added). This attempt by the EPA to enforce state law standards was *ultra vires.* It was "in excess of statutory ... authority," in contravention of 5 U.S.C. § 706(2)(C). In addition, because state law is a "factor[ ] which Congress has not intended [the EPA] to consider," the EPA's reliance on it was arbitrary and capricious. *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856.

The EPA now attempts to discount its repeated invocation of state law standards by pointing to its passing assertions in its final rule that the "EPA is disapproving the [PCP Standard Permit] because it does not meet the requirements of the CAA," 75 Fed.Reg. at 56,424, and that the "EPA reviews a SIP revision submission for its compliance with the Act and EPA regulations." *Id.* at 56,447. This will not do, however, because these bald assertions are belied by the entirety of the EPA's discussion of the PCP Standard Permit. Nowhere in either the proposed or final disapproval does the EPA explain how the PCP Standard Permit is inconsistent with any particular provision of the Act. In addition to the EPA's five unambiguous statements that it relied on Texas law, a holistic review of the EPA's analysis demonstrates that it evaluated the PCP Standard Permit for compliance with the features of Texas's SIP-approved standard **\*927** permits program, not the requirements of the CAA. *See, e.g., id.* at 56,445 (discussing at length the ways in which the PCP Standard permit purportedly "does not meet the requirements of" Texas's standard permits program). The EPA impermissibly

treated Texas's standard permits program as if it were the applicable legal standard. [6]

### B. The So–Called "Similar Source" Requirement

In addition to disapproving the PCP Standard Permit for not complying with the EPA's interpretation of Texas law, the agency also disapproved it on the grounds that its availability is not limited to "similar sources." 75 Fed.Reg. at 56,447. According to the EPA's proposed disapproval, the "similar source" requirement limits the availability of each standard permit to a "narrowly defined categor[y] of emission sources," such as "oil and gas facilities, asphalt concrete plants, and concrete batch plants." 74 Fed.Reg. at 48,476 & n.10. Petitioners challenge the EPA's authority to impose a "similar source" requirement, arguing that no such requirement exists in any applicable provision of the CAA or its implementing regulations. The EPA parries that it has "properly tie[d] the requirement that general permits be limited to similar sources to CAA section 110(a)(2) [42 U.S.C. § 7410(a)(2) ] requirements that control measures be enforceable." The EPA then points to several agency guidance documents that are said to "elucidate principles" relevant to its interpretation of the Act—presumably out of the hope that we will apply *Chevron* deference in reviewing that interpretation. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Petitioners reply that the EPA's "similar source" requirement merits no deference and is without support in the CAA.

[14]    We first address what level of deference, if any, we owe to the EPA's interpretation of § 7410(a)(2) as embracing a "similar source" requirement. We do not owe any deference to that interpretation based on the EPA's insistence on a "similar source" requirement in its proposed and final disapproval. That is because nowhere in the rulemaking record does the EPA even hint that the "similar source" requirement reflects its interpretation of any applicable provision of the CAA or its implementing regulations. [7] There is thus no agency interpretation in the rulemaking record to which to defer. *See United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (setting forth the framework for when and to what degree courts must defer to agency interpretation "of a particular statutory provision"). For this same reason we owe **\*928** no deference to the "similar source" requirement based on the EPA's citation to agency guidance documents. *See* 74 Fed.Reg. at 48,476 n.11 (citing various agency guidance documents). The EPA

concedes that these documents do not interpret the relevant statutory provisions—that is, those that govern SIP approval of minor NSR. *See* 75 Fed.Reg. at 56,447 ("The utility of these citations is not in the specific subject matter they address, but in their discussion of the regulatory principles to be applied in reviewing permit schemes that adopt emission limitations created through standardized protocols."). [8]

[15]   [16]   [17]   [18]   Nevertheless, we must still consider whether we owe some measure of deference to the EPA's interpretation of the Act in its appellate brief, which represents the first time it has argued that the CAA authorizes it to impose a "similar source" requirement on minor NSR. *Chevron* deference is out of the question. *See Pool Co. v. Cooper,* 274 F.3d 173, 177 n. 3 (5th Cir.2001) (litigation briefs are not entitled to *Chevron* deference). Still, we ordinarily must afford a weaker form of deference under *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), to agency interpretations of statutes they administer that do not carry the force of law and, therefore, do not command *Chevron* deference. *Mead,* 533 U.S. at 234–35, 121 S.Ct. 2164. The deference due under *Skidmore* varies with the persuasive force of the agency interpretation. *See id.* at 228, 121 S.Ct. 2164. In *Mead,* the Court described as "near indifference" the level of *Skidmore* deference due "an interpretation advanced for the first time in a litigation brief." *Id.* (citing *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212–13, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). In discussing the deference question in *Bowen,* the Court explained that "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." *Bowen,* 488 U.S. at 213, 109 S.Ct. 468. Thus, it appears that although we are bound to extend some modicum of deference to the EPA's appellate counsel's interpretation, that degree of deference is minimal. *See Mead,* 533 U.S. at 228, 121 S.Ct. 2164 (the approach outlined in *Skidmore* "has produced a spectrum of judicial responses," with deference to litigation briefs at the lowest end of that spectrum).

[19]   Even affording *Skidmore* deference to the EPA's interpretation of the CAA, we agree with the Petitioners that the Act does not authorize the EPA to impose a "similar source" requirement on minor NSR. [9] We have already made clear that the Act empowers the EPA to disapprove a SIP revision only "if the revision would interfere with any applicable requirement concerning attainment [of the NAAQS] ... or any other applicable requirement of [the Act]."

§ 7410(*l* ). Otherwise the EPA must approve the revision. § 7410(k)(3).

 **\*929** We can quickly dispense with any supposition that inclusion of a "similar source" rule in the PCP Standard Permit is necessary to prevent interference with the NAAQS. The Texas regulations governing the PCP Standard Permit provide that "[t]his standard permit must not be used to authorize [any PCP] that ... the [TCEQ] executive director determines [has] the potential to exceed a [NAAQS]." 30 Tex. Admin. Code § 116.617(a)(3)(B). Given this provision, which makes the PCP Standard Permit unavailable for any PCP that has even the potential to cause a breach of the NAAQS, we cannot say that the permit "*would* interfere" with the NAAQS. 42 U.S.C. § 7410(*l* ) (emphasis added). Indeed, it is impossible for the PCP Standard Permit to cause interference with the NAAQS, provided that we assume, as we ought, that Texas will enforce this provision of its own regulations. *See City of Seabrook, Tex. v. EPA,* 659 F.2d 1349, 1367 (5th Cir.1981) (admonishing that the "EPA could assume [that the] state would implement [its regulations and if it] fails to do so, then either the EPA or a concerned citizen may bring an enforcement action").

Nor can we accept the EPA's argument that its "similar source" requirement is an applicable provision of the Act. First, the "similar source" requirement finds no purchase in the text of any applicable provision of the Act. *See* § 7410(a)(2)(C) (each SIP minor NSR program need only "include ... regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that [the NAAQS] are achieved"). [10] In addition, the inclusion of a "similar source" requirement elsewhere in the Act is strong evidence that the requirement does not apply to minor NSR. Title V of the CAA, which governs operating permits, explicitly imposes a "similar source" limitation. *Compare* § 7661c(d) (operating permit rules) *with* § 7410 (containing the requirements for minor NSR); *see Keene Corp. v. United States,* 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) (" '[W]here Congress includes particular language in one section of a statute but omits it in another ..., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' ") (quoting *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)). Finally, the structure of the CAA militates against reading an extra-statutory requirement into the Act's limitations on state discretion. Because the states enjoy "wide discretion" in implementing the Act, the imposition of newfound

restrictions upsets the Act's careful balance between state and federal authority. *Union Elec. Co.,* 427 U.S. at 250, 96 S.Ct. 2518; *see also Fla. Power & Light Co.,* 650 F.2d at 587 ("The great flexibility accorded the states under the Clean Air Act is ... illustrated by the sharply contrasting, narrow role to be played by EPA."). This structural principle applies with special force in this case because, as previously discussed, the Act imposes only **\*930** the most minimal of requirements on minor NSR.

 **[20]** Because the so-called "similar source" requirement is neither necessary to safeguard the NAAQS nor warranted by any applicable provision of the Act, we must conclude that the EPA's insistence upon it here was unjustified. Like the EPA's reliance on its interpretation of Texas law, its imposition of a "similar source" standard was arbitrary and capricious. *See State Farm,* 463 U.S. at 43, 103 S.Ct. 2856 (agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider"). The EPA's attempt to graft a "similar source" rule onto the applicable provisions of the CAA was also a violation of 5 U.S.C. § 706(2)(C), which requires reviewing courts to set aside agency action that is "in excess of statutory ... authority."

### C. "Replicability"

 **[21]** Petitioners further argue that the EPA lacked the authority to disapprove the PCP Standard Permit based on its view that the permit affords the TCEQ Director too much discretion under certain circumstances. The EPA took issue with this provision of the permit because, in the EPA's view, it does not include any "replicable" limits on how the Director is to exercise his discretion. In a different context, the EPA has defined "replicability" to mean "procedures [that] are sufficiently specific and nonsubjective so that two independent entities applying the procedures would obtain the same result." 57 Fed.Reg. 13,498, 13,568 (Apr. 16, 1992) (outlining guidelines for states when developing an overall SIP control strategy). The EPA's proposed disapproval expressed its objection as follows: "There are no replicable conditions in the PCP Standard Permit that specify how the Director's discretion is to be implemented." 74 Fed.Reg. at 48,476. The EPA explained in its final rule that one reason it was disapproving Texas's PCP Standard Permit is that it "lacks the requisite replicable standardized permit terms specifying how the Director's discretion is to be implemented for the case-by-case determinations." 75 Fed.Reg. at 56,447. Petitioners contend that the EPA's reliance on this rationale was impermissible because there is no applicable provision of the Act or the EPA's implementing regulations that requires

a state's minor NSR program to include replicable permit conditions. [11]

**\*931** Petitioners are correct. The EPA had no legal basis to demand "replicable" limitations on the Director's discretion. Not once in its proposed or final disapproval, or in its argument before this court, has the EPA pointed to any applicable provision of the Act or its regulations that includes a "replicability" standard. Moreover, the EPA cannot argue that the lack of replicable conditions would interfere with the NAAQS because, as we have explained, § 116.617(a)(3)(B) can only serve to protect the NAAQS. Thus, the EPA had no statutory basis under 42 U.S.C. § 7410(*l* ) to disapprove Texas's SIP revision because of "replicability" concerns.

 [22]    This straightforward conclusion is unaffected by the EPA's invocation of an agency policy document, entitled the "General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990." 57 Fed.Reg. 13,498 (Apr. 16, 1992) [hereinafter General Preamble]. The only portion of the rulemaking record that discusses the General Preamble is Section IV.A of the proposed rule, which begins with the heading: "What are the Requirements for EPA's Review of a Submitted *Major* NSR SIP Revision?" 74 Fed.Reg. at 48,471–72 (emphasis added). The EPA's discussion of the PCP Standard Permit appears pages later, in Section VII of the proposed rule, under the heading: "Does the Submitted PCP Standard Permit Meet the *Minor* NSR SIP Requirements?" *Id.* at 48,475–76. Thus, it is *post hoc* rationalization for the EPA now to argue that it relied on the General Preamble in concluding that § 116.617(a)(3)(B)—which indisputably applies only to minor sources —"lacks the requisite replicable standardized terms." 75 Fed.Reg. at 56,447 (final rule). We must disregard this *post hoc* rationale. *See Burlington Truck Lines,* 371 U.S. at 168–69, 83 S.Ct. 239. Moreover, even if we were to consider the 1992 General Preamble, it would not change our conclusion that the CAA does not impose a "replicability" standard on minor NSR. We do not owe *Chevron* deference to the General Preamble because, by its own terms, it does not carry the force of law. *See Mead,* 533 U.S. at 226–27, 121 S.Ct. 2164 (*Chevron* deference only due agency statutory interpretations "promulgated in the exercise of" the agency's delegated authority "to make rules carrying the force of law"). The General Preamble states unequivocally that it represents only the "EPA's preliminary interpretations, and thus do[es] not bind the States and the public as a matter of law." 57 Fed.Reg. at 13,498. Although *Skidmore* instructs us to defer to agency interpretations insofar as they

are persuasive, *see Mead,* 533 U.S. at 234–35, 121 S.Ct. 2164 (*Skidmore* deference due agency interpretations that do not qualify for deference under *Chevron*)*,* in our view the General Preamble's discussion of "replicability" does not reflect a persuasive interpretation of the provisions of the CAA applicable to minor NSR. As the State of Texas correctly observes in its reply brief, the General Preamble "does not expressly address Minor NSR SIP revisions" and was issued in response to CAA amendments "dealing with SIP requirements for *major* sources in nonattainment areas" (emphasis in original).

 **\*932** Like Texas law and the "similar source" limitation, "replicability" is not a legal standard that the Act authorizes the EPA to enforce when reviewing a state's minor NSR program. Thus, the EPA acted "in excess of statutory ... authority," and thereby violated 5 U.S.C. § 706(2)(C), by disapproving the PCP Standard Permit based on the want of replicable limitations in 30 Tex. Admin. Code § 116.617(a)(3)(B). Moreover, "replicability" was (yet another) "factor[ ] which Congress has not intended [the EPA] to consider," meaning the EPA's reliance on it was (yet again) arbitrary and capricious agency action. *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856.

### IV. CONCLUSION

This chapter in regulatory history has lasted almost two decades. Texas submitted its first two standard permits for PCPs to the EPA for approval in 1994. Texas made various amendments to these permits over the years, and promptly submitted each amendment to the EPA. The most recently amended version is the PCP Standard Permit at issue in this case. Despite an eighteen-month statutory deadline, the EPA did not take action on any of these submissions until September 15, 2010. At that late date, the EPA disapproved the PCP Standard Permit—submitted four and a half years earlier—based on its purported nonconformity with three extra-statutory standards that the EPA created out of whole cloth. Moreover, the EPA did this in the context of a cooperative federalism regime that affords sweeping discretion to the states to develop implementation plans and assigns to the EPA the narrow task of ensuring that a state plan meets the minimum requirements of the Act. The EPA applied these unauthorized standards to disapprove of a state program for projects that reduce air pollution and that, under the Act's plain terms, is subject to only the most minimal regulation.

Because the EPA waited until more than three years after the statutory deadline to act on Texas's submission, we order the EPA to reconsider it expeditiously. On remand, the EPA must limit its review of Texas's regulations to ensuring that they meet the minimal CAA requirements that govern SIP revisions to minor NSR, as set forth in 42 U.S.C. § 7410(a)(2)(C) and § 7410(*l* ). If Texas's regulations satisfy those basic requirements, the EPA must approve them, as § 7410(k)(3) requires. [12] That is the full extent of the EPA's authority in the SIP-approval process because that is all the authority that the CAA confers. *See La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)*

("[A]n agency literally has no power to act ... unless and until Congress confers power upon it.").

We VACATE the EPA's disapproval of **\*933** 30 Tex. Admin. Code §§ 116.610(a), 116.610(b), and 116.617 and REMAND with instructions that the EPA reconsider these regulations and approve or disapprove them most expeditiously.

**Parallel Citations**

74 ERC 1417

Footnotes

\*   Emilio M. Garza, Circuit Judge, concurs in the judgment only.

1   The CAA's requirements for major NSR differ depending on whether a region is designated "nonattainment," "attainment," or "unclassifiable." Part D of the Act, which governs nonattainment NSR, refers to "major stationary sources." 42 U.S.C. § 7502(c)(5). The Act defines that term as sources that have the potential to emit 100 tons or more of a regulated pollutant. § 7602(j). Part C of the Act, which applies the prevention of significant deterioration (PSD) program to attainment and unclassifiable regions, see § 7471, uses the term "major emitting facility." § 7475. The Act defines that term as certain specified types of stationary sources that have the potential to emit 100 tons or more of a regulated pollutant and all other stationary sources that have the potential to emit 250 tons or more of a regulated pollutant. § 7479(1). For convenience, the EPA refers to both statutory terms as "major sources." 74 Fed.Reg. 51,418, 51,421 n.11 (Oct. 6, 2009).

2   If a project's collateral emissions meet the threshold level for major NSR, it must obtain an individual permit pursuant to Texas's major NSR permitting program. 30 Tex. Admin. Code § 116.617(b)(1)(C) (incorporating § 116.610(b)).

3   Although somewhat counterintuitive, PCPs can fall within the bailiwick of the CAA's regulations because although the projects by definition reduce or maintain emissions of the primary pollutant, they have the potential to cause incidental increases in the emissions of other regulated pollutants.

4   The EPA took no action on 30 Tex. Admin. Code § 116.610(d). 68 Fed.Reg. at 64,547.

5   Petitioners are Luminant Generation Company, LLC; Oak Grove Management Company, LLC; Big Brown Power Company, LLC; Luminant Mining Company, LLC; Sandow Power Company, LLC; Texas Association of Business; Texas Association of Manufacturers; Texas Oil & Gas Association; Chamber of Commerce of the United States; and the State of Texas.

6   Nor could the EPA have lawfully treated Texas's SIP-approved standard permits program as a proxy for the CAA's requirements in this case, as the EPA suggested at oral argument. That the standard permits program meets the CAA's requirements does not mean that it supplants those requirements in the next case. It may be that the program passed CAA muster with flying colors, and that the PCP Standard Permit could likewise satisfy the Act even assuming, for argument's sake, that it does not meet the high standards of the standard permits program and is significantly less environmentally protective (assumptions that Petitioners vigorously dispute and that seem unlikely given that PCPs are, by definition, environmentally protective).

7   To the contrary, the EPA suggested in its final rule that the "similar source" standard derives from Texas law. *See, e.g.,* 75 Fed.Reg. at 56,444 ("Under the Texas Standard Permits Minor NSR SIP, an individual Standard Permit must be limited to new or existing similar sources."). Insofar as the "similar source" requirement reflects the EPA's interpretation of Texas law, imposition of it here is *ultra vires* for the reasons discussed above in Part III.A.

8   The EPA stated in its final disapproval that "[t]he memoranda cited in the proposal were cited for the purpose of providing documentary evidence of how EPA has exercised its *discretionary* authority when reviewing general permit programs similar to the Texas Standard Permits SIP." *Id.* (emphasis added). This statement reflects a misapprehension by the EPA of its authorized role in the SIP-approval process. As discussed above, the EPA does not possess any "discretionary authority" in that process. *See* 42 U.S.C. § 7410(k)(3). Only the states enjoy discretion in implementing the dictates of the CAA. *See, e.g., Union Elec. Co.,* 427 U.S. at 250, 96 S.Ct. 2518 ("Each State is given wide discretion in formulating its [SIP].").

9    We note that the interpretation advanced in the EPA's brief is not particularly persuasive because the agency's brief merely asserts, without any statutory analysis or support, that the "EPA properly ties the requirement that general permits be limited to similar sources to CAA section 110(a)(2) requirements that control measures be enforceable."

10   The EPA also argues that a "similar source" limitation is necessary to ensure enforceability. The only mention of enforceability in § 7410 is the requirement that SIPs "include enforceable emission limitations and other control measures ... as may be necessary or appropriate to meet the applicable requirements of this chapter." § 7410(a)(2)(A). However, the only requirement in this chapter applicable to minor NSR is that the SIP include "regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that [NAAQS] are achieved." § 7410(a)(2)(C). As explained above, the PCP Standard Permit necessarily meets this requirement because it is unavailable for any PCP that has even the potential to cause a breach of the NAAQS.

11   Petitioners also point out that the lack of "replicable" conditions is not problematic here because the permit only grants the Director the discretion to require *more* of registrants if he is concerned that a registration will threaten public health or the NAAQS. The provision at issue states: "This standard permit must not be used [if] the executive director determines there are health effects concerns or the potential to exceed a [NAAQS] ... until those concerns are addressed by the registrant to the satisfaction of the executive director." 30 Tex. Admin. Code § 116.617(a)(3)(B). We confess that we are at a loss to comprehend the EPA's concern. Subsection 116.617(a)(3)(B) in no way jeopardizes the NAAQS. Instead, it safeguards them. It provides a safety valve procedure whereby, in the event a registration should present even the potential of threatening the NAAQS or public health, the Director is authorized to intervene and require the registrant to take additional steps to protect air quality.

> Moreover, the EPA's concern about the Director's discretion is especially perplexing in light of its approval, just seven months before it disapproved Texas's PCP Standard Permit, of similar Georgia regulations that are less environmentally protective and afford the Georgia director far greater discretion than the Texas Director. *See* 75 Fed.Reg. 6,309 (Feb. 9, 2010) (approving Ga. Comp. R. & Regs. 391–3–1–.03(6)(j) into Georgia's SIP). Georgia's regulations *exempt* PCPs from minor NSR construction permitting. Ga. Comp. R. & Regs. 391–3–1–.03(6)(j). The EPA approved this provision because it "applies to minor sources only." 75 Fed.Reg. at 6,312. So too does Texas's PCP Standard Permit. 30 Tex. Admin. Code § 116.617(b)(1)(C). The Georgia director has discretion whether or not to require certain ongoing monitoring and reporting requirements. *See* Ga. Comp. R. & Regs. 391–3–1–.03(2)(c) ("As a condition for the issuance of an operating permit, the Director may require the applicant to conduct performance tests and monitoring and provide reports concerning operations."). By contrast, Texas's detailed reporting, recordkeeping, and monitoring requirements are mandatory. *See* 30 Tex. Admin. Code §§ 116.617(b)(1), 116.617(e).

12   It is difficult to conceive, and the EPA has not suggested, how it could disapprove the PCP Standard Permit under the appropriate statutory factors. The provisions of the CAA that apply to minor NSR require state regulation only insofar as is necessary to assure achievement of the NAAQS, see 42 U.S.C. §§ 7410(a)(2)(C), 7410(*l* ), and Texas's regulations provide that "[t]his standard permit must not be used to authorize [any PCP] that ... the [TCEQ] executive director determines [has] the potential to exceed a [NAAQS]." 30 Tex. Admin. Code § 116.617(a)(3)(B). In addition, we have already concluded that each of the EPA's grounds for disapproval was unlawful. Finally, when pressed at oral argument, the EPA was unable to identify any legal deficiency with the PCP Standard Permit—other than its supposed failure to meet the EPA's extra-statutory requirements that today we hold unlawful—despite the half decade the EPA has had to evaluate it. Nevertheless, we defer to the agency to reevaluate Texas's regulations in light of the proper CAA standards.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

663 S.W.2d 622
Court of Appeals of Texas,
Austin.

David MADDEN, et al., Appellants,

v.

TEXAS BOARD OF CHIROPRACTIC
EXAMINERS, Appellee.

No. 13790.    |    Dec. 21, 1983.
|    Rehearing Denied Jan. 11, 1984.

Applicant, who had applied to take state chiropractic licensure examination, and chiropractic college brought action for judicial review of State Board of Chiropractic Examiners' final order determining that applicant was not eligible to sit for the state board examination on ground that chiropractic college he had attended was not a bona fide reputable chiropractic school. The 98th Judicial District Court, Travis County, Charles D. Mathews, J., affirmed the Board's final order, and applicant and chiropractic school appealed. The Court of Appeals, Powers, J., held that: (1) applicant was denied due process of law by manner in which Board determined he was ineligible to take examination administered by the Board, and (2) applicant was entitled, at minimum, to notice and opportunity to direct evidence and argument, in addition to cross-examination and object to contrary evidence, at whatever narrower issues of reliability, validity, and reputability were encompassed within new definition of "bona fide reputable chiropractic" school adopted by Board at hearing on Board's refusal to accept his application.

Reversed and remanded with instructions.

**Attorneys and Law Firms**

**\*623**  Gerald H. Beckman, Huertz, Beckman & Rodriguez, Corpus Christi, for appellants.

Mark White, Atty. Gen., Eva King Loutzenhiser, Asst. Atty. Gen., for appellee.

Before SHANNON, POWERS and BRADY, JJ.

**Opinion**

POWERS, Justice.

David Madden and the Sherman College of Straight Chiropractic appeal a trial-court judgment that affirms a final order issued by the Texas State Board of Chiropractic Examiners. The order denies Madden permission to take a licensing examination administered by the Board. We will reverse the judgment below and order that the proceedings be remanded to the Board.

**THE REGULATORY STATUTE**

The Board regulates the practice of "chiropractic" as that word is defined in § 1 of the statute. Tex.Rev.Civ.Stat.Ann. art. 4512b (Supp.1982). Under § 5a of the statute, only individuals licensed by the Board may lawfully practice chiropractic. Section 10 requires that the Board administer an examination to "[a]ll applicants ... not otherwise licensed ...," of which class Madden is a member. The applicant must, under § 10, "successfully pass" the examination before he may receive a license. To be admitted to the examination, the applicant must be a citizen of the United States and present to the Board "satisfactory evidence" showing: (a) he is over age eighteen and of good moral character; (b) he has completed sixty semester hours of college courses at an institution other than a chiropractic school; and (c) he is a graduate of a "bona fide reputable chiropractic" school having "entrance requirements and [a] course of instruction ... as high as those of the better class of chiropractic schools in the United States ...." A "reputable chiropractic school," it is said in § 10,

> shall maintain a resident course of instruction equivalent to not less than four (4) terms of eight (8) months each, or a **\*624** resident course of not less than the number of semester hours required by The University of Texas for the granting of a Bachelor of Arts degree; shall give a course of instruction in the fundamental subjects named in Section 12 of [the] Act; and shall have the necessary teaching force and facilities for proper instruction in all of said subjects.

Section 10 of art. 4512b also provides that "[t]he Board is authorized to adopt and enforce rules of procedure not inconsistent with the statutory requirements" applicable to the licensing of new practitioners. Section 4(d) requires

the Board to "adopt guidelines for educational preparation and acceptable practices for all aspects of the practice of chiropractic." Section 14a authorizes the Board to exclude from its examinations any person who fails to comply with art. 4512b, including the provisions of § 10 which relate to educational preparation.

 **[1]**    Finally, § 14(f) provides that "[i]f the Board proposes to refuse a person's application for a license, ... the person is entitled to a hearing before the Board." While this provision is unenlightening for the reason that it does not specify the issues to be considered and determined in such "hearing," it does imply an adjudicatory hearing, invoking the provisions of the Texas Administrative Procedure and Texas Register Act (APTRA), Tex.Rev.Civ.Stat.Ann. art. 6252–13a (1982) relative to contested cases and their judicial review. *See* APTRA § 18(a).

### THE CONTROVERSY

The record reveals that Madden wrote the Board on September 10, 1979, stating that he would soon graduate from the Sherman College of Straight Chiropractic and that he wished to take the examination administered by the Board, for which he requested the necessary application form. The Board replied that he was not eligible to take the examination because the Board "does not recognize credits from Sherman College of Straight Chiropractic" as being sufficient to meet the "entrance requirements for taking the licensure examinations given by the Board." In a subsequent letter to Madden, the Board explained further that it "only accepts credits from those Chiropractic colleges which are accredited by the Counsel [sic] on Chiropractic Education" and that the Board had determined that Sherman College of Straight Chiropractic was not accredited by that body. It is undisputed that Sherman College of Straight Chiropractic is not accredited by "the accrediting Commission of the Council on Chiropractic Education ...." The Board's position in the matter was dictated by its rule adopted June 11, 1975, which reads as follows:

> All applicants for licensure who have matriculated in a chiropractic college after October 1, 1975 must present evidence of having graduated from a chiropractic college having status [sic] with the accrediting commission of the

Council on Chiropractic Education or the equivalent thereof.

Madden and Sherman College of Straight Chiropractic sued the Board in a district court of Travis County, seeking various forms of relief against the Board's decision refusing Madden admission to the examination. An agreed judgment was evidently rendered in the case, requiring the Board to abrogate its rule of June 11, 1975 and requiring, in addition, a hearing as to whether Madden's chiropractic education qualified under the more general standards of art. 4512b, § 10—specifically whether Sherman College of Straight Chiropractic was a "bona fide reputable chiropractic school" within the meaning of that section.

The Board conducted an evidentiary hearing in Austin, Texas, on September 26, 1981, following which the Board issued its final order dated November 7, 1981. The order sets forth thirty-five findings of fact and two conclusions of law. The Board's conclusions of law read as follows:

> 1. A chiropractic college must either show accreditation by an accrediting body viewed as reliable by the Board or show a valid reason why such accreditation cannot be obtained and otherwise give proof **\*625** of reputable status in order to be a bona fide and reputable school for the purposes of Section 10, Article 4512b, V.A.C.S.

> 2. Sherman College of Straight Chiropractic located in Spartanburg, South Carolina, is not a bona fide reputable school as that term is used in Section 10, Article 4512b, V.A.C.S., and defined by the Board, and therefore, it is

> ORDERED that David Madden a Sherman College graduate, is not eligible to sit for the state board examination.

Madden and the College attacked the Board's final order by a motion for rehearing and an amended motion for rehearing filed in the agency. The latter was not acted upon and therefore overruled by operation of law. APTRA § 16(e).

Madden and the College sued in a Travis County district court for judicial review of the Board's final order, setting forth many contentions that the Board's decision violated various statutes applicable to the proceedings in the agency. These generally revolve around the contention that the Board was not permitted to use the examination provisions of art. 4512b as a means of implementing its philosophy that a particular branch or doctrine of chiropractic was superior to another

—in this instance that the "mixer" doctrine of chiropractic was superior to that of "straight" chiropractic, the difference between the two doctrines being primarily a difference as to the proper scope allowed chiropractic practitioners in the matter of diagnosis. [1] The district court affirmed the Board's final order based upon that court's finding that the order "is reasonably supported by substantial evidence and is in all respects valid, legal and proper." This appeal ensued.

## HOLDING AND DISCUSSION

[2] In the amended motion for rehearing filed by Madden and the College in the Board proceedings, and in their suit for judicial review in district court, they contended, as they do here, that Madden was denied due process of law in violation of the Fourteenth Amendment to the Constitution of the United States. We hold that Madden was denied due process of law owing to the manner in which it was determined that he was ineligible to take the examination administered by the Board.

[3] The provisions of the Fourteenth Amendment apply to the exercise of state power through an administrative tribunal having jurisdiction over the rights or privileges of a licensed occupation. *Rector v. Texas Alcoholic Beverage Commission,* 599 S.W.2d 800 (Tex.1980); *Francisco v. Board of Dental Examiners,* 149 S.W.2d 619 (Tex.Civ.App.1941, writ ref'd).

The Board having abrogated its rule of June 11, 1975, Madden's hearing was ostensibly to be determined under the general standards of art. 4512b, § 10, including the broad issue of whether his college was a "bona fide reputable chiropractic" school having the minimum curriculum requirements specified in the section. At the conclusion of Madden's case, however, the Board first assigned meaning to the statutory term "bona fide reputable chiropractic" **\*626** school: the school must be accredited "by an accrediting body viewed as reliable by the Board"; or a valid reason must be shown "why such accreditation cannot be obtained," coupled with proof that the school "is otherwise ... of reputable status." That is the meaning we derive from the Board's first conclusion of law. It has not been suggested to us that the Board was unable for some reason to formulate the controlling definition *before* commencement of Madden's case so that the hearing which followed would have meaning.

[4] [5] The Board possesses both rule-making and adjudicatory powers. Art. 4512b, §§ 4(a), 14(f). The Board was therefore arguably free in its informed discretion to announce and apply the new definition in an *ad hoc* adjudicative proceeding rather than by promulgation of a general rule through an exercise of its rule-making power. *SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947); *State Bd. of Ins. v. Deffebach,* 631 S.W.2d 794, 799 (Tex.Civ.App.1982, writ ref'd n.r.e.). [2] The Board's action in assigning the new meaning to the term "bona fide chiropractic" school nevertheless raised the question of fundamental fairness for that new meaning was applied for the first time to Madden in the decision in his contested case and as the sole basis for denying him entrance to the examination. [3]

[6] [7] Among the elements of procedural due process of law are *notice* and *hearing. City of Houston v. Fore,* 412 S.W.2d 35, 37 (Tex.1967). These elements have a well-understood meaning of their own. To be meaningful, "notice" and "hearing" require *previous* notice and a hearing *relative to* the issues of fact and law which will *control the result* to be reached by the administrative **\*627** tribunal. *Morgan v. United States,* 304 U.S. 1, 18–19, 58 S.Ct. 773, 776–77, 82 L.Ed. 1129 (1938) ("Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be *fairly advised* of *what* the Government proposes and to be heard *upon its proposals before it issues its final command.*" (emphasis added)); *Gonzales v. United States,* 348 U.S. 407, 413, 75 S.Ct. 409, 412, 99 L.Ed. 467 (1955) (In order that a selective service registrant may effectively present his case before the appeal board of the service, he "must be cognizant of all the facts before the Board as well as the overall position of the Department of Justice" in opposition to his claim, and apprising him of these matters after the decision, but before he is required to file a motion for rehearing, comes too late.) These elements of fundamental fairness were particularly undermined in Madden's case by the essentially subjective and undefined terms of the controlling definition ultimately settled upon by the Board in its final order: "an accrediting body *viewed as reliable by the Board* "; "a *valid* reason why such accreditation cannot be obtained"; "and *otherwise* give proof of *reputable* status." (emphasis added).

[8] The emphasized words and phrases imply the greatest range of legal and factual possibilities and Madden was entitled, at minimum, to notice and an opportunity to direct evidence and argument at whatever narrower issues

of reliability, validity, and reputability were encompassed within those words and phrases since they were to be the controlling issues of fact and law in his case. Similarly, he was entitled to test by cross-examination any contrary evidence and to make objections to its admissibility if that were dictated by the nature of the evidence and the context made by the controlling issues. "Opportunity must be afforded all parties to respond and present evidence and argument on all issues involved." APTRA § 13(d). This is more than a statutory requirement; it expresses the constitutional guaranty of fundamental fairness implicit in the concepts of "notice" and "hearing."

We reverse the final order of the Board and the judgment of the district court. The cause is remanded to the district court with instructions that it be remanded to the Board for proceedings not inconsistent with this opinion.

**Parallel Citations**

15 Ed. Law Rep. 1376

Footnotes

1    Among allegations made by Madden and the College were their charges that the Board had unlawfully delegated to the accrediting commission of the Council on Chiropractic Education the Board's power to determine what schools were "bona fide reputable chiropractic schools" under art. 4512b, § 10; that the Board's abrogation of its previous rule was "cosmetic only" and that the Board continued unfairly and subjectively to apply its terms to Madden's case; that the Board's refusal to allow Madden to take the examination was arbitrary, capricious, unreasonable, and in deprivation of Madden's constitutional rights; and that the result of the Board's adoption of the "mixer" branch or doctrine of chiropractic effectuates a systematic violation of the laws of the State of Texas governing the practice of chiropractic, for the permissible scope of diagnosis allowed chiropractic practitioners under those laws is that consistent with "straight" chiropractic and contrary to that of "mixer" chiropractic.

Madden and the College prayed for the following relief: that the final order of the Board be set aside; that the College be "recognized" as a "bona fide, reputable school of chiropractic"; that Madden be permitted to take the examination; that the Board be enjoined "from engaging in any dilatory tactics to delay the effect of the relief granted" in the court's final judgment; and, for general relief.

2    The following quotation from *Chenery,* 332 U.S. at 202, 67 S.Ct. at 1580 briefly summarizes the applicable principles:

Since the Commission, unlike a court, does have the ability to make new law prospectively through the exercise of its rule-making powers, it has less reason to rely upon ad hoc adjudication to formulate new standards of conduct within the framework of the [constitutive] Act. The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise.... Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

Hence we refuse to say that the Commission ... was forbidden from utilizing this particular proceeding for announcing and applying a new standard of conduct.... That such action might have a retroactive effect was not necessarily fatal to its validity. Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency .... (citations omitted)

*See also* 1 F. Cooper, State Administrative Law, 177–85 (1965), discussing the circumstances when the agency's choice to proceed by *ad hoc* adjudication may constitute an "abuse of discretion" under statutes such as APTRA. The matter is not raised by Madden and the College in the present case; however, the foregoing principles should not be confused with an issue they do raise, and that is the issue of due process of law within a contested-case context once the choice is made by the agency to proceed on that basis.

3    We may in this instance evaluate the Board's final order solely upon the basis stated therein for its refusal to admit Madden to the examination—that his graduation from Sherman College of Straight Chiropractic did not satisfy the statutory requirement that he graduate from a "bona fide reputable chiropractic" school.

[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*SEC v. Chenery Corp., supra,* 332 U.S. at 196, 67 S.Ct. at 1577.

**End of Document**                                             © 2015 Thomson Reuters. No claim to original U.S. Government Works.

70 S.W.3d 261
Court of Appeals of Texas,
San Antonio.

MASS MARKETING, INC. d/
b/a Super S Foods, Appellant,
v.
Josie GAINES, Appellee.

No. 04–00–00578–CV.    |    Dec. 26, 2001.

Customer brought slip and fall action against store. The 81st Judicial District Court, Frio County, Olin B. Strauss, J., entered judgment on a jury verdict that awarded customer $65,000.00. Store appealed. The Court of Appeals, Catherine Stone, J., held that evidence was sufficient to find that store had actual or constructive knowledge of dangerous condition in store, which consisted of presence of one or two grapes on floor.

Affirmed.

Tom Rickhoff, J., dissented and filed an opinion.

**Attorneys and Law Firms**

 **\*262** Rinaldo J. Gonzalez, Law Offices of Rinaldo J. Gonzalez, san Antonio, for Appellant.

Stephen F. White, Mark E. Macias, White & Davis, P.C., San Antonio, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice, CATHERINE STONE, Justice.

**OPINION**

CATHERINE STONE, Justice.

Mass Marketing, Inc. d/b/a Super S Foods (Super S Foods) appeals the trial court's judgment in Josie Gaines's premise liability suit. After she slipped and fell in the Super S Foods store, Gaines brought a negligence suit against Super S Foods; the jury awarded damages of $65,000.00. Super S Foods contends there is no evidence to support the jury's finding and the trial court erred in overruling its motions for a directed verdict, judgment notwithstanding the verdict, and new trial. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Gaines slipped and fell on one or two grapes in a Super S Foods store in Dilley, **\*263** Texas. [1] The area where she slipped was a high traffic area of the store. Gaines testified that before she slipped on the grapes, they were green and undamaged. Gaines also stated that the grapes did not appear to have been smashed or walked on prior to her fall, and she did not believe that any Super S Foods employees were aware of grapes on the floor prior to her fall. Gaines acknowledged that the grapes she slipped on could have been on the ground for only a few seconds before she fell.

Moments before Gaines fell, store manager Manuel DeLeon was assisting a female customer with her groceries. The customer had a child sitting in the shopping cart eating grapes out of a bag. The grapes were hanging out of the bag, but DeLeon saw no grapes fall to the ground. After bagging the female customer's groceries, DeLeon moved her basket and "glanced" to see if any grapes were on the floor. He saw no grapes. After assisting the customer to her car, DeLeon returned and looked at the floor two more times for the presence of any grapes. DeLeon stated that he "glanced" three times to check for any presence of fallen grapes. DeLeon testified that his use of the word "glance" is synonymous with looking for a reasonable amount of time.

Also present before the fall was the cashier, Evarista Esqueda. Esqueda testified that she remembered the customer and her child eating grapes. Esqueda never saw a grape on the ground prior to Gaines' fall. While Esqueda stated that the grape was "probably" dropped by the child, she did not see any fall. No witnesses testified that they had seen or were aware of any grapes on the floor.

**ANALYSIS**

 **[1]    [2]**    To recover in a premise defect case, a plaintiff must establish:

> (1) Actual or constructive knowledge of some condition on the premises by the owner/operator;
>
> (2) that the condition posed an unreasonable risk of harm;

(3) that the owner/operator did not exercise reasonable care to reduce or eliminate the risk; and

(4) that the owner/operator's failure to use such care proximately caused the plaintiff's injuries.

*Keetch v. Kroger Co.,* 845 S.W.2d 262, 264 (Tex.1992). Super S Foods argues there is insufficient evidence to support the jury's finding that Super S Foods had actual or constructive knowledge of the dangerous condition in the store. Gaines was an invitee on Super S Foods's property. Super S Foods owed Gaines a duty to exercise ordinary care to protect her from risks of which Super S Foods was actually aware, and also from risks that it should have been aware of after a reasonable inspection. *Motel 6 G.P., Inc. v. Lopez,* 929 S.W.2d 1, 3 (Tex.1996) (per curiam). Constructive knowledge can be found if a reasonably careful inspection would have revealed an unreasonable risk. *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 295 (Tex.1983).

### Standard of Review

**[3]** **[4]** The standard for reviewing legal sufficiency is well-established. In determining if there is legally sufficient evidence, we review all the evidence in the light most favorable to the verdict and indulge every reasonable inference in favor of the verdict. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). **\*264** A no evidence challenge will be sustained if:

(a) there is a complete absence of evidence of a vital fact;

(b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact;

(c) the evidence offered to prove a vital fact is no more than a mere scintilla; or

(d) the evidence conclusively establishes the opposite of the vital fact.

*Id.* (*citing* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)).

**[5]** If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge must fail. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). There is less then a scintilla of evidence when the evidence "is so weak as to do no more than create a mere surmise or suspicion" of a

vital fact. *Id.* There is more than a scintilla of evidence if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner,* 953 S.W.2d at 711 (quotation omitted).

### Evidence of Actual or Constructive Knowledge

**[6]** DeLeon testified that he looked three separate times to see if grapes had fallen. Gaines argues that the inspection was not done reasonably. Based on the evidence presented, the jury reasonably inferred that the child eating grapes at the supermarket checkout line dropped the grape that Josie Gaines ultimately slipped on. The testimony of Evarista Esqueda and Manuel DeLeon establishes that this child was in the checkout line just a few brief minutes before Gaines proceeded through the checkout line. There is no testimony that any other customer purchased grapes in the few intervening moments before Gaines fell. This state of the evidence establishes that it was more likely than not that the grape fell on the floor some point while (1) the child was eating the grapes, or (2) the checkout clerk, Esqueda, took the open bag of grapes from the child, weighed the grapes on the scale, re-bagged the grapes, and then placed them in the shopping cart. This testimony establishes more than just a mere possibility of how long the grape was on the floor; it establishes more likely than not that the grape was on the floor just a few brief moments.

The question then becomes whether a few brief moments was a sufficient amount of time to charge Super S with notice. In this case, it was. Both DeLeon and Esqueda saw the child eating the grapes as the grapes dangled out of the bag. Both DeLeon and Esqueda were aware of the danger posed by the presence of any grapes on the floor. Indeed, knowledge of this potential danger is why DeLeon "glanced" at the floor. The jury was free to judge DeLeon's credibility and take his testimony at face value when he stated that he "glanced" at the floor several times and found no grapes. The jury could have believed that DeLeon did not look for a reasonable amount of time for any grapes on the floor. Rather, the jury could have determined that on this busy day when DeLeon was called to the front checkout line to help bag groceries, he merely "glanced" at the floor—he merely took "a quick or cursory look." WEBSTER'S COLLEGIATE DICTIONARY 519–20 (9th ed.1991). The jury evidently found that DeLeon's cursory look was insufficient, and there is more than a scintilla of evidence to support their conclusion.

Accordingly, we overrule the point of error and affirm the trial court's judgment.

Dissenting opinion by TOM RICKHOFF, Justice.

**\*265** TOM RICKHOFF, Justice, dissenting.

Because the "circumstantial evidence [ ] relied upon to prove constructive notice" did not establish "that it is more likely than not that the dangerous condition existed long enough to give [Super S Foods] a reasonable opportunity to discover the condition," I respectfully dissent from the majority's holding to the contrary. *Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (1998). The evidence in the record reveals that none of the witnesses had seen or were aware of any grapes on the floor prior to the time Gaines fell. In addition, there is very little circumstantial evidence to show how long the grapes were actually on the floor. It is clear, from the record, that the grapes were neither smashed nor soiled with dirt, which tends to show that the grapes were probably not on the ground very long. Furthermore, even if the grapes had been damaged, the Texas Supreme Court has held that such evidence alone is insufficient to show how long the grapes had been on the floor. *Gonzalez,* 968 S.W.2d at 937 (citing *H.E. Butt Grocery Co. v. Rodriguez,* 441 S.W.2d 215, 217 (Tex.Civ.App.—Corpus Christi 1969, no writ)(holding that testimony that the grape on which plaintiff slipped was squashed and muddy, that the floor was dirty, and that pieces

of paper were strewn around nearby was no evidence that the grape had been on the floor long enough to charge the store with notice)); *see also H.E. Butt Grocery Store v. Hamilton,* 632 S.W.2d 189, 191 (Tex.App.—Corpus Christi 1982, no writ)(holding that testimony that grapes were stepped on and that the juices from both red and green grapes had blended together was no evidence of how long the grapes were on the floor).

In summary, it was Gaines's burden to demonstrate that "it was more likely than not" that the grapes had been on the floor long enough to charge Super S Foods with notice. However as in *Gonzalez,* "the circumstantial evidence ... supports only the possibility that the dangerous condition existed long enough to give [Super S Foods] a reasonable opportunity to discover it." *Gonzalez,* 968 S.W.2d at 936. "This rule, while harsh and demanding on plaintiffs, is nevertheless well established and plaintiffs must always discharge the burden of proving that the dangerous condition was either known to the defendant or had existed for such a length of time that he should have known it." *Id.* at 938 (quoting *Henderson v. Pipkin Grocery Co.,* 268 S.W.2d 703, 705 (Tex.Civ.App.—El Paso 1954, writ dism'd w.o.j.)). Accordingly, I find that there is insufficient evidence from which the jury could have inferred that the grapes were on the floor long enough for Super S Foods to have had a reasonable opportunity to discover them.

Footnotes

1     There is some conflicting testimony in the record involving how many grapes Josie Gaines slipped on. Gaines testified that she slipped on two of four or five grapes on the floor. The store manager and checker stated there was only one grape.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

651 F.2d 414
United States Court of Appeals,
Fifth Circuit.

MITCHELL ENERGY CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

No. 80-1166.  |  July 24, 1981.

Gas producer petitioned for review of Federal Energy Regulatory Commission order refusing to declare that certain natural gas was not dedicated to interstate commerce, and instead directing producer to apply for authority to abandon interstate service. The Court of Appeals, Henderson, Circuit Judge, held that Commission failed to adequately explain its reasons, requiring remand for further consideration.

So ordered.

## Attorneys and Law Firms

**\*415**  Morgan, Lewis & Bockius, Frank P. Saponaro, Jr., Washington, D. C., for petitioner.

Jerome Feit, Jane C. Murphy, Joanne Leveque, Attys., F. E. R. C., Washington, D. C., for respondent.

Petition for Review of An Order of the Federal Energy Regulatory Commission (Texas Case).

Before HENDERSON, ANDERSON and SAM D. JOHNSON, Circuit Judges.

## Opinion

HENDERSON, Circuit Judge.

Mitchell Energy Corporation (hereinafter referred to as "Mitchell") petitions for review of a Federal Energy Regulatory Commission [1] order refusing to declare that certain natural gas was not dedicated to interstate commerce, and instead directing Mitchell to apply for authority to abandon interstate service. We do not now decide whether the gas in question is dedicated. We agree that the Commission failed to adequately explain its reasons, and therefore remand the case for further consideration. Before probing into the Commission's duty to engage in reasoned decision making

it would be helpful, by way of background, to briefly summarize the meaning of dedication under the Natural Gas Act and the operative facts of this case.

Under s 7(c) of the Natural Gas Act (15 U.S.C.A. s 717f(c)), producers who sell natural gas to pipelines for resale in interstate commerce must obtain a certificate of public convenience and necessity from the Federal Energy Regulatory Commission. Section 7(b) of the Act (15 U.S.C.A. s 717f(b)) obligates these producers to continue supplying gas in the interstate market until the Commission authorizes an "abandonment." United Gas Pipe Line Co. v. McCombs, 442 U.S. 529, 531, 99 S.Ct. 2461, 2463, 61 L.Ed.2d 54, 59 (1979) (footnotes omitted); accord Harrison v. FERC, 567 F.2d 308, 310 (5th Cir. 1978). [2] See generally California v. Southland Royalty Co., 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978); Sunray Mid-Continent Oil Co. v. FPC, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960); **\*416** Sun Oil Co. v. FPC, 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed.2d 1639 (1960); Falcon Petroleum v. FERC, 642 F.2d 780, 784-85 (5th Cir. 1981); Harrison; Gulf Oil Corp. v. FPC, 563 F.2d 588 (3d Cir. 1977), cert. denied, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978); Mitchell Energy Corp. v. FPC, 533 F.2d 258 (5th Cir. 1976); Vreeland v. FPC, 528 F.2d 1343 (5th Cir. 1976). The Commission has never authorized Mitchell to abandon interstate service so if the gas in dispute has ever been dedicated it is still dedicated. On the other hand, if the gas has not been dedicated Mitchell can put it into intrastate commerce without first procuring the Commission's approval. But cf. Mesa Petroleum Co. v. FPC, 441 F.2d 182 (5th Cir. 1971) (abandonment authority necessary even where no certificate).

In the early 1950's Natural Gas Pipeline Company (hereinafter referred to as "Natural") developed plans to extend its pipeline into Texas. [3] As part of these plans Natural entered into a long-term gas purchase agreement with numerous producers, including Oil Drilling, Inc. (hereinafter referred to as "Oil Drilling"), Mitchell's predecessor. The agreement "covered" all gas (except certain production, not here in issue, reserved for development and operation of the leases) from any wells located on the property described in the sellers' [4] leases, including after-acquired leases, in a defined geographic area of about 400,000 acres in and around Wise County, Texas. [5] Natural had the option to refuse to connect wells too far from its gathering lines or those producing only small quantities of gas. [6] If Natural rejected such a well,

the agreement provided for the release of the surrounding acreage. The controversy in this case involves gas from wells subject to the contractual release provision. [7]

Late in October of 1954, Natural, Oil Drilling and others applied to the Commission for certificates of public convenience and necessity authorizing construction of the pipeline and the gas sales. Oil Drilling's application asked for a certificate for the sale of gas to Natural under the agreement which was incorporated by reference. In 1956 the Commission ordered "(c) ertificates of public convenience and necessity be and the same are hereby issued to Oil Drilling (and others), authorizing the sale ... of natural gas in interstate commerce to Natural as set forth in their applications and in the record in these proceedings...." Natural Gas Pipeline Co., 16 FPC 81, 98 (1956), aff'd sub nom. Oklahoma Natural Gas Co. v. FPC, 257 F.2d 634 (D.C.Cir.), cert. denied, 358 U.S. 948, 79 S.Ct. 603, 3 L.Ed.2d 567 (1959). [8]

On April 28, 1978, Mitchell sought a Commission declaration that the gas from seventeen wells never connected by Natural, and thus impliedly rejected, was not dedicated to interstate commerce. The Commission denied the request for declaratory relief and ordered Mitchell to apply for permission to abandon the wells. Mitchell's application for reconsideration was denied when the Commission failed to act on its request. Mitchell then petitioned for review.

**\*417** The question before the Commission was whether the 1956 certificate covered gas from wells that were not connected by Natural, pursuant to its contract rights. If the gas was within the scope of the certificate, it was dedicated for purposes of the Natural Gas Act when service was initiated, see, e. g., Falcon, at 784, and remains so dedicated.

**[1]** By accepting a certificate of public convenience and necessity a gas company agrees to perform the service authorized therein, even if that service is not required by the underlying contract. Southland; Sunray; Sun Oil Co. But see NGPA s 2(18)(B)(iii), 15 U.S.C.A. s 3301(18)(B)(iii) (reversion's effect on dedication). The Commission is free to issue a certificate obligating an applicant to perform service exceeding that for which it sought authorization. Sunray. So, as the parties agree, the ultimate question is whether the certificate dedicated the gas. If it did, the gas is dedicated to interstate commerce regardless of the terms of the 1954 contract.

**[2]** **[3]** Although the certificate controls, the Commission oftentimes issues a certificate that simply authorizes the service described in the application, which, in turn, frequently simply requests authorization for the service required under the contract. See, e. g., Sun Oil Co., 364 U.S. at 175, 80 S.Ct. at 1391, 4 L.Ed.2d at 1642. In such cases the scope of the certificate can be ascertained only by examining the application, and perhaps the contract. Harrison; Gulf. It follows that in this case there are at least two arguable ways that gas subject to the contractual release provision was dedicated to interstate commerce. It could be said that the certificate dedicates all the gas described in the contract, cf. Southland, 436 U.S. at 527-28, 98 S.Ct. at 1959-60, 56 L.Ed.2d at 512-13 (ambiguity of "dedication"), and that the contract dedicates the gas involved here. This is the Commission's explanation before us. Alternatively one could urge that the certificate by its own terms included the gas. This approach, which does not require any reference to the terms of the contract or application, is apparently the basis of the order. [9]

**[4]** If the controlling law is comparatively simple, its application to the facts of this case is not so clear. Despite its duty to do so, the Commission did not articulate the theory supporting its determination, let alone explain its reasoning. See FPC v. Texaco, Inc., 417 U.S. 380, 395-96, 94 S.Ct. 2315, 2325-2326, 41 L.Ed.2d 141, 155 (1974); SEC v. Chenery Corp., 332 U.S. 194, 196-97, 67 S.Ct. 1575, 1577-1579, 91 L.Ed. 1995, 1999 (1947); 5 U.S.C.A. s 557(c). This perfunctory treatment of a complicated issue was improper, and it is apparent to us that the Commission failed to give meaningful consideration to Mitchell's contentions. We therefore remand to the Commission for the elaboration it should have provided in the first place. See 15 U.S.C.A. s 717r(b); 5 U.S.C.A. s 706.

**[5]** **[6]** Although it has been said many times and in many ways, we repeat

> a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

**\*418**  ... If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.

SEC v. Chenery Corp., 332 U.S. at 196-97, 67 S.Ct. at 1577-78, 91 L.Ed. at 1999; accord, Pitre Bros. Transfer, Inc. v. United States, 580 F.2d 140 (5th Cir. 1978). But cf. Bowman v. Arkansas-Best Freight, 419 U.S. 281, 285-86, 95 S.Ct. 438, 441-442, 42 L.Ed.2d 447, 456 (1974) (remand unnecessary if agency's rationale can be "discerned"); Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206, 1219 (1945) (same).

Because we hold that the Commission did not adequately explain the basis of its action, it is appropriate to reproduce here in its entirety the order's brief "Discussion."

The Commission does not agree with Mitchell's contention that the subject gas is not dedicated in interstate commence (sic) to Natural. Mitchell has commenced deliveries under its certificate from acreage covered by its contract with Natural. "The initiation of interstate service pursuant to the certificate dedicated all of the acreage which is subject to that certificate." "Once dedicated, there can be no withdrawal of that supply from continued interstate movement without Commission approval." "The service in which (a) producer engages is distinct from the contract which regulates his relationship with the transmission company...." Furthermore, "the obligation to serve the interstate market imposed by a certificate of unlimited duration can not be terminated by private contractual arrangements." Thus, all of the acreage covered by Mitchell's certificate is dedicated in interstate commerce to Natural. The certificate issued to Mitchell did not provide for pre-granted Section 7(b) authorization with respect to those wells subsequently released from the contract by the purchaser. Nor did the Commission either by the issuance of the certificate or the acceptance of the contract for filing as a rate schedule approve the contractual release provisions. Accordingly, Mitchell's service obligation can not be terminated unless Mitchell obtains Commission approval under Section 7(b).

It follows that the Commission must deny Mitchell's petition for a declaratory order.

Order at 3-4 (citations omitted). [10]

The several quotations are all correct statements of law, but are not in any way dispositive of our problem. The Commission had to decide whether the gas subject to the contractual release provisions was covered by the certificate. There is no question but that if it was, it is dedicated now. Omitting the inapposite portions then, the Commission's explanation of its conclusion that the certificate included the gas reduces to this:

The Commission does not agree with Mitchell's contention that the subject gas is not dedicated in interstate commence (sic) to Natural. Mitchell has commenced deliveries under its certificate from acreage covered by its contract with Natural. "The service in which (a) producer engages is distinct from the contract which regulates his relationship with the transmission group...." The certificate issued to Mitchell did not provide for pre-granted Section 7(b) authorization with respect to those wells subsequently released from the contract by the purchaser [11] Nor did the Commission either by the issuance of the certificate or the **\*419** acceptance of the contract for filing as a rate schedule approve the contractual release provisions.

It follows that the Commission must deny Mitchell's petition for a declaratory order.

[7]   This is simply not enough. The key to the order is the conclusional statement that "the Commission (did not) either by the issuance of the certificate or the acceptance of the contract for filing as a rate schedule approve the contractual release provisions." That is indeed the point, and this is the Commission's answer. However, while the Commission may interpret its certificates, it must give interested parties and reviewing courts at least some idea of the process of interpretation. SEC v. Chenery Corp.; Pitre Bros. The order says the certificate did not approve the release provision, yet it never discusses the contract, see FPC v. Texaco, Inc., 417 U.S. 380, 396, 94 S.Ct. 2315, 2325, 41 L.Ed.2d 141, 156 (1974), and the Commission's 1956 opinion, which doubled as the certificate, does not even mention the release clause. See note 8, supra.

Before us the Commission claimed that "the certificate covered all the acreage dealt with in Mitchell's contract with Natural," and "Mitchell's contract with Natural did not except from dedication the leases at issue here." This argument may be a strong one, but as far as we can tell the order construed

the certificate, not the contract. [12] The order does not focus on the contract and "we cannot 'accept appellate counsel's post hoc rationalizations for agency action'; for an agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.' " FPC v. Texaco, 417 U.S. at 397, 94 S.Ct. at 2326, 41 L.Ed.2d at 156 (citations omitted).

The Commission should have the opportunity to clarify its meaning.

The case is REMANDED to the Commission for further proceedings consistent with this opinion.

Footnotes

1   FERC assumed most of the duties of the Federal Power Commission on October 1, 1977. In this opinion the term "Commission" refers to one or the other agency, depending on the date of the action discussed.

2   The law in this area is by and large settled. This analysis of natural gas law is undertaken only to provide the background for our administrative law holding. We do not decide any open question on the underlying dedication issue. Any appearance to the contrary is inadvertent. Nor is it our purpose to make any conclusive interpretation of the contract and certificate involved in this case.

3   The Commission has never ruled on the truth of these facts, and even if its argument on the law eventually prevails, Mitchell has yet to prove the facts it alleges. Again, our discussion is by way of background. Should the proceedings require. The Commission is free to make whatever determinations of fact are appropriate.

4   The contract referred to all sellers collectively as "Seller."

5   The parties disagree on the meaning of this section of the contract.

6   The quantity of gas required of a well increased with its distance from Natural's planned facilities. The contract also provided for the release of depleted wells.

7   The parties apparently entered into a roll-over contract in 1977, and the Commission accepted it for filing in 1978. The Commission's order does not mention this contract, and the parties have not furnished us with a copy.

8   Two alternative pipeline proposals were before the Commission, and the order was addressed primarily to their relative merits. The Commission found it "appropriate to dispose briefly of such questions as arise in respect of the application( ) of ... Oil Drilling." 16 FPC at 90. The scope of the dedication was not considered.

9   This difference is critical to the scope of our review. The Commission's construction of its certificates is entitled to great weight and commensurate deference. Cf. Seaboard Coast Lie Railway Co. v. United States, 599 F.2d 650, 652 (5th Cir. 1979) (deference to ICC interpretation of merger conditions); Harrison, 567 F.2d at 311 (noting Commission's position). On the other hand, despite the Commission's "expertise and familiarity with natural gas contracts," Zachary v. FERC, 621 F.2d 155, 157 (5th Cir.), cert. denied, -- U.S. --, 101 S.Ct. 795, 66 L.Ed.2d 611 (1980), its interpretation of a contract or application is entitled to less weight, Harrison. But see Gulf, 563 F.2d at 616 n. 4 (Aldisert, J., dissenting) (Commission maintains that its interpretation of contracts also carries great weight).

10   The omitted citations do not remedy the want of explanation. Even so far as they support the propositions for which they are cited, they only say that once gas is dedicated to interstate commerce it stays dedicated. This is not in issue. Once again, our question more precisely the Commission's question is whether the gas was once dedicated.

11   As both parties note, "pregranted abandonment (authority) was contrary to Commission practice in 1956...." FERC brief at 17 n. 15.

12   In fact, the order's assertion that the 1956 certificate did not approve the release provisions suggests that the Commission read the contract (as opposed to the certificate) as not dedicating the gas.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

501 So.2d 438
Supreme Court of Alabama.

MOBILE COUNTY, a political subdivision of
and body corporate in the State of Alabama
v.
CITY OF SARALAND, Alabama,
a municipal corporation.

84-460.   |   Oct. 3, 1986.   |   As
Corrected on Denial of Rehearing Jan. 9, 1987.

County sought writ of mandamus to require city to grant county permit to install drainage pipe across right-of-way of city street. The Circuit Court, Mobile County, Telfair J. Mashburn, J., denied petition for writ, and county appealed. The Supreme Court, Almon, J., held that: (1) construction of drainage pipe was not prohibited by constitutional provision requiring permission of city for use of its streets for construction of public utility, as drainage pipe was not public utility; (2) city council's refusal to grant permit was arbitrary and capricious; and (3) mandamus was only remedy available to require city to grant permit.

Reversed and remanded.

Houston, J., concurred in result.

**Attorneys and Law Firms**

 **\*438**  James C. Wood and J. Randall Crane of Simon, Wood & Crane, Mobile, for appellant.

 **\*439**  Richard L. Thiry of Thiry, Maples & Bronson, Mobile, for appellee.

ALMON, Justice.

Mobile County appeals from an order of the circuit court denying its petition for a writ of mandamus directing the City of Saraland to grant Mobile County a permit to install a drainage pipe across the right-of-way of Bayou Sara Avenue. We reverse and remand to the circuit court of Mobile County for that court to issue an order granting the writ of mandamus.

The county requested a permit from Saraland pursuant to Saraland's ordinance providing for street excavation. The county sought the permit in order to install a drainage

pipe under Bayou Sara Avenue. The permit from Saraland is necessary to complete the county's drainage system to improve the Blackjack community, an unincorporated area of Mobile County. Blackjack is bordered on the north by the City of Satsuma, on the east by the City of Mobile, and on the south and west by the City of Saraland. The streets of Blackjack are unpaved, and the condition of the roads is deplorable as a result of the lack of drainage. The county, seeking to solve the drainage problem, secured a grant of $318,000.00 from the Department of Housing and Urban Development, which, when added to county funds, would pay the cost of the project. All that remains to be done in order for the county to proceed with the drainage project is a permit from Saraland to install a pipe under Bayou Sara Avenue. The county has permits from the City of Satsuma and the U.S. Army Corps of Engineers.

Meanwhile, prior to requesting a permit from Saraland to install the pipe under the street, the county asked the Saraland City Council to bring condemnation proceedings against the land needed for the project within Saraland city limits. When the city did not bring the condemnation proceeding, the county filed an action in December 1983 to condemn the right-of-way. The city resisted.

In March 1984, the probate court denied the county's application to condemn. No appeal was taken by the county. The county eventually purchased the land from the property owners within Saraland city limits. The county continued to negotiate with Saraland for street excavation and requested a permit pursuant to Saraland Ordinance 206. Section one of this ordinance provides that before any excavation can be done on a Saraland city street a permit must first be obtained from the *city clerk.* Section five provides that before any permit to excavate is granted a bond must be furnished in double the amount of the cost of the repairs necessary to return the street to its original condition. The county posted a sufficient surety bond pursuant to the ordinance.

Although the ordinance provides that a request for a permit shall be filed with the clerk, the county's request was addressed to the city council. However, no issue is made of this technicality.

Saraland maintained at the trial that it refused to issue a permit because of its concern with the impact of the drainage system on pollution and the flooding of Bayou Sara Creek. The mayor testified that the refusal was partly because of political pressure from the Saraland citizens. The county's engineers testified, however, that the drainage system would

reduce surface water pollution because it would help prevent the water table from rising.

After hearing the evidence, the trial judge made findings of fact and conclusions of law. First, the court held that the county had no legal right to the permit because the city had the absolute authority under Art. XII, § 220, Constitution 1901, to determine who may be granted a permit. Alternatively, the court held that to grant or deny a permit was within the discretion of the city council, and that the council did not abuse its discretion. Second, the court held that the county was not entitled to the writ of mandamus because it had other remedies, and that the county was attempting to use mandamus as a substitute for appeal. Third, the court affirmed the city's **\*440** defenses of res judicata, collateral estoppel, and laches.

Section 220, Constitution 1901, provides:

> "No person, firm, association, or corporation shall be authorized or permitted to use the streets, avenues, alleys, or public places of any city, town, or village for the construction or operation of any public utility or private enterprise, without first obtaining the consent of the proper authorities of such city, town, or village."

The trial court held that the county was a person or corporation, and further held that the proposed drainage system was a public utility. We do not agree that the proposed drainage pipe comes within the ambit of this section of the Constitution. Section 228 prohibits a city or town from granting a right to use its streets, etc., "for the construction or operation of water works, gas works, telephone or telegraph line, electric light or power plants, steam or other heating plants, street railroads, or any other public utility," for longer than 30 years. Similarly, Code 1975, § 37-4-1, defines "utility" for the Code chapter on "Public Utilities Other Than Transportation Companies or Motor Vehicle Carriers," including as the only arguably pertinent provision: "Any plant, property or facility for the supply, storage, distribution, or furnishing to or for the public of water for manufacturing, municipal, domestic or other uses." These provisions do not include drainage systems, which allow for the run-off of rainwater and are normally constructed and maintained by government entities; instead, the enumerated utilities are for

the furnishing of electricity, telephone service, gas, water, or steam, or transportation on the streets themselves, and are principally operated by private entities.

**[1]** None of the annotated cases interpreting any of these sections appears to involve a sewer or drainage system. Instead, § 220 has been held to govern the granting a franchise to use the city streets. *Crabtree v. City of Birmingham,* 292 Ala. 684, 299 So.2d 282 (1974), and cases cited therein. We conclude that the proposed drainage pipe is not a "public utility" within the meaning of § 220, and therefore that its construction cannot be prohibited by reference to this section of the Constitution of 1901. Cf. *Opinion of the Justices,* 263 Ala. 174, 81 So.2d 699 (1955), holding that a tunnel is not a utility for purposes of § 228.

**[2]** The trial court's alternative ground for denying the petition on its merits, that the city was within its discretion in denying the permit, must also fall. We find that the city council's refusal to grant the county a permit pursuant to the provisions of its Ordinance 206 was arbitrary and capricious. The county complied with all of the provisions of the ordinance. The city clerk testified that she routinely granted permits under the ordinance; that the applications for permits never went to the mayor; that the application filed by the county was the first to be denied since 1978, and she further testified that, had the application come to her initially, she would have issued the permit. The trial court held that the denial of the permit by the city was discretionary and that it did not abuse its discretion. We do not agree. The city had no flood plain management plan; it had no ordinance on the subject, and its decision appears not to have been based on any expert opinion. In fact, the city did not consult an expert until after the petition for mandamus was filed by the county. This Court stated in *Pritchett v. Nathan Rodgers Construction & Realty Corp.,* 379 So.2d 545 (Ala.1980), that mandamus will lie to order an official not to exercise his discretion in an arbitrary and capricious manner. Further, the Court stated that a city has the power to regulate for the protection of the health of its citizens, but that that power cannot be exercised arbitrarily. In *Pritchett* the Court found that the city was proceeding to grant or deny applications on an arbitrary case-by-case basis, as the City of Saraland appears to have done in this case.

**[3]** Contrary to contentions of the city, mandamus is the only remedy available to the county to prevent a failure of justice. The county has a clear right to improve the conditions of the Blackjack community. Drainage of the area is the first link

in the chain of improvement. The county should **\*441** not be denied that right for arbitrary reasons-particularly political pressure. In *Foshee v. State,* 210 Ala. 155, 97 So. 565 (1923), this Court held that a writ of mandamus could be used to prevent a failure of justice where there is a clear right and there is an absence of any other adequate remedy to correct the errors of an inferior tribunal. See *Katz v. Alabama State Board of Medical Examiners,* 351 So.2d 890 (Ala.1977).

We hold that the denial of the permit to excavate Bayou Sara Avenue was arbitrary and capricious. The trial court's order denying the writ is reversed, and the cause remanded. The writ is due to be granted.

REVERSED AND REMANDED.

TORBERT, C.J., and MADDOX, JONES, SHORES, ADAMS and STEAGALL, JJ., concur.

HOUSTON, J., concurs in the result.

### ON APPLICATION FOR REHEARING

PER CURIAM.

OPINION CORRECTED; APPLICATION OVERRULED.

TORBERT, C.J., and MADDOX, JONES, ALMON, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 34615363
Only the Westlaw citation is currently available.

NOTICE: NOT DESIGNATED FOR PUBLICATION.
UNDER TX R RAP RULE 47.7, UNPUBLISHED
OPINIONS HAVE NO PRECEDENTIAL
VALUE BUT MAY BE CITED WITH THE
NOTATION "(not designated for publication)."

OPINION
**Do not publish. Tex.R.App. P. 47.3(b).**
Court of Appeals of Texas,
Corpus Christi-Edinburg.

Kay B. MOFFITT, Appellant,
v.
TOWN OF SOUTH PADRE
ISLAND, Texas, Appellee.

No. 13-00-453-CV.   |   Nov. 1, 2001.

On appeal from the 107th District Court of Cameron County,
Texas.

**Attorneys and Law Firms**

Francisco J. Zabarte, for Kay B. Moffitt.

Paul Y. Cunningham, for Town of South Padre Island, Texas.

Before Chief Justice VALDEZ and Justices DORSEY and
RODRIGUEZ.

OPINION

Opinion by Chief Justice VALDEZ.

**\*1** Kay B. Moffitt requested the trial court to issue a writ
of mandamus ordering the Town of South Padre Island (the
"Town") to approve the replat and subdivision of Lot 1, Block
192, Fiesta Isles Subdivision, South Padre Island, Texas into
two single family residential lots. The trial court denied
her request for mandamus relief and dismissed her cause of
action. We affirm the decision of the trial court.

*Factual and Procedural Background*

Moffitt owns Lot 1, Block 192 of Fiesta Isles Subdivision
in South Padre Island, Texas, and has owned this property
for twenty-five to thirty years. It is one of only five lots
zoned as single-family residential lots on the beach in the
Town. The lot is located on the corner of Gulf Boulevard
and Sapphire Circle, and the rear of the lot faces the beach.
In November of 1999, Moffitt applied with the Planning and
Zoning Commission of the Town of South Padre Island (the
"Commission") for a proposed replat in order to subdivide
her property, putatively 100 feet wide, into two equal single
family residential lots.

The Commission published notice of Moffitt's proposed
replat, and gave neighboring realty owners written notice
under section 212.015 of the Texas Local Government
Code.*See*TEX. LOC. GOV'T CODE ANN. § 212.015
(Vernon 1999). After the hearing, the Commission denied the
requested replat on grounds that the resulting lots failed to
meet the minimum size required by the Town of South Padre
Island's Code of Ordinances (the "Code"). The proposed
replat was resubmitted to the Commission in December
of 1999, and again the Commission denied the replat.
Moffitt appealed the Commission's decision to the Board of
Aldermen, who also denied the replat. Moffitt then filed an
action in district court for mandamus or temporary injunction,
arguing that because her proposed replat met all requirements
of the Code and the Texas Local Government Code, the
approving authority had a ministerial duty to approve the
replat and did not have discretion to deny it. After an
evidentiary hearing, the trial court denied Moffitt's requested
relief, and this appeal ensued.

Moffitt presents three issues for review. She contends that
(1) there was no evidence or insufficient evidence to support
the trial court's finding of fact that the replat would not
meet the minimum square footage as required by section
20-6(c)(4) of the South Padre Island Code of Ordinances;
(2) the uncontroverted evidence or overwhelming evidence
established that the replat met all requirements of the South
Padre Island Code of Ordinances and section 212.010 of
the Texas Local Government Code, therefore, the trial court
should have found that the Town had a ministerial duty to
approve the replat; and (3) the trial court erred in denying
mandamus relief because the uncontroverted evidence or
overwhelming evidence established that the replat met all
requirements of the South Padre Island Code of Ordinances
and the Texas Local Government Code.

### Municipal Control of Plats and Subdivisions

**\*2** Under the Texas Local Government Code, a municipality's power to regulate subdivisions is broad. *See Elgin Bank of Texas v. Travis County,* 906 S.W.2d 120, 121-23 (Tex.App.-Austin 1995, writ denied)(comparing regulation powers of county and municipality). The governing body of a municipality may adopt rules governing plats and subdivisions of land within the municipality's jurisdiction to promote the health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful development of the municipality. TEX. LOCAL GOV'T CODE ANN. § 212.002 (Vernon 1999). The municipal authority approves a plat only if the plat conforms to the general plan of the municipality and its current and future streets, alleys, parks, playgrounds, and public utility facilities. *See* TEX. LOCAL GOV'T CODE ANN. § 212.010 (Vernon 1999). The plat must also conform to the general plan for the extension of the municipality, taking into account access to and extension of sewer and water mains and the instrumentalities of public utilities. *Id.* Further, the plat must conform to any rules adopted to promote the health, safety, morals, or general welfare of the municipality. *Id.* However, the municipal authority responsible for approving plats must approve a plat or replat that is required to be prepared under this subchapter and that satisfies all applicable regulations. TEX. LOCAL GOV'T CODE ANN. § 212.005 (Vernon 1999). The foregoing rules that govern the issuance of plats are equally applicable to replats. *See* TEX. LOCAL GOV'T CODE ANN. § 212.001 (Vernon 1999)(the definition of "plat" includes a replat).

### Mandamus

A writ of mandamus will issue to compel a public official to perform a ministerial act. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 793 (Tex.1991). An act is ministerial when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion. *Id.* Generally, mandamus will not issue to compel a public official to perform an act which involves an exercise of discretion. *Id.* However, mandamus may issue in a proper case to correct a clear abuse of discretion by a public official. *Id.*

If a landowner believes that a municipality's action is arbitrary, then it may obtain relief by mandamus or mandatory injunction. *Kirschke v. City of Houston,* 330 S.W.2d 629, 631 (Tex.Civ.App.-Houston [1st Dist.] 1959, writ ref'd n.r.e.)(refusal to issue building permit), *rev'd on other grounds, Austin v. Teague,* 570 S.W.2d 389, 394 (Tex.1978).

### Standard of Review

An action for a writ of mandamus initiated in the trial court is a civil action subject to appeal as any other civil suit. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 792 n. 1 (Tex .1991); *Dallas Area Rapid Transit v. Dallas Morning News,* 4 S.W.3d 469, 473 (Tex.App.-Dallas 1999, no pet.); *City of Beaumont v. Spivey,* 1 S.W.3d 385, 389 (Tex.App.-Beaumont 1999, pet. denied). In such actions, we review the trial court's findings of fact and conclusions of law in accordance with standards generally applicable to a trial court's findings and conclusions. *Anderson,* 806 S.W.2d at 794 n. 2; *Dallas Area Rapid Transit,* 4 S.W.3d at 473; *City of Beaumont,* 1 S.W.3d at 389; *Univ. Of Texas v. Texas Legal Found.,* 958 S.W.2d 479, 481 (Tex.App.-Austin 1997, no pet.). We review findings of fact for legal and factual evidentiary support, and we review conclusions of law de novo. *Dallas Area Rapid Transit,* 4 S.W.3d at 473; *City of Beaumont,* 1 S.W.3d at 389.

**\*3** While findings of fact have the same force and dignity as a jury's verdict upon jury questions, they are not conclusive when a complete reporter's record appears in the record, as here. *See Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994); *Tucker v. Tucker,* 908 S.W.2d 530, 532 (Tex.App.-San Antonio 1995, writ denied). If a reporter's record is filed, unchallenged findings of fact are binding on the appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696-97 (Tex.1986). The trial court's findings of fact are reviewed for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing the legal or factual sufficiency of the evidence supporting jury findings. *Autohaus, Inc. v. Aguilar,* 794 S.W.2d 459, 461 (Tex.App.-Dallas 1990, writ denied); *see Ortiz v. Jones,* 917 S.W.2d. 770, 772 (Tex.1996) (per curiam).

The legal conclusions of the trial court are not binding upon an appellate court; instead, the appellate court is free to draw its own legal conclusions. *See Pegasus Energy Group, Inc. v. Cheyenne Pet. Co.,* 3 S.W.3d 112, 121 (Tex.App.-Corpus Christi 1999, pet. denied); *Austin Hardwoods, Inc. v. Vanden*

*Berghe,* 917 S.W.2d 320, 322 (Tex.App.-El Paso 1995, writ denied). When reviewing the trial court's legal conclusions, we evaluate them independently, determining whether the trial court correctly drew the legal conclusions from the facts. *Dallas Morning News v. Bd. of Trs.,* 861 S.W.2d 532, 536 (Tex.App.-Dallas 1993, writ denied). Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Mack v. Landry,* 22 S.W.3d 524, 528 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *Spiller v. Spiller,* 901 S.W.2d 553, 556 (Tex.App.-San Antonio 1995, writ denied).

### Size Requirements for Replat

In her second and third issues, Moffitt argues that her proposed replat met all requirements of the Town of South Padre Island, including minimum lot size, and therefore the Board of Aldermen had a ministerial duty to approve her replat, and the trial court erred in failing to grant mandamus relief. The trial court's ultimate conclusion was that "Plaintiff's proposed replat did not meet the requirements of the Zoning Ordinance of the Town (Section 20-6(C)(4) of the Town of South Padre Island Code of Ordinances)." Section 20-6(C)(4) provides that "the minimum area of a lot shall be 5,000 square feet or as recorded in the county courthouse as of November 7, 1979."

We begin our analysis of this issue by noting that the ordinance at issue is subject to differing interpretations. Under one construction (Moffitt's proposed construction), the word "or" can be interpreted to imply "whichever is lesser," as in the following construction:

> the minimum area of the lot shall be 5000 square feet or as recorded in the county courthouse as of November 7, 1979, *whichever is lesser.*

 **\*4**  Under another equally reasonable construction, the word "or" can be read to imply "whichever is applicable," as in the following construction:

> the minimum area of the lot shall be 5000 square feet or as recorded in the county courthouse as of November 7, 1979, *whichever is applicable based on the date of recordation.*

Both constructions are equally valid in the absence of any clarifying evidence, but in this case we have evidence that the persons charged with enforcing the ordinance apply the latter construction. *See Citizens Active in San Antonio v. Bd. of Adjustment,* 649 S.W.2d 804, 806 (Tex.App.-San Antonio 1983, no writ) (the interpretation of an ordinance by the officials charged with its enforcement may be accorded weight in construing the ordinance); *City of Grand Prairie v. Finch,* 294 S.W.2d 851, 854 (Tex.Civ.App.-Dallas 1956, no writ). Specifically, Robert Fudge, the public works director for the Town, testified that the minimum size of a lot that was recorded as of November 7, 1979, was the square footage as recorded in 1979. There is no evidence in the record supporting Moffitt's alternative construction of the ordinance. Accordingly, we overrule Moffitt's second and third points of error. Under this interpretation of the ordinance, we need not address Moffit's first point of error. *See*TEX.R.APP. P. 47.1. Nevertheless, we further note that the record does not support the legal and factual sufficiency challenge raised in Moffitt's first point of error.

An examination of the relevant plats and testimony pertaining thereto shows that the original plat, as a corner lot, has a curved edge affecting both the frontage and size of the lot. As an initial matter, the City staff had calculated the frontage of Moffitt's lot as 99.95 feet rather than 100 feet, thus precluding the creation of two 50 feet wide lots. Further, although Moffitt's surveyor testified that the corner lot has a 50 foot frontage, he admitted that the frontage included some of the curved edge of the lot abutting Sapphire Circle, and that it is "a matter of opinion" which part of the curve fronts on Sapphire Circle and can be calculated as lot width. This evidence is legally and factually sufficient to sustain the trial court's finding that the replat would not meet the legislative intent for minimum square footage as contained in section 20-6(C)(4).

### Conclusion

The judgment of the trial court will not be set aside if there is any evidence of a probative nature to support it, and this Court may not substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings. *Ray v. Farmers' State Bank of Hart,* 576 S.W.2d 607, 609 (Tex.1979); *Harlingen Irrigation Dist. Cameron County No. 1 v. Caprock Comm. Corp.,* No. 13-99-396-CV, 2001 Tex.App. LEXIS 3680, *17 (Corpus

Christi May 31, 2001, no pet.). The trial court's conclusion that Moffitt's proposed replat did not meet the requirements of section 20-6(C)(4) of the Town of South Padre Island Code of Ordinances was supported by legally and factually sufficient evidence.

**\*5** It is uncontradicted that Moffitt's proposed replat would fail to comply with the Code if the Code were construed to preclude the subdivision of lots that had been recorded by 1979. Moreover, based on our review of the trial court's findings and the record evidence, Moffitt's proposed replat would fail to comply with the Code even if the Code were construed to require a minimum size of 5,000 square feet. Given our determination that Moffitt's proposed replat failed to meet the requisites of the Town's Code of Ordinances, we need not address the other issues raised by appellant. *See* TEX.R.APP. P. 47.1.

The judgment of the trial court is affirmed.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

498 S.W.2d 147
Supreme Court of Texas.

MORGAN DRIVE AWAY, INC., et al., Appellants,

v.

RAILROAD COMMISSION
OF TEXAS et al., Appellees.

No. B—3684. | April 25, 1973.

Specialized motor carrier filed application to amend its certificate authorizing transportation of used house trailers so as to authorize transportation of certain commodities between all points within the state. The Railroad Commission granted the application and protestants filed suit challenging grant of the application. The District Court, No. 98, Travis County, Jones, J., rendered judgment in favor of the applicant-carrier and protestants appealed. The Supreme Court, Steakley, J., held that statements in examiner's report, which was adopted by the Commission, that protestants had relied upon foreign based power units not properly registered with the Commission for handling of intrastate traffic, that witnesses testified regarding instances where protestants had been unable to supply appropriate equipment when and as needed and that, 'in consideration of the above,' protestants were not providing fully adequate service for handling of all traffic in intrastate commerce did not meet fact-finding requirements of statute.

Reversed and rendered.

Pope, J., dissented and filed opinion in which Denton, J., joined.

**Attorneys and Law Firms**

 **\*148** Robinson, Felts, Starnes & Nations, Mert Starnes and Phillip Robinson, Austin, for appellants.

John Hill, Atty. Gen., James H. Cowden and Rex H. White, Jr., Asst. Attys. Gen., Doherty & Robertson, James M. Doherty and Pat H. Robertson, Austin, for appellees.

**Opinion**

STEAKLEY, Justice.

This is a direct appeal by Morgan Drive Away, Inc. and National Trailer Convoy, Inc., appellants, for a judgment

of the trial court denying a permanent injunction on the ground of the validity of an order of the Railroad Commission granting Transit Homes, Inc. a specialized motor carrier certificate. Our jurisdiction is not questioned. See Sec. 3 —b of Article V of the Constitution of Texas; Article 1738a; [1] Rule 499a, Texas Rules of Civil Procedure; Railroad Commission of Texas v. Manziel, 361 S.W.2d 560, 93 A.L.R.2d 432 (Tex.1962); and Railroad Commission v. Shell Oil Co., 146 Tex. 286, 206 S.W.2d 235 (1947).

Transit Homes, Inc., an appellee here in addition to the Railroad Commission, is the holder of a specialized motor carrier certificate authorizing the transportation of used house trailers from Harlingen, Texas, to all points in Texas and vice versa. It filed application with the Commission to amend its certificate so as to authorize the transportation of the following commodities between all points in Texas:
(1) Trailers, including house trailers, mobile homes, and other structures moving on wheeled undercarriages;

(2) Appurtenances for the items named in (1) above, when moving therewith; and

(3) Equipment, materials and supplies used in connection with the itmes named in (1) and (2) above when moving therewith, between all points in Texas.

See Secs. 1(i) and 5a of Article 911b. The application was opposed by Morgan and National Trailer. Each is the holder of certificates issued by the Commission authorizing the transportation of house trailers between all points in Texas.

After hearing and various administrative steps, some later noticed, the Commission granted the application of Transit in its entirety. Morgan and National Trailer thereupon filed suit as an appeal under the provisions of Sec. 20 of Article 911b to set aside the granting order, and to enjoin Transit's operations under the certificate issued pursuant thereto. After trial to the court, a take nothing judgment was entered against Morgan and National Trailer and all injunctive relief sought by them was denied. This direct appeal was then taken.

Appellants level a three-pronged attack upon the order of the Commission. They **\*149** say, first, that an initially served examiner's report to the Commission that recommended a denial of Transit's application 'is still the only lawful order in this case,' notwithstanding the subsequent withdrawal of the report as issued in error and the subsequent adoption by order of the Commission of a successor examiner's report

that recommended the granting of the application. Appellants say, second, that, even so, the findings in the examiner's report which became those of the Commission by adoption in the Commission order, do not meet the fact finding requirements of Sec. 5a(d) of Article 911b. They cite our holdings to such effect in Miller v. Railroad Commission, 363 S.W.2d 244 (Tex.1962); Thompson v. Hovey Petroleum Co., 149 Tex. 554, 236 S.W.2d 491 (1951); and Thompson v. Railroad Commission, 150 Tex. 307, 240 S.W.2d 759 (1951). Appellants say, finally, that the order of the Commission is not reasonably supported by substantial evidence. We overrule the first contention; sustain the second; and so do not reach the third.

The administrative circumstances giving rise to the first attack on the order of the Commission were these. Rule 43 of the effective Rules of Procedure for the Transportation Division of the Commission, the pertinent text of which is copied in the margin, [2] provides that in all contested proceedings the examiner for the Commission shall prepare and file a report and recommended order which shall be filed with the Director of the Division and served by him on each party of record. In this instance the examiner initially filed with the Director a report and recommendation that the application of Transit be denied. This was dated January 31, 1972 and was served on the parties. On the following February 2, the Director notified the parties that the report had been issued in error and that it was withdrawn. Then, under date of February 3, 1972, a successor report and recommended order likewise signed by the examiner was served on the parties, and this report recommended that Transit's application be granted in its entirety. Exceptions were filed by the appellants to the successor order and were overruled by the Commission. Under date of June 1, 1972, the Commission issued its official order in which, as to this, it was found that the initial report and recommended order was served as the result of a clerical error; that it was withdrawn by notice to all parties; and that its withdrawal was procedurally correct and legally effective.

 [1]     [2]     [3]     A hearing examiner of the motor transportation division of the Railroad Commission serves the function of hearing the evidence offered by applicants for motor carrier operating rights, and that offered by existing carriers or other parties who may appear in opposition to the application. His subsequent report to the Commission, accompanied by a recommended order, is an internal administrative device whereby the examiner may report his findings and recommendation to the Commission. The report also performs the office of affording parties in disagreement an opportunity to present their views to the Commission in the form of exceptions prior to action of the Commission upon the report and recommended order. This administrative process thus brings to the Commission for official action in a contested proceeding the hearing record, the report and recommendation of the examiner, **\*150** and the exceptions of parties that are adversely affected by the recommendation. The order of the Railroad Commission issued in response to all of this constitutes the official action of the Commission. It alone has binding force. An administrative mistake in the preliminary proceedings whereby a report and recommendation contrary to, and in fact not that of, the examiner is necessarily subject to correction; otherwise, the actual report and recommendation of the examiner would not receive the attention of the parties or be given consideration by the Commission. This is emphasized by the fact that the procedural rules of the Commission contemplate service upon the parties of the actual report and recommendation of the examiner, not a mistaken one; and it can properly be said that these rules also contemplate the inherent power of the Commission to approve and affirm corrective acts of its administrative personnel to accomplish this purpose. We hold that the erroneously issued report here was ineffective for any purpose.

 [4]     [5]     The Second and Third Points of Error which attack the granting order of the Commission are related. They require us to decide whether the fact findings in the order meet the statutory requirements; and, if so, whether the order is reasonably supported by substantial evidence. We recognized in Miller v. Railroad Commission, 363 S.W.2d 244 (Tex.1962), that assistance to the Courts in exercising their function of reviewing such orders is a statutory function of the fact finding requirement, and that the sufficiency of findings to meet the requirements of the statute must be related to the issues and the evidence in each case separately. This is but to recognize the logic that determination of the validity Vel non of an administrative order under the precepts of the substantial evidence rule should be made in the light of the findings of fact upon which the order of the Commission is predicated, where such findings are required by statute. In such case it is reasonable to proceed from the premise that the facts found were regarded by the Commission to have reasonable support in the evidence and to support its action. So a fact finding requirement has substantial statutory purpose and is more than a technical prerequisite.

The fact finding statutory requirement governing applications to operate as a specialized motor carrier is found in Sec. 5a(d) of Article 911b, as follows:

'The order of the Commission granting said application and the certificate issued thereunder shall be void unless the Commission shall set forth in its order full and complete findings of fact pointing out in detail the inadequacies of the services and facilities of the existing carriers, and the public need for the proposed service.'

The order of the Commission under attack contains the following:

'THE COMMISSION FINDS that after statutory notice the said application was heard before the Commission's Examiners, and that Examiner . . . made and filed his corrected report herein, served February 3, 1972, containing his findings of fact and conclusions of law thereon, which report is hereby adopted and made a part hereof, and said proceedings was duly submitted.'

As thus stated, the Commission did not purport to independently set forth findings of fact; the parties agree, however, that the Commission adopted the report of the examiner and that we look there to determine compliance, or not, with the statutory fact finding requirements.

The adopted report is divided into three sections entitled Statement of the Case, Statement of Facts, and Discussions and Conclusions. It will not be quoted in full so as not to further extend this opinion. The parties recognize that the findings of fact are to be found, if at all, in the third section. These findings must relate, as the statute says, to the inadequacies in the services and facilities of the existing carriers **\*151** and to the public need for the proposed service. The findings may be sufficient as to both, or as to neither, or as to only one. But under the statute they must be sufficient as to both for the order to stand.

 **[6]**   The order under review contains a lengthy general discussion of conditions in the mobile home industry and perhaps findings of fact could be gleaned that point to the public need for the proposed service. But we do not reach this since the immediately apparent problem is the absence of findings of fact which qualify under the statute with respect to the services and facilities of the existing carriers. In their

briefs, appellees point to portions of two paragraphs in the third section of the adopted order which they argue supplies the requisite findings of fact as to the existing services. These paragraphs are quoted in full in the margin, [3] and contain the only express reference in the adopted order to the adequacy or not of the existing services. It is also clear that the conclusions in the second of the two quoted paragraphs do not qualify as fact findings under the rationale of Miller, supra, where we held that statements that 'service is inadequate in that the service is not available when needed' and 'trucks and facilities are not available when needed' do not provide sufficient findings of basic facts from which the Court can determine if reasonable grounds existed for issuance for the order; as well as under the rationale of Thompson, supra, where similar statements were recognized as no more than a finding of an ultimate conclusion, partly in the words of the statute.

So we turn to the first of the quoted paragraphs. Each of its three sentences is no more than a reference to the evidence with no stated findings of fact. Appellees quote as directly relating to this issue a portion of one sentence, as follows: '(p)rotestants have relied upon foreignbased power units, not properly registered with the Texas Railroad Commission, for the handling of intrastate traffic in Texas, contrary to the Commission's regulations.' But this sentence begins as a recitation that '(t)he evidence further indicates that in some instances . . .,' so it is no more than a reference to the evidence without any purport as a finding of fact. Even so, it implies no more than an adverse criticism of the actions of the protesting carriers 'in some instances.' Appellees also urge the sentence which reads '(t)he public witness testimony includes specific testimony regarding instances wherein protestants have been unable to supply appropriate equipment when and as needed for the movement of traffic moving in Texas intrastate commerce.' But here again the sentence is not drawn or stated in terms of a finding of fact; it is no more than a recitation of certain matters which were included in the public witness testimony.

 **[7]**   Appellees say, however, that the first sentence in the next succeeding paragraph converts the foregoing into acceptable **\*152** and sufficient findings of fact. This sentence reads: '(i)n consideration of the above, the Examiner concludes that protestants are not providing a fully adequate service for the handling of the involved traffic in Texas intrastate commerce.' Appellees argue that these sentences represent a finding that the public witnesses had been unable to secure trucks when needed; and that they constitute 'direct

findings that the examiner is relying upon such testimony in concluding that 'protestants are not providing a fully adequate service for the handling of the involved traffic in Texas intrastate commerce.'' It may well be that the Commission relied upon the recited evidence in reaching its conclusions; but there are no findings of fact pertaining to what may have been 'included' in the public witness testimony, or to any inadequacies in the existing services. Quite clearly there are no findings of fact that are full and complete in pointing out such inadequacies in detail. We may consider only what was written by the Commission in its order, and we must measure its statutory sufficiency by what it says. This is the teaching of Miller, Hovey, Thompson, supra; and cf. Alamo Express, Inc. v. Union City Transfer, 158 Tex. 234, 309 S.W.2d 815 (1958). The orders in Hovey and Thompson contained exhaustive summations of the evidence and it could have been inferred that the Commission subjectively relied thereon in the approval orders. But Thompson stands for the propositions that to be valid an order must contain more than references to the testimony of witnesses or to what their testimony may have included; and that summations of the evidence are not findings of fact Miller says further that findings of basic facts cannot be presumed from findings of a conclusional nature; and that under the mandatory language of the statute, the findings of fact must fully and completely point out any inadequacies in the services and facilities of the existing carriers. Were we to reach the substantial evidence point, we would look in vain for findings to test against the evidence in such respects.

Morgan Drive Away, Inc. v. Railroad Commission, 483 S.W.2d 320 (Tex.Civ.App.1972, writ ref'd n.r.e.), is urged by appellees as our most recent review of an order of the Commission granting motor carrier operating rights where the attack upon the order was as here. The intermediate court there stated that it had examined the order of the Commission and had concluded that the findings met the test stated in Miller v. Railroad Commission, Supra, 363 S.W.2d 244, 246. We likewise examined the order and agreed with that conclusion. A comparison of the order there, and the one under review here, discloses controlling difference in the nature and completeness of the fact findings.

The judgment of the trial court is reversed and judgment is here rendered vacating the order of the Commission.

Dissenting opinion by POPE, J., joined by DENTON, J.

POPE, Justice (dissenting).

I respectfully dissent. The majority has concluded that the commission's order falls short of the statutory requirement that it contain full and complete findings of fact. Art. 911b, Sec. 5a(d). The order incorporates the examiner's report and recommended order, and attached to that was a summation of copious proof offered by both the applicant and protestants.

The conclusion reached by the majority flows from its disregard of many portions of the six-page report of the examiner and its attention to only two conclusionary paragraphs of that document which paragraphs it reads with a hostile eye. I should think that all parts of the report should be examined. When we do that we learn that twenty public witnesses asked for better service than they now receive and only one public witness appeared against the applicant. There were findings **\*153** of four-fold growth in the public's use of mobile homes over a ten-year period, and that this increase was to the extent of almost 25,000 units during the year prior to the hearing. Texas plants which fabricate such units have increased from 43 in 1968 to 126 at the time of the hearing and other plants are being built. Paralleling this exceptional growth of the mobile home industry, there has been an increase in what the witnesses called 'bootlegging' by unauthorized transporters of mobile homes. In 1966 there were 18 cases of illegal transportation whereas in 1970 there were 281 cases filed against illegal carriage of such units. Applicant's public witnesses testified that the protestants have been unable to supply transportation when needed. The commission found that the application is supported by manufacturers located in every part of Texas who ship, receive and influence the movements of such units from and between points scattered throughout Texas.

'In consideration of the above,' that is, the recitals contained in the foregoing parts of the report, the examiner concluded that the two protestants are not providing fully adequate service for handling the intrastate traffic in such units, the proposed new service is required by the public convenience and necessity, and the new service will result in improvement in existing service. The examiner concluded that any loss of intrastate traffic to the protestants would be more than offset by the increase in the traffic which is resulting from the growth in the mobile home industry.

The majority cites in support of its decision, Miller v. Railroad Commission, 363 S.W.2d 244 (Tex.1963); Thompson v. Railroad Commission, 150 Tex. 307, 240 S.W.2d 759 (1951) and Thompson v. Hovey Petroleum Co., 149 Tex. 554, 236 S.W.2d 491 (1951), neither of which has an order comparable

to the one here questioned. More recently this court wrote Alamo Express, Inc. v. Railroad Commission, 407 S.W.2d 479, 485 (Tex.1966), wherein we said concerning those three cases:

> In Miller, the finding of fact was embodied in a single sentence, which was clearly inadequate. In Thompson, the order contained a recital of the evidence but no findings of fact from the evidence. In Hovey, railroads as well as motor carriers protested the grant of additional authority to an applicant. The order found that an inadequate number of tank cars were furnished by the railroads but wholly failed to find that an inadequate number of tank trucks were furnished by the protesting motor carriers. It was a case of no finding at all upon the material issues.

This court recently considered the application for writ of error in Morgan Drive Away, Inc. v. Railroad Commission of Texas, 483 S.W.2d 320 (Tex.Civ.App.1972, writ ref'd n.r.e.), wherein the same two protestants urged the same

lack of full and complete findings in the commission's order which granted a certificate to Warfield Walker to transport mobile homes in northeast Texas. The commission's findings followed the same format as that employed in this case. The commission invoked its common knowledge of the 'tremendous increase in the use and transportation of mobile homes in Texas within the last ten years' as well as the increase in recreational facilities and the mobility of college students who use mobile homes. The court of civil appeals concluded in that case, as did this court, 'that a court upon reading them (the findings) can fairly and reasonably say that they either do or do not support the required ultimate statutory findings of inadequacy of the services and facilities of existing carriers and a genuine public need for the proposed service.' Miller v. Railroad Commission, Supra.

I would conclude that proof of an exceptional growth of a new industry over a short time-span, and a projected continuation **\*154** of that growth would be valid findings which support the need for new competitive carrier services.

I would affirm the judgment of the trial court upholding the validity of the commission's order.

DENTON, J., joins in this dissent.

Footnotes

1    References are to Vernon's Ann.Civ.St.

2    Rule 43: The Examiner's Report and Recommended Order.
     In all contested proceedings, and in all uncontested proceedings wherein the examiner recommends action other than that sought by the applicant, petitioner, or complainant, he shall prepare and file with the Director a report and recommended order. . . . She report and recommended order shall contain a brief statement of the nature of the case and the issues, a complete discussion of the evidence, the findings of fact and ultimate conclusions based thereon. A copy thereof shall be served forthwith by the Director on each party of record.

3    'Virtually all of applicant's public witnesses complain of a lack of equipment availability from protestants Morgan and National. The public witness testimony includes specific testimony regarding instances wherein protestants have been unable to supply appropriate equipment when and as needed for the movement of traffic moving in Texas intrastate commerce. The evidence further indicates that in some instances protestants have relied upon foreign-based power units, not properly registered with the Texas Railroad Commission, for the handling of intrastate traffic in Texas, contrary to the Commission's regulations.
     'In consideration of the above, the Examiner concludes that protestants are not providing a fully adequate service for the handling of the involved traffic in Texas intrastate commerce. Applicant has established by substantial evidence that the service proposed is required by the public convenience and necessity, and has established further that the service it proposes will result in a material improvement in existing transportation service.'

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

363 S.W.3d 871
Court of Appeals of Texas,
Austin.

NUCOR STEEL–TEXAS, a Division
of Nucor Corporation, Appellant,

v.

PUBLIC UTILITY COMMISSION OF TEXAS,
Oncor Electric Delivery Company and Texas Energy
Future Holdings Limited Partnership, Appellees.

No. 03–10–00430–CV.    |    March 15, 2012.

**Synopsis**

**Background:** Steel company, as intervenor in proceedings for electric provider's proposed acquisition of utility, sought review of Public Utilities Commission (PUC) determination that acquisition was in public interest. The 98th Judicial District Court, Rhonda Hurley, J., affirmed. Steel company appealed.

**Holdings:** The Court of Appeals, David Puryear, J., held that:

[1] construction of regulatory statutes by PUC as prohibiting review and enforcement of stipulations that did not relate to utility was reasonable and consistent with governing statutes;

[2] PUC acted within its discretion in allowing individual witnesses to withdraw their previously-filed testimony;

[3] PUC staff member was not a "party" to proceedings, and therefore testimony originally proposed by staff member but later withdrawn was not admissible as admission by party-opponent; and

[4] evidence was sufficient to support finding that agreed, non-unanimous stipulation regarding proposed acquisition was reasonable and in public interest.

Affirmed.

**Attorneys and Law Firms**

**\*873** Nelson H. Nease, Brickfield, Burchette, Ritts & Stone, P.C., Austin, TX, for appellant.

John C. Wander, Michael J. Tomsu, Vinson & Elkins, LLP, Elizabeth R.B. Sterling, Assistant Attorney General, Environmental Protection & Administrative Law Division, Austin, TX, Howard Fisher, Oncor Electric Delivery Company LLC, Matthew C. Henry, Richard L. Adams, Jo Ann Biggs, Vinson & Elkins, LLP, Dallas, TX, for appellee.

Jonathan S. Day, Tammy Cooper, Lino Mendiola III, Andrews Kurth LLP, Thomas L. Brocato, Lloyd, Gosselink, Rochelle & Townsend, PC, Austin, TX.

Before Justices PURYEAR, PEMBERTON and ROSE.

## *OPINION*

DAVID PURYEAR, Justice.

Texas Energy Future Holdings Partnership ("Texas Energy") sought to acquire Oncor Electric Delivery Company ("Oncor"), which is a transmission-and-distribution electric utility. Under the relevant statutory scheme, the Public Utility Commission ("Commission") is required to analyze whether the acquisition of a regulated utility is in the public interest. *See* Tex. Util.Code Ann. § 14.101 (West Supp. 2011). Consequently, Texas Energy and Oncor filed various business commitments with the Commission regarding the acquisition **\*874** and asserted that the proposed acquisition was in the public interest. In response, Nucor Steel–Texas, a division of Nucor Corporation ("Nucor"), intervened and opposed the proposed acquisition. Ultimately, the Commission determined that the transaction was in the public interest, and the district court upheld that determination. On appeal, Nucor challenges the Commission's construction of the statutes setting out the public-interest analysis relevant to the proposed transaction. Essentially, Nucor argues that the Commission's erroneous construction foreclosed the admission of certain evidence and testimony that Nucor contends should have been considered as part of the public-interest analysis. In addition, Nucor also contends that the Commission's public-interest determination is not adequately supported by the evidence in the record. We will affirm the judgment of the district court.

### STATUTORY FRAMEWORK

As mentioned above, this case involves the acquisition of a utility. For some time now, the legislature has imposed

various restrictions on certain business transactions involving public utilities. *See* Tex. Util.Code Ann. § 14.101. A restriction relevant to this case states that if a public utility is going to enter into a transaction that "involves the sale of at least 50 percent of the stock of the utility," the utility must report the transaction to the Commission "within a reasonable time." *Id.* § 14.101(b). After being informed of the transaction, the Commission is required to investigate the proposed transaction in order "to determine whether the action is consistent with the public interest." *Id.* Further, the legislature provided the Commission with the following various factors to consider in making its public-interest determination:

(1) the reasonable value of the property, facilities, or securities to be acquired, disposed of, merged, transferred, or consolidated;

(2) whether the transaction will:

(A) adversely affect the health or safety of customers or employees;

(B) result in the transfer of jobs of citizens of this state to workers domiciled outside this state; or

(C) result in the decline of service;

(3) whether the public utility will receive consideration equal to the reasonable value of the assets when it sells, leases, or transfers assets; and

(4) whether the transaction is consistent with the public interest.

*Id.* If the Commission ultimately concludes that the transaction is not in the public interest, the Commission will "take the effect of the transaction into consideration in ratemaking proceedings and disallow the effect of the transaction if the transaction will unreasonably affect rates or service." *Id.* § 14.101(c).

Recently, the legislature enacted another provision that is related to the public-interest analysis. *See id.* § 39.262(*o* ) (West Supp. 2011). In particular, the new provision provides that if a utility or a person seeking to "acquire or merge with" the utility "files with the [C]ommission a stipulation, representation, or commitment" as part of its filing under section 14.101, the Commission "may enforce the stipulation, representation, or commitment to the extent that" it "is consistent with the standards provided by this section and

Section 14.101." *Id.* In addition, the provision states that the Commission "may reasonably interpret and enforce conditions adopted under" the new provision. *Id.*

When Texas Energy and Oncor informed the Commission about the proposed transaction, they filed various commitments relating to the transaction. Before performing the public-interest analysis in this case, the Commission **\*875** asked the parties to provide briefing regarding the scope of the types of information that the Commission may consider in light of the deregulation of the electric market. In particular, although the Commission was not faced with the prospect of being asked to actually enforce one of the proposed commitments, the Commission asked the parties to explain whether the Commission has the authority to enforce every commitment that is made or whether its authority is limited to commitments that affect the regulated transmission-and-distribution-electric utility. After the parties filed their briefs, the Commission determined that its enforcement authority is limited to stipulations affecting the regulated utility. In light of that determination, the Commission made evidentiary rulings limiting the types of evidence that may be admitted in the public-interest hearing to evidence demonstrating how the regulated utility will be affected by the transaction and by the various stipulations made by Texas Energy and Oncor. The determination regarding the scope of the Commission's enforcement authority and the accompanying evidentiary rulings form the basis for this appeal. [1]

## BACKGROUND

With the preceding in mind, we now summarize the events that led to the dispute at issue. As described previously, Oncor is a transmission-and-distribution electric utility. *See* Tex. Util.Code Ann. § 31.002(19) (West 2007) (defining "transmission and distribution utility"). During the time relevant to this appeal, Oncor was a wholly owned subsidiary of TXU Corp. At that time, TXU Corp. also owned two other companies that were affiliated with Oncor. Those companies were TXU Energy (a retail-electric provider) and Luminant (a power-generation company).

Texas Energy sought to acquire TXU Corp. in its entirety, and Texas Energy and Oncor informed the Commission about the proposed acquisition. *See id.* § 14.101 (requiring public utilities to report proposed sales or acquisitions to Commission so that Commission may investigate proposed

transactions). Nucor and various other parties intervened and opposed the proposed acquisition.

When Texas Energy initiated the acquisition, it made several business commitments, and Texas Energy and Oncor filed a stipulation with the Commission that set out all of the various commitments. The filed stipulation explained that some of the commitments were designed "to support the separateness of Oncor from the rest of TXU Corp. and its subsidiaries." However, the stipulation also detailed other commitments that were "unrelated to Oncor's **\*876** business [or] the [Commission] proceeding" and that were only included for "the sake of completeness." Many of those commitments addressed Oncor's affiliates and are the subject of part of the dispute at issue in this case. Specifically, the controversial commitments were promises to reduce the rates charged by the retail-electric provider, to maintain majority ownership of TXU Corp. for more than five years, to reduce the number of planned coal units, and to invest resources into emerging energy technologies.

Early on in the application process, the Commission asked the various parties to brief certain procedural issues regarding the scope of the newly adopted subsection 39.262(*o* ) of the utilities code. *See id.* § 39.262(*o* ). As discussed previously, that provision empowers the Commission to enforce stipulations filed as part of the approval process. In essence, the Commission wanted input from the parties regarding whether the Commission's new statutory authority to enforce commitments allowed it to enforce all commitments that are made or whether the authority is limited only to commitments related to the public utility. Although the Commission was not being asked to enforce any specific stipulation at that time, the Commission was seeking clarification regarding the types of information that it could consider during the public-interest determination regarding the proposed transaction by Texas Energy and Oncor. In other words, the Commission elicited responses regarding whether the Commission is limited to considering how commitments will affect the utility or whether the Commission may more globally consider the effect of the commitments.

After receiving various responses, the Commission issued an order stating that its review of a proposed business transaction under the utilities code is limited in scope. Specifically, the Commission determined that it could only enforce commitments that directly related to a public utility. Essentially, the Commission reasoned that in light of the recent deregulation of the electric industry, the legislature

only intended to empower the Commission to enforce commitments that related to a public utility and did not intend to allow the Commission to "evaluate or enforce any commitment made that relates to [an] affiliate of [a] public utility." In light of that determination, the Commission reasoned that it could "only address commitments that directly affect Oncor" in the public-interest analysis under section 14.101 of the utilities code. *See id.* § 14.101.

Soon after the Commission issued its limiting order, Nucor filed discovery requests regarding the four commitments previously discussed that were "unrelated to Oncor's business," but Texas Energy and Oncor objected to the discovery requests as exceeding the scope of the proceeding. The Commission sustained those objections. Later, Nucor attempted to file testimony pertaining to, among other things, the four commitments. When seeking the admission of the testimony, Nucor insisted that the Commission should consider the offered testimony because it demonstrated that the sale of Oncor will have a negative impact on the State as a whole. As with the discovery requests, Oncor moved to strike the testimony as being beyond the scope of the proceeding, and the Commission agreed in part and struck portions of the offered testimony that it determined were beyond the scope of the proceeding.

During the course of the proceeding, Texas Energy and Oncor agreed to amend their initial stipulation in order to address the concerns of some of the intervening parties. Several of the intervening parties **\*877** endorsed the amendments, and Texas Energy, Oncor, and many of the intervening parties adopted the new stipulation. The new stipulation did not contain the four controversial commitments that did not pertain to Oncor. Nucor did not endorse the new stipulation and continued to object to the acquisition by arguing that the stipulation was not in the public interest.

When contesting the stipulation, Nucor relied on testimony that had been previously submitted by parties that originally objected to the merger but had now changed their minds. Shortly after Nucor filed its objections, the parties whose evidence Nucor relied on moved to withdraw their previously filed testimony. Because the now-settling parties withdrew their testimony, Texas Energy and Oncor moved to strike the portion of Nucor's filings that relied on the withdrawn testimony. The Commission granted the motions to strike and thereby removed portions of Nucor's filed testimony and exhibits.

Ultimately, the Commission issued an order concluding that the proposed acquisition and stipulation were in the public interest, and Nucor appealed the Commission's order. *See* Tex. Gov't Code Ann. § 2001.144(a) (West 2008) (explaining when agency decision is final in contested case), § 2001.145 (West 2008) (stating that final agency decision is appealable). The district court affirmed the Commission's final order, and Nucor appeals the district court's judgment.

#### DISCUSSION

On appeal, Nucor presents three issues challenging the district court's affirmance of the Commission's final order. First, Nucor contends that the Commission erred when it determined that the provisions of the utilities code described above only authorized the Commission to "evaluate and enforce" the commitments made by Texas Energy that directly affected Oncor (the public utility). Relatedly, Nucor asserts that the Commission erred by concluding that it could not consider "any broader public interest evaluation of the entire transaction." Second, Nucor challenges the Commission's decision based on the previous determinations to limit Nucor's permissible discovery requests and to remove portions of Nucor's filed testimony. Finally, Nucor argues that the Commission's approval of the stipulation by Texas Energy and Oncor was not adequately supported by evidence in the record.

#### The Commission's Interpretation of the Scope of its Authority

 [1]  As mentioned above, Nucor challenges the Commission's construction of the various statutes that govern the public-interest analysis that the Commission was required to perform in this case. After this appeal was filed, the supreme court was confronted with a similar situation in which an agency determined that the statutes at issue limited the type of information that it may consider when performing a public-interest analysis. *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619 (Tex.2011). As in the present case, a party challenged the agency's construction as being too narrow and inconsistent with the relevant governing scheme, *id.* at 622–23, and the supreme court explained that the "crux of the dispute, then, is whether the term 'public interest' is a broad, open-ended term, encompassing any conceivable subject potentially affecting the public, or a more narrow term," *id.* at 624. When determining whether to uphold the

Commission's interpretation, the supreme court noted that rather than being clear and unambiguous, the meaning of the term "public interest" is instead an amorphous concept. *Id.* at 628.

After setting out the dispute in the case, the supreme court outlined the proper **\*878** standard by which courts review an agency's construction of an ambiguous statute that the agency is charged with enforcing. Although generally stating that statutory construction is a question of law that appellate courts review de novo, *id.* at 624 (citing *First Am. Title Ins. Co. v. Combs,* 258 S.W.3d 627, 631 (Tex.2008)); *see also Fireman's Fund County Mut. Ins. Co. v. Hidi,* 13 S.W.3d 767, 768–69 (Tex.2000) (stating that when performing statutory construction, courts should look to plain meaning of words used in statute), the court also explained that reviewing courts also give "serious consideration" or "some deference" to an agency's interpretation of a statute that it is charged with enforcing, *Texas Citizens,* 336 S.W.3d at 624–25, provided that the statutory language at issue is "ambiguous," *id.* at 625 (quoting *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 747–48 (Tex.2006)), and provided that the agency's interpretation " 'is reasonable and does not contradict the plain language of the statute,' " *id.* (quoting *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993)); *see also id.* (stating that " 'alternative *unreasonable* constructions do not make' " statute ambiguous (quoting *Fiess,* 202 S.W.3d at 748)). In addition, the court explained that it "is precisely when a statutory term is subject to multiple understandings that we should defer to an agency's reasonable interpretation." *Id.* at 628. The court then emphasized that deference is particularly warranted when the statutory term at issue is "as amorphous as 'public interest,' " when the agency oversees "a complex regulatory scheme," and when the analysis to be performed "implicates" the agency's technical expertise. *Id.* at 629–30. Finally, the court reasoned that because an agency's interpretation "of a statute it is charged with administering" only has "to be reasonable and in accord with the statute's plain language," an agency's construction does not have to be "the only—or the best—interpretation in order to warrant ... deference." *Id.* at 628.

As with the agency involved in *Texas Citizens,* the Commission is charged with overseeing a complex regulatory scheme. *See* Tex. Util.Code Ann. §§ 11.002(c) (stating that purpose of public utility regulatory act is to grant Commission authority to protect customers of electric services), 14.001 (West 2007) (bestowing upon Commission power to regulate public utilities within its jurisdiction). Also, the issue in this

case involves the boundaries of a similarly amorphous public-interest determination that falls within the Commission's technical expertise. *See id.* § 14.101. Accordingly, we apply the same standard of review that was applied in *Texas Citizens.* [2]

**\*879** **[2]** In challenging the Commission's construction of the statutes as prohibiting review and enforcement of stipulations that do not relate to Oncor, Nucor asserts that "nowhere in Section 39.262(*o* ) are there the limitations the Commission claims." More specifically, Nucor argues that no language requires that a stipulation have a "direct effect" on the transmission-and-distribution utility and asserts that the Commission's determination provides no guidance regarding when something directly affects a utility. Instead, Nucor contends that although the Commission typically only has authority over regulated utilities, the plain language of subsection 39.262(*o* ) expansively empowered the Commission to review and enforce any stipulation given as part of a filing under section 14.101, "no matter who made the stipulation." As support for this proposition, Nucor notes that subsection 39.262(*o* ) applies to stipulations made by "an electric utility or transmission and distribution utility or a *person* seeking to acquire or merge with an electric utility or transmission and distribution utility." Tex. Util.Code Ann. § 39.262(*o* ) (emphasis added). In light of this provision as well as the broad definition for "person" found in the utilities code, Nucor urges that subsection 39.262(*o* ) plainly empowers the Commission to enforce any stipulation filed regardless of whether the stipulation had an effect on the regulated transmission-and-distribution utility and to determine whether all filed stipulations are in the public interest. *See id.* § 11.003(14) (West 2007) (defining "[p]erson" as including individuals, partnerships, mutual or cooperative associations, and corporations"); *see also id.* § 39.262(*o* ) (stating that Commission "may reasonably interpret and enforce conditions adopted under this section").

Similarly, Nucor contends that there is no statutory support in section 14.101 for the limitations imposed by the Commission. In making this assertion, Nucor notes that subsection 14.101(b) requires the Commission to determine if a "transaction" is in the "public interest" and asserts that nothing in the remainder of section 14.101 "suggests that the 'transaction' under review is limited to the public utility (in this case Oncor) or that the 'public interest' is somehow limited exclusively to the regulated electric utility transmission and distribution service." *Id.* § 14.101. To the contrary, Nucor insists that the plain meaning of the

wording in the statute supports the opposite conclusions. In addition, Nucor argues that the factors listed in the public-interest analysis under section 14.101—value of property to be acquired, adverse health or safety effects, transfer of jobs, decline of service, consideration given for acquisition, and public interest—are broad considerations that may be applied to anyone seeking to acquire a transmission-and-distribution utility **\*880** under subsection 39.262(*o* ). *See id.* §§ 14.101, 39.262(*o* ).

In addition, Nucor insists that construing the statutes in the manner suggested by the Commission would render subsection 39.262(*o* ) a "functional nullity" because even though the language of the statute seems to expand the Commission's power, the Commission's interpretation provides the Commission "with no more and no less authority than it had under Section 14.101(b) to review mergers and acquisitions of regulated utilities." *See* Tex. Gov't Code Ann. § 311.021 (West 2005) (explaining that when construing statutes, courts should presume that legislature intended entire statute to be effective). Moreover, Nucor contends that if the legislature had intended the limitation suggested by the Commission, the legislature could have easily said that when it promulgated subsection 39.262(*o* ). *See USA Waste Servs. of Houston, Inc. v. Strayhorn,* 150 S.W.3d 491, 494 (Tex.App.-Austin 2004, pet. denied) (explaining that courts presume that every word was deliberately chosen and that excluded words were left out on purpose). Finally, Nucor argues that the Commission's construction improperly favors Texas Energy's private interest in avoiding oversight of the deregulated portions of the acquisition over the public's interest in having "review and enforcement of [all] commitments beneficial to the public that were placed before the Commission, even if not directly applicable to Oncor." *See* Tex. Gov't Code Ann. § 311.021(5) (stating that when performing statutory construction, courts presume that "public interest is favored over any private interest").

Nucor presents a reasonable construction of the various statutes involved to the extent that the language of the statutes could be read as empowering the Commission to review and enforce all stipulations that are filed as part of a section 14.101 application. However, the question to be decided in this case is whether the Commission's interpretation is also reasonable, consistent with the governing statutes, and therefore, entitled to deference.

When construing the statutes involved, the Commission took note of the foundational shift in the Texas electricity market

that occurred in the time between when section 14.101 was originally enacted and when section 39.262 was amended to add subsection 39.262(*o* ). At the time section 14.101 was enacted, utilities were operating as monopolies that were regulated by the Commission. *See CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coal. of Cities,* 252 S.W.3d 1, 7 (Tex.App.-Austin 2008) (on reh'g), *aff'd in part, rev'd in part sub nom., State v. Public Util. Comm'n,* 344 S.W.3d 349 (Tex.2011). Under this scheme, a region in Texas "was served by a single vertically integrated utility," *Cities of Corpus Christi v. Public Util. Comm'n,* 188 S.W.3d 681, 684 (Tex.App.-Austin 2005, pet. denied), meaning that a single utility "produced, transported, and retailed electricity" for the region, *Reliant Energy, Inc. v. Public Util. Comm'n,* 101 S.W.3d 129, 133 (Tex.App.-Austin 2003), *rev'd in part sub nom., CenterPoint Energy, Inc. v. Public Util. Comm'n,* 143 S.W.3d 81 (Tex.2004).

However, in 1999, the legislature enacted various statutes that began the transition to a competitive retail-service industry. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543 (current version at Tex. Util.Code Ann. §§ 39.001–.910 (West 2007 & Supp. 2010)). Under the new competitive market, "the formerly integrated utilities were required to 'unbundle' and divide into three separate entities: (1) retail electric providers, (2) power-generation companies, and (3) transmission-and-distribution utilities." *Gulf Coast,* 252 S.W.3d at 7; *see* Tex. Util.Code Ann. § 39.051(a)-(b) (West 2007). **\*881** "After the deregulation process was completed, the power-generation and retail electric markets would be subject to the 'normal forces of competition' and 'customer choices,' but the transmission-and-distribution utilities would remain regulated by the Commission." *Gulf Coast,* 252 S.W.3d at 8 (quoting Tex. Util.Code Ann. § 39.001(a) (West 2007)).

Consistent with the statutory mandate, a formerly integrated utility was unbundled and divided into Oncor, an affiliated retail-electric provider, and an affiliated power-generation company. As a result, only Oncor was still subject to regulation by the Commission, but its affiliated companies were not. In light of this dramatic regulatory shift, the Commission concluded that its enforcement powers under subsection 39.262(*o* ) extended only to stipulations that affected the company over which it had regulatory authority (Oncor) and not to stipulations that related to companies affiliated with Oncor but did not directly affect Oncor. [3] For that reason, the Commission also determined that it may only consider evidence related to the regulated utility when

considering whether a proposed transaction is in the public interest under section 14.101 of the utilities code. *See* Tex. Util.Code Ann. § 14.101.

The Commission's limiting interpretation is supported by the language in section 14.101. Section 14.101 applies to transactions involving a "public utility" and imposes obligations and restrictions on public utilities. *See id.* After deregulation, Oncor remained a public utility by statutory directive, but the affiliated companies did not. *See id.* §§ 11.004 (defining "public utility" as including electric utilities), 31.002(6) (West 2007) (specifying that term "electric utility" includes transmission-and-distribution utility but expressly excluding power-generation companies and retail-electric providers); *see also id.* § 36.001(a) (West 2007) (authorizing Commission to "regulate rates of an electric utility"). Accordingly, the Commission's construction of section 39.262(*o* ) as pertaining only to stipulations involving Oncor is consistent with the focus in section 14.101 on public utilities.

In light of the dramatic change in the electric market and in light of the Commission's newly diminished regulatory role, the Commission's construction of the statutes at issue is reasonable and consistent with the language of the statutes at issue as well as the entire statutory structure changing the Texas electric market to a competitive and deregulated market. *See Jones v. Fowler,* 969 S.W.2d 429, 432 (Tex.1998) (explaining that when determining legislative intent, entire act, not isolated portions, must be considered). [4]

**\*882** We also observe that the Commission's interpretation is consistent with the legislative history pertaining to the enactment of subsection 39.262(*o* ). *See* Tex. Gov't Code Ann. § 311.023(3) (West 2005) (explaining that when construing statutes, court may consider legislative history). Subsection 39.262(*o* ) was enacted by house bill 624 in 2007. Act of May 23, 2007, 80th Leg., R.S., ch. 1186, § 1, 2005 Tex. Gen. Laws 4049, 4049. That same year, a competing bill, senate bill 482, was also proposed and covered many of the same topics addressed by house bill 624. Ultimately, senate bill 482 did not pass, but it contained a provision that was identical to that of subsection 39.262(*o* ) with the exception of the section numbers. *Compare* Tex. Util.Code Ann. § 39.262(*o* ), *with* Conf. Comm. Rep't, S.B. 482, 80th Leg., R.S., at p. 24 (May 20, 2007); *see* Conf. Comm. Rep't, S.B. 482, 80th Leg., R.S., Section–by–Section Analysis, at p. 16. When discussing the breadth of the enforcement power bestowed by senate bill 482, representative Miller explained

that the proposed amendments only dealt with "regulated industries, which are the transmission lines" and do "not touch generation [or] retail." H.J. of Tex., 80th Leg., R.S. 1866 (2007). Further, Miller confirmed that the amendment did not "impact competitive companies." *Id.* [5]

Moreover, we cannot agree with Nucor's assertion that the Commission's interpretation renders subsection 39.262(*o* ) a functional nullity. Although it is true that the Commission's interpretation of the statutes **\*883** at issue more sharply limits the Commission's authority to review and enforce stipulations than the interpretation offered by Nucor, that fact does not render subsection 39.262(*o* ) a nullity. Further, prior to the enactment of subsection 39.262(*o* ), the Commission had no express statutory authority to enforce stipulations filed as part of a notification of a proposed transaction under section 14.101. In fact, in reviewing a filing under section 14.101, the Commission is only explicitly permitted to "disallow the effect of the transaction if the transaction will unreasonably affect rates or service" and to "take the effect of the transaction into consideration in ratemaking proceedings." Tex. Util.Code Ann. § 14.101(c). However, subsection 39.262(*o* ) granted the Commission the additional authority to enforce stipulations made as part of a filing under section 14.101. *Id.* § 39.262(*o* ).

Furthermore, although Nucor correctly points out that the Commission's interpretation shields portions of the transaction pertaining to affiliated companies from oversight by the Commission, in light of the fact that the affiliated companies are no longer subject to regulation by the Commission, we cannot agree with Nucor's assertion that the Commission's interpretation somehow improperly elevated Texas Energy's private interests over that of the public. [6]

Because we conclude that the Commission's construction of subsection 39.262(*o* ) is reasonable and consistent with the plain language of that statute as well as the statutes deregulating the electric industry, we hold that the trial court properly upheld the Commission's construction. Accordingly, we overrule Nucor's first issue on appeal.

### The Commission's Limitations on Discovery and the Admission of Testimony

 **[3]**    In its second issue, Nucor argues that various evidentiary rulings by the Commission denied it the right to a full hearing and violated its due process rights and its right to equal protection under the law. *See* U.S. Const. amend. XIV, §

1; Tex. Const. art. I, §§ 3, 19. When reviewing an agency's rulings on the admission or exclusion of evidence, appellate courts apply an abuse-of-discretion standard. *Texas Dep't of Pub. Safety v. Nordin,* 971 S.W.2d 90, 93 (Tex.App.-Houston [14th Dist.] 1998, no pet.); *see* Tex. Gov't Code Ann. § 2001.174(2)(F) (West 2008) (stating that courts may reverse agency order under substantial-evidence standard when order is "arbitrary or capricious or characterized by abuse of discretion or clearly **\*884** unwarranted exercise of discretion"). Under this standard, an agency abuses its discretion if it acts without reference to any guiding rules and principles or if its actions are arbitrary or unreasonable. *See City of San Benito v. Rio Grande Valley Gas Co.,* 109 S.W.3d 750, 757 (Tex.2003).

First, Nucor challenges the Commission's order denying several of its discovery requests. *See* 16 Tex. Admin. Code § 22.141 (2011) (setting scope and forms of discovery). Those requests related to the four commitments that were originally filed by Texas Energy and that did not relate to Oncor (the public utility). For that reason, the Commission determined that the discovery requests were beyond the scope of the proceeding. *See id.* (stating that parties may obtain discovery on matters "relevant to the subject matter in the proceeding" unless matters are privileged or exempted under rules of evidence or civil procedure).

Second, Nucor disputes the Commission's order striking parts of Dennis W. Goins's testimony. Nucor had previously filed testimony from Goins that addressed, among other things, Oncor's affiliates, the four commitments discussed previously, and the scope of subsection 39.262(*o* ). For that reason, Oncor filed a motion to strike parts of Goins's testimony from Nucor's filings, and the Commission granted the motion in part and struck various portions of the testimony.

As discussed above, the Commission determined that the governing statutes only authorized the Commission to review and enforce stipulations that bear upon a regulated utility, and we concluded that the Commission's construction is reasonable, consistent with the governing statutory scheme, and therefore, entitled to deference. In light of that determination, we cannot conclude that the Commission abused its discretion by denying Nucor's discovery requests for information that did not pertain to Oncor or by striking testimony that also did not address Oncor. See Tex. Gov't Code Ann. § 2001.051 (West 2008) (stating that party in contested case is entitled to opportunity to present

evidence on issues "involved in the case"); Tex. Util.Code Ann. § 14.054(b)(1) (West 2007) (addressing settlements of contested cases and saying that parties are entitled to hearing "on issues that remain in dispute"). In fact, Nucor essentially conceded in its reply brief that this portion of its second issue is dependent on a determination that the Commission improperly narrowed the scope of its review.

 [4]    In its second issue, Nucor also criticizes another decision by the Commission that limited other testimony that Nucor sought to introduce. As mentioned before, several parties in addition to Nucor originally objected to the proposed acquisition of Oncor. The Commission Staff also initially objected to the proposed transaction. When the parties and the Commission Staff objected, they filed testimony from various witnesses contending that the proposed transaction was not in the public interest. Under Commission rules, testimony from expert witnesses must be pre-filed, but the testimony is not admitted into the record until it is offered by a witness and until the witness testifies that the "testimony is a true and accurate representation of what the testimony would be if the testimony were to be given orally at the time the written testimony is offered into evidence." 16 Tex. Admin. Code § 22.225(a)-(b) (2011). Although the testimony at issue was pre-filed with the Commission, it was not admitted into the administrative record. After Texas Energy agreed to modify the stipulations that it originally proposed in order to address some of the concerns of the objecting parties, the Commission Staff and many of the parties that originally objected to the acquisition **\*885** changed their minds and endorsed the proposed transaction.

Because Nucor was concerned that some of the previously objecting parties might withdraw the testimony that they had previously filed, Nucor asked the Commission to inquire whether the parties intended to have their previously filed testimony offered into evidence. The Commission issued an order asking all intervening parties as well as the Commission Staff to confirm "whether their previously filed direct testimony will be offered into evidence." After the order was issued, Nucor submitted its proposed testimony, including Goins's testimony. Goins's proposed testimony partially relied on the testimony of a Commission Staff witness, Dr. Craig Roach, and a witness for Texas Industrial Energy Consumers ("Texas Industrial"), Jeffry Pollock, that had been filed prior to Texas Energy's modifications. Nucor also attached as an exhibit to Goins's testimony a copy of Roach's testimony. However, after Nucor filed its testimony, the Commission Staff and Texas Industrial elected

to withdraw the testimony by Roach and Pollock that they had previously submitted.

On appeal, Nucor contends that the Commission erred by allowing the Commission Staff and Texas Industrial to withdraw the previously filed testimony of Roach and Pollock and also asserts that it was error to allow the Commission Staff and Texas Industrial to withdraw their testimony after having the opportunity to review the testimony that Nucor filed. Under the Commission's rules, the only express prohibition on the ability to withdraw evidence during proceedings before the Commission limits the ability of an individual to withdraw evidence *after* it has been admitted into the record. 16 Tex. Admin. Code 22.225(e) (2011) (stating that party may withdraw evidence after it has been admitted into record only by agreement of all parties to proceeding). As mentioned above, although the testimony at issue was pre-filed with the Commission, both the Commission Staff and Texas Industrial withdrew their pre-filed testimonies before they were admitted into the record. *See id.* § 22.225(a)-(b). Nucor has not referred us to any rule, statute, or case law that explicitly prohibits the Commission from allowing individuals to withdraw proposed testimony before it is admitted into the record. It is also worth noting that Nucor has not referred us to any request that it made to the Commission after the parties withdrew their testimony that asked for an extension of time to file or to modify its testimony in response to the withdrawal.

Furthermore, as described previously, the pre-filed testimony was initially offered to show that the proposed transaction was not in the public interest, and the Commission authorized the withdrawal after Texas Energy and Oncor made significant modifications to the proposed transaction. Moreover, as a result of those modifications, neither Texas Industrial nor the Commission Staff continued to believe that the transaction was against the public interest. In fact, they endorsed the modified transaction.

In light of the above, including the changes made to the stipulation, we cannot conclude that the Commission abused its discretion by allowing the Commission Staff and Texas Industrial to withdraw their previously filed testimony.

 [5]    After Texas Industrial and the Commission Staff withdrew the testimony of Roach and Pollock, Texas Energy and Oncor filed a motion to strike the portions of Goins's proposed testimony that discussed and extensively quoted from the withdrawn testimony as well as the exhibit

containing Roach's testimony. Specifically, Texas Energy and Oncor argued that **\*886** because the testimony of Roach and Pollock had been withdrawn, the portions of Goins's testimony quoting and referring to their testimony as well as the exhibit constituted impermissible hearsay. *See* Tex. Gov't Code Ann. § 2001.081 (West 2008) (stating that rules of evidence apply to hearings before Commission); Tex. Admin. Code § 22.221 (2011) (same). In other words, Texas Energy and Oncor stated that because those pages "simply restate[d] testimony by" witnesses whose testimony had been withdrawn, "Goins' restatement of their testimony is hearsay—an out of court statement offered to prove the truth of the matter asserted." *See* Tex.R. Evid. 801(d) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). After reviewing the motion, the Commission granted the motion in part and struck all of the testimony by Goins that discussed or quoted the testimony of Roach and Pollock as well as the exhibit containing Roach's testimony.[7]

On appeal, in addition to challenging the Commission's decision to allow the Commission Staff and Texas Industrial to withdraw the testimony of Roach and Pollock, Nucor also challenges the Commission's decision to strike the portion of Goins's testimony that discussed or quoted the withdrawn testimony as well as the exhibit containing Roach's testimony.

In contesting the Commission's ruling, Nucor alleges that the portions of Goins's testimony quoting and summarizing the testimony of Roach and Pollock as well as the accompanying exhibit are either not hearsay or fall within an exception to hearsay. First, Nucor contends that they are admissions by party-opponents and, therefore, are not hearsay by definition. *See id.* R. 801(e)(2) (setting out circumstances in which statement may be admitted as admission by party-opponent).

However, we believe that Nucor's reliance on the rule addressing statements by party-opponents is misplaced. That rule, by its terms, applies only to admissions by a party to the proceeding. *Id.* The Commission was the adjudicative body with which Nucor sought to file testimony, not a party to the proceeding. Accordingly, the Commission could reasonably have concluded that its Staff did not qualify as a "party" to that proceeding as that term is used in the rule governing admissions by party-opponents. Accordingly, the Commission could have determined that the testimony originally proposed by the Commission Staff and later

withdrawn could not be admitted as an admission by a party-opponent.

 **[6]** For different reasons, we also believe that Nucor's reliance on the rule as support for the admission of testimony previously filed by Texas Industrial is equally misplaced. At the time that Texas Industrial initially offered the testimony, **\*887** the interests of Texas Industrial and Nucor were aligned because they each opposed the proposed transaction. Moreover, after Texas Industrial initially filed the proposed testimony of Pollock, Texas Industrial entered into the agreed stipulation that settled all of its issues pertaining to the proposed transaction. That settlement effectively ended Texas Industrial's participation in the case. Although Texas Industrial still filed a brief and participated in the hearings after entering into the stipulation, its primary involvement in the case was limited to demonstrating that it was now in favor of the transaction and stating its reasons for no longer contesting the transaction. For these reasons, we believe that the Commission could reasonably have determined that the testimony originally proposed by Texas Industrial and then withdrawn was not admissible as an admission by a party-opponent in the case.

 **[7]** As mentioned above, Nucor also contends that portions of Goins's testimony as well as the accompanying exhibit were admissible under an exception to the hearsay rule. Specifically, Nucor contends that the parts of Goins's testimony discussing and quoting the Commission Staff's witness (Roach) as well as the exhibit containing Roach's testimony were admissible as public records. *Id.* R. 803(8)(C). The public-record exception provides, in relevant part, that the following types of documents are not excluded by the general prohibition against the admission of hearsay:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies setting forth:
>
>> (C) in civil cases as to any party ..., factual findings resulting from an investigation made pursuant to authority granted by law;
>
> unless the sources of information or other circumstances indicate lack of trustworthiness.

*Id.*

Nucor contends that the requirements of the rule were met because Roach was paid by the Commission Staff to prepare testimony and because his testimony "is essentially

a report reflecting his expert opinion and conclusions regarding the underlying transaction." Further, Nucor argues that Roach's testimony regarding the protective measures that should be imposed as part of the transaction "are factual findings resulting from his investigation, which was conducted pursuant to instructions given by Staff, under authority granted by law." Finally, Nucor alleges that the Commission Staff must have considered Roach's testimony to be trustworthy or else they would not have retained his services or initially filed the testimony.

However, Nucor has referred to no statute, rule, or case concluding that proposed testimony from an expert witness who was hired by the Commission Staff qualifies as a public record. Further, although Roach was hired by the Commission Staff, no showing was made that he was under the supervision of the Commission Staff when he researched and prepared his testimony. *Cf. Fibreboard Corp. v. Pool,* 813 S.W.2d 658, 676 (Tex.App.-Texarkana 1991, writ denied) (stating that rule 803(8) "is applicable only when the exhibit is prepared by public officials or employees under their supervision in the performance of their official duties," that "[d]ocuments prepared by private individuals and filed with a governmental agency are not official documents as contemplated by Rule 803(8)," and that even if individual preparing document is under contract with agency, document is not public record if individual preparing document was not under supervision of public official). In addition, Nucor has provided no support for the **\*888** proposition that a hired expert's proposed testimony could qualify as "factual findings resulting from an investigation made pursuant to authority granted by law." Although the Commission Staff hired Roach to prepare testimony, that does not automatically render his review of the proposed transaction an investigation performed under "authority granted by law."

Finally, we have been unable to find any support for the idea that the mere filing of proposed testimony renders the testimony a public record under rule 803(8). The absence of support is even more compelling in a case like this where the testimony was pre-filed but was not admitted into the record before it was withdrawn. *See* 16 Tex. Admin. Code 22.225(a)-(b).

In light of the preceding, we cannot conclude that the Commission abused its discretion by failing to conclude that the portion of Goins's testimony at issue as well as the accompanying affidavit were admissions by party-opponents or that they qualified under the public-record exception to the

hearsay rule. Moreover, because the testimony and exhibit were offered to prove that Pollock and Roach objected to the proposed transaction, we cannot conclude that the Commission abused its discretion by striking the testimony and the exhibit as hearsay. *See* Tex.R. Evid. 801, 802. [8]

 **[8]**    In a final challenge to the Commission's decision to strike portions of Goins's testimony, Nucor contends that the Commission's order granting Texas Energy and Oncor's motion to strike is arbitrary and unreasonable on its face because the Commission "refused to grant Nucor's argument that testimony filed by Oncor [and Texas Energy] should be stricken on the same grounds" that Oncor and Texas Energy alleged in their motion to strike. Stated differently, Nucor alleges that because the Commission struck the portion of Goins's testimony that discussed testimony by other witnesses that had been withdrawn, the Commission should have also struck the rebuttal testimony filed by Texas Energy and Oncor that responded to testimony that had been withdrawn.

As support for this argument, Nucor refers to its administrative filing entitled "Nucor Steel–Texas' Response to TEF's and Oncor's Motion to Strike Supplemental Direct Testimony of Dr. Dennis W. Goins." In that filing, Nucor argued that the portions of Goins's testimony that Texas Energy and Oncor objected to should not be stricken because they were relevant to the subject matter at issue, were admissible under the public-record exception to hearsay, and were admissions by a party-opponent. Near the end of the response, Nucor asserted that Texas Energy and Oncor had "made no attempt to withdraw their own rebuttal testimony, almost all of which was prepared to refute direct testimony that their co-Signatories have now elected to withdraw." Further, Nucor argued that in light of Texas Energy and Oncor's contentions that portions of Goins's testimony should be stricken, the Commission "should strike all of Movants' rebuttal testimony responding to witnesses whose testimony will not be offered into evidence at hearing" and then listed the rebuttal testimony of six witnesses that had been filed by Texas Energy or Oncor.

However, nothing in the title of the filing indicates that Nucor was actually seeking **\*889** to strike the testimony of any witness; on the contrary, the title stated that the filing was a response to Texas Energy and Oncor's motion to strike testimony. Furthermore, with the exception of the argument regarding Texas Energy's and Oncor's witnesses that was discussed above, the whole thrust of the filing was that Goins's testimony should be admitted in its entirety. *See In re*

*Brookshire Grocery Co.,* 250 S.W.3d 66, 72–73 (Tex.2008) (explaining that nature of motion and relief sought are not ascertained by simply looking at motion's caption and that courts also look to substance of motion); *Finley v. J.C. Pace, Ltd.,* 4 S.W.3d 319, 320 (Tex.App.-Houston [1st Dist.] 1999, no pet.)* (stating that substance of motion is gleaned from body of motion and from "prayer for relief"). Furthermore, the prayer for relief failed to alternatively plead that in the event that the Commission grants Texas Energy and Oncor's motion to strike, the Commission should also strike the testimony that Nucor highlighted. In fact, the prayer makes no mention of striking any testimony at all. On the contrary, the prayer requested "that [Texas Energy] and [Oncor's] Motion to Strike be denied and that Nucor be granted such further relief to which it may be entitled." In addition, after the Commission granted Texas Energy and Oncor's motion to strike, Nucor did not file its own motion to strike the testimony of the six witnesses listed in its response, nor did it object when those witnesses' testimonies were later admitted into the administrative record. *Cf.* Tex.R.App. P. 33.1 (explaining that in order to preserve complaint for appellate review, party must make complaint to trial court in "a timely request, objection, or motion"); *see also Kaufman v. Commission for Lawyer Discipline,* 197 S.W.3d 867, 875 (Tex.App.-Corpus Christi 2006, pet. denied) (stating that party waives right to raise appellate claim if not presented below).

In light of the preceding, we cannot conclude that the Commission's order granting Texas Energy and Oncor's motion to strike was arbitrary or unreasonable or that the Commission abused its discretion when it issued the order.

Having found no abuse of discretion in any of the rulings that Nucor argued were erroneous, we cannot conclude that the Commission's evidentiary rulings deprived Nucor of the right to a fair hearing or violated Nucor's constitutional rights to due process and equal protection.

### The Commission's Order Is Supported by Substantial Evidence

In its third issue, Nucor contends that there is no evidence supporting the Commission's finding that the non-unanimous stipulation was in the public interest. Nucor groups its various assertions into three sets of arguments.

In its first set of arguments, Nucor argues that the Commission's order does not satisfy the statutory requirements for a final administrative decision because the Commission's order amounted to no more than bald and conclusory assertions that the transaction and stipulation were in the public interest. *See* Tex. Gov't Code Ann. § 2001.141(b)-(d) (West 2008) (stating that final decision must contain findings of fact and conclusions of law, that findings may only be based on evidence and matters that were "officially noticed," and that findings, "if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings"). Further, Nucor contends that the Commission's order is improper because it contains no reference to evidence in the record. [9]

**\*890** **[9]** **[10]** As discussed previously, most of the parties to this administrative proceeding entered into an agreed stipulation, and the Commission approved that stipulation and incorporated the stipulation into its order. Various cases have described the manner in which agencies may use non-unanimous stipulations. *See City of Corpus Christi v. Public Util. Comm'n,* 51 S.W.3d 231 (Tex.2001); *City of El Paso v. Public Util. Comm'n,* 883 S.W.2d 179 (Tex.1994). In particular, an administrative agency is required to consider the stipulation "on its merits," *Corpus Christi,* 51 S.W.3d at 263 (Owen, J., concurring), and may not simply adopt a non-unanimous stipulation, *City of El Paso,* 883 S.W.2d at 183. Stated differently, the incorporation of a non-unanimous stipulation is proper when an agency makes its own independent finding that the stipulation satisfies the relevant governing criteria based on substantial evidence in the record as a whole, *see id.* (discussing adoption of non-unanimous stipulation in rate context and stating that adoption is proper if agency makes finding that proposal will establish reasonable rates for area (quoting *Mobil Oil Corp. v. Federal Power Comm'n,* 417 U.S. 283, 314, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974))), and when the agency "provides all parties, including non-signatories, the opportunity to be heard on the merits of the stipulation," *id.* at 183–84; *see* 16 Tex. Admin. Code § 22.206 (2011) (providing that when some parties have reached agreement on some or all issues, each party to proceeding still has right to full hearing on issues still in dispute). [10]

As a preliminary matter, we note that Nucor was given the opportunity to be heard regarding the stipulation and the proposed transaction. Although the Commission limited the scope of the proceeding in light of its interpretation of section 39.262(*o*), Nucor fully and actively participated in the hearings regarding the approval of the transaction, including cross-examining the chief executive officer of Oncor, and

filed expert testimony as well as several exhibits contesting that the proposed transaction was in the public interest.

 **[11]**    Having considered whether Nucor was given an opportunity to be heard on the merits of the stipulation, we now consider whether the Commission made its own finding that the stipulation satisfied the requirements of section 14.101 **\*891** and whether that determination is supported by substantial evidence. At the conclusion of the proceeding, the Commission issued its order approving the transaction. The order is thirty pages in length and contains 102 findings of fact and 10 conclusions of law. In the introductory paragraphs of the order, the Commission concluded that "the merger fulfills the requirements set forth in" section 14.101 and "that the stipulation reached by certain parties ... fulfills the standards for approval of non-unanimous stipulation[s] set forth ... in *City of El Paso v. Public Utility Commission.*" Next, the Commission set out the background of the case, including identifying the various parties involved in the case, listing the various hearings that were conducted, and summarizing the proposed transaction and the stipulation entered into by various parties. Following the discussion of the merger, the Commission directly incorporated all of the commitments made in the non-unanimous stipulation in findings of fact 43 through 95.

After listing the commitments in the stipulation, the Commission found that "[b]ased on the record evidence, the terms of the stipulation reached by certain parties in this docket are reasonable" and that "the stipulation reached by certain parties in this docket is in the public interest." Then, the Commission made findings specific to the requirements from subsection 14.101(b). *See* Tex. Util.Code Ann. § 14.101(b). Although the Commission concluded that several of the factors listed in subsection 14.101 did not apply because "the merger does not involve the sale of a utility's assets or a merger of operating utilities,"[11] *see id.* § 14.101(b)(1), (3), the Commission made findings regarding the remaining factors. Specifically, the Commission found as follows:

98. Based upon the record evidence and the commitments offered by Oncor, the merger will not adversely affect the health or safety of Oncor's customers or employees.

99. No party presented evidence to rebut [Texas Energy]'s position that the merger will not result in the transfer of jobs of citizens of this state to workers domiciled out of this state.

100. Based upon the record evidence and the commitment offered by Oncor relative to specific performance and customer service standards, the merger will not result in a decline in service.

...

102. The merger, coupled with the terms of the stipulation, as amended, is in the public interest.

*See id.* § 14.101(b)(2), (4). The Commission also found that "[b]ased upon the commitment by [Texas Energy] and Oncor that Oncor will not seek to include merger costs in future rate requests, the merger will not result in Texas ratepayers bearing merger-related costs unrelated to the corresponding benefits to Texas ratepayers."

At the end of the order, the Commission concluded that the "merger, coupled with the terms of the stipulation, as amended, meet the requirements set forth in" section 14.101 "to support a public interest finding"; that the "stipulation, as amended, is in the public interest"; and that the "stipulation, as amended, satisfies all of the Commission's standards for review of a non-unanimous stipulation."

The findings underlying the Commission's public-interest determination are supported by substantial evidence in the **\*892** record. A party challenging an order by the Commission "bears the burden of overcoming a presumption that the Commission's findings are supported by substantial evidence." *Nucor Steel v. Public Util. Comm'n,* 168 S.W.3d 260, 267 (Tex.App.-Austin 2005, no pet.). When determining whether an agency's actions are supported by substantial evidence, courts are prohibited from substituting their judgment for the Commission's "as to the weight of the evidence on questions committed to agency discretion." *Cities of Abilene, San Angelo, & Vernon v. Public Util. Comm'n,* 146 S.W.3d 742, 748 (Tex.App.-Austin 2004, no pet.) (citing Tex. Gov't Code Ann. § 2001.174 (West 2008)); *see also* Tex. Util.Code Ann. § 15.001 (stating that judicial review of agency action is under substantial-evidence standard); Tex. Gov't Code Ann. § 2001.174(2) (allowing court to reverse agency determination if it is not supported by substantial evidence). In making this determination, courts are not asked to verify whether "the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the agency's action." *Cities of Abilene, San Angelo, & Vernon,* 146 S.W.3d at 748. In fact, the evidence may actually preponderate against the Commission's finding and be upheld as long as there is enough evidence to suggest

that the Commission's "determination was within the bounds of reasonableness." *Id.*

Several witnesses testified that the proposed transaction was in the public interest. For example, Dr. William Avera, Texas Energy's witness, testified that the terms of the stipulation "ensure Oncor's financial independence with several ring-fencing provisions and commit [Texas Energy] to maintaining Oncor's capital structure and limiting its embedded debt cost." Furthermore, Avera clarified that the ring-fencing portions of the stipulation isolated Oncor from the financial risks or expenses of its affiliates and "ensures that the risk" from affiliates "does not negatively impact the financial viability of the utility." In addition, Avera explained that the terms of the stipulation also "ensure Oncor's operational independence" and "preserve Oncor's financial independence." Then, Avera related that "[b]ecause Oncor's operations will not be directly affected, the merger does not threaten the health or safety of customers or employees, jobs in Texas, or quality of service." Additionally, Avera explained that as a result of the stipulation, Texas Energy "will expend substantial funds on demand-side management and energy efficiency programs." Avera clarified that the demand-side-management expenditures will be $200 million "over the amount included in Oncor's rates." Further, Avera testified that the stipulation requires Oncor to "make capital expenditures on its traditional system ... during the next five years." Moreover, Avera stated that the stipulation "establishes detailed reliability and performance standards" that will be effective for five years after the transaction and that "Oncor also agreed to customer service metrics for maintaining street lights and handling customer service requests."

Finally, Avera explained that the stipulation provided additional benefits to the public that were "beyond the Commission's authority to order." In particular, Avera referenced Oncor agreeing to issue a $72 million credit to its customers as well as agreeing to not seek recovery for various expenses in future rate cases, including a $35 million write-off to Oncor's storm reserve and a $20.9 million write-off resulting from the restructuring of Oncor's regulated assets.[12]

 **\*893**  Another witness for Texas Energy, Frederick Goltz, similarly testified that the stipulation and transaction were "undoubtedly consistent with the public interest." As with Avera, Goltz explained that the stipulation is designed "to provide reasonable assurance that Oncor will function as a separate company from [its] affiliates and that Oncor will be protected from any possible negative impacts from financial difficulties at those affiliates." Goltz also testified that as a result of the stipulation, Oncor agreed to provide the rate credit discussed above and to not seek to recoup the expenses associated with the transaction through its rates. Further, Goltz stated that Oncor's customers will receive the benefit of improvements to Oncor's efficiency and of additional demand-side-management spending and that under the stipulation, Oncor is required to either maintain or improve its transmission-and-distribution system. In addition, Goltz related that the transaction will not adversely affect any of Oncor's customers or employees because "Oncor will be managed no differently after the closing of the [t]ransaction" and that "Oncor has historically provided safe, reliable service." Additionally, Goltz clarified that the transaction will not result in the transfer of jobs to workers out of Texas and "will not result in a decline of Oncor's services."

In addition to the testimony of Texas Energy's witnesses, Oncor also offered testimony **\*894**  from its chief executive officer, Robert Shapard. Shapard agreed that the transaction was "in the public interest in accordance with [subsection] 14.101(b) and considering the factors identified therein." In his testimony, Shapard agreed with the portions of Goltz's testimony regarding how the requirements of the stipulation separate Oncor from its affiliates and protect Oncor from any negative impacts stemming from one of its affiliate's financial problems. Shapard also discussed the benefits to Oncor's customers, including the credit, the additional money spent on demand-side management and energy-efficiency programs, and the fees that Oncor agreed not to recover in its next rate case. Furthermore, Shapard explained that the stipulation requires Oncor to make significant investments in its transmission-and-distribution system, which Shapard characterized as a "major concession by [Texas Energy] and Oncor." Shapard also related that under the stipulation, Oncor is required to meet certain "aggressive" reliability standards that will lead to rebate payments "if the standards are not achieved." Finally, Shapard testified that the transaction will not result in a decline in service to Oncor's customers due to the capital-investment commitments under the stipulation as well as the additional reliability standards that will be applied and that because Oncor "will be managed no differently after the closing of the [t]ransaction," the acquisition will not affect the health or safety of its employees.

A witness for the Commission Staff, Darryl Tietjen, also testified that the transaction was in the public interest. He

explained that the stipulation represented "an acceptable resolution of contested issues in this proceeding as well as in Oncor's current rate proceeding." In addition, Tietjen listed various benefits arising from the stipulation, including the investments in demand-side management, the decision by Oncor to not seek recovery of certain expenses, and the credit that will be given to Oncor's customers. Furthermore, Tietjen explained that the stipulation serves the public interest by providing "certainty on the resolution of a variety of issues, it ensures an outcome that, in the aggregate, is at least equal to—or, in some instances, possibly better than—what would result from continued litigation." Moreover, Tietjen summarized the various commitments that were designed to keep Oncor independent and to insulate Oncor from any potential negative effects stemming from one of its affiliates. Tietjen also mentioned the promise by Oncor to adhere to certain reliability standards as well as Oncor's promise to pay $3.6 billion over the next five years "to support the traditional Oncor system" and to "ensure Oncor's adherence to at least the same levels of capital investment that would have occurred absent the merger transaction."

In light of the preceding, we must conclude that the Commission considered the stipulation on its merits, made its own finding that the stipulation satisfied the relevant statutory requirements, and provided all parties with an opportunity to address the merits of the stipulation. We must also conclude that the stipulation is supported by substantial evidence in the record as a whole.

In its second set of arguments, Nucor contends that two of the commitments contained in the stipulation and that were relied on by the Commission in its determination could not support the Commission's conclusion that the proposed transaction was in the public interest. The first is the one-time $72 million credit offered by Oncor to retail-electric providers that the providers would then pass on to their retail customers. The Commission found that the credit represented "a great benefit for Texas retail consumers." The second **\*895** involved the $56 million in write-offs to Oncor's storm reserve and from restructuring fees that Oncor promised not to include in its future rate case.

When attacking the propriety of the credit, Nucor asserts that none of the settling parties provided any testimony demonstrating that the amount of the credit, $72 million, was adequate. In making this contention, Nucor refers to the fact that the credit was given in exchange for the Commission's decision to dismiss Oncor's then-pending rate case. Essentially, Nucor theorizes that had the rate case continued, the Commission might have discovered that Oncor's excess revenue well exceeded the amount offered as a credit and that without evidence of Oncor's cost of service, the Commission was unable to evaluate the reasonableness of the credit. [13] Regarding the write-offs, Nucor contends that the benefit of the write-offs is illusory because there is no guarantee or evidence "that Oncor would have requested recovery of any of these expenses in its 2008 rate case, or that the Commission would have granted that request."

Rather than challenge the evidentiary support for the stipulation as a whole, Nucor posits the concept that reviewing courts may only affirm a Commission's order approving a non-unanimous stipulation if each term of a stipulation is individually supported by substantial evidence. Even assuming that Nucor's assertion is correct, its challenge to these particular findings still fails. As summarized above, various witnesses testified that the credit and the write-offs represented a benefit to Oncor's customers and were in the public interest. Moreover, although Nucor correctly points out that Oncor's rate case was dismissed prior to a final determination regarding whether and to what amount Oncor had accumulated excess revenue, that uncertainty does not necessitate a conclusion that the finding regarding the $72 million credit was erroneous. Similarly, the fact that the dismissal of the rate case foreclosed the possibility of finding out whether the Commission would have authorized recoveries during the rate case for the write-offs that Oncor agreed to make under the stipulation does not render the findings pertaining to those write-offs improper. Undeniably, the stipulation, by its nature as a settlement agreement, foreclosed knowledge of the ultimate outcome had the parties fully litigated the various claims, but Nucor's challenges ignore the actual benefits obtained from the settlement, including a speedier resolution of the issues and recovery without the need for and added expense of continued and protracted litigation. Moreover, although Nucor correctly points out that the Commission may have ultimately forbidden recovery of the expenses that were written off under the stipulation or concluded that Oncor had obtained excess revenues well beyond $72 million, the Commission could have as easily made the opposite determinations. In other words, the stipulation might have given a benefit that otherwise would not have been given had the rate case continued.

In its final set of arguments, Nucor argues that the write-offs had no bearing on whether the proposed transaction was in the

public interest. In other words, Nucor argues that the write-offs related to Oncor's **\*896** rate case but were not relevant to the proposed acquisition of Oncor. [14]

Although those write-offs pertained to Oncor's then-pending rate case, we can find no support for the proposition that a concession relating to a rate case could not be included in a stipulation filed under section 14.101 or in an order by the Commission endorsing the stipulation. This seems particularly true given that the Commission is authorized under subsection 14.101(c) to consider the effects of a proposed transaction in a utility's "ratemaking proceedings." Tex. Util.Code Ann. § 14.101(c).

For all the reasons previously given, we overrule Nucor's third issue on appeal.

## CONCLUSION

Having overruled all three of Nucor's issues on appeal, we affirm the judgment of the district court.

Footnotes

1    In addition to the provision authorizing the enforcement of stipulations, the legislature also recently promulgated other statutory provisions pertaining to transactions involving an electric utility. *See* Tex. Util.Code Ann. § 39.262(*l* )-(n) (West Supp. 2011). As with section 14.101, the new statutory provisions require utilities to inform the Commission about certain proposed transactions and state that the Commission must approve a transaction provided that it "finds that the transaction is in the public interest." *Id.* § 39.262(*l* ), (m). These additional statutory provisions also include new factors for the Commission to consider when it performs a public-interest analysis. *Id.* § 39.262(m) (listing following factors for consideration: whether transaction will adversely affect reliability of service, availability of service, or cost of service). However, the legislature expressly limited the applicability of those new factors to proposed business transactions that were filed with the Commission after the filing at issue in this case. *Id.* § 39.262(n) (stating that subsections (*l* ) and (m) do not apply to transactions in which agreement was executed before April 1, 2007, provided that filing for review before Commission was filed before May 1, 2007). Accordingly, the Commission did not consider the new provisions when performing its public-interest analysis.

2    In its reply brief, Nucor asserts that the Commission's interpretation is not entitled to any deference because "the Commission provided no discernible reason for making its decision." We disagree. Although Nucor correctly points out that the Commission did not refer to the arguments made by Texas Energy or Oncor regarding the Commission's authority under subsection 39.262(*o* ), the Commission did provide a basis in its order for its limited construction of section 39.262(*o* ). In particular, the Commission stated as follows:

> The Commission finds that the legislative intent of the language in § 39.262(*o* ) indicates that this section only applies to the public utility and to commitments that directly affect the public utility. While the Commission has examined a wide variety of issues related to public utility transactions using the public interest standard in § 14.101(b)(4), most of these proceedings took place prior to S.B. 7 and a restructured electric industry in ERCOT, and are not directly comparable to this proceeding. The restructuring of the electric industry in Texas, as well as the legislative history concerning § 39.262(*o* ), limit the Commission's review of the pending transaction. Therefore, the Commission's determination ... is that the Commission cannot evaluate or enforce any commitment made that relates to the affiliate of the public utility, and can only address commitments that directly affect Oncor.

In its brief, Nucor also contends that the more thorough explanation for the limited construction that is found in the Commission's appellate brief should be disregarded because it amounts to nothing more than impermissible "*post hoc* rationalization." *See Trans–American Van Serv., Inc. v. United States,* 421 F.Supp. 308, 319 (N.D.Tex.1976) (stating that reviewing courts may not search record for "*post hoc* rationalizations that the [agency] itself has not articulated as a basis for its result"). Although the Commission elaborated on its construction in its appellate brief, the main thrust of the Commission's briefing on this issue is the same as that expressed in its order: that the Commission does not have authority over the companies affiliated with Oncor because it currently only has authority over public or regulated utilities. Accordingly, we cannot conclude that the Commission's briefing on the issue represents the sort of post hoc rationalization that we should disregard.

3    As support for its assertion that the Commission's limited interpretation of subsection 39.262(*o* ) is incorrect, Nucor refers to two cases addressing controversies arising prior to deregulation in which courts broadly described the Commission's authority over agreements between parties. *See In re Entergy Corp.,* 142 S.W.3d 316, 324 (Tex.2004) (stating that merger agreement between utility and various parties was basis for Commission's approval of merger and that administrative character that gave effect to merger agreement also gave Commission authority to adjudicate disputes arising from agreement); *Public Util. Comm'n v. Southwestern Bell Tel. Co.,* 960 S.W.2d 116, 119–20 (Tex.App.-Austin 1997, no pet.) (explaining that power to conduct adjudicative proceedings necessarily includes

"power to accept and act upon an agreement between the parties that removes from dispute and litigation a subsidiary issue of fact or law" and "power to formulate and award a reasonable remedy to effectuate the agreement"). However, nothing in either of those cases compels a conclusion that the Commission's limited interpretation, particularly in light of the deregulation of the electric market, is inconsistent with the governing statutory language.

4   We note that subsection 39.262(*o* ) does not require the Commission to enforce stipulations filed. *See* Tex. Util.Code Ann. § 39.262(*o* ). Instead, the legislature stated that the Commission "may enforce" filed stipulations. *Id.* Accordingly, the legislature has left the decision regarding whether to enforce a stipulation to the Commission's discretion. *See* Tex. Gov't Code Ann. § 311.016(1) (West 2005) (explaining that legislature's use of word "[m]ay creates discretionary authority"). Even assuming that the Commission could exert authority over stipulations unrelated to a public utility, in light of the legislature's decision to deregulate the electric market, we would be unable to conclude that the Commission abused its discretion by refusing to consider stipulations that do not relate to Oncor. *See* Tex. Gov't Code Ann. § 2001.174(2)(F) (West 2008) (allowing court to reverse agency's order if agency's determinations are "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion"); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985) (explaining that action is abuse of discretion if it occurs without reference to any guiding rules or principles or is arbitrary or unreasonable).

5   Although we generally recognize that courts should be wary of using the legislative history for statutes that were not enacted in order to divine the meaning of a statutory provision that actually became law, *see Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 442–43 (Tex.2009), we believe that the legislative history for senate bill 482 is noteworthy in this case given that the relevant statutory language proposed in senate bill 482 is identical to the language enacted and codified into subsection 39.262(*o* ), *compare* Conf. Comm. Rep't, S.B. 482, 80th Leg., R.S., at p. 24 (May 20, 2007), *with* Tex. Util.Code Ann. § 39.262(*o* ).

   In its reply brief, Nucor refers to the summary provided by the Texas Legislative Council as support for its broader interpretation of subsection 39.262(*o* ). *See* Texas Legislative Council, *Summary of Enactments,* 80th Leg., R.S., at 432 (2007); *see also* Tex. Gov't Code Ann. § 323.001 (West 2005) (specifying who members of council are). In that summary, the Council wrote that house bill 624 authorizes the Commission "to enforce" a "stipulation, representation, or commitment" filed by an electric utility, transmission-and-distribution utility, or "acquisition or merger party." *Summary of Enactments,* 80th Leg., R.S., at 432. After referring to this language, Nucor urges that the language in the summary demonstrates that the legislature intended to make all stipulations filed be subject to enforcement by the Commission regardless of whether the stipulations directly affect a regulated utility. Although the report does not specify whether a stipulation must directly affect a regulated utility to be enforceable, the report does not explicitly contradict the Commission's interpretation either.

6   As discussed previously, in addition to enacting subsection 39.262(*o* ), the legislature also added other subsections to section 39.262 but limited the applicability of those subsections to transactions occurring after the one at issue in this case. *See* Tex. Util.Code Ann. § 39.262(*l* ), (m). One of those new subsections—subsection 39.262(m)—provides factors for the Commission to consider when deciding whether a proposed transaction is in the public interest. Although that subsection does not apply to the transaction here, the factors provide some insight regarding what the legislature intended the Commission to consider after deregulation. It is worth noting that the legislature directed the Commission to consider whether "the transaction will adversely affect the reliability of service, availability of service, or cost of service of the ... *transmission and distribution utility.*" *Id.* § 39.262(m) (emphasis added). Further, although the provision also allows the Commission to consider those effects on an "electric utility," the definition of electric utility does not include power-generation companies or retail-electric providers that were unbundled from a formerly integrated utility. *See id.* § 31.002(6), (10), (17) (West 2007) (defining electric utility, power-generation company, and retail-electric provider). Accordingly, the legislature has limited the factors to be considered, and this limitation is consistent with the Commission's construction of subsection 39.262(*o* ) as applied to transactions filed under section 14.101.

7   On appeal, Nucor contends that the Commission erred by striking portions of Goins's testimony without setting out the reasons why the testimony should be removed. Although Nucor correctly points out that the ordering paragraph does not explicitly say why portions of Goins's testimony were stricken, Texas Energy and Oncor's motion provided only one basis for the removal of the testimony at issue. In particular, they urged that nearly all of the testimony appearing on pages eight through eleven as well as the entirety of the accompanying exhibit was hearsay. Moreover, the Commission summarized in its order the hearsay arguments made by Texas Energy and Oncor and the responsive arguments made by Nucor and then stated that it was striking the testimony of Goins "[a]fter reviewing the pleadings" by the parties. Accordingly, we cannot agree with Nucor's assertion that the Commission's order was improper because it provided no basis for the exclusion.

8   In its reply brief, Nucor also contends that the stricken parts of Goins's testimony as well as the exhibit were admissible "as the deliberate creation of hearsay exceptions by the [Commission] in permitting parties to withdraw testimony *after* having had a chance to review Nucor's testimony addressing the settlement." Having reviewed the record, we cannot agree with Nucor's assertion that the Commission's actions could have somehow created a hearsay exception.

9    Nucor also contends that the order is improper and may not be upheld because it contains no discussion of the arguments or evidence offered by the non-settling parties. However, Nucor has referred to no statutory authority or case law for that proposition, and we have been unable to find any. To the contrary, although we were construing a prior version of the Administrative Procedure Act, this Court has concluded that the Commission is only required to state findings that support "its ultimate findings; it is not required to state facts that it rejected and upon which it did not rely in reaching its conclusions." *See Pedernales Elec. Coop. v. Public Util. Comm'n,* 809 S.W.2d 332, 337 (Tex.App.-Austin 1991, no writ).

10    Nucor also asserts that the Commission's order cannot be upheld because the Commission did not make a specific finding that the stipulation "resulted in just and reasonable rates." As support for the proposition that the Commission is required to make that type of finding, Nucor refers to *City of El Paso v. Public Utility Commission,* 883 S.W.2d 179 (Tex.1994). That case involved a situation in which a regulated utility sought to increase its rates. *Id.* at 181. Because *El Paso* was a rate case, the supreme court explained that the Commission was required to independently find that the stipulation resulted in just and reasonable rates.

     However, the present case is not a rate case. Rather, this case involves the acquisition of a public utility under section 14.101 of the utilities code. *See* Tex. Util.Code Ann. § 14.101 (West 2007). Accordingly, we cannot conclude that the Commission's failure to make the specific finding suggested by Nucor would constitute grounds for overturning the Commission's order.

11    We note that Nucor makes no specific challenge to the Commission's determination that the provisions in subsection 14.101(b) pertaining to the value of the utility's assets and the consideration offered under the transaction had no applicability to the public-interest analysis at issue.

12    Throughout its first and third issues, Nucor complains that although the Commission's interpretation of the governing statutes limited its ability to consider or enforce commitments to those that directly related to Oncor, the Commission in its public-interest analysis approved stipulations made by "Oncor's unregulated affiliates and unregulated third party market participants." Given that the Commission's construction prohibited Nucor from introducing evidence regarding effects of the transaction beyond those relating to Oncor, Nucor insists that the Commission erred by including commitments relating to unregulated companies. Moreover, Nucor argues that "under the Commission's reading of the law, there is no way to enforce these commitments" and that the allegedly problematic commitments may be disregarded "without penalty."

     The commitments Nucor is referring to are the promise to spend $200 million on demand-side management and the $72 million credit Oncor agreed to give to its customers. Specifically regarding the credit, Oncor promised to give the credit to its retail-electric-provider customers. Under the stipulation, the retail providers are required to pass the credit on to their retail customers. In challenging the propriety of this stipulation, Nucor asserts that the Commission will be unable to enforce the commitment because it depends on the actions of unregulated companies. Admittedly, although we need not make a final determination regarding the issue, we do note that based on the Commission's construction, it is not entirely clear that the Commission would be able to force the unregulated companies to pass the credit on to their customers. However, the Commission would unquestionably be able to enforce the commitment as it relates to the obligations imposed on Oncor. *See* Tex. Util.Code Ann. § 39.262(*o* ); *see also id.* § 14.101(c) (authorizing Commission to take "the effect of the transaction into consideration in ratemaking proceedings"). For that reason, we cannot agree with Nucor's assertion that the Commission's inclusion of this commitment in its order was somehow improper.

     Under the demand-side-management commitment, Texas Energy agreed to fund $200 million for demand-side-management programs. Further, the commitment required Oncor, through the funding given by Texas Energy, to spend $100 million on demand-side-management issues. The commitment also extensively listed the manner in which Oncor was required to spend the money, including using $16 million for low-income-customer programs. Finally, the commitment explained that Texas Energy would be giving the other $100 million to Texas Energy "affiliates other than Oncor." Other than mentioning Texas Energy's decision to provide funding for companies other than Oncor, the stipulation and the Commission's order make no further reference to that funding. Accordingly, we cannot conclude that the mere mention of this promise, without more, was reversible error or could have somehow invalidated the Commission's limited construction of the governing statutes.

13    In this set of arguments, Nucor again challenges the Commission's decision to not address or include in its order the evidence that Nucor offered regarding the stipulation. In particular, Nucor contends that the Commission should have addressed the testimony by Goins stating that the credit was tied to the Commission's decision to dismiss Oncor's then-pending rate case that was initiated when the Commission Staff estimated that Oncor's rates led to $80 million in excess revenue. In footnote nine, we addressed similar arguments made by Nucor, and for those same reasons, we reject this challenge as well.

14    Although it did not contest the following findings in its opening brief, in its reply brief, Nucor seems to challenge several findings regarding steps that were taken to "minimize any deleterious impact the merger might otherwise have on Oncor." Specifically, Nucor contends that those commitments in the stipulation "do absolutely nothing to determine whether with those measures and other elements the merger/acquisition is in the public interest."

     As discussed earlier, the legislature provided factors for the Commission to consider when performing a public-interest analysis, including whether a proposed transaction will result in a decline in service and, more generally, whether the acquisition "is

consistent with the public interest." *See* Tex. Util.Code Ann. § 14.101(b)(1)-(4). Given this language, we cannot conclude that the Commission's decision to consider commitments designed to protect the public utility from potential financial ruin was unreasonable or inconsistent with the plain language of the governing statutes. *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619, 625 (Tex.2011).

**End of Document**                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

837 S.W.2d 94
Supreme Court of Texas.

Michol O'CONNOR, Justice,
First Court of Appeals, Relator,
v.
FIRST COURT OF APPEALS, Respondent.

No. D–1571. | Sept. 16, 1992.

Justice of Court of Appeals and plaintiff in underlying action sought writ of mandamus directing Court of Appeals to instruct its clerk to file the Justice's dissent from denial of motion to hear an appeal en banc. The Supreme Court, Mauzy, J., held that: (1) when Court of Appeals votes against hearing a case en banc, any member of court is entitled to file a dissent, regardless of whether that judge was on original panel deciding case, and the Court of Appeals has nondiscretionary duty to allow filing of such a dissent, and (2) mandamus would issue if court failed to vacate its order instructing its clerk not to file dissent.

Writ conditionally granted.

Phillips, C.J., concurred with an opinion.

**Attorneys and Law Firms**

 **\*95** Hon. Michol O'Connor, pro se.

Steven A. Gibbins, Jay L. Winckler, Austin, John D. Ellis, Jr., Katherine Lynn Levy, Houston, for respondent.

**OPINION**

MAUZY, Justice.

In this original proceeding, Justice Michol O'Connor of the First Court of Appeals seeks a writ of mandamus directing that court to instruct its clerk to file O'Connor's dissent from the denial of a motion to hear an appeal en banc. Richard Fought, the appellant in the underlying suit, seeks the same relief. We conditionally grant the writ of mandamus.

In the underlying case, Richard Fought sued Dr. David Solce for medical malpractice. The trial court granted summary judgment for Dr. Solce. Fought appealed to the First Court of

Appeals, where the case was submitted to a panel consisting of Justices Jon N. Hughes, Sam Bass and D. Camille Dunn. In accordance with the court's customary practice, a proposed opinion was eventually circulated to all members of the court for comments. Justice O'Connor, exercising her prerogative under Rule 79(e) of the Texas Rules of Appellate Procedure, [1] made a written motion to submit the case for en banc hearing; but the motion failed to receive a majority vote. When the opinion in *Fought v. Solce* was issued, [2] O'Connor informed the court that she planned to file a dissent from the order denying en banc consideration. A majority of the full court then voted to deny O'Connor leave to file the dissent, and accordingly instructed its clerk by written order not to file the dissent. When O'Connor presented her dissent for filing, it was refused.

O'Connor argues that a court of appeals has a duty to allow a nonpanel justice to file a dissent from the court's denial of a motion for en banc consideration. We agree.

Rule 90(e) of the Texas Rules of Appellate Procedure provides in part that "[a]ny justice may file an opinion concurring in or dissenting from the decision of the court of appeals." The First Court of Appeals construes this provision to mean that any justice *on the panel deciding the case* may file a dissenting opinion; but neither policy **\*96** nor precedent supports that interpretation of the rule.

The viability of the First Court's interpretation must be considered in light of Texas Rule of Appellate Procedure 79, which governs panel and en banc submission in the courts of appeals. The adoption of Rule 79 was made possible by the passage in 1978 of a constitutional amendment permitting courts of civil appeals to sit in sections. *See* Act of May 25, 1977, 65th Leg., R.S., 1977 Tex.Gen.Laws 3366 (proposing amendment to Tex. Const. art. V, § 6). That amendment was not intended to splinter the courts of appeals into new, distinct courts; it was intended "to authorize the increase in size of existing Courts of Civil Appeals to meet population demands rather than creating more new courts." HOUSE COMM. ON CONST. AMENDMENTS, BILL ANALYSIS, S.J.R. 45, 65th Leg., R.S. (1977). The enabling statute accordingly allowed courts of civil appeals to sit in panels of three or more, as in the federal circuit courts of appeals. Act of May 27, 1977, ch. 624, 65th Leg., R.S., 1977 Tex.Gen.Laws 1531. [3]

 [1] The provisions of Rule 79 reflect the view that a court of appeals is a single, unitary body, even though it may sit in panels. Unless a court of appeals chooses to hear a case en

banc, the decision of a panel constitutes the decision of the whole court. *See* Tex.R.App.P. 79(a). Thus, the rule provides for en banc review when necessary to maintain uniformity of the court's decisions. Tex.R.App.P. 79(e).

 **[2]**    Because a court of appeals is an integral body, even when it sits in panels, we construe the words "any justice" in Rule 90(e) to signify any justice serving on the court of appeals. To read the rule more restrictively would divide the court into distinct subparts, effectively disenfranchising those members of the court who were not on the original panel deciding the case. *See generally Textile Mills Sec. Corp. v. Commissioner of Internal Revenue,* 314 U.S. 326, 333, 62 S.Ct. 272, 277, 86 L.Ed. 249 (1941).

A nonpanel member's dissent from denial of en banc review serves the same salutary purposes served by any other dissenting opinion: chiefly, promoting the uniformity and correctness of the court's decisions. Chief Justice Hughes of the United States Supreme Court once called the dissenting opinion

> an appeal to the brooding spirit of the law, to the intelligence of a future day, when a later decision may possibly convert the error into which the dissenting judge believes the court to have been betrayed.

CHARLES EVAN HUGHES, THE SUPREME COURT OF THE UNITED STATES 68 (1937). As with any other dissent, the prospect of a dissenting opinion by a nonpanel member of the court of appeals "heightens the opinion writer's incentive to 'get it right.' " Ruth Bader Ginsburg, *Remarks on Writing Separately,* 65 WASH.L.REV. 133, 144 (1990); *see also* Karl M. ZoBell, *Division of Opinion in the Supreme Court: A History of Judicial Disintegration,* 44 CORNELL L.Q. 186, 211 (1959).

Our interpretation of Rules 79 and 90(e) is consistent with practice in the federal circuit courts of appeals, on which this state's panel system was modelled.[4] The federal rule governing en banc review, Fed.R.Civ.P. 35, does not expressly address the right to dissent from an order overruling a motion for en banc review; but nonetheless, such dissents are common. *See Isaacs v. Kemp,* 782 F.2d 896, 897 n. 1 (11th Cir.1986) ("Dissents from orders denying rehearing *en banc* have proliferated in our court ... to the point where the practice may be said to have become institutionalized."); *Golden Eagle Distrib. Corp. v. Burroughs Corp.,* 809 F.2d

584, 585 (9th Cir.1987) ("Denial of rehearing en banc does not foreclose the opportunity to point out where the opinion distorts what the district court did, to underline certain **\*97** difficulties the opinion creates, and finally to point out alternative avenues that the opinion does not cut off."). In the Fifth Circuit Court of Appeals alone, there are abundant examples of dissents from the denial of en banc review.[5]

Our interpretation is also consistent with previous practice in other Texas courts. Though no Texas court has expressly addressed the present issue, nonpanel justices have dissented from the denial of motions for rehearing en banc in the Court of Criminal Appeals[6] and in at least one court of appeals.[7]

By enabling Justice O'Connor to file her dissent, our construction of Rule 90(e) avoids any potential constitutional difficulties, *see Davenport v. Garcia,* 834 S.W.2d 4 (Tex.1992); *Ex parte Tucker,* 110 Tex. 335, 337–38, 220 S.W. 75, 76 (1920), posed by a restrictive interpretation of the rule. *See Federal Sav. & Loan Ins. Corp. v. Glen Ridge I Condominiums, Ltd.,* 750 S.W.2d 757, 759 (Tex.1988) (statutes should be construed to avoid doubts of their constitutionality).

We hold that when a court of appeals votes against hearing a case en banc, any member of the court is entitled to file a dissent, regardless of whether the judge was on the original panel deciding the case. The court of appeals has a duty under Rule 90(e) to allow the filing of such a dissent, and this duty is non-discretionary. *Cf. Cowan v. Fourth Court of Appeals,* 722 S.W.2d 140 (Tex.1987) (court of appeals has no discretion to deny a party the right to file a motion for rehearing).

 **[3]**     **[4]**    Mandamus will issue when there is a legal duty to perform a non-discretionary act, a demand for performance, and a refusal. *Doctors Hosp. Facilities v. Fifth Court of Appeals,* 750 S.W.2d 177, 178 (Tex.1988). Because O'Connor and Fought have established all three requisites, they are entitled to mandamus relief. We are confident that the First Court will vacate its order instructing its clerk not to file the dissent at issue. The writ will issue only if the court fails to do so.

Concurring opinion by PHILLIPS, C.J., joined by COOK, HECHT and CORNYN, JJ.

PHILLIPS, Chief Justice, concurring.

I concur in the judgment of the Court, but I am not willing to join in that portion of the opinion which suggests that our interpretation of Tex.R.App.P. 90(e) is premised, in part, on a desire to avoid a potential constitutional defect. I believe that our interpretation of Rule 90(e) is correct. **\*98** Accordingly, there is no need to reach, and I express no opinion regarding, relator's argument that the Court of Appeals' decision infringes upon her constitutional rights. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *San Antonio General Drivers, Helpers Local No. 657 v. Thornton,* 156 Tex. 641, 647, 299 S.W.2d 911, 915 (1957).

COOK, HECHT and CORNYN, JJ., join in this concurring opinion.

## Footnotes

1 Rule 79(e) provides in part:
> A vote need not be taken to determine whether a cause shall be heard or reheard en banc unless a justice of the en banc court requests a vote. If a vote is requested and a majority of the membership of the en banc court vote to hear or rehear the case en banc, the case will be heard or reheard en banc; otherwise, it will be decided by a panel of the court.

2 *Fought v. Solce,* 821 S.W.2d 218 (Tex.App.—Houston [1st Dist.] 1991, writ requested).

3 The statute, which amended Tex.Rev.Civ.Stat.Ann. art. 1812 (Vernon 1964), is now codified as amended at sections 22.222–.223 of the Texas Government Code.

4 *See* HOUSE COMM. ON JUDICIAL AFFAIRS, BILL ANALYSIS H.B. 1355, 65th Leg., R.S. (1977).

5 *See, e.g., Eichenseer v. Reserve Life Ins. Co.,* 894 F.2d 1414 (5th Cir.1990); *Trevino v. General Dynamics Corp.,* 876 F.2d 1154 (5th Cir.1989); *U.S. v. Lawrence County School Dist.,* 808 F.2d 1063 (5th Cir.1987); *Hagerty v. L & L Marine Services, Inc.,* 797 F.2d 256 (5th Cir.1986); *Dahl v. Pinter,* 794 F.2d 1016 (5th Cir.1986); *Grandstaff v. City of Borger,* 779 F.2d 1129 (5th Cir.1986); *Levine v. CMP Publications, Inc.,* 753 F.2d 1341 (5th Cir.1985); *Cleburne Living Center, Inc. v. City of Cleburne,* 735 F.2d 832 (5th Cir.1984); *U.S. v. M/V Big Sam,* 693 F.2d 451 (5th Cir.1982); *Lubbock Civil Liberties Union v. Lubbock Indep. Sch. Dist.,* 680 F.2d 424 (5th Cir.1982); *Cook v. Hudson,* 515 F.2d 762 (5th Cir.1975); *Johnson v. Mississippi,* 491 F.2d 94 (5th Cir.1974); *U.S. v. Buras,* 475 F.2d 1370 (5th Cir.1972); *Greco v. Seaboard C.L.R. Co.,* 468 F.2d 822 (5th Cir.1972); *Logue v. U.S.,* 463 F.2d 1340 (5th Cir.1972); *Becker v. Thompson,* 463 F.2d 1338 (5th Cir.1972); *Novak v. Beto,* 456 F.2d 1303 (5th Cir.1972); *Pendergraft v. Cook,* 449 F.2d 1372 (5th Cir.1971); *Johnson v. Oil Transport Co.,* 445 F.2d 1402 (5th Cir.1971); *Schnautz v. Beto,* 416 F.2d 214 (5th Cir.1969); *Whirl v. Kern,* 407 F.2d 781 (5th Cir.1968).

6 *See Miller v. State,* 702 S.W.2d 586 (Tex.Crim.App.1981); *Hightower v. State,* 629 S.W.2d 920 (Tex.Crim.App.1981); *Williams v. State,* 622 S.W.2d 95 (Tex.Crim.App.1981); *Hamilton v. State,* 621 S.W.2d 407 (Tex.Crim.App.1981); *Rushing v. State,* 621 S.W.2d 606 (Tex.Crim.App.1981); *Young v. State,* 621 S.W.2d 779 (Tex.Crim.App.1981); *Green v. State,* 615 S.W.2d 700 (Tex.Crim.App.1980); *Garcia v. State,* 605 S.W.2d 565 (Tex.Crim.App.1980); *Mason v. State,* 604 S.W.2d 83 (Tex.Crim.App.1980); *Hernandez v. State,* 603 S.W.2d 848 (Tex.Crim.App.1980); *Ex Parte Solete,* 603 S.W.2d 853 (Tex.Crim.App.1980); *McNiel v. State,* 599 S.W.2d 328 (Tex.Crim.App.1980); *Hardison v. State,* 597 S.W.2d 355 (Tex.Crim.App.1980); *Ozuna v. State,* 587 S.W.2d 385 (Tex.Crim.App.1979); *Cleland v. State,* 575 S.W.2d 296 (Tex.Crim.App.1978); *Johnson v. State,* 573 S.W.2d 778 (Tex.Crim.App.1978); *Brewer v. State,* 572 S.W.2d 940 (Tex.Crim.App.1978).

7 *See Molnar v. Engels, Inc.,* 705 S.W.2d 224 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.).

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

379 So.2d 545
Supreme Court of Alabama.

Charles H. PRITCHETT, etc., et al.
v.
NATHAN RODGERS CONSTRUCTION
AND REALTY CORP.

78-467.    |    Nov. 21, 1979.    |
Rehearing Denied Jan. 11, 1980.

Proceeding was brought by apartment complex owner for writ of mandamus against city maintenance mechanical inspector, mayor and five councilmen for writ of mandamus to show cause why they should not grant permission for connection of apartment complex to city sanitary sewer system. The Circuit Court, Mobile County, Ferrill D. McRae, J., issued peremptory writ ordering mayor and council members to grant permission, and mayor and councilmen appealed. The Supreme Court, Torbert, C. J., held that record amply supported finding that council acted arbitrarily and capriciously in denying permit to apartment complex owner and thus, based on that finding, trial court properly issued writ.

Affirmed.

**Attorneys and Law Firms**

 **\*545**  Mayer W. Perloff, Mobile, for appellants.

Mitchell G. Lattof, Mobile, for appellee.

**Opinion**

 **\*546**  TORBERT, Chief Justice.

The appellee, plaintiff below, Nathan Rodgers Construction and Realty Corp., filed a petition for a writ of mandamus against Charles Pritchett, the maintenance mechanical inspector of the City of Saraland, and Richard Prescott, the mayor of Saraland, as well as five of the city's councilmen to show cause why they should not grant permission for the connection of plaintiff's sixteen-unit apartment complex to the sanitary sewer system of the City of Saraland. Nathan Rodgers, president of the plaintiff corporation, testified that he first appeared before the council and requested permission to connect the plaintiff's sixteen-unit apartment complex to the sanitary sewer system in the City of Saraland on

December 28, 1978. On that date his request was tabled. Rodgers also attended the council's meetings on January 15, 16, and 18. No decision was made at these meetings because too few council members attended to meet the quorum required for a vote. Mr. Rodgers also attended the January 25, 1979, meeting of the council, at which no action was taken on his request, and the mayor informed him that taking no action was equivalent to denying his request. Rodgers testified that he had a telephone conversation with the mayor on January 3, 1979, during which the mayor led him to believe that there would be no problem with obtaining the council's permission to connect his apartments to the sewer system. After this conversation, Rodgers obtained financing for his apartments. Rodgers testified that Mr. Isherwood, the city engineer, and several of the city councilmen told him that there would be no problem with obtaining a permit: "It's just a matter of formality of going before the council, then, voting on it and, then, the permit being issued."

The minutes of the special meeting of the Saraland City Council on October 3, 1977, show that a motion was passed "that no apartments be allowed to tie into our sewer whether it is available or not until the council can check to see if it is feasible." The same minutes show that a Mr. Palmer appeared after the motion was adopted and requested that he be allowed to tie his apartment on Richie Street into the sewer system of Saraland. The record shows, and the city clerk, Mrs. Potter, testified, that Mr. Palmer's request was granted after that motion had passed. In November of 1978, Mr. Isherwood wrote the council and recommended that the city declare a moratorium on all future requests for connection to the sanitary sewer system. The Circuit Court of Mobile County found that approximately 600 more units could be attached to the sewer system without creating a health problem and that plaintiff's proposed apartment complex would be equivalent to about seven units.

The trial court further found that:

> The city council has not declared a moratorium as recommended by the Engineer nor adopted any motion or resolution relating thereto.

> The 600 units which can still be connected to the sanitary sewer system have not been assigned by any motion, ordinance or resolution of the City Council to the property owners involved in the current sewer project and they are available to be issued to the public at large.

In addition, on or about January 18, 1979, Nathan J. Rodgers, President of the Plaintiff corporation, met with Mayor Richard H. Prescott, Jr., and some of the City Councilmen and was led to believe that the request of the Plaintiff corporation for permission to connect to said sanitary sewer system would be granted at the next meeting of the City Council to be held on January 25, 1979, and acting on this belief the Plaintiff corporation completed its permanent financing for said apartment complex project and thereby incurred substantial liability, and the defendant's subsequent refusal to permit the Plaintiff to connect to said sanitary sewer system and to issue the building permit applied for, which are mere ministerial functions or duties required to be performed by the Defendants, although the same had been demanded, are actions which are arbitrary, capricious and without lawful right.

**\*547** On April 9, 1979, the circuit judge issued a peremptory writ of mandamus to the mayor of Saraland and several council members ordering them to grant the plaintiff, Nathan Rodgers Construction and Realty Corp., permission to connect its apartments to the sanitary sewer system of the City of Saraland. The mayor and councilmen brought this appeal, alleging that it was error for the trial court to issue the writ of mandamus.

 **[1]**   The appellant argues, and we agree, that the petition must on its face state facts which show that the petitioner is entitled to have this extraordinary writ granted. Ex parte Alabama Power Co., 280 Ala. 586, 196 So.2d 702 (1967); Lassiter v. Werneth, 275 Ala. 555, 156 So.2d 647 (1963); Guaranty Funding Corporation v. Bolling, 288 Ala. 319, 260 So.2d 589 (1972). "Mandamus is an extraordinary legal remedy, grantable only when petitioner show(s) a clear, specific legal right for the enforcement of which there is no other adequate remedy." All American Life and Casualty Co. v. Moore, 286 Ala. 492, 242 So.2d 661 (1970). See also: Campbell v. City of Hueytown, 289 Ala. 388, 268 So.2d 3 (1972). The appellant contends that the petition in the instant case does not meet the requirements established by this court for a mandamus to issue. We disagree.

 **[2]**   **[3]**   The application for mandamus in the instant case avers that the decision of the city council to reject the request of Nathan Rodgers Construction and Realty Corp., to connect its apartments to the sanitary sewer system was made without the aid of reasonable regulations concerning health and sanitation, and without any statement of the reasons

for denying the building permit and that the decision was thus arbitrary and capricious. These allegations, if supported by proof, are sufficient to require the issuance of a writ of mandamus because though a city may regulate matters of health and sanitation through reasonable ordinances or resolutions, it may not regulate on an arbitrary case-by-case basis. Code 1975, s 11-47-131, entitled "Powers as to health, sanitation and quarantine generally," reads:

> In addition to the powers granted to them by the applicable provisions of this title or any other provisions of law, all cities and towns of this state shall have the following powers, and the councils or other governing bodies of such cities and towns May Provide By Ordinance Or Resolution for the exercise or enforcement of the same:
>
> > (1) To prevent the introduction of contagious, infectious or pestilential diseases into such cities or towns;
> >
> > (2) To establish and regulate a sufficient quarantine, not inconsistent with laws of the state, in the towns and cities and within the police jurisdiction thereof and to punish any breach of quarantine law;
> >
> > (3) To Adopt Such Ordinances And Regulations As The Council Or Other Governing Body May Deem Necessary To Insure Good Sanitary Condition in public places or in private premises in the cities and towns; and
> >
> > (4) To prescribe the duties and fix the salaries and compensation for such health officials as they may deem necessary.

Code 1975, s 11-47-131 (emphasis added).

This statute is a reenactment of previous statutes (Code 1940, Tit. 37 ss 491, 492) which codified the judicially created principle that a state, pursuant to its police power, may regulate for the protection of its citizens' health. This concept, however, is not a license to abuse the police power by applying it capriciously and arbitrarily.

> > Where a statute confers on a municipality the power to regulate the use of sewers, and neither defines the limits of that power nor prescribes the manner of its exercise, the municipality is necessarily invested with power to exercise its discretion, and the courts will not interfere with

such action Unless It Appears To Be Unreasonable Or Arbitrary.

64 C.J.S. Municipal Corporations s 1805, p. 265, (1950) (emphasis added).

 **\*548** **[4]** Appellant argues that the council's decision to grant or deny a permit is discretionary, and the trial court's finding that the decision was ministerial is in error. Whether that decision was discretionary or ministerial, it is clear that the council can not exercise its discretion in an arbitrary manner. Appellant argues mandamus will not lie to order a person to exercise his discretion in a particular manner. We agree; however, mandamus will lie to order an official not to exercise his discretion in an arbitrary or capricious manner. In Foshee v. State, 210 Ala. 155, 97 So. 565 (1923), this court held:

> As a general rule a writ of mandamus will not issue to review an exercise of judicial or quasi judicial discretion, and this rule applies to the approval of official bond. Payne v. Spragins, 207 Ala. 264, 92 So. 466; Mobile Co. v. Cleveland, 76 Ala. 321; Ex parte Harris, 52 Ala. 87, 23 Am.Rep. 559.

> This rule, however, has an exception in this jurisdiction, for in some cases The Writ of Mandamus Has Been Employed to correct errors of inferior tribunals, and to prevent a failure of justice where there is a clear right and there is an absence of any other adequate remedy, and it has also been employed To Prevent An Abuse Of Discretion, Or To Correct An Arbitrary Action Outside Of The Exercise Of a Reasonable Discretion. 26 Cyc. 189; Wilson v. Duncan, 114 Ala. 659, 21 So. 1017; Ex parte Tower Mfg. Co., 103 Ala. 415, 15 So. 836; Ex parte Dowe, 54 Ala. 258.

Foshee v. State, 210 Ala. at 156, 157, 97 So. at 566 (emphasis added). See also: Williams v. Board of Dental Examiners, 222 Ala. 411, 133 So. 11 (1931); Katz v. Alabama State Board of Medical Examiners, 351 So.2d 890 (Ala.1977).

 **[5]** Clearly, the city has the power to regulate for the protection of the health of its citizens, but that power can not be exercised arbitrarily. In this case the city had adopted no moratorium on connections to its sewer system, but was proceeding to grant or deny these connections on a case-by-case basis. This was an abuse of the discretion placed with the city council.

 **[6]** **[7]** When the trial court hears evidence ore tenus, its conclusions will not be disturbed on appeal unless palpably erroneous. Rice v. Hill, 278 Ala. 342, 178 So.2d 168 (1965); Custred v. Jefferson County, 360 So.2d 285 (Ala.1978). Peterson v. Jefferson County, 372 So.2d 839 (Ala.1979). The record amply supports the trial court's finding that the council acted arbitrarily and capriciously in denying this permit to Nathan Rodgers Construction and Realty Corp. Based on that finding, the trial court properly issued the writ.

AFFIRMED.

BLOODWORTH, FAULKNER, ALMON and EMBRY, JJ., concur.

635 S.W.2d 954
Court of Appeals of Texas, Austin.

PUBLIC UTILITY COMMISSION
OF TEXAS, et al., Appellants,
v.
SOUTH PLAINS ELECTRIC
COOPERATIVE, INC., Appellee.

No. 13624.  |  July 21, 1982.
|  Rehearing Denied July 28, 1982.

The 98th District Court, Travis County, Hume Cofer, J., reversed and set aside an order of the Public Utility Commission and remanded the case, and an appeal was taken. The Court of Appeals, Phillips, C. J., held that proper standards and issues set out in Public Utility Regulatory Act for granting application of city for an amendment of its certificate of public convenience and necessity to allow its municipal electric utility to serve three areas recently annexed by city were not followed by Public Utility Commission in its decision to deny application, thus requiring a remand to enable Commission to again review application, where decision was based, not on a criteria or standard found in statute or in any rule or regulation, but on ground that "a city that has a municipally-owned utility has a right to serve its constituency, serve the people within the city."

Affirmed.

### Attorneys and Law Firms

**\*954** Mark White, Atty. Gen., J. Scott Wilson, Asst. Atty. Gen., Don R. Butler, Austin, John C. Ross, Jr., City Atty., James P. Brewster, Asst. City Atty., Lubbock for appellants.

B. D. St. Clair, McGinnis, Lochridge & Kilgore, Austin, for appellee.

### Opinion

**\*955** PHILLIPS, Chief Justice.

The parties hereto, both public utilities-one municipally owned, are vying to serve three subdivisions in the City of Lubbock. The principal question for decision is whether the Public Utility Commission, in granting a dual certificate to the municipally owned utility, acted in an arbitrary and capricious manner and in derrogation of the standards mandated by the Public Utility Regulatory Act. [1]

The district court thought so and reversed and set aside the Commission's order and remanded the case to the Commission. We affirm the judgment of the trial court.

The facts are these. On May 25, 1979, Lubbock filed its application with the Commission seeking dual certification for its municipal electric utility to serve three areas recently annexed by the City which, at the date of such annexations, were singly certificated to South Plains. Hearings on the merits were held before two different hearing examiners for the Public Utility Commission from January 21, 1980, through January 29, 1980. A third hearing examiner issued a report recommending against the City's application. However, by order dated September 3, 1980, as modified by Order on Motion for Rehearing dated November 21, 1980, the PUC granted the application of the City for an amendment of its certificated service area boundaries, to include the newly annexed areas of the City.

It should be noted that this is not the first time for one of the three areas in question to be before the Commission or this Court. In a much earlier proceeding, Southwestern Public Service Company, an investor-owned utility serving a large area in the panhandle and, in Lubbock, along with the city utility, had sought dual certification with the co-op in one of the new areas involved in this litigation. The City was made a party over its objection. The application of Southwestern was denied by the PUC, but a certificate was granted the City, even though it had made no application for one. This grant was later reversed upon appeal because the City had not sought a certificate, but specifically without prejudice to the right of the City to file a subsequent application for certification. Southwestern Public Service Company v. Public Utility Commission, 578 S.W.2d 507 (Tex.Civ.App.-Austin 1979, writ ref'd n.r.e.). The Court did not pass on the merits of the City's application.

The City, contended then that it need not seek certification from the PUC in order to serve the citizens within its corporate limits. This issue was subsequently decided contrary to its contention. City of Lubbock v. South Plains Electric Co-operative, Inc., 593 S.W.2d 138 (Tex.Civ.App.-Amarillo 1979, writ ref'd n.r.e.). The City subsequently filed its application for certification in Docket 2616, which is the present case on appeal here. The City of Lubbock has steadfastly taken the position that it was not required to

secure a certificate of convenience and necessity from the Commission and was, in fact, running concurrent lines to one of these new areas without permission when they were halted by an injunction upheld by the Court in City of Lubbock v. South Plains Electric Cooperative, supra.

Appellants bring some eight points of error which they have winnowed into three principal areas of controversy: (1) was the PUC order in form and substance in compliance with the requirements of the Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat.Ann. art. 6252-13a (Supp.1982)?; (2) were the proper standards and issues for determination set out in PURA, followed by the PUC in its decision?; (3) were the findings and orders of the PUC based upon substantial evidence?

Inasmuch as we do not find that the question of substantial evidence plays any part in our decision, we will say no more about it. Since we find the order invalid our discussion will be directed, principally, to question No. 2 above.

The areas involved were singly certificated to South Plains by the Commission in *956 1976. At this time, South Plains was the only electric utility serving the three areas in question. Pursuant to its duties and responsibilities as a public utility under PURA, South Plains has constructed and operated all facilities necessary to render adequate retail electric service to the areas in question, and, as found by the Commission in this case, has in fact provided adequate service to such areas, both before and after annexation of these areas by the City. Despite this fact, since the areas have become annexed to Lubbock, development has become imminent and right to service has become very attractive.

In our judgment the grant of the city's application was based on a criterion or standard not found in the statute or in any Commission rule or regulation. That criterion was, apparently, expressed by the Chairman of the Commission when the Commission decided to grant the application when he remarked that "a city that has a municipally-owned utility has a right to serve its constituency, serve the people within the city." This view was undoubtedly spelled out in the Commission's September 1980 order. Findings 36 and 37 which are as follows:

36. Community values are promoted by allowing a municipally-owned utility to extend its services to all areas within the municipal boundaries, because all citizens should be allowed the opportunity to be served by a utility

which they as taxpayers help to support, either directly or indirectly.

37. It is in the public interest that Lubbock Power and Light, a municipal utility owned by the City of Lubbock, be allowed to provide retail electric service to all consumers within the city's municipal boundaries.

The original findings of underlying facts made by the examiner (with several modifications subsequently made by the Commission and not pertinent here) were that:

South Plains is now rendering and is capable of continuing to render reasonable and adequate service to the disputed areas; South Plains has always made itself available to serve disputed areas, has trained service men on call at all times and is capable of providing underground service; South Plains has laid extensive distribution lines in the disputed area; there is insufficient evidence of a need for additional service justifying dual certification of utilities; South Plains is willing and able to provide street lighting and other energy needed by the City in the disputed areas; it costs more to serve on a per customer basis in areas with duplication of system construction; dual certification of utilities results in overbuilding because both utilities are required to serve 100% of the customers in the area if requested to do so; South Plains will be harmed by dual certification because it will have to share its service area and revenues generated therefrom while incurring costs required to supply 100% of the service area; dual certification results in duplication of facilities; dual certification will result in increased costs due to duplicated facilities and other expenses; the quality of service rendered by South Plains is adequate; and South Plains' rates are lower than LPL's.

Yet despite these findings of basic, underlying facts which are overwhelmingly in favor of South Plains, the Commission decided to grant Lubbock Power & Light's application.

Consequently, the only inference of ultimate fact that can reasonably be drawn is that the requested certificate enabling Lubbock Power and Light to serve the area along with South Plains is not necessary for the service, accommodation, convenience and safety of the public as is required by section 54(b) of PURA. Indeed, these findings negate the requirements necessary under 54(b) for sustaining a certificate of public convenience and necessity for the City.

It seems clear that under PURA municipally-owned utilities, as retail public utilities, are no different from any other retail public utility with respect to certificates of **\*957** public convenience and necessity. [2] Section 54(b) of PURA states that the Commission may grant applications and issue certificates "only if the Commission finds that the certificate is necessary for the service and accommodation, convenience and safety of the public;" Then in paragraph (c) the Act states that "certificates of convenience and necessity shall be granted on a nondiscriminatory basis after consideration by the Commission of the adequacy of existing service, the need for additional service ...."

As we stated above, the basic underlying facts found by the Commission overwhelmingly favor South Plains and also point to a lack of such findings necessary to uphold the order in favor of Lubbock Power & Light. It is difficult for us to find other than that because Lubbock Power & Light is a municipally-owned utility, it was given a preference not sanctioned by the PURA. As held by the trial court, municipally-owned status is not a relevant factor under the statute and does not constitute statements or findings of underlying facts supporting the ultimate statutory findings of convenience and necessity. We hold that the order is fatally deficient and the trial court correctly set it aside.

Another decision of this Court makes it clear that under the Administrative Procedure Act an agency's consideration of a non-statutory standard amounts to arbitrary and capricious action requiring reversal. Starr County v. Starr Industrial Services, Inc., 584 S.W.2d 352 (Tex.Civ.App.-Austin 1979, writ ref'd n.r.e.); see Vandygriff v. Sabine Valley Savings & Loan, 613 S.W.2d 523 (Tex.Civ.App.-Austin 1981, writ ref'd n.r.e.).

We also overrule appellant's point that South Plain's motion for rehearing was inadequate to preserve their contention of whether the Commission's finding of public convenience and necessity is supported by the underlying facts stated, found, or adopted by the Commission and whether its ultimate finding and decision were based on impermissible standards and criteria.

In response to the first order entered by the Commission dated September 3, 1980, South Plains pointed out to the Commission in a variety of ways that the decision of the Commission is not supported by proper findings of fact. Specifically, in point 5 of its motion for rehearing, South Plains pointed out that the Commission erred in entering conclusion of Law No. 5 because it is not supported by the findings of fact made or adopted by the Commission. South Plains further contended that in its motion for rehearing that conclusion of Law No. 5 is not supported by and is contrary to the statutory standards and criteria set forth in PURA. South Plains also argued that findings of fact Nos. 36 and 37 (which were the only findings made by the Commission in its September 3, 1980 order to support conclusion No. 5) were not proper findings because they are based on impermissible criteria for the determination of public convenience and necessity.

In addition, the Commission was aware of and fully understood the complaint of South Plains and attempted to respond and buttress its decision by amending several of its prior fact findings.

Appellees have a cross-point asking this Court to render this cause in their favor rather than remanding the case to the agency for further proceedings. We do not agree.

We are of the opinion the district court properly remanded the cause to the agency for further proceedings consistent with the conclusions of the district court. In those instances where revision of an administrative order requires a reconsideration of matters that are committed by law to the initial decision of the agency, a court should remand the cause to the agency. It should not seek to substitute its discretion for that of the agency. 2 F. Cooper, State Administrative Law 776 (1965).

**\*958** As the Commission improperly considered non-statutory standards in arriving at its order granting the application for an amendment of its certificate, it is the task of the agency to again review the application for amendment, absent any consideration of the non-statutory standard. The

decision to grant or not to grant the application is plainly that of the agency on remand and not that of the reviewing courts by rendition of judgment, since the grant or denial of the application requires consideration of matters vested by law in the Commission and not in the courts.

Appellee's cross-point is overruled and the judgment of the district court is in all things affirmed.

Footnotes

1   Tex.Rev.Civ.Stat.Ann. art. 1446c (1980) hereinafter, PURA.

2   Southwestern Public Service Co. v. Public Utility Comm'n, 578 S.W.2d 507 (Tex.Civ.App.-Austin 1979, writ ref'd n.r.e.); see also, City of Brownsville v. Public Utility Comm'n, 616 S.W.2d 402 (Tex.Civ.App.-Texarkana 1981, writ ref'd n.r.e.). City of Lubbock v. South Plains Electric Cooperative, 593 S.W.2d 138 (Tex.Civ.App.-Amarillo 1979, writ ref'd n.r.e.).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

215 S.W.3d 559
Court of Appeals of Texas,
Austin.

RAILROAD COMMISSION OF TEXAS and
Dos Republicas Resources Co., Inc., Appellants,
v.
Theodosia COPPOCK, Juanita Alvarado,
Guadalupe Davila, and Kickapoo
Traditional Tribe of Texas, Appellees.

No. 03–05–00097–CV.  |  Feb. 1, 2007.

**Synopsis**
**Background:** Neighboring landowners appealed Railroad Commission's decision to extend coal mining company's surface coal mining permit. The 201st Judicial District Court, Travis County, Scott H. Jenkins, J., entered judgment for landowners. Commission and company appealed.

**Holdings:** The Court of Appeals, David Puryear, J., held that:

[1] Commission had the authority to grant company's request for a permit extension, even though three-year deadline had expired, and

[2] company could obtain permit extension due to unfavorable market conditions beyond the control of and without the fault or negligence of the company.

Reversed and remanded.

**Attorneys and Law Firms**

**\*560** Chesley N. Blevins, Rebecca L. Fink, Lloyd Gosselink Blevins Rochelle & Townsend, P.C., Nathan M. Bigbee, Assistant Attorney General, Natural Resources Division, Austin, for appellants.

Enrique Valdivia, Texas RioGrande Legal Aid, San Antonio, David O. Frederick, Lowere & Frederick, John G. Soule, Scott Douglass & McConnico, L.L.P., Austin, for appellees.

Before Justices PATTERSON, PURYEAR and SMITH.[*]

**\*561** *OPINION*

DAVID PURYEAR, Justice.

Our opinion and judgment issued on December 29, 2006, are withdrawn, and the following opinion is substituted.

Dos Republicas Resources Co., Inc. ("Dos Republicas") asked the Railroad Commission of Texas (the "Commission") to extend its surface coal mining permit under the provisions of the Texas Surface Coal Mining and Reclamation Act codified in the natural resources code, but Theodosia Coppock, Juanita Alvarado, Guadalupe Davila, and Kickapoo Traditional Tribe of Texas (the "appellees") opposed the extension. Ultimately, the Commission granted the extension, and the appellees appealed the Commission's decision. The district court concluded that the Commission's basis for granting the extension, namely the lack of a market for Dos Republicas to sell its coal, was not authorized under the natural resources code. *See* Tex. Nat. Res.Code Ann. § 134.072 (West 2001). Dos Republicas and the Commission appeal the district court's judgment, and we will reverse the court's judgment.

**BACKGROUND**

In 1992, Dos Republicas applied to the Commission for a permit to allow it to engage in coal mining on a 2700–acre tract in Eagle Pass, Texas, and the Commission approved the permit in 1994. However, Dos Republicas did not request that the permit be issued at that time.

For years, Dos Republicas attempted to enter into an agreement to sell its coal to the Comision Federal de Electricidad ("CFE"), a state-owned electricity provider in Mexico that operates two coal-fired plants near Eagle Pass. In 1999, CFE became concerned about the financial security of the mining company that had been its coal supplier. As a result, it alerted Dos Republicas that, in early 2000, it would be issuing a request for proposals asking companies to submit bids offering to supply CFE with coal and asked Dos Republicas to issue a bid. To ensure that it would have a supply when necessary, Dos Republicas asked the Commission to issue the permit it had previously approved, and the Commission issued the permit in April 2000.

Due to a number of political changes and pressure from various interested parties, CFE never issued its request for proposals. Employees from mines in Mexico complained that importing coal from Texas might eliminate their jobs. In addition, during this time, the governing political party in Mexico changed, and the leaders of CFE were replaced.

Dos Republicas continued its efforts to enter into an agreement with CFE, and, in 2001, CFE again indicated that it would issue a request for proposals. However, as had happened previously, no request was ever issued. Instead, CFE entered into a long-term supply contract with a Mexican mining company, Coahuila Industrial Minera ("Coahuila").

Prior to and after CFE entered into a contract with Coahuila, Dos Republicas unsuccessfully attempted to find other market options for selling its coal. Even though Dos Republicas asked the Commission to issue it a mining permit, it never began mining coal at the Eagle Pass mine and, eventually, filed an application with the Commission seeking to terminate its permit. Although Dos Republicas asked that its permit be terminated, the natural resources code also contains an early termination provision mandating that a mining permit will expire within three years of **\*562** its issuance if the permit holder has not begun "surface coal mining" operations by that date. Tex. Nat. Res.Code Ann. § 134.072(a); [1] *see also id.* § 134.004(20) (West 2001) (definition of "surface coal mining operations"). Dos Republicas filed its application to terminate its permit shortly before the three-year termination date.

Just before the three-year termination deadline passed, Coahuila contacted Dos Republicas and indicated that it was interested in purchasing the Eagle Pass mining operation. Consequently, Dos Republicas filed a request to withdraw its application to terminate the permit and also filed a request to extend its permit beyond the three-year deadline. The natural resources code allows the Commission to grant "reasonable extensions" if it is shown that the extensions are necessary because of:

(1) litigation that precludes the beginning of operations or threatens substantial economic loss to the permit holder; or

(2) conditions beyond the control and without the fault or negligence of the permit holder.

*Id.* § 134.072(b). [2]

The Commission referred the matter to a hearings examiner. Coppock, a landowner near the Eagle Pass property,

opposed the extension. [3] She claimed that, because the three-year deadline had passed by the time of the hearing, the Commission had no authority to grant an extension. Alternatively, she argued that the Commission should deny the extension because the conditions allowing for an extension found in section 134.072 were not satisfied. Specifically, she asserted that the absence of a market in which Dos Republicas could sell its coal could not justify an extension.

The hearing examiner concluded that the Commission had jurisdiction to consider the request for an extension because the request for an extension was filed prior to the three-year deadline. Further, she concluded that the Commission should grant the extension because Dos Republicas's failure to begin mining was due to **\*563** the absence of a market for the coal and that the market condition was "beyond the control and without the fault or negligence" of Dos Republicas. The Commission adopted the examiner's proposal for decision and granted the extension.

The appellees appealed the Commission's order to the district court. *See* Tex. Gov't Code Ann. § 2001.171 (West 2000) (person who has exhausted all administrative remedies and is aggrieved by final agency decision is entitled to judicial review). In its judgment, the district court concluded that the Commission had jurisdiction over the extension request because the Commission has authority over a request as long as it is filed within three years of the permit's issuance. However, the court also concluded that "[s]ubsection 134.072(b) does not authorize the Commission to grant an extension based upon the absence of a market or other economic, political, or social conditions that are beyond the control of and without the fault or negligence of the permit holder." Dos Republicas and the Commission appeal the district court's judgment.

### STANDARD OF REVIEW

In addressing the issues raised in this appeal by the appellants and the appellees, we must necessarily construe the relevant provisions of the natural resources code. Statutory construction is a question of law, which we review de novo. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006). In determining the meaning of a statute, our primary purpose is to determine the legislature's intent when enacting the statute, and we begin with the language used in the statute. *Id.* Every word in a statute is presumed to have been used for a

purpose and every word excluded is presumed to have been excluded for a purpose. *Laidlaw Waste Sys., Inc. v. City of Wilmer,* 904 S.W.2d 656, 659 (Tex.1995). Further, we look to the entire act and do not look at a single provision isolated from the remainder of the act. *Watts v. City of Houston,* 126 S.W.3d 97, 100 (Tex.App.-Houston [1st Dist.] 2003, no pet.); *see also* Tex. Gov't Code Ann. § 311.021(2) (West 2005) (presume that entire statute was meant to be effective). We should not adopt a construction of a statute that will render the statute meaningless or lead to absurd results. *See Watts,* 126 S.W.3d at 100; *see also* Tex. Gov't Code Ann. § 311.021(3) (West 2005) (in construing statutes, we presume that just and reasonable result was intended). Finally, the construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration so long as the construction is reasonable and does not contradict the plain language of the statute. *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993); *Anderson–Clayton Bros. Funeral Home, Inc. v. Strayhorn,* 149 S.W.3d 166, 178 (Tex.App.-Austin 2004, pet. denied) (even if there are other reasonable interpretations, we will accept agency's construction of statute if it is consistent with language and purpose of statute); *see also* Tex. Gov't Code Ann. § 311.023(6) (West 2005) (in construing statutes, courts may consider administrative construction of statute regardless of whether statute is considered ambiguous). This is particularly true when the statute involves a complex subject matter. *Buddy Gregg Motor Homes v. Motor Vehicle Bd.,* 156 S.W.3d 91, 99 (Tex.App.-Austin 2004, pet. denied). However, for nontechnical questions of law and other questions not lying within an agency's expertise, courts do not defer to an agency's interpretation. *Id.*

## DISCUSSION

On appeal, the Commission and Dos Republicas contend that the district court erred when it reversed the Commission's **\*564** order granting Dos Republicas's extension because the extension was authorized by the natural resources code. In response, the appellees assert that the extension was not authorized by statute and that the Commission did not have the authority to grant the extension after the three-year deadline.

**The Commission Possessed Authority to Address Dos Republicas's Extension Request**

 **[1]** On appeal, the appellees assert that the Commission lacked the authority to grant the permit extension because the three-year deadline specified in the statute had expired. Before we address this issue, we note that there is some question about whether the appellees may make this cross-claim without first filing a notice of appeal. The Commission and Dos Republicas contend that the appellees may not bring this cross-claim on appeal because they failed to file a notice of appeal. *See* Tex.R.App. P. 25.1 (party who seeks to alter trial court's judgment must file notice of appeal), 26.1 (specifying deadlines for filing notices of appeal). The appellees, on the other hand, insist that this issue may be considered on appeal. Specifically, they assert that it was unnecessary for them to file a notice of appeal because they are not seeking more favorable relief than that granted by the district court. *See First Gen. Realty Corp. v. Maryland Cas. Co.,* 981 S.W.2d 495, 503 (Tex.App.-Austin 1998, pet. denied) (because appellees' arguments did not ask for relief greater than that granted by trial court, appellees were not required to file notice of appeal). Rather, they argue that they are simply seeking to affirm the final judgment of the district court and that they raise this issue merely as an alternative ground for affirming the district court's judgment. *See Helton v. Railroad Comm'n,* 126 S.W.3d 111, 119–20 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (noting distinction between cross-points that require separate notice of appeal and claims that merely seek to raise alternate grounds opposing recovery by appealing party). In the interests of justice, we will address their argument.

 **[2]** The appellees insist that Dos Republicas's permit terminated *automatically* on April 11, 2003, because Dos Republicas had not commenced surface mining and had not *obtained* an extension by that date. In support of this assertion, the appellees contend that nothing in the natural resources code provides that requesting an extension within the three-year deadline will toll the termination deadline or allows for a conditional extension pending a final determination by the Commission. In response, the Commission argues that it may grant an extension request after the three-year deadline as long as the request was filed within the three-year cutoff.

The Commission's interpretation of the statute is consistent with the language of the statute. Nothing in the natural resources code necessitates that the Commission rule on an extension request before the three-year deadline passes in order for the extension to be effective. *See* Tex. Nat. Res.Code Ann. § 134.072. The lack of a Commission deadline for issuing its decision is instructive given that the code provides

specific deadlines for agency action in other contexts. For example, section 134.080 of the code mandates that the Commission issue a decision regarding a permit revision filed by a permit holder within 90 days of receiving the application for revision. *See id.* § 134.080 (West 2001); *see also* Tex. Gov't Code Ann. § 2001.146(c) (West 2000) (agency must act on motion for rehearing within 45 days or motion is overruled by operation of law).

 **\*565** Moreover, the code does not mandate that a permit holder file an extension request within a given time prior to the termination date in order to allow the Commission to fully consider the request. The lack of a specific deadline by which a permit holder must file a request is noteworthy when looking at other code provisions. The section concerning permit renewals explicitly provides a deadline by which an applicant must file a permit renewal application that is prior to the permit expiration date. Specifically, section 134.078 provides as follows:

> Application for permit renewal must be made not later than the 120th day before the date the existing permit expires.

Tex. Nat. Res.Code Ann. § 134.078 (West 2001); *see also* 16 Tex. Admin. Code § 12.106(b)(2) (2006) (requiring permit holder to file permit renewal 180 days before permit expires), (b)(3) (2006) (requiring permit holder to file permit revision application 180 days before it expects to revise its operations). The absence of a similarly worded deadline in the extension context supports the Commission's interpretation, which allows for the filing of an extension request up to the three-year termination deadline. *See Laidlaw Waste Sys., Inc.,* 904 S.W.2d at 659 (presume that every word omitted was purposefully excluded).

Furthermore, if the appellees' interpretation of the statute were correct, applicants would have the onerous task of estimating how far in advance they would need to file an extension request in order to allow the Commission time to fully review the application and issue its decision prior to the expiration of the three-year deadline. In addition, the appellees' construction would effectively eliminate extensions for events occurring between the time a permit holder should file an extension request to ensure that a timely decision is issued and the three-year termination date. Given that the possible reasons for requesting an extension might vary in complexity, the amount of time necessary for full consideration of a request will vary, the extension may or

may not be opposed, hearings may or may not be scheduled on the proposed extension, and there is no statutory deadline for the Commission releasing its decision, this interpretation would lead to unfair results. For example, under the appellees' interpretation, a permit holder who files for an extension just prior to the termination deadline would receive an extension as long as the Commission issued the extension by the three-year deadline, whereas a permit holder who files a request for an extension well in advance of the deadline would not receive an extension if the Commission is unable to grant the extension by the cut-off date. [4] We cannot adopt an interpretation that would lead to such arbitrary results. *See Watts,* 126 S.W.3d at 100.

This construction is also supported by the effect of the extension provisions. *Cf.* Tex. Gov't Code Ann. § 311.023(1) (West 2005) (in interpreting statute, courts may consider "object sought to be attained"). Section 134.072 terminates a permit, regardless of the length of the permit's effective term, within three years of the permit's issuance if the permit holder has not begun mining operations. Tex. Nat. Res.Code Ann. § 134.072; *see also id.* § 134.071 (West 2001) (allowing Commission to issue permits with terms of five years or more). Given that section 134.072 can shorten the effective term of a mining permit by imposing a three-year deadline, **\*566** the Commission's interpretation that a request for an extension is effective if filed within the three-year deadline seems logical and equitable.

For all the reasons previously given, we conclude that the Commission's interpretation of the statute is consistent with section 134.072 and further conclude that the Commission had the authority to grant Dos Repulicas's extension request even though the three-year termination date had passed. Accordingly, we affirm that portion of the district court's judgment.

## The Statute Allows Extension Requests to be Granted for Market Reasons

 **[3]** In their only issue on appeal, the Commission and Dos Republicas contend that the district court erred by reversing the Commission's order. Specifically, they argue that the absence of a market for the coal present at the Eagle Pass mine was a condition outside of Dos Republicas's control that occurred "in the absence of any fault or negligence" on behalf of Dos Republicas and that, therefore, the Commission was authorized by statute to grant the extension. [5]

The appellees, on the other hand, contend that the district court correctly concluded that the Commission was not authorized to issue an extension to Dos Republicas. First, the appellees argue that the language of subsection 134.072(b)(2), which is the subsection relevant in this appeal, acts as a *force majeure* provision that prohibits an extension unless the permit holder has physically been prevented from commencing operations due to "conditions beyond its control and without its fault or negligence." Further, the appellees contend that Dos Republicas was not actually prevented from mining and, therefore, insist that Dos Republicas should not have been given an extension for its conscious choice not to begin mining.

 **[4]**   **[5]**   We disagree with the appellees' assertion. There is no requirement listed in 134.072 that a permit holder must be "physically" prevented from engaging in mining operations to obtain an extension. Further, we have been unable to find any case applying the doctrine of *force majeure* to the issuance of a permit by a state regulatory authority. The doctrine is designed to protect parties to a contract and excuses a party's nonperformance because of events outside the control of the parties. *See Black's Law Dictionary* 445 (abridged 6th ed.1991); *see also Perlman v. Pioneer Ltd. P'ship,* 918 F.2d 1244, 1248 n. 5 (5th Cir.1990) (*force majeure* describes particular type of event, which may excuse performance under contract). The scope and applicability of the doctrine is dependent upon the terms specified in a contract. *See Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.,* 157 S.W.3d 462, 466 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *see also Perlman,* 918 F.2d at 1248 n. 5 (should look to language of contract to determine parties' intent concerning whether event complained of excuses performance); *Sun Operating Ltd. P'ship v. Holt,* 984 S.W.2d 277, 282–83 (Tex.App.-Amarillo 1998, pet. denied) (much of historic meaning of phrase *force majeure* is gone and, therefore, scope and application of doctrine is "utterly dependent upon the terms of the contract in which it appears"); 30 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 77:31 (4th ed. 1990 & Supp.2004) (specific language of clause indicates what events will excuse performance and typical clause **\*567** states that party's performance is subject to "acts of God, war, government regulation, terrorism, disaster, strikes ... civil disorder, curtailment of transportation facilities, or any other emergency beyond the parties control").

In addition, the cases the appellees refer to in support of their assertion that, under the doctrine of *force majeure,* market conditions cannot justify a permit extension are distinguishable. The appellees refer to *Day v. Tenneco, Inc.,* 696 F.Supp. 233 (S.D.Miss.1988); *Huffines v. Swor Sand & Gravel Co., Inc.,* 750 S.W.2d 38 (Tex.App.-Fort Worth 1988, no writ); and *Valero Transmission Co. v. Mitchell Energy Corp.,* 743 S.W.2d 658 (Tex.App.-Houston [1st Dist.] 1987, no writ), for the proposition that unfavorable market conditions cannot justify a permit extension under subsection (b)(2). Although the courts in these cases did conclude that poor market conditions do not excuse a party's obligation to perform under a contract, *see Day,* 696 F.Supp. at 236; *Huffines,* 750 S.W.2d at 40; and *Valero,* 743 S.W.2d at 663, this case does not involve a contractual dispute or a breach of contract claim. Furthermore, in two of the cases cited, *Day* and *Valero,* the contracts at issue specifically contained a *force majeure* clause that the courts were required to interpret: there is no comparable provision in this case. [6]

 **[6]**   Second, the appellees analogize the effect of Dos Republicas's failure to begin mining operations to the effect of a lessee's failure to undertake physical efforts to drill under the terms of an oil and gas lease. Specifically, they contend that, under an oil and gas lease, a lessee's failure to engage in physical activity on the leased property will terminate the lease at the end of the lease's primary term [7] and will not allow for renewal, and they insist that a similar result should apply here. *See* Smith & Weaver, *Texas Law of Oil & Gas* § 4.5 (2000) ("A lessee cannot safely rely upon activities which do not involve actual physical activity on the land such as ... applying ... for a drilling permit.... [T]he reported cases speak in terms of actual physical contact with the leased premises.").

However, the appellees have not referred us to cases holding that a permit holder's failure to engage in mining activities is equivalent to a lessee's failure to drill under an oil and gas lease, and we see no reason to adopt such a rule. The circumstances and expectations surrounding the issuance of a permit are remarkably different than those present during the formation of an oil and gas lease. Unlike a mining permit, an oil and gas lease involves two parties to an agreement, not a single party and a regulatory agency. Because **\*568** the issuance of a permit by the Commission does not involve two parties entering into a contract for mutual economic benefit, the need for a termination due to non-production is not as pressing because the Commission does not receive an economic benefit from a mining company corresponding to the amount of coal mined. *Cf. id.* (if lessee under oil and gas lease does not begin drilling, it is obligated to pay lessor delay rental). Further, the economic effects of a coal mining company's actions are only one factor for the Commission

to consider when issuing, extending, or terminating a permit; as highlighted by the appellees, the Commission is also charged with considering, among other things, the potential environmental effects from coal mining and the effects on neighboring landowners. *See* Tex. Nat. Res.Code Ann. § 134.003 (West 2001).

Third, the appellees urge that, because Dos Republicas was aware that it did not have a market established when it filed for a permit in 1994 and was aware of the social and political instability present in Mexico when it asked for the permit to be issued, Dos Republicas assumed those market risks knowing that it was obligated to begin mining operations within three years or lose the permit. Accordingly, they contend that the permit should not be extended because the potential market problems were foreseeable.

We disagree with the appellees' assertion that the fact that the event was foreseeable bars invocation of the extension provision. There is no requirement in section 134.072 mandating that conditions justifying a permit extension must have been unforeseeable to the permit holder. *See id.* § 134.072. Moreover, many of the conditions that the appellees insist would justify a permit extension will no doubt be foreseeable to a certain extent, including natural disasters and individuals filing suit against the company.

Fourth, the appellees note that subsection 134.072(b)(2) does not specifically authorize an extension for economic reasons but note that subsection 134.072(b)(1) does allow for extension due to economic concerns. Subsection 134.072(b)(1) allows the Commission to grant an extension if the permit holder is involved in "litigation that precludes the beginning of operations or threatens *substantial economic loss.*" *Id.* § 134.072(b)(1) (emphasis added). The appellees insist that if potential economic loss was a factor to be considered under subsection (b)(2), the legislature would have incorporated that language into the section. *Cf.* Laidlaw Waste Sys., Inc., 904 S.W.2d at 659 (Tex.1995) (when legislature employs term in one section of statute and excludes it from another, term should not be implied into section it was excluded from).

We cannot adopt the appellees' construction of section 134.072. Although subsection 134.072(b)(2) does not specifically list "economic conditions" or "the lack of a market" as permissible reasons justifying a permit extension, the subsection does not list any specific situation justifying an extension. Instead, the subsection uses very broad language authorizing the Commission to grant an extension when

it believes an extension is necessary due to "conditions beyond the control and without the fault or negligence of the permit holder." Tex. Nat. Res.Code § 134.072(b)(2); *see also Webster's Seventh New Collegiate Dictionary* 235 (7th ed.1973) ("condition" means "a restricting or modifying factor"). On its face, this language is broad enough to justify the Commission's extension for market conditions that are not caused by the permit holder.

Further, we disagree with the appellees' contention that the inclusion of the phrase **\*569** "substantial economic loss" in subsection 134.072(b)(1) and its exclusion in subsection 134.072(b)(2) indicates the legislature's intent that economic conditions, including the lack of a viable coal market, cannot be used to justify a permit extension. *See* Tex. Nat. Res.Code Ann. § 134.072(b); *see also Mid–Century Ins. Co. of Tex. v. Kidd,* 997 S.W.2d 265, 274 (Tex.1999) ( "doctrine of *expressio unius est exclusio alterius* is simply an aid .... [and] [a]s a rule of reason and logic, it should not be mechanically applied to compel an unreasonable interpretation"). The subsections apply in different contexts. Subsection (b)(1) applies only to situations where the permit holder is involved in litigation that either precludes the beginning of mining or threatens economic loss to the permit holder regardless of whether the litigation was initiated due to some fault of the permit holder. Subsection (b)(2) applies when conditions, which are not caused by the permit holder, are present and warrant an extension. Unlike subsection (b)(1), which is expressly limited to instances where the permit holder is involved in some type of litigation, subsection (b)(2) applies to a broader number of situations and provides no express limitation on its applicability except that the permit holder cannot be the cause of the condition resulting in the failure to mine. Due to the distinct situations in which these statutes apply, we believe that the legislature's failure to include the phrase "economic loss" in subsection (b)(2) is no indication that the lack of a market cannot be used to justify an extension. The legislature specified that economic conditions are permissible considerations when determining whether to grant an extension under the first part of subsection 134.072(b). We can discern no reason to exclude economic conditions as permissible factors for the Commission to consider when determining whether to grant an extension under the more broadly written second part of subsection 134.072(b).

Finally, the appellees refer to federal case law and to the legislative history accompanying the federal counterpart to the Texas Surface Coal Mining and Reclamation Act as

support for the proposition that market conditions cannot justify an extension. First, the appellees refer to *Shawnee Coal Co. v. Andrus,* 661 F.2d 1083 (6th Cir.1981). In *Shawnee,* the Office of Surface Mining, Reclamation, and Enforcement (the "Office") concluded that Shawnee was in violation of the Act because it had stockpiles of coal products that released toxic runoff and ordered Shawnee to comply with the Act and its accompanying regulations. The district court granted an injunction in favor of Shawnee preventing enforcement of the Office's orders, but the Sixth Circuit reversed because Shawnee had not exhausted its administrative remedies prior to filing suit. *Shawnee Coal Co.,* 661 F.2d at 1092. During a subsequent administrative proceeding, Shawnee argued that it was unable to comply with the Office's orders because it could not sell the stockpiled coal products due to a depressed market. *See* Coalex Report 305 *available at* http://www.osmre. gov/coalex/coalex305.htm (last modified Mar. 24, 1999). The administrative law judge concluded that Shawnee had to either comply with the regulations in question or no longer conduct operations. *Id.*

The appellees' reliance on this case is misplaced. Shawnee was ordered by the Office to comply with an environmental regulation relating to surface coal mining and subsequently sought injunctive relief from having to comply with the order. Dos Republicas has not failed to comply with nor has it been ordered to comply with a regulation. Further, it is not seeking injunctive relief from compliance with an environmental regulation. Rather, it is **\*570** attempting to extend the termination date of its mining permit, which is an action authorized by the natural resources code.

Next, the appellees refer to the legislative history accompanying the Surface Mining Control and Reclamation Act. Like the Texas statute, the federal statute also provides that a permit will terminate within three years if no mining activity is undertaken but allows a permit to be extended for reasons similar to those articulated in section 134.072. *See* 30 U.S.C.A. § 1256(c) (West 1986); *see also id.* § 1253 (West 1986 & Supp.2006) (states may obtain jurisdiction over mining if states develop program capable of implementing Act). The Senate Committee's 1977 analysis of the act recognized that permits may be issued and renewed without operations being undertaken and specified that one of the reasons for the three-year deadline is to ensure "that no one will be locked into outdated reclamation requirements" that were in effect when the permit was issued. S.Rep. No. 95–128, at 74 (1977), U.S.Code Cong. & Admin.News 1977, 593, 612. Based on the federal legislative history's emphasis

on maintaining current environmental reclamation standards and the fact that the Texas reclamation regulations in effect when Dos Republicas first obtained its permit are different from the regulations in effect now, the appellees insist that Dos Republicas's permit should not have been extended for economic reasons. *Cf.* 30 U.S.C.A. § 1201(d) (expansion of coal mining requires establishment of "appropriate standards to minimize damage to the environment"), (k) (West 1986) (Act is necessary to "mitigate adverse environmental effects").

However, the fact that the federal statute was enacted with a focus on implementing current environmental reclamation standards does not mandate a conclusion that a permit cannot be extended for market reasons under the Texas statute. If anything, the focus on reclamation standards indicates the need for agency expertise in determining what standards to enforce and whether a permit should be extended. Furthermore, the administrative code authorizes the Commission to review an existing permit and modify the permit's provisions to ensure compliance with the Surface Mining and Reclamation Act and the relevant administrative code provisions. *See* 16 Tex. Admin. Code § 12.225 (2006). Therefore, the Commission can compel a permit holder to comply with more recent reclamation requirements prior to the permit's termination.

Dos Republicas and the Commission's assertion that the Commission may consider market conditions when determining whether to grant an extension is also supported by the broad authority the legislature bestowed upon the Commission. The natural resources code specifies that the Commission has been granted exclusive jurisdiction over surface coal mining and reclamation activities, has been charged with enforcing the relevant portions of the code, and has been given the authority to issue rules pertaining to mining and reclamation activities that are consistent with the code. *See* Tex. Nat. Res.Code Ann. §§ 134.011 (Commission given broad powers, including power to adopt rules, issue and revoke permits, conduct hearings, issue orders requiring miners to take certain actions, and order cessation of mining activities), 134.012(a)(1) (Commission has exclusive jurisdiction), 134.013 (West 2001) (Commission required to adopt rules relating to surface coal mining and reclamation), 134.161–.181 (West 2001) (enforcement powers of Commission). It has also been specifically charged with determining whether a permit extension should be granted. Moreover, the two types of circumstances described by section 134.072 as **\*571**

justifying an extension are broadly written. Accordingly, the Commission's interpretation of section 134.072 is entitled to judicial respect. *See Hammack v. Public Util. Comm'n of Tex., 131 S.W.3d 713, 723 (Tex.App.-Austin 2004, pet. denied); see also Moore, 845 S.W.2d at 823.*

Furthermore, the appellees' arguments ignore the need for agency expertise in determining whether a permit extension should be granted. *See Hammack, 131 S.W.3d at 723* (legislature bestows powers upon agency with idea that its goals will be more effectively realized by employing agency's "specialized judgment, knowledge, and expertise"). The code specifies that the Commission "may" grant an extension and further states that, in determining whether to grant an extension, the Commission must consider whether the permit holder's failure to mine is the result of events beyond the control of the permit holder and must determine whether granting the extension is "necessary." *See* Tex. Nat. Res.Code Ann. § 134.072(b)(2); *see also* Tex. Gov't Code Ann. § 311.016(1) (West 2005) (word "may" creates discretionary authority). If the Commission determines that an extension is necessary, the agency must also determine a "reasonable" extension time. Tex. Nat. Res.Code Ann. § 134.072(b). These determinations necessarily involve an assessment of the circumstances surrounding the permit holder's activities and knowledge of the factual situations that might justify a permit extension. *Cf. State v. Public Util. Comm'n,* 883 S.W.2d 190, 195 n. 6 (Tex.1994) (determination of whether something should be considered capital or expense should be "left to the agency created to centralize expertise in this area and granted broad authority concerning just such matters"). Accordingly, deference to the Commission's expertise regarding the conditions warranting an extension is appropriate.

For all the reasons previously given, we conclude that the Commission's interpretation of section 134.072 as allowing for a permit extension due to unfavorable market conditions "beyond the control and without the fault or negligence of the permit holder" is consistent with the plain language of the statute. Accordingly, we conclude that the Commission did not exceed its authority when it granted Dos Republicas's extension request because of unfavorable market conditions. Therefore, we sustain Dos Republicas and the Commission's issue on appeal.

## CONCLUSION

Having concluded that the Commission had the authority to issue Dos Republicas's extension and having sustained Dos Republicas and the Commission's issue on appeal, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

Footnotes

\* Bea Ann Smith, Justice (retired), Third Court of Appeals, sitting by assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1 Subsection 134.072(a) reads as follows:
> A permit terminates if the permit holder has not begun the surface coal mining operation covered by the permit on or before the third anniversary of the date on which the period for which the permit is issued begins.

> Tex. Nat. Res.Code Ann. § 134.072(a) (West 2001).

2 The administrative rule interpreting section 134.072 contains nearly identical language. It provides:
> (b) Automatic termination shall occur as follows:

> (1) a permit shall terminate, if the permittee has not begun the surface coal mining and reclamation operation covered by the permit within 3 years of the issuance of the permit;

> (2) the Commission may grant reasonable extensions of time for commencement of these operations, upon receipt of a written statement showing that such extensions of time are necessary, if:

>> (A) litigation precludes the commencement or threatens substantial economic loss to the permittee; or

>> (B) there are conditions beyond the control and without the fault or negligence of the permittee

> 16 Tex. Admin. Code § 12.219(b) (2006). Because the rule is nearly identical to the statute, we will limit our discussion to the statute.

3 Coppock owns a cattle ranch near Dos Republicas's proposed mine site. She opposed the extension because she was concerned about how mining operations might affect the groundwater under her ranch. The remaining appellees—Juanita Alvarado, Guadalupe Davila, and Kickapoo Traditional Tribe of Texas—did not intervene until after the hearing examiner's proposal for decision was issued.

4 In this case, almost a year passed between Dos Republicas's filing for an extension and the Commission's decision granting the extension.

Whether the Commission's order was supported by substantial evidence is not at issue in this case. For this reason, we focus solely on whether the Commission exceeded its statutory authority by issuing the extension.

The appellees also assert that in *Day v. Tenneco, Inc.,* the Mississippi court concluded that market conditions cannot be used to excuse a party's performance under a statute. 696 F.Supp. 233, 235–36 (S.D.Miss.1988). The statute listed various events that would excuse a party's nonperformance under a contract and included a catch-all phrase for events "beyond the control of such party." *See id.* at 235–36 (citing former Miss.Code Ann. § 75–2–617 (1972)). However, as discussed previously, this case does not involve a contract dispute, and Dos Republicas is not attempting to avoid an obligation by invoking a statute excusing performance under a contract.

A primary term is "a period of time at the end of which the [leasehold] estate granted will terminate but which estate may be extended by some other provision, usually one for production." *Fox v. Thoreson,* 398 S.W.2d 88, 91 (Tex.1966); *see also Eastern Energy, Inc. v. SBY P'ship,* 750 S.W.2d 5, 6 (Tex.App.-Houston [1st Dist.] 1988, no writ) ("primary term of the lease is the maximum period of time for which the lessee can maintain lease rights without drilling").

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

52 S.W.3d 770
Court of Appeals of Texas,
Amarillo.

SOUTH PLAINS LAMESA RAILROAD, LTD.
and Kitten Family Living Trust, Appellants,
v.
HIGH PLAINS UNDERGROUND WATER
CONSERVATION DISTRICT NO. 1, Appellee.

No. 07–00–0089–CV.    |    April 17, 2001.

Landowner and trust brought action for declaratory relief that water district erred in revoking one water well permit and denying another water well permit and for attorney fees. The 364th District Court, Lubbock County, Bradley S. Underwood, J., entered summary judgment in favor of water district, and landowner and trust appealed. The Court of Appeals reversed and rendered in part and severed and remanded in part for further proceedings. On district's motion for rehearing, the Court of Appeals, Reavis, J., held that: (1) water district lacked authority to deny or revoke water well permits for "disproportionate taking" in relation to tract size as rule cited as authority had no provision relating to disproportionate taking or minimum tract size; (2) district was not clearly authorized by statute to deny permit on ground of disproportionate taking; (3) legislature did not establish reasonable standards to guide water district in exercising its rule-making powers; and (4) water district lacked discretionary power to regulate disproportionate taking of groundwater and could only have regulated groundwater rights by rule adopted after public notice and hearing requirements.

Reversed and rendered in part, severed and remanded for further proceedings.

## Attorneys and Law Firms

**\*773** William R. Power, Arlington, Leonard J. Kolanowski III, Keller, for appellant.

McWhorter Cobb & Johnson LLP (Gary R. McLaren), Lubbock, for appellee.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

## ON MOTION FOR REHEARING

REAVIS, Justice.

On original submission, we reversed and rendered in part and severed and remanded in part for further proceedings. High Plains Underground Water District No. 1 (District) has now filed a motion for rehearing. We overrule the motion, but withdraw our original opinion of January 25, 2001 and, in lieu thereof, issue the following opinion. Our judgment of January 25, 2001 is unaffected.

By this appeal, South Plains Lamesa Railroad, Ltd. (South Plains) and the Kitten Family Living Trust (Kitten Trust) challenge a summary judgment denying their request for declaratory relief and awarding attorney's fees to the District. By their four issues, they ask 1) whether the trial court erred in granting the motion for summary judgment of the District, 2) whether the District could reopen and revoke a water well application four months after granting the permit absent a finding of changed circumstances, 3) whether the District could apply an *ad hoc* standard not part of its rules to deny a water well permit even though the application had satisfied all of the District's rules, and 4) whether the District can nullify the rule of capture. In this appeal, we must determine the validity of the action of the District revoking one water well permit and denying another permit on the ground that it was proper to avoid the pumping of a disproportionate amount of water as it relates to the tract size and the District's well spacing regulations. Because none of the eleven cases cited by the District involve groundwater districts or their rule making authority, we conclude that the question presented is a case of first impression. Based upon the rationale and authorities expressed herein, we reverse and render in part; and sever and remand in part for further proceedings.

 **[1]**    Section 59(a) of Article XVI of the Texas Constitution provides that the Legislature shall pass all laws as may be appropriate to water conservation and development and section 59(b) authorizes the creation of districts to have the authority as may be conferred by the law, which **\*774** subsection (a) directs the Legislature to enact. By section 36.0015 of the Water Code, [1] the Legislature has declared that regional groundwater districts are the State's preferred method of groundwater management and under section 36.001(15), a district is a political subdivision exercising State powers and such districts stand upon the same footing

as a county. Lewis Cox & Son v. High Plains Underground Water, 538 S.W.2d 659, 663 (Tex.Civ.App.—Amarillo 1976, writ ref'd n.r.e.).

On December 9, 1997, the District approved water well application permit no. 8149-A that allowed the Kitten Trust to drill, equip, and produce a water well on its easement covering a small tract owned by South Plains. After the Kitten Trust drilled and equipped a well and constructed a pipeline at a cost of approximately $30,000, on April 13, 1998, adjoining landowners filed a protest to the Kitten Trust application for water well permit no. 8149–A. Following a hearing on May 12, 1998, the Board of the District passed a motion to disallow water well permit no. 8149–A, which provided that the Board found:

> 1. That the legal description supplied by Plaintiff Kitten Trust in Water Well Application 8149–A was not of sufficient detail to apprise Defendant of the size of the tract on which the well was to be drilled.

> 2. That if the size of the tract had been known, it is unlikely that the Lubbock County Committee would have recommended its approval.

> 3. That Water Well Permit 8149–A would have allowed a disproportionate amount of water to be pumped as it relates to the tract size and Defendant District's well spacing regulations as they relate to gallons per minute per acre as set by the District's spacing rules.

Then, on May 13, 1998, South Plains filed its water well application permit no. 8209 that remedied alleged procedural deficiencies in the Kitten Trust application. On July 13, 1998, the same adjacent landowners filed a protest to water well application no. 8209. At a hearing on July 14, 1998, the District Board denied application permit no. 8209 even though the District Board Manager reported to the Board that the application complied with the District's spacing requirements.[2] In response to request for admissions, the District admitted that the District's Board of Directors on July 14, 1998, voted to deny South Plains's application permit no. 8209 "to prevent disproportionate taking of water."

By their trial pleadings, South Plains and the Kitten Trust contended that the action of the District in revoking application permit no. 8149-A and denying application permit no. 8209 was in error as a matter of law, and they also sought attorney's fees in accordance with the Uniform Declaratory Judgments Act, Tex. Civ. Prac. & Rem.Code Ann. §§

37.001–37.011 (Vernon 1997), specifically section 37.009. The answer of the District included a general denial and a request for an award of attorney's fees pursuant to section 37.009. After traditional motions for summary judgment were filed by all parties, the trial court granted the motion for summary judgment of the District and awarded attorney's fees to the District. Before we commence our analysis of the issues, we first set out the appropriate standard of review.

## *775 Summary Judgment Standard of Review

[2] [3] [4] [5] [6] For a party to prevail on a traditional motion for summary judgment under Tex.R. Civ. P. 166a(c), he must conclusively establish the absence of any genuine question of material fact and that he is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). This requirement dictates that when the defendant is the movant, he must conclusively negate at least one of the essential elements of the plaintiff's cause of action. Likewise, a defendant who conclusively establishes each element of an affirmative defense is entitled to summary judgment. Randall's Food Markets, Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex.1995). In Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548–49 (Tex.1985), the Court set out the standard by which we are to review a summary judgment:

> 1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

> 2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

> 3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

Once the movant has established a right to summary judgment, the non-movant has the burden to respond to the motion for summary judgment and present to the trial court any issues that would preclude summary judgment. City of Houston v. Clear Creek Basin Authority, 589 S.W.2d 671, 678 (Tex.1979); Barbouti v. Hearst Corp., 927 S.W.2d 37, 64 (Tex.App.—Houston [1st Dist.] 1996, writ denied). Issues which the non-movant contends preclude the granting of a summary judgment must be expressly presented to the trial court by written answer or other written response to the motion and not by mere reference to summary judgment evidence. McConnell v. Southside Indep. School Dist., 858

S.W.2d 337, 341 (Tex.1993). Issues not expressly presented to the trial court in writing shall not be considered on appeal as grounds for reversal. Tex.R. Civ. P. 166a(c). Further, all theories in support of or in opposition to a motion for summary judgment must be presented in writing to the trial court. Casso v. Brand, 776 S.W.2d 551, 553 (Tex.1989).

[7]  Where, as here, both sides move for summary judgment and the trial court grants one motion and denies the other, on appeal, we review the summary judgment evidence of both sides and determine all questions presented, and render judgment the trial court should have rendered. Bradley v. State ex rel. White, 990 S.W.2d 245, 247 (Tex.1999); Greg Lair, Inc. v. Spring, 23 S.W.3d 443, 446 (Tex.App.— Amarillo 2000, pet. denied).

### Summary Judgment Grounds

As the sole ground for their motion for summary judgment, the Kitten Trust and South Plains contended that they were entitled to summary judgment because the District's Board did not have the authority under law to revoke a well permit, or refuse to issue a well permit, based on the reason that to permit such a well would "allow a disproportionate amount of water to be pumped as it relates to the tract size and the District's well spacing regulations as they relate to gallons per minute per acre as set by the District's spacing rules." We construe the grounds [3] of the motion **\*776** for summary judgment by the District to be (1) section 36 .253, which provides that the burden of proof is on the petitioner and the challenged rule order or act shall be deemed *prima facie* valid and the substantial evidence rule as defined by section 2001.174 of the Texas Government Code, and (2) a general allegation that the District complied with groundwater statutes and local rules.

By their first issue, the Kitten Trust and South Plains contend the trial court erred in granting the motion for summary judgment of the District and by the third issue, they contend the District did not have the lawful authority to apply an *ad hoc* [4] standard not part of its rules to deny a water well permit even though the applicant has satisfied all of the District's rules. Also, by their fourth issue, they contend the District cannot nullify the rule of capture. Because these three issues and argument thereunder present the issue of lawful authority of the District and its rule making power, we will consider them together.

### Applicable Water Code Provisions

[8]  [9]  Because water regulation is essentially a duty of the Legislature, Sipriano v. Great Spring Waters of America, 1 S.W.3d 75, 80 (Tex.1999), and the Legislature has declared districts to be the preferred method of groundwater management, we first review several provisions of chapter 36 of the Water Code entitled "Groundwater Districts." A district has only such powers and authority as "may be conferred by law." Tex. Const. Art. XVI, § 59(b). Because the power of a district is limited by the terms of applicable statutes authorizing its creation and a district can exercise no authority that the Legislature has not clearly granted, Tri–City Fresh Water Supply Dist. No. 2 v. Mann, 135 Tex. 280, 142 S.W.2d 945, 948 (1940), the statutes must be closely examined to determine if any statute clearly grants a district the authority to revoke or deny a well permit to prevent the production of a disproportionate amount of water as it relates to the tract size and a district's well spacing regulations as they relate to gallons per minute per acre.

[10]  After defining certain terms and stating the purpose of groundwater districts, by section 36.002, the Legislature confirmed ownership rights of groundwater. That section provides:

> The ownership and rights of the owners of the land and their lessees and assigns in groundwater are hereby recognized, and *nothing* in this *code* shall be construed as *depriving* or *divesting* the owners or their lessees and assigns of the ownership or rights, subject to rules promulgated by a district.

(Emphasis added). By using the term *code* and not *chapter,* this section applies to groundwater notwithstanding any provision to the contrary in any other chapter of the Water Code. Because a statute is presumed to have been enacted by the Legislature with complete knowledge of the existing law and with reference to it, Acker v. Texas Water Com'n, 790 S.W.2d 299, 301 (Tex.1990), by enactment of this section effective September 1, 1995, the Legislature recognized the rule of capture as it applies to groundwater according to the decisions of the Texas Supreme Court in Houston & T.C. Ry. Co. v. East, 98 Tex. 146, 81 S.W. 279 (1904) and City of Corpus Christi v. City of Pleasanton, 154 Tex. 289, 276 S.W.2d 798, 801 (Tex.1955). Under section 36.001(1) a

district is defined as an authority created under section 59, article XVI of the Texas Constitution that has the authority to "regulate the spacing of water wells, the production from water wells, or **\*777** both." However, spacing of wells or regulation of production from water wells is not defined.

To implement the management responsibility, the rule making power of a district is covered by subchapter D. Among other provisions, section 36.101(a) gives a district rule making authority "to control subsidence or prevent waste of groundwater and to carry out the powers and duties provided by this chapter." Section 36.116 specifically addresses well spacing and production. This section authorizes a district to provide for well spacing and regulation of production to (1) minimize the drawdown of the water table or (2) the reduction of artesian pressure (3) to control subsidence or (4) to prevent waste. Because a district is not a state agency with statewide jurisdiction, but is a regional political subdivision, the Administrative Procedure and Practice Act does not apply,[5] except that section 2001.174 of the Government Code is made applicable under section 36.253 for purposes of judicial review of district actions.

### De Novo Review

 [11]    By its first ground for its motion for summary judgment, the District urged that the challenged rulings of the District are deemed *prima facie* valid and the substantial evidence rule applied. Sections 36.251 through 36.254 of the Water Code contain provisions regarding judicial review of any rule or order made by a district. As applicable here, section 36.253 provides that any challenged law, rule, order, or act shall be "deemed prima facie valid," and the section provides that the substantial evidence rule covered by section 2001.174 of the Government Code shall also apply upon judicial review of a district's rule or order. However, where, as here, the ruling of a district is challenged on the ground that it did not have the authority to revoke a well permit or refuse to issue a well permit for the purpose of disallowing a disproportionate amount of water to be pumped as it related to the tract size, our review of this question of law is *de novo*. Matter of Humphreys, 880 S.W.2d 402, 404 (Tex.1994). Accordingly, the first ground of the District is not applicable.

By its second ground, the District contended that it "complied with state groundwater statutes and local district rules in rendering the decisions which are now challenged...."

Because this ground raises questions of statutory authority of a district, we will combine our analysis with the contentions of the Kitten Trust and South Plains presented in their motion for summary judgment and presented here by their first, third, and fourth issues complaining that the District did not have the authority under law to revoke a well permit or refuse to issue a well permit, because to permit such a well would "allow a disproportionate amount of water to be pumped as it relates to the tract size the District's well spacing regulations as they relate to gallons per minute per acre as set by the District's spacing rules."

### Application Met Spacing Requirements

 [12]    It is undisputed that at the hearing, the Board Manager of the District reported to the Board that the application complied with the District's spacing requirements. Minutes of the District hearing regarding application permit no. 8209 state in part that:

> Mr. Wyatt said that Application for Permit Number 8209 meets the spacing requirements of the Water District. However, the question remains as to whether a 4–inch well on the 100–foot wide right- **\*778** of-way would take a disproportionate amount of water from the strip of land on which it is located.

By interrogatory number 7, the Kitten Trust and South Plains asked the District if any of its rules authorized or specified a "disproportionate taking" or similar standard for the grant or denial of water well permits and, if so, requested that the rule be identified. By its answer, the District designated its Rule 8 entitled "Minimum Spacing of Wells," as authorizing the district to deny a water well application permit because of "disproportionate taking" or similar standard. As material herein, the rule provides in part:

### RULE 8—MINIMUM SPACING OF WELLS

(a) Wells to be drilled after the effective date of these rules shall be spaced as follows:

A well to be equipped with a four-inch or smaller pump shall be located at least 200 yards from the nearest well or authorized well site; a well to be equipped with a five-

inch pump shall be located at least 250 yards from the nearest well or authorized well site; a well to be equipped with a six-inch pump shall be located at least 300 yards from the nearest well or authorized well site; a well to be equipped with an eight-inch pump shall be located at least 400 yards from the nearest well or authorized well site; and a well to be equipped with a ten-inch or larger pump shall be located at least 440 yards from the nearest well or authorized well site. An authorized well site is not a permit to drill. An authorized well site shall be:

(1) The location of a proposed well on an application duly filed until such application is denied; or

(2) The location of a proposed well on a valid permit.

\* \* \*

(b) It is contemplated that the pumps of the respective sizes set out above shall refer to the inside diameter of the pump column pipe and shall produce water at the ordinary or usual pumping rates of pumps of such sizes. The ordinary or usual pumping rates of such pumps are to be regarded as follows:

\* \* \*

If the pump which is to be used by the applicant is of a different size or type, or is to be operated at a different rate in gallons per minute from the pumps in general use as set out above, such facts shall be made known in the application; and in such case, the actual rate at which the well is to be pumped shall be the determining factor in the spacing for such well instead of the size of the pump. A pump to be operated against an artificial head in a closed or semi-closed system shall be given special consideration.

\* \* \*

The rule contains no provisions that would authorize the denial of a permit because a well would produce a disproportionate amount of water from the land on which the proposed well is located and does not establish a minimum tract size. Further, if the proposed well site meets the minimum distance requirement between wells, the size of the tract and its shape or dimensions are irrelevant for purposes of Rule 8. Accordingly, because the application complied with the spacing rule, the District's action in revoking the well

permit and denying the other application for a well permit was improper.

Moreover, the action of the District prohibiting "a disproportionate amount of water **\*779** to be pumped as it relates to tract size" was not otherwise authorized by statute because (1) such authority was not clearly authorized by the Legislature, (2) the statute did not provide reasonable standards to guide the District in exercising its powers, (3) the District was not authorized to deny a permit to prohibit the pumping of a disproportionate amount of water to be pumped as it relates to tract size based upon its alleged discretionary power.

### Not Clearly Authorized

 [13]    [14]    Following the decisions of the Supreme Court in Sipriano v. Great Spring Waters of America, 1 S.W.3d 75 (Tex.1999) and Barshop v. Medina Under. Wat. Cons. Dist., 925 S.W.2d 618 (Tex.1996), it is firmly established that (1) the common law rule of capture that an owner has the right to withdraw underground percolating water is not correlative but is "absolute," and is not subject to the reasonable use rule adopted by some other jurisdictions, remains the law in Texas, and (2) as provided by section 59, article XVI of the Texas Constitution adopted in 1917, that groundwater regulation is a duty imposed on the Legislature. [6] The need for legislative regulation of water continues to be recognized. *Sipriano, 1 S.W.3d at 79.* Even though the Legislature has declared that groundwater districts are the State's preferred method of groundwater management, we must review the Water Code to determine if the Legislature has clearly authorized the action of the District.

 [15]    In Tri–City Fresh Water Supply Dist. No. 2 v. Mann, 135 Tex. 280, 142 S.W.2d 945, 948 (1940), the Court held that a district "can exercise no authority that has not been *clearly* granted by the Legislature." The *clearly* granted test was reaffirmed in Quincy Lee Company v. Lodal & Bain Engineers, 602 S.W.2d 262, 264 (Tex.1980). Accordingly, we presume that the applicable Water Code provisions were enacted by the Legislature with complete knowledge of the rule that any authority granted to a district must be clearly granted. Acker v. Texas Water Com'n, 790 S.W.2d 299, 301 (Tex.1990).

The action of the District to prevent the pumping of a disproportionate amount of water as it relates to the tract size

is contrary to the rule of capture as applied to underground water in Texas law as established by *East,* 81 S.W. at 279, and its progeny, and also prohibited by section 36.002.[7] Moreover, although section 36.101 authorizes the District to make rules to control subsidence or prevent waste of groundwater, and section 36.116 authorizes the District to provide for spacing of water wells and regulation of production of wells for the four purposes stated in the section, these sections do not clearly authorize the District to revoke or deny a well permit to prohibit the production of a disproportionate amount of groundwater as it relates to the tract size. Because the right to withdraw underground percolating water is not correlative, but is "absolute," and the Legislature has not enacted a "reasonable use" rule as exists in other jurisdictions, *Barshop,* 925 S.W.2d at 625, and considering that by section 36.002, the Legislature provided that nothing in the Code shall deprive or divest the owners of groundwater of their ownership rights, we hold that the applicable Code provisions do not *clearly* authorize the District to enact a regional rule to **\*780** prohibit the production of a disproportionate amount of groundwater as it relates to the size of the tract or to implement a reasonable use rule.

### No Reasonable Standards

 [16]    [17]    [18]    In Texas, legislative power is defined broadly and includes the power to set public policy. FM Properties Operating v. City of Austin, 22 S.W.3d 868, 873 (Tex.2000). Article XVI Section 59 of the Texas Constitution charged the Legislature with the duty of groundwater conservation and authorized the creation of districts to have "the authority to exercise such rights, privileges and functions concerning the subject matter of this amendment as may be conferred by law." By section 36.002, the Legislature announced the state wide public policy regarding the rule of capture as applied to groundwater. It is important to note that none of the applicable code provisions make any reference to the size of the tract upon which a proposed well is to be located or address the issue of production of disproportionate volumes of water as it relates to tract size.[8] This omission is significant because omissions are presumed to be intentional. Matter of Ament, 890 S.W.2d 39, 41 (Tex.1994).

 [19]    Although the Legislature may delegate powers to the District to carry out legislative purposes, it must establish reasonable standards to guide the District in exercising those powers. *FM Properties Operating,* 22 S.W.3d at 873. Several

code sections mention regulations to prevent waste, control subsidence, or avoid reduction of artesian pressure, but none of the sections authorize a rule creating a "reasonable use" rule or address the issue of disproportionate production of water as it relates to tract size. We recognize that the last clause of section 36.002, which provides that the announced public policy is "subject to rules promulgated by a district," is nevertheless ineffective to authorize the action of the District to deny and revoke well permits in order to prevent the production of a disproportionate amount of water as it relates to tract size because the subject is not mentioned in any of the sections authorizing regulations, and the statute does not establish reasonable standards to guide the agency in exercising its rule making power as applied to the expressed public policy favoring the rule of capture.

### Section 36.002 Requires Rule

 [20]    Moreover, the decision of the District based on discretion vested "in a groundwater District by the Legislature to regulate a natural resource" does not support the action of the District. The District does not cite any specific section of the Water Code granting such discretionary powers and we have found none. Further, under section 36.002, which, as applicable to groundwater, prevails over any other provision in the Water Code to the contrary, groundwater ownership rights are "subject to *rules,*" but the section does not make groundwater ownership rights subject to discretionary decisions of the District.

 [21]    As above discussed, the source of the District's authority is legislative action and the District has no power that is not clearly granted by the Legislature. *Mann,* 142 S.W.2d at 948. Section 36.101 **\*781** gives the District the discretion to promulgate rules under the procedure that is also prescribed by the Legislature, but neither section 36.101 nor section 36.002 define the term "rule" as applicable here.[9] As applied to section 36.002, we conclude that the word *rule* contemplates an established standard prescribing a guide for conduct, regulation or principle that does not include discretionary acts of the District Board. Black's Law Dictionary, 1331 (6th ed.1990). Because section 36.002 requires that regulation of groundwater ownership rights must be by *rule* promulgated by the District, not discretionary decisions, the District did not have the authority to implement such regulation without a rule adopted after public notice and public hearing are required by Section 36.101(b). We

conclude that the action of the District cannot be supported on the ground of its alleged discretion.

 **[22]**   We have not overlooked the District's argument that its action was proper under sections 36.113(d)(2) and 36.1131(b)(8). However, section 36.113(d)(2) is not applicable because it is concerned with the proposed use of water and not the size of the tract where the well is located. Also, section 36.113(d)(2) does not apply because water withdrawal may be limited to prevent waste, but prevention of waste was not the basis of the District's actions. Further, these sections cited by the District clearly do not authorize it to revoke or deny a well permit because such a well would allow a disproportionate amount of water to be pumped as it relates to the tract size and the well spacing regulations as they relate to gallons per minute as set by the spacing rules. Accordingly, we hold that the District's second ground will not support summary judgment, and issues one, three, and four of the Kitten Trust and South Plains are sustained. Our sustension of these issues pretermits consideration of their second issue.

 **[23]**   As was also presented in *Barshop,* 925 S.W.2d at 637, the final matter which we must address is the trial court's award of attorney's fees to the District under section 37.009 of the Texas Civil Practice and Remedies Code, which may be awarded or denied in accordance with the discretion of the trial court. Oake v. Collin County, 692 S.W.2d 454, 455 (Tex.1985). Here, by its motion for summary judgment, the District also sought an award of attorney's fees and the trial court's order granted the motion for summary judgment and awarded $9,500 in attorney's fees. As in *Barshop,* because this award may no longer be valid, and because the award of attorney's fees in declaratory judgment actions is within the discretion of the trial court, we remand this cause to the trial court for it to consider and exercise its discretion regarding attorney's fees, if any, which should be awarded to the parties in the underlying case.

In conclusion, rendering judgment the trial court should have rendered, the judgment of the trial court signed January 18, 2000, is reversed and the motion for summary judgment of the Kitten Trust and South Plains is granted. It is further ordered that the actions of the District in revoking the Kitten Trust application permit no. 8149–A and the denial of South Plains's water well application permit no. 8209 are hereby declared to be null and void because such acts were in excess of the lawful authority of the District. That portion of the judgment regarding whether attorney's fees and costs should be awarded  **\*782**  to either party and the amount thereof is

severed and the cause is remanded to the trial court for its determination and rendition of judgment in accordance with this opinion and its determination of the severed question.

QUINN, J., concurring.

QUINN, Justice, concurring.

I join in the judgment rendered by the majority and concur in that portion of the opinion discussing the Conservation District's deviation from Rule 8. So too do I write to say that the actions of an administrative body must be reasonable to survive judicial review. Implicit in this standard of reasonableness lies the concept of prior notice or what some would call fundamental fairness.

Admittedly, administrative bodies may regulate on an *ad hoc* or case-by-case basis. *Securities & Exchange Comm'n v. Chenery Corp.,* 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); *Southwestern Bell Tel. Co. v. Public Utility Comm'n,* 745 S.W.2d 918, 926 (Tex.App.—Austin 1988, writ denied); *Madden v. Texas Bd. Chiropractic Examiners,* 663 S.W.2d 622, 626 (Tex.App.—Austin 1983, writ ref'd n.r.e.). Despite that power, however, those appearing before the administrative body must be afforded prior notice of the issues of fact and law which will control the result to be reached by the body. *Madden v. Texas Bd. Chiropractic Examiners,* 663 S.W.2d at 626 (imposing, *ad hoc*, a requirement restricting the practice of chiropractic medicine to those who have graduated from an accredited institution). Violating the latter principle contravenes fundamental fairness and renders the agency decision arbitrary and unreasonable. *Id.* at 626-27. In short, an administrative body cannot say that factors A, B, and C determine a particular result and then interject factor D once the proceeding has begun.

As expressed in the majority opinion at bar, Rule 8 said nothing about a minimum number of acres needed to obtain particular well permits. So, to use that factor as a basis to revoke a permit *already issued* and deny another application pending issuance constitutes a deprivation of fundamental fairness. That is, the Kitten Family Living Trust and South Plains Lamesa Railroad, Ltd. were entitled to prior notice of the facts and law which would control the Conservation District's ultimate decision. Those two entities being denied that entitlement by the District, the latter's decision cannot stand. *Madden v. Texas Bd. Chiropractic Examiners, supra.*

For the foregoing reason, I concur in the judgment of the majority.

Footnotes

1      Unless otherwise designated all references are to the Texas Water Code Annotated (Vernon 2000).

2      Uncontroverted by the District.

3      Rule 166a(c) of the Texas Rules of Civil Procedure provides that a motion for summary judgment shall state the specific grounds therefor.

4      Ad hoc. For this special purpose. Black's Law Dictionary 41 (6th ed.1990).

5      *See* Tex. Gov't Code Ann. § 2001.003(7) (Vernon 2000).

6      Because the rule of capture applies only to groundwater, our analysis will be limited to chapter 36 entitled Groundwater Districts.

7      Section 36.002 provided in part "and nothing in this code shall be construed as depriving or divesting the owners ... of their ownership or rights...."

8      The action of the District was based on its decision to prohibit the production of volumes of water that it considered to be a disproportionate amount of water from the strip of land on which it is located. However, because the District does not cite any code provision or other authority or commentary supporting such a test it appears to be an attempt to apply a "reasonable use" rule.

9      The Administrative Procedure and Practice Act does not apply because the District is not a statewide agency. Section 2001.003(7).

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

75 S.W.3d 487
Court of Appeals of Texas,
San Antonio.

Leonard SANTOYA, in his capacity as Justice of the Peace for Precinct 1 of Maverick County, and Cesar Iracheta, in his capacity as Justice of the Peace for Precinct 3 of Maverick County, Texas, Appellants,
v.
Carlos A. PEREDA, Jr., in his capacity as County Auditor of Maverick County, Texas, Appellee.

No. 04–00–00825–CV.    |    Jan. 16, 2002.    |
Rehearings Overruled Feb. 11 and March 18, 2002.

County employees petitioned for writ of mandamus to compel county auditor to compensate them in accordance with settlement agreement they entered into with county commissioners' court. The 365th Judicial District Court, Maverick County, Amado J. Abascal, III, J., granted summary judgment for county auditor. Employees appealed. The Court of Appeals, Alma L. Lopez, J., held that incorporation of terms of settlement agreement into court decree was not prerequisite to enforceability of agreement.

Reversed and rendered.

Karen Angelini, J., filed dissenting opinion.

**Attorneys and Law Firms**

 **\*488**  David Riojas, Javier Riojas, Texas Rural Legal Aid, Inc., Eagle Pass, for appellants.

Alejandra I. Villarreal, Ron H. Mata, Wickliff & Hall, P.C., San Antonio, for appellee.

Sitting: ALMA L. LÓPEZ, Justice, CATHERINE STONE, Justice, KAREN ANGELINI, Justice.

**Opinion**

Opinion by: ALMA L. LÓPEZ, Justice.

Leonard Santoya, in his capacity as Justice of the Peace for Precinct 1 of Maverick County ("Santoya") and Cesar Iracheta, in his capacity as Justice of the Peace for Precinct 3 of Maverick County, Texas ("Iracheta") appeal a summary judgment granted in favor of Carlos A. Pereda, Jr., in his

capacity as County Auditor of Maverick County, Texas ("Pereda"). The summary judgment was granted based on the trial court's finding that Pereda did not abuse his discretion in refusing to pay the increased salaries to Santoya and Iracheta set forth in a Compromise and Settlement Agreement between Santoya, Iracheta, and the Commissioners' Court of Maverick County, Texas ("Commissioners' Court"). We reverse the trial court's judgment and render judgment ordering Pereda to pay Santoya and Iracheta in accordance with the terms of the settlement agreement.

**BACKGROUND**

In 1999, the Commissioners' Court raised the salaries of Santoya and Iracheta to $13,000; however, it raised the salaries of two other justices of the peace to $23,000. The Commissioners' Court justified the salary differential based on the greater amount of revenue collected by the other two justices from traffic fines. Although Santoya and Iracheta sought a hearing before the salary grievance committee, [1] the salary grievance committee determined that the notice provided by Santoya and Iracheta was untimely and refused to grant them a hearing.

After unsuccessfully attempting to resolve the dispute without litigation, Santoya and Iracheta filed suit against the Commissioners' Court alleging that the Commissioners' Court had acted illegally in basing their compensation on the amount of traffic fines they collected. After the lawsuit was filed, the county judge was informed by the attorney general's office that the Texas Transportation Code prohibits basing the compensation of justices **\*489**  of the peace on the amount of revenue generated in traffic fines. [2] In view of that information, the Commissioners' Court voted to settle their dispute with Santoya and Iracheta. A letter agreement dated November 19, 1999, was signed by the attorneys for the parties, documenting a settlement agreement that had been reached on November 17, 1999.

In accordance with the terms of the settlement agreement, Santoya and Iracheta filed a motion to dismiss their lawsuit on November 22, 1999. On November 24, 1999, the trial court entered an order dismissing the lawsuit with prejudice, noting "the Court having been fully informed in the premises finds that all things in controversy having been fully comprised and settled by and between the parties." On January 14, 2000, the trial court signed the compromise and settlement agreement containing the terms of the settlement stating "IT IS SO

ORDERED, ADJUDGED AND DECREED." On February 1, 2000, the trial court signed an order vacating its January 14, 2000, order because it had lost plenary jurisdiction on December 24, 1999.

On March 7, 2000, Pereda, without the authority of the Commissioners' Court, informed Santoya and Iracheta that the salary paid based on the settlement agreement was not authorized because the trial court vacated its order. When Santoya and Iracheta did not reimburse the county for the alleged "overpayment," Pereda deducted the "overpayment" from their subsequent payroll checks.

Santoya and Iracheta filed a petition for writ of mandamus in the trial court seeking to compel Pereda to compensate them in accordance with the terms of the settlement agreement. Pereda filed a motion for summary judgment, asserting that because Santoya and Iracheta did not have a valid district court order setting aside the budgeted salaries or a salary grievance recommendation increasing their salaries, their entitlement to the increased salaries was not clearly established. Pereda testified in his deposition that his duty to pay the increased salaries would have been clearly established if the trial court's order stating that the terms of the compromise and settlement agreement are "ordered, adjudged and decreed" had not been set aside. Santoya and Iracheta filed a counter motion for summary judgment and provided affidavits establishing that the Commissioners' Court considered itself bound by the settlement agreement and that Pereda was acting without the authority or consent of the Commissioners' Court. The trial court granted Pereda's summary judgment finding that Pereda "did not abuse his discretion in refusing to pay the increased salaries."

## STANDARD OF REVIEW

 **[1]** **[2]** A writ of mandamus will issue to compel a public official to perform a ministerial act. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 793 (Tex.1991). An act is ministerial when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion. *Id.* A writ of mandamus generally will not issue to compel a public official to perform an act which involves an exercise of discretion. *Id.* However, this rule is not without exception-a writ of mandamus may issue in a proper case to correct a clear abuse of discretion by a public official. *Id.*

The party moving for summary judgment carries the burden of establishing that no material fact issue exists and that it is entitled to judgment as a matter of law. **\*490** *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant. *Id.* We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.*

 **[3]** **[4]** When competing motions for summary judgment are filed, and one is granted and the other denied, the reviewing court must review the summary judgment evidence presented by both sides and determine all questions presented. *Commissioners Court of Titus County v. Agan,* 940 S.W.2d 77, 81 (Tex.1997). We are required to consider all summary judgment grounds the trial court ruled on and the movant preserved for appellate review that are necessary for final disposition of the appeal. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex.1996).

## DISCUSSION

 **[5]** **[6]** Mandamus relief is available if a plaintiff proves that he is entitled to payment as a matter of law and an auditor withholds payment without legal justification. *Smith v. McCoy,* 533 S.W.2d 457, 460 (Tex.Civ.App.-Dallas 1976, writ dism'd); *Ham v. Garvey,* 155 S.W.2d 976, 977 (Tex.Civ.App.-San Antonio 1941, no writ). Pereda contends that he had a legal justification for withholding payment because the salary increases were not approved by the salary grievance committee or court order. However, Pereda does not cite any legal authority to support his position that the Commissioners' Court did not have the authority to settle a pending lawsuit involving a claim regarding the illegality of the court's action in setting a salary.

 **[7]** Clearly, a commissioners' court has the general authority to settle pending lawsuits. *See* TEX. LOCAL GOV'T CODE ANN. 115.021 (Vernon 1999); *County of Bexar v. Garcia,* 974 S.W.2d 107, 109 (Tex.App.-San Antonio 1998, no pet.) (noting possibility of settlement by commissioners' court as reason for presentment requirement); Op. Tex. Att'y Gen. No. LO–98–103 (1998) (noting authority of commissioners' court to settle lawsuit). If this were not the case, a county, which can act only through its commissioners' court, would never be able to resolve litigation through settlement. *Nueces County v. De Pena,* 953 S.W.2d 835, 836 (Tex.App.-Corpus Christi 1997, no pet.).

Pereda's position appears to be that in the absence of a formal order by a trial court adopting the provisions of a settlement agreement entered into by a county, the settlement agreement does not establish the legal right to payment thereunder. However, a trial court has discretion in incorporating the terms of a settlement agreement into a final decree. TEX. CIV. PRAC. & REM.CODE ANN. 154.071(b) (Vernon 1999). The incorporation of the terms of the settlement agreement into a court decree is not a prerequisite to the enforceability of the agreement. TEX. CIV. PRAC. & REM.CODE ANN. 154.071(a) (Vernon 1999). The settlement agreement was legally enforceable when the parties reached a settlement and executed the written agreement. *Id.* Furthermore, the trial court impliedly adopted and approved the terms of the settlement agreement on November 24, 1999, by dismissing the lawsuit filed by Santoya and Iracheta based on the terms and conditions of the settlement agreement. The trial court's order vacating its subsequent signature on the final settlement agreement does not vacate its initial action dismissing the underlying lawsuit based on the terms and conditions of the parties' settlement agreement, thereby recognizing the validity of that agreement.

 **[8]**    Chapter 152 of the Texas Local Government Code establishes the general procedure for setting salaries of elected **\*491** officials through the budgetary process. No provision in chapter 152 precludes a commissioners' court from resolving litigation involving the legality of a salary in a peaceable manner. In fact, such a provision would be directly contrary to the state's policy of encouraging the peaceable resolution of disputes and the early settlement of pending litigation through voluntary settlement procedures. TEX. CIV. PRAC. & REM.CODE ANN. 154.002 (Vernon 1999); *Elbaor v. Smith,* 845 S.W.2d 240, 250 (Tex.1992). Accordingly, Pereda failed to conclusively establish a legal justification for withholding payment. Since Santoya and Iracheta established their entitlement to payment as a matter of law, they were entitled to mandamus relief.

## CONCLUSION

The trial court's order is reversed. Judgment is rendered ordering Pereda to pay Santoya and Iracheta in accordance with the terms of the settlement agreement between the Commissioners' Court, Santoya and Iracheta.

Dissenting opinion by: KAREN ANGELINI, Justice.
I respectfully dissent.

A mandamus cannot issue to compel an official to perform a discretionary act. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 793 (Tex.1991). Because County Auditor Carlos A. Pereda, Jr. was performing a discretionary act when he refused to pay the increased salaries to Leonard Santoya and Cesar Iracheta, I would affirm the judgment of the trial court.

Section 112.006 of the Texas Local Government Code grants the county auditor "general oversight of the books and records" of county offices and charges the auditor with the "strict enforcement of the law governing county finances." TEX. LOC. GOV'T CODE ANN.. § 112.006 (Vernon 1999). "In a county with a county auditor, the county treasurer and the county depository may not pay a check or warrant unless it is countersigned by the county auditor *to validate it as a proper and budgeted item of expenditure.*" *Id.* § 113.043 (emphasis added). Further, section 113.064 mandates,

> (a) In a county that has the office of county auditor, each claim, bill, and account against the county must be filed in sufficient time for the auditor to examine and approve it before the meeting of the commissioners court. A claim, bill, or account may not be allowed or paid *until it has been examined and approved by the auditor.*

> (b) The auditor shall stamp each approved claim, bill, or account. If the auditor considers it necessary, the auditor may require that a claim, bill, or account be verified by an affidavit indicating its correctness.

*Id.* § 113.064(a)-(b) (emphasis added). "The county auditor may not audit or approve a claim unless the claim was incurred as provided by law." *Id.* § 113.065. Thus, pursuant to the Texas Local Government Code, "the approval of the auditor is a condition precedent to the exercise of the commissioners court's authority to order payment of claims." *Smith v. McCoy,* 533 S.W.2d 457, 459 (Tex.Civ.App.-Dallas 1976, writ dism'd) (citing *Anderson v. Ashe,* 99 Tex. 447, 90 S.W. 872, 873 (1906)). This statutory authority granted to the auditor creates "a delicate system of checks and balances" to protect the county's funds. *Id.* While the commissioners court has the authority to expend county funds, it may not do so without the approval of the auditor "whose approval may not be arbitrarily withheld." *Id.* Likewise, the auditor has no authority to order the expenditure of county funds without the approval of the **\*492** commissioners court. *Id.*

"[T]hese statutory requirements make the approval of a claim against the county (or a payment thereof) a discretionary act of the auditor rather than a mere ministerial act." *Id.* "To hold [otherwise] would remove one of the safeguards in this system of checks and balances and would permit a commissioners court to disburse county funds without restraint." *Id.*

In the instant case, the auditor withheld his approval based on his reading of chapter 152 of the Texas Local Government Code and article V, section 8 of the Texas Constitution. Section 152.011 of the Texas Local Government Code mandates that the commissioners court shall set the amount of the compensation for county and precinct officers. TEX. LOC. GOV'T CODE ANNN § 152.011 (Vernon 1999). Section 152.013 describes the procedure for setting amounts of compensation for elected officers:

> (a) Each year the commissioners court shall set the salary, expenses, and other allowances of elected county or precinct officers. The commissioners court shall set the items at a regular meeting of the court during the regular budget hearing and adoption proceedings.

> (b) Before the 10th day before the date of the meeting, the commissioners court must publish in a newspaper of general circulation in the county a notice of:

>> (1) any salaries, expenses, or allowances that are proposed to be increased; and

>> (2) the amount of the proposed increases.

> (c) Before filing the annual budget with the county clerk, the commissioners court shall give written notice to each elected county and precinct officer of the officer's salary and personal expenses to be included in the budget.

*Id.* § 152.013.[1] The Attorney General has interpreted this section to require that salaries of elected county and precinct officers be set during the regular budget hearing. "It is clear that since the county attorney is an *elected official,* the salary for that office may be considered and adopted only during the regular, annual budget hearing and adoption proceedings." Op. Tex. Att'y Gen. No. JM–839 (1988) (emphasis added);

*see also id.* No. JC–0147 (1999) ("The salaries of employees and non-elected county officers may be changed by a budget amendment at any time, while the salaries of elected officers may be changed only once a year, 'during the regular budget hearing and adoption proceedings.' "). Santoya and Iracheta's increase in salary was not adopted through the budget process.

Besides chapter 152, the only other means of increasing the salary of an elected official is through an order by a district court. *See* TEX. CONST. art. V, § 8 ("The District Court shall have appellate jurisdiction and general supervisory control over the County Commissioners Court…"). On November 22, 1999, Santoya and Iracheta filed a motion to dismiss their lawsuit against the commissioners court with prejudice, informing the trial court that the parties had settled. The trial court dismissed the lawsuit on November 24, 1999. After the trial court lost plenary power, it signed an order approving the settlement agreement. On February 1, 2000, it vacated this order, noting that it had no authority to sign the order. Therefore, there is no court order directing **\*493** Pereda that Santoya and Iracheta's claim was valid. All that was established as a matter of law was that the commissioners court had entered into a settlement agreement. However, the commissioners court does not have authority to unilaterally increase the salary of an elected official. *See* TEX. LOC. GOV'T CODE ANN.. §§ 113.043, 113.064 (Vernon 1999); *Smith,* 533 S.W.2d at 459. As such, Santoya and Iracheta did not establish the validity of their claim as a matter of law. *See Smith,* 533 S.W.2d at 460 ("[W]hen a plaintiff proves that he is entitled to payment *as a matter of law,* and, when there is no legal justification for the auditor withholding approval of the claim or payment thereof, mandamus will lie.") (emphasis added). When presented with a difficult legal question, an auditor acts within his official discretion to deny a claim and to require that its validity be established in a court of law. *See id.* at 459–60. I would hold that Pereda, faced with a difficult legal question, was acting within his discretion. As such, the trial court properly granted summary judgment in favor of Pereda.

For the above reasons, I dissent and would affirm the judgment of the trial court.

Footnotes

1    *See* TEX. LOCAL GOV'T CODE ANN. § 152.016 (Vernon 1999).
2    *See* TEX. TRANSP. CODE ANN. § 720.002 (Vernon 1999).

1    Additionally, section 152.016 outlines the procedure for an elected county or precinct officer to complain about the setting of his or her salary to the Salary Grievance Committee. TEX. LOC. GOV'T CODE ANN. . § 152.016 (Vernon 1999). Appellants' request for a hearing before the Salary Grievance Committee was denied for being untimely.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

67 S.Ct. 1575
Supreme Court of the United States

SECURITIES AND EXCHANGE COMMISSION

v.

CHENERY CORPORATION et al.

SAME

v.

FEDERAL WATER & GAS CORPORATION.

Nos. 81 and 82. | Argued Dec. 13—
16, 1946. | Decided June 23, 1947. |
Rehearing Denied Oct. 13, 1947. See 68 S.Ct. 26.

Separate petitions by Chenery Corporation and others and by the Federal Water & Gas Corporation to review an order of the Securities and Exchange Commission disapproving an amendment to reorganization plan. A judgment of the United States Court of Appeals, District of Columbia, reversed the order, 154 F.2d 6, and the Securities and Exchange Commission brings certiorari.

Judgment reversed.

Mr. Justice FRANKFURTER and Mr. Justice JACKSON dissenting.

On Writs of Certiorari to the United States Court of Appeals for the District of Columbia.

**Attorneys and Law Firms**

**\*\*1577** Mr. **\*195** Roger S. Foster, of Philadelphia, Pa., for petitioner.

Mr. **\*196** Spencer Gordon, of Washington, D.C., for Chenery Corporation and others.

Mr. Allen S. Hubbard, of New York City, for Federal Water & Gas Corporation.

**Opinion**

Mr. Justice MURPHY delivered the opinion of the Court.

This case is here for the second time. In S.E.C. v. Chenery Corporation, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626, we held that an order of the Securities and Exchange Commission could not be sustained on the grounds upon which that agency

acted. We therefore directed that the case be remanded to the Commission for such further proceedings as might be appropriate. On remand, the Commission reexamined the problem, recast its rationale and reached the same result. The issue now is whether the Commission's action is proper in light of the principles established in our prior decision.

When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

We also emphasized in our prior decision an important corollary of the foregoing rule. If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled **\*197** to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.' United States v. Chicago, M., St. P. & P.R. Co., 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023.

**\*\*1578** Applying this rule and its corollary, the Court was unable to sustain the Commission's original action. The Commission had been dealing with the reorganization of the Federal Water Service Corporation (Federal), a holding company registered under the Public Utility Holding Company Act of 1935, 49 Stat. 803, 15 U.S.C.A. s 79 et seq. During the period when successive reorganization plans proposed by the management were before the Commission, the officers, directors and controlling stockholders of Federal purchased a substantial amount of Federal's preferred stock on the over-the-counter market. Under the fourth reorganization plan, this preferred stock was to be converted into common stock of a new corporation; on the basis of the purchases of preferred stock, the management would have received more than 10% of this new common stock. It was frankly admitted that the management's purpose in buying the preferred stock was to protect its interest in the new company. It was also

plain that there was no fraud or lack of disclosure in making these purchases.

But the Commission would not approve the fourth plan so long as the preferred stock purchased by the management was to be treated on a parity with the other preferred stock. It felt that the officers and directors of a holding company in process of reorganization under the Act were fiduciaries and were under a duty not to trade in the securities of that company during the reorganization period. 8 S.E.C. 893, 915-921. And so the plan was amended to provide that the preferred stock acquired by the management, unlike that held by others, was not to be converted **\*198** into the new common stock; instead, it was to be surrendered at cost plus dividends accumulated since the purchase dates. As amended, the plan was approved by the Commission over the management's objections. 10 S.E.C. 200.

The Court interpreted the Commission's order approving this amended plan as grounded solely upon judicial authority. The Commission appeared to have treated the preferred stock acquired by the management in accordance with what it thought were standards theretofore recognized by courts. If it intended to create new standards growing out of its experience in effectuating the legislative policy, it failed to express itself with sufficient clarity and precision to be so understood. Hence the order was judged by the only standards clearly invoked by the Commission. On that basis, the order could not stand. The opinion pointed out that courts do not impose upon officers and directors of a corporation any fiduciary duty to its stockholders which precludes them merely because they are officers and directors, from buying and selling the corporation's stock. Nor was it felt that the cases upon which the Commission relied established any principles of law or equity which in themselves would be sufficient to justify this order.

The opinion further noted that neither Congress nor the Commission had promulgated any general rule proscribing such action as the purchase of preferred stock by Federal's management. And the only judge-made rule of equity which might have justified the Commission's order related to fraud or mismanagement of the reorganization by the officers and directors, matters which were admittedly absent in this situation.

After the case was remanded to the Commission, Federal Water and Gas Corp. (Federal Water), the surviving corporation under the reorganization plan, made an application for approval of an amendment to the plan to

provide **\*199** for the issuance of now common stock of the reorganized company. This stock was to be distributed to the members of Federal's management on the basis of the shares of the old preferred stock which they had acquired during the period of reorganization, thereby placing them in the same position as the public holders of the old preferred stock. The intervening members of Federal's management joined in this request. The Commission denied the application in an order issued on February 7, 1945. Holding Company Act Release No. 5584. That order was reversed by the Court of Appeals, 154 F.2d 6, which felt that our **\*\*1579** prior decision precluded such action by the Commission.

The latest order of the Commission definitely avoids the fatal error of relying on judicial precedents which do not sustain it. This time, after a thorough reexamination of the problem in light of the purposes and standards of the Holding Company Act, the Commission has concluded that the proposed transaction is inconsistent with the standards of ss 7 and 11 of the Act. It has drawn heavily upon its accumulated experience in dealing with utility reorganizations. And it has expressed its reasons with a clarity and thoroughness that admit of no doubt as to the underlying basis of its order.

The argument is pressed upon us, however, that the Commission was foreclosed from taking such a step following our prior decision. It is said that, in the absence of findings of conscious wrongdoing on the part of Federal's management, the Commission could not determine by an order in this particular case that it was inconsistent with the statutory standards to permit Federal's management to realize a profit through the reorganization purchases. All that it could do was to enter an order allowing an amendment to the plan so that the proposed transaction could be consummated. Under this view, the Commission would be free only to promulgate a general rule **\*200** outlawing such profits in future utility reorganizations; but such a rule would have to be prospective in nature and have no retroactive effect upon the instant situation.

[1] We reject this contention, for it grows out of a misapprehension of our prior decision and of the Commission's statutory duties. We held no more and no less than that the Commission's first order was unsupportable for the reasons supplied by that agency. But when the case left this Court, the problem whether Federal's management should be treated equally with other preferred stockholders still lacked a final and complete answer. It was clear that the Commission could not give a negative answer by resort to prior judicial declarations. And it was also clear that the Commission was not bound by settled judicial precedents in

a situation of this nature. 318 U.S. at page 89, 63 S.Ct. at page 460, 87 L.Ed. 626. Still unsettled, however, was the answer the Commission might give were it to bring to bear on the facts the proper administrative and statutory considerations, a function which belongs exclusively to the Commission in the first instance. The administrative process had taken an erroneous rather than a final turn. Hence we carefully refrained from expressing any views as to the propriety of an order rooted in the proper and relevant considerations. See Siegel v. Federal Trade Commission, 327 U.S. 608, 613, 614, 66 S.Ct. 758, 760, 761, 90 L.Ed. 888.

When the case was directed to be remanded to the Commission for such further proceedings as might be appropriate, it was with the thought that the Commission would give full effect to its duties in harmony with the views we had expressed. Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 374, 59 S.Ct. 301, 307, 83 L.Ed. 221; Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 278, 53 S.Ct. 627, 633, 77 L.Ed. 1166, 89 A.L.R. 406. This obviously meant something more than the entry of a perfunctory order giving parity treatment to the management holdings of preferred stock. The fact that the Commission had committed a legal error in its first disposition of the case certainly gave Federal's **\*201** management no vested right to receive the benefits of such an order. See Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 145, 60 S.Ct. 437, 442, 84 L.Ed. 656. After the remand was made, therefore, the Commission was bound to deal with the problem afresh, performing the function delegated to it by Congress. It was again charged with the duty of measuring the proposed treatment of the management's preferred stock holdings by relevant and proper standards. Only in that way could the legislative policies embodied in the Act be effectuated.

 **[2]**    The absence of a general rule or regulation governing management trading during reorganization did not affect the Commission's duties in relation to the particular **\*\*1580** proposal before it. The Commission was asked to grant or deny effectiveness to a proposed amendment to Federal's reorganization plan whereby the management would be accorded parity treatment on its holdings. It could do that only in the form of an order, entered after a due consideration of the particular facts in light of the relevant and proper standards. That was true regardless of whether those standards previously had been spelled out in a general rule or regulation. Indeed, if the Commission rightly felt that the proposed amendment was inconsistent with those standards, an order giving effect to the amendment merely because there was

no general rule or regulation covering the matter would be unjustified.

 **[3]**    It is true that our prior decision explicitly recognized the possibility that the Commission might have promulgated a general rule dealing with this problem under its statutory rule-making powers, in which case the issue for our consideration would have been entirely different from that which did confront us. 318 U.S. at pages 92, 93, 63 S.Ct. at pages 461, 462, 87 L.Ed. 626. But we did not mean to imply thereby that the failure of the Commission to anticipate this problem and to promulgate a general rule withdrew all power from that agency to perform **\*202** its statutory duty in this case. To hold that the Commission had no alternative in this proceeding but to approve the proposed transaction, while formulating any general rules it might desire for use in future cases of this nature, would be to stultify the administrative process. That we refuse to do.

Since the Commission, unlike a court, does have the ability to make new law prospectively through the exercise of its rule-making powers, it has less reason to rely upon ad hoc adjudication to formulate new standards of conduct within the framework of the Holding Company Act. The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise. See Report of the Attorney General's Committee on Administrative Procedure in Government Agencies, S. Doc. No. 8, 77th Cong., 1st Sess., p. 29. Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

 **[4]**    In other words, problems may arise in a case which the administratvie agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or **\*203** the problem may be so specialized and varying in nature as to

be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency. See Columbia Broadcasting System v. United States, 316 U.S. 407, 421, 62 S.Ct. 1194, 1202, 86 L.Ed. 1563.

 [5]    Hence we refuse to say that the Commission, which had not previously been confronted with the problem of management trading during reorganization, was forbidden from utilizing this particular proceeding for announcing and applying a new standard of conduct. Cf. **1581 Federal Trade Commission v. R. F. Keppel & Bro., 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814. That such action might have a retroactive effect was not necessarily fatal to its validity. Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law. See Addison v. Holly Hill Co., 322 U.S. 607, 620, 64 S.Ct. 1215, 1222, 88 L.Ed. 1488, 153 A.L.R. 1007.

And so in this case, the fact that the Commission's order might retroactively prevent Federal's management from securing the profits and control which were the objects of the preferred stock purchases may well be outweighed by the dangers inherent in such purchases from the statutory standpoint. If that is true, the argument of retroactivity becomes nothing more than a claim that the Commission lacks power to enforce the standards of *204 the Act in this proceeding. Such a claim deserves rejection.

 [6]    The problem in this case thus resolves itself into a determination of whether the Commission's action in denying effectiveness to the proposed amendment to the Federal reorganization plan can be justified on the basis upon which it clearly rests. As we have noted, the Commission avoided placing its sole reliance on inapplicable judicial precedents. Rather it has derived its conclusions from the particular facts in the case, its general experience in reorganization matters and its informed view of statutory requirements. It is those matters which are the guide for our review.

The Commission concluded that it could not find that the reorganization plan, if amended as proposed, would be 'fair and equitable to the persons affected (thereby)' within the meaning of s 11(e) of the Act, under which the reorganization was taking place. Its view was that the amended plan would involve the issuance of securities on terms 'detrimental to the public interest or the interest of investors' contrary to ss 7(d)(6) and 7(e), and would result in an 'unfair or inequitable distribution of voting power' among the Federal security holders within the meaning of s 7(e). It was led to this result 'not by proof that the interveners (Federal's management) committed acts of conscious wrongdoing but by the character of the conflicting interests created by the interveners' program of stock purchases carried out while plans for reorganization were under consideration.'

The Commission noted that Federal's management controlled a large multi-state utility system and that its influence permeated down to the lowest tier of operating companies. The financial, operational and accounting policies of the parent and its subsidiaries were therefore under the management's strict control. The broad range of business judgments vested in Federal's management *205 multiplied opportunities for affecting the market price of Federal's outstanding securities and made the exercise of judgment on any matter a subject of greatest significance to investors. Added to these normal managerial powers, the Commission pointed out that a holding company management obtains special powers in the course of a voluntary reorganization under s 11(e) of the Holding Company Act. The management represents the stockholders in such a reorganization, initiates the proceeding, draws up and files the plan, and can file amendments thereto at any time. These additional powers may introduce conflicts between the management's normal interests and its responsibilities to the various classes of stockholders which it represents in the reorganization. Moreover, because of its representative status, the management has special opportunities to obtain advance information of the attitude of the Commission.

Drawing upon its experience, the Commission indicated that all these normal and special powers of the holding company management during the course of a s 11(e) reorganization placed in the management's **1582 command 'a formidable battery of devices that would enable it, if it should choose to use them selfishly, to affect in material degree the ultimate allocation of new securities among the various existing classes, to influence the market for its own gain and to

manipulate or obstruct the reorganization required by the mandate of the statute.' In that setting, the Commission felt that a management program of stock purchase would give rise to the temptation and the opportunity to shape the reorganization proceeding so as to encourage public selling on the market at low prices. No management could engage in such a program without raising serious questions as to whether its personal interests had not opposed its duties 'to exercise disinterested judgment in matters pertaining to subsidiaries' accounting, budgetary and dividend policies, to present **\*206** publicly an unprejudiced financial picture of the enterprise, and to effectuate a fair and feasible plan expeditiously.'

The Commission further felt that its answer should be the same even where proof of intentional wrongdoing on the management's part is lacking. Assuming a conflict of interests, the Commission thought that the absence of actual misconduct is immaterial; injury to the public investors and to the corporation may result just as readily. 'Questionable transactions may be explained away, and an abuse of investors and the administrative process may be perpetrated without evil intent, yet the injury will remain.' Moreover, the Commission was of the view that the delays and the difficulties involved in probing the mental processes and personal integrity of corporate officials do not warrant any distinction on the basis of evil intent, the plain fact being 'that an absence of unfairness or detriment in cases of this sort would be practically impossible to establish by proof.'

Turning to the facts in this case, the Commission noted the salient fact that the primary object of Federal's management in buying the preferred stock was admittedly to obtain the voting power that was accruing to that stock through the reorganization and to profit from the investment therein. That stock had been purchased in the market at prices that were depressed in relation to what the management anticipated would be, and what in fact was, the earning and asset value of its reorganization equivalent. The Commission admitted that the good faith and personal integrity of this management were not in question; but as to the management's justification of its motives, the Commission concluded that it was merely trying to 'deny that they made selfish use of their powers during the period when their conflict of interest, vis-a-vis public investors was in existence owing to their purchase program.' Federal's management had **\*207** thus placed itself in a position where it was 'peculiarly susceptible to temptation to conduct the reorganization for personal gain rather than the public good' and where its desire to make advantageous purchases of stock could have an important influence, even

though subconsciously, upon many of the decisions to be made in the course of the reorganization. Accordingly, the Commission felt that all of its general considerations of the problem were applicable to this case.

 **[7]** The scope of our review of an administrative order wherein a new principle is announced and applied is no different from that which pertains to ordinary administrative action. The wisdom of the principle adopted is none of our concern. See Board of Trade of Kansas City, Mo. v. United States, 314 U.S. 534, 548, 62 S.Ct. 366, 373, 86 L.Ed. 432. Our duty is at an end when it becomes evident that the Commission's action is based upon substantial evidence and is consistent with the authority granted by Congress. See National Broadcasting Co. v. United States, 319 U.S. 190, 224, 63 S.Ct. 997, 1013, 87 L.Ed. 1344.

 **[8]**    **[9]**    We are unable to say in this case that the Commission erred in reaching the result it did. The facts being undisputed, we are free to disturb the Commission's conclusion only if it lacks any rational and statutory foundation. In that connection, the Commission has made a thorough examination of the problem, utilizing statutory **\*\*1583** standards and its own accumulated experience with reorganization matters. In essence, it has made what we indicated in our prior opinion would be an informed, expert judgment on the problem. It has taken into account 'those more subtle factors in the marketing of utility company securities that gave rise to the very grave evils which the Public Utility Holding Company Act of 1935 was designed to correct' and has relied upon the fact that 'Abuse of corporate position, influence, and access to information may raise questions so subtle that the law can deal with them effectively only by prohibitions **\*208** not concerned with the fairness of a particular transaction.' 318 U.S. at page 92, 63 S.Ct. at page 461, 87 L.Ed. 626.

 **[10]**    **[11]**    Such factors may properly be considered by the Commission in determining whether to approve a plan of reorganization of a utility holding company, or an amendment to such a plan. The 'fair and equitable' rule of s 11(e) and the standard of what is 'detrimental to the public interest or the interest of investors or consumers' under s 7(d)(6) and s 7(e) were inserted by the framers of the Act in order that the Commission might have broad powers to protect the various interests at stake. 318 U.S. at pages 90, 91, 63 S.Ct. at pages 460, 461, 87 L.Ed. 626. The application of those critera, whether in the form of a particular order or a general regulation, necessarily requires the use of informal discretion by the Commission. The very breath of the statutory language

precludes a reversal of the Commission's judgment save where it has plainly abused its discretion in these matters. See United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208; I.C.C. v. Railway Labor Executives Ass'n, 315 U.S. 373, 62 S.Ct. 717, 86 L.Ed. 904. Such an abuse is not present in this case.

The purchase by a holding company management of that company's securities during the course of a reorganization may well be thought to be so fraught with danger as to warrant a denial of the benefits and profits accruing to the management. The possibility that such a stock purchase program will result in detriment to the public investors is not a fanciful one. The influence that program may have upon the important decisions to be made by the management during reorganization is not inconsequential. Since the officers and directors occupy fiduciary positions during this period, their actions are to be held to a higher standard than that imposed upon the general investing public. There is thus a reasonable basis for a value judgment that the benefits and profits accruing to the management from the stock purchases should be prohibited, regardless of the good faith involved. And **\*209** it is a judgment that can justifiably be reached in terms of fairness and equitableness, to the end that the interests of the public, the investors and the consumers might be protected. But it is a judgment based upon public policy, a judgment which Congress has indicated is of the type for the Commission to make.

The Commission's conclusion here rests squarely in that area where administrative judgments are entitled to the greatest amount of weight by appellate courts. It is the product of administrative experience, appreciation of the complexities of the problem, realization of the statutory policies, and responsible treatment of the uncontested facts. It is the type of judgment which administrative agencies are best equipped to make and which justifies the use of the administrative process. See Republic Aviation Corporation v. National Labor Relations Board, 324 U.S. 793, 800, 65 S.Ct. 982, 986, 89 L.Ed. 1372, 157 A.L.R. 1081. Whether we agree or disagree with the result reached, it is an allowable judgment which we cannot disturb.

Reversed.

Mr. Justice BURTON concurs in the result.

The CHIEF JUSTICE and Mr. Justice DOUGLAS took no part in the consideration or decision of this case.

**\*\*1584** Mr. Justice FRANKFURTER and Mr. Justice JACKSON dissent, but there is not now opportunity for a response adequate to the issues raised by the Court's opinion. These concern the rule of law in its application to the administrative process and the function of this Court in reviewing administrative action. Accordingly, the detailed grounds for dissent will be filed in due course.

For dissenting opinion of Mr. Justice JACKSON, see 332 U.S. 194, 67 S.Ct. 1760.

**Parallel Citations**

69 P.U.R.(NS) 65, 67 S.Ct. 1575, 91 L.Ed. 1995

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

330 S.W.3d 670
Court of Appeals of Texas,
San Antonio.

Edward SLAVIN, Sr., Edward Slavin,
Jr., and Sheila Slavin, Appellants,
v.
CITY OF SAN ANTONIO, Appellee.

No. 04–09–00601–CV. | Oct. 27, 2010.

**Synopsis**

**Background:** Property owners appealed decision of the city dangerous structure determination board issuing a repair and demolition order. The 225th Judicial District Court, Bexar County, Larry Noll, J., affirmed decision with respect to two property owners, but remanded matter with respect to third property owners. Owners appealed. City cross-appealed.

**Holdings:** The Court of Appeals, Sandee Bryan Marion, J., held that:

[1] owners' due process rights were not violated, and

[2] city could not rely on notice to owner by posting or publication.

Affirmed.

**Attorneys and Law Firms**

**\*671** Edward L. Bravenec, McKnight & Bravenec, San Antonio, TX, for Appellants.

Samuel C. Adams, Office of the City Attorney, San Antonio, TX, for Appellee.

Sitting: CATHERINE STONE, Chief Justice, SANDEE BRYAN MARION, Justice, STEVEN C. HILBIG, Justice.

**OPINION**

Opinion by: SANDEE BRYAN MARION, Justice.

The underlying case involves an appeal to the district court from a repair and demolition order issued by the City of San Antonio's Dangerous Structure Determination Board ("the Board"). The district court remanded consideration of Edward Slavin Sr.'s property back to the Board and affirmed the Board's order as to Edward Slavin, Jr. and Sheila Slavin (collectively, "the Slavins"). The Slavins appeal on due process grounds. The City filed a cross-appeal arguing the trial court improperly remanded Slavin Sr.'s property to the Board and improperly did not rule on its request for attorney's fees.

**DUE PROCESS**

[1] The Slavins do not challenge the sufficiency of the evidence in support of the Board's order. Instead, the Slavins contend they were improperly denied the opportunity to conduct discovery and offer evidence on the issue of whether their due process rights had been violated by the Board's alleged fraud, bad faith, or abuse of discretion.

**\*672** After the Board issued its demolition order, the Slavins appealed to district court. The City filed the Verified Return of Writ of Certiorari containing the record of the hearing before the Board. At some point, the Slavins served the City with discovery requests "dealing with due process issues in front of the" Board. It is unclear what form these requests took, but in any event, the City did not respond and, instead, filed for a protective order. The Slavins filed a motion to compel. At a pretrial hearing, Judge Martha Tanner heard the motion to compel, and subsequently denied it. Later at trial, Judge Noll refused to reconsider Judge Tanner's ruling, and the Slavins' attorney asked and was allowed to make a "proffer" on the record of what he expected to find in discovery. The Slavins stated they had two witnesses who would testify that the Board was comprised of City employees who conferred with the City attorney before making their decision "and then they do whatever the City recommends." The Slavins also said they had witnesses who would "testify that a number of people are prevented from testifying in front of the" Board. Finally, they asserted they could show that "the board ruled six to zero [in] 99.9 percent of the cases. When the board appears, they don't allow people to ask questions directly. They only allow questions to be asked through the board. Numerous witnesses are not allowed to present evidence...."

The Slavins also asserted that the only issue before Judge Tanner was the motion to compel discovery and her ruling on that motion did not dictate what evidence Judge Noll

could hear at the trial. The Slavins argued that a footnote in this court's opinion in *Perkins v. City of San Antonio,* 293 S.W.3d 650 (Tex.App.-San Antonio 2009, no pet.), allowed them to present evidence to Judge Noll on their due process claims. In *Perkins,* a panel of this court discussed the type of review that must be conducted when reviewing a repair and demolition order such as the one here. The court held that a "pure substantial evidence" review was appropriate, but the court also stated as follows in a footnote:

> We note, however, that in addition to reviewing whether substantial evidence supports the Board's order, an arbitrary action of an administrative agency cannot stand, including any action that deprives a party of due process; therefore, the trial court also is permitted to consider whether the proceedings before the Board satisfied the requirements of due process.

*Id.* at 654 n. 2.

On appeal, the Slavins assert this footnote allows for the type of discovery they requested for the purpose of determining due process violations, such as fraud, bad faith, or abuse of discretion.

Under a pure substantial evidence review, the trial court must consider only the factual record made before the administrative body in determining whether substantial evidence supports the Board's order. *Id.* at 654. However, an agency's final order may be supported by substantial evidence and yet be invalid for arbitrariness. *Lewis v. Metro. Sav. & Loan Ass'n,* 550 S.W.2d 11, 13–14 (Tex.1977). An administrative agency acts in an arbitrary manner when the treatment accorded to parties in the administrative process denies them due process of law. *Id.* at 16.

We do not agree that a broad allegation that a landowner's due process rights are violated because the administrative body considering whether to issue a repair and demolition order is composed entirely of City employees rather than impartial citizens is per se the type of claim envisioned by the *Lewis* and *Perkins* courts. Instead, **\*673** any alleged due process violation must be founded in the record that was made before the Board. For example, as discussed further below, the trial court here considered whether Slavin Sr. received proper notice of the hearing. Neither the Slavins nor the City raised notice as an issue. Instead, while reviewing

the administrative record, the trial court sua sponte raised the issue because the record indicated Slavin Sr. may not have received proper notice. Another example is found in the *Lewis* opinion wherein the record indicated the hearing examiner excluded competent and material evidence from the administrative record, thus precluding its consideration by the Commissioner in his decision. 550 S.W.2d at 14. The appellate court held that "[t]he requirement that proper evidence be received is a necessary counterpart of the rule that the agency must give due weight to all the evidence before it; refusal to consider proper evidence which has been duly proffered falls within the condemnation that voids arbitrary administrative action." *Id.* at 15 (internal citation omitted).

**[2]** We conclude the record from the hearing before the Board does not indicate a due process violation in this case. Even if the Slavins are correct that the Board is comprised entirely of City employees, the record does not reveal the Board acted in any arbitrary manner. Our review of the transcript of the Board hearing reveals that at no time were the Slavins prevented from asking questions of any witness, the Slavins were allowed to speak on each property, at no time were they prevented from testifying, and they did not attempt to present any evidence. Therefore, we hold the trial court did not err in refusing to allow additional discovery to be conducted or additional evidence to be placed into the record. [1]

## SERVICE ON EDWARD SLAVIN, SR.

**[3]** In its cross-appeal, the City asserts the trial court erred in reversing the Board's order with regard to all property in which Slavin Sr. has an interest. According to the City, it mailed notice to Slavin Sr., and because proof that he actually received the notice is not required, notice by publication and posting was sufficient. [2]

The San Antonio Municipal Code requires that pre-notice of a hearing before the Board "shall be: (1) Personally to the owner in writing; or (2) By letter addressed to the owner at the owner's post office address." SAN ANTONIO, TX., MUN. CODE § 6–162(b)(1), (2). "*If personal service cannot be obtained* or the owner's post office address is unknown [service **\*674** may be]: a. By publication at least twice within ten (10) consecutive days; and b. By posting the notice on or near the front door of each building on the property to which the violation relates." *Id.* § 6–162(b)(3) (emphasis added).

The Texas Local Government Code also requires that the record owners of the affected property must be given notice of all proceedings: "(1) by personal delivery, by certified mail with return receipt requested, or by delivery by the United States Postal Service using signature confirmation service...." TEX. LOC. GOV'T CODE ANN.. § 54.035(a)(1) (West Supp. 2010). If the owner is unknown, notice must be given "by posting a copy of the notice on the front door of each improvement situated on the affected property or as close to the front door as practicable." *Id.* at § 54.035(a)(2). "The notice must be posted and either personally delivered or mailed on or before the 10th day before the date of the hearing before the commission panel and must state the date, time, and place of the hearing. In addition, the notice must be published in a newspaper of general circulation in the municipality on one occasion on or before the 10th day before the date fixed for the hearing." *Id.* at § 54.035(b). The Local Government Code further provides as follows: "When a municipality mails a notice in accordance with this section to a property owner, lienholder, or registered agent *and the United States Postal Service returns the notice as 'refused' or 'unclaimed,'* the validity of the notice is not affected, and the notice is considered delivered." *Id.* at § 54.035(f) (emphasis added).

Thus, the City is correct that it may provide notice to a landowner by publication or posting. However, we do not agree that such notice is proper in the absence of evidence that personal service on the landowner could not be obtained. Here, the record contains a copy of (1) the Notice of Public Hearing addressed to Slavin Sr., (2) a copy of the United States certified mail receipt addressed to Slavin Sr. indicating the notice was sent by certified mail on March 13, 2009, and (3) a copy of the back of the "green card." The "green card" is not signed by Slavin Sr. or anyone else evidencing its receipt. The City contends the notice was subsequently returned as "unclaimed," but nothing in the record supports this contention. The only stamp on the back of the "green card" reads "Received Apr 17 2009," a date after the Board hearing. At the hearing before the trial court, the City's attorney stated he thought the "Received" stamp was placed there by a City employee when the City received the notice back from the post office. The City wanted to supplement the record before the trial court with a copy of the side of the envelope that, according to the City, showed the number of attempts at delivery to Slavin Sr. The trial court voiced its concern that its review was limited to the record brought before it; however, the court was willing to entertain

arguments and recommendations on this issue and continued the hearing until the next day.

The next day, the City stated it went back to the original record that was before the Board and found the other side of the envelope, and the City asked to supplement the record before the trial court. The trial court then asked how the copy could be added to the record if nothing indicated the copy was of an original document reviewed by the Board and the copy was not sponsored or certified by the Board, anyone from Code Compliance, or the City's Housing and Development Services Department. The City then recommended a stay in the proceedings and the court could "reverse the portion with [Slavin Sr.] ... and that would bring it back ... for a de novo review of ... the entire **\*675** process." The trial court decided to affirm as to everyone except Slavin Sr., and as to him "it's remanded back to the Board for further proceedings to start the process."

Nothing in this record supports the City's contention on appeal that personal service on Slavin Sr. could not be obtained or that the notice sent to Slavin Sr. was returned as unclaimed, undelivered, or refused. Because the City did not establish that service on Slavin Sr. was unsuccessful, it was not entitled to rely on notice by posting or publication. Therefore, we conclude the trial court did not err in remanding the cause as to Slavin Sr. because the record does not show the validity of service of the notice.

### ATTORNEY'S FEES

**[4]** The City also contends the trial court erred by not awarding it attorney's fees. A district court "shall allow to the municipality all attorney's fees and other costs and expenses" "[i]f the decision of the municipality is affirmed or not substantially reversed but only modified." *Id.* at § 214.0012(h) (West 2008). On appeal, the City asserts that because the trial court found in its favor as to all property owners except Slavin Sr., it should be awarded its attorney's fees. At the end of the hearing the trial court told the City "[w]hen this case comes back up, I will deal with this issue [regarding fees]. I'm not going to deal with it now." The City's attorney did not object. Therefore, the City has not established error on the part of the trial court.

### CONCLUSION

We overrule all issues on appeal and affirm the trial court's judgment.

Footnotes

1    On appeal, the Slavins also assert they were denied a fair hearing under the due process clause of both the U.S. and Texas constitutions. In a single sentence under their argument they contend the City's "statute is unconstitutional because it has persons with a pecuniary interest (their jobs) making the decision" to tear down structures on private property. Also in a single sentence, the Slavins contend the City may be going beyond its authority to "destroy[ ] houses" on a nuisance abatement pretext, and in doing so "is completing an unjustified taking." We do not address these complaints because the Slavins do not cite to the specific City ordinance with which they take issue and which they claim is unconstitutional; they make no argument as to how any ordinance is unconstitutional either facially or as applied; and they do not elaborate on their takings claim or establish the elements of such a claim.

2    There appears to be no dispute that the City published notice of the hearing in the "Daily Commercial Recorder"; posted notice on the Slavins' property, although it is unclear whether notice was posted on every building on the property; and sent a copy of the notice to the Oak Grove Estates Neighborhood Association and the Bexar County District Clerk's Office.

**End of Document**                                                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

584 S.W.2d 352
Court of Civil Appeals of Texas, Austin.

STARR COUNTY, Appellant,

v.

STARR INDUSTRIAL SERVICES, INC., Appellee.

No. 12899. | June 20, 1979.

Applicant was denied his application for solid waste permit by Water Quality Board. Intervenor county appealed judgment of the 98th District Court, Travis County, Hume Cofer, J., setting aside and vacating Board's order and remanding cause to its successor, Texas Water Commission, for further proceedings. The Court of Civil Appeals, Phillips, C. J., held that a significant part of Board's action was arbitrary and capricious where applicant had complied with requirements of Board's staff for permit and where Board based its decision, at least in part, on local opposition to application.

Judgment affirmed.

**Attorneys and Law Firms**

 **\*353** Robert Wilson, McGinnis, Lochridge & Kilgore, Austin, for appellant.

Edward C. Small, Dennis R. Reese, Small, Craig & Werkenthin, Austin, for appellee.

**Opinion**

PHILLIPS, Chief Justice.

Appellee filed an application with the Texas Water Quality Board requesting approval for a Class I industrial solid waste permit for a landfill to be located in Starr County, Texas. The Board [1] denied the application after a hearing. Appellee appealed the denial of the order to the district court wherein Starr County intervened.

The trial court reviewed the order and rendered judgment setting aside and vacating the Board's order and remanding the cause to its successor, Texas Water Commission, for further proceedings. Intervenor, Starr County, subsequently perfected its appeal from the judgment.

We affirm.

**I.**

Hearing was held on September 29, 1976, in Rio Grande City and testimony was concluded on that same day. The record was held open twenty days for certain supplemental information which was supplied and the record was then closed.

On January 7, 1977, the Board considered the application and the hearing examiner's report in connection with the application. On that same day the Board voted to deny the application and a written order was prepared in which the reasons for the denial of the permit were stated. The order was entered February 3, 1977.

The administrative record in this case is extensive and highly detailed. Appellee requested a permit to operate a commercial industrial solid waste management site to be located approximately nine miles northwest of Rio Grande City in Starr County, Texas. The site was to consist of a landfill type operation on an 81-acre tract leased by appellee wherein certain stabilized and neutralized industrial wastes would be buried in trenches and surrounded and covered **\*354** with clay-rich soil. The anticipated active life of the site was three to four years, and the permit sought provided for various safeguards and monitoring of the site, both during its active life and for a period of time after closure.

The original application contained extensive and detailed information concerning the character of the wastes, operations and closing of the facility. The details of many aspects of the application were modified and supplemented by additional information and specifications subsequently submitted as a result of conferences with, and requests by, the Board's staff.

The Board's technical staff, using the application and information supplied by appellee, along with its own information resources, drafted a proposed permit which it felt would include all of the provisions necessary for the protection of ground and surface waters, public and private property and the general health and public welfare. The provisions of the proposed permit were explained by the staff and fully discussed at the public hearing which was held at Rio Grande City.

The principal opposition to the permit came from the county judge of Starr County, the Rio Grande City Chamber of

Commerce, and from a state senator. The general tenor of the objections was that the opponents were totally against any Class I toxic waste dump in Starr County.

Consequently, in a letter from the Board's executive director, Hugh Yantis, Jr., who was a member of the hearing commission, it was stated: "It appears that the site and the technical factors surrounding it are sustainable as permitting an industrial solid waste disposal operation," but concluded that the application could be denied "on the basis of the express views of the people within the county." At the hearing of the Board on January 7, 1977, a Board member moved that the permit be denied for the reason that:

> "I likewise am reluctant to imply that we have veto power over the local government and I must conclude, all the arguments possibly to the contrary, that there is considerable local opposition on the part of the local governments, more than just one, and I'm inclined to agree with Mr. Yantis."

The motion carried and the permit was denied.

A written order, denying the application, was entered on February 3, 1977, and included the following pertinent findings and conclusions.

### "FINDINGS OF FACT

1. The construction and management of the industrial solid waste disposal site as proposed is inadequate to prevent or minimize adverse public health and environmental impact from accidents resulting from the transportation, processing, and disposal of industrial solid waste, which includes hazardous and toxic materials, because of the following:
(a) the proposed staffing pattern at the site would allow for extended periods of time during which no one would be at the site; and

(b) the lack of resources or necessary equipment in Starr County to adequately handle the possibility of accidents from fire, explosions, or traffic mishaps.

2. The lease agreement for a term of only five years will not allow for adequate supervision, control or monitoring of the site after it is closed.

3. The operation of an industrial solid waste management site in Starr County at the location proposed is inconsistent with the future land use and development in the area.

4. The adamant local opposition to the application for a proposed industrial solid waste management site evidences that the granting of a permit would be contrary to the welfare of the people in the area.

### CONCLUSIONS OF LAW

Based on all findings of fact, the following conclusions of law are made:

> **\*355** 3. There has been full compliance with all applicable provisions of Chapter 21 of the Texas Water Code and Section 4 of the Solid Waste Disposal Act and the accompanying Rules of Practice and Procedure of the Texas Water Quality Board concerning the application for a permit."

In its motion for rehearing, appellee offered to comply with some of the new requirements, but the Board simply overruled the motion.

### II.

The Administrative Procedure and Texas Register Act (APA) provides that the courts shall remand the case for further proceedings ". . . if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) in violation of constitutional or statutory provisions;

(2) in excess of the statutory authority of the agency;

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) Not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." (Emphasis added). Tex.Rev.Civ.Stat.Ann. art. 6252-13a, s 19(e) (Supp.1978). [2]

 **[1]**    In distinguishing between paragraphs five and six, the legislature has decided that arbitrary and capricious action or abuse of discretion by an administrative board is of equal proscription as that action "not reasonably supported by substantial evidence." In other words, subsection six sets out a basis for invalidation of an agency order in addition to and distinct from subsection five.

This conclusion is more difficult than would appear merely from reading section 19(e). The well recognized explanation of the substantial evidence rule has blended the two concepts, substantial evidence and arbitrary or capricious, into one standard of review. The substantial evidence rule is generally described as a limitation on the power of the courts to overturn a decision by an administrative agency in that there must be a showing ". . . the administrative decision is illegal, arbitrary, or capricious; that is, that it is not reasonably supported by substantial evidence." Board of Firemen's Relief and Retirement Fund Trustees v. Marks, 150 Tex. 433, 242 S.W.2d 181, 182-83 (1951). Accord, e. g., Gerst v. Cain, 388 S.W.2d 168 (Tex.1965); Chemical Bank and Trust Co. v. Falkner, 369 S.W.2d 427 (Tex.1963); Industrial Accident Board v. O'Dowd, 157 Tex. 432, 303 S.W.2d 763 (1957). Stated in even stronger language, ". . . an arbitrary action cannot stand and the test generally applied by the courts in determining the issue of arbitrariness is whether or not the administrative order is reasonably supported by substantial evidence." Gerst v. Nixon, 411 S.W.2d 350, 354 (Tex.1966).

 **[2]**    The Texas Supreme Court has expressly qualified the language of Gerst v. Nixon, Supra, in Lewis v. Metropolitan Savings and Loan Association, 550 S.W.2d 11 (Tex.1977). There the Court made it clear that an order may be supported by substantial evidence and yet be invalid for arbitrariness. "(A)rbitrary action of an administrative agency cannot stand. There is arbitrariness where the treatment accorded parties in the administrative process denies them due process of law." Id. at 16.

 **[3]**     **[4]**    In determining whether an agency has acted arbitrarily or capriciously the reviewing court must decide whether the agency order was based on a consideration of all relevant factors. The reviewing court may not substitute its judgment for that of  **\*356**  the agency. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). There must appear a rational connection between the facts and the decision of the agency. Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); 5 B. Mezines, J. Stein and J. Gruff, Administrative Law s 51.03, at 51-33 (1979). Stated differently, the reviewing court must remand ". . . if it concludes that the agency has not actually taken a hard look at the salient problems and has not genuinely engaged in reasoned decision-making." Texas Medical Association v. Mathews, 408 F.Supp. 303, 305 (W.D.Tex.1976). That court set aside an order because the agency had been subjected to pressure from congressional sources.

The major factor that runs throughout arbitrary-capricious review cases is that parties must be able to know what is expected of them in the administrative process. We believe this notice was lacking in the present case.

 **[5]**    As we stated above, the appellee worked quite closely with the Board's staff, and, apparently, had complied with all of the staff's requirements for a permit when, to its surprise, the Board denied the permit citing additional requirements that had neither been expected by appellee nor proposed by the Board's staff. In addition, the Board found: "The adamant local opposition to the application for a proposed industrial solid waste management site evidences that the granting of a permit would be contrary to the welfare of the people in the area." Nowhere in the Act is local opposition mentioned for consideration as a standard to govern the Board's decision and such opposition, standing alone, should have no part in the Board's decision-making process. Yet obviously it did.

 **[6]**    Inasmuch as we find that a significant part of the Board's action herein was arbitrary and capricious under Section 19(e) (6) of the Administrative Procedure Act, we need not reach the substantial evidence question raised by appellant. Because appellee's substantial rights were prejudiced by entry of the agency order, the district court correctly set aside the order and remanded the cause to the agency for further proceedings.

The judgment is affirmed.

Footnotes

1   Now consolidated into the Texas Department of Water Resources.

2   Section 19(e) (and its subsections) is applicable where the relevant statute ". . . authorizes review under the substantial evidence rule, or where the law does not define the scope of judicial review." The Solid Waste Disposal Act is silent as to the scope of judicial review; therefore, section 19(e) applies to this case.

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext® © 2015 Thomson Reuters. No claim to original U.S. Government Works.  4

2004 WL 2597443
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

OPINION
Court of Appeals of Texas,
San Antonio.

James R. STOLTE, Jr., Trustee, Appellant
v.
COUNTY OF GUADALUPE, Appellee.

No. 04-04-00083-CV.    |    Nov. 17, 2004.

From the 25th Judicial District Court, Guadalupe County, Texas, Trial Court No. 03-1092-CV; Gus J. Strauss, Judge Presiding.

**Attorneys and Law Firms**

Frank B. Suhr and David G. Pfeuffer, Brazle & Pfeuffer, L.L.P., New Braunfels, for appellant.

Robert E. Etlinger, 1st Assistant County Attorney, Seguin, for appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, SANDEE BRYAN MARION, Justice.

## OPINION

Opinion by SANDEE BRYAN MARION, Justice.

**\*1** In this appeal we determine whether Guadalupe County has the inherent authority to reject a plat application in the interest of public health and safety in the absence of a specific statute or a properly adopted county regulation. We conclude that it does not, and reverse the trial court's judgment and remand for further proceedings.

## BACKGROUND

James Stolte is the owner and developer of a 154.641-acre tract of land lying in Guadalupe County, Texas. Seeking to subdivide the tract into fifty-five lots, Stolte filed a plat application with the Guadalupe County Commissioners Court. The application was denied on the grounds that (1) the County did not want a 0.911-acre dedication, (2) several lots had less than 100 feet of road frontage on Muehl Road, and (3) the number of driveways onto Muehl Road was excessive. Stolte filed a second application, which also was denied. Stolte then sued the County, and asked the trial court to issue a writ of mandamus directing the County to "acknowledge approval" of the plat application. Stolte again filed his plat application, this time removing the proposed 0.911-acre dedication. The application was again denied.

Stolte filed a motion for summary judgment in which he requested that the trial court issue a writ of mandamus directing the County to approve the plat application, refund to him $345.00 as required by Texas Local Government Code section 232.0025(i), and pay him all taxable court costs. The trial court denied the motion, and concluded the County has the inherent authority, pursuant to Texas Local Government Code Chapter 232, "to reject a plat application in the interest of public health and safety in the absence of a specific and properly adopted county regulation addressing such issue."The trial court allowed Stolte to appeal the interlocutory order pursuant to Texas Civil Practice and Remedies Code section 51.014(d), and stated the controlling question of law as: "whether a county has the legal authority to reject a plat application due to the width of the lot or due to the number of driveways accessing a public road in the absence of a specific and properly adopted county regulation addressing such issues."The trial court found that the parties agreed there were no material issues of fact, and the facts asserted in Stolte's motion and the County's response were true and not in dispute.

## STANDARD OF REVIEW

Under traditional summary judgment standards, a party moving for summary judgment has the burden of establishing as a matter of law that no genuine issue of material fact exists as to one or more essential elements of the plaintiff's cause of action. *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989); *Nixon v. Mr. Property Mgmt. Co.,* 690 S.W.2d 546, 548-49 (Tex.1985); *Medina County Comm'r Court v. The Integrity Group, Inc.,* 21 S.W.3d 307, 309 (Tex.App.-San Antonio, 1999, pet. denied). If the defendant meets this burden, the plaintiff must then raise a genuine issue of material fact on that element. *Gonzalez v. City of Harlingen,* 814 S.W.2d 109, 112 (Tex.App.-Corpus Christi 1991, writ denied).

**\*2** A party can invoke the district court's constitutional supervisory power over a commissioners court only when the commissioners court acts beyond its jurisdiction or clearly abuses the discretion conferred upon the commissioners court by law. *Commissioners Court of Titus County v. Agan,* 940 S.W.2d 77, 80 (Tex.1997); *Medina County,* 21 S.W.3d at 309. A writ of mandamus may issue to compel a public official to perform a ministerial act. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 793 (Tex.1991). An act is ministerial when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion. *Id.*

## DISCUSSION

On appeal, the County first argues that because Stolte "effectively stipulated" that the design of his subdivision creates a safety hazard, he should be precluded from arguing that the County and trial court abused their discretion in denying his plat application. Nowhere in the County's response to Stolte's motion for summary judgment is there a statement of fact that his design creates a safety hazard. Instead, the County's response and attached affidavits reference "safety concerns" and "safety issues" and, in its response, the County accused Stolte of "arguing" that he is entitled to "develop a subdivision whose design/configuration clearly gives rise to hazards to public safety ...." We do not consider Stolte's failure to dispute the "concerns" raised in the County's response as rising to the level of a stipulation or a judicial admission. Even if it did, this does not resolve the legal issue presented by the trial court.

The County next argues it has the inherent authority to regulate subdivisions for the public's safety pursuant to Texas Local Government Code section 232.101, which provides as follows:

> By an order adopted and entered in the minutes of the commissioners court and after a notice is published in a newspaper of general circulation in the county, the commissioners court may adopt rules governing plats and subdivisions of land within the unincorporated area of the county to promote the health, safety, morals, or general welfare of the county and the safe, orderly, and healthful

> development of the unincorporated area of the county.

TEX. LOC. GOV'T CODE ANN. § 232.101(a) (Vernon Supp.2004).

Stolte readily concedes the County has the right to enact rules and regulations for the public's safety and welfare pursuant to section 232.101(a). Stolte also acknowledges that Chapter 232 authorizes the County to adopt other rules. *See*TEX. LOC. GOV'T CODE ANN. §§ 232.102; 232.103; 232.104. However, Stolte argues that because the County has not in fact enacted any rules and regulations regarding lot frontages or the number of driveways, the County has no authority to deny his plat application. The County does not dispute Stolte's assertion that it has no such rules or regulations. Instead, the County contends *Cowboy Country Estates v. Ellis County,* 692 S.W.2d 882 (Tex.App.-Waco 1985, no writ), supports its argument under section 232.101. We disagree with the County.

**\*3** Unlike the trial court below, the court in *Cowboy Country Estates* dealt with specific statutes addressing the specific dispute between the parties. For example, one of the issues on appeal was whether the development was a "subdivision" within the meaning of the applicable statutes examined by the court. *Id.* at 885-86.On that issue, the court held, "The manifest overall purpose of the statutes concerned is to give counties the power to control subdivisions to protect its citizens in matters of public health and sanitation, drainage, and maintenance of public roads."*Id.* at 886.The issue of inherent authority was not before the *Cowboy Country Estates* court. Therefore, this case does not support the County's argument that it has inherent authority to regulate subdivisions in the absence of a specific statute or rule. Instead, we hold that a county's authority to grant or deny plat applications must be based on a specific statute or rule. Those statutes and rules are contained in the Texas Local Government Code and other rules properly enacted under section 232.101. *See The Integrity Group, Inc. v. Medina County Comm'r Court,* No. 04-03-00413-CV, slip op. at 2 (Tex.App.-San Antonio Oct. 20, 2004, no pet. h.) ("A commissioners court's power relative to the plat approval process is found in Chapter 232 of the Texas Local Government Code.").

Local Government Code section 232.003 sets forth subdivision requirements, none of which specifies the number of driveways or lot frontages. *But see id.* § 232.003(8) (allowing commissioners court to adopt

reasonable specifications that provide for drainage in the subdivision); *see also Elgin Bank of Texas v. Travis County, Texas,* 906 S.W.2d 120, 123 (Tex.App.-Austin 1995, writ denied)("Section 232.003 authorizes the commissioner's court to adopt rules regulating the design and construction of roads."). Although section 232.003 is the only section under Chapter 232 that sets forth specific subdivision requirements, a county may adopt other rules governing plats and subdivisions. *See* TEX. LOC. GOV'T CODE ANN. §§ 232.101; 232.102; 232.103; 232.104. For example, the Local Government Code authorizes the County to enact rules and regulations for the public's safety and welfare. *See* TEX. LOC. GOV'T CODE ANN. §§ 232.101 ("Rules"); 232.102 (major thoroughfare right-of-ways); 232.103 ("Lot Frontages"); 232.104 ("Set-backs"). A county may also impose additional requirements pursuant to other statutory authority. *See Medina County,* 21 S.W.3d at 310. Here, the County has adopted other rules applicable to plats, which are contained in the Guadalupe County Subdivision Rule Book. The County Engineer admitted in his deposition that the County's rule book contains no requirements regarding minimum lot frontage, number of driveways, or the distance between driveways, and the County has not adopted any such rules pursuant to Local Government Code Chapter 232.

**\*4** "The commissioners court of the county in which land is located must approve ... a plat required by Section 232.001."*Id.* § 232.002(a); *see also Medina County,* 21 S.W.3d at 309. A commissioners court cannot require additional substantive requirements not contained within the statute for a plat if the submitted plat meets all statutory requirements. *Medina County,* 21 S.W.3d at 309; *Projects American Corp. v. Hilliard,* 711 S.W.2d 386, 389 (Tex.App.-Tyler 1986, no writ); *see also Elgin Bank,* 906 S.W.2d at 122. The County does not contend Stolte's plat application does not meet any specific statutory requirement. Therefore, the County's authority to approve Stolte's plat under section 232.002 is not discretionary. *See Medina County,* 21 S.W.3d at 309; *Projects American Corp.,* 711 S.W.2d at 389;*see also The Integrity Group,* slip op. at 2 ("... if the developer meets the statutory requirements, the commissioners court's duty to approve the plat becomes ministerial.").

The County's final argument is that it should not be required to imagine every possible scenario under which land may be developed. We do not discount the County's concern for the welfare of its residents, and we understand the County's concern that a large number of driveways entering onto a county road may pose safety issues for residents along that road. However, a county's authority to grant or deny a plat application is limited by statute or other properly adopted rules, and in this case, there is no statute or other rule governing lot frontages or driveways. Therefore, the County's duty to grant the plat application was ministerial in nature and the trial court erred in denying Stolte's motion for summary judgment and his request for mandamus relief.

## CONCLUSION

We reverse the trial court's judgment and remand the cause for further proceedings consistent with this opinion.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

616 S.W.2d 411
Court of Civil Appeals of Texas, Waco.

TEXAS ALCOHOLIC BEVERAGE
COMMISSION, Appellant,
v.
GOOD SPIRITS, INC., Appellee.

No. 6193.　|　April 30, 1981.

Alcoholic Beverage Commission appealed from an order of the 150th District Court, Bexar County, James C. Onion, P.J., reversing the Commission's order denying applications for a wine only package store permit and for a beer retailer's off-premises license. The Court of Civil Appeals, James, J., held the order of Commission denying application for a wine only package store permit and for a beer retailer's off-premises license on ground that the applicant was a subterfuge corporation was not supported by substantial evidence and was arbitrary.

Affirmed.

**Attorneys and Law Firms**

**\*412**  Mark White, Atty. Gen., John W. Fainter, Jr., First Asst. Atty. Gen., Ted L. Hartley, Executive Asst. Atty. Gen., W. Barton Boling, Asst. Atty. Gen., El. Paso, W. Reed Lockhoof, Asst. Atty. Gen., Austin, for appellant.

William F. Stolhandske, Stolhandske, Simmons & Stolhandske, San Antonio, for appellee.

**OPINION**

JAMES, Justice.

This is an appeal from a judgment of a district court reversing an order of the Texas Alcoholic Beverage Commission. We affirm the district court's judgment.

On September 28, 1978, Plaintiff-Appellee Good Spirits, Inc., a Texas Corporation, made applications for a Wine Only Package Store Permit and for a Beer Retailer's Off-Premises License. On October 25, 1978, a hearing was held before the County Judge of Bexar County after which both of Good Spirits' applications were approved. Said order of the

County Court was appealed to the Texas Alcoholic Beverage Commission (hereinafter called "Commission").

On January 17, 1979, a hearing was held before the Hon. John Bingaman, a Hearings Examiner of and for the Commission, after which said examiner tendered his "Proposal for Decision" which included findings of fact, conclusions of law, and a recommendation that the applications made by Good Spirits be granted. However, on March 19, 1979, the Commission acting by and through Hon. Joe Darnall, Assistant Administrator of the Commission, entered an order wherein the findings of fact made by the Hearings Examiner were adopted but which order refused and denied the applications in question. From this order of the Commission, Good Spirits perfected its appeal to a District Court of Bexar County, which court, sitting without a jury, after hearing, entered judgment reversing the Commission's order and ordered the applications in question to be granted and the licenses issued. In essence, the trial court found that there was not substantial evidence to support the Commission's order, and that such order was arbitrary.

The Commission appeals from the trial court's judgment upon one point of error, to wit, that the trial court erred in not affirming the Commission's order because (Appellant says) the Commission's findings were reasonably supported by substantial evidence. We overrule this point of error and affirm the trial court's judgment.

The pertinent facts herein are virtually undisputed, and are fairly presented in the "findings of fact" as made (after certain amendments) by the Hearings Examiner and as adopted by the Commission, as follows, to wit:

"1. That on September 28, 1978, Good Spirits, Inc., made original application for a Wine Only Package Store Permit and a Beer Retailer's Off-Premises License for the premises located at 11743 West Avenue, San Antonio, Texas.

"2. That Thomas C. Reynolds is currently the president of the Applicant hereafter, Good Spirits, Inc.

"3. That Mr. Reynolds was approached in 1977 by a representative of Albertson's, Inc., with the idea of forming Good Spirits.

"4. That Albertson's is an out of state corporation with its main offices in Florida.

"5. That prior to being approached by Albertson's, Mr. Reynolds had no prior experience in the alcoholic beverage business.

"6. That the basic structure of Good Spirits was set up before Mr. Reynolds became involved.

"7. That Good Spirits is currently owned as follows: Thomas C. Reynolds 5300 shares voting stock; Mr. Harris 5300 shares voting stock; and Albertson's, Inc. 9,400 shares non-voting stock.

"8. That when a stockholder wishes to sell his stock, the other shareholders must either approve the sale or buy the stock themselves.

"9. That Good Spirits was financed with money from Mr. Reynolds, Mr. Harris, Albertson's, Inc., and a $200,000.00 loan from Frost National Bank in San Antonio, Texas, guaranteed by Albertson's, Inc.

 **\*413** "10. That Good Spirits subsequently renegotiated said note and later extinguished the Frost Bank note with a new note from Brooks Field National Bank in San Antonio, Texas, guaranteed by Mr. Reynolds personally.

"11. That in the first year of operation, Good Spirits made approximately $139,000.00 in note payments.

"12. That Good Spirits has paid no dividends to its stockholders.

"13. That Good Spirits makes a net profit of approximately 7% of sales.

"14. That Good Spirits presently holds permits for seven locations throughout the State of Texas.

"15. That if the permit and license applied for is granted, the operation under said permit and license would be virtually the same as the current operations at the seven other locations.

"16. That the current Good Spirits businesses operate as follows:

a. Each is located in an Albertson's grocery store.

b. The area in which Good Spirits operates inside Albertson's is not sectioned off from the area used by Albertson's.

c. Good Spirits pays 4½% of its gross sales to Albertson's to lease the premises for alcoholic beverage sales.

d. The life of the lease is one year after which time either party may terminate on thirty days notice.

e. The manager of the Albertson's grocery store is also the manager of Good Spirits.

f. The manager of Good Spirits is paid $125.00 per month.

g. The two assistant managers of each Albertson's are also under contract as the assistant managers of Good Spirits.

h. Good Spirits employs no one else except the president, Mr. Reynolds, who is paid $100.00 per week.

i. Good Spirits is not obligated to hire Albertson's employees but does so because of the marketing experience of the Albertson's manager and because it is economically profitable for Good Spirits.

j. Good Spirits has the right to hire and fire all employees.

k. Good Spirits' managers, subject to the approval of Mr. Reynolds, order and pay for alcoholic beverages as necessary and set competitive prices for the beverages Good Spirits sells.

l. Each Good Spirits location has its own checking account to pay for alcoholic beverages.

m. Good Spirits pays 1½% of its gross sales to Albertson's under a service contract.

n. The service contract may be terminated by either party upon thirty days notice.

o. Under the service contract, Albertson's provides accounting services, use of cash registers, and employees to ring up sales.

p. Included in the accounting service, Albertson's provides purchase and sales records, bank statements, filing of all tax returns, weekly sales reports, payment of license fees, payment of invoices and quarterly reports and financial statements.

q. Under the service contract Good Spirits also pays directly to Albertson's $1040.00 per quarter at each location for Albertson's employees to stock the shelves and cooler of Good Spirits.

r. Good Spirits has a right to hire an independent auditing firm to audit books which Albertson's keeps under the service contract for Good Spirits.

s. Other than a small sign inside the premises, Good Spirits does no advertising.

"17. Mr. Reynolds takes an active part in overseeing all aspects of the operation of Good Spirits."

The "Proposal for Decision" made by the Hearings Examiner went on to recite that "after consideration of the above findings of fact, the Hearings Examiner concludes the following (Conclusions of Law):

"A. That there is not substantial evidence to conclude that the Applicant, Good Spirits, Inc., is a subterfuge corporation for **\*414** Albertson's, Inc., a foreign corporation with its principal offices in a State other than Texas, in violation of Section 109.53 of the Texas Alcoholic Beverage Code.

"B. That there is not substantial evidence to conclude that the Applicant, Good Spirits, Inc., will not have and maintain exclusive occupancy and control of the entire licensed premises in every phase of the storage, distribution, possession, transportation, and sale of all alcoholic beverages purchased, stored or sold on the licensed premises, in violation of Section 109.53 of the Texas Alcoholic Beverage Code.

"C. That there is not substantial evidence to conclude that the Applicant, Good Spirits, Inc., has entered into a device, scheme, or plan which surrenders control of the employees, premises, or business of the said Applicant to persons other than the said Applicant, in violation of Section 109.53 of the Texas Alcoholic Beverage Code."

### "RECOMMENDATION.

"It is the recommendation of the Hearings Examiner that the original application of Good Spirits, Inc., for a Wine Only Package Store Permit and a Beer Retailer's Off-Premises License be GRANTED."

As stated before, Mr. Darnall, the Assistant Administrator of and for the Commission, entered the order of the Commission dated March 19, 1979, now appealed from, wherein the findings of fact made by the Hearings Examiner were adopted, and based upon said fact findings, the Commission reached opposite conclusions of law from those of the Hearings Examiner, and thereupon refused and denied the applications in question.

More specifically, the conclusions of law found by the Commission are as follows:

"A. That there is substantial evidence to conclude that the Applicant, Good Spirits, Inc., is a subterfuge corporation for Albertson's, Inc., a foreign corporation with its principal offices in a State other than Texas, in violation of Section 109.53 of the Texas Alcoholic Beverage Code.

"B. That there is substantial evidence to conclude that the Applicant, Good Spirits, Inc., will not have and maintain exclusive occupancy and control of the entire licensed premises in every phase of the storage, distribution, possession, transportation, and sale of all alcoholic beverages purchased, stored, or sold on the licensed premises, in violation of Section 109.53 of the Texas Alcoholic Beverage Code.

"C. That there is substantial evidence to conclude that the Applicant, Good Spirits, Inc., has entered into a device, scheme, or plan, which surrenders control of the employees, premises, or business of the said Applicant to persons other than the said Applicant, in violation of Section 109.53 of the Texas Alcoholic Beverage Code."

At the time of the hearing before the Hearings Examiner, Appellee Good Spirits was currently operating seven locations in the State of Texas under Texas Alcoholic Beverage Commission Licenses, all upon the same mode of operation as was proposed to be done pursuant to the applications now in question. Moreover, prior to the commencement of the operation of any of these seven places of business, representatives of Appellee Good Spirits went to Austin, Texas, and had a face to face conference with Mr. Joe Darnall, the Assistant Administrator of the Commission hereinabove referred to, at which conference Appellee presented the instruments forming the basis of the proposed business operation to determine whether they were in proper form and not in conflict with the Code. More specifically, Appellee presented the proposed service agreements, employment contracts, leases, corporate structure, and operational procedures to be used in the conduct of business. At this conference Mr. Darnall thoroughly reviewed the matters presented and told

Appellee's representatives that same were acceptable to the Commission and were not in violation of the Texas Alcoholic Beverage Code.

Since the Commission has approved Appellee's applications seven times previously, what is the reasoning behind the Commission's refusing the permits the eighth time? **\*415** Appellant Commission argues that in the instant hearing, the Commission learned for the first time that Albertson's, Inc., an out of State corporation, had gratuitously guaranteed a $200,000.00 note executed by Good Spirits to the Frost National Bank of San Antonio, and that this one act made Good Spirits a subterfuge corporation in violation of Section 109.53 of the Texas Alcoholic Beverage Code. We do not agree.

This $200,000.00 note transaction was originally consummated prior to the previous seven approvals of applications by Mr. Darnall, was a debt of Good Spirits, and was paid for entirely out of the funds of Good Spirits. This original note was thereafter renegotiated with Frost National Bank and subsequently paid off by the securing by Good Spirits of a new loan from Brooks Field National Bank in San Antonio, which last-mentioned note was guaranteed by Mr. Reynolds personally. In short, this debt complained of by the Commission was paid off in full prior to the hearing on the application in question. This loan was presented as a part of the operational structure of Good Spirits for the first seven approved applications.

We are unable to see how Albertson's guaranty of this $200,000.00 note for Good Spirits would cause Good Spirits to be and become a subterfuge corporation. After all, Albertson's was a minority non-voting stockholder of Good Spirits, and it was in the best business interest of Albertson's to assist Good Spirits in its financing. There is nothing in this record to show anything except that Good Spirits was operating independently and free of Albertson's control. Although both corporations worked in close conjunction with each other, pursuant to their agreements and operations, we fail to see any aspect thereof that constitutes a violation of the Texas Alcoholic Beverage Code.

[1] [2] [3] We recognize that this Court is not to substitute its discretion for that committed to the agency by the Legislature, but is to sustain the agency if its decision is reasonably supported by substantial evidence. However, if the evidence as a whole is such that reasonable minds could not have reached the conclusion that the agency must have reached in order to justify its action, then the order must be set aside. Trapp v. Shell Oil Co., Inc., (1946) 145 Tex. 323, 198 S.W.2d 424.

The substantial evidence rule is a court review device to keep the courts out of the business of administering regulatory statutes enacted by the Legislature, but it remains the business of the courts to see that justice is administered to competing parties by governmental agencies. Lewis v. Metropolitan Savings and Loan Assn., (Tex.1977) 550 S.W.2d 11.

In the case at bar, we agree with the trial court that the Commission's findings and conclusions are not reasonably supported by substantial evidence, and that under the record before us, the Commission's order was arbitrary. We therefore affirm the trial court's judgment.

AFFIRMED.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

260 S.W.3d 233
Court of Appeals of Texas,
Austin.

TEXAS DEPARTMENT OF INSURANCE
and Mike Geeslin, in his Capacity as
Commissioner of Insurance, Appellants
State Farm Lloyds, Cross–Appellant
v.
STATE FARM LLOYDS, Appellee
Texas Department of Insurance and Mike
Geeslin, in his Capacity as Commissioner
of Insurance, Cross–Appellees.

No. 03–07–00168–CV.  |  July 24, 2008.

## Synopsis

**Background:** Homeowners insurer petitioned for review, declaratory judgment, and injunctive relief after Insurance Commissioner revoked ability to file and use rates without prior approval. The 250th Judicial District Court, Travis County, Scott H. Jenkins, J., entered summary judgment that Commissioner had authority to issue the order, but that it was arbitrary and capricious. Appeal and cross-appeal were taken.

**Holdings:** The Court of Appeals, Diane M. Henson, J., held that:

[1] the order was final and reviewable;

[2] insurer had no right to a contested case hearing;

[3] order was arbitrary and capricious in considering at least one legally irrelevant factor; and

[4] Commissioner had authority to issue the order.

Affirmed in part and reversed in part.

## West Codenotes

**Recognized as Unconstitutional**
V.A.T.S. Insurance Code, art. 5.26–1, § 4(Expired)

## Attorneys and Law Firms

**\*236** Karen Pettigrew, Asst. Atty. Gen., Financial Litigation Div., Austin, for Appellants.

Susan G. Conway, Graves, Dougherty, Hearon & Moody, PC, Austin, for Appellee.

Before Chief Justice LAW, Justices WALDROP and HENSON.

## *OPINION*

DIANE M. HENSON, Justice.

This appeal concerns a rate supervision order issued by the Commissioner of Insurance (the "commissioner"). The order revoked State Farm Lloyds's ability to file and use its insurance rates without prior approval from the Texas Department of Insurance ("TDI"). [1] State Farm Lloyds filed a petition for judicial review, declaratory judgment, and injunctive relief in the district court. On cross-motions for summary judgment, the district court granted each of the parties' motions in part and denied each motion in part, holding that the commissioner had authority to issue the order on one or more of the grounds listed except the ground that State Farm Lloyds had exercised its right to judicial review. The court further found that the supervision order was not based on substantial evidence, was arbitrary and capricious, and violated State Farm Lloyds's due process rights. Both parties appeal. We affirm the judgment of the trial court as to the commissioner's authority to issue the rate supervision order. In so doing, we uphold the trial court's finding that the commissioner's order was arbitrary and capricious. As to due process and substantial evidence, we hold that a contested case hearing was not required and, therefore, reverse the trial court's judgment on those points. Accordingly, because we agree that the rate supervision order was arbitrary and capricious, we affirm the trial court's judgment reversing the rate supervision order. Because no contested case hearing was required, we decline to remand the case to TDI for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In response to problems existing under the flexible rate-setting scheme in effect prior to 2003, including a largely

unregulated homeowners insurance market and escalating insurance rates, the Texas Legislature passed Senate Bill 14, which amended the insurance code, establishing a new system for regulating residential property insurance rates. Act of June 2, 2003, 78th Leg., R.S., ch. 206, 2003 Tex. Gen. Laws 907; House Research Organization, Bill Analysis, Tex. S.B. 14, 78th Leg., R.S. (2003); House Comm. Report, Tex. S.B. 14, 78th Leg., R.S. (2003). When **\*237** legislators proposed SB 14, ninety-five percent of the Texas homeowners insurance market was unregulated, and insurance premiums in Texas were the highest in the country, often for reduced coverage. House Research Organization, Bill Analysis, Tex. S.B. 14, 78th Leg., R.S. (2003); House Comm. Report, Tex. S.B. 14, 78th Leg., R.S. (2003). The new system set out in SB 14 required insurers to file their rates with TDI, and TDI could review and approve or disapprove these rates. Act of June 2, 2003, 78th Leg., R.S., ch. 206, 2003 Tex. Gen. Laws 907.

The system established by SB 14 was to be implemented in three phases. Article 5.26–1, effective June 11, 2003, through September 1, 2004, set out the procedure by which insurers were to quickly establish their initial rates under the new rate-regulation program. Tex. Ins.Code Ann. art. 5.26–1, § 2 (West Supp.2004–2005). Under article 5.26–1, insurers were required to file their initial regulated rates with TDI within twenty days of the effective date of SB 14—June 11, 2003— and to implement the rates immediately. *Id.* art. 5.26–1, § 2(a). Within forty days of the filing deadline, TDI was required to review and either approve or modify the initial rates. *Id.* art. 5.26–1, § 2(b). If TDI failed to act within the designated statutory time period, the insurer's filed rates were deemed approved. *Id.* art. 5.26–1, § 2(c).

The second phase of implementation was governed by article 5.142, effective June 11, 2003, through December 1, 2004, which provided temporary rate-regulation procedures that required prior approval of a new rate before the new rate could be used. *Id.* art. 5.142 (West Supp.2004–2005). Under the terms of article 5.142, insurers could change their initial article 5.26–1 rates by filing their rates with TDI and awaiting the commissioner's approval before implementing these rates. *Id.* art. 5.142, § 5.

The final phase of implementation went into effect after December 1, 2004, and was governed by article 5.13–2. *Id.* art. 5.13–2, § 5 (West Supp.2004–2005). Under the terms of article 5.13–2, insurers were permitted to file rates and implement the rates immediately without prior approval. *Id.* This permanent file-and-use system allows insurers to use

proposed rates immediately, but TDI can review and either disapprove the rates before they go into effect or disapprove further use of the filed rates after they go into effect. *Id.* art. 5.13–2, §§ 5, 7.

On June 26, 2003, State Farm Lloyds made its required rate filing under article 5.26–1, submitting its then-existing rates as its initial rates. On August 18, 2003, TDI notified State Farm Lloyds of its determination that the rates must be reduced by twelve percent because the rates "are not reasonable for the risks to which they apply." State Farm Lloyds appealed.

Contesting TDI's determination, State Farm Lloyds requested a hearing before the commissioner under the terms of article 5.26–1. *See id.* art. 5.26–1, §§ 3–4. The commissioner heard the merits of the case on September 2 and 3, 2003. To prevail in its appeal under the terms of article 5.26–1, State Farm Lloyds was required to show by clear and convincing evidence that the rate reduction specified by TDI would produce inadequate rates. *Id.* art. 5.142, § 2(b)(2). An inadequate rate was defined as a rate that is "insufficient to sustain projected losses and expenses" and "endangers the solvency of an insurer using the rate." *Id.; see also id.* art. 5.26–1, § 1(b) ("The definitions adopted under article 5.142 of this code apply to this article."). Following the hearing, the commissioner issued a final order affirming the department's rate reduction, stating in a **\*238** single conclusion of law that the rates recommended by TDI would produce adequate base rates for State Farm Lloyds.

State Farm Lloyds appealed the commissioner's determination to district court. The district court granted summary judgment in favor of State Farm Lloyds, declaring the department's actions void and unenforceable, vacating the commissioner's rate order, and denying the department's request to remand the case for further administrative proceedings. According to the district court, article 5.26–1 was unconstitutional on its face and as applied, violating the due course of law provision of the Texas Constitution and the due process clause of the United States Constitution. Article 5.26–1 was also unconstitutional, the court found, because it violated the takings provisions of both the Texas Constitution and the United States Constitution. Further, the court found that the department had denied State Farm Lloyds due process by failing to follow the applicable contested case provisions of the Administrative Procedure Act ("APA") and TDI's own contested case rules. *See* Tex. Gov't Code Ann. §§ 2001.051–.178 (West 2000); 28 Tex. Admin. Code §§

1.1–1.90 (2003). The commissioner and TDI appealed to this Court. *See Geeslin v. State Farm Lloyds,* 255 S.W.3d 786 (Tex.App.-Austin 2008, no pet. h.).

Nine days after the trial court declared TDI's rate order void, TDI initiated disciplinary action against State Farm Lloyds, seeking to prevent State Farm Lloyds from charging its current rates, which, according to TDI, were excessive, to require State Farm Lloyds to pay restitution to affected policyholders, and to impose sanctions on State Farm Lloyds. *See* Tex. Ins.Code Ann. arts. 1.02, 5.144 (West Supp.2004– 2005 & Supp.2007). The parties filed cross-motions for summary judgment in district court, seeking declarations as to TDI's authority to act and impose sanctions under article 1.02 and chapters 82 and 84 of the insurance code.[2] *See id.* art. 1.02, §§ 82.051–.056, 84.021–.022 (West Supp.2005).

The trial court denied State Farm Lloyds's motion for summary judgment and granted TDI's motion, holding that TDI could seek restitution and sanctions from State Farm Lloyds based on State Farm Lloyds's allegedly excessive rates. State Farm Lloyds appealed to this Court. The matter is pending under cause number 03–05–00524–CV.

On December 6, 2004, the commissioner issued a rate supervision order, determining that "State Farm Lloyds' rates require supervision because of the rating practices of State Farm Lloyds." According to the commissioner's order, "State Farm Lloyds has charged excessive rates for homeowners insurance from June 11, 2003, to the present." State Farm Lloyds sought judicial review of this order in district court, arguing that the order was invalid because it was based on excessive rates, not rating practices. On July 7, 2005, the trial court granted State Farm Lloyds's motion for summary judgment in cause number GN500537 without stating the grounds, ordering "that Commissioner's Order No. 04–1164 dated December 6, 2004 is REVERSED." The parties did not appeal this judgment.

On May 30, 2006, pursuant to article 5.13–2, State Farm Lloyds filed new proposed homeowners insurance rates with TDI. In response, on July 21, 2006, the **\*239** commissioner issued both an order disapproving State Farm Lloyds's rate filing and the supervision order at issue in this case, which indefinitely revoked State Farm Lloyds's right to file and use its rates without prior approval from TDI.[3] The rate supervision order was based on the following "Rating Practices Requiring Supervision":

(1) From January 13, 2003 to the present State Farm Lloyds has charged rates that were determined by the Commissioner to be excessive and in violation of Texas law, and which should have been reduced by twelve (12%).

(2) The Commissioner has repeatedly sought to correct the excessive rates charged by State Farm Lloyds, has attempted to prevent State Farm Lloyds from further charging excessive rates, and has attempted to obtain refunds for State Farm Lloyds' policyholders charged such excessive rates in the past through means afforded him under Texas law.

(3) In response to the Commissioner's efforts, State Farm Lloyds repeatedly failed to reduce excessive rates or pay refunds, continued to file excessive rates, and prevented a final determination of whether its rate was legal.

(4) Since September 2003, State Farm Lloyds has avoided and thwarted any judicial procedure to determine whether their rates are excessive, unreasonable or unfairly discriminatory. Instead, State Farm Lloyds has challenged the Commissioner's regulatory authority on procedural grounds, forestalling the effective application of such authority, and preventing a final determination of whether State Farm Lloyds' homeowners rates are legal.

(5) In May 2006 State Farm Lloyds again filed rates that were determined by the Commissioner to be excessive, inadequate, unreasonable, and/or unfairly discriminatory for the risks to which they apply in violation of Texas law. Specifically:

a) the provision for non-catastrophe incurred losses and loss adjustment expenses is excessive;

b) the provision for hurricane losses and loss adjustment expenses is excessive;

c) the provision for fixed expenses is excessive;

d) the provisions for underwriting profits, contingencies, and surplus note produce an unreasonably high rate of return;

e) the adjustment to remove mold losses did not remove mold losses for years prior to 2001, even

though State Farm Lloyds reported such losses in previous TDI data calls;

f) the premium trend factor for inflation was inadequate relative to movement in Texas building costs in recent years, and thus produced an excessive rate indication;

g) the zone system used to classify risk and price insurance results in large rate differences between adjacent geographical areas which are not actuarially justified, and result in unfair discrimination between policyholders of the same class and essentially the same hazard in violation of Texas law;

**\*240** h) the selection of territorial rate relativities results in rates for certain territories that do not reasonably relate to their actual risk exposure;

i) the indicated territorial relativities are inconsistently applied, resulting in excessive rates for many policyholders;

j) the two percent retained hurricane risk provision is unsupported and excessive;

k) the relative risk attributable to hurricanes is improperly used to determine the needed overall company operating return, even though non-hurricane losses represent the vast majority of expected company exposure, and are less risky, resulting in an overstated rate of return; and

l) the proposed substantial increase in the cost of excess of loss reinsurance purchased by State Farm Lloyds from State Farm Mutual Automobile Insurance Company is unsupported and not reasonable.

State Farm Lloyds filed suit in district court, seeking judicial review of the rate supervision order and a judicial declaration that the commissioner had no authority to issue the supervision order on the grounds stated. The parties filed cross-motions for summary judgment in the district court. On March 21, 2007, the district court granted in part and denied in part the motions of both parties, and reversed and remanded the commissioner's supervision order. The court granted summary judgment for State Farm Lloyds in part, finding that the commissioner had no authority to issue the supervision order on the grounds that State Farm Lloyds exercised its right to judicial review, that the commissioner violated State

Farm Lloyds's due process rights in issuing the order, that the order was not supported by substantial evidence, and that the commissioner's decision to issue the order was arbitrary and capricious. The court granted summary judgment for the department on the grounds that the commissioner had authority to issue the supervision order on all grounds except the ground that State Farm Lloyds exercised its right to judicial review. The court did not reach the question of whether res judicata and collateral estoppel prevented the commissioner from issuing the supervision order.

On May 22, 2008, this Court issued its decision in the first rate appeal. *Geeslin v. State Farm Lloyds,* 255 S.W.3d 786. We concluded that the portion of section 4 of article 5.26–1 setting out the insurer's proof requirement is unconstitutional on its face and as applied to State Farm Lloyds and that State Farm Lloyds was denied any constitutionally meaningful review of TDI's rate order. Accordingly, we affirmed the judgment of the trial court as to the insurer's proof requirement and as to due process. We severed the unconstitutional provision requiring an insurer to prove that a rate reduction by TDI would produce inadequate rates, reversed the trial court's judgment as to the constitutionality of the remainder of the statute, and remanded to the department for further proceedings consistent with the opinion. As we explained, under the remaining, valid provisions of article 5.26–1, an insurer must show by clear and convincing evidence that a rate filed under article 5.26–1 is "just, reasonable, adequate, not excessive, and not unfairly discriminatory for the risks to which it applies," which means that the rate must allow for a "reasonable profit," but not one that is "unreasonably high in relationship to the insurance coverage provided." *See* Tex. Ins.Code Ann. art. 5.26–1, § 2(b), art. 5.142, §§ 2(b)(1–3), 3(d), art. 1.02(c)(1–3).

We now address the validity of the rate supervision order at issue in this third appeal.

## \*241 ANALYSIS

### Standard of review

[1] The material facts are not in dispute, and the propriety of summary judgment is a question of law. *Westcott Commc'ns, Inc. v. Strayhorn,* 104 S.W.3d 141, 145 (Tex.App.-Austin 2003, pet. denied). We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). When

the material facts are not in dispute, both parties move for summary judgment, and the district court grants one motion and denies the other, we review the summary judgment evidence presented by both sides, determine all questions presented, and render the judgment that the district court should have rendered. *Texas Workers' Comp. Comm'n v. Patient Advocates of Tex.,* 136 S.W.3d 643, 648 (Tex.2004); *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000).

## The department's appeal

The trial court granted summary judgment in favor of State Farm Lloyds on the grounds that the commissioner had no authority to issue the supervision order based on State Farm Lloyds's exercise of its right to judicial review, that the manner in which the commissioner issued the supervision order violated State Farm Lloyds's due process rights, that the supervision order was not supported by substantial evidence, and that the commissioner's decision to issue the order was arbitrary and capricious. The department appeals these determinations.

## *Jurisdiction*

 **[2]** In its first point of error, the department argues that this Court and the trial court have no jurisdiction to review the rate supervision order. According to the department, because the applicable statute requires no hearing, there is no administrative record for this Court to review, and this Court cannot review the supervision order under the terms of either the insurance code or the government code. State Farm Lloyds responds that this Court and the trial court have jurisdiction over its claim under the Uniform Declaratory Judgments Act ("UDJA") and pursuant to chapter 36, subchapter D, of the insurance code and that State Farm Lloyds has an independent common-law right to judicial review.

Chapter 36 of the insurance code grants broad authority for judicial review of the commissioner's actions. The statute authorizes judicial review of a "decision, order, rate, rule, form, or administrative or other ruling of the commissioner." Tex. Ins.Code Ann. § 36.201 (West Supp.2007). Section 36.202 further provides: "[a]fter failing to get relief from the commissioner, any insurance company or other party at interest, who is dissatisfied with an action of the commissioner may file a petition for judicial review against the commissioner as defendant." *Id.* § 36.202 (West Supp.2007). The supervision order is entitled "Official Order

of the Commissioner of Insurance" and is signed by the commissioner. Under the plain language of the statute, such an order can be reviewed by the district court.

The department argues that, because chapter 36 provides that "[j]udicial review of the action is under the substantial evidence rule and shall be conducted under Chapter 2001, Government Code," this particular supervision order is not reviewable. According to the department's reasoning, because no hearing was held and no administrative record was created, there is nothing for the district court to review. We disagree. Although the statute **\*242** sets out a substantial evidence standard of review, nothing in the language of the statute requires that there have been an administrative hearing and corresponding administrative record as a prerequisite for judicial review. Such an interpretation would lead to the conclusion that TDI could simply refuse to hold administrative hearings and then issue an order that would be immune from judicial review, a result that could hardly be contemplated by the statutory review process. *See Fleming Foods of Tex., Inc. v. Rylander,* 6 S.W.3d 278, 284 (Tex.1999) (explaining that a court should not adopt a statutory construction that would render the statute meaningless or lead to absurd results).

 **[3]** Further, the APA provides that when a court reviews an agency decision under the substantial evidence rule,

[the] court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

(1) may affirm the agency decision in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann. § 2001.174. Thus, the substantial evidence standard of review requires only that the court "not substitute its judgment for the judgment of the state agency on the weight of the evidence" but allows the court to address other aspects of the decision, including whether the decision violated a constitutional or statutory provision, whether the agency acted outside its authority in issuing the decision, and whether the agency violated procedural requirements in issuing the decision. *Id.* Several of State Farm Lloyds's claims —that the actions for which the commissioner placed it under supervision are not "rating practices," that the supervision order is arbitrary and capricious, that the commissioner acted outside his authority in issuing the supervision order, and that its due process rights were violated—do not require review of an administrative record, and all are authorized grounds for reversal or remand of a decision under the APA. *See id.* § 2001.174(2).

 **[4]** The department further argues that, to be reviewable, an agency order must be final. Here, the department contends, there is no final order to review. Although the department cites cases to support its position and explains the rationale behind requiring a final order before review, it never adequately explains why the supervision order does not qualify as a final agency action. According to the department, "[t]he order State Farm Lloyds challenges sets a regulatory process in motion; that process gives State Farm Lloyds the opportunity to be heard and ultimately seek judicial review of orders that result from that process." We find the department's analysis unpersuasive. **\*243** An agency order does not become interlocutory simply because it affects the administrative process. The department is correct that the supervision order allows State Farm Lloyds to file rates for the commissioner's review and to request an administrative hearing if the commissioner disapproves those rates; however, nothing in that established process allows State Farm Lloyds to challenge the supervision order itself. The only means of challenging the commissioner's supervision order is to seek judicial review of the order. We find nothing in the order to suggest that it is not a final, completed agency action. We conclude that this Court and

the district court have jurisdiction to address State Farm Lloyds's claim under chapter 36 of the insurance code. *See* Tex. Ins.Code Ann. §§ 36.201–.202.

Having concluded that the district court and this Court have jurisdiction to address State Farm Lloyds's claims pursuant to chapter 36 of the insurance code, we overrule the department's first point of error. [4]

### *Hearing*

 **[5]** In its second point of error, the department argues that the commissioner was not required to hold a hearing and develop a record before issuing the rate supervision order. According to the department, because no hearing was required, the supervision order cannot be found to be arbitrary and capricious because of a lack of substantial evidence. As support for this argument, the department argues that nothing in section 5A of article 5.13–2 expressly requires a hearing and that State Farm Lloyds has no property right in the statutory file-and-use system and, therefore, no constitutional right to a hearing. State Farm Lloyds counters that its statutory right to file and use its rates without prior approval is a constitutionally protected property interest; therefore, its due process rights were violated when the commissioner issued the supervision order without first holding a hearing.

This Court has long held that, absent express statutory authority, the APA does not independently provide a right to a contested case hearing. *Texas Logos, L.P. v. Texas Dep't of Transp.,* 241 S.W.3d 105, 123 (Tex.App.-Austin 2007, no pet.); *Eldercare Props., Inc. v. Texas Dep't of Human Servs.,* 63 S.W.3d 551, 557 (Tex.App.-Austin 2001, pet. denied), overruled on other grounds by *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.,* 145 S.W.3d 170, 173 (Tex.2004); *Best & Co. v. State Bd. of Plumbing Exam'rs,* 927 S.W.2d 306, 309–10 (Tex.App.-Austin 1996, writ denied). [5] State Farm Lloyds does not contend that any provision in the statute requires a hearing before an order is issued pursuant to article 5.13–2, section 5A, and we find none. In the absence of express statutory authority, State Farm Lloyds had no right to a contested case hearing.

 **[6]** **[7]** State Farm Lloyds argues that, even in the absence of express statutory authority, it was entitled to a contested case hearing because its statutory right to file and use its rates is a constitutionally protected property interest that cannot be taken away without due process. There is no vested right in the continuation of a current law. **\*244** *Subaru of Am. v.*

*David McDavid Nissan, Inc.,* 84 S.W.3d 212, 219 (Tex.2002); *Board of Med. Exam'rs for Tex. v. Nzedu,* 228 S.W.3d 264, 273 (Tex.App.-Austin 2007, pet. denied). In *Subaru,* the court explained:

> that no one has a vested right in the continuance of present laws in relation to a particular subject, is a fundamental proposition; it is not open to challenge. The laws may be changed by the Legislature so long as they do not destroy or prevent an adequate enforcement of vested rights. There cannot be a vested right, or a property right, in a mere rule of law.

*Subaru,* 84 S.W.3d at 219 (quoting *Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556, 560 (1916)). The distinction between a vested right and a "mere rule of law" turns on whether the statute granting the right in question is substantive or procedural in nature. *See id.*

Here, the protected right claimed by State Farm Lloyds is the right to a certain procedure in setting its rates. In other words, the vested right claimed by State Farm Lloyds is not the right to set a certain rate but the right to a certain procedure in setting that rate. State Farm Lloyds is, thus, claiming a property interest in a procedural rather than a substantive right. While State Farm Lloyds may have a vested right in a reasonable rate, we find no vested right in the method of establishing or reviewing those rates.

Further, the language of the statute points to the legislature's intent that no contested case hearing be required before the commissioner issues a rate supervision order. The primary rule in statutory interpretation is that a court must give effect to legislative intent. *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 383 (Tex.2000). In determining legislative intent, we read the statute as a whole and interpret it in a manner that gives effect to all and not just isolated portions. *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex.2003). The statute at issue here provides:

> (a) The commissioner by order may require an insurer to file with the commissioner all rates, supplementary rate information, and any supporting information as prescribed by this section if the commissioner determines that:

(1) an insurer's rates require supervision because of the insurer's financial condition;

(2) an insurer's rates require supervision because of the insurer's rating practices; or

(3) a statewide insurance emergency exists.

Tex. Ins.Code Ann. art. 5.13–2, § 5A. The legislature is unlikely to have intended that a contested case hearing be held to determine whether a statewide emergency exists. Requiring such a hearing would require the participation of all regulated insurers in Texas and would defeat the statute's purpose of providing the commissioner with quick and efficient means for addressing a statewide insurance emergency. The same could be true for an insurer's financial condition. An insurer's financial condition may become such that the commissioner is compelled to quickly issue a rate supervision order to protect Texas policyholders. In setting up such a process, the legislature likely contemplated giving the commissioner a tool by which he could quickly and expeditiously address acute issues that may arise with insurers or with the insurance market as a whole. [6] **\*245** Requiring a contested case hearing, which is often a slow and lengthy proceeding, is inconsistent with this intent.

In sum, we conclude that no statutory provision requires the commissioner to hold a contested case hearing before issuing a rate supervision order, that State Farm Lloyds has no constitutionally protected right in any given rate setting procedure, and that the legislature did not intend to require a contested case hearing under section 5A. We therefore hold that a contested case hearing was not required, and we reject State Farm Lloyds's contentions that the supervision order is void on those grounds.

Also subsumed in the department's second point of error is its challenge to the trial court's conclusions that the supervision order was not supported by substantial evidence and that the order was arbitrary and capricious. As to substantial evidence, because we agree with the department that no hearing is or was required, no administrative record is or was developed. Absent an administrative record, no substantial evidence review is required or even possible. However, as State Farm Lloyds recognizes, even without an administrative record, judicial review may still be possible on other grounds: "Even if State Farm Lloyds were not entitled to a hearing, the District Court's reversal of the Supervision Order is still correct. The Order is also arbitrary and capricious because

it is based on legally irrelevant factors, and is in excess of the Commissioner's statutory authority." State Farm Lloyds is apparently arguing that, if no hearing was required, reversal of the order could still be had, but reversal would have to be based on grounds other than a lack of substantial evidence.

As the department's final component in its second point of error, we next address whether the supervision order was arbitrary and capricious. Implied in the department's single sentence on this issue is its argument that because State Farm Lloyds was not entitled to a hearing, and because there was no requirement that the supervision order be supported by substantial evidence, the supervision order cannot be arbitrary or capricious. According to the department: "Because no hearing is required, the absence of a hearing record does not make the order invalid or arbitrary and capricious as not supported by substantial evidence." The department, however, provides no additional argument on this point.

 **[8]**  **[9]**  **[10]**  An agency's order is arbitrary and capricious if the order is not supported by substantial evidence. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 454 (Tex.1984). Even if supported by substantial evidence, however, an agency order may be arbitrary and capricious if a denial of due process has prejudiced the litigant's rights or if the agency has improperly based its decision on non-statutory criteria. *Id.; Kawasaki Motors Corp. U.S.A. v. Texas Motor Vehicle Comm'n,* 855 S.W.2d 792, 794–95 (Tex.App.-Austin 1993, no writ). Similarly, an agency decision may be found to be arbitrary and capricious if it is based on legally irrelevant factors or if legally relevant factors were not considered or if the agency reached an unreasonable result. *City of El Paso v. Public Util. Comm'n,* 883 S.W.2d 179, 184 (Tex.1994); *Dunn v. Public Util. Comm'n,* 246 S.W.3d 788, 791 (Tex.App.-Austin 2008, no pet.) ("We will consider an administrative agency's decision to be arbitrary and capricious or an abuse of discretion if the agency reaches a completely unreasonable **\*246** result after weighing the relevant factors established by the legislature.").

 **[11]**  Here, we have already determined that, because State Farm Lloyds was not entitled to a hearing, there has been no due process violation, and there was no requirement that the order be supported by substantial evidence. We must now determine whether the commissioner's decision was arbitrary and capricious because the commissioner based the order on legally irrelevant factors, failed to consider legally relevant factors, or reached an unreasonable result. In

granting summary judgment for State Farm Lloyds, the trial court determined that the commissioner had no authority to issue the supervision order on the grounds that State Farm Lloyds exercised its right to judicial review. The department did not appeal this determination. Thus, even if some of the factors on which the order was based were relevant, at least one of the factors was irrelevant. In other words, even if the commissioner also considered other legally relevant factors, the order was based in part on at least one legally irrelevant factor. The commissioner's supervision order did not consider each factor as an independent ground for rate supervision; rather, the order was based on all of the "rating practices identified." Because the commissioner considered at least one legally irrelevant factor in issuing his order, we agree that the order is arbitrary and capricious.

Having found that no hearing was required and, therefore, that no substantial evidence review was required, we reverse the judgment of the trial court as to those points. However, having determined that the commissioner's order was arbitrary and capricious, we affirm the trial court's judgment as to that point. Because we have upheld one of the trial court's grounds for reversal of the supervision order, we accordingly uphold the trial court's reversal of that order; however, because we have found that no contested case hearing was required, we decline to remand the case to TDI for further proceedings.

### State Farm Lloyds's appeal

The trial court granted summary judgment in favor of the department on the grounds that the commissioner had authority to issue the supervision order on one or more of the grounds stated in the order, except the ground that State Farm Lloyds exercised its right to judicial review. State Farm Lloyds appeals these determinations.

### *Rating practices*

 **[12]**  In its first point of error, State Farm Lloyds argues that the commissioner lacks authority to issue the supervision order on the grounds that State Farm Lloyds charged or filed excessive rates. According to State Farm Lloyds, the grounds on which the commissioner based his order are not rating practices under article 5.13–2, section 5A; therefore, the commissioner had no authority to issue the order on those grounds. The department responds that State Farm Lloyds's interpretation of rating practices is too narrow and that " 'rating practices' includes an insurer's activities relating to all matters involved in the filing and use of rates."

The insurance code defines rates as "the cost of insurance per exposure unit ... before any application of individual risk variations based on loss or expense considerations." Tex. Ins.Code Ann. art. 5.13–2, § 3(a)(5). The insurance code does not define rating practices, and the term appears only in section 5A of article 5.13–2. According to the department, because article 5.13–2's express purpose is to "promote the public welfare by regulating rates to prohibit excessive, inadequate, or unfairly **\*247** discriminatory rates," in the context of article 5.13–2, an insurer's rating practices must include "all matters involved in the filing and use of rates," including:

1) whether or not the rating system has an unfair impact on certain segments of the insured population or otherwise violates public policy objectives;

2) the marketing objectives embodied in existing or proposed rating structures;

3) whether or not the rating structures or prices are based on sound actuarial principles; and

4) whether or not the rates represent a continuation of past approaches that have been repeatedly rejected or otherwise been shown to be in error.

State Farm Lloyds counters that, by context, rating practices refer only to how an insurer applies its various filed rates to different insured individuals and businesses. State Farm Lloyds points out that the word "rating" appears in two other definitions included in article 5.13–2. A "rating manual" is defined as "a publication or schedule that lists rules, classifications, territory codes and descriptions, rates, premiums, and other similar information used by an insurer to determine the applicable premium charged an insured." Tex. Ins.Code Ann. art. 5.13–2, § 3(a)(6). Similarly, "supplementary rating information" is defined as information "used by the insurer to determine the applicable premium for an insured." Id. art. 5.13–2, § 3(a)(8). Thus, according to State Farm Lloyds, because other definitions that include the term "rating" apply to "determine the applicable premium" for an insured, a rating practice, similarly, is intended to refer only to how an insurer applies its filed rates to individual insureds.

Even if we accept State Farm Lloyds's interpretation of the meaning of rating practices, however, we find that one or more of the grounds included in the commissioner's supervision order involves the application of State Farm Lloyds's filed rates to individual insureds. Specifically, the order finds that State Farm Lloyds's May 6, 2006 filed rates were "excessive, inadequate, unreasonable, and/or unfairly discriminatory for the risks to which they apply" because, among other reasons:

g) the zone system used to classify risk and price insurance results in large rate differences between adjacent geographical areas which are not actuarially justified, and result in unfair discrimination between policyholders of the same class and essentially the same hazard in violation of Texas law;

h) the selection of territorial rate relativities results in rates for certain territories that do not reasonably relate to their actual risk exposure;

i) the indicated territorial relativities are inconsistently applied, resulting in excessive rates for many policyholders;

These grounds (grounds g, h, and i) do not implicate State Farm Lloyds's rate, which is defined as "the cost of insurance per exposure unit ... before any application of individual risk variations based on loss or expense considerations"; rather, these grounds implicate State Farm Lloyds's application of its rates to individual policyholders. Thus, even assuming that the commissioner has no authority to address rates through an article 5.13–2, section 5A, supervision order, and that excessive rates must be addressed under the specific rate disapproval provisions set out in section 7 of article 5.13–2, as State Farm Lloyds contends, the commissioner has the authority to issue a supervision order on the basis of the above-mentioned practices because those practices involve not the rates **\*248** themselves but the application of rates to individual policyholders. We, therefore, agree with the trial court that "the Commissioner has authority to issue Official Order No. 06–0746 on one or more of the grounds stated in Official Order 06–0746, except on the ground that State Farm Lloyds exercised its right to judicial review." [7] We overrule State Farm Lloyds's first point of error.

### Res judicata and collateral estoppel

[13] In its second point of error, State Farm Lloyds argues that res judicata prohibits the commissioner from issuing the supervision order on the ground that State Farm Lloyds's existing rates are excessive. According to State Farm Lloyds, by reversing the commissioner's December 6, 2004 rate supervision order in cause number GN500537, the trial court found that State Farm Lloyds's rates cannot be placed under

supervision on this ground and, because the department did not appeal the judgment, the department is bound by it.

 **[14]** **[15]** **[16]** **[17]** **[18]** The general doctrine of res judicata encompasses two distinct categories: (1) res judicata, or claim preclusion, and (2) collateral estoppel, or issue preclusion. *Barr v. Resolution Trust Corp.,* 837 S.W.2d 627, 628 (Tex.1992). Res judicata, or claim preclusion, precludes relitigation of claims that have been finally adjudicated or that arise out of the same subject matter and that could have been litigated in the prior action. *Amstadt v. United States Brass Corp.,* 919 S.W.2d 644, 652 (Tex.1996). It requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Id.* Collateral estoppel, or issue preclusion, is more narrow than res judicata because it only prevents relitigation of identical issues of fact or law that were actually litigated and essential to the judgment in a prior suit. *Barr,* 837 S.W.2d at 628. Once an actually litigated and essential issue is determined, that issue is conclusive in a subsequent action between the same parties. *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 384 (Tex.1985).

In the 2004 supervision order that was the subject of the trial court's 2005 summary judgment order in cause number GN500537, the commissioner set out only the following rating practice: "Based on the information currently available to TDI, State Farm has charged excessive rates for homeowners insurance from June 11, 2003, to the present." State Farm Lloyds sought review of the commissioner's 2004 order in district court and filed a motion for summary judgment, arguing that the order was invalid because it was based on excessive rates, not rating practices. The trial court granted summary judgment in part, voiding the commissioner's 2004 rate supervision order.[8] Thus, the trial court's order determined only that the 2004 supervision order was void. The judgment did not determine the validity of any other future rate supervision order, as future **\*249** rate supervision orders could be based on completely different and valid criteria.

Here, as in his 2004 rate supervision order, the commissioner concluded that "[f]rom January 13, 2003 to the present State Farm Lloyds has charged rates that were determined by the Commissioner to be excessive and in violation of Texas law, and which should have been reduced by twelve percent (12%)." Unlike the 2004 supervision order, however, we conclude that the commissioner's 2006 supervision order was based in part on State Farm Lloyds's rating practices. Nothing in the trial court's 2005 judgment prohibits issuing a supervision order based on rating practices. The trial court's judgment simply determines that the commissioner's 2004 order is invalid. Here, the 2006 supervision order includes one or more grounds that are based on rating practices, not excessive rates. We conclude that, to the extent that the commissioner's 2006 supervision order included rating practices, the order was not prohibited by res judicata or collateral estoppel.[9] Accordingly, we overrule State Farm Lloyds's second point of error.

### CONCLUSION

Having concluded that the commissioner's order included one or more grounds that qualify as rating practices under article 5.13–2, section 5A, and that, to that extent, the commissioner's order was not prohibited by res judicata or collateral estoppel, we overrule State Farm Lloyds's points of error. We further conclude that State Farm Lloyds was entitled to judicial review and accordingly overrule the department's jurisdictional complaint. Finding that State Farm Lloyds was not entitled to a contested case hearing and that no substantial evidence review was required, we sustain the department's complaint as to these points, but, holding that the commissioner's order was arbitrary and capricious, we overrule the department's complaint as to this point. Accordingly, we affirm the trial court's order reversing the commissioner's supervision order; however, because no contested case hearing was or is required, we decline to remand the case to TDI for further proceedings.

Footnotes

1    Because their interests do not diverge, we refer to appellants// cross-appellees collectively as the "department," but, when necessary in recounting historical facts, we distinguish between the actions of the commissioner and TDI.

While the case was pending in district court, TDI referred the disciplinary action to the State Office of Administrative Hearings ("SOAH") for hearing. The SOAH judge abated the action pending final decision by this Court in the first rate appeal, cause number 03–05–00067–CV.

State Farm Lloyds requested a hearing on the commissioner's rate disapproval order pursuant to section 7(b) of article 5.13–2. *See* Tex. Ins.Code Ann. art. 5.13–2, § 7 (West Supp.2004–2005). A contested case on the rate disapproval order is pending at SOAH. The rate disapproval order is not at issue in this appeal.

Having determined that jurisdiction exists under chapter 36, subchapter D, of the insurance code, we need not address State Farm Lloyds's additional arguments that jurisdiction also exists under the Uniform Declaratory Judgments Act ("UDJA") and that it has an independent common-law right to judicial review.

Neither party has asserted a basis for our distinguishing or departing from these decisions.

In the context of this case, we are compelled to note that this broad authority is granted only to address rating practices, and we express no opinion here as to whether all grounds included in the commissioner's rate supervision order are included within the scope of a rating practice.

We do not address whether the commissioner had authority to issue the rate supervision order on the ground that State Farm Lloyds exercised its right to judicial review, as the department does not appeal this issue.

The trial court denied the remainder of the summary judgment as moot. Because the trial court had invalidated the rate supervision order, it no longer needed to determine whether rates filed by State Farm Lloyds pursuant to the order were deemed approved by operation of law under article 5.13–2, section 5A(d).

Similarly, to the extent that the commissioner issued the order based on excessive rates rather than rating practices, the order might be prohibited by res judicata. As noted, we have found that three specific grounds amount to rating practices and, therefore, affirm the trial court's conclusion that "the Commissioner has authority to issue Official Order No. 06–0746 on one or more of the grounds stated in Official Order 06–0746, except on the ground that State Farm Lloyds exercised its right to judicial review"; however, we neither address nor decide whether other specific grounds in the supervision order are based on rating practices or excessive rates.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

924 S.W.2d 433
Court of Appeals of Texas,
Fort Worth.

Patricia Susan THOMAS, Appellant,

v.

Linda Lorraine CASALE, Appellee.

No. 2–95–178–CV.  |  June 13, 1996.
|  Rehearing Overruled July 11, 1996.

Husband's paramour appealed from order of the 231st District Court, Tarrant County, Randy Catterton, J., which required her to pay into registry of court amounts which husband had allegedly spent on paramour. The Court of Appeals, Holman, J., held that: (1) Uniform Fraudulent Transfer Act was not applicable; (2) wife did not establish that paramour knew about husband's intent to defraud community estate; and (3) there was no evidence to conclude that money still on deposit in paramour's account at the time of judgment was an in-kind equivalent to the money that husband had deposited in the account.

Affirmed in part and reversed and rendered in part.

Livingston, J., dissented without opinion.

**Attorneys and Law Firms**

**\*434** Elizabeth Sturdivant Kerr, Watson, Kerr & Parker, P.C., Fort Worth, for Appellant.

Gary L. Nickelson and Sydney A. Beckman, Law Offices of Gary L. Nickelson, Fort Worth, for Appellee.

Before DAUPHINOT, RICHARDS and HOLMAN, JJ.

**OPINION**

HOLMAN, Justice.

The trial court granted Linda Lorraine Casale a divorce from Robert Nicholas Casale. Linda named Patricia Susan Thomas as a co-respondent in the divorce, and Patricia is the only appellant. We affirm the judgment in all respects except the portion that orders Patricia to deposit $61,753.00 into the registry of the court. We reverse only **\*435** that portion of the judgment, as we will discuss.

Another co-respondent named by Linda in the divorce action is Robert's alleged alter ego, Seahorse Pool Corporation. Linda joined the co-respondents on a theory that Robert defrauded her by secretly depositing money belonging to the marital estate into a bank account that the evidence shows was created before or during Patricia's divorce and existed in her name. Linda's suit alleged that Robert had paramours on whom he lavished excessive gifts and expenditures with community funds, and that, without Linda's knowledge, Robert wasted and squandered portions of the community estate and misused his corporation as a conduit for that purpose.

Although the petition only implies that Patricia was Robert's paramour, the evidence establishes that she was. At times, Robert arranged for employment of Patricia and her son by Seahorse Pool Corporation. Linda's suit alleged that Robert devised a conspiracy to defraud her and that Patricia had notice of Robert's intent to injure Linda's community property rights. In her unverified answer, Patricia said she was not a party to fraud and denied that she had ever known of Robert's alleged intent to injure Linda's rights. Patricia also answered that the money Robert transferred into her account was presumed to be subject to his sole management control and disposition and that she had no notice to the contrary.

The divorce was granted after the court considered the evidence and issues in a four-day bench trial ending March 2, 1995. Patricia did not attend the trial, but her attorney did. The judgment was signed April 27, 1995 and ordered Patricia to surrender $61,753.00 of the money in her bank account. The court made findings of fact and conclusions of law supporting its judgment.

Patricia appeals on grounds that the evidence was both legally and factually insufficient to support the trial court's findings or conclusions that: (1) Patricia knew the deposits into her bank account were community funds from Linda and Robert's marital estate, (2) Patricia knew Robert intended to injure Linda by hiding the funds in Patricia's account, (3) Robert had never made Patricia the owner of the funds on deposit, (4) Robert retained control of the deposited funds, and (5) that Patricia was liable to Linda under either TEX. FAM. CODE ANN. § 3.57 (Vernon 1993) or TEX. BUS. & COM. CODE ANN. § 24.001 (Vernon 1987) (Uniform Fraudulent Transfer Act).

An intimate relationship between Patricia and Robert began in 1992 after he separated from Linda but before the divorce was granted. Robert testified that Patricia and her own husband divorced on March 31, 1993 and that Patricia had her own savings account. Sometime during March 1993, Robert moved into Patricia's home, and they agreed to share living expenses. Patricia already had approximately $68,000 of her own money on deposit in her savings account at NationsBank, and Robert's name was authorized for that account in April 1993. His name was removed from the account in June 1994, almost eight months before trial.

 **[1]**   On appeal, Patricia's challenge to the legal sufficiency is a "no evidence" point. In determining "no evidence" points of error, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994); *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993).

 **[2]**   **[3]**   A "no evidence" point of error may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Assocs.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990); **\*436** Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 TEX. L. REV. 361 (1960). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992).

 **[4]**   Patricia's challenge to the factual sufficiency of the evidence is an "insufficient evidence" point of error, which places on her the burden of showing that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the trial court result is clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

A two-page document admitted in evidence over the objection of Patricia's attorney, lists the dates and amounts of bank deposits made by or through Robert between April 1993 and July 1994 into the savings account he and Patricia were sharing during that time. Those deposits totaled $68,752.93, and although the money came from Robert, some of the deposits were taken to the bank by Robert and some by Patricia. While both Robert's and Patricia's names were on the account, its balance at some point rose above $131,000. Robert testified that during the fourteen-month period in which he deposited a total of $68,752.93 into the account, he also withdrew a total of approximately $68,000 and used portions "[t]o defray some living expenses," to buy a bedroom suite for Patricia's home, and to pay Patricia $250 per month for using her car, although Robert owned a Cadillac that both he and Patricia drove during that time. In May 1994, Robert bought the car from Patricia with $10,000 he withdrew from the account. He also used money he withdrew from the account to pay twenty-four months' worth of his own living expenses.

Two other documents were admitted in evidence without objection, that list twelve trips taken by Robert and Patricia. The lists do not include the dates of every trip, but each trip appears to have been made while the divorce was pending. Eight appear to have been within the time that Robert and Patricia shared the savings account, and those eight destinations were Colorado, New Jersey, Minnesota, California, New York, England, Mexico, and St. Martin Island in the Dutch West Indies. Robert also testified about their trip to St. Croix in the Virgin Islands.

Eight of Patricia's ten points of error attack the legal and factual sufficiency of the evidence to support these four findings of fact by the trial court:

> 25. The Court finds that although the funds in the amount of $68,742.21 were in an account in the name of [Patricia] at the time of trial, no transfer was ever made by [Robert or Linda] to [Patricia]. [Challenged by points of error number three and eight.]
>
> ....
>
> 27. The Court finds that at sometimes during the pendency of the divorce, NationsBank account number 16306099677 had [Robert's] name on it; the Court further finds, however, that at all times during the pendency of the divorce, [Robert] had control over the funds in [the account]. [Challenged by points of error number four and nine.]

....

34. The Court finds that [Patricia] knew that [Robert] was depositing community funds in the [account]. [Challenged by points of error number one and six.]

....

36. The Court finds that [Patricia] knew that [Robert] intended to injure the rights of [Linda] by his hiding community property funds in [the account]. [Challenged by points of error number two and seven.]

Under points of error numbers five and ten, Patricia argues that she should not be required to comply with the trial court's order to pay Linda $61,753.00 because the evidence was neither legally nor factually sufficient to support the trial court's *implied* finding that Linda had met the burden of proof required by either TEX. FAM. CODE ANN. § 3.57 (Vernon 1993) or TEX. BUS. & COM. CODE ANN. § 24.001 (Vernon 1987).

 **\*437**   **[5]**    We first conclude that the Uniform Fraudulent Transfer Act is not applicable and that the trial court made no implied finding that it does apply. Although the term "creditor" is defined by section 24.002(4) of the Act, *id.,* to include a spouse who has a claim for property fraudulently transferred by the other spouse, we presume that the trial court's conclusions of law do not mention the Act because there is no evidence in the record that Robert was insolvent during the time he shared an account with Patricia or that the sharing of the account left Robert with "unreasonably small" assets or debts beyond his ability to pay. The Act does not apply in the absence of such evidence. *See id.* § 24.005 (Vernon Supp.1996), § 24.006 (Vernon 1987).

Neither do the conclusions of law mention TEX. FAM. CODE ANN. § 3.57 (Vernon 1993), but Patricia asks us to accept her contention that a reasonable inference to be drawn from findings of fact numbers 25, 27, 34, and 36 is that, despite legal and factual insufficiency of the evidence, the trial court related those four findings to the evidentiary requirements of section 3.57. That section enables a court to void a community property transfer made by one spouse with the intent to injure the rights of the other spouse, provided the spouse who asks the court to grant that remedy meets the burden of proving that the transferee had notice of the transferor's intent to injure the other spouse's rights. TEX. FAM. CODE ANN. § 3.57 (Vernon 1993).

Linda replies that findings of fact numbers 25, 27, 34, and 36 are immaterial to Patricia's appeal because Patricia did not challenge the following fact findings that Linda contends are sufficient to support the judgment:

No. 24.—that the $68,742.21 in Patricia's bank account at the time of trial was Robert and Linda's community property.

No. 28.—that Robert deposited community funds in the bank account for the purpose of hiding them from Linda in an attempt to avoid a just and right division of community assets.

No. 30.—that Robert and Linda did not intend the $68,742.21 to be a gift to Patricia.

No. 31.—that the $68,742.21 was never delivered or transferred to Patricia as a gift.

No. 32.—that Patricia never accepted the $68,742.21 as a gift from Robert or Linda.

No. 37.—that Robert intentionally hid community assets from Linda in the hopes that she could not find them and the court could not divide them.

 **[6]**    **[7]**    **[8]**    The general rule is that a finding of fact not challenged in a point of error is binding on the appellate court. *Atascosa County Appraisal Dist. v. Tymrak,* 815 S.W.2d 364, 367 (Tex.App.—San Antonio 1991, no writ), *aff'd,* 858 S.W.2d 335 (Tex.1993). Unchallenged findings of fact also bind the parties, and a party complaining that a trial court's findings or conclusions are incorrect or incomplete has a procedure available in trial court for requesting specified, additional, or amended findings. *See* TEX. R. CIV. P. 298; *Des Champ v. Featherston,* 886 S.W.2d 536, 541 (Tex.App.—Austin 1994, no writ); *James Holmes Enter. Inc. v. John Bankston Const. & Equip. Rental, Inc.,* 664 S.W.2d 832, 834 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.). However, an equally significant principle is that findings of fact bind an appellate court only if the findings are supported by evidence of probative force. *See Block v. Waters,* 564 S.W.2d 113, 115 (Tex.Civ.App.—Beaumont 1978, no writ) (citing *Stephenson v. Perlitz,* 537 S.W.2d 287, 289 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.)). Unchallenged findings of fact are binding on the appellate court "unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex.1986).

 [9]  Patricia argues that the evidence shows no more than conjecture that she ever knew that Robert intended to defraud and injure Linda's rights. Linda testified that "I believe" Patricia had "complete knowledge" that Robert was acting to defraud the marital estate by putting the money in the account. Linda conceded, however, that aside from her "belief," she had no personal knowledge of what Robert may have told Patricia about the deposits made in the account. **438** Earlier, Linda told the court that she only had a "gut feeling" that Robert was putting their money in an account under Patricia's name, but became fully convinced of it when she looked through some trash and found a four-word note written by Robert that said: "Deposit in savings, please." Linda's direct examination by her lawyer continued:

Q. Now, it doesn't say anything about there on there that Pat's name with an account or anything, does it?

A. No, it doesn't.

Q. But that's how you became convinced; is that correct?

A. Absolutely.

The issue on appeal is not whether Robert defrauded the community estate. That was established at trial and is not challenged by Patricia. Her appeal is based on a contention that the evidence was legally and factually insufficient to prove that she knew about Robert's fraudulent intent or that the money deposited was community property. Although Linda testified that she knew of no savings account in Robert's name at the time she discovered the note in the trash, none of her testimony was sufficient to prove her vital factual allegations that Patricia knew that the money deposited was community property or knew that the deposits were made to defraud Linda.

The only witnesses who testified at trial were Robert, Linda, a process server, a certified public accountant who had been engaged to evaluate Seahorse Pool Corporation, and the attorneys who testified about attorney fees. We are not directed to any evidence that, while she shared the bank account with Robert, Patricia had notice of Robert's intent to defraud Linda or injure her rights to community assets. Neither are we persuaded that a trial court may infer such proof merely by weighing the credibility of those who testified.

To recap, the record shows that before Robert came along, Patricia had approximately $68,000 in her savings account; then, Robert's name was added to the account and another $68,752.93 was deposited by or through him; during the same period in which those deposits were made, Robert also withdrew at least $68,000 from the account and spent it on himself and Patricia; the account balance at time of trial was $68,742.21, and the evidence established that $7,000 in the account did not come from Robert. On this evidence, the trial court allowed Patricia to keep $7,000 of the account balance and ordered her to surrender the other $61,753.00 to the registry of the court. The court later ordered that the funds be released from the registry and paid to Linda.

Although there is proof that Robert put community funds into Patricia's account, there also is proof that he withdrew about the same amount and spent it. We conclude that the evidence left the trial court with nothing more than speculation about the extent of Patricia's knowledge of whether the deposits made were community property and about Robert's possible motives for placing the money into her bank account when he had accounts of his own. Although the trial court easily may have speculated that Patricia, living with Linda's husband and having just gone through her own divorce, was a willing participant in a plan to defraud Linda of a share of community funds, neither suspicion nor conjecture equates to proof by a preponderance of the evidence. *Connell v. Connell,* 889 S.W.2d 534, 539 (Tex.App.—San Antonio 1994, writ denied).

Having searched the record for the evidence and inferences that tend to support findings of fact numbers 34 and 36, we find none. Whether Patricia knew that the transitory funds were community property and whether she knew that the funds were deposited with the intent to hide them and injure Linda's rights in the marital estate, are vital facts not proved in the trial of Linda's cause of action against Patricia.

 [10]   [11]  Because there is no dispute that the money from Robert was deposited into an account on which Patricia was a person jointly authorized with Robert to withdraw funds, we find no evidence in the record supporting finding of fact number 25 that the deposited funds were never transferred to her. Robert's name was removed from the account in June 1994, eight months before the divorce trial, and we find no evidence in the record supporting finding of fact number **439** 27 that Robert had control of the funds in the account at all times while the divorce was pending.

**[12]** There is no evidence to conclude that the money still on deposit in Patricia's account at the time of judgment was an in-kind equivalent to the money that Robert had deposited. Well before trial, he had already withdrawn and spent as much money as he had deposited, if not more. We conclude that the evidence afforded the trial court no basis in law or fact to order Patricia to surrender $61,753.00 to Linda. Patricia's own funds in the account exceeded that amount before Robert added the funds that he later withdrew and spent.

Although Patricia does not challenge finding of fact number 24 on appeal, we find no evidence to support that finding that all of the funds in Patricia's account at the time of trial were the community property of Robert and Linda, and we reject Linda's contention that the other unchallenged findings of fact numbers 28, 30, 31, 32, and 37 are alone sufficient to support the judgment against Patricia.

Points of error numbers one, two, three, four, six, seven, eight, and nine are sustained. We sustain points of error numbers five and ten only with regard to their assertion that the evidence is legally and factually insufficient to support an implied finding by the trial court that Linda had met the burden of proof required by TEX. FAM. CODE ANN. § 3.57 (Vernon 1993). We overrule points five and ten only with regard to their reliance upon TEX. BUS. & COM. CODE ANN. § 24.001 (Vernon 1987).

We hold that Linda Lorraine Casale has no lawful right to the $61,753.00 deposited in the registry of the court under the judgment. We reverse the portion of the judgment that orders Patricia Susan Thomas to deposit $61,753.00 into the registry of the court. We also reverse the trial court's post-judgment order that the trial court clerk pay that sum of money to Linda Lorraine Casale from the registry of the court. On that issue, we render judgment that Patricia Susan Thomas is entitled to have the $61,753.00 returned to her by the trial court, and the clerk of that court is ordered to pay to Patricia Susan Thomas, from the registry, $61,753.00 plus the interest, if any, that may have accrued. In all other respects, the judgment is affirmed.

LIVINGSTON, J., (nonpanel) dissents without opinion.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

804 S.W.2d 117
Court of Appeals of Texas,
Dallas.

John and Susan VAN BRUNT, Appellants,

v.

BANCTEXAS QUORUM, N.A.
and Pat Greer, Appellees.

No. 05–87–01165–CV.    |    Aug. 15, 1989.    |
Opinion on Motion for Rehearing    May 8, 1990.

Bank brought action against guarantors of note seeking deficiency judgment. The District Court, Collin County, rendered judgment for bank, and ruled that four-acre parcel of land was not homestead of guarantors. Both parties appealed. The Court of Appeals, Baker, J., held that: (1) bank failed to give adequate notice to guarantors of its intent to sell collateral at private sale, and (2) trial court's finding that land was not homestead of guarantors was not manifestly wrong or unjust. On motion for rehearing, the Court, Kinkeade, J., held that bank was not precluded from seeking deficiency judgment on note which was secured by both personal property and real estate, even though bank failed to give adequate notice of its intent to sell personal property.

Affirmed in part, and reversed in part.

Kinkeade, J., dissented from original opinion, and filed opinion.

Baker, J., dissented from opinion on rehearing, and filed opinion.

**Attorneys and Law Firms**

 **\*119** Robert M. Nicoud, Harvey G. Joseph, Dallas, for John and Susan Van Brunt.

G. Roland Love, Cynthia Hollingsworth, Dallas, for BancTexas Quorum.

Before McCLUNG, BAKER and KINKEADE, JJ.

**Opinion**

BAKER, Justice.

The two issues in this case are: (1) whether BancTexas Quorum, N.A. gave John and Susan Van Brunt sufficient notice of its intent to sell the Van Brunts' collateral pursuant to section 9.504(c) of the Uniform Commercial Code [1] ; and (2) whether the Van Brunts' four-acre tract was entitled to a homestead exemption. The trial court concluded that BancTexas complied with section 9.504 of the Code and that the Van Brunts' four-acre tract was not a homestead. We reverse the trial court's judgment on its notice finding and render judgment that BancTexas is not entitled to sue the Van Brunts for a deficiency. We affirm the trial court on its judgment finding that the four-acre tract was not a homestead.

John Van Brunt was the president of a company known as Labels Unlimited, Inc. This company executed five promissory notes totaling an amount in excess of $840,000 payable to BancTexas. To secure the debt, Labels Unlimited executed security agreements granting BancTexas a security interest in its equipment, inventory, and receivables. John Van Brunt executed an agreement personally guaranteeing all of the obligations of Labels Unlimited to BancTexas.

Labels Unlimited defaulted on the notes and declared bankruptcy. The bankruptcy court authorized the bankruptcy trustee to abandon the secured property to BancTexas. Subsequently, on January 6, 1987, BancTexas sent John Van Brunt notice of **\*120** its intent to sell the collateral. On January 29, 1987, BancTexas sent notice to both Labels Unlimited and John Van Brunt of its intent to conduct a public auction on February 18, 1987, in Lawrence, Kansas, the site of one of Labels Unlimited's plants. BancTexas held the public auction on that date, and John Van Brunt was there. At the auction BancTexas announced that it reserved the right to reject all bids. Shawnee Sales and Marketing submitted the highest bid of $40,000. However, BancTexas rejected this and all other bids. Subsequently, Causey Mason, the person BancTexas hired to organize the auction, telephoned numerous persons who had attended the auction, and other individuals, in an attempt to negotiate a higher sales price. Shawnee increased its bid to $55,000 and purchased the property. BancTexas did not notify John Van Brunt of its attempts to sell the property after the public auction.

On the homestead issue, the facts are that in 1981 the Van Brunts purchased a two-acre tract of land and subsequently built a home on it. In 1982, John Van Brunt purchased a contiguous four-acre tract, which is the property in dispute. The trial court found that John Van Brunt had previously listed the four-acre tract as a separate asset in his financial

statements. Pat Greer, a vice president of BancTexas, testified that John Van Brunt told Greer that he was holding the property for investment purposes. The Van Brunts testified that they used the four acres for family recreation, mowed the tract two or three times a year, and occasionally threw grass seed on it. They also stated that the family dog had the full run of all six acres. While BancTexas and John Van Brunt were negotiating a business loan, BancTexas required John Van Brunt to pledge the four-acre tract as collateral. BancTexas requested a title company to prepare a deed of trust and title policy on the four-acre tract in connection with the loan; however, the title company refused because it determined that the four-acre tract was a part of the Van Brunts' homestead. BancTexas then prepared an affidavit of nonhomestead as to the four-acre tract and a homestead designation as to the two-acre tract. Both John and Susan Van Brunt executed this affidavit. BancTexas then completed and funded the loan.

The trial court rendered judgment that BancTexas recover from John Van Brunt the unpaid principal on the notes together with interest due through the date of judgment. The trial court also rendered judgment that the four-acre tract was not a homestead and denied injunctive relief to the Van Brunts.

In their first point of error, the Van Brunts contend that the trial court erred in holding that BancTexas complied with the notice requirements of section 9.504 of the Code. The Van Brunts argue that the notice of the public auction does not constitute notice of the subsequent private sale. The Van Brunts assert that because they received no notice of the private sale, BancTexas is not entitled to sue for a deficiency, and the trial court should have rendered judgment that BancTexas take nothing on the deficiency claims. *See Tanenbaum v. Economics Laboratory, Inc.,* 628 S.W.2d 769, 771 (Tex.1982); *Gentry v. Highlands State Bank,* 633 S.W.2d 590, 591 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd). We agree and hold that BancTexas failed to give the Van Brunts sufficient notice.

**[1]**    The relevant portion of section 9.504 provides:

> Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended

disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale.

§ 9.504(c). The purpose of requiring reasonable notification is to provide the debtor sufficient notice to enable him to protect his interest in the collateral. *See MBank Dallas v. Sunbelt Mfg., Inc.,* 710 S.W.2d 633, 636 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). Such notification gives the debtor **\*121** the opportunity to pay the debt, find a buyer, or to attend the sale and bid on the property or have others do so, to the end that the property will not be sacrificed by a sale at less than its true value. *See Wright v. Interfirst Bank Tyler,* 746 S.W.2d 874, 877 (Tex.App.—Tyler 1988, no writ). Official comment 5 to section 9.504 states:

> "Reasonable notification" is not defined in this Article; at a minimum it must be sent in such time that persons entitled to receive it will have sufficient time to take appropriate steps to protect their interests by taking part in the sale or other disposition if they so desire.

§ 9.504 comment 5.

**[2]**    The letter that BancTexas sent John Van Brunt on January 6, 1987, notified him that BancTexas intended to sell all the collateral under the terms of its security agreement. The January 29, 1987 letter from BancTexas to John Van Brunt notified him that:

> [P]ursuant to the provisions of Section 9.504 of the Texas Uniform Code, BancTexas will hold a public auction of the Collateral which is located at the Labels plant in Lawrence, Kansas on February 18, 1987, at 12:00 p.m. The public auction will be held at the Labels plant located at 2201 Haskell, Lawrence, Kansas 60044.

John Van Brunt attended the public auction. When the auction started, Mason, the person BancTexas hired to evaluate and liquidate the collateral, announced that BancTexas reserved the right to reject all bids. At the end of the auction, BancTexas rejected all bids. Shawnee had submitted the highest bid of $40,000. Subsequently, without notice to John

Van Brunt, Mason telephoned some of the persons who were at the public auction and a few other persons, and he eventually sold the collateral to Shawnee for $55,000.

The Van Brunts argue that BancTexas's reserving the right to reject all bids at the public auction did not constitute notice that BancTexas would sell the collateral privately if it rejected bids made at the public auction. The Van Brunts contend that the notice of the public auction does not constitute notice of a subsequent private sale. *See Wright,* 746 S.W.2d at 877; *Gateway Aviation, Inc. v. Cessna Aircraft Co.,* 577 S.W.2d 860, 862 (Mo.Ct.App.1978). The Van Brunts argue that, pursuant to section 9.504(c) of the Code, they were entitled to notice of a specific date after which BancTexas would proceed to otherwise dispose of the collateral. We agree.

In *Wright,* a creditor sent the debtor a notice that if he did not repay the note, the creditor would sell the collateral under the terms of the security agreement. The creditor later notified the debtor that the creditor intended to sell the collateral at a public auction, specifying the date and time. The creditor apparently never conducted a public auction and ended up selling the collateral at a private sale at a later date. The court held, as a matter of law, that notice of a public sale did not constitute "reasonable notification" of the subsequent private sale. The court noted that the purpose of the notice requirement was to enable the debtor to protect his interest in the collateral. *Wright,* 746 S.W.2d at 875, 877.

In *Gateway,* the creditor gave the debtor notice of a public auction, held the public auction, and rejected the highest bid of $130,000. Subsequently, the creditor sold the collateral at a private sale for $134,000. The creditor did not give the debtor notice of its intent to sell the collateral privately. In *Gateway,* the court reasoned that because the debtor could have taken measures to protect his interest in the collateral, the failure to give the debtor notice of the private sale was fatal to recovery for the deficiency. *Gateway,* 577 S.W.2d at 862.

In our view, these cases correctly state the law applicable to this case. Where a creditor intends to sell collateral privately, section 9.504(c) of the Code requires "reasonable notification of the time after which any private sale or other intended disposition is to be made...." *See* § 9.504(c). At a minimum, "reasonable notification" requires that persons entitled to notice have sufficient time "to take appropriate steps **\*122** to protect their interests by taking part in the sale or other disposition if they so desire." *See* § 9.504 comment 5. BancTexas's January 6, 1987 letter to John Van Brunt

informed him that BancTexas intended to sell the collateral. This letter did not contain any notice of whether the sale would be public or private, nor did it contain any notice of an anticipated date of a sale. BancTexas's January 29, 1987 letter notified John Van Brunt that BancTexas intended to sell the collateral at a public auction, specifying the place, the date, and the time. BancTexas concedes that no further notice of any kind was given to the Van Brunts concerning the additional efforts to sell the collateral at a private sale following the public auction on February 18, 1987.

Based on the facts of this case, we hold that the Van Brunts did not have reasonable notice that BancTexas intended to sell the collateral privately. We cannot assume that the Van Brunts could not have taken action to protect their interests if they had been given notice of the private negotiations following the public auction. *See Gateway,* 577 S.W.2d at 862. BancTexas fails to persuade us by their argument that they should not be penalized for attempting to obtain a higher price for the collateral. We wish to make it clear that we do not disapprove such attempts to secure a higher price for the collateral; we only disapprove the *failure to notify the debtors.* Because it failed to give proper notice, BancTexas is not entitled to sue for a deficiency judgment against the Van Brunts. *Tanenbaum,* 628 S.W.2d at 772. We sustain the Van Brunts' first point of error. Because of our disposition of this point of error, we deem it unnecessary to consider the Van Brunts' points of error numbers two through five.

**[3]** In their sixth point of error, the Van Brunts argue that the evidence is legally and factually insufficient to support the trial court's findings that the four-acre tract was not a homestead. An appellate court, in reviewing a legal insufficiency point, must consider only the evidence and the inferences tending to support the finding and disregard all evidence and inferences to the contrary. *See Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). On the other hand, when an appellate court considers a factual insufficiency assertion, all of the evidence in the record must be considered to decide the issue. *Garza,* 395 S.W.2d at 823. Only if the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust will the finding be set aside. *See In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

**[4]** The Van Brunts executed an affidavit that the four-acre tract was not their homestead. This fact alone provides some evidence to support the trial court's finding. The Van Brunts' no evidence argument is without merit.

 [5]    [6]    [7]    To establish homestead rights, the claimant must show a combination of both overt acts of homestead usage and the intention on the part of the owner to claim the land as a homestead. *Lifemark Corp. v. Merritt,* 655 S.W.2d 310, 314 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.). The Van Brunts testified that they used the four acres for family recreation and enjoyment which included family picnics, family recreational games, and company picnics. They mowed the four-acre tract two or three times a year and occasionally threw grass seed on it. The family dog had the full run of all six acres. Pat Greer, BancTexas's vice president, said that John Van Brunt told him that Van Brunt was holding the property for investment purposes. The general rule is that the testimony of interested witnesses, such as the parties to the suit, merely raises a fact issue to be determined by the fact finder. *See Lifemark,* 655 S.W.2d at 315.

The two-acre and four-acre tracts were purchased separately. Both of the Van Brunts executed an affidavit that the four-acre tract was not a homestead. John Van Brunt had previously listed the four-acre tract as a separate asset in his financial statements. Based on this record, we cannot say that the trial court's finding that the four-acre tract was not a homestead is  **\*123**  manifestly wrong or unjust. We overrule the Van Brunts sixth point of error.

In their seventh point of error, the Van Brunts argue that the trial court erred in finding that they were estopped from asserting the homestead exemption because once property is impressed with homestead character, the representations of the owners that the property is not a homestead have no effect. They rely on *Braden Steel Corp. v. McClure,* 603 S.W.2d 288 (Tex.Civ.App.—Amarillo 1980, no writ) and *Blomgren v. Van Zandt,* 126 S.W.2d 506 (Tex.Civ.App.—Eastland 1939, no writ). Because the trial court found that the four-acre tract was not impressed with a homestead character, the estoppel finding is moot. *Braden Steel* and *Blomgren* do not apply to the facts of this case. We overrule the Van Brunts' seventh point of error.

 [8]    In their eighth point of error, the Van Brunts contend that the trial court made fatally inconsistent and contradictory findings of fact and conclusions of law. They quote the portion of the judgment that provides:

> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that the following property is not, at the date of the judgment, nor has it ever been, the homestead of JOHN VAN BRUNT AND SUSAN VAN BRUNT; but if the following property ever has been the homestead of those parties, they are estopped from so claiming....

The Van Brunts also quote the corresponding finding of fact which contains similar language. The Van Brunts argue that, on the one hand, the trial court finds that the four-acre tract was never a homestead; however, on the other hand the court impliedly finds that the tract was a homestead and that the Van Brunts are estopped from so claiming. The Van Brunts argue that these two findings conflict and are therefore fatal to the judgment. *See Woodyard v. Hunt,* 695 S.W.2d 730, 732 (Tex.App.—Houston [1st Dist.] 1985, no writ).

Both the judgment and the finding of fact are worded in the alternative. Because we have held that the four-acre tract was never a homestead, we agree with the trial court's first finding. Because we agreed with this finding, we need not consider the second alternate finding. We disregard this finding, and the conflict, if any, is immaterial. *See Border State Life Ins. Co. v. Noble,* 138 S.W.2d 119, 123 (Tex.Civ.App.—El Paso 1940, writ dism'd judgmt cor.) We hold that there is no conflict between the finding of fact and the judgment rendered by the trial court. We overrule the Van Brunts' eighth point of error.

BancTexas has asserted one cross point, arguing that if this Court determines that the four-acre tract was a homestead, then the homestead was an urban homestead and not a rural homestead. Because we have not held that the four-acre tract is a homestead, we need not consider the merits of this cross point.

We reverse the trial court's judgment granting a deficiency in favor of BancTexas and render judgment that BancTexas take nothing from the Van Brunts on the BancTexas suit for deficiency. *See* TEX.R.APP.P. 81(c). We affirm the trial court's judgment that the four-acre tract was not a homestead.

Dissenting opinion by KINKEADE, J.

KINKEADE, Justice, dissenting.
The majority holds that the trial court erred in its finding on the issue of notice of sale from BancTexas to the Van Brunts. I respectfully dissent from that holding.

The majority correctly states the facts of the case and the key issue of whether the notice of public sale, followed by a private sale for more money than was bid at the public sale, was also sufficient notice of the private sale. I would hold that such notice was sufficient.

The relevant portion of section 9.504 provides:

> Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale *or reasonable notification of the time after which any private sale* or other intended **\*124** disposition *is to be made* shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale.

TEX.BUS. & COM.CODE ANN. § 9.504(c) (Tex.UCC) (Vernon Supp.1989) (emphasis added). [1] The purpose of the Code's requirement of reasonable notification is to provide the debtor sufficient notice to enable him to protect his interest in the collateral, *MBank Dallas N.A. v. Sunbelt Manufacturing, Inc.,* 710 S.W.2d 633, 636 (Tex.App.—Dallas 1986, writ ref'd n.r.e.), "by paying the debt, finding a buyer or being present at the sale to bid on the property [at public auction] or have others do so, *to the end that it not be sacrificed by a sale at less than its true value.*" *Wright v. Interfirst Bank Tyler, N.A.,* 746 S.W.2d 874, 877 (Tex.App.—Tyler 1988, no writ) (emphasis added). The official comment to section 9.504 states:

> "Reasonable notification" is not defined in this Article; at a minimum it must be sent in such time that persons entitled to receive it will have sufficient time to take appropriate steps to protect their interests by taking part in the sale or other disposition if they so desire.
> Tex.UCC § 9.504 comment 5.

By letter dated January 6, 1987, BancTexas informed John Van Brunt of the following: "This letter shall constitute formal notice to you that the real property, improvements, personal property and other collateral (the 'Property') covered by the applicable documentation securing the repayment of the Indebtedness will be sold in accordance with the terms of the applicable security documentation." By

letter dated January 29, 1987, BancTexas informed John Van Brunt:

> [P]ursuant to the provisions of Section 9.504 of the Texas Uniform Code, BancTexas will hold a public auction of the Collateral which is located at the Labels plant in Lawrence, Kansas on February 18, 1987, at 12:00 p.m. The public auction will be held at the Labels plant located at 2201 Haskell, Lawrence, Kansas 60044.

John Van Brunt attended the public auction. At the commencement of the sale, Mason, the person BancTexas hired to evaluate and liquidate the secured collateral, orally notified all those present at the auction that BancTexas reserved the right to reject all bids. After the auction concluded, BancTexas rejected all bids. Shawnee submitted the highest bid of $40,000. Subsequently, without notifying John Van Brunt, Mason telephoned some of the individuals who had attended the auction and a few other persons. Mason eventually sold the collateral to Shawnee for $55,000.

The majority holds that BancTexas's action in reserving the right to reject all bids at the public auction did not constitute notice that BancTexas would sell the collateral privately if it rejected all the bids at the public auction. The majority holds that the notice of the public auction does not constitute notice of a subsequent private sale. *See Wright,* 746 S.W.2d at 877; *Gateway Aviation, Inc. v. Cessna Aircraft Co.,* 577 S.W.2d 860, 862–63 (Mo.Ct.App.1978). The Court holds that the Van Brunts were entitled to notice of a specific date after which BancTexas would proceed to otherwise dispose of the collateral. *See* Tex.UCC § 9.504(c). For the reasons given below, I disagree.

The majority relies on *Wright v. Interfirst Bank Tyler, N.A.* to support its holding. In *Wright,* on March 23, 1984, the bank wrote the debtor that if he did not repay his note, the bank would sell the collateral according to the terms of the security agreement. *Wright,* 746 S.W.2d at 875 n. 3. On April 2, 1984, the bank wrote the debtor that the bank intended to sell the collateral at a public auction to be held on April 13, 1984. The bank apparently never conducted a public auction and ended up selling the collateral privately on May 24, 1984. The court held that notice of a public sale did not constitute "reasonable notification" of the subsequent private sale as a matter of law. **\*125** *Wright,* 746 S.W.2d at 877. The court noted that the

purpose of the notice requirement was to enable the debtor to protect his interest in the collateral.

The majority also relies on *Gateway Aviation Inc. v. Cessna Aircraft Co.*. In *Gateway,* the creditor gave the debtor notice of a public auction, held the public auction, rejected the highest bid of $130,000, and subsequently sold the collateral for $134,000. The creditor did not give the debtor a notice of its intent to sell the collateral privately. *Gateway,* 577 S.W.2d at 861. The court reasoned that because the debtor could have taken measures to protect his interest in the collateral, the failure to give the debtor notice of the private sale was fatal. *Gateway,* 577 S.W.2d at 862.

I am not persuaded by these cases. Where a creditor intends to sell collateral privately, section 9.504 of the Code requires "reasonable notification of the time after which any private sale or other intended disposition is to be made...." Tex.UCC § 9.504(c). At a minimum, "reasonable notification" requires the persons with interests in the collateral to have sufficient time "to take appropriate steps to protect their interests by taking part in the sale or other disposition if they so desire." Tex.UCC § 9.504 comment 5. BancTexas's January 6, 1987, letter to John Van Brunt informed him that BancTexas intended to sell the collateral. Failure of a notice to state whether the creditor intends to sell the collateral privately or at public auction is not fatal to the notice for purposes of section 9.504(c). *Hall v. Crocker Equipment Leasing, Inc.,* 737 S.W.2d 1, 3 (Tex.App.—Houston [14th Dist.] 1987, writ denied). Accordingly, the only element arguably missing from the January 6, 1987, letter is the time after which BancTexas intended to make a private sale.

BancTexas's January 29, 1987, letter informed John Van Brunt that BancTexas intended to sell the collateral on February 18, 1987, at a public auction. Considering both the January 6 and January 29 letters together, I would hold that the Van Brunts had reasonable notification that they had until February 18, 1987, to take whatever steps they could to protect their interest in the collateral. The fact that BancTexas did not sell the collateral on February 18, 1987, did not deprive the Van Brunts of an opportunity to protect their interest in the collateral; to the contrary, BancTexas's refusal to accept the $40,000 high bid provided the Van Brunts additional time to pursue other avenues.

On the basis of the facts of this case, I would hold that when BancTexas rejected all the bids at the auction, the Van Brunts had reasonable notice that BancTexas intended to sell the

collateral privately. I note that section 9.504 of the Code does not require the creditor to notify the debtor of whatever attempts the creditor is making to sell the collateral; rather, section 9.504 merely requires the creditor to inform the debtor that, as of a certain date, the creditor will attempt to sell the collateral privately. Once the creditor informs the debtor that the creditor intends to sell the collateral as of a certain date, the creditor has fulfilled its burden. From that point, the Code leaves the debtor to fend for himself on how best to protect his interests.

In this case, John Van Brunt was present at the public auction and witnessed BancTexas's efforts to prevent the property from selling at less than its full value. Acting in the interest of John Van Brunt, BancTexas negotiated a price that was $15,000 higher than the highest auction bid. BancTexas' actions saved John Van Brunt that amount of loss. It is interesting to note that, based on the record in this case, BancTexas would have been better off taking the $40,000 bid at the public auction because BancTexas then would not have lost its right to pursue the Van Brunts for the deficiency, which in this case amounts to approximately $637,000. On the facts of this case, I would hold that the Van Brunts had notice that BancTexas intended to sell the collateral on February 18, 1987, or thereafter, either publicly or privately, and that the Van Brunts had until February 18, 1987, to act on that notice. I would overrule the Van Brunts' first point of error. Based on this holding, I would rule on **\*126** points of error numbers two through five as follows:

In point of error two, the Van Brunts contend that BancTexas's purported notice did not give them sufficient time to protect their interests. The Van Brunts argue that even if the rejection of all bids at the public auction constituted notice that BancTexas intended to sell the collateral privately, thereafter they had no time to take any steps to protect their interest in the collateral. I disagree. As of February 18, 1987, the Van Brunts had notice for approximately one month, by virtue of the January 6, 1987, letter, that BancTexas intended to sell the collateral. The January 29, 1987, letter told the Van Brunts that they had until February 18, 1987, to protect their interests. The Van Brunts do not argue that these periods were insufficient or unreasonable. I would overrule the Van Brunts' point of error number two.

In point of error three, the Van Brunts contend that a notice under section 9.504 must be written and not oral. This Court has previously held that a notice under section 9.504 may be oral. *MBank Dallas, N.A. v. Sunbelt Mfg., Inc.,* 710 S.W.2d

633, 635–36 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). I would overrule point of error number three.

In point of error four, the Van Brunts argue that because the notice was not given by a secured party, it failed to comply with section 9.504. The Van Brunts focus their argument on Mason's oral statement that BancTexas reserved the right to reject all bids at the auction. The Van Brunts maintain that there is no evidence that Mason was BancTexas's agent for purposes of giving the Van Brunts notice. I disagree. BancTexas hired Mason to perform the February 18, 1987, public auction. Mason performed the auction on behalf of BancTexas. I would hold that Mason had the authority to give the Van Brunts notice. I would overrule point of error four.

In point of error five, the Van Brunts argue that the sale of the collateral was not commercially reasonable; therefore, BancTexas is not entitled to a deficiency judgment. The Van Brunts argue that where a party does not receive notice, the creditor may not recover the deficiency. *Tanenbaum v. Economics Laboratory, Inc.,* 628 S.W.2d 769, 772 (Tex.1982); *Gentry v. Highlands State Bank,* 633 S.W.2d 590, 591 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd). The Van Brunts are correct in asserting that where a debtor does not receive notice of the sale of his property, the creditor may not recover any deficiency from the debtor. However, I would hold that the Van Brunts had sufficient notice; therefore, those authorities would not apply. I would overrule point of error five.

I concur in the remainder of the majority opinion, and I would affirm the judgment of the trial court.

Before the court en banc.

## OPINION ON MOTION FOR REHEARING

KINKEADE, Justice.

We withdraw that portion of this Court's opinion entered on August 15, 1989, to the extent that this Court held that BancTexas Quorum, N.A., could not seek a deficiency judgment on the March 29, 1985 promissory note. The following is now the opinion of this Court only with regard to that note.

All parties to this appeal have filed motions for rehearing. In its motion for rehearing, BancTexas contends that this Court erred in its opinion and judgment by holding that

BancTexas's failure to provide adequate notice pursuant to the Texas Business and Commerce Code precludes it from seeking a deficiency judgment against the Van Brunts for the unpaid balance of one of the five promissory notes executed by Labels Unlimited. Specifically, BancTexas contends that Labels Unlimited's personal property, sold by BancTexas in February 1987, did not secure the $200,000 note executed by Labels Unlimited on March 29, 1985, and guaranteed by the Van Brunts. The trial court found that the unpaid principal balance of this note was $145,549.50, and the unpaid accrued interest was $8,837.81. BancTexas contends that all parties concede, and the record **\*127** confirms, these facts. We disagree with BancTexas's contention that personal property did not secure the $200,000 note. In a case of first impression in Texas, we find that, as both real and personal property secured the note, BancTexas had the option under section 9.501(d) of the Texas Business & Commerce Code [1] to proceed under that Code as to the personal property, and later proceed under the Texas Property Code as to the real property, without being adversely affected by any defects in its personal property foreclosure proceedings. *See* TEX.PROP.CODE ANN. § 51.002 (Vernon 1984).

 **[9]**    When executed in March 1985, the $200,000 note listed as security a deed of trust on the four-acre tract located in Collin County, the same property involved in the homestead dispute. When BancTexas notified the Van Brunts of its intention to sell Labels Unlimited's collateral under the terms of its security agreements, BancTexas included the $200,000 note as one of the notes in the notice. BancTexas also stated in that notice that it intended to conduct the sale pursuant to its rights under those security agreements, including one dated November 30, 1985. That security agreement, executed subsequent to the $200,000 note, provided that the security interest created, secured "all obligations and indebtedness owed to [BancTexas] direct or indirect, now existing or hereafter arising." Paragraph two of that security agreement described as security all of Labels Unlimited's personal property. Accordingly, the record reflects that both real and personal property secured the $200,000 note.

 **[10]**    The Code defines a "security interest" as an interest in personal property or fixtures, and "collateral" as property subject to a security interest. *See* §§ 1.201(37), 9.105(a)(3). By its very terms, the Code's provisions setting forth procedures regarding "collateral" or "security interests" apply solely to personal property. The Code does not apply to the creation or transfer of an interest in or lien on real estate:

§ 9.104 Transactions Excluded From Chapter

This chapter does not apply

....

(10) except to the extent that provision is made for fixtures ..., to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder.

§ 9.104(10).

Section 9.501(d) states:

§ 9.501 Default; Procedure When Security Agreement Covers Both Real and Personal Property

....

(d) If the security agreement covers both real and personal property, the secured party may proceed under this subchapter [the subchapter entitled "Default"] as to the personal property or he may proceed as to both the real and the personal property in accordance with his rights and remedies in respect of the real property in which case the provisions of this subchapter do not apply.

§ 9.501(d).

Comment 5 to section 9.501 states:

> 5. The collateral for many corporate security issues consists of both real and personal property. In the interest of simplicity and speed subsection [d] permits, although it does not require, the secured party to proceed as to both real and personal property in accordance with his rights and remedies in respect of the real property. Except for the permission so granted, this Act leaves to other state law all questions of procedure with respect to real property. For example, this Act does not determine whether the secured party can proceed against the real estate alone and later proceed in a separate action against the personal property in accordance with his rights and remedies against the real estate. By such separate actions the

secured party "proceeds as to both," and this Part does not **\*128** apply in either action. But subsection [d] does give him an option to proceed under this Part as to the personal property.

§ 9.501, comment 5.

 [11]    Under section 9.501(d), if the security agreement covers both real and personal property, the secured party may proceed as to both in accordance with his rights and remedies in respect of the real property. The Code default rules then become inapplicable. Alternatively, the secured party may proceed under the Code as to the personal property. 1A Coogan, Hogan, and Vagts, Bender's UCC Service (MB) § 8.07[5] (1984). Comment 5 to section 9.501(d) states that separate actions may be considered proceeding "as to both" real and personal property. Section 9.501(d) provides an *option* to proceed separately under the Code *as to the personal property. See* § 9.501(d), comment 5. Section 9.501(d) and comment 5 exclude any mention of proceeding under the Code as to the real property.

Several courts in other jurisdictions that have enacted the Uniform Commercial Code have construed provisions with language identical to section 9.501(d) and comment 5. The Illinois Supreme Court held that the language of section 9.501(d) and its comment indicate that when both real and personal property secure a debt, secured creditors have the option upon the debtor's default to proceed against both the real and personal property collateral in separate actions, whether concurrently or successively. If the secured creditor chooses to proceed in separate actions, the default provisions of the Uniform Commercial Code apply only with regard to the personal property. *Kramer v. Exchange National Bank of Chicago,* 118 Ill.2d 277, 113 Ill.Dec. 248, 252, 515 N.E.2d 57, 61 (1987); *see also Brenton State Bank of Jefferson v. Tiffany,* 440 N.W.2d 583, 587 (Iowa 1989); *State Bank v. Hansen,* 302 N.W.2d 760, 764 (N.D.1981); *Bank of Spring Valley v. Wolske,* 144 Wis.2d 762, 424 N.W.2d 744, 747 (App.1988).

 [12]    [13]    Through the enactment of section 9.501, the drafters of the Uniform Commercial Code intended to broaden the options available to a secured creditor upon a debtor's default. *Kramer,* 113 Ill.Dec. at 252, 515 N.E.2d at 61. Courts must interpret section 9.501(d) in light of the overall policy of the Uniform Commercial Code to expand creditors' remedies with respect to personal property collateral. Courts cannot interpret the section to reduce the rights of secured creditors with respect to personal property in

cases where both real property and personal property secure a debt. *Wiley v. Bank of Fountain Valley,* 632 P.2d 282, 285 (Colo.App.1981). The creditor may choose either to proceed as to both the real and personal property in accordance with real property law in one action or in separate actions. *See* § 9.501(d), comment 5. The creditor may also opt to proceed against the personal property under the Code, but has no option to proceed as to the real property under the Code. *See* §§ 1.201(37), 9.105(a)(3), 9.104(10), 9.501(d).

Under the reasoning of the dissent to this opinion on motion for rehearing, BancTexas can foreclose on its real and personal property liens but cannot seek a deficiency in either proceeding. In its original opinion, the majority holds that BancTexas's failure to provide adequate notice precludes it from seeking a deficiency judgment against the Van Brunts, citing *Tanenbaum v. Economics Laboratory, Inc.,* 628 S.W.2d 769 (Tex.1982). However, the *Tanenbaum* Court found that the legislature, in enacting two sections of the Code governing disposition of collateral, intended to put the creditor to an election either to sell the repossessed collateral pursuant to section 9.504 or to retain the collateral in complete satisfaction of the debt pursuant to section 9.505. The Court held that, because the creditor had not complied with the notice provisions of section 9.504, it, in effect, had elected to retain the collateral in complete satisfaction of the debt. *Tanenbaum,* 628 S.W.2d at 771. If, as alleged by the dissent to this opinion, failure to give adequate notice precludes BancTexas from seeking a deficiency as to both the real and personal property, it also precludes BancTexas from foreclosing on its real property **\*129** lien because the sale of the personal property would have satisfied all indebtedness. *See, e.g., Hildner v. Fox,* 17 Ill.App.3d 97, 308 N.E.2d 301, 303 (1974). The *Hildner* court suggested that a secured creditor's failure to comply with the Code and notify the debtor of a foreclosure on personal property requires cancellation of a real estate mortgage taken as additional security. However, the Illinois Supreme Court implicitly rejected the *Hildner* court's suggestion when it concluded that section 9.501(d) gives a secured creditor the option to proceed against both the real and personal property collateral in separate actions. *Kramer,* 113 Ill.Dec. at 252, 515 N.E.2d at 61. Further, according to one commentator who expressly disapproved the *Hildner* court's comment, the language of section 9.501(d) "would seem to cut the other way, driving a wedge between any defect in the Code foreclosure and rights under a real estate mortgage." CLARK, THE LAW OF SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE § 4.03(4), n. 159 (2d ed. 1988).

The dissent stops short of the *Hildner* court's suggestion that a secured creditor's failure to comply with the Code when foreclosing on personal property requires cancellation of a real estate mortgage taken as additional security. The dissent simply treats the real property collateral as additional personal property collateral, and then applies the *Tanenbaum* rule to preclude BancTexas from seeking a deficiency in either proceeding.

 **[14]** Application of a rule must advance the policy that gives rise to the rule in the first instance. This concept is fundamental to our system of jurisprudence, as well as to a proper application of the Uniform Commercial Code. *Barclays Bank D.C.O. v. Mercantile National Bank,* 481 F.2d 1224, 1230 (5th Cir.1973). The Code does not provide for the elimination of a deficiency because of a secured creditor's failure to comply with its default provisions. Rather, the Code provides that a secured creditor may hold a debtor liable for a deficiency. § 9.504(b). Because the secured creditor's loss of its right to seek a deficiency is judicially imposed, we must closely examine the *Tanenbaum* Court's rationale for eliminating that right. *See Barclays Bank D.C.O.,* 481 F.2d at 1230. In *Tanenbaum,* a creditor with a security interest only in personal property sought to hold a debtor liable for a deficiency after seizing and destroying that collateral. The *Tanenbaum* Court, in seeking to prevent a secured creditor's abuse, found that the creditor's failure to give proper notice to the debtor when disposing of the collateral under section 9.504 of the Code resulted in an election to retain the collateral in full satisfaction of the debt, an option available under section 9.505 when a secured party takes possession of the debtor's personal property after default. The election is triggered by an irrebuttable presumption that the creditor has proceeded under section 9.505 rather than under section 9.504. The result comports with section 1.106 of the Code, which provides that the remedies provided under the Code "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." When the debt is also collateralized by real property, however, as to which section 9.505 is inapplicable, the basis for the irrebuttable presumption addressed in *Tanenbaum* is absent. Application of the *Tanenbaum* rule under these differing circumstances is not warranted because of the additional penalty damages which the secured creditor thereby suffers with respect to the real property interest. The Code prohibits interpretation of its provisions to impose penalty damages. *See* § 1.106.

The Van Brunts agreed to provide both real and personal property to secure the $200,000 note, and to provide only personal property to secure the other four promissory notes. In its original opinion, the majority applied the *Tanenbaum* rule to preclude BancTexas from seeking a deficiency in the personal property foreclosure proceedings, thus providing the Van Brunts with the benefit of the rule. If, as the dissent to this opinion contends, the *Tanenbaum* rule applies to the real property foreclosure proceedings, the dissent must conclude, as the *Hildner* court did, that BancTexas's **\*130** foreclosure on the personal property satisfied the debt, eliminating any deficiency and requiring cancellation of the real estate mortgage. The only other rationale available to the dissent is to treat the real property as personal property, a remedy prohibited by the terms of the Code, which excludes real property as collateral. *See* §§ 1.201(37), 9.105(a)(3). We hold that any defect in BancTexas's foreclosure under the Code has no effect on its rights under the real property mortgage, including its right to seek a deficiency.

We vacate this Court's August 15, 1989 judgment to the extent that it precluded BancTexas from seeking a deficiency judgment on the March 29, 1985 promissory note. We affirm the portion of the trial court's judgment awarding BancTexas a deficiency judgment on the March 29, 1985 promissory note in the amount of $145,549.50, together with accrued interest in the amount of $8,837.81. We reverse the portion of the trial court's judgment awarding BancTexas a deficiency judgment for principal or interest amounts due under the other four promissory notes and render judgment that BancTexas take nothing on those four notes. In all other respects, we affirm the trial court's judgment.

BAKER, Justice, dissenting.

In the beginning, the majority finds that as both real and personal property secured the $200,000 Van Brunt note, BancTexas had the option under section 9.501(d) of the Texas Business and Commerce Code [1] to proceed separately as to the personal property and later proceed under the Texas Property Code as to the real property securing the Van Brunt indebtedness. In the end, the majority holds that any defect in BancTexas's foreclosure under the Code has no effect on its rights under the real estate mortgage, including its right to seek a deficiency under real property law. In my view, the majority lost its way between the beginning and end. Consequently, I respectfully dissent.

Section 9.501(d) provides that if the security agreement covers both real and personal property, the secured party may proceed as to both in accordance with his rights and remedies in respect to the real property or the secured party may proceed under the Code as to the personal property. If the secured party proceeds as to both real and personal property in accordance with his rights and remedies in respect to the real property, then the Code default rules do not apply. The majority concludes, in accordance with the holdings of other jurisdictions, that when both real and personal properties secure a debt, section 9.501(d) gives secured creditors the option, upon a debtor's default, to proceed against both the real and personal property collateral in separate actions, whether concurrently or successively. *E.g., Kramer v. Exchange Nat'l Bank of Chicago,* 118 Ill.2d 277, 113 Ill.Dec. 248, 252, 515 N.E.2d 57, 61 (1987).

However, the flaw in the majority's analysis is that the majority wholly and consistently ignores the statutory requirement that the secured party must proceed as to *both* the real and personal property *in accordance with its rights and remedies under real property law* if the secured party wishes to avoid application of the Code default provisions as to the personal property. *See* § 9.501(d). The comment, also relied upon by the majority, makes this clear by suggesting that the secured party can proceed against the real property in one action and "in a separate action against the personal property in accordance with his rights and remedies against the real estate." *See* § 9.501(d), comment 5.

The record reflects that when the Van Brunts executed the $200,000 note, BancTexas chose to secure it only with a deed of trust against the four-acre tract of land in Collin County. Subsequently, in November 1985, BancTexas chose to cross-collateralize the $200,000 note with a personal property security interest in all of the assets of **\*131** Labels Unlimited. When BancTexas gave notice to the Van Brunts of its intention to sell Labels Unlimited's collateral under the security agreement, BancTexas chose to include the $200,000 note as one of the debts involved in the foreclosure proceeding. BancTexas chose to withdraw the collateral from the public sale previously noticed and proceed with a private sale without further notice to the Van Brunts. The record clearly reflects that BancTexas chose to proceed as to the personal property and all of the indebtedness in accordance with the Code provisions concerning default. There is no indication in the record that BancTexas attempted to sell the personal property in a manner consistent with a trustee's sale of real property. In other words, BancTexas clearly did not

do what it needed to do in order to avoid application of the Code provisions.

We held in the original opinion that because BancTexas failed to give proper notice of the private sale of the personal property, it could not seek a deficiency for the unpaid balances. *See Tanenbaum v. Economics Laboratory, Inc., 628 S.W.2d 769, 772 (Tex.1982).* If the protection provided to debtors by *Tanenbaum* is to be meaningful in cases where a debt is secured by both personal and real property and where the secured party has not taken the necessary action to avoid application of the Code provisions on default, the *Tanenbaum* principles must apply to prohibit a creditor from seeking a deficiency judgment after the sale of the real property. The majority's holding eviscerates the *Tanenbaum* holding in any case where a debt is secured by both real and personal property, regardless of whether the secured creditor acted properly to opt out of the Code provisions regarding default. In cases where a creditor fails to comply with the applicable notice requirements of section 9.504, the majority effectively holds that *Tanenbaum's* prohibition against suing for a deficiency is really not a prohibition if the debt was also secured by real property, despite the fact that the creditor has not complied with the provisions of section 9.501(d) allowing avoidance of the Code default provisions as to the personal property.

Contrary to the majority's assertion, I do not read *Hildner* [2] to suggest that the failure to notify a debtor of a foreclosure on personal property under the Code requires cancellation of a real estate mortgage taken as additional security. What I do read *Hildner* to say is that if a secured creditor chooses, as BancTexas did here, to proceed under the Code as to the entire indebtedness, including debt cross-collateralized by real property, by repossessing and selling the personal property, such course of action binds that creditor to any other applicable sections of the Code. *See Hildner,* 308 N.E.2d at 303.

The majority contends that the dissent's position leads to the conclusion that BancTexas is precluded from foreclosing on its real property lien because the sale of the personal property would have *satisfied* all indebtedness. In my view, the fact that *Tanenbaum* prevents BancTexas from seeking a deficiency due to its failure to give adequate notice does not mean that BancTexas is precluded from foreclosing on its real property lien. The proceeds of the sale of the personal property did not satisfy all of the Van

Brunt indebtedness. The unsatisfied balance remained as a deficiency, but because BancTexas failed to give adequate notice, *Tanenbaum* precludes it from asserting a cause of action for that unsatisfied deficiency. Foreclosing on the real property is not the seeking of a deficiency, so such action is not barred by *Tanenbaum.*

The *Hildner* rationale does not require the conclusion that the real estate mortgage is canceled, nor does it require the conclusion that the secured creditor is precluded from posting the real property and foreclosing under its deed of trust; it only compels the conclusion that after these actions are taken BancTexas is precluded from taking any action against the Van Brunts for any remaining deficiency on the note. This result is consistent with *Tanenbaum.* The majority's suggestion to the **\*132** contrary is based upon their erroneous construction of *Tanenbaum.* Under the particular facts in *Tanenbaum,* the Supreme Court held that when the creditor took possession of the collateral and scrapped it without giving notice of such disposition to the debtor, the creditor was deemed to have elected to retain the collateral in full satisfaction of the indebtedness under section 9.505 of the Code. *See Tanenbaum,* 628 S.W.2d at 772; § 9.505(b). Such is not the situation in the case before us. BancTexas did not destroy the collateral. BancTexas sold it by private sale without proper notice to the Van Brunts. Therefore, there is no basis for concluding that BancTexas effectively elected to retain the collateral in full satisfaction of the indebtedness in accordance with section 9.505.

BancTexas could have chosen to proceed against all of its collateral in accordance with its rights and remedies with respect to real property, or BancTexas could have chosen to proceed against the personal property collateral in a separate action under the Code provisions and against the real property collateral under the Texas Property Code provisions. In my view, because of the course of action that BancTexas chose to take, I would hold that although the defect in BancTexas's foreclosure under the Code does not affect its right to post and foreclose the real property and sell it under its deed of trust lien, BancTexas is precluded from seeking a deficiency of any balance remaining subsequent to such foreclosure.

I respectfully dissent.

**Parallel Citations**

14 UCC Rep.Serv.2d 931

Footnotes

1    All references to "the Code" and to section 9.504 are to the Texas Business and Commerce Code. *See* TEX.BUS. & COM.CODE
     ANN. § 9.504 (Tex.UCC) (Vernon Supp.1989).

1    All textual references to "the Code" are to the Texas Uniform Commercial Code; all citations to "Tex.UCC" are to the Texas Uniform
     Commercial Code.

1    Unless otherwise stated, all section and code references are to the Texas Business and Commerce Code. *See* TEX.BUS. &
     COM.CODE ANN. §§ 1.106, 1.201, 9.104, 9.105, 9.501, 9.504, 9.505 (Tex.UCC) (Vernon 1989).

1    All section and Code references are to the Texas Business and Commerce Code Annotated (Vernon Supp.1990).

2    *Hildner v. Fox,* 17 Ill.App.3d 97, 308 N.E.2d 301 (1974).

---

**End of Document**                               © 2015 Thomson Reuters. No claim to original U.S. Government Works.

620 S.W.2d 104
Supreme Court of Texas.

H. T. VONDY, Petitioner,
v.
COMMISSIONERS COURT OF UVALDE
COUNTY, Texas et al., Respondents.

No. B-9727.   |   July 22, 1981.
|   Rehearing Denied Sept. 16, 1981.

Duly elected constable sought writ of mandamus against commissioners court and four of its five members to compel them to set a reasonable salary for his office. The District Court, No. 38, Uvalde County, Woodley, J., entered judgment denying petitioner relief, and the Eastland Court of Civil Appeals, Eleventh Supreme Judicial District, Brown, J., 601 S.W.2d 808, vacated trial court's judgment and dismissed the cause. Petitioner appealed. The Supreme Court, Spears, J., held that: (1) it was not fundamental error to omit the fifth commissioner, individually, as a respondent in the petition for writ of mandamus, and (2) county commissioners court had duty to set a reasonable salary for the constable.

Reversed and remanded.

Greenhill, C.J., and McGee, Denton and Barrow, JJ., concurred in result.

**Attorneys and Law Firms**

 **\*104**  Harry A. Nass, Jr., James M. Parker, San Antonio, for petitioner.

David R. White, Uvalde, for respondents.

**Opinion**

SPEARS, Justice.

This is an appeal from a mandamus action. Petitioner H. T. Vondy, the duly elected constable of Precinct 6 in Uvalde County, sought a writ of mandamus against the Commissioners Court of Uvalde County and four of its five members, County Judge J. R. White, Commissioners Gene Isle, Gilbert Torres, and Norment Foley, to compel **\*105** them to set a reasonable salary for Vondy's office. One commissioner, Woodrow Head, was not named as a party, but no objection was made to his absence in the trial court.

The trial court entered judgment denying Vondy relief. The court of civil appeals vacated the trial court's judgment and dismissed the cause, holding the failure to join Commissioner Woodrow Head was fundamental error. 601 S.W.2d 808. We reverse the judgment of the court of civil appeals and remand the cause to the trial court for further proceedings consistent with this opinion.

Two issues are presented in this appeal: first, was it fundamental error to omit Commissioner Head, individually, as a respondent in Vondy's petition for writ of mandamus; second, is it the duty of the county commissioners court to set a reasonable salary for its duly elected constables?

Vondy was elected to the office of constable, Precinct 6, Uvalde County, Texas on November 4, 1978, and took his oath of office on January 17, 1979. Vondy appeared before the commissioners court requesting that a salary be set for his office. The commissioners other than Head, voted not to set a salary for Vondy. Vondy then petitioned the district court for a writ of mandamus against the commissioners court and each of the commissioners, individually, except Head. The trial court denied Vondy any relief. The failure of Vondy to name Head in his petition was not brought up before the district court by any type of plea or as a point of error before the court of civil appeals. The court of civil appeals, on its own motion, held that Commissioner Head's absence from the mandamus petition was fundamental error since he was an indispensable party to the suit, citing Gaal v. Townsend, 77 Tex. 464, 14 S.W. 365 (1890). The court of civil appeals then dismissed the cause.

Vondy contends that the commissioners court must fix a reasonable salary for him pursuant to Tex.Rev.Civ.Stat.Ann. art. 3883i, s 1 (Vernon's 1971), which provides:

> Section 1. That in each county in the State of Texas having the population of less than twenty thousand (20,000) inhabitants according to the last preceding federal census where all county and district officials are compensated on a salary basis, the Commissioners Court shall fix the salaries of the officials named in this Act at not more than Six Thousand, Seven Hundred and Fifty Dollars ($6,750) per annum; provided, however, that no salary shall be set at a

figure lower than that actually paid on the effective date of this Act. [1]

Vondy argues that Head was not an indispensable party because Head was willing to comply with the statute in this dispute. The commissioners argue that Woodrow Head was an indispensable party and the failure of Vondy to name Head individually in his petition was fundamental error.

Rule 39, Tex.R.Civ.P. governs the joinder of parties to a lawsuit. The present rule was completely rewritten in 1970 to remedy much of the confusion and criticism leveled at prior Rule 39. See Dorsaneo III, Compulsory Joinder of Parties in Texas, 14 Hou.L.R. 345, 359 (1977). Present Rule 39 provides in part:

Rule 39. Joinder of Persons Needed for Just Adjudication

(a) Persons to be Joined if Feasible. A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or other inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff.

**\*106** (b) Determination by Court Whenever Joinder Not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.

Prior to the enactment of the present rule, the courts drew a distinction between necessary and indispensable parties. [2] In Petroleum Anchor Equipment, Inc. v. Tyra, 406 S.W.2d 891 (Tex.1966), this court interpreted prior Rule 39. We stated that the language of Rule 39(a), when properly interpreted, constituted the rule's definition of "indispensable" parties whose joinder in the trial court is essential to the court's jurisdiction. Therefore, if a person were truly indispensable, it would be fundamental error to proceed in his absence. Id. at 892.

In 1970, using Federal Rule 19 as its source, this court completely changed Rule 39. Then, in Cooper v. Texas Gulf Industries, Inc., 513 S.W.2d 200 (Tex.1974), we reviewed the new rule. There, the spouses acting together bought realty which was conveyed to both of them. The husband sued the grantor to rescind the transaction in 1970. The wife was not a party to the suit. The husband's suit was later dismissed with prejudice. Subsequently, in 1971, a suit for similar relief was brought by the husband and wife jointly. The grantor sought summary judgment on the basis of res judicata, asserting that both the husband and wife were bound by the prior judgment. We held that the judgment of dismissal was res judicata as to the claims of the husband in the second suit. We pointed out that prior to the enactment of new Rule 39, failure to join the wife would be jurisdictional, but stated: "(T)oday's concern is less that of the jurisdiction of a court to proceed and is more a question of whether the court ought to proceed with those who are present." We then observed: "under the provisions of our present Rule 39 it would be rare indeed if there were a person whose presence was so indispensable in the sense that his absence deprives the court of jurisdiction to adjudicate between the parties already joined."

**[1]** To determine whether a party is jurisdictionally indispensable under Rule 39 the surrounding facts and circumstances of each case must be examined. In the present case, the facts fail to warrant a finding that Commissioner Head was truly an indispensable party under our interpretation of Rule 39 Tex.R.Civ.P. This is not a situation where a judgment would adversely affect the interests of absent parties who **\*107** had no opportunity to assert their rights in the trial court. See Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 110, 126, 88 S.Ct. 733, 746, 19 L.Ed.2d 936 (1968). Here, the interests of all the parties could be adjudicated and complete relief given. Further, the remaining commissioners would not be subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations due to the absence of Commissioner

Head. We conclude, therefore, that because Head was not an indispensable party to the proceeding, the nonjoinder of Head was not fundamental error.

The commissioners contend that the rules relating to indispensable parties are modified in this case because this is a mandamus action. They rely on Gaal v. Townsend, supra, which involved an action to procure a writ of mandamus to compel the county judge to permit the appellant to perform his duties as a county commissioner. The other members of the commissioners court were not made parties to the suit. We stated: "When the performance of a duty is sought to be compelled by the writ of mandamus, all persons charged with the performance of that duty must be made parties defendant in the writ."

Part of the rationale behind the Gaal v. Townsend decision was that only a majority of the commissioners could permit the appellant to perform his duties as a county commissioner. We stated:

> The other members of the (commissioners) court, not being parties to the writ, could not be affected by any judgment that might be rendered, and could not be held in contempt for refusing to admit the plaintiff to act as a member, although this court should in this suit declare him entitled to the office, and command the defendant Townsend to admit him as such. It is clear that a mandamus should not issue to compel the county judge to do an act which could only be performed with the consent of others.

In the present suit three of the four commissioners and the county judge were made parties individually. The commissioners court itself was also named. Therefore, the reasoning of Gaal v. Townsend is not applicable in the present situation.

Further, the fact that the commissioners court itself was named in the petition distinguishes this cause from Gaal v. Townsend under the holding in Rodriquez v. Richmond, 234 S.W.2d 248 (Tex.Civ.App. San Antonio 1950, writ ref'd). That case involved a mandamus suit brought against the county judge to compel an election for the incorporation of

an independent school district for the election of trustees. The county judge was not sued in his individual capacity but rather in his official capacity as county judge. No question was raised as to the capacity of the county judge until after appeal had been perfected. The court of civil appeals held that the Texas Rules of Civil Procedure were now controlling and disavowed the early case of City of Beaumont v. Stephenson, 95 S.W.2d 1360 (Tex.Civ.App. Beaumont 1936, writ ref'd n.r.e.). In Stephenson, the court had held that officers acting in their personal capacities in refusing to perform a duty are necessary parties in those capacities. The Rodriquez court interpreted Rule 358, Tex.R.Civ.Civ.P., as providing that a named public officer in a mandamus suit may be made a party in his official capacity. [3] Further, since Rule 93 required that the lack of capacity of a party defendant to be sued must be raised by verified pleading, defendant's failure to do so constituted a waiver under Rule 90. The failure to name the county judge in his personal capacity was specifically held to not be fundamental error. Id. at 250.

**\*108** **[2]** We think the reasoning in Rodriquez is correct. Mandamus is a legal proceeding and although extraordinary, the Rules of Civil Procedure are applicable. The commissioners court was officially named although Commissioner Head was not named individually. The commissioners did not point out any defect in Vondy's petition relating to the omission of Commissioner Head and the capacity in which the commissioners court was sued. The failure to name Head individually in this mandamus action was not fundamental error. Gaal v. Townsend, supra, was decided long before the present Rules were enacted and is not controlling.

Consequently, Vondy's failure to join all four county commissioners was not fundamental error. Since the commissioners court did not raise the point, the court of civil appeals should not have dismissed the case, but should have considered the merits of Vondy's mandamus action against the commissioners.

We now turn to the question of the duty of the commissioners court to set a reasonable salary for the position of constable. The Texas Constitution art. XVI s 61 (amended 1972) provides in part as follows:

> In all counties in this State, the Commissioners Courts shall be authorized to determine whether precinct officers shall be compensated

on a fee basis or on a salary basis, with the exception that it shall be mandatory upon the Commissioners Courts, to compensate all justices of the peace, constables, deputy constables and precinct law enforcement officers on a salary basis beginning January 1, 1973; .... (emphasis added)

Thus, it is mandatory that the commissioners court compensate constables on a salary basis.

The commissioners court argues that this constitutional provision only requires the court to compensate these officials on a salary basis if they are compensated at all. It reasons that if the officials have never been compensated, they need not be compensated. The purpose of the amendment was to prohibit the practice of compensating justices on a fee basis. Wichita County v. Robinson, 155 Tex. 1, 276 S.W.2d 509 (1954). Therefore, it asserts that the provision is a mandate that constables be compensated, if at all, on a salary basis. Additionally, it urges that since no other statute mandates a minimum salary, the commissioners court has discretion to set no salary at all.

The commissioners court next argues that since Vondy is also a Class B Security Service Contractor [4] and operates the business for profit, the trial court did not abuse its discretion in denying the mandamus. It argues that a person cannot accept a public office knowing the amount of compensation and then claim more is due, citing Terrell v. King, 118 Tex. 237, 14 S.W.2d 786, 791 (1929). Vondy replies that this does not apply when the amount of compensation is mandated by law. Broom v. Tyler County Commissioners Court, 560 S.W.2d 435, 437 (Tex.Civ.App. Beaumont 1977, no writ). Also the commissioners court contends that there was no money budgeted or available with which to pay Vondy at the time of his request.

A final argument made by the commissioners court is that by setting no salary, the court has set a salary. In any event, it contends that the constitutional provision does not mandate that it set a reasonable salary, which Vondy is requesting.

 [3]   We do not find the commissioners courts' arguments persuasive. The constitutional provision clearly mandates that constables receive a salary. While cases cited by the commissioners court point out that the constitutional provision was amended to stop the practice of paying

constables on a fee basis, this does not lead to the conclusion that constables need not now be compensated at all. Furthermore, we conclude that the commissioners court must **\*109** set a reasonable salary. While a reasonable salary would be a determination for the commissioners court, Vondy is entitled to be compensated by a reasonable salary. Any other interpretation of the provision would render it meaningless.

We also note, that by failure to pay a salary to Vondy, the commissioners court could be subject to prosecution under Tex.Penal Code Ann. s 39.01(a)(3) (Vernon 1974), for failure to perform its duties imposed by law. By this statute, the legislature recognized the necessity that public officials perform the duties required of them by law and provided sanctions for their failure to do so when the failure was intentional and to obtain a benefit or harm another.

 [4]   [5]   This court lacks original mandamus jurisdiction over county officials. Cocke v. Smith, 142 Tex. 396, 179 S.W.2d 958 (1944). Rather, that power is vested in the district court in the exercise of its general supervisory control over the orders of the commissioners court. Art. V s 8 Tex.Const.; Grant v. Ammerman, 437 S.W.2d 547, 550 (Tex.1969); and Article 1908. While such jurisdiction is not used to substitute the discretion of the district court for that of the public official, Weber v. City of Sachse, 591 S.W.2d 559 (Tex.Civ.App. Dallas 1979, no writ), the performance of a clear statutory duty which is ministerial and nondiscretionary should be mandated by the district court. Wichita County v. Griffin, 284 S.W.2d 253 (Tex.Civ.App. Ft. Worth 1955, writ ref'd n.r.e.). Even in matters involving some degree of discretion, the commissioners court may not act arbitrarily. Avery v. Midland County, 406 S.W.2d 422, 428 (Tex.1966); Stovall v. Shivers, 129 Tex. 256, 103 S.W.2d 363, 367 (1937). Here, the district court should have granted the mandamus sought by Vondy.

There is another compelling reason that mandamus is proper in this case. This court, as well as the trial court, has inherent power to act to protect and preserve the proper administration of the judicial system. The Texas Constitution now recognizes this fundamental principle by providing that the Supreme Court "shall exercise the judicial power of the State except as otherwise provided in this Constitution." Tex.Const. Art. V s 3 (effective September 1, 1981). We recently discussed and recognized the inherent power to the judicial branch in Eichelberger v. Eichelberger, 582 S.W.2d 395 (Tex.1979). In Eichelberger, we listed examples of the

exercise of inherent power by courts in Texas and other jurisdictions. 582 S.W.2d at 398 n. 1. Texas courts have recognized their inherent powers to control their judgments, e. g., Coleman v. Zapp, 105 Tex. 491, 151 S.W. 1040, 1041 (1912), to punish by contempt, e. g., Ex Parte Barnett, 600 S.W.2d 252, 254 (Tex.1980), to summon and compel the attendance of witnesses, e. g., Burttschell v. Sheppard, 123 Tex. 113, 69 S.W.2d 402, 403 (1934), and to regulate the admission to the practice of law, e. g., State Bar of Texas v. Heard, 603 S.W.2d 829, 831 (Tex.1980); Scott v. State, 86 Tex. 321, 24 S.W. 789, 790 (1894). In one instance, a Texas court recognized that a district court would have the power to appoint probation personnel and set their compensation, if that action were necessary for the effective administration of the business of the court. Commissioners Court of Lubbock County v. Martin, 471 S.W.2d 100, 110 (Tex.Civ.App. Amarillo 1971, writ ref'd n.r.e.).

Other state courts have often recognized the necessity of this inherent power to compel payment of sums of money if they are reasonable and necessary in order to carry out the court's mandated responsibilities. This power is necessary for the judiciary to carry out its functions, independently of the other branches of government. Carlson v. State ex rel. Stodola, 247 Ind. 631, 220 N.E.2d 532 (1966). This inherent power is also necessary to protect and preserve the judicial powers from impairment or destruction. Mowrer v. Rusk, 95 N.M. 48, 618 P.2d 886, 892 (1980); Judges for the Third Judicial Circuit v. County of Wayne, 386 Mich. 1, 190 N.W.2d 228, 231 (Mich.1971), cert. denied, 405 U.S. 923, 92 S.Ct. 961, 30 L.Ed.2d 794 (1972). See also Annot., 59 A.L.R.3d 569 (1974).

 *110  In particular, courts have employed their inherent power to hire and require salaries be paid for secretaries, Millholen v. Riley, 211 Cal. 29, 293 P. 69, 71 (1930), clerks, Smith v. Miller, 153 Colo. 35, 384 P.2d 738, 741 (1963), probation officers, Noble County Council v. State ex rel. Fifer, 234 Ind. 172, 125 N.E.2d 709, 714 (1955), and assistants, In Re Matter of Court Reorganization Plan of Hudson County, 161 N.J.Super. 483, 391 A.2d 1255, 1259 (1978). In Commonwealth ex rel. Carroll v. Tate, 442 Pa. 45, 274 A.2d 193 (1971), cert. denied, 402 U.S. 974, 91 S.Ct. 1665, 29 L.Ed.2d 138 (1971), the court issued a mandamus requiring the city council of Philadelphia to appropriate

additional funds necessary to adequately administer the court of common pleas. In 1857, the Supreme Court of Pennsylvania required the county to compensate a constable for his services because of the benefit derived by the county for such services in the preservation of order and administration of justice. Lancaster County v. Brinthall, 29 Pa. 38, 40 (1857).

We hold that the county commissioners of Uvalde County must compensate the county's constables. The judicial system of this state cannot function properly if those officials who are responsible for carrying out certain duties in that process are not properly compensated. Tex.R.Civ.P. 103 allows constables to serve process in this state. If these constables are not compensated for their services the judicial process will be impaired because process may not be served. It is the duty of the commissioners court to provide process servers as a necessary part of the proper administration of justice in this state, and to compensate them adequately. See Pope & McConnico, Practicing Law With the 1981 Texas Rules, 32 Baylor L.Rev. 457, 484-86 (1980). Constables, provided for in the "Judicial Branch" Article of the Constitution, Tex.Const. Art. V s 18, additionally serve other functions necessary to the judicial branch of the state.

Even though the commissioners court is also part of the judicial branch of this state, existing under Article V Section 1 of the Texas Constitution, this fact does not alter our powers to protect and preserve the judiciary by compelling payment for process servers. The legislative branch of this state has the duty to provide the judiciary with the funds necessary for the judicial branch to function adequately. If this were not so, a legislative body could destroy the judiciary by refusing to adequately fund the courts. The judiciary must have the authority to prevent any interference with or impairment of the administration of justice in this state.

Accordingly, the judgment of the court of civil appeals is reversed and the cause is remanded to the district court of Uvalde County for further proceedings consistent with this opinion.

GREENHILL, C. J., and McGEE, DENTON and BARROW, JJ., concur in the result.

Footnotes

1      All statutory references are to Texas Revised Civil Statutes Annotated.

2  Prior Rule 39 provided in part:

Necessary Joinder of Parties.

(a) Necessary joinder. Except as otherwise provided in these rules, persons having a joint interest shall be made parties and be joined as plaintiffs or defendants. When a person who should join as a plaintiff refuses to do so, he may be made a defendant or, in proper cases, an involuntary plaintiff.

(b) Effect of failure to join. When persons who ought to be parties if complete relief is to be accorded between those already parties, have not been made parties and are subject to the jurisdiction of the court, the court shall order them made parties. The court in its discretion may proceed in the action without making such persons parties, if its jurisdiction over them can be acquired only by their consent or voluntary appearance; but the judgment rendered therein shall not affect the rights or liabilities of persons who are not parties.

(c) Names of omitted persons and reasons for non-joinder to be pleaded. In any pleading in which relief is asked, the pleader shall set forth the names, if known to him, of persons who ought to be parties, if complete relief is to be accorded between those already parties, but who are not joined, and shall state why they are omitted.

3  Rule 358 Tex.R.Civ.P. provided in part:

(a) When a suit in mandamus or injunction is brought against a person holding a public office, in his official capacity, and after final trial and judgment in the trial court, and notice of appeal to the Court of Civil Appeals or Supreme Court has been given, if such person should vacate such office, the suit shall not abate, but his successor may be made a party thereto by a motion showing such facts. (emphasis added) (This rule was amended in 1976 to eliminate the reference to notice of appeal as an appellate step.)

4  Article 4413(29bb), s 16(b)(2) and s 2(9) defines a security service contractor as "any guard company, alarm systems company, armored car company, courier company, or guard dog company as defined herein."

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

714 S.W.2d 417
Court of Appeals of Texas,
San Antonio.

H.T. VONDY, Appellant,
v.
COMMISSIONERS COURT OF
UVALDE COUNTY, Appellees.

No. 04–85–00525–CV. | July 9,
1986. | Rehearing Denied July 31, 1986.

Duly elected constable sought writ of mandamus against Commissioners Court and four of its five members to compel them to set reasonable salary for his office. The 38th District Court, Uvalde County, Jack Woodley, J., denied relief and the Eastland Court of Civil Appeals, 11th Supreme Judicial District, Brown, J., 601 S.W.2d 808, vacated trial court's judgment and dismissed the case. Petitioner appealed. The Supreme Court, 620 S.W.2d 104, Spears, J., reversed and remanded. A writ of mandamus was issued ordering Commissioners Court to set reasonable salary. After Commissioners Court had set salary of $40 per month and requested that they be discharged from any further duties under writ, the District Court, Mickey R. Pennington, J., discharged Commissioners Court from the writ and denied constable's motion for contempt. On appeal, the Court of Appeals, Cantu, J., held that in view of numerous duties imposed by law upon constable, salary of $40 per month or equivalent of 20 cents per hour for time spent by constable in performance of his duties, was unreasonable.

Reversed and remanded with instructions.

Butts, J., dissented and filed an opinion.

**Attorneys and Law Firms**

**\*419** Harry A. Nass, Jr., James M. Parker, San Antonio, for appellant.

Lloyd Lochridge, Austin, for appellees.

Before CADENA, C.J., and BUTTS and CANTU, JJ.

**OPINION**

CANTU, Justice.

This is an appeal from an order discharging the appellees, the Commissioners Court of Uvalde County, from a writ of mandamus on the basis that the writ had been complied with. The appellant, H.T. Vondy, was elected constable for Precinct 6, Uvalde County, Texas on November 4, 1978, and took office on January 17, 1979. Vondy filed an Application for Writ of Mandamus in the 38th District Court of Uvalde County on May 17, 1979, seeking to compel the appellees to set and pay him a reasonable salary. The application was denied. On appeal the Eastland Court of Appeals dismissed the cause on jurisdictional grounds. *See Vondy v. Commissioners Court of Uvalde County,* 601 S.W.2d 808 (Tex.Civ.App.—Eastland 1980).

The Supreme Court reversed and remanded the cause, and instructed the trial court to issue the writ sought by Vondy. The Supreme Court determined that the Texas Constitution, Article XVI, section 61 (Vernon Supp.1986) as amended in 1972, mandates that the Commissioners Court compensate constables on a salary basis and that such salary be reasonable. *Vondy v. Commissioners Court of Uvalde County,* 620 S.W.2d 104, 108 (Tex.1981) ("Vondy I"). The Supreme Court expressly rejected the appellees' arguments that they had the discretion to set no salary at all, that because no salary was set when Vondy accepted the office he could not now claim one, and that because no money was budgeted or available to pay Vondy there was no requirement to provide compensation for Vondy's services.

A writ of mandamus was issued by the trial court on September 17, 1981, ordering the appellees to set a reasonable salary and to extinguish the debt owed Vondy by virtue of his having held the office of constable. The writ further ordered the return of the writ by February 1, 1982, stating what was done in compliance with the writ.

The return was filed on January 27, 1982, wherein the appellees stated that on December 14, 1981, the Commissioners Court met and set a salary of $40.00 per month. The appellees tendered the sum of $960.00 into the registry of the court, representing payment of $40.00 per month for the 24 months Vondy was in office. The appellees also requested that they be discharged from any further duties under the writ.

Vondy objected to the proposed entry of an order discharging appellees, and filed a motion for contempt against the

appellees. Vondy alleged that he was not afforded the opportunity for an evidentiary hearing to establish a record concerning the setting of a salary; that a salary of $40.00 per month was unreasonable and capricious and in violation of the mandate of the Supreme Court and the trial court; and that no interest was allotted for payment to Vondy.

A hearing was held on September 16, 1985, and a final judgment signed on October 9, 1985. The trial court discharged appellees from the writ, and denied Vondy's motion for contempt. All relief sought by Vondy was denied by the trial court except entitlement to the compensation set by appellees. All costs were assessed against Vondy.

Vondy presents four points of error. The first three allege that "the trial court erred in discharging the appellees from the writ of mandamus by finding as a matter of law" (1) that a salary of $40.00 per **\*420** month is a reasonable salary for the office of constable; (2) that Vondy was not entitled to recover any expenses of office and (3) that Vondy was not entitled to any interest on the unpaid salary amounts from and after the date such payments were due.

Appellees argue that the trial court did not make findings as alleged by Vondy, and furthermore, that the trial court had no jurisdiction to make such findings. The appellees also attack Vondy's points of error as incorrectly failing to assign error on the part of the trial court, to-wit: in failing to state that the trial court erred in not finding that the Commissioners Court acted arbitrarily and abused its discretion.

The Texas Constitution, Article V, section 8 provides, in pertinent part:

> The District Court shall have appellate jurisdiction and general supervisory control over the County Commissioners Court, with such exceptions and under such regulations as may be prescribed by law ... [1]

**[1]** The legislature has not established a method or procedure for invoking the appellate jurisdiction or supervisory control of the district court over the Commissioners Court by any statutory enactment. *Scott v. Graham,* 156 Tex. 97, 292 S.W.2d 324 (1956). However, it is clearly established that the supervisory power of the district court can only be invoked when the Commissioners Court acts beyond its jurisdiction or clearly abuses the discretion conferred upon it by law. *Yoakum County v. Gaines County,* 139 Tex. 442, 163 S.W.2d 393 (1942). If the Commissioners

Court does abuse its discretion, the district court has the power and authority to abrogate such actions. *Bomer v. Ector County Commissioners Court,* 676 S.W.2d 662 (Tex.App. —El Paso 1984, writ ref'd n.r.e.). Thus "this supervisory jurisdiction can be invoked in a direct attack in the district court when it is alleged that the Commissioners Court order is voidable as being arbitrary, capricious, unsupported by substantial evidence or that the court has acted beyond its jurisdiction." *Mobil Oil Corp. v. Matagorda County Drainage District No. 3,* 580 S.W.2d 634, 638 (Tex.Civ.App. —Corpus Christi 1979), *rev'd on other grounds,* 597 S.W.2d 910 (Tex.1980).

Analyzing Vondy's points of error to determine the substance of the argument rather than the form of the allegations, as we are required to do under the liberal briefing rules, TEX.R.CIV.P. 422; *Cleaver v. Dresser Industries,* 570 S.W.2d 479 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.), Vondy's argument necessarily complains of the trial court's failure to find that the Commissioners Court acted arbitrarily and capriciously in setting Vondy's salary. In arguing that the trial court erroneously found that what the Commissioners Court did was reasonable, Vondy necessarily argues that the Commissioners Court's actions were unreasonable and an abuse of that court's discretion. Thus the real question before us is whether the district court erred in not finding that the Commissioners Court acted arbitrarily and capriciously and abused its discretion.

**[2]** **[3]** Additionally, we construe Vondy's objection or challenge to the appellees' motion for discharge from the writ of mandamus as a direct attack upon the order of the Commissioners Court. Therefore, Vondy has properly invoked the jurisdiction of the district court requiring it to exercise its supervisory control over the Commissioners Court by reviewing the order of the Commissioners Court. However, we note that the district court has no authority to set the salary of the constable. Rather, the Commissioners Court must determine what is a reasonable salary. *See Vondy I, supra.*

At the hearing before the trial court, Vondy offered testimony and evidence concerning what he considered to be a reasonable salary. Appellant testified that he **\*421** worked at least 8 hours a day, 6 days each week performing duties as a constable for Precinct 6 during his term of office. Appellant stated that $650.00 would be a reasonable salary; and offered evidence that the two other constables of Uvalde County made $1,001.00 per month and $475.00 per month

respectively, plus expenses. Vondy also presented evidence of his expenses incurred in performing his duties as constable, including approximately $3,500.00 spent in modifying a car for patrol purposes.

Four witnesses who were members of the Commissioners Court during the 1978 to 1981 period also testified. Each of these witnesses related that they felt "under the circumstances" $40.00 per month was a reasonable salary for the constable of Precinct 6. These circumstances included: (1) the lack of funds available to pay Vondy; (2) that Vondy knew when he sought and accepted the job that there was no salary; (3) that the Precinct 6 area had adequate law enforcement protection so there was no need for Vondy's services; and (4) that Vondy's concurrent involvement in a private security business presented a conflict in interest in having Vondy serve as constable. [2] The major factor in determining the salary was that the Commissioners Court perceived a lack of need of Vondy's services, since they believed the constable functions were being adequately performed by others. Our review of the record also indicates that the commissioners were concerned with the lack of funds to pay Vondy. In fact, one of the commissioners, Norment Foley, testified that the Commissioners Court set the salary at $40.00 in an attempt to stall paying a larger salary until funds to do so were available.

 [4]    The duties of a precinct constable are set out in TEX.REV.CIV.STAT.ANN. art. 6885 (Vernon 1960);

> Each constable shall execute and return according to law all process, warrants, and precepts to him directed and delivered by any lawful officer, attend upon all justice courts held in his precinct and perform all such other duties as may be required of him by law.

Constables are also peace officers, TEX.CODE CRIM.PROC.ANN. art. 2.12 (Vernon Supp.1986); with all of the duties imposed on such officers, including; the prevention of threatened injuries and death, TEX.CODE CRIM.PROC.ANN. art. 6.01–6.07 (Vernon Supp.1986); the assisting of magistrates in the performance of their duties, TEX.CODE CRIM.PROC.ANN. art. 7.01–7.17 (Vernon Supp.1986); and the execution of arrest warrants, TEX.CODE CRIM.PROC. art. 15.16 (Vernon Supp.1986). Article 2.13 of the Code of Criminal Procedure also sets out duties imposed upon constables as peace officers:

> It is the duty of *every* peace officer to preserve the peace within his jurisdiction. To effect this purpose, he shall use all lawful means. He shall in every case where he is authorized by the provisions of this Code, interfere without warrant to prevent or suppress crime. He shall execute all lawful process issued to him by any magistrate or court. He shall give notice to some magistrate of all offenses committed within his jurisdiction, where he has good reason to believe there has been a violation of the penal law. He shall arrest offenders without warrant in every case where he is authorized by law, in order that they may be taken before the proper magistrate or court and be tried. (Emphasis added).

Once Vondy was duly elected and qualified to serve as constable for Precinct 6, he was obligated to perform these duties prescribed by law. A failure to perform such duties could subject Vondy to prosecution under the Penal Code. *See* TEX.PENAL CODE ANN. § 39.01 (Vernon Supp.1986).

 [5]    In view of these numerous duties imposed upon Vondy, we find that, as a matter of law, $40.00 per month, or the equivalent of $.20 per hour for the time spent by Vondy in performance of his duties is unreasonable.

 *422 [6]    The record is replete with evidence that the Commissioners Court did not deliberate as to what would be a reasonable compensation for Vondy, but rather they considered only the need for Vondy's services. The Commissioners Court cannot attempt to restrict or abolish a constitutionally established office by refusing to reasonably compensate the holder of such office. The Commissioners Court also cannot attempt to abolish or restrict the office of constable by refusing to allow or by preventing the elected official from performing those duties required of him.

The El Paso Court of Appeals in *Bomer v. Ector County, supra,* noted that a commissioners court may elect to use other official departments (such as the sheriff's office) to perform those duties imposed upon constables (such as the service of process) as determined by an exercise of their discretion. However, the delegation of such duties does not eliminate

the obligation of a constable to perform such duties where required by law to do so or if called upon to do so; nor does it relieve the Commissioners Court from compensating a constable for other services rendered or which he is obligated to perform. Moreover, the issue of the reasonableness of a $20.00 per month salary in *Bomer* was not before the appellate court as the appellants in that case testified that they did not perform their duties as constables.

The Uvalde Commissioners Court did not set Vondy's salary by evaluating the work performed by or required of Vondy, but considered only those factors previously rejected by the Supreme Court in *Vondy I.* Neither did the Commissioners Court exercise its discretion by assigning some of those duties imposed on Vondy to other law enforcement agencies as was done in *Bomer.* [3] The appellees merely, without any reason or basis other than that already rejected as improper, set Vondy's salary at $40.00 per month. Such act was clearly arbitrary and capricious.

 **[7]**    Although Vondy attempted to accept the burden of proving what a reasonable salary was at the district court hearing, we find that the appellees, because of their request for discharge from the writ of mandamus, had the burden of proving that the salary that they set was reasonable. This was not done. There is no evidence in the record supporting the implied finding that the salary set was reasonable. Thus, Vondy's first point of error complaining of the trial court's error in finding that such salary is reasonable is meritorious and is sustained.

In sustaining this point of error, we do not attempt to instruct the Commissioners Court as to what would be a reasonable salary. Such is a determination to be made by the Commissioners Court after proper consideration of relevant factors. *Vondy I. See also White v. Commissioners Court of Kimble County,* 705 S.W.2d 322 (Tex.App.— San Antonio 1986, no writ). We note however, that TEX.REV.CIV.STAT.ANN. art. 3912i §§ 1 & 2 (Vernon 1966) provides that the Commissioners Court shall fix the salary of constables in counties with populations of less than 20,000 at not more than $5,000.00 per annum, or in counties of 20,000 to 46,000 at a salary of not more than $6,000.00 per annum. These maximums may be considered by the Commissioners Court in determining what a reasonable salary would be. [4]

 **[8]**    Points of error two and three complain of the trial court's failure to find that the Commissioners Court abused its

discretion in failing to reimburse Vondy for expenses of office and failing to include interest **\*423** on the unpaid salary amounts. The original application for writ of mandamus filed by Vondy and the writ itself, requested and required only that the appellees set and pay a reasonable salary for the office of constable of Precinct 6 of Uvalde County. Therefore, without expressing an opinion as to entitlement we simply do not consider these complaints as properly before us on appeal. Points of error two and three are overruled.

 **[9]**    Point of error four complains of the trial court's error in assessing all costs of court against appellant. The opinion of the Supreme Court in *Vondy I* ordered that the appellees pay "all costs in this Court and the Court of Civil Appeals." We find that this order referred only to costs incurred in procuring the writ of mandamus. Nevertheless, as the successful party before this Court, Vondy is entitled to recover all court costs associated with seeking compliance with the writ from the appellees. Point of error number four is sustained.

The judgment of the trial court is reversed and the cause is remanded to the district court with instructions that appellees not be discharged from the writ of mandamus until a reasonable salary is set by the Commissioners Court for the constable of Precinct 6. All costs of this appeal are taxed against appellees.

BUTTS, Justice, dissenting.

I respectfully dissent. The majority opinion treats this case as if the appellate court were reviewing a writ of mandamus decision by the district court and not merely an appeal from a supervisory review order. Actually the writ of mandamus action in the district court was in 1981. That case was resolved by the Supreme Court in *Vondy v. The Commissioners Court of Uvalde County,* 620 S.W.2d 104 (Tex.1981). The Supreme Court directed the district court to issue the writ of mandamus, ordering the Commissioners Court to set a reasonable salary pursuant to constitutional requirements. The writ was issued. The Commissioners Court did set the constable's salary at $40.00 per month at that time. They filed their return on the writ showing their compliance.

When the salary was set, the constable filed his motion in district court objecting to the discharge of the respondents on the 1981 writ, along with his motion for contempt directed against the Commissioners Court. The question before the district court in its review was whether or not the Commissioners Court abused its discretion in setting the

salary at $40.00 per month. The former constable Vondy had the burden to show there was an abuse of discretion.

The record contains the findings upon which the Commissioners Court based its salary determination:

1. Before January 17, 1979, there had never been a constable, Precinct 6, in Uvalde County, nor was there any expressed need for the office.

2. There was no money in the budget for the office.

3. The sheriff and police departments provided adequate peace officer protection.

4. The sheriff's office served all process for the justice of the peace offices in the county without difficulty. They continued to do so after the constable of Precinct 6 was elected.

5. There was no need for the office in Precinct 6 and it was a financial burden.

6. Vondy knew there was no salary set for the office when he ran for the position.

The record reflects that Vondy was in office for two years, that he worked in his own security business fulltime, and that Precinct 6 is within the city and thus all police protection is by the Uvalde Police Department. It is obvious that other officers did the work and that a constable in Precinct 6 was a redundancy.

Under the circumstances of this case, the Commissioners Court of Uvalde County should be permitted to exercise their sound discretion in setting a reasonable salary based on their knowledge of the county's **\*424** condition and duties and needs of its officials. The trial court, after hearing the evidence agreed this amount was reasonable. There is no basis for this court to hold the amount was unreasonable as a matter of law.

*Bomer v. Ector County Commissioners Court,* 676 S.W.2d 662 (Tex.App.—El Paso 1984, writ ref'd n.r.e.), decided after *Vondy, supra,* presents *facts closely analogous* to the present case. The constables there sought to have that Commissioners Court set a reasonable salary also. The court of appeals affirmed the trial court's denial of the writ of mandamus. In that case the salary which the petitioners believed was unreasonable was $20.00 per month.

TEX.REV.CIV.STAT.ANN. art. 3912i (Vernon 1966) provides in part:

> Sec. 9. The Commissioners Court shall not be required to fix the salaries in all precincts at equal amounts, but shall have discretion to determine the amount of salaries to be paid each ... Constable in the several precincts on an individual basis without regard to the salaries paid in other precincts or to other officials. In arriving at the compensation to be paid the officials governed by the provisions of this Act the Commissioners Courts shall consider the financial condition of their respective counties and the duties and needs of their officials ...

Since there was no showing of an abuse of discretion, the judgment should be affirmed.

## ON APPELLEES' MOTION FOR REHEARING

As noted in our original opinion in this case, at the hearing on Vondy's objections to the proposed order discharging the Commissioners Court, members of the Commissioners Court testified that $40.00 per month was a reasonable salary "under the circumstances" because: (1) there was lack of funds to pay Vondy; (2) Vondy knew when he sought and accepted the job that there was no salary; (3) the Precinct 6 area had adequate law enforcement protection so there was no need for Vondy's services; and (4) Vondy's concurrent involvement in a private security business presented a conflict of interest in having Vondy serve as constable.

Again we point out that these reasons were expressly considered and rejected in *Vondy I,* 620 S.W.2d at 108. In *Vondy I* the Supreme Court stated:

> [I]t is mandatory that the commissioners court compensate constables on a salary basis.

> The commissioners court argues that this constitutional provision only requires the court to compensate these officials on a salary basis if they are compensated at all.... Additionally, it urges that since no other statute mandates

a minimum salary, the commissioners court has discretion to set no salary at all.

The commissioners court next argues that since Vondy is also a Class B Security Service Contractor and operates the business for profit, the trial court did not abuse its discretion in denying the mandamus. It argues that a person cannot accept a public office knowing the amount of compensation and then claim more is due.... Also the commissioners court contends that there was no money budgeted or available with which to pay Vondy at the time of his request.

_____

We do not find the commissioners courts' arguments persuasive. The constitutional provision clearly mandates that constables receive a salary.... Furthermore, we conclude that the commissioners court must set a reasonable salary. While a reasonable salary would be a determination for the commissioners court, Vondy is entitled to be compensated by a reasonable salary.

Clearly, the Supreme Court rejected the same circumstances or factors again considered by the Commissioners Court in determining what a reasonable salary would be. Although the Supreme Court did not hold or say that these circumstances could **\*425** not be considered by the Commissioners Court in fixing a reasonable salary for Vondy, in finding the factors to be unpersuasive the court necessarily found that these factors were alone not an adequate basis for determination of a reasonable salary. Therefore, since the Commissioners Court considered no other factors in determining what a reasonable salary would be, consideration of those same factors must once again be unpersuasive and irrelevant.

The appellees' contention in its Motion for Rehearing that "uncorroborated" testimony by Vondy concerning the amount of time he spent in performing the duties of constable "is not only that of a party and interested witness but, as well, is a pure guess unsupported by any record, totally lacking in corroboration and which the Commissioners Court could not

dispute," presumes that Vondy had the burden of proving at the hearing what a reasonable salary would be. That in fact is not where the burden should have been placed. Rather, the Commissioners Court, in seeking discharge from the writ of mandamus ordering it to set a reasonable salary, had the burden of establishing that a reasonable salary had been set before being discharged.

Again, since the Commissioners Court considered no circumstances or factors other than those previously rejected as unpersuasive in *Vondy I,* the Commissioners Court has failed to meet its burden of entitlement to discharge from the writ of mandamus.

Moreover, testimony was introduced at the hearing concerning the salaries paid to other constables in Uvalde County. These constables, Arthur Harwell Davis, Jr., and Jack Bain Preston, Jr., were paid in excess of $1,000.00 per month plus expenses and other benefits. As we noted in our original opinion, TEX.REV.CIV.STAT.ANN. art. 3912i §§ 1 & 2 (Vernon 1966) provides that the salary of constables in counties with populations the size of Uvalde County are not to exceed $5,000 or $6,000 per annum. Thus, the other two constables of Uvalde County would have been making more than twice the maximum rate of salary provided by statute. Not only do we fail to see how Vondy's salary at $40.00 per month could be reasonable in light of the other constables being paid in excess of $1,000.00 per month; such also conclusively establishes that the Commissioners Court acted arbitrarily and capriciously in determining Vondy's salary. Furthermore, if the county lacked funds to pay Vondy, as asserted by the Commissioners Court, we fail to see how the Commissioners Court could justify payment to the other constables of more than double the statutory maximums.

Again, we reiterate that Commissioners Court acted arbitrarily and capriciously in failing to provide Vondy with a reasonable salary.

The motion for rehearing is denied.

Footnotes

1    TEX. CONST. art. V, § 8 was amended on November 5, 1985. The pertinent language of the section, however, was unchanged.

2    All of these reasons were considered and rejected in *Vondy I,* 620 S.W.2d at 108.

3    We do not necessarily agree with the El Paso Court that a Commissioners Court can, even in an exercise of its discretion, delegate those duties imposed on constables by the constitution and statutes of Texas to other law enforcement agencies. However, such question is not before us at this time.

4     The original application for the writ of mandamus alleged that the population of Uvalde County according to the federal census of 1970 was 16,619 persons. The 1980 census determined the population of Uvalde County at 22,441 persons. These figures may be taken into account in determining the applicable salary for the constable position.

     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.     

75 S.W.3d 528
Court of Appeals of Texas,
San Antonio.

John H. WITHERS, et al., Appellants,
v.
The COMMISSIONERS' COURT
OF BANDERA COUNTY, Appellee.

No. 04–01–00322–CV. | Feb. 13, 2002.
| Rehearing Overruled March 19, 2002.

Taxpayers filed a petition for writ of mandamus seeking to compel the Commissioners' Court to accept their petition for a tax rollback election. The 216th Judicial District Court, Bandera County, David Peeples, J., denied taxpayers' request for mandamus relief. Taxpayers appealed. The Court of Appeals, Hardberger, C.J., held that petition for tax rollback election was not invalid.

Reversed.

**Attorneys and Law Firms**

**\*528** Christopher J. Weber, Law Office of Christopher J. Weber, San Antonio, for Appellant.

**\*529** K.H. Schneider, County Attorney–Bandera County, Bandera, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, PAUL W. GREEN, Justice.

**Opinion**

Opinion by PHIL HARDBERGER, Chief Justice.

The sole issue presented in this appeal is whether a petition for a tax rollback election is invalid if it does not include the birth dates of the signatories. Because the absence of the birth dates does not render the petition invalid, we reverse the trial court's order. The law should not prevent the voice of the people from being heard by the application of an empty technicality.

**BACKGROUND**

The appellants filed a petition for writ of mandamus seeking to compel The Commissioners' Court of Bandera County (the

"Commissioners' Court") to accept their petition for a tax rollback election. The cause was submitted to the trial court on stipulated facts.

A petition seeking a tax rollback election was submitted to the Commissioners' Court on December 14, 2000. The petition contained the requisite number of signatures. The petition also contained the printed name of the signatories, the signatories' addresses, and the signatories' voter registration numbers; however, the petition did not include the signatories' dates of birth. On or about December 28, 2000, the Commissioners' Court passed a resolution finding that the petition was invalid because it did not meet the requirements of section 277.002 of the Texas Election Code. No supplemental petition was filed. After a hearing, the trial court denied the appellants' request for mandamus relief.

**STANDARD OF REVIEW**

**[1]** **[2]** A writ of mandamus will issue to compel a public official to perform a ministerial act. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 793 (Tex.1991); *Medina County Comm'rs Court v. Integrity Group, Inc.,* 21 S.W.3d 307, 309 (Tex.App.-San Antonio 1999, pet. denied). The appellants seek to challenge the trial court's denial of their petition for writ of mandamus. In denying the petition, the trial court stated, "I hold that there's not been compliance with the statute which is mandatory on date of birth." Therefore, the basis of the trial court's ruling is the trial court's conclusion that the statutory requirements for a petition seeking a tax rollback election are mandatory. Matters of statutory construction are legal questions that we review de novo. *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 357 (Tex.2000); *Johnson v. City of Fort Worth,* 774 S.W.2d 653, 656 (Tex.1989); *Beldon Roofing & Remodeling Co. v. San Antonio Water System,* 898 S.W.2d 351, 353 (Tex.App.-San Antonio 1995, writ denied).

**DISCUSSION**

**[3]** The parties do not dispute that section 277.002 of the Texas Election Code governs the validity of the petition signatures. Section 277.002 of the Election Code states:

(a) For a petition signature to be valid, a petition *must:*

(1) *contain* in addition to the signature:

(A) the signer's printed name;

(B) *the signer's date of birth* and the signer's voter registration number and, if the territory from which signatures must be obtained is situated in more than one county, the county of registration;

**\*530** (C) the signer's residence address; and

(D) the date of signing; and

(2) comply with any other applicable requirements prescribed by law.

TEX. ELEC.CODE ANN. § 277.002 (Vernon Supp.2001) (emphasis added). The signature is the only information that is required to appear on the petition in the signer's own handwriting. TEX. ELEC.CODE ANN. § 277.002(b) (Vernon Supp.2001). The omission of the state from the signer's residence address does not invalidate a signature unless the political subdivision from which the signature is obtained is situated in more than one state. TEX. ELEC.CODE ANN. § 277.002(d) (Vernon Supp.2001). The omission of the zip code from the address also does not invalidate a signature. *Id.*

The Commissioners' Court contends that the term "must" in subsection 277.002(a) should be strictly construed, making each of the items listed a mandatory requirement. The appellants argue that substantial compliance with the petition requirements set forth in subsection 277.002(a) is sufficient.

 **[4]** "It is a cardinal rule of statutory construction that we are to give effect to the intent of the Legislature." *Fleming Foods of Texas, Inc. v. Rylander,* 6 S.W.3d 278, 284 (Tex.1999). Section 311.016 of the Code Construction Act provides that the term "must" creates or recognizes a condition precedent. TEX. GOV'T CODE ANN. § 311.016 (Vernon 1998). This construction of the term "must" is to be applied unless the context in which the word appears necessarily requires a different construction or unless a different construction is expressly provided by statute. *Id.* Applying this construction of "must" to section 277.002, it would appear that the requirement that the petition contain the signer's date of birth is a condition precedent to the validity of a petition signature. *See City of Sherman v. Hudman,* 996 S.W.2d 904, 918 (Tex.App.-Dallas 1999, pet. granted, judgm't vacated).

However, the appellants assert that the purpose of the petition content requirements is to enable the governing body

reviewing the petition to verify the validity of a particular voter's signature. *See* TEX. TAX CODE ANN. § 26.081 (Vernon 1992). Therefore, so long as the governing body is able to verify the eligibility of the voter even absent all of the information required by section 277.002, the purpose of the verification requirement is satisfied. *See Reese v. Comm'rs' Court of Cherokee County,* 861 S.W.2d 281, 283 (Tex.App.-Tyler 1993, no writ) (noting main factor in determining what degree of deviation from the Election Code will be allowed is whether the deviation will impair the ability to verify eligibility). The Texas Supreme Court recently followed this logic, holding that signatures on a petition for a place on a ballot were not invalid because the signers omitted their city of residence from their address. *In re Bell,* 2002 WL 87074, 91 S.W.3d 784 (Tex. 2002). [1]

In analyzing earlier cases holding that various omissions invalidated petitions, the Texas Supreme Court noted that the earlier cases failed to "consider the alleged signature defects in relation to the objects 'sought to be attained' by the Election Code, one such object being to prevent election fraud." *In re Bell,* 2002 WL 87074, at \*2, 91 S.W.3d at ——. Therefore, the Texas Supreme Court considered **\*531** the precedential value of those cases questionable. *Id.*

The Texas Supreme Court further noted that the more recent decisions recognize that the statutory purpose of the petition requirements "is to provide a basis for verifying the voter's eligibility (*i.e.* county residency, qualified voter, etc.) to participate in a particular election." *Id.,* at \*3, at ——. Those recent decisions concluded that if the verification purpose is served, petition signatures are not invalid if they omit certain information required by the Election Code. *Id.* The Texas Supreme Court reasoned that the recent decisions "apply a rationale that furthers one of the principal purposes behind the Election Code—the prevention of election fraud—and produces a 'just and reasonable result.' " *Id.* The Texas Supreme Court stated, "That rationale does not invalidate a petition signature if the signer provides enough information to allow verification of the signer's voting eligibility for a particular election." *Id.*

In this case, the petition contained the signer's signature, address, and voter registration number, which is enough information to allow verification of the signer's voting eligibility. Accordingly, the petition is not invalid. *See id.*

### CONCLUSION

Because the petition contained enough information to allow verification of the signers' voting eligibility, the petition is not invalid. The trial court's order is reversed, and the cause is remanded to the trial court for further proceedings consistent with this court's opinion.

Footnotes

1    We note that the trial court did not have the benefit of the Texas Supreme Court's decision in reaching its ruling.

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter IV. Permits and Licenses (Refs & Annos)

33 U.S.C.A. § 1342

§ 1342. National pollutant discharge elimination system

Effective: February 7, 2014
Currentness

(a) Permits for discharge of pollutants

**(1)** Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

**(2)** The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

**(3)** The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

**(4)** All permits for discharges into the navigable waters issued pursuant to section 407 of this title shall be deemed to be permits issued under this subchapter, and permits issued under this subchapter shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

**(5)** No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objective of this chapter to issue permits for discharges into the navigable waters within the jurisdiction of such State. The Administrator may exercise the authority granted him by the preceding sentence only during the period which begins on October 18, 1972, and ends either on the ninetieth day after the date of the first promulgation of guidelines required by section 1314(i)(2) of this title, or the date of approval by the Administrator of a permit program for such State under subsection (b) of this section, whichever date first occurs, and no such authorization to a State shall extend beyond the last day of such period. Each such permit shall be subject to such conditions as the Administrator determines are necessary to carry out the provisions of this chapter. No such permit shall issue if the Administrator objects to such issuance.

(b) State permit programs

At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each such submitted program unless he determines that adequate authority does not exist:

**(1)** To issue permits which--

**(A)** apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

**(B)** are for fixed terms not exceeding five years; and

**(C)** can be terminated or modified for cause including, but not limited to, the following:

**(i)** violation of any condition of the permit;

**(ii)** obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

**(iii)** change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

**(D)** control the disposal of pollutants into wells;

**(2)(A)** To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title; or

**(B)** To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;

**(3)** To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

**(4)** To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

**(5)** To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if

any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

(6) To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

(7) To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

(8) To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require the identification in terms of character and volume of pollutants of any significant source introducing pollutants subject to pretreatment standards under section 1317(b) of this title into such works and a program to assure compliance with such pretreatment standards by each such source, in addition to adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

(9) To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.

(c) Suspension of Federal program upon submission of State program; withdrawal of approval of State program; return of State program to Administrator

(1) Not later than ninety days after the date on which a State has submitted a program (or revision thereof) pursuant to subsection (b) of this section, the Administrator shall suspend the issuance of permits under subsection (a) of this section as to those discharges subject to such program unless he determines that the State permit program does not meet the requirements of subsection (b) of this section or does not conform to the guidelines issued under section 1314(i)(2) of this title. If the Administrator so determines, he shall notify the State of any revisions or modifications necessary to conform to such requirements or guidelines.

(2) Any State permit program under this section shall at all times be in accordance with this section and guidelines promulgated pursuant to section 1314(i)(2) of this title.

(3) Whenever the Administrator determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw approval of such program. The Administrator shall not withdraw approval of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

**(4) Limitations on partial permit program returns and withdrawals**

A State may return to the Administrator administration, and the Administrator may withdraw under paragraph (3) of this subsection approval, of--

**(A)** a State partial permit program approved under subsection (n)(3) of this section only if the entire permit program being administered by the State department or agency at the time is returned or withdrawn; and

**(B)** a State partial permit program approved under subsection (n)(4) of this section only if an entire phased component of the permit program being administered by the State at the time is returned or withdrawn.

(d) Notification of Administrator

**(1)** Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.

**(2)** No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this chapter. Whenever the Administrator objects to the issuance of a permit under this paragraph such written objection shall contain a statement of the reasons for such objection and the effluent limitations and conditions which such permit would include if it were issued by the Administrator.

**(3)** The Administrator may, as to any permit application, waive paragraph (2) of this subsection.

**(4)** In any case where, after December 27, 1977, the Administrator, pursuant to paragraph (2) of this subsection, objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing, or, if no hearing is requested within 90 days after the date of such objection, the Administrator may issue the permit pursuant to subsection (a) of this section for such source in accordance with the guidelines and requirements of this chapter.

(e) Waiver of notification requirement

In accordance with guidelines promulgated pursuant to subsection (i)(2) of section 1314 of this title, the Administrator is authorized to waive the requirements of subsection (d) of this section at the time he approves a program pursuant to subsection (b) of this section for any category (including any class, type, or size within such category) of point sources within the State submitting such program.

(f) Point source categories

The Administrator shall promulgate regulations establishing categories of point sources which he determines shall not be subject to the requirements of subsection (d) of this section in any State with a program approved pursuant to subsection (b) of this section. The Administrator may distinguish among classes, types, and sizes within any category of point sources.

(g) Other regulations for safe transportation, handling, carriage, storage, and stowage of pollutants

Any permit issued under this section for the discharge of pollutants into the navigable waters from a vessel or other floating craft shall be subject to any applicable regulations promulgated by the Secretary of the department in which the Coast Guard is operating, establishing specifications for safe transportation, handling, carriage, storage, and stowage of pollutants.

(h) Violation of permit conditions; restriction or prohibition upon introduction of pollutant by source not previously utilizing treatment works

In the event any condition of a permit for discharges from a treatment works (as defined in section 1292 of this title) which is publicly owned is violated, a State with a program approved under subsection (b) of this section or the Administrator, where no State program is approved or where the Administrator determines pursuant to section 1319(a) of this title that a State with an approved program has not commenced appropriate enforcement action with respect to such permit, may proceed in a court of competent jurisdiction to restrict or prohibit the introduction of any pollutant into such treatment works by a source not utilizing such treatment works prior to the finding that such condition was violated.

(i) Federal enforcement not limited

Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

(j) Public information

A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or permit, or portion thereof, shall further be available on request for the purpose of reproduction.

(k) Compliance with permits

Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section 1317 of this title for a toxic pollutant injurious to human health. Until December 31, 1974, in any case where a permit for discharge has been applied for pursuant to this section, but final administrative disposition of such application has not been made, such discharge shall not be a violation of (1) section 1311, 1316, or 1342 of this title, or (2) section 407 of this title, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application. For the 180-day period beginning on October 18, 1972, in the case of any point source discharging any pollutant or combination of pollutants immediately prior to such date which source is not subject to section 407 of this title, the discharge by such source shall not be a violation of this chapter if such a source applies for a permit for discharge pursuant to this section within such 180-day period.

(l) Limitation on permit requirement

(1) Agricultural return flows

The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture, nor shall the Administrator directly or indirectly, require any State to require such a permit.

(2) Stormwater runoff from oil, gas, and mining operations

The Administrator shall not require a permit under this section, nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of stormwater runoff from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

(3) Silvicultural activities

(A) NPDES permit requirements for silvicultural activities

The Administrator shall not require a permit under this section nor directly or indirectly require any State to require a permit under this section for a discharge from runoff resulting from the conduct of the following silviculture activities conducted in accordance with standard industry practice: nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, or road construction and maintenance.

(B) Other requirements

Nothing in this paragraph exempts a discharge from silvicultural activity from any permitting requirement under section 1344 of this title, existing permitting requirements under section 1342 of this title, or from any other federal law.

(C) The authorization provided in Section [1] 1365(a) of this title does not apply to any non-permitting program established under 1342(p)(6) [2] of this title for the silviculture activities listed in 1342(l)(3)(A) [3] of this title, or to any other limitations that might be deemed to apply to the silviculture activities listed in 1342(l)(3)(A) [3] of this title.

(m) Additional pretreatment of conventional pollutants not required

To the extent a treatment works (as defined in section 1292 of this title) which is publicly owned is not meeting the requirements of a permit issued under this section for such treatment works as a result of inadequate design or operation of such treatment works, the Administrator, in issuing a permit under this section, shall not require pretreatment by a person introducing conventional pollutants identified pursuant to section 1314(a)(4) of this title into such treatment works other than pretreatment required to assure compliance with pretreatment standards under subsection (b)(8) of this section and section 1317(b)(1) of this title. Nothing in this subsection shall affect the Administrator's authority under sections 1317 and 1319 of this title, affect State and local authority under sections 1317(b)(4) and 1370 of this title, relieve such treatment works of its obligations to

meet requirements established under this chapter, or otherwise preclude such works from pursuing whatever feasible options are available to meet its responsibility to comply with its permit under this section.

(n) Partial permit program

(1) State submission

The Governor of a State may submit under subsection (b) of this section a permit program for a portion of the discharges into the navigable waters in such State.

(2) Minimum coverage

A partial permit program under this subsection shall cover, at a minimum, administration of a major category of the discharges into the navigable waters of the State or a major component of the permit program required by subsection (b) of this section.

(3) Approval of major category partial permit programs

The Administrator may approve a partial permit program covering administration of a major category of discharges under this subsection if--

**(A)** such program represents a complete permit program and covers all of the discharges under the jurisdiction of a department or agency of the State; and

**(B)** the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b) of this section.

(4) Approval of major component partial permit programs

The Administrator may approve under this subsection a partial and phased permit program covering administration of a major component (including discharge categories) of a State permit program required by subsection (b) of this section if--

**(A)** the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b) of this section; and

**(B)** the State submits, and the Administrator approves, a plan for the State to assume administration by phases of the remainder of the State program required by subsection (b) of this section by a specified date not more than 5 years after submission of the partial program under this subsection and agrees to make all reasonable efforts to assume such administration by such date.

(o) Anti-backsliding

(1) General prohibition

In the case of effluent limitations established on the basis of subsection (a)(1)(B) of this section, a permit may not be renewed, reissued, or modified on the basis of effluent guidelines promulgated under section 1314(b) of this title subsequent to the original issuance of such permit, to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit. In the case of effluent limitations established on the basis of section 1311(b)(1)(C) or section 1313(d) or (e) of this title, a permit may not be renewed, reissued, or modified to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit except in compliance with section 1313(d)(4) of this title.

(2) Exceptions

A permit with respect to which paragraph (1) applies may be renewed, reissued, or modified to contain a less stringent effluent limitation applicable to a pollutant if--

(A) material and substantial alterations or additions to the permitted facility occurred after permit issuance which justify the application of a less stringent effluent limitation;

(B)(i) information is available which was not available at the time of permit issuance (other than revised regulations, guidance, or test methods) and which would have justified the application of a less stringent effluent limitation at the time of permit issuance; or

(ii) the Administrator determines that technical mistakes or mistaken interpretations of law were made in issuing the permit under subsection (a)(1)(B) of this section;

(C) a less stringent effluent limitation is necessary because of events over which the permittee has no control and for which there is no reasonably available remedy;

(D) the permittee has received a permit modification under section 1311(c), 1311(g), 1311(h), 1311(i), 1311(k), 1311(n), or 1326(a) of this title; or

(E) the permittee has installed the treatment facilities required to meet the effluent limitations in the previous permit and has properly operated and maintained the facilities but has nevertheless been unable to achieve the previous effluent limitations, in which case the limitations in the reviewed, reissued, or modified permit may reflect the level of pollutant control actually achieved (but shall not be less stringent than required by effluent guidelines in effect at the time of permit renewal, reissuance, or modification).

Subparagraph (B) shall not apply to any revised waste load allocations or any alternative grounds for translating water quality standards into effluent limitations, except where the cumulative effect of such revised allocations results in a decrease in the amount of pollutants discharged into the concerned waters, and such revised allocations are not the result of a discharger eliminating or substantially reducing its discharge of pollutants due to complying with the requirements of this chapter or for reasons otherwise unrelated to water quality.

(3) Limitations

In no event may a permit with respect to which paragraph (1) applies be renewed, reissued, or modified to contain an effluent limitation which is less stringent than required by effluent guidelines in effect at the time the permit is renewed, reissued, or modified. In no event may such a permit to discharge into waters be renewed, reissued, or modified to contain a less stringent effluent limitation if the implementation of such limitation would result in a violation of a water quality standard under section 1313 of this title applicable to such waters.

(p) Municipal and industrial stormwater discharges

(1) General rule

Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under this section) shall not require a permit under this section for discharges composed entirely of stormwater.

(2) Exceptions

Paragraph (1) shall not apply with respect to the following stormwater discharges:

**(A)** A discharge with respect to which a permit has been issued under this section before February 4, 1987.

**(B)** A discharge associated with industrial activity.

**(C)** A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.

**(D)** A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.

**(E)** A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

(3) Permit requirements

(A) Industrial discharges

Permits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 1311 of this title.

(B) Municipal discharge

Permits for discharges from municipal storm sewers--

(i) may be issued on a system- or jurisdiction-wide basis;

(ii) shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

(iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.

(4) Permit application requirements

(A) Industrial and large municipal discharges

Not later than 2 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraphs (2)(B) and (2)(C). Applications for permits for such discharges shall be filed no later than 3 years after February 4, 1987. Not later than 4 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

(B) Other municipal discharges

Not later than 4 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraph (2)(D). Applications for permits for such discharges shall be filed no later than 5 years after February 4, 1987. Not later than 6 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

(5) Studies

The Administrator, in consultation with the States, shall conduct a study for the purposes of--

(A) identifying those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;

(B) determining, to the maximum extent practicable, the nature and extent of pollutants in such discharges; and

(C) establishing procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality.

Not later than October 1, 1988, the Administrator shall submit to Congress a report on the results of the study described in subparagraphs (A) and (B). Not later than October 1, 1989, the Administrator shall submit to Congress a report on the results of the study described in subparagraph (C).

(6) Regulations

Not later than October 1, 1993, the Administrator, in consultation with State and local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5)) which designate stormwater discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. The program shall, at a minimum, (A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines. The program may include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate.

(q) Combined sewer overflows

(1) Requirement for permits, orders, and decrees

Each permit, order, or decree issued pursuant to this chapter after December 21, 2000 for a discharge from a municipal combined storm and sanitary sewer shall conform to the Combined Sewer Overflow Control Policy signed by the Administrator on April 11, 1994 (in this subsection referred to as the "CSO control policy").

(2) Water quality and designated use review guidance

Not later than July 31, 2001, and after providing notice and opportunity for public comment, the Administrator shall issue guidance to facilitate the conduct of water quality and designated use reviews for municipal combined sewer overflow receiving waters.

(3) Report

Not later than September 1, 2001, the Administrator shall transmit to Congress a report on the progress made by the Environmental Protection Agency, States, and municipalities in implementing and enforcing the CSO control policy.

(r) Discharges incidental to the normal operation of recreational vessels

No permit shall be required under this chapter by the Administrator (or a State, in the case of a permit program approved under subsection (b)) for the discharge of any graywater, bilge water, cooling water, weather deck runoff, oil water separator effluent, or effluent from properly functioning marine engines, or any other discharge that is incidental to the normal operation of a vessel, if the discharge is from a recreational vessel.

**CREDIT(S)**

(June 30, 1948, c. 758, Title IV, § 402, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 880; amended Pub.L. 95-217, §§ 33(c), 50, 54(c)(1), 65, 66, Dec. 27, 1977, 91 Stat. 1577, 1588, 1591, 1599, 1600; Pub.L. 100-4, Title IV, §§ 401 to 404(a), (c), formerly (d), 405, Feb. 4, 1987, 101 Stat. 65 to 67, 69; Pub.L. 102-580, Title III, § 364, Oct. 31, 1992, 106 Stat. 4862; Pub.L. 104-66, Title II, § 2021(e)(2), Dec. 21, 1995, 109 Stat. 727; Pub.L. 106-554, § 1(a)(4) [Div. B, Title I, § 112(a)], Dec.

21, 2000, 114 Stat. 2763, 2763A-224; Pub.L. 110-288, § 2, July 29, 2008, 122 Stat. 2650; Pub.L. 113-79, Title XII, § 12313, Feb. 7, 2014, 128 Stat. 992.)

Notes of Decisions (220)

Footnotes

1  So in original. Probably should not be capitalized.

2  So in original. Probably should read "section 1342(p)(6)".

3  So in original. Probably should read "section 1342(l)(3)(A)".

33 U.S.C.A. § 1342, 33 USCA § 1342

Current through P.L. 113-296 (excluding P.L. 113-235, 113-287, and 113-291) approved 12-19-2014

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Research and Related Programs (Refs & Annos)

33 U.S.C.A. § 1251

§ 1251. Congressional declaration of goals and policy

Currentness

(a) Restoration and maintenance of chemical, physical and biological integrity of Nation's waters; national goals for achievement of objective

The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter--

(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

(2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

(3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

(4) it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;

(5) it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State;

(6) it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans; and

(7) it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution.

(b) Congressional recognition, preservation, and protection of primary responsibilities and rights of States

It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter. It is the policy of Congress that the States manage the construction grant program under this chapter and implement the permit programs

under sections 1342 and 1344 of this title. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution, and to provide Federal technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

(c) Congressional policy toward Presidential activities with foreign countries

It is further the policy of Congress that the President, acting through the Secretary of State and such national and international organizations as he determines appropriate, shall take such action as may be necessary to insure that to the fullest extent possible all foreign countries shall take meaningful action for the prevention, reduction, and elimination of pollution in their waters and in international waters and for the achievement of goals regarding the elimination of discharge of pollutants and the improvement of water quality to at least the same extent as the United States does under its laws.

(d) Administrator of Environmental Protection Agency to administer chapter

Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency (hereinafter in this chapter called "Administrator") shall administer this chapter.

(e) Public participation in development, revision, and enforcement of any regulation, etc.

Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

(f) Procedures utilized for implementing chapter

It is the national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government.

(g) Authority of States over water

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.

**CREDIT(S)**

(June 30, 1948, c. 758, Title I, § 101, as added Oct. 18, 1972, Pub.L. 92-500, § 2, 86 Stat. 816; amended Dec. 27, 1977, Pub.L. 95-217, §§ 5(a), 26(b), 91 Stat. 1567, 1575; Feb. 4, 1987, Pub.L. 100-4, Title III, § 316(b), 101 Stat. 60.)

**EXECUTIVE ORDERS**

## EXECUTIVE ORDER NO. 11548

Ex. Ord. No. 11548, July 20, 1970, 35 F.R. 11677, which related to the delegation of Presidential functions, was superseded by Ex. Ord. No. 11735, Aug. 3, 1973, 38 F.R. 21243, set out as a note under section 1321 of this title.

## EXECUTIVE ORDER NO. 11742

<Oct. 23, 1973, 38 F.R. 29457>

### Delegation of Functions to Secretary of State Respecting Negotiation of International Agreements Relating to Enhancement of Environment

Under and by virtue of the authority vested in me by section 301 of title 3 of the United States Code and as President of the United States, I hereby authorize and empower the Secretary of State, in coordination with the Council on Environmental Quality, the Environmental Protection Agency, and other appropriate Federal agencies, to perform, without the approval, ratification, or other action of the President, the functions vested in the President by Section 7 of the Federal Water Pollution Control Act Amendments of 1972 (Public Law 92-500; 86 Stat. 898) with respect to international agreements relating to the enhancement of the environment.

RICHARD NIXON.

Notes of Decisions (119)

33 U.S.C.A. § 1251, 33 USCA § 1251
Current through P.L. 113-296 (excluding P.L. 113-235, 113-287, and 113-291) approved 12-19-2014

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 2. Judicial Branch (Refs & Annos)
      Subtitle A. Courts
        Chapter 24. District Courts
          Subchapter A. General Provisions

V.T.C.A., Government Code § 24.020

§ 24.020. Jurisdiction Over Commissioners Court

Currentness

The district court has appellate jurisdiction and general supervisory control over the commissioners court, with the exceptions and regulations prescribed by law.

**Credits**

Added by Acts 1987, 70th Leg., ch. 148, § 1.37, eff. Sept. 1, 1987.

Notes of Decisions (47)

V. T. C. A., Government Code § 24.020, TX GOVT § 24.020
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Local Government Code (Refs & Annos)
    Title 7. Regulation of Land Use, Structures, Businesses, and Related Activities
      Subtitle C. Regulatory Authority Applying to More than One Type of Local Government
        Chapter 245. Issuance of Local Permits (Refs & Annos)

V.T.C.A., Local Government Code § 245.002

§ 245.002. Uniformity of Requirements

Effective: April 27, 2005
Currentness

(a) Each regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time:

(1) the original application for the permit is filed for review for any purpose, including review for administrative completeness; or

(2) a plan for development of real property or plat application is filed with a regulatory agency.

(a-1) Rights to which a permit applicant is entitled under this chapter accrue on the filing of an original application or plan for development or plat application that gives the regulatory agency fair notice of the project and the nature of the permit sought. An application or plan is considered filed on the date the applicant delivers the application or plan to the regulatory agency or deposits the application or plan with the United States Postal Service by certified mail addressed to the regulatory agency. A certified mail receipt obtained by the applicant at the time of deposit is prima facie evidence of the date the application or plan was deposited with the United States Postal Service.

(b) If a series of permits is required for a project, the orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project. All permits required for the project are considered to be a single series of permits. Preliminary plans and related subdivision plats, site plans, and all other development permits for land covered by the preliminary plans or subdivision plats are considered collectively to be one series of permits for a project.

(c) After an application for a project is filed, a regulatory agency may not shorten the duration of any permit required for the project.

(d) Notwithstanding any provision of this chapter to the contrary, a permit holder may take advantage of recorded subdivision plat notes, recorded restrictive covenants required by a regulatory agency, or a change to the laws, rules, regulations, or ordinances of a regulatory agency that enhance or protect the project, including changes that lengthen the effective life of the permit after the date the application for the permit was made, without forfeiting any rights under this chapter.

(e) A regulatory agency may provide that a permit application expires on or after the 45th day after the date the application is filed if:

(1) the applicant fails to provide documents or other information necessary to comply with the agency's technical requirements relating to the form and content of the permit application;

(2) the agency provides to the applicant not later than the 10th business day after the date the application is filed written notice of the failure that specifies the necessary documents or other information and the date the application will expire if the documents or other information is not provided; and

(3) the applicant fails to provide the specified documents or other information within the time provided in the notice.

(f) This chapter does not prohibit a regulatory agency from requiring compliance with technical requirements relating to the form and content of an application in effect at the time the application was filed even though the application is filed after the date an applicant accrues rights under Subsection (a-1).

(g) Notwithstanding Section 245.003, the change in law made to Subsection (a) and the addition of Subsections (a-1), (e), and (f) by S.B. No. 848, Acts of the 79th Legislature, Regular Session, 2005, apply only to a project commenced on or after the effective date of that Act.

**Credits**
Added by Acts 1999, 76th Leg., ch. 73, § 2, eff. May 11, 1999. Amended by Acts 2005, 79th Leg., ch. 6, § 2, eff. April 27, 2005.

Notes of Decisions (24)

V. T. C. A., Local Government Code § 245.002, TX LOCAL GOVT § 245.002
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Local Government Code (Refs & Annos)
    Title 3. Organization of County Government
      Subtitle B. Commissioners Court and County Officers
        Chapter 81. Commissioners Court (Refs & Annos)
          Subchapter A. Organization and Procedure

V.T.C.A., Local Government Code § 81.001

§ 81.001. Composition, Presiding Officer

Currentness

(a) The members of the commissioners court are the county judge and the county commissioners.

(b) If present, the county judge is the presiding officer of the commissioners court.

**Credits**
Acts 1987, 70th Leg., ch. 149, § 1, eff. Sept. 1, 1987.

Notes of Decisions (12)

V. T. C. A., Local Government Code § 81.001, TX LOCAL GOVT § 81.001
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Natural Resources Code (Refs & Annos)
    Title 4. Mines and Mining (Refs & Annos)
      Chapter 134. Texas Surface Coal Mining and Reclamation Act (Refs & Annos)
        Subchapter B. Powers and Duties of Commission

V.T.C.A., Natural Resources Code § 134.012

§ 134.012. Jurisdiction of Commission Over Surface Coal, Iron
Ore, and Iron Ore Gravel Mining and Reclamation Operations

Currentness

(a) The commission has exclusive jurisdiction over:

(1) surface coal mining and reclamation operations in this state; and

(2) iron ore and iron ore gravel mining and reclamation operations in this state.

(b) This chapter governs iron ore and iron ore gravel mining and reclamation operations to the extent it can be made applicable.

(c) The jurisdiction conferred by Subsection (a)(2) does not extend to:

(1) a mining or reclamation activity in progress on or before September 1, 1985; or

(2) a mining operation or reclamation activity that is conducted solely on real property owned in fee simple by the person authorizing the operation or reclamation activity and that is confined to a single, contiguous tract of land, if:

(A) the activity is conducted in an area not larger than 20 acres;

(B) the depth of the mining operation is restricted to 30 inches or less; and

(C) the fee simple owner receives surface damages.

(d) This chapter does not authorize the commission to adjudicate property title or property rights disputes.

**Credits**
Added by Acts 1995, 74th Leg., ch. 76, § 12.02(a), eff. Sept. 1, 1995.

V. T. C. A., Natural Resources Code § 134.012, TX NAT RES § 134.012
Current through the end of the 2013 Third Called Session of the 83rd Legislature

---

**End of Document**                                  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle C. Water Development
        Chapter 16. Provisions Generally Applicable to Water Development (Refs & Annos)
          Subchapter I. Flood Insurance (Refs & Annos)

V.T.C.A., Water Code § 16.312

§ 16.312. Purpose

Currentness

The State of Texas recognizes the personal hardships and economic distress caused by flood disasters since it has become uneconomic for the private insurance industry alone to make flood insurance available to those in need of such protection on reasonable terms and conditions. Recognizing the burden of the nation's resources, congress enacted the National Flood Insurance Act of 1968, as amended (42 U.S.C. Sections 4001 through 4127), whereby flood insurance can be made available through coordinated efforts of the federal government and the private insurance industry, by pooling risks, and the positive cooperation of state and local government. The purpose of this subchapter is to evidence a positive interest in securing flood insurance coverage under this federal program and to so procure for those citizens of Texas desiring to participate and in promoting the public interest by providing appropriate protection against the perils of flood losses and in encouraging sound land use by minimizing exposure of property to flood losses.

**Credits**
Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977.

V. T. C. A., Water Code § 16.312, TX WATER § 16.312
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle D. Water Quality Control
        Chapter 26. Water Quality Control (Refs & Annos)
          Subchapter B. General Powers and Duties

V.T.C.A., Water Code § 26.023

§ 26.023. Water Quality Standards

Currentness

The commission by rule shall set water quality standards for the water in the state and may amend the standards from time to time. The commission has the sole and exclusive authority to set water quality standards for all water in the state. The commission shall consider the existence and effects of nonpoint source pollution, toxic materials, and nutrient loading in developing water quality standards and related waste load models for water quality. The commission shall develop standards based on all quality assured data obtained by the commission, including the local watershed and river basin database described by Section 26.0135(c)(2). In this section, "quality assured data" has the meaning assigned by Section 26.0135(i).

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.072, eff. Sept. 1, 1985; Acts 1991, 72nd Leg., ch. 294, § 3, eff. June 7, 1991; Acts 1997, 75th Leg., ch. 101, § 3, eff. Sept. 1, 1997.

Notes of Decisions (1)

V. T. C. A., Water Code § 26.023, TX WATER § 26.023
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
Water Code (Refs & Annos)
Title 2. Water Administration (Refs & Annos)
Subtitle D. Water Quality Control
Chapter 26. Water Quality Control (Refs & Annos)
Subchapter B. General Powers and Duties

V.T.C.A., Water Code § 26.011

§ 26.011. In General

Currentness

Except as otherwise specifically provided, the commission shall administer the provisions of this chapter and shall establish the level of quality to be maintained in, and shall control the quality of, the water in this state as provided by this chapter. Waste discharges or impending waste discharges covered by the provisions of this chapter are subject to reasonable rules or orders adopted or issued by the commission in the public interest. The commission has the powers and duties specifically prescribed by this chapter and all other powers necessary or convenient to carry out its responsibilities. This chapter does not apply to discharges of oil covered under Chapter 40, Natural Resources Code.

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.065, eff. Sept. 1, 1985; Acts 1991, 72nd Leg., ch. 10, § 4, eff. March 28, 1991.

Notes of Decisions (8)

V. T. C. A., Water Code § 26.011, TX WATER § 26.011
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle D. Water Quality Control
                Chapter 26. Water Quality Control (Refs & Annos)
                    Subchapter B. General Powers and Duties

V.T.C.A., Water Code § 26.027

§ 26.027. Commission May Issue Permits

Effective: April 1, 2009
Currentness

(a) The commission may issue permits and amendments to permits for the discharge of waste or pollutants into or adjacent to water in the state. No permit shall be issued authorizing the discharge of any radiological, chemical, or biological warfare agent or high-level radioactive waste. The commission may refuse to issue a permit when the commission finds that issuance of the permit would violate the provisions of any state or federal law or rule or regulation promulgated thereunder, or when the commission finds that issuance of the permit would interfere with the purpose of this chapter.

(b) A person desiring to obtain a permit or to amend a permit shall submit an application to the commission containing all information reasonably required by the commission. The commission shall, at minimum, require an applicant who is an individual to provide:

  (1) the individual's full legal name and date of birth;

  (2) the street address of the individual's place of residence;

  (3) the identifying number from the individual's driver's license or personal identification certificate issued by the state or country in which the individual resides;

  (4) the individual's sex; and

  (5) any assumed business or professional name of the individual filed under Chapter 71, Business & Commerce Code.

(c) A person may not commence construction of a treatment facility until the commission has issued a permit to authorize the discharge of waste from the facility, except with the approval of the commission.

(d) The commission may not require under this chapter any permit for the placing of dredged or fill materials into or adjacent to water in the state for the purpose of constructing, modifying, or maintaining facilities or structures, but this does not change or limit any authority the commission may have with respect to the control of water quality. The commission may adopt rules and regulations to govern and control the discharge of dredged or fill materials consistent with the purpose of this chapter.

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.074, eff. Sept. 1, 1985; Acts 1993, 73rd Leg., ch. 152, § 2, eff. Sept. 1, 1993; Acts 2007, 80th Leg., ch. 885, § 2.40, eff. April 1, 2009.

Notes of Decisions (6)

V. T. C. A., Water Code § 26.027, TX WATER § 26.027
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Water Code (Refs & Annos)
     Title 2. Water Administration (Refs & Annos)
       Subtitle C. Water Development
         Chapter 16. Provisions Generally Applicable to Water Development (Refs & Annos)
           Subchapter I. Flood Insurance (Refs & Annos)

V.T.C.A., Water Code § 16.318

§ 16.318. Rules

Effective: September 1, 2007
Currentness

Political subdivisions which qualify for the National Flood Insurance Program, the Texas Department of Insurance, and the board may adopt and promulgate reasonable rules which are necessary for the orderly effectuation of the respective authorizations herein.

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.051, eff. Sept. 1, 1985; Acts 2001, 77th Leg., ch. 258, § 4, eff. Sept. 1, 2001; Acts 2007, 80th Leg., ch. 1323, § 9, eff. Sept. 1, 2007.

V. T. C. A., Water Code § 16.318, TX WATER § 16.318
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Rules Annotated |
| --- |
|    Texas Rules of Appellate Procedure |
|       Section Two. Appeals from Trial Court Judgments and Orders (Refs & Annos) |
|         Rule 43. Judgment of the Court of Appeals (Refs & Annos) |

TX Rules App.Proc., Rule 43.2

43.2. Types of Judgment

Currentness

The court of appeals may:

(a) affirm the trial court's judgment in whole or in part;

(b) modify the trial court's judgment and affirm it as modified;

(c) reverse the trial court's judgment in whole or in part and render the judgment that the trial court should have rendered;

(d) reverse the trial court's judgment and remand the case for further proceedings;

(e) vacate the trial court's judgment and dismiss the case; or

(f) dismiss the appeal.

**Credits**
Eff. Sept. 1, 1997.

Notes of Decisions (119)

Rules App. Proc., Rule 43.2, TX R APP Rule 43.2
Current with amendments received through 3/15/2015

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Constitution of the State of Texas 1876 (Refs & Annos)
      Article V. Judicial Department

Vernon's Ann.Texas Const. Art. 5, § 18

§ 18. Division of counties into precincts; election of constable and justice
of the peace; county commissioners and county commissioners' court

Effective: November 20, 2002
Currentness

Sec. 18. (a) Each county in the State with a population of 50,000 or more, according to the most recent federal census, from time to time, for the convenience of the people, shall be divided into not less than four and not more than eight precincts. Each county in the State with a population of 18,000 or more but less than 50,000, according to the most recent federal census, from time to time, for the convenience of the people, shall be divided into not less than two and not more than eight precincts. Each county in the State with a population of less than 18,000, according to the most recent federal census, from time to time, for the convenience of the people, shall be designated as a single precinct or, if the Commissioners Court determines that the county needs more than one precinct, shall be divided into not more than four precincts. Notwithstanding the population requirements of this subsection, Chambers County and Randall County, from time to time, for the convenience of the people, shall be divided into not less than two and not more than six precincts. A division or designation under this subsection shall be made by the Commissioners Court provided for by this Constitution. Except as provided by this section, in each such precinct there shall be elected one Justice of the Peace and one Constable, each of whom shall hold his office for four years and until his successor shall be elected and qualified; provided that in a county with a population of less than 150,000, according to the most recent federal census, in any precinct in which there may be a city of 18,000 or more inhabitants, there shall be elected two Justices of the Peace, and in a county with a population of 150,000 or more, according to the most recent federal census, each precinct may contain more than one Justice of the Peace Court. Notwithstanding the population requirements of this subsection, any county that is divided into four or more precincts on November 2, 1999, shall continue to be divided into not less than four precincts.

(b) Each county shall, in the manner provided for justice of the peace and constable precincts, be divided into four commissioners precincts in each of which there shall be elected by the qualified voters thereof one County Commissioner, who shall hold his office for four years and until his successor shall be elected and qualified. The County Commissioners so chosen, with the County Judge as presiding officer, shall compose the County Commissioners Court, which shall exercise such powers and jurisdiction over all county business, as is conferred by this Constitution and the laws of the State, or as may be hereafter prescribed.

(c) When the boundaries of justice of the peace and constable precincts are changed, each Justice and Constable in office on the effective date of the change, or elected to a term of office beginning on or after the effective date of the change, shall serve in the precinct in which the person resides for the term to which each was elected or appointed, even though the change in boundaries places the person's residence outside the precinct for which he was elected or appointed, abolishes the precinct for which he was elected or appointed, or temporarily results in extra Justices or Constables serving in a precinct. When, as a result of a change of precinct boundaries, a vacancy occurs in the office of Justice of the Peace or Constable, the Commissioners Court shall fill the vacancy by appointment until the next general election.

(d) When the boundaries of commissioners precincts are changed, each commissioner in office on the effective date of the change, or elected to a term of office beginning on or after the effective date of the change, shall serve in the precinct to which

each was elected or appointed for the entire term to which each was elected or appointed, even though the change in boundaries places the person's residence outside the precinct for which he was elected or appointed.

(e) The office of Constable is abolished in Mills County, Reagan County, and Roberts County. The powers, duties, and records of the office are transferred to the County Sheriff.

(f) The Legislature by general law may prescribe the qualifications of constables.

(g) [Deleted].

(h) The commissioners court of a county may declare the office of constable in a precinct dormant if at least seven consecutive years have passed since the end of the term of the person who was last elected or appointed to the office and during that period of time no person was elected to fill that office, or during that period a person was elected to that office, but the person failed to meet the qualifications of that office or failed to assume the duties of that office. If an office of constable is declared dormant, the office may not be filled by election or appointment and the previous officeholder does not continue to hold the office under Subsection (a) of this section or Section 17, Article XVI, of this constitution. The records of an office of constable declared dormant are transferred to the county clerk of the county. The commissioners court may reinstate an office of constable declared dormant by vote of the commissioners court or by calling an election in the precinct to reinstate the office. The commissioners court shall call an election to reinstate the office if the commissioners court receives a petition signed by at least 10 percent of the qualified voters of the precinct. If an election is called under this subsection, the commissioners court shall order the ballot for the election to be printed to permit voting for or against the proposition: "Reinstating the office of Constable of Precinct No. _____ that was previously declared dormant." The office of constable is reinstated if a majority of the voters of the precinct voting on the question at the election approve the reinstatement.

**Credits**
Amended Nov. 2, 1954; Nov. 8, 1983, eff. Jan. 1, 1984; Nov. 5, 1985, eff. Jan. 1, 1986; Nov. 3, 1987; Nov. 7, 1995; Nov. 4, 1997; Nov. 2, 1999; Nov. 6, 2001, eff. Nov. 26, 2001; Nov. 5, 2002, eff. Nov. 20, 2002.

Notes of Decisions (279)

Vernon's Ann. Texas Const. Art. 5, § 18, TX CONST Art. 5, § 18
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.